UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re VIRTU FINANCIAL, INC. SECURITIES LITIGATION | ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |

Master File No. 1:23-cv-03770-NGG-PK

<u>CLASS ACTION</u>

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

<u>DEMAND FOR JURY TRIAL</u>

# TABLE OF CONTENTS

Page

NATURE OF THE ACTION ..................................................................................................1

JURISDICTION AND VENUE ..............................................................................................6

THE PARTIES.........................................................................................................................7

SUBSTANTIVE ALLEGATIONS .........................................................................................8

    The Company and Its Business..................................................................................8

    Virtu Acquires Rival KCG Holdings, Inc................................................................10

    Virtu Begins Loading Extremely Sensitive Trade Execution Information onto Its Systems, but Fails to Block Its Proprietary Traders from Having Access to It.................14

    Upon Acquiring a Scandal-Scarred Rival, Cifu Embarks on a Campaign Promoting Virtu's Protection of Sensitive Client Trading Information, While, at the Same Time, Access to Sensitive Client Trading Information in the FS Database Was Completely Unrestricted ...................17

    The Truth Begins to Emerge.....................................................................................23

DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD....................................................28

DEFENDANTS VIOLATED SEC DISCLOSURE RULES AND REGULATIONS.................48

ADDITIONAL SCIENTER ALLEGATIONS .........................................................................50

    The Individual Defendants Controlled the Company's Messaging to the Investing Public ...................50

    The Individual Defendants' Numerous and Specific Statements About Virtu's Protection of Confidential Client Trading Information Support a Strong Inference of Scienter ...................51

    Defendant Cifu's Explicit Admission of the Awareness He and "[E]verybody" at Virtu Would Have on the Topic of Protecting Client Trading Information Supports a Strong Inference of Scienter ...................53

    Virtu's Protection of Confidential Client Trading Information Was Critical to Developing Its New Agency Execution Business and Thus Supports a Strong Inference of Scienter ...................54

    Corporate Scienter ...................56

- i -

**Page**

LOSS CAUSATION/ECONOMIC LOSS ......................................................................56

NO SAFE HARBOR ...............................................................................................60

APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET
    DOCTRINE .......................................................................................................60

CLASS ACTION ALLEGATIONS ...........................................................................62

COUNT I ..............................................................................................................63

    Violation of Section 10(b) of the Exchange Act and Rule 10b-5 Against All
    Defendants ....................................................................................................63

COUNT II .............................................................................................................64

    Violations of Section 20(a) of the Exchange Act Against the Individual
    Defendants ....................................................................................................64

PRAYER FOR RELIEF ..........................................................................................65

DEMAND FOR TRIAL BY JURY ...........................................................................65

Lead Plaintiff City of Birmingham Retirement and Relief System ("Lead Plaintiff"), on behalf of itself and all others similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to Lead Plaintiff and Lead Plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by Virtu Financial, Inc. ("Virtu" or the "Company"), Company press releases and earning calls, analyst and media reports about the Company, and the complaints filed in *Securities and Exchange Commission v. Virtu Financial Inc. and Virtu Americas LLC*, No. 1:23-cv-08072 (S.D.N.Y.).  Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of all persons, other than Defendants (defined below), who purchased or otherwise acquired Virtu Class A common stock between November 7, 2018 and September 12, 2023, inclusive (the "Class Period"), under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

2.      Virtu is a New York-based financial services firm that operates both proprietary trading and client-facing businesses in the financial marketplace.  This case arises from the Company's egregious failure to restrict access to extremely sensitive and confidential client trading information within its own business lines, and the numerous materially false and misleading statements Defendants made about Virtu's supposed protection of such client data.

3.      Virtu is well-known as a "high-frequency trading" firm, using its self-described "cutting-edge technology" to carry out a high volume of transactions at ultra-fast speeds, using, among other things, advanced algorithms and lightning quick execution capabilities.  Virtu is a leader in electronic market making for numerous asset classes, whereby it provides liquidity to financial markets by buying and selling securities at high speeds.

4.      On April 20, 2017, Virtu announced that it had reached an agreement to acquire KCG Holdings, Inc. ("KCG") – a rival financial services firm engaging in market making, high-frequency trading, electronic execution, and other trading – for approximately $1.4 billion.  KCG had a well-established agency execution business, in which it executed trades for both large money managers and major retail brokerages.  Acquiring KCG represented a significant transformation in Virtu's business – from a market maker to a company that now also carried out trades for many institutional and retail clients, as an agent with a best execution mandate and a responsibility to maintain client confidentiality.

5.      As a result of acquiring KCG's trade execution business, Virtu was now going to be storing troves of extremely sensitive and confidential trade execution information on its systems. Adequately safeguarding such sensitive client information is critical for any business carrying out trades for clients, but even more so at Virtu because of its other business lines that could potentially use that information to their advantage if they were allowed access to it.  In particular, both before and after the KCG acquisition, Virtu had a proprietary trading business, in which it bought and sold securities in its own account and for its own benefit.  As part of the KCG acquisition, Virtu formed a new subsidiary, Virtu Americas, LLC ("VAM"), an SEC registered broker-dealer, which operated the customer-facing trade execution business acquired from KCG, as well as some of the proprietary trading business of KCG.

- 2 -

6.      No later than January 2018, VAM began storing extremely sensitive customer trade execution information in the ***very same database*** that also continued to hold Virtu's existing proprietary trading data.  This trade execution information consisted of at least: (i) specific customer-identifying information; (ii) the name of the security; (iii) the side of the transaction (buy or sell); (iv) the execution price; (v) the execution volume; and (vi) the trading algorithm used for each order. To Virtu's proprietary traders, this information would be a granular, and essentially real time, answer key into how some of the world's largest investors were trading (and in some circumstances could be reasonably anticipated to trade), that they could use to engage in a variety of trading abuses.  Later in the Class Period, defendant Douglas Cifu, Virtu's co-founder and CEO, characterized the post-trading information Virtu received from its clients as "***literally the secret sauce of [] large asset managers***."

7.      Unbeknownst to investors, despite the highly sensitive nature of this customer-specific trading information, from at least January 2018 through April 2019, essentially ***anyone*** at Virtu, including its proprietary traders – who should not have been able to view any aspect of this information – ***could directly access the database*** and its material, nonpublic trade execution information, using widely known and frequently shared rudimentary usernames and passwords (*i.e.*, a username of "viewonly" and a password of "viewonly").  Employees entering the database with these generic credentials could access ***all*** of the data contained therein, with Virtu having no ability to track who accessed the database.

8.      Then, on November 7, 2018 (the first day of the Class Period), Virtu announced another major acquisition, this time of Investment Technology Group, Inc. ("ITG") for approximately $1 billion.  ITG was a global financial technology company that, like KCG, had an extensive trade execution business, carrying out trades for major institutional investors.

9.     The same day that Virtu announced its plans to acquire ITG, the SEC issued an order against ITG and an affiliate, finding, among other things, that "[f]rom 2010 until 2017, ITG *failed to establish adequate safeguards and procedures to appropriately limit access to systems containing . . . confidential trading information*."

10.     The SEC's findings about ITG's failure to protect confidential client trading information raised concerns in the market about Virtu's ability to protect the sensitive trading information generated and/or maintained within its business groups.  To quell these concerns, defendant Cifu went on a campaign to proactively address Virtu's protection of such information. During the Fall of 2018 – when Virtu's proprietary traders had *unrestricted access* to execution services customers' material non-public trading information – Cifu made a multitude of materially false and misleading statements, including by:

- Giving a detailed slide presentation in which he flagged Virtu's "*<u>existing</u>* safeguards to protect client information," which purportedly included "*physical separation, logical access control and entitlement reviews*";

- Highlighting "*the importance we place on protecting client information in all aspects of our business.  We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have.*";

- Claiming that "*no other firm gives this much transparency to its clients into how their information is protected*," and that "*Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with*"; and

- Declaring that following the closing of the ITG acquisition, "Virtu intends to *<u>continue to maintain and enforce</u> appropriate information barriers to segment and protect sensitive client data[.]*"

11.     As alleged herein, these statements (and the many others made by Defendants throughout the Class Period) misrepresented and failed to disclose that Virtu was failing to segregate and protect confidential client information in the trade execution business it was *already operating*. In other words, Virtu was currently engaging in the exact conduct defendant Cifu was repeatedly –

- 4 -

and forcefully – assuring investors would not take place.  There were *no* "appropriate information barriers" in place to prevent proprietary traders from accessing VAM's execution services customers' confidential trading information.  Rather, they had unfettered access to this information, regarded by clients as sacrosanct, and Defendants either knew about it, or were reckless in repeatedly addressing this specific issue without knowing about it.

12.    In fact, in November 2018 – at the same time Cifu was promoting Virtu's protection of client trading information – VAM *increased* by 66% the number of users who could have simultaneous access to the client database.  This user limit increase came after traders complained about too many people being logged into the database at once.

13.    Nor was Virtu being either "*transparen[t]*" or "*very upfront and direct*" with (among others) its execution services customers and investors.  For nearly five years during the Class Period, Defendants concealed that essentially anyone at Virtu had access to its execution customers' confidential trading information for a period of *at least* 15 months – never once even hinting at this massive problem to investors.   Instead, Defendants continued to make materially false and misleading statements about Virtu's protection of its clients' confidential information, including by cautioning, during every fiscal quarter of the Class Period, about the potential of "*[the] failure to* maintain or protect "*confidential and proprietary information*," when that had already come to pass. Moreover, by failing to protect their clients' confidential and proprietary trading information, Defendants exposed the Company to significant financial, regulatory, and litigation risks.

14.    Sure enough, on February 17, 2023, Virtu revealed that it had been responding to requests for information from the SEC "in connection with an investigation of aspects of the Company's information access barriers."  As information about Defendants' fraud was gradually revealed to investors through a series of partial disclosures about the SEC's investigation into and

eventual commencement of litigation against the Company and VAM for the misconduct described herein, Virtu's stock price dropped precipitously, ultimately declining to a low of just over $17 per share, more than *54%* below the Class Period high.

15.    Through this action, Lead Plaintiff seeks to recover the hundreds of millions of dollars of damages that Lead Plaintiff and other Class members have suffered as a result of Defendants' violations of the federal securities laws, and the resultant decline in the value of their investments in Virtu Class A common stock.

## JURISDICTION AND VENUE

16.    The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

17.    This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. §78aa] and 28 U.S.C. §1331.

18.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because the Company conducts business in this District and the events or omissions giving rise to the claims asserted herein occurred in substantial part in this District. Moreover, Virtu Class A common stock trades on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Virtu Class A common stock located across the United States, some of whom likely reside in this Judicial District.

19.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephonic communications, and the facilities of the national securities markets.

## THE PARTIES

20.     Lead Plaintiff City of Birmingham Retirement and Relief System is a public pension system organized for current and former employees of the City of Birmingham, Alabama.  Lead Plaintiff manages approximately $1 billion in assets for the benefit of its approximately 7,000 active and retired participants.  During the Class Period, Lead Plaintiff purchased Virtu Class A common stock, as set forth in its previously filed certification (ECF No. 22-2), and was damaged thereby.

21.     Defendant Virtu is a global financial services firm, headquartered in New York. Virtu leverages its technology to provide liquidity, execution services and data, analytics, and other products to its clients.  Virtu Class A common stock trades on the NASDAQ under the ticker "VIRT."  Virtu is a holding company, with no operations of its own, that conducts its business through Virtu Financial LLC and its various subsidiaries.

22.     Defendant Douglas Cifu ("Cifu") has served as Virtu's Chief Executive Officer since November 2013.  Cifu previously served as Virtu's President and Chief Operating Officer and has served on its board of directors or the boards of its predecessors since co-founding the firm in April 2008.  Defendant Cifu is a former partner at Paul, Weiss, Rifkind, Wharton & Garrison LLP, who admits to being aware of "***the mandates of the 34 Act***."  On the first day of the Class Period, Cifu acknowledged that "***[i]n my prior life, I was a lawyer, so I've read the statute***."

23.     Defendant Joseph Molluso ("Molluso") has served as Virtu's Co-President and Co-Chief Operating Officer since May 2020.  Molluso joined Virtu in November 2013 as Chief Financial Officer and served in that role until a brief departure from Virtu, beginning in September 2019.

24.     Defendant Alex Ioffe ("Ioffe") served as Virtu's Executive Vice President and Chief Financial Officer during the Class Period from September 2019 – August 2020.

- 7 -

25.     Defendant Sean Galvin ("Galvin") has served as Virtu's Executive Vice President and Chief Financial Officer since August 2020.  Galvin previously served in various roles at KCG, which, as described above, was acquired by Virtu in June 2017.

26.     Defendants Cifu, Molluso, Ioffe, and Galvin are collectively referred to herein as the "Individual Defendants" and, together with Virtu, as "Defendants."

27.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Virtu's reports to the SEC, press releases, documents posted by the Company on its official website, and presentations to securities analysts, money portfolio managers and institutional investors, *i.e.*, the market.  The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading before, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material nonpublic information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## SUBSTANTIVE ALLEGATIONS

**The Company and Its Business**

28.     Co-founded in 2008 by defendant Cifu and Vincent Viola, Virtu, together with its subsidiaries, is a global financial firm that uses its self-described "cutting-edge technology" to provide a variety of financial services and products in markets around the world.

29.     Virtu is well-known as a "high frequency trading" firm.  High-frequency trading is a trading method using powerful computer programs to transact many orders in just fractions of a

- 8 -

second – as fast as nanoseconds – using complex algorithms to execute the orders. These algorithms utilize large datasets of historic market behavior to profitably trade with both customers and market participants.

30.    Originally scheduled to go public in April 2014, Virtu postponed its IPO until April 2015, following a storm of negative attention from the release of Michael Lewis' book "*Flash Boys*," alleging the stock market is rigged in favor of high-frequency traders because of the algorithms they employ to execute orders at very fast speeds and the incentives that certain stock exchanges provide to them.

31.    Prior to mid-2017, Virtu operated as a single reportable business segment. Nearly all of its revenue came from its market making business. Market making is a form of trading where a trader or firm simultaneously offers to buy and sell securities with the hope of collecting the difference between those prices, known as bid/ask spreads. Market makers provide liquidity by continuously supplying bid and ask prices to ensure there is a liquid market for buyers and sellers of securities to transact.

32.    These small spreads add up over the course of millions of trades. According to an August 11, 2016 *Bloomberg* article, "[r]ather than go for big trades that could blow up and lose a lot of money, Virtu prides itself on making small amounts—as in $10—millions of times a day." In 2021 and 2022, Virtu's net trading income from its Market Making segment totaled $2.1 billion and $1.6 billion, respectively.

33.    Today, Virtu makes markets in the cash, futures, and options markets across global equities, fixed income, currencies, cryptocurrencies, and commodities in 37 countries worldwide, using high-frequency trading strategies.

**Virtu Acquires Rival KCG Holdings, Inc.**

34.     On April 20, 2017, Virtu announced it had reached an agreement to acquire KCG in a cash transaction valued at $20.00 per KCG share, or a total of approximately $1.4 billion.  KCG, formed in December 2012 from the merger of New Jersey-based Knight Capital Group and Chicago-based Getco LLC, was a financial services firm engaging in market making, high-frequency trading, electronic execution, and institutional sales and trading.

35.     In a Company presentation the same day, Virtu promoted the benefits of acquiring KCG, in pertinent part, as follows:



36.     Before acquiring KCG, Virtu did not have a significant trade execution business of its own.  But, with the acquisition, Virtu acquired KCG's extensive agency brokerage business.

37.     Agency brokers execute trades on securities markets on behalf of their clients. Distinct from a market maker, agency brokers are simply charged with finding the best possible execution on behalf of their clients and do not hold inventory of the securities they buy and sell.

- 10 -

When an executing broker is acting as an agent, there is a presumption that most of those executions would occur against an exchange, Alternative Trading System (one type of which is known as a dark pool), or other market participants – and not the firm executing the trade.

38.    Virtu's acquisition of KCG represented a transformative shift in the Company's business model.  As an April 20, 2017 *Bloomberg* article reporting on the acquisition explained, "[a]lthough New York-based Virtu and KCG compete in markets including stocks, futures, currencies and bonds, the deal pushes Virtu into business lines it has shied away from. That new terrain includes ***carrying out trades for big money managers and filling individual investors' trades on behalf of retail brokerages*** such as E*Trade Financial Corp. and TD Ameritrade Holding Corp."

39.    As further described by *Bloomberg*, "Virtu, which has acted as a market-maker for the majority of its existence and only recently started doing transactions for customers, is seeking to broaden its access to institutional and retail clients.  KCG has hundreds of customers they arrange trades for in their agency business, Cifu said, while Virtu has fewer than 10."  According to a press release issued by Virtu, the acquisition would "extend Virtu's scaled operating model to KCG's wholesale market making businesses and broaden the distribution of Virtu's technology and execution services to KCG's extensive institutional client base."

40.    In a televised interview with *Bloomberg* the same day, Cifu described the gravity of acquiring KCG's agency execution business, as follows: "KCG has a fabulous institutional practice – institutional agency business, where they have literally hundreds of customers.  We started this a year ago – we['ve] got less than ten customers.  We've got a great product.  In an execution-only environment, we think we can be exceedingly competitive…We think marrying the algorithmic

- 11 -

business that we have, some of the post-trade analytics that we have, with their extensive client base, we really think we can build a winning product[.]"

41.    According to Virtu's April 20, 2017 presentation, the acquisition of KCG was expected to significantly expand Virtu's overall net revenues attributable to execution services, from 2% to almost **20%**:



42.    In the wake of the announcement, analysts wrote favorably about Virtu's new access to KCG's institutional client-base for its agency execution business.  For example, on April 20, 2017, a UBS analyst wrote as follows:

- 12 -

**VIRT gains access to KCG's institutional client base on the agency side**
In addition to acquiring KCG's high-profile retail market making business (#2 in the industry), VIRT will also be moving upstream to provide its superior order execution and post-trade analytics to KCG's already-established institutional client base. The deal accelerates VIRT's efforts to diversify into agency execution (~20% of revenue post deal) at a time when regulations could drive more flow to execution specialists.

43.     Virtu announced the completion of the KCG acquisition on July 20, 2017. After the deal closed, Cifu continued to boast about the significance of acquiring KCG's agency execution business. On Virtu's August 8, 2017 earnings call, Cifu stated that "[w]e think one of the great strengths that Virtu had on the agency side with our offering was superior execution quality but also transparency into how orders were routed and whatnot. So now taking that product, if you will. And offering that to all the great legacy KCG customers, a lot of whom I've already met and are meeting more both in Europe and the United states is a significant opportunity for us."

44.     As a result of the KCG acquisition, Virtu added a second reportable segment – Execution Services. Through its Execution Services business, Virtu now offered agency-based, execution-only trading, whereby the Company utilizes its technology to execute trades for some of the largest institutional investors in the world, including mutual funds, pension plans, plan sponsors, hedge funds, and trusts and endowments, earning a commission.

45.     After acquiring KCG, Virtu formed VAM, an SEC registered broker-dealer, which operated the customer-facing trade execution business acquired from KCG, as well as some of the proprietary trading business of KCG. According to Virtu's annual report on Form 10-K for the year ended December 31, 2022, VAM is Virtu's "principal U.S. subsidiary," through which Virtu "primarily conducts [its] Americas equities business." Virtu reports its financial statements on a consolidated basis, which includes Virtu's equity interests in VAM and its numerous other subsidiaries.

- 13 -

46.    The addition of KCG's execution business created a natural conflict within the walls of Virtu that needed to be addressed immediately.  That is, the Company now maintained a trove of confidential information with granular details into how some of the largest investors in the entire world were trading, which, if left unprotected, could be exploited by proprietary traders within the Company, for Virtu's own financial benefit.

**Virtu Begins Loading Extremely Sensitive Trade Execution Information onto Its Systems, but Fails to Block Its Proprietary Traders from Having Access to It**

47.    No later than January 2018 – just five months after the KCG acquisition closed – VAM began storing extremely sensitive customer trade execution details generated from VAM's customer orders in the ***same database*** that also continued to hold Virtu's proprietary trading data.

48.    The trading information stored in VAM's primary database for daily business operations, as well as a backup database (together, the "FS Database") consisted of the following:

- specific customer-identifying information;

- the name of the security;

- the side of the transaction (buy or sell);

- the execution price;

- the execution volume; and

- the trading algorithm used for each order.

49.    Notwithstanding the highly sensitive, customer-specific, nature of this information, from at least January 2018 through April 2019, essentially ***anyone*** at Virtu, including its proprietary traders – who were supposed to be walled off from accessing such information – could directly access the FS Database and its material, nonpublic information, using widely known and frequently shared generic usernames and passwords.

- 14 -

50.     The primary FS Database could be accessed by essentially any employee at Virtu, by using rudimentary login credentials consisting of a username of "viewonly" and a password of "viewonly." Similarly, the backup FS Database could be accessed by virtually any employee by entering a username of "fsviewonly" and a password of "fsviewonly." These credentials were not unique to any individual employee at the Company.

51.     Employees entering the FS Database with these generic – and widely known and frequently shared – login credentials could access ***all*** of the data contained therein, including, but not limited to, customer-specific and virtually real-time post-trade information – regardless of their role at Virtu, or their business purpose.

52.     Throughout the entire time this sensitive data was left unprotected, Virtu did not monitor which specific employees were accessing the FS Database using the generic usernames and passwords, or what information proprietary traders viewed, or used.

53.     At one point, Virtu's traders even complained internally about the number of users accessing the FS Database simultaneously via the generic login credentials. For example, in a June 2018 chat conversation, one proprietary trader wrote to another that they would be less likely to encounter alerts that the system had exceeded the number of permitted users if they shielded the "fsviewonly" username and password for the backup FS Database. That trader joked about the prospect of selling "subscriptions" to the generic log-in credentials "for like a buck each."

54.     In August 2018, VAM developers began discussing the need to improve the insufficient permissioning for the FS Database – which they were aware included the unrestricted access of Virtu's proprietary traders to customers' post-trade information. For example, on August 13, 2018, more than 20 employees from different departments at Virtu received an email indicating that the FS Database was in need of a "revamp" to fix the permissioning.

- 15 -

55.     The detailed material non-public information contained in Virtu's FS Database would be extremely valuable to a proprietary trader because it, among other things, provided a direct window into how VAM's large institutional clients were trading, and in certain cases, could be reasonably anticipated to trade, in which securities, and in what precise amounts.

56.     Indeed, during the Class Period, Defendant Cifu would characterize the post-trade information Virtu received from its large clients, to run analytics on, as follows:

> The 38 or so or more of the top 50 asset managers in the world give us ***their entire trade blotter at the end of the day*** so that we can run analytics on it.  Think about the trust that you've built with the buy side if someone will do that.  ***That is literally the secret sauce of all these large asset managers.***  Having a client list like that is priceless, as the Visa commercial says.

57.     The vast amount of confidential client post-trade information Virtu left unprotected could, in a variety of situations, easily be abused by its proprietary traders, as it could help them better understand market dynamics and predict future price action.

58.     For example, as many of VAM's clients were large institutional investors, if a client purchased a stock on consecutive days, it could be assumed that it would continue to do so, as many orders would be executed over multiple days given their size.  A proprietary trader could then purchase that security for Virtu's own benefit ahead of that customer's future anticipated transactions.

59.     Similarly, if a proprietary trader observed that a large execution services customer had stopped buying the same stock it had been continually purchasing large amounts of, the proprietary trader could use that information to sell the same stock presuming the price of that stock would subsequently fall.

60.     Also, because proprietary traders could see historic orders placed in VAM's trade execution business, proprietary traders had the ability to run statistical analyses to generate

additional trading opportunities.  For instance, a proprietary trader could observe that a certain customer was consistently profitable in a particular strategy and replicate it.

61.    Moreover, because proprietary traders could see the actual identities of the customers whose information was stored in the FS Database, they could use this trading information to their advantage in a situation where, for example, an activist investor was acquiring large amounts of shares of a particular company in advance of a strategic transaction.

62.    By acquiring KCG, Virtu also took on KCG's robust retail execution business in which it carried out trades for major retail brokerage clients such as E*Trade Financial Corp. and TD Ameritrade Holding Corp.  After combining the companies, VAM handled approximately *25% of all market orders placed by retail investors in the United States*.  As a result, the FS Database now contained a trove of post-trade information from both institutional and retail investors, readily accessible to Virtu's proprietary traders.

**Upon Acquiring a Scandal-Scarred Rival, Cifu Embarks on a Campaign Promoting Virtu's Protection of Sensitive Client Trading Information, While, at the Same Time, Access to Sensitive Client Trading Information in the FS Database Was Completely Unrestricted**

63.    On November 7, 2018, Virtu announced its financial results for the quarter ended September 30, 2018 and revealed that it had entered into a definitive agreement to acquire ITG for approximately $1 billion.  At the time, ITG was a global financial technology company that was an independent agency broker and financial technology provider specializing in institutional liquidity, execution services, analytical tools and proprietary research.

64.    ITG ran a full-service institutional agency brokerage executing trades for more than 1,000 firms, including mutual, pension and hedge funds, in equities, options, futures and FX, while offering research and a trading desk.  According to materials published by Virtu, ITG's business was

- 17 -

to be "combined with Virtu's existing agency brokerage business," largely developed in connection with the acquisition of KCG.

65.     The ***same day*** that Virtu announced it was acquiring ITG, the SEC issued an Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order, against ITG and an affiliate, finding, among other things, that "[f]rom 2010 until 2017, ITG ***failed to establish adequate safeguards and procedures to appropriately limit access to systems containing*** . . . ***confidential trading information***."  According to an SEC press release, "ITG failed to ensure that trading information was protected, and in some instances used this information to attempt to grow its business."

66.     Without admitting or denying the findings, ITG and its affiliate consented to the entry of the SEC's Order finding that they violated the antifraud provisions of the federal securities laws and agreed to pay a civil penalty of $12 million to settle the charges.

67.     The SEC's findings about ITG's failure to protect confidential trading information raised serious concerns throughout the market about Virtu's own ability to safeguard the extremely sensitive trading information generated and/or maintained within its different business groups.  As a result, Defendant Cifu embarked on a campaign to publicly address Virtu's supposed protection of the confidential client trading information that it kept on its systems.

68.     First, on Virtu's November 7, 2018 earnings call, defendants Cifu and Molluso gave a presentation about the ITG acquisition, during which defendant Cifu discussed Virtu's protection of sensitive client data, including keeping such information segregated between its different business groups.  In particular, Cifu stated that:

- 18 -

Turning to Slide 6.  ***You see the importance we place on protecting client information in all aspects of our business****.  **We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have.  Virtu has established policies and procedures for our existing client and market making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind.  These safeguards include physical separation, logical access control and entitlement reviews.**

69.    The slide referenced by Cifu in ¶68 above highlighted, among other things, Virtu's "***existing*** safeguards to protect client information," stating, in full, as follows:



70.    During the earnings call, Cifu was asked about the concerns in the market about combining Virtu with a company that, earlier the same morning, agreed to pay a penalty of $12 million to settle SEC charges in connection with its failure to establish adequate safeguards and procedures to protect confidential trading information over a seven year period.

71.    In response to a question by an analyst from Compass Point Research & Trading about this issue, Cifu likened ITG's misconduct to a mere "***foot fault***," addressing the issue, in pertinent part, as follows:

> *[W]e're obviously very aware of the foot fault or more that they had in 2015. I think the issue in 2015 was that they were engaged in prop trading and candidly hadn't been upfront with their clients.* That's really ultimately what the issue is. *And Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with*… When we acquired Knight in 2017, they had been in business for over 20 years.  So this is not a new phenomena.  It's also not a new phenomenon that sell side, every bank that we deal with that you are very well aware, has this conflict as well.

72.      Then, on November 14, 2018, *Bloomberg* interviewed Cifu for an article titled "Trader Virtu Seeks to Erase Its 'Bogeyman' Image in ITG Takeover[.]"  The article discussed how acquiring ITG "caused some to worry that Virtu, one of modern finance's most successful traders, will snoop on its soon-to-be clients' orders, leveraging that knowledge to place winning trades before they do."

73.      Cifu described to *Bloomberg* the steps that Virtu would take to protect trading data maintained by its trade execution arm, including that the Company would "erect barriers to keep those businesses separate."  Recognizing the obvious dangers associated with Virtu's proprietary traders being able to view client trading information from its execution business, Cifu explained to *Bloomberg*, as follows:

> Virtu's proprietary traders -- who are based in a suburb of Austin, Texas, as well as Chicago and Dublin, far from ITG's customer-facing employees in New York and London -- won't have the key cards needed to enter the workspace of the division that has outside clients, Cifu said.  Software will block proprietary traders from viewing client data.  An outside auditor will vet the safeguards.  And Cifu mentioned a few hypothetical high-tech solutions that the governance committee could ask Virtu to deploy, like biometric scanners or facial-recognition software for unlocking doors.

74.      The same day, Cifu sat down for an interview with *Business Insider* for an article titled "Wall Street is worried that a $1 billion acquisition will allow Virtu to spy on clients, but the firm has a big plan to quell those anxieties[.]"  *Business Insider* explained that the acquisition of ITG caused market observers to "worr[y] about Virtu's stock trading business – which trades the firm's

capital – peeking into its new broker-dealer business and using that information to trade against clients."

75.    In the interview, Cifu explained that he "***can't overstate how important it is to me personally that client information is properly protected***." Cifu also declared, *inter alia*, that "***no other firm gives this much transparency to its clients into how their information is protected***."

76.    Then, on December 5, 2018, defendants Cifu and Molluso spoke on behalf of Virtu at the Goldman Sachs U.S. Financial Services Conference. During the conference, Cifu was asked by a Goldman Sachs analyst to address the "concerns in the market" surrounding Virtu's acquisition of ITG. Cifu acknowledged that "they are all real concerns," in particular with Virtu's proprietary traders being able to access its clients' "end of the day trade file."

77.    But defendant Cifu made clear that: (i) "***there's going to be physical and virtual barriers, so prop folks can't get into it***"; and (ii) if Virtu was failing to protect client information, he and others at Virtu would be well-aware of it, admitting that "***we run a very small firm where everybody knows what's going on, in particular myself***, it's maybe one of the old Wall Street partnership types of places. Not going to happen, not going to happen. Why would we do that?"

78.    The concerns reverberating throughout the market about Virtu's ability to segregate and protect sensitive client trading information proved prescient. Unbeknown to investors, ***at that very moment***, Virtu was already engaging in the exact conduct that Cifu was publicly assuring investors and customers would not occur – *i.e.*, its ***proprietary traders currently had unrestricted access*** into execution services customers' material non-public trading information.

79.    Nothing resembling the safeguards Cifu was consistently describing currently existed to block Virtu's proprietary traders from accessing the sensitive client information in the significant trade execution business Virtu had already acquired from KCG. At that time, the only thing a

proprietary trader needed to do to access a database containing *all* of the post-trade information generated from VAM's customer orders was to type in "viewonly" or "fsviewonly" as both the username and password – which were widely known and frequently shared within Virtu.

80.    Indeed, in November 2018 – the same month Cifu went on his campaign promoting Virtu's protection of, and restricted access to, client trading information – steps were being taken within VAM to ***boost*** the access that proprietary traders had to the FS Database.  At that time, the main FS Database could be accessed simultaneously by 75 users using the generic login credentials described herein.  Instead of decreasing the number of concurrent logins to the FS Database – or eliminating this rudimentary and wholly unsecure login method entirely until such time as proper permissioining was put into place – the main database user limit was ***increased*** to 125 users later that month.  Significantly, this enlargement came as a direct result of complaints by traders about the database's capacity limits.

81.    The next month, December 2018, VAM's main FS Database developer conceded in internal correspondence that the project to fix the FS Database's inadequate permissioning had not yet begun, writing internally that "I was going to start on it this week but have been side tracked."

82.    Defendants continued to falsely and misleadingly promote Virtu's information access barriers and protection of sensitive client information to investors.  For example, on January 25, 2019, Virtu issued a press release providing an update on the ITG acquisition, stating that "[p]ost-closing, Virtu intends to ***continue to maintain and enforce*** *appropriate information barriers to segment and protect sensitive client data*[.]"  But there were no such information barriers in place to protect such sensitive data.  At that time – a full year after sensitive post-trade information began being stored on its systems – there was still no system in place to track which specific employees

were accessing the FS Database with the generic usernames and passwords, or what information they were viewing.

83.     Indeed, until the end of February 2019, VAM did not implement a program to monitor whether employees were querying post-trade customer information in the FS Database. And once that program was finally implemented, it was immediately abandoned due to the system disruptions it caused.

84.     Despite being aware (or reckless in not knowing) that following Virtu's acquisition of KCG, essentially all Virtu employees – including its proprietary traders – had unfettered access to execution services customers' material non-public trading information, Virtu continued to allow unrestricted access to such information with the aforementioned generic login credentials, until *at least April 2019*.

85.     Throughout the entirety of the Class Period – a period of nearly five years – Defendants continued to make materially false and misleading statements about Virtu's protection of proprietary client information, never once publicly disclosing anything about the access essentially all Virtu employees had to its execution services customers' confidential trading information in the FS Database, or the significant financial, regulatory, and litigation risks Virtu faced as a result.  For example, in every fiscal quarter during the Class Period, Defendants cautioned about the potential of "*[the] failure to*" maintain or protect "*confidential and proprietary information*," when they had already failed in that regard.

**The Truth Begins to Emerge**

86.     The truth about Virtu's failure to safeguard confidential client trading information emerged over the course of a series of disclosures, causing declines in the price of Virtu Class A common stock as a result of the revelation of the relevant truth and/or the materializations of the risks that had been concealed by Defendants' fraud.

- 23 -

87.    *First*, on February 17, 2023, after the market closed, Virtu filed its Form 10-K for the year ended December 31, 2022 and revealed, for the first time, that "the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers."

88.    In response to this announcement, Virtu's stock declined 1.6% from its closing price on February 17, 2023 of $20.27 per share, to close at $19.94 per share on February 21, 2023, the next trading day.  Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

89.    *Second*, on April 28, 2023, after the market closed, Virtu filed its Form 10-Q for the quarter ended March 31, 2023, in which Virtu reiterated that it had been responding to requests for information from the SEC in connection with an investigation of aspects of the Company's information access barriers, and further revealed, in relevant part, that "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC[,]" and that "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

90.    In response to this news, the price of Virtu Class A common stock fell $3.19 per share, or 15.9%, over the next four trading days from its closing price on April 28, 2023 of $20.05 per share, to close at $16.86 per share on May 4, 2023.  Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit

material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

91.    *Bloomberg* published two articles in response to the Company's April 28, 2023 revelations.  The first was an article titled "Virtu Falls After Reporting Settlement Talks Over SEC Probe," stating that "Virtu Financial Inc. shares fell 2.7% in extended trading after the firm said it was in settlement talks with the Securities and Exchange Commission regarding a probe into whether employees could access off-limits trading data."

92.    The second *Bloomberg* article, titled "Virtu Financial Sees Potential Wells Notice Tied to SEC Probe," stated, in pertinent part, that "Virtu Financial says in a regulatory filing it's cooperating with requests for information from the U.S. Securities and Exchange Commission in connection with a civil investigation of aspects of its information access barriers.  The shares fell 5.7% in extended trading."

93.    Shortly thereafter, on May 1, 2023, *The Wall Street Journal* published an article titled "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," stating that "Shares of Virtu Financial are down more than 3% after the electronic trading firm disclosed Friday that it is facing a potential enforcement lawsuit from the Securities and Exchange Commission."

94.    Also, analysts from Piper Sandler issued a report on May 4, 2023, commenting on Virtu's disclosures and resulting stock price decline, stating, in pertinent part:

> A look at VIRT's ***recent disclosures about SEC investigation.  VIRT's stock is down 15%+ since Friday, April 28 and has fallen every day this week.***  While volatility & trading volumes are down across asset classes, ***we suspect the decline is due to a disclosure in VIRT's 1Q23 10-Q filing*** (on Friday, April 28) 'warning' of a potential Wells notice from the SEC.  The SEC investigation focuses on certain of aspects of VIRT's information access barriers from January 2019 to April 2019.

95.    ***Third***, on July 28, 2023, after the market closed, Virtu filed its Form 10-Q for the quarter ended June 30, 2023, in which Virtu revealed that "the Company has been unable to reach a

- 25 -

settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded. The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

96.    On this news, the price of Virtu Class A common stock declined $0.34 per share, or 1.8%, from its closing price on July 28, 2023 of $18.90 per share, to close at $18.56 per share on July 31, 2023.  Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

97.    The same day, *Bloomberg* published an article titled "Virtu Is Bracing for SEC Lawsuit After Settlement Talks Fail," stating that "Virtu Financial Inc. expects to be sued by the Securities and Exchange Commission after talks failed to settle a dispute over the firm's safeguards for trading data.  The shares fell in extended trading."  *Bloomberg* continued, "The stock dropped more than 4% after the disclosure and was down 3.4% as of 5:45 p.m. in New York."

98.    **Finally**, the SEC issued a press release on September 12, 2023, announcing that it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. (collectively, Virtu), for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information." The press release continued, in pertinent part, as follows:

> As alleged in the SEC's complaint, Virtu Americas and its affiliates operated two businesses that it purported to have walled off from each other: an order execution service for large institutional customers, whereby Virtu Americas executed customer orders, typically for a commission, and a proprietary trading business, through which Virtu Americas bought and sold securities for its own accounts and benefit. From approximately January 2018 through the beginning of April 2019, however, Virtu

Americas allegedly failed to safeguard a database that contained all post-trade information generated from customer orders routed to, and executed by, Virtu Americas, including customer identifying information and other material nonpublic information.  The SEC's complaint alleges that this database was accessible to practically anyone at Virtu Americas and its affiliates, including their proprietary traders, through two sets of widely known and frequently shared generic usernames and passwords. . . .

99.    In response to this news, the price of Virtu Class A common stock fell $1.07 per share over the next four trading days, or 5.8%, from its closing price on September 12, 2023 of $18.46 per share, to close at $17.39 per share on September 18, 2023.

100.    Following the announcement of the SEC lawsuit, *Reuters* published an article on September 12, 2023 titled "SEC sues Virtu Financial for misleading customers about security of their information," stating in pertinent part:

In a complaint filed in federal court in Manhattan, the SEC said Virtu repeatedly and falsely told customers that it used 'information barriers' and 'systemic separation between business groups' to protect their material nonpublic information.

The SEC said that, in reality, 'anyone' at the New York-based company's Virtu Americas unit could from January 2018 to April 2019 access sensitive information about customers and their trades by using generic user names and passwords.

This created the risk that Virtu's proprietary traders, who were supposed to be 'walled off' from customers' trades, could use the information to benefit themselves at the expense of customers, even as Virtu accepted trading commissions from those same customers, the SEC said.

Information that was allegedly exposed included details identifying the customers, and the names, prices and volumes of securities they bought and sold, the regulator added.

The lawsuit seeks civil fines, the recoupment of ill-gotten gains, and an injunction against further violations.

*        *        *

Shares of Virtu fell 2% to $18.10 in trading after market-hours.

101.    On September 14, 2023, analysts from Citi issued a report, commenting on Virtu's price stock decline following the SEC's filing of its suit against Virtu and VAM, stating, in pertinent

- 27 -

part: "Post the SEC filing suit against VIRT on 9/12, the stock finished **down 8.5%, shaving $200M+ in market cap from the stock**."

## DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS DURING THE CLASS PERIOD

102.    The Class Period begins on November 7, 2018, when Virtu announced its plans to acquire ITG.  On Virtu's 3Q18 earnings call, held the same day, Defendants Cifu and Molluso gave a presentation to investors about the impending ITG acquisition.  During the presentation, defendant Cifu addressed the concerns about combining Virtu's market making business with ITG's trade execution business, and discussed Virtu's protection of sensitive client information, in pertinent part, as follows (the referenced slide appears in ¶107 below):

> Turning to Slide 6.  ***You see the importance we place on protecting client information in all aspects of our business.  We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have***.  ***Virtu has established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind.  These safeguards include physical separation, logical access control and entitlement reviews.***  Clients have entrusted their most sensitive confidential information to ITG in POSIT, in Triton, in the analytics segment.  Rest assured that we will be vigilant in protecting that information.  We will build on the existing safeguards ITG has employed and ensure that going forward, there continues to be physical and logical separation, monitoring, testing and training.
>
> Let's discuss the analytics or POSIT Alert businesses, for example.  They will be located in separate physical spaces.  Access will be restricted by keycard to only authorized and personnel and monitor.  Technology controls will restrict logical access.  Personnel will be trained to ensure adherence.  In addition to monitoring and testing our safeguards and policies through internal audits, we are also looking to contract an external independent auditing firm to regularly review ***the effectiveness of our controls***.  In addition to these safeguards, Virtu is a firm believer in using technology to enhance transparency to end customer.  Our tools provide the ability for institutions to have unprecedented visibility into the complete life cycles of their orders.  That includes importantly why their orders were routed, not just that they were routed.

103.    The statements in ¶102 above by defendant Cifu regarding "***the importance we place on protecting client information in all aspects of our business***," and describing that they "***take this***

- 28 -

*obligation seriously*," were materially false and misleading when made because they misrepresented and failed to disclose that, at the time this statement was made, the confidential post-trade information of VAM's execution services customers was ***not*** being protected, as it was readily accessible to essentially everyone at the Company, through logging into the FS Database via widely known and frequently shared generic usernames and passwords, which Defendants knew, or recklessly disregarded. The employees who had access to this information included Virtu's proprietary traders, who could abuse and benefit from that information. Indeed, that same month – as a direct result of complaints by traders about capacity limits – VAM ***increased*** the number of users who could have simultaneous access to the FS Database by ***66%***.

104.    Further, the statements in ¶102 above by defendant Cifu about "***safeguards includ[ing] physical separation***, ***logical access control and entitlement reviews***" were materially false and misleading when made, because they misrepresented and failed to disclose that these safeguards were not currently in place to segregate and protect the confidential post-trade client information in connection with the agency brokerage business that Virtu was already operating, which Defendants knew, or recklessly disregarded.

105.    In addition, the statement in ¶102 above by defendant Cifu that "we are also looking to contract an external independent auditing firm to regularly review ***the effectiveness of our controls***" was materially false and misleading because speaking about the effectiveness of the Company's controls created a duty for defendant Cifu to speak fully and truthfully about then-existing failures in the effectiveness of the Company's controls, which enabled proprietary traders to access confidential trading information in the FS Database, which Defendants knew, or recklessly disregarded.

106.    Finally, each of the statements in ¶102 above were materially false and misleading when made, because they misrepresented and failed to disclose that Virtu's failure to protect confidential client trading information in the FS Database exposed Virtu to significant financial, regulatory, and litigation risks, which Defendants knew, or recklessly disregarded.

107.    Slide 6 of the presentation, referenced by defendant Cifu in the remarks quoted above in ¶102, stated as follows:



108.    The statement in the slide in ¶107 above that Virtu was going to "***Enhance Existing Safeguards to Protect Client Information***" was materially false and misleading when made because it led investors to believe that Virtu's "***existing*** safeguards" were adequately "protect[ing] client information," when, at that time, sensitive client post-trade information was not being safeguarded, as it was accessible to essentially everyone at the Company, including Virtu's proprietary traders, through logging into the FS Database via widely known and frequently shared generic usernames and passwords, which Defendants knew, or recklessly disregarded.  Moreover, speaking about

Virtu's "existing safeguards to protect client information" created a duty for Defendants to speak fully and truthfully about the failures of the Company's then-existing safeguards, which allowed sensitive client post-trade information to be accessible to essentially everyone at the Company, including Virtu's proprietary traders, through logging into the FS Database via a widely known and frequently shared generic usernames and passwords, which Defendants knew, or recklessly disregarded.

109.    During the 3Q18 earnings call, an analyst from Compass Point Research & Trading LLC asked defendant Cifu about the concerns in the market on combining a market maker with a company that – earlier the same morning – agreed to pay a penalty of $12 million to settle SEC charges in connection with its failure to establish adequate safeguards and procedures to protect confidential trading information over a seven year period.  That exchange went, in pertinent part, as follows:

**Christopher John Allen - *Compass Point Research & Trading, LLC, Research Division - Analyst***

Just wanted to ask, ITG's core brand has been as an independent agency broker. Obviously, Virtu is a market maker, a little bit different business.  And just how do you kind of reconcile potential customer dis-synergies?  What's the level of customer overlap?  The onetime ITG has gotten in trouble with its customers, obviously, was the project, the Omega issue, where it was kind of hooking in to market making and arguably damage its brands were digging out from there.  So just trying to think about how you guys are thinking about potential revenue dis-synergies moving forward.  I know you guys have talked about the percent of revenues synergies.  But I think the assumption out there for the market, is there going to be at decent level of revenue dis-synergies?

**Douglas A. Cifu - *Virtu Financial, Inc. - CEO & Director***

Yes, absolutely.  It's a great question.  Obviously, we are cognizant of it, and we have great respect for ITG brand as an independent and we're obviously very aware of the foot fault or more that they had in 2015.  *I think the issue in 2015 was that they were engaged in prop trading and candidly hadn't been upfront with their clients.  That's really ultimately what the issue is.  And Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with.*  And so

obviously, the universe is going to know and clients will know that we are a very significant prop and retail market making firm, and we always will be. We have been in this business, the institutional business, since 2015 on a legacy Virtu basis. When we acquired Knight in 2017, they had been in business for over 20 years. So this is not a new phenomena. It's also not a new phenomenon that sell side, every bank that we deal with that you are very well aware, has this conflict as well. They've got prop market making. They've got customers and whatnot. And so there are mechanisms in place to make that happen. I would argue this actually makes the offering that much better for a couple of reasons . . . So I'm aware that customers will be concerned. I will do my best to be out there and to be transparent and talk to customers as will our entire institutional team. I think ultimately customers will see the value proposition of having a firm like Virtu and its skill set, married with a great firm like ITG.

110.    The statement in ¶109 above by defendant Cifu that ITG was "***engaged in prop trading and candidly hadn't been upfront with their clients. That's really ultimately what the issue is. And Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with***," was materially false and misleading when made because at that time Virtu was being neither "***transparen[t]***" nor "***very upfront and direct***" with, among others, its execution services customers, when, unbeknownst to them – and Virtu's investors – Virtu's proprietary traders ***currently had*** unrestricted access into their material non-public post-trade information in the FS Database, which Defendants knew, or recklessly disregarded.

111.    The next day, November 8, 2018, Virtu filed with the SEC its Form 10-Q reporting on the quarter ended September 30, 2018, signed by defendants Cifu and Molluso (the "3Q18 10-Q"). In the Management's Discussion and Analysis ("MD&A") section, the 3Q18 10-Q purported to caution against reliance on forward-looking statements contained therein, stating that "many factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] ***failure to*** maintain system security or ***otherwise maintain confidential and proprietary information[.]***"

- 32 -

112.    The statement referenced in ¶111 above was materially false and misleading when made because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants, or recklessly disregarded by them, by the start of the Class Period:

(a)    that Virtu was *already* failing to maintain its customers' confidential and proprietary information, given that detailed confidential trading information from VAM's execution services customers was accessible to essentially everyone at the Company via widely known and frequently shared generic usernames and passwords, including to proprietary traders, who could abuse and benefit from that information; and

(b)    that, as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from Virtu's failure to protect confidential client trading information in the FS Database.

113.    On November 14, 2018, *Bloomberg* published an article titled "Trader Virtu Seeks to Erase Its 'Bogeyman' Image in ITG Takeover[.]"  The article discussed how Virtu's acquisition of ITG "caused some to worry that Virtu, one of modern finance's most successful traders, will snoop on its soon-to-be clients' orders, leveraging that knowledge to place winning trades before they do." The article continued, as follows:

> Virtu denies it'll do that and says it will erect barriers to keep those businesses separate and assuage critics' concerns.  The security regime will be overseen by a client-data governance committee made up of representatives from investment firms, Virtu Chief Executive Officer Doug Cifu said in an interview this week.
>
> "We're going to empower folks on the buy side -- our clients -- to assist us in how we design and implement these barriers," he said, declining to name potential members.  "*If you're upfront about things and transparent about how you do things, not only does it eliminate the bogeyman factor, it's the best sales pitch we have*."
>
> *Virtu's proprietary traders* -- who are based in a suburb of Austin, Texas, as well as Chicago and Dublin, far from ITG's customer-facing employees in New York and London -- *won't have the key cards needed to enter the workspace of the division that has outside clients, Cifu said.  Software will block proprietary traders from*

- 33 -

*viewing client data*.  ***An outside auditor will vet the safeguards***.  And Cifu mentioned a few hypothetical high-tech solutions that the governance committee could ask Virtu to deploy, like ***biometric scanners or facial-recognition software*** for unlocking doors.

"If that's what people want us to do, that's what we'll do," he said.

114.    The statement in ¶113 above by defendant Cifu that, with respect to protecting sensitive client information, "***[i]f you're upfront about things and transparent about how you do things, not only does it eliminate the bogeyman factor, it's the best sales pitch we have***" was materially false and misleading when made, because it led investors to believe that Virtu was "***upfront***" and "***transparent***" with how it presently handled such information, when, unbeknownst to VAM's execution services customers – and Virtu's investors – proprietary traders currently had unrestricted access into execution services customers' material non-public post-trade information, which Defendants knew, or recklessly disregarded.

115.    Moreover, the statements in ¶113 above attributed to defendant Cifu regarding Virtu's plans to protect sensitive client information after acquiring ITG, including by telling *Bloomberg* that "***Virtu's proprietary traders . . . won't have the key cards needed to enter the workspace of the division that has outside clients***" and that "***[s]oftware will block proprietary traders from viewing client data***" were materially false and misleading when made, because, by speaking about Virtu's segregation and protection of confidential client information from its proprietary traders, it created a duty to disclose that proprietary traders ***already had*** unrestricted access to enter a database where confidential and extremely sensitive outside client information was stored, *i.e.*, Virtu was then-currently engaging in the same conduct Cifu was assuring investors would not take place, which Defendants knew, or recklessly disregarded.

116.    Also on November 14, 2018, *Business Insider* published an article titled "Wall Street is worried that a $1 billion acquisition will allow Virtu to spy on clients, but the firm has a big plan

- 34 -

to quell those anxieties[.]"  The article noted that the acquisition of ITG caused market observers to "worr[y] about Virtu's stock trading business – which trades the firm's capital – peeking into its new broker-dealer business and using that information to trade against clients."

117.    The article continued, "[i]t's an issue that's important to CEO Doug Cifu [who] said in an interview that the firm is building a committee of global clients to oversee the firm to ensure that data is protected."  The article quoted defendant Cifu, as follows:

> Our first order of business is to take the great ITG products, Analytics, Workflow Technology, and Commission Management Aggregation products and invest in them, and of course, we're going to enhance safeguards and transparency around the protection of client data.
>
> ***I can't overstate how important it is to me personally that client information is properly protected and, to that end, we're talking to the buy-side about establishing a client data governance committee made up of clients from all over the globe to assist in the oversight, design, implementation, and integrity of logical and physical barriers***.  It's still early and we are engaging the buy-side, getting their input, but the idea is that clients would oversee the management of their data and be empowered to recommend and engage an outside auditing firm and the meetings will be open to the all clients.
>
> The committee concept is an extension of our history of always pushing for more transparency and using technology to deliver more transparency.  ***This is a good thing – no other firm gives this much transparency to its clients into how their information is protected***.

118.    The statements in ¶117 above by defendant Cifu that he "***can't overstate how important it is to me personally that client information is properly protected***" and that "***no other firm gives this much transparency to its clients into how their information is protected***" were materially false and misleading when made because they misrepresented and failed to disclose that, at the time these statements were made, extremely sensitive post-trade client information in the FS Database was not being "***protected***," and "***transparency***" regarding client information was not being provided to Virtu's clients, which Defendants knew, or recklessly disregarded.

119.    On December 5, 2018, defendants Cifu and Molluso spoke on behalf of Virtu at the Goldman Sachs U.S. Financial Services Conference.  During the conference, they were asked about the concerns in the market about Virtu's acquisition of ITG.  That exchange went, in pertinent part, as follows:

**Alexander Blostein** *Goldman Sachs Group Inc., Research Division - Lead Capital Markets Analyst*

On the -- that was helpful by the way.  On the other end of the ledger, there is, obviously, some concerns in the market around revenue synergies and really, coming from a couple of places, either it's marrying a Market Maker with a dark pool operator.  Or having a Market Maker run just a product that will contain a lot of valuated information before it.  So what's been response from clients so far, so the customers of ITG, that [focus] your deal and how do you manage these?

**Douglas A. Cifu** *Virtu Financial, Inc. - CEO & Director*

Sure. I mean, they are all real concerns, right?  And so we don't marginalize any of them.  We address them right at front.  On the dark pool side, that I'm very unconcerned about because today, we run a dark pool called Match it, all right. And a lot of brokers, like Goldman Sachs, run a dark pool, right?  And also have Market Making, right?  So I think the buy side is very comfortable with that.  That is really not a concern, it's -- candidly nobody has raised that with me as an issue.  It saw it in your report, but I'm happy to talk to whoever told you that, but no one has raised that with me.  I think the larger concern is, hey, ITG has historically been a valued analytics provider, right?  I don't want you to send to Virtu, which is a prop Market Making firm[, m]y end of the day trade file because somehow they are going to reverse engineer what I'm doing.  What -- I've had proactively a dozen conversations with the large influencers and the 800-pound gorillas, if you will, on the buy side. And we, obviously, cooperated with a couple of articles, if you Google around, to Bloomberg, and we had some ideas about creating a buy side governance panel, which people really liked.  And we've educated the sales force at ITG to say, listen: one, we're never going to do that; two, there's going to be contractual restrictions against that; *three, there's going to be physical and virtual barriers, so prop folks can't get into it;* and four, at the end of the day, we run a very small firm where everybody knows what's going on, in particular myself, it's maybe one of the old Wall Street partnership types of places.  Not going to happen, not going to happen. Why would we do that?

120.    The statement in ¶119 above by defendant Cifu that Virtu was going to employ "*physical and virtual barriers*" to protect ITG customers' end of the day trade file "*so prop folks can't get into it*" was materially false and misleading when made, because by speaking about Virtu's

segregation and protection of confidential client information from its proprietary traders, it created a duty to disclose that Virtu itself had no physical and virtual barriers currently in place to prevent "prop folks" from accessing execution services customers' confidential post-trade information in the FS Database, which Defendants knew, or recklessly disregarded.

121.    On January 25, 2019, Virtu issued a press release, filed with the SEC on Form 8-K, about the ongoing acquisition of ITG.  The press release stated, in pertinent part, that "[p]ost-closing, Virtu intends to *continue to maintain and enforce appropriate information barriers to segment and protect sensitive client data[.]*"

122.    The statement in ¶121 above that Virtu planned to "*continue to maintain and enforce appropriate information barriers to segment and protect sensitive client data*" was materially false and misleading when made, because it led investors to believe that Virtu already maintained and enforced appropriate information barriers to "segment and protect sensitive client data" in the FS Database when, at that time, sensitive client post-trade information was accessible to essentially everyone at the Company, including Virtu's proprietary traders, through logging into the FS Database via widely known and frequently shared generic usernames and passwords, which Defendants knew, or recklessly disregarded.

123.    On February 7, 2019, Virtu held its 4Q18 earnings call.  In the question-and-answer session of the earnings call, defendant Cifu was asked about the concerns in the market regarding Virtu's acquisition of ITG, in particular, as described by Cifu, "the initial concern around we're adding an additional conflict because ITG, historically has been an agency business."  That exchange went, in pertinent part, as follows:

> **Richard Henry Repetto** *Sandler O'Neill + Partners, L.P., Research Division - Principal of Equity Research*
>
> So I've already gotten an e-mail saying that -- it sounds like that you're more bullish on the ITG acquisition.  And I guess the question is, we've talked to clients, we know

you've been out, as you said in the prepared remarks. I was talking to clients and just some feedback and why the feedback we've gotten has been incrementally positive? And how are you getting people over -- or getting to that more positive view? A couple of people that we talked to certainly were more positive after they talked with you. If you could expound on that?

**Douglas A. Cifu** *Virtu Financial, Inc. - CEO & Director*

Sure. Yes. Thank you, and good morning, Rich. Yes, I think it's really two elements to that. The first is, you're right. We've been out there, we've talked to dozens and dozens of ITG customers, both here in Canada and in Europe, and I think this is obviously the initial concern around we're adding an additional conflict because ITG, historically has been an agency business. And we're -- we get that, we are very sensitive to that, and we're very direct and transparent about that. *I think they like the transparency and the directness of Virtu. We have no other way of conducting business. There's no gray area at Virtu. It's all black-and-white, and so we've been very upfront about how we will physically and virtually separate the businesses to ensure that we are good stewards of customer information, all the things you would expect that we do, and I think customers are encouraged to hear those words*.

124.    The statement in ¶123 above by defendant Cifu discussing the "***transparency and the directness of Virtu***" was materially false and misleading when made because it misrepresented and failed to disclose that Virtu was being neither "***transparen[t]***" nor "***direct[]***" with, among others, its execution services customers about Virtu's protection of their sensitive trading information. Indeed, at the time that defendant Cifu made this statement, Virtu's proprietary traders had unrestricted access to Virtu's execution services customers' material non-public trading information, which Defendants knew, or recklessly disregarded.

125.    In addition, the statement in ¶123 above by defendant Cifu that Virtu had "***been very upfront about how we will physically and virtually separate the businesses to ensure that we are good stewards of customer information***" was materially false and misleading when made because by speaking about Virtu's physical and virtual separation of its business, it created a duty to disclose that Virtu was ***not*** presently being a "good steward[] of customer information," or keeping its proprietary trading and agency execution businesses "physically and virtually separate." At the time

- 38 -

this statement was made, there were no barriers in place preventing, among other things, Virtu's proprietary traders from being able to access execution services customers' sensitive post-trade information, which Defendants knew, or recklessly disregarded.

126.    On or about March 1, 2019, Virtu posted a letter on its website from defendant Cifu to Virtu's clients, announcing the completion of the ITG acquisition.  The letter, signed by Cifu stated, in pertinent part, as follows:

> ***Prior to merging, both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data.  As we integrate, we will draw on the best practices of our combined company to continue to ensure that our policies, procedures and tools remain designed to safeguard confidential client information***.  These safeguards will include physical and logical separations, where appropriate, between businesses and access control procedures.

127.    The statement in ¶126 by Defendant Cifu that "***both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data***," was materially false and misleading when made, because by speaking about Virtu's segregation and protection of sensitive client data it created a duty to  disclose that the "procedures to segregate and protect sensitive client data" Virtu claims to have had in place prior to acquiring ITG did ***not*** "segregate and protect" its execution customers' post-trade information in the FS Database, which Defendants knew, or recklessly disregarded.

128.    In addition, the statement in ¶126 by Defendant Cifu that Virtu would "***draw on the best practices of our combined company to continue to ensure that our policies, procedures and tools remain designed to safeguard confidential client information***," was materially false and misleading when made, because by speaking about Virtu's tools to safeguard confidential client information, it created a duty to disclose that Virtu's "policies, procedures and tools" were ***not*** adequately safeguarding confidential client trading information in the FS Database, which Defendants knew, or recklessly disregarded.

- 39 -

129.    Also on March 1, 2019, Virtu filed with the SEC its Form 10-K for the year ending December 31, 2018, signed by defendants Cifu and Molluso (the "2018 Form 10-K"). In the MD&A section, the 2018 Form 10-K purported to caution against reliance on forward-looking statements contained therein, stating that "many factors could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] *failure to protect confidential and proprietary information[.]*"

130.    The statement referenced in ¶129 above was materially false and misleading when made because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them by the start of the Class Period:

(a)    that Virtu was *already* failing to protect its customers' confidential and proprietary information, given that detailed confidential trading information from Virtu's execution services customers was accessible to essentially everyone at the Company via widely known and frequently shared generic usernames and passwords, including to proprietary traders, who could abuse and benefit from that information; and

(b)    that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from Virtu's failure to protect confidential client trading information in the FS Database, which caused the price of Virtu Class A common stock to trade at artificially inflated prices during the Class Period.

131.    On March 13, 2019, Virtu filed a Form 8-K with the SEC, which included as an exhibit, a presentation Virtu stated it planned to use at the FIA International Futures Industry Conference on March 13, 2019, and "from time to time thereafter in connection with presentations to

investors and potential investors, clients and potential clients, industry analysts and others." The following slide was part of that presentation deck:



132.    The statements in the slide in ¶131 above that "***Virtu has established policies and procedures designed to safeguard sensitive client information***" including "***[p]hysical and logical safeguards of client information***," were materially false and misleading when made because they led investors to believe that Virtu's established policies were "safeguard[ing] sensitive client information," with "physical and logical safeguards" when, at the time these statements were made, sensitive post-trade client information was accessible to essentially everyone at Virtu, including Virtu's proprietary traders, through logging into the FS Database via widely known and frequently shared generic usernames and passwords, which Defendants knew, or recklessly disregarded.

133.    On May 3, 2019, Virtu held its 1Q2019 earnings call. In his prepared remarks, defendant Cifu stated, in pertinent part, as follows:

> Also, as you may recall, when the deal was announced, ***we promised to provide unparalleled transparency into how we protect client information***. I'm pleased to report that on April 9 and April 30, we held our first client information security

forums in New York and London, respectively. We had over 100 clients and prospective clients attend in person or participate via telephone and Webex. These forums are one element of our continuous commitment to our clients, and we look forward to similar engagements in other regions.

134. The statement in ¶133 by Defendant Cifu regarding Virtu's "***promise[] to provide unparalleled transparency into how we protect client information***" was materially false and misleading when made because speaking about this specific issue created a duty to disclose that Virtu's proprietary traders, among others, had unrestricted access into execution services customers' material non-public post-trade information for a period of ***at least*** 15 months, which Defendants knew, or recklessly disregarded.

135. On May 10, 2019, Virtu filed a form 10-Q for the quarter ended March 31, 2019, signed by defendants Cifu and Molluso (the "1Q19 10-Q"). In the MD&A section, the 1Q19 10-Q purported to caution against reliance on forward-looking statements contained therein, stating that "many factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] ***failure to protect confidential and proprietary information[.]***"

136. The statement referenced in ¶135 above was materially false and misleading when made because Defendants misrepresented and failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them by the start of the Class Period:

(a)    that Virtu had ***already*** failed and/or was failing to protect its customers' confidential and proprietary information, given that for a period of at least 15 months, detailed confidential trading information from Virtu's execution services customers was accessible to essentially everyone at the Company via widely known and frequently shared generic usernames and passwords, including to proprietary traders, who could abuse and benefit from that information; and

(b)     that as a result of the foregoing, the market was unaware of the Company's true exposure to financial, regulatory, and litigation risks arising from Virtu's failure to protect confidential client trading information in the FS Database, which caused the price of Virtu Class A common stock to trade at artificially inflated prices during the Class Period.

137.    On June 5, 2019, defendant Cifu represented Virtu at the Sandler O'Neill Global Exchange and Brokerage Conference.   In response to a question about potential "revenue dissynergies" from the ITG acquisition, Cifu addressed the concerns about combining Virtu's market making business with ITG's execution business, stating, in pertinent part, as follow:

> Yes, I mean we had guided towards $10 million of revenue dissynergies because people are running around with their hair on fire that like, all these analytics and Triton customers are going to turn us off. . . . And so we had guided to that number. On the last earnings call, and I'll repeat what I said, we're going to be within that number. I mean there are certain customers that are doing a review of Virtu like we were a new broker and I'm totally fine with that, as they should. There's a small handful of customers that can't get themselves comfortable because we're a "market-making" or HFT firm but it's really going to be ultimately de minimis. ***The large asset managers and the fashion forward, if you will, hedge funds and others and quant firms that kind of understand what we are and recognize we didn't buy ITG to steal customer information. It's kind of preposterous and borderline insulting to suggest we would do that. We would never do that***. So people are sticking with us, they're giving us the benefit of the doubt here.

138.    The statement in ¶137 by Defendant Cifu that Virtu "***would never do that***" was materially false and misleading when made because it misrepresented and failed to disclose that for a period of at least 15 months Virtu allowed its proprietary traders to access material non-public customer post-trade information stored in the FS Database, which Defendants knew, or recklessly disregarded.

139.    From August 9, 2019 through May 3, 2022, Virtu filed quarterly reports and annual reports with the SEC on Forms 10-Q and 10-K, signed by the Individual Defendants as follows:

| Date | Document | Defendant Signatories |
|---|---|---|
| August 9, 2019 | Form 10-Q for the quarter ended June 30, 2019 | Cifu and Molluso |
| November 8, 2019 | Form 10-Q for the quarter ended September 30, 2019 | Cifu and Ioffe |
| February 28, 2020 | Form 10-K for the year ended December 31, 2019 | Cifu and Ioffe |
| May 11, 2020 | Form 10-Q for the quarter ended March 31, 2020 | Cifu and Ioffe |
| August 7, 2020 | Form 10-Q for the quarter ended June 30, 2020 | Cifu and Ioffe |
| November 6, 2020 | Form 10-Q for the quarter ended September 30, 2020 | Cifu and Galvin |
| February 25, 2021 | Form 10-K for the year ended December 31, 2020 | Cifu and Galvin |
| May 7, 2021 | Form 10-Q for the quarter ended March 31, 2021 | Cifu and Galvin |
| August 4, 2021 | Form 10-Q for the quarter ended June 30, 2021 | Cifu and Galvin |
| November 3, 2021 | Form 10-Q for the quarter ended September 30, 2021 | Cifu and Galvin |
| February 18, 2022 | Form 10-K for the year ended December 31, 2021 | Cifu and Galvin |
| May 3, 2022 | Form 10-Q for the quarter ended March 31, 2022 | Cifu and Galvin |
| August 2, 2022 | Form 10-Q for the quarter ended June 30, 2022 | Cifu and Galvin |
| November 3, 2022 | Form 10-Q for the quarter ended September 30, 2022 | Cifu and Galvin |

140.    In the MD&A section of each of Virtu's SEC filings listed in ¶139 above, Virtu

purported to caution against reliance on forward-looking statements contained therein, stating that

"many factors . . . could affect our actual financial results or results of operations and cash flows,

and could cause actual results to differ materially from those in such forward-looking statements,

including, but not limited to . . . [the] *failure to protect confidential and proprietary information[.]*"

141.    The statement referenced in ¶140 made in each of the Forms 10-Q and 10-K listed in

¶139 above was materially false and misleading when made because Defendants misrepresented and

failed to disclose the following adverse facts, which were known to Defendants, or recklessly disregarded by them, by the start of the Class Period:

(a)     that Virtu had *already* failed and/or was failing to protect its customers' confidential and proprietary information, given that for a period of at least 15 months, detailed confidential trading information from Virtu's execution services customers was accessible to essentially everyone at the Company via widely known and frequently shared generic usernames and passwords, including to proprietary traders, who could abuse and benefit from that information; and

(b)     that as a result of the foregoing, the market was unaware of the Company's true exposure to significant financial, regulatory, and litigation risks arising from Virtu's failure to protect confidential client trading information in the FS Database, which caused the price of Virtu Class A common stock to trade at artificially inflated prices during the Class Period.

142.    On February 17, 2023, Virtu filed its Form 10-K for the year ended December 31, 2022, signed by defendants Cifu and Galvin (the "2022 Form 10-K"). In the 2022 Form 10-K, Virtu revealed that "the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers."

143.    On this news, the price of Virtu Class A common stock declined $0.33 per share, or 1.6%, from its closing price on February 17, 2023 of $20.27 per share, to close at $19.94 per share on February 21, 2023, the next trading day.

144.    Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated. For example,

the MD&A section of the 2022 Form 10-K contained the same purported cautionary language quoted in ¶140 above, which was materially false and misleading for the reasons explained in ¶141.

145.    Then, on April 28, 2023, Virtu filed its Form 10-Q for the quarter ended March 31, 2023, signed by defendants Cifu and Galvin (the "1Q23 10-Q").  In the 1Q23 10-Q, Virtu reiterated that it had been responding to requests for information from the SEC in connection with an investigation of aspects of the Company's information access barriers, and further disclosed, in relevant part, "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC[,]" and "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

146.    On this news, the price of Virtu Class A common stock fell $3.19 per share, or 15.9%, over the course of the next four trading days, from its closing price on April 28, 2023 of $20.05 per share, to close at $16.86 per share on May 4, 2023.

147.    Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.  In particular, in the MD&A section, the 1Q23 10-Q contained the same purported cautionary language quoted in ¶140 above, which was materially false and misleading for the reasons explained in ¶141.

148.    Next, on July 28, 2023, Virtu filed its Form 10-Q for the quarter ended June 30, 2023, signed by defendants Cifu and Galvin (the "2Q23 10-Q"), which, in pertinent part, stated as follows:

> The Company and its subsidiaries are subject to several of these matters at the present time, including, among others, a matter in which the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's

internal information access barriers. The Company has continued to cooperate with this civil investigation and engaged in settlement discussions. The Company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded. The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period.

149.    On this news, Virtu Class A common stock declined $0.34 per share, or 1.8%, from its closing price on July 28, 2023 of $18.90 per share, to close at $18.56 per share on July 31, 2023.

150.    Defendants, however, failed to disclose the full extent of their fraud, resulting in the price of Virtu Class A common stock remaining artificially inflated. In particular, the MD&A section to the 2Q23 10-Q contained the same purported cautionary language quoted in ¶140 above, which was materially false and misleading for the reasons explained in ¶141.

151.    Finally, on September 12, 2023, the SEC issued a press release announcing that it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. (collectively, Virtu), for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information." The press release continued, in pertinent part, as follows:

> As alleged in the SEC's complaint, Virtu Americas and its affiliates operated two businesses that it purported to have walled off from each other: an order execution service for large institutional customers, whereby Virtu Americas executed customer orders, typically for a commission, and a proprietary trading business, through which Virtu Americas bought and sold securities for its own accounts and benefit. From approximately January 2018 through the beginning of April 2019, however, Virtu Americas allegedly failed to safeguard a database that contained all post-trade information generated from customer orders routed to, and executed by, Virtu Americas, including customer identifying information and other material nonpublic information. The SEC's complaint alleges that this database was accessible to practically anyone at Virtu Americas and its affiliates, including their proprietary traders, through two sets of widely known and frequently shared generic usernames and passwords. . . .

- 47 -

152.    In response to this news, Virtu Class A common stock fell $1.07 per share over the next four trading days, or 5.8%, from its closing price on September 12, 2023 of $18.46 per share, to close at $17.39 per share on September 18, 2023.

## DEFENDANTS VIOLATED SEC
## DISCLOSURE RULES AND REGULATIONS

153.    In addition to the materially false and misleading statements identified above, Defendants also violated their affirmative obligations to provide certain material information in SEC filings as required by applicable SEC rules and regulations.

154.    Specifically, Item 303 of SEC Regulation S-K, 17 C.F.R. §229.303 ("Item 303"), required Defendants to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

155.    In May 1989, the SEC issued an interpretive release on Item 303 (the "1989 Interpretive Release"), stating, in pertinent part, as follows:

> Required disclosure is based on currently known trends, events and uncertainties that are reasonably expected to have material effects, such as: A reduction in the registrant's product prices; erosion in the registrant's market share; changes in insurance coverage; or the likely non-renewal of a material contract.
>
> *    *    *
>
> A disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation.

156.    Furthermore, the 1989 Interpretive Release sets forth the following test to determine if disclosure under Item 303(a) is required:

> Where a trend, demand, commitment, event or uncertainty is known, management must make two assessments:

(1) Is the known trend, demand, commitment, event or uncertainty likely to come to fruition? If management determines that it is not reasonably likely to occur, no disclosure is required.

(2) If management cannot make that determination, it must evaluate objectively the consequences of the known trend, demand, commitment, event or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is not reasonably likely to occur.

157.    Item 303 required Virtu's quarterly and annual financial reports issued during the Class Period to disclose Virtu's failure to properly safeguard the material non-public trading information of its execution services customers in the FS Database. Defendants' failure to disclose the unfettered access that essentially everyone at Virtu had to this confidential information – including its proprietary traders who could use and benefit from that information – violated Item 303, because these known, but undisclosed, risks, events, and uncertainties subjected Virtu to contingent liabilities, including fines, reputational damage, civil and/or criminal penalties, and/or other sanctions, that were reasonably likely to – and when they came to fruition did – adversely affect Virtu's financial condition and results.

158.    Moreover, Item 105 of Regulation S-K, 17 C.F.R. §229.105 ("Item 105"), required disclosure of "the material factors that ma[d]e an investment in [Virtu] speculative or risky" and an explanation of "how [the] risk affect[ed] [Virtu]." Defendants violated Item 105 because the adverse facts described herein regarding Virtu's failure to protect its clients' confidential and proprietary trading information in the FS Database for a period of at least 15 months created significant risks that were not disclosed, even though they were some of the most significant facts that made an investment in Virtu speculative or risky.

## ADDITIONAL SCIENTER ALLEGATIONS

**The Individual Defendants Controlled the Company's Messaging to the Investing Public**

159.    As alleged herein, the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements they issued or disseminated in the name of the Company or in their own name during the Class Period were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

160.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding the Company, their control over, and/or receipt and/or modification of Virtu's allegedly materially false and misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Virtu, were active and culpable participants in the fraudulent scheme alleged herein.

161.    The Individual Defendants knew, or recklessly disregarded, the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including defendants Cifu, Molluso, Ioffe, and Galvin.

162.    The Individual Defendants, by virtue of their high-level positions with the Company during the Class Period – as Chief Executive Officer (Cifu), Co-President and Co-Chief Operating Officer (Molluso), and Chief Financial Officers (Molluso, Ioffe, and Galvin) – directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and final condition, as alleged herein.

The Individual Defendants, because of their positions within Virtu, controlled the content of the Company's public statements during the Class Period.

163.    In drafting, reviewing or commenting on press releases and SEC filings, and preparing for conference calls and investor presentations, the Individual Defendants were either already knowledgeable, became knowledgeable, or recklessly disregarded the underlying facts regarding Virtu's failure to protect confidential client trading information.

164.    These facts, in conjunction with the additional indicia of scienter detailed herein, collectively support a strong inference of scienter for each of the Individual Defendants.

**The Individual Defendants' Numerous and Specific Statements About Virtu's Protection of Confidential Client Trading Information Support a Strong Inference of Scienter**

165.    During the Class Period, Defendants spoke frequently about Virtu's protection of its clients' confidential trading information, which supports a strong inference of scienter.  For example, the November 7, 2018 presentation given by defendants Cifu and Molluso contained the following slide specifically addressing Virtu's "***existing safeguards to protect client information***":



- 51 -

166.    Defendant Cifu also sat for multiple interviews to specifically discuss Virtu's segregation and protection of sensitive client information between its market making and trade execution businesses.  As Cifu noted during a December 5, 2018 conference, "we, obviously, cooperated with a couple of articles, if you Google around, to Bloomberg, and we had some ideas about [steps to ensure client data protection, including] creating a buy side governance panel, which people really liked."  The headlines of those articles were "Trader Virtu Seeks to Erase Its 'Bogeyman' Image in ITG Takeover" and "Wall Street is worried that a $1 billion acquisition will allow Virtu to spy on clients, but the firm has a big plan to quell those anxieties[.]"

167.    Defendants had numerous opportunities to prevent their statements from being made, or to cause them to be corrected – but did not – which underscores their scienter.  Indeed, at the time Cifu made the above-referenced presentation and during his media campaign about Virtu's protection of client information, Virtu's proprietary traders **had unrestricted access** into execution services customers' material non-public post-trade information.

168.    Moreover, each of the Individual Defendants signed quarterly and/or annual Company reports filed with the SEC during the Class Period purporting to caution about the potential of "**[the] failure to**" maintain or protect "**confidential and proprietary information**,"when the Company had already failed in that regard.

169.    These and other numerous and specific statements reflect that the Individual Defendants were receiving specific information regarding Virtu's protection (or lack thereof) of sensitive client trading information.  In addition, the fact that many of Defendants' false and misleading statements were scripted, and were reviewed by Company executives before they were made, shows that the statements were premeditated.

170.    Similarly, it is common knowledge that companies undertaking large acquisitions undergo a substantial due diligence process prior to completing the transaction.  Given that Virtu announced its plans to acquire ITG on the ***same day*** the SEC announced that "[f]rom 2010 until 2017, ITG failed to establish adequate safeguards and procedures to appropriately limit access to systems containing . . . subscribers' confidential trading information," it is inconceivable that Defendants did not have access to or inquire into the measures that Virtu itself had in place to protect its own clients' confidential trading information, before they began promoting the Company's supposed information safeguards to investors.

171.    Even the most superficial of investigations by the Individual Defendants – for example, speaking with FS Database developers – would have revealed that client information was exposed to essentially anyone at the Company.  Indeed, according to internal correspondence, in August 2018, more than 20 employees from different departments at Virtu received an email indicating that a "revamp" was needed to fix the FS Database's inadequate permissioning.  And in December 2018, the developer of the main FS Database acknowledged in internal correspondence that the project to remediate inadequate permissioing had still not yet started.

172.    The only other plausible inference that can be drawn from Defendants' many pronouncements about Virtu's protection of confidential client trading information is that the Individual Defendants either fabricated the information they provided to investors and the market or they deliberately ignored information they possessed or had access to relating to such matters.  In either event, such recklessness satisfies the scienter requirement.

**Defendant Cifu's Explicit Admission of the Awareness He and "[E]verybody" at Virtu Would Have on the Topic of Protecting Client Trading Information Supports a Strong Inference of Scienter**

173.    Shortly after announcing the ITG acquisition, Defendants Cifu and Molluso spoke on behalf of Virtu at the Goldman Sachs U.S. Financial Services Conference.  During the December 5,

2018 conference, defendant Cifu was asked by an analyst to address the "concerns in the market" about Virtu's acquisition of ITG. Cifu addressed several self-described "real concerns," including the fact that Virtu, as a "prop Market Making firm," could use the confidential "end of the day trade file" it received from its clients to "reverse engineer" their trading actions. Cifu then highlighted the "physical and virtual barriers" Virtu was going to employ to protect its customers' trading information "***so prop folks can't get into it***."

174.    Defendant Cifu proceeded to *sua sponte* acknowledge that "***we run a very small firm where <u>everybody knows what's going on, in particular myself</u>***, it's maybe one of the old Wall Street partnership types of places. Not going to happen, not going to happen. Why would we do that?" This express admission by defendant Cifu – made while discussing the specific topic of Virtu's segregation and protection of sensitive client trading information between its business lines – supports a strong inference that Defendants were well-aware (or, at a bare minimum, reckless in not knowing) that their repeated Class Period statements to investors on this topic were false and misleading.

**Virtu's Protection of Confidential Client Trading Information Was Critical to Developing Its New Agency Execution Business and Thus Supports a Strong Inference of Scienter**

175.    As alleged herein, Virtu's venture into the agency execution business signified a major shift in the Company's traditional business model as a market maker. Accordingly, Virtu's ability to adequately safeguard the confidential trading information generated by its execution services clients was critical to the Company's ability to develop its new business line.

176.    This is evidenced by the fact that several of VAM's execution services customers – *i.e.*, the very clients whose sensitive information was left exposed in the FS Database during the Class Period – asked pointed questions to VAM as to how their trading information was going to be

- 54 -

protected and who specifically had access to it, when determining whether VAM should be an approved broker-dealer for executing their trade orders.

177.    For example, in a November 2018 due diligence questionnaire, a VAM customer asked who at VAM had access to "real-time and *post trade*" information.  Making no mention of the access proprietary traders had to such information, VAM responded as follows:

> Electronic Execution Services Sales and supervisory personnel as well as certain support personnel in technology, operations, finance, compliance and legal may have access to systems containing [that specific customer's] post trade information.

178.    Similarly, in a January 2019 due diligence questionnaire, a VAM customer asked as follows:

> Do any cash traders, research sales and/or *proprietary traders* see electronic order flow information, whether this is intraday or *post-trade*? What safeguards do you have in place to maintain the confidentiality of our order flow?

VAM responded:

> *No*. *The Firm employs information barrier processes and procedures as part of its oversight functions*, such as procedures to approve and review systems entitlements for all of the Firm's business units, including Electronic Execution Services.

179.    Likewise, in another January 2019 questionnaire, a customer inquired about the policies and procedures that VAM then-had in place to protect "client confidential information." VAM answered that it had "*encryption/password protection*" and "*access controls*" in place.

180.    Because Virtu reports its financial statements on a consolidated basis, which includes Virtu's equity interests in VAM, these and other similar misrepresentations made by VAM ultimately benefited Virtu financially.  On information and belief, upon receiving VAM's responses to their respective due diligence questions, the customers identified in ¶177 and ¶179 thereafter utilized VAM's trade execution services, paying commissions to VAM for carrying out their respective transactions.

- 55 -

181.    Furthermore, recognizing the importance of protecting sensitive client trading information in order to win new business, defendant Cifu repeatedly touted Virtu's safeguarding of such data.  Cifu also claimed to have "had proactively a dozen conversations with the large influencers and the 800-pound gorillas, if you will, on the buy side" on this issue and to be, *inter alia*, "talking to the buy-side about establishing a client data governance committee made up of clients from all over the globe to assist in the oversight, design, implementation, and integrity of logical and physical barriers."

182.    As a result, given the unequivocal importance of Virtu's protection of client trading information to its core business and operations, the Individual Defendants, as executive officers of the Company, at a bare minimum, should have been aware of key facts relating to Virtu's protection of confidential client trading information (or lack thereof) between its own business lines.

**Corporate Scienter**

183.    Virtu, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to ascertain and disclose such facts, even though such facts were available to them.  Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Virtu's true operating condition from investors.

**LOSS CAUSATION/ECONOMIC LOSS**

184.    During the Class Period, as detailed herein, Defendants made materially false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Virtu Class A common stock and operated as a fraud or deceit on

Class Period purchasers of Virtu Class A common stock by misrepresenting the value of the Company's business and prospects in the Company's operations.

185.    When the relevant truth became known and/or the materialization of the risks that had been concealed by Defendants occurred, the price of Virtu's Class A common stock declined immediately and precipitously as the artificial inflation was removed from the market price of the stock.  As a result of their purchases of Virtu Class A common stock during the Class Period, Lead Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

186.    As detailed below, the information disclosed on February 17, 2023, April 28, 2023, July 28, 2023, and September 12, 2023, was both related to and the foreseeable consequence of the relevant truth that Defendants misrepresented and concealed from investors during the Class Period – namely that for a period of at least 15 months, detailed confidential trading information from VAM's execution services customers was accessible to essentially everyone at the Company via widely known and frequently shared generic usernames and passwords, including to proprietary traders, who could abuse and benefit from that information.

187.    The stock price declines immediately following the February 17, 2023, April 28, 2023, July 28, 2023, and September 12, 2023 disclosures were substantially, if not wholly, caused by the revelation of the relevant truth and/or the materializations of the risks that had been concealed by Defendants' fraud.

188.    On February 17, 2023, after the market closed, Virtu revealed in the 2022 Form 10-K that "the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers."

189.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Virtu Class A common stock declined $0.33 per share, or 1.6%, from its closing price on February 17, 2023 of $20.27 per share, to close at $19.94 per share on February 21, 2023, the next trading day. Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

190.    On April 28, 2023, after the market closed, Virtu reiterated in the 1Q23 10-Q that it had been responding to requests for information from the SEC in connection with an investigation of aspects of the Company's information access barriers, and further disclosed, in relevant part, "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC[,]" and "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

191.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Virtu Class A common stock fell $3.19 per share, or 15.9%, over the course of the next four trading days from its closing price on April 28, 2023 of $20.05 per share, to close at $16.86 per share on May 4, 2023. Defendants, however, failed to disclose the full extent of their fraud and continued to make materially false and misleading statements and omit material information, as alleged herein, resulting in the price of Virtu Class A common stock remaining artificially inflated.

192.    Then, on July 28, 2023, after the market closed, Virtu disclosed in the 2Q23 10-Q that "[t]he Company and its subsidiaries are subject to several [] matters at the present time, including, among others, a matter in which the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's internal information access barriers.  The Company has continued to cooperate with this civil investigation and engaged in settlement discussions.  The Company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded.  The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."

193.    As a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Virtu Class A common stock declined $0.34 per share, or 1.8%, from its closing price on July 28, 2023 of $18.90 per share, to close at $18.56 per share on July 31, 2023.  Defendants, however, failed to disclose the full extent of their fraud, resulting in the price of Virtu Class A common stock remaining artificially inflated.

194.    Finally, on September 12, 2023, after the market closed, the SEC issued a press release announcing that it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. (collectively, Virtu), for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information."  The SEC complaint detailed, *inter alia*, how, for a period of at least fifteen months, proprietary traders at Virtu, among others, had nearly unfettered access to

material nonpublic information about its customers' trades, via widely used and frequently shared generic usernames and passwords, which could be abused to engage in trading abuses.

195.    As a direct and proximate result of this disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud, the price of Virtu Class A common stock fell $1.07 per share over the next four trading days, or 5.8%, from its closing price on September 12, 2023 of $18.46 per share, to close at $17.39 per share on September 18, 2023.

## NO SAFE HARBOR

196.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the company making the statement who knew that those statements were false or misleading when made.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

197.    At all relevant times, the market for Virtu Class A common stock was an efficient market for the following reasons, among others:

(a)     Virtu stock met the requirements for listing, and its Class A common stock was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     according to the Company's 2022 Form 10-K for the fiscal year ended December 31, 2022, Virtu had over 97 million shares of its Class A common stock outstanding as of February 17, 2023;

(c)     as a regulated issuer, Virtu filed periodic public reports with the SEC; and

(d)     Virtu regularly communicated with public investors via established market communication mechanisms, including the regular dissemination of press releases on national circuits of major newswire services, the Internet, and other wide-ranging public disclosures; and unexpected material news about Virtu was rapidly reflected in and incorporated into prices for the Company's shares during the Class Period.

198.    As a result of the foregoing, the market for Virtu Class A common stock promptly digested current information regarding Virtu from publicly available sources and reflected such information in the price of Virtu Class A common stock.  Under these circumstances, all purchasers of Virtu Class A common stock during the Class Period suffered similar injury through their purchases of Virtu Class A common stock at artificially inflated prices, and a presumption of reliance applies.

199.    A presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because Lead Plaintiff's claims are based, in part, on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding Virtu's business, operations, and risks, positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them

important in making investment decisions. Given the importance of defendants' material misstatements and omissions set forth above, that requirement is satisfied here.

## CLASS ACTION ALLEGATIONS

200. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of Virtu Class A common stock during the Class Period (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

201. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Virtu Class A common stock actively traded on the NASDAQ. While the exact number of Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there could be hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Virtu or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

202. Lead Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

203. Lead Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

204.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by Defendants as alleged herein;

(b)    whether statements made by Defendants misrepresented and/or omitted material facts about the business and operations of Virtu; and

(c)    to what extent the members of the Class have sustained damages and the proper measure of damages.

205.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5
Against All Defendants**

206.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

207.    During the Class Period, Defendants disseminated or approved the statements specified above, which they knew, or deliberately disregarded, were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

208.    Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)    employed devices, schemes, and artifices to defraud;

(b)    made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Lead Plaintiff and others similarly situated in connection with their purchases of Virtu Class A common stock during the Class Period.

209.    Lead Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Virtu Class A common stock.  Lead Plaintiff and the Class would not have purchased Virtu Class A common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violations of Section 20(a) of the Exchange Act
### Against the Individual Defendants

210.    Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

211.    The Individual Defendants, and/or persons under their control, violated §10(b) of the Exchange Act and Rule 10b-5 by their acts and omissions described above, causing economic injury to Lead Plaintiff and the other members of the Class.  By virtue of their positions as controlling persons, each of these defendants is liable pursuant to §20(a) of the Exchange Act for the acts and omissions of their co-defendants in violation of the Exchange Act.

212.    Each of these defendants acted as a controlling person of some or all of their co-defendants, because they each had the capacity to control, or did actually exert control, over the actions of their co-defendants in violation of the securities laws.  Each of the Individual Defendants

had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to, and did, control or influence the business practices or conditions giving rise to the securities violations alleged herein, and the contents of the statements which misled investors about those conditions and practices, as alleged above. By virtue of their high-level positions, ownership of, and contractual rights with, Virtu, participation in or awareness of the Company's operations, and intimate knowledge of the matters discussed in the public statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the contents and dissemination of the false and misleading statements alleged above.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff demands judgment against Defendants as follows:

A.      Determining that this action is a proper Class action, designating plaintiff as Lead Plaintiff and certifying Lead Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of Lead Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Lead Plaintiff hereby demands a trial by jury.

- 65 -

DATED:  January 22, 2024

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
ROBERT D. GERSON
MAGDALENE ECONOMOU

*/s/ Robert D. Gerson*

ROBERT D. GERSON

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
malba@rgrdlaw.com
rgerson@rgrdlaw.com
meconomou@rgrdlaw.com

*Attorneys for Lead Plaintiff*