UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN RE VIRTU FINANCIAL, INC.
SECURITIES LITIGATION

**MEMORANDUM & ORDER**
**23-CV-3770 (NGG) (PK)**

NICHOLAS G. GARAUFIS, United States District Judge.

This is a putative federal securities class action brought by Lead Plaintiff City of Birmingham Retirement and Relief System ("Plaintiff" or "Birmingham"), on behalf of itself and all others similarly situated, who purchased Virtu Financial, Inc.'s ("Virtu") Class A common stock ("Virtu Shares") between November 7, 2018 and September 12, 2023, inclusive (the "Class Period"). (Consol. Compl. ("Compl.") (Dkt. 39) ¶ 1.) Plaintiff alleges that Defendants made materially false and misleading statements, for which Defendants are liable under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), and U.S. Securities Exchange Commission ("SEC") Rule 10b-5 promulgated thereunder. (*Id.* ¶¶ 206-12.) Defendants are Douglas Cifu (Virtu's Chief Executive Officer since November 2013), Joseph Molluso (Virtu's Co-President and Co-Chief Operating Officer since May 2020), Alex Ioffe (Virtu's Executive Vice President and Chief Financial Officer from September 2019 to August 2020), Sean Galvin (Virtu's Executive Vice President and Chief Financial Officer since August 2020) (together, the "Individual Defendants"), and Virtu (together with the Individual Defendants, "Defendants"). (*Id.* ¶¶ 21-25.) Pending before the court is Defendants' motion to dismiss the action for failure to state a claim pursuant to Federal Rules of Civil Procedure ("Rule") 9(b) and 12(b)(6), as well as the PSLRA, 15 U.S.C. §§ 78u-4, 78u-5. (*See generally* Defs.' Mot. to Dismiss ("Mot.") (Dkt.

44-1); Pl.'s Opp. to Mot. to Dismiss ("Pl.'s Opp.") (Dkt. 44-23); Defs.' Reply ("Reply") (Dkt. 44-24).) For the following reasons, Defendants' motion is GRANTED in part and DENIED in part, and Plaintiff's request for leave to amend is GRANTED.

## I.  BACKGROUND

### A.  Factual Background[1]

Virtu is a New York-based financial services firm that operates both proprietary trading (buying and selling securities in its own account for its own benefit) and client-facing businesses (executing trades for some of the largest institutional investors in the world, including pension plans and hedge funds, earning a commission) in the financial marketplace. (Compl. ¶¶ 2, 5, 44.) Defendant Cifu and Vincent Viola co-founded Virtu in 2008. (*Id.* ¶ 28.) The firm is known for its "high-frequency trading" and "cutting-edge technology," allowing it to carry out "a high volume of transactions at ultra-fast speeds." (*Id.* ¶ 3.) Using its high-frequency trading strategies, Virtu "makes markets in the cash, futures, and options markets across global equities, fixed income, currencies, cryptocurrencies, and commodities in 37 countries worldwide." (*Id.* ¶ 33.)

On April 20, 2017, after Virtu announced that it had reached an agreement to acquire KCG Holdings, Inc. ("KCG")—a rival financial services firm engaged in market making,[2] high-frequency trading, electronic execution, and other trading—Virtu's business transformed from being a market maker to a company that also

---

[1] The court draws the following facts from the Consolidated Complaint and any documents upon which it relies. For purposes of this motion to dismiss, the court assumes that these facts are true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022).

[2] "Market making is a form of trading where a trader or firm simultaneously offers to buy and sell securities with the hope of collecting the difference between those prices, known as bid/ask spreads." (Compl. ¶ 31.)

carried out trades for many institutional and retail clients. (*Id.* ¶¶ 4-5, 34.) Specifically, Virtu expected its acquisition of KCG to expand Virtu's overall net revenues attributable to execution services, from 2% to almost 20%. (*Id.* ¶ 41.) Virtu finalized this acquisition on July 20, 2017. (*Id.* ¶ 43.) Furthermore, as part of the KCG acquisition, Virtu formed a new subsidiary, Virtu Americas, LLC ("VAM"), an SEC registered broker-dealer which, among other things, "operated the customer-facing trade execution business acquired from KCG." (*Id.* ¶ 5.) As a result of this acquisition, Virtu began storing "extremely sensitive and confidential trade execution information" on its databases. (*Id.*)

Relatedly, in or around January 2018, VAM started storing "extremely sensitive customer trade execution information" in the same database, as well as a backup database (together, the "FS Database"), that also contained Virtu's existing proprietary trading data. (*Id.* ¶¶ 6, 48.) Specifically, the sensitive customer trade execution information included at least the following: (1) specific customer-identifying information; (2) the name of the security; (3) the side of the transaction (buy or sell); (4) the execution price; (5) the execution volume; and (6) the trading algorithm used for each order. (*Id.* ¶¶ 6, 48.) According to Plaintiff, this customer trade execution information was essentially an "answer key into how some of the world's largest investors were trading." (*Id* ¶ 6.) Although the investors did not know about it until 2023, "essentially *anyone* at Virtu, including its proprietary traders" could directly access this material non-public information stored by VAM from at least January 2018 through April 2019. (*Id.* ¶¶ 7, 14, 49 (emphasis in original).) And to do so, Virtu traders only needed to use a widely known and frequently shared username and password, "viewonly" and "viewonly," respectively. (*Id.* ¶ 7.) Indeed, after Virtu traders complained about too many people logging into the FS Database at the same time, in November 2018, VAM increased by 66% the number of users who could simultaneously access the database. (*Id.* ¶ 12.) Virtu

"allow[ed] unrestricted access to [the sensitive] information with the aforementioned generic login credentials, until *at least April 2019*." (*See id.* ¶ 84 (emphasis in original).)

While Virtu traders had access to sensitive client information, which Plaintiff alleges they could use to engage in a variety of trading abuses (the "FS Database Issue"), (*id.* ¶ 6), on November 7, 2018, Virtu announced that it was acquiring Investment Technology Group, Inc. ("ITG"), another trade execution company like KCG, (*id.* ¶ 8.) However, on the same day Virtu made this announcement, the SEC issued an order against ITG, finding that between 2010 and 2017, ITG "failed to establish adequate safeguards and procedures to appropriately limit access to systems containing . . . confidential trading information." (*Id.* ¶ 9 (emphasis omitted).)[3] This order "raised concerns in the market about Virtu's ability to protect the sensitive trading information generated and/or maintained" in the FS Database. (*Id.* ¶ 10.) To respond to these concerns, Defendant Cifu went on a campaign to address Virtu's protection of client information at investor conferences, (*see id.* ¶¶ 10, 119, 137), interviews for newspaper articles, (*see id.* ¶¶ 113, 117), and earnings calls, (*see id.* ¶¶ 102, 107, 109, 123, 133.) Likewise, both Cifu and the remaining Individual Defendants, throughout the Class Period, signed Virtu's quarterly and annual reports filed with the SEC, discussing some of the risks involving protection of confidential information, (*see id.* ¶¶ 111, 129, 135, 139, 140, 144, 147, 150), while Virtu itself made and drafted presentations, (*see id.* ¶¶ 107, 131), issued a press release, (*see id.* ¶ 121), and a letter to clients, (*see id.* ¶ 126), also discussing protecting client information. Plaintiff alleges that Defendants made these representations even though they either

---

[3] ITG and its affiliate eventually consented to the entry of the SEC's Order finding that they violated the antifraud provisions of the federal securities laws and agreed to pay a civil penalty of $12 million to settle the charges. (Compl. ¶ 66.) Neither ITG nor its affiliate admitted any guilt. (*Id.*)

knew about the FS Database Issue or recklessly disregarded it. (*See id.* ¶¶ 159-83.)

Finally, on February 17, 2023, Virtu disclosed that it "ha[d] been responding to requests for information from the [SEC] in connection with an investigation of aspects of [Virtu's] information access barriers." (2022 Form 10-K (Dkt. 44-9) at ECF p. 6; Compl. ¶¶ 14, 142.) Following this disclosure and other information gradually revealed to investors through a series of disclosures about the SEC's investigation, Virtu's stock price dropped to "just over $17 per share, more than *54%* below the Class Period high." (Compl. ¶ 14 (emphasis in original).) This allegedly caused Plaintiff "hundreds of millions of dollars of damages." (*Id.* ¶¶ 14-15.) The putative class action followed.

### B. Procedural History

Lindsay Hiebert, who purchased Virtu Shares between March 1, 2019 and April 28, 2023, filed the original putative Class Action Complaint on May 19, 2023. (*See* Original Compl. (Dkt. 1) ¶¶ 1, 14.) On July 18, 2023, Fred Farkash, individually and on behalf of the Clay Trust ("Movant"), moved this court, pursuant to 15 U.S.C. § 78u-4(a)(3)(B), for an order (1) appointing Movant as Lead Plaintiff and (2) approving Levi & Korsinsky, LLP as Lead Counsel for the proposed class. (Farkash's Not. of Mot. for Appointment as Lead Pl. (Dkt. 15) at 1.) In addition to Birmingham, Plaintiffs Bruce Gatward and Lindsay Hiebert filed similar motions. (*See* Gatward's Not. of Mot. for Appointment as Lead Pl. (Dkt. 18); *see also* Birmingham's Not. of Mot. for Appointment as Lead Pl. (Dkt. 20); Hiebert's Not. of Mot. for Appointment as Lead Pl. (Dkt. 23).) On July 19, 2023, this court referred the competing motions to Magistrate Judge Peggy Kuo for a decision pursuant to 28 U.S.C. § 636(b)(1)(A) and Rule 72(a). (*See* Order Dated 07/19/2023.)

Eventually, however, Plaintiffs Farkash, Gatward, and Hiebert withdrew their respective motions because they no longer believed that they possessed the "largest financial interest in the relief sought by the class" as required by the PSLRA, 15 U.S.C. § 78u-4(a)(3)(B)(iii)(I)(bb). (Farkash's Not. of Withdrawal (Dkt. 26) at 2; Gatward's Not. of Withdrawal (Dkt. 24) at 1; Hiebert's Not. of Withdrawal (Dkt. 25) at 1.) And while Birmingham's motion for appointment as Lead Plaintiff was pending, on October 31, 2023, Birmingham initiated a separate putative class action against the same Defendants. *See City of Birmingham Ret. & Relief Sys. v. Virtu Fin., Inc. et al.*, No. 23-CV-8123 (NGG) (PK) (E.D.N.Y. 2023) (the "Birmingham Action"). Thereafter, on November 3, 2023, in this case, Birmingham filed an unopposed motion to consolidate the instant action with the Birmingham Action pursuant to Rule 42(a). (*See* Birmingham's Not. of Unopposed Mot. for Consol. (Dkt. 32).) Again, on November 8, 2023, this court referred the motion for consolidation to Judge Kuo for a decision pursuant to 28 U.S.C. § 636(b)(1)(A) and Rule 72(a). (*See* Order Dated 11/08/2023.)

On November 21, 2023, Judge Kuo consolidated the two actions and appointed Birmingham as Lead Plaintiff and Robbins Geller Rudman & Dowd LLP as Lead Counsel. (*See* Mem. & Order Granting Birmingham's Mot. to Consolidate & Mot. for Appointment as Lead Pl. (Dkt. 34) at 2, 11.) Then, Birmingham filed the operative Consolidated Complaint on January 22, 2024. (*See generally* Compl.) The Consolidated Complaint alleges that Defendants made materially false and misleading statements in violation of Sections 10(b) and 20(a) of the Exchange Act, as amended by the PSLRA, and SEC Rule 10b-5 promulgated thereunder. (Compl. ¶¶ 206-12.) After the parties fully briefed Defendants' instant motion to dismiss, they also appeared before this court for oral argument. (*See* Min. Entry Dated 09/13/2024.)

## II. LEGAL STANDARDS

### A. Rule 12(b)(6) Standard

Rule 12(b)(6) provides for dismissal of a complaint for "failure to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).[4] The standard is met "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A complaint should be dismissed if the plaintiff has not offered factual allegations sufficient to render the claims facially plausible. *See id.*; *see also ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 93, 98 (2d Cir. 2007) ("*ATSI*") (affirming district court's judgment dismissing plaintiff's securities action "alleg[ing] that the defendants made misrepresentations in connection with securities transactions . . . in violation of § 10(b) of the Securities Exchange Act of 1934"). However, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555; *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 166 (2d Cir. 2000) (holding that the complaint adequately alleged material misrepresentations made in defendants' Form 10-Qs). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556).

"[F]aced with a Rule 12(b)(6) motion to dismiss a § 10(b) action, courts must, as with any motion to dismiss for failure to plead a

---

[4] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

claim on which relief can be granted, accept all factual allegations in the complaint as true." *See Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007); *see also In re Fannie Mae 2008 Sec. Litig.*, 742 F. Supp. 2d 382, 394 (S.D.N.Y. 2010) (recognizing that the court must draw all reasonable inferences in plaintiff's favor). And though "a court must accept as true all of the allegations contained in a complaint[,] . . . [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. To that end, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679. And "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.*

### B. Rule 9(b) & PSLRA Heightened Pleading Standards

Private securities fraud actions are subject to the heightened pleading requirements of Rule 9(b) and the PSLRA. *See* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."); *see also Anschutz Corp. v. Merrill Lynch & Co.*, 690 F.3d 98, 108 (2d Cir. 2012) (recognizing that "[a] complaint alleging securities fraud must also satisfy the heightened pleading requirements" of Rule 9(b) and the PSLRA). As such, when plaintiff alleges a false statement or omission, "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1). Additionally, plaintiffs must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). Likewise, the Second Circuit "has read Rule 9(b) to

require that a complaint (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004). But the Second Circuit has also instructed the district courts to "be careful not to mistake heightened pleading standards for impossible ones." *In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 161 (2d Cir. 2021) ("*Synchrony*"); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, 19 F.4th 145, 150 (2d Cir. 2021) (same).

## III. DISCUSSION

### A. Primary Liability: Section 10(b) of the Exchange Act and Rule 10b-5(b)

Plaintiff adequately pleads facts evidencing that Defendants made materially false and misleading statements with scienter as to all but one category of statements. Section 10(b) of the Exchange Act provides, in relevant part, that it is unlawful "[t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations" that the SEC "may prescribe as necessary or appropriate in the public interest or for the protection of investors." 15 U.S.C. § 78j(b). Likewise, SEC Rule 10b-5 prohibits "mak[ing] any untrue statement of a material fact or . . . omit[ting] to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading[.]" 17 C.F.R. § 240.10b-5(b); *Press v. Chem. Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir. 1999) (noting that Rule 10b-5 "more specifically delineates what constitutes a manipulative or deceptive device or contrivance"). Put differently, to state a claim under Section 10(b) and Rule 10b-5(b), Plaintiff must plausibly

allege: "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance on the misrepresentation or omission, (5) economic loss, and (6) loss causation." *Noto v. 22nd Century Grp.*, 35 F.4th 95, 102-03 (2d Cir. 2022) (adding that "[t]he first two elements must be pled with heightened specificity pursuant to" the PSLRA and Rule 9(b)).[5] Now, the court turns to the first two elements of Plaintiff's Section 10(b) claim.

### 1. Alleged Material Misrepresentations and Omissions

Defendants have identified the following five categories of material misrepresentations mentioned in the Complaint: (1) statements about Virtu's commitment to transparency to safeguarding client information; (2) descriptions of Virtu's policies and procedures designed to protect confidentiality; (3) statements about Virtu's plans to enhance its safeguards post-ITG acquisition; (4) Virtu's risk disclosures about any failure to protect confidential information; and (5) statements made post-April 2019, after the FS Database Issue was resolved. (Mot. at 11.) Although Plaintiff does not agree with Defendants' "cursory categorization" of these statements "because it obscures the context in which these statements were made," Plaintiff nevertheless "endeavors to address the statements by category, to the extent possible" to aid the court's examination. (Pl.'s Opp. at 10 n.4.)

The court finds that Plaintiff adequately alleges that Defendants[6] made material misrepresentations with respect to all the statements contained in Categories 1, 2, 4, and 5; but fails to

---

[5] Defendants challenge the adequacy of the Consolidated Complaint with respect to the first two elements only. As such, the court does not discuss the remaining elements.

[6] Count I of the Complaint alleges Section 10(b) and SEC Rule 10b-5 violations against all Defendants. (Compl. ¶¶ 206-09.) While the Individual

adequately plead enough facts showing that the Category 3 statements were materially false and misleading when made. "The test for whether a statement is materially misleading under Section 10(b) . . . is whether the defendants' representations, taken together and in context, would have misled a reasonable investor." *Rombach*, 355 F.3d at 172 n.7; *see also In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 250 (2d Cir. 2016) (emphasizing that the inquiry is context-dependent). Plaintiff must also plead that "[a]n untrue statement of *fact* . . . is one that was false *at the time it was made*." *City of Westland Police and Fire Ret. Sys. v. MetLife, Inc.*, 129 F. Supp. 3d 48, 67 (S.D.N.Y. 2015) (emphases in original); *Novak*, 216 F.3d at 309 (identifying several limitations on the scope of liability in securities fraud actions, including the Second Circuit's "refus[al] to allow plaintiffs to proceed with allegations of fraud by hindsight"); *In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d 457, 465 (E.D.N.Y. 2020) ("[A] plaintiff must plead facts that show that the defendant made a statement of material fact that was untrue at the time it was made."). Moreover, to adequately allege a material misstatement, the complaint must "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1); *see also Novak*, 216 F.3d at 307 (same).

---

Defendants made most, if not all, of the challenged statements, "[a] corporation can only act through its employees and agents," as such, "an allegation that a particular agent may have [made a material misrepresentation or omission] will not immunize the principals from liability for a knowing deception." *Suez Equity Invs., L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 101 (2d Cir. 2001); *see also Floyd v. Liechtung*, No. 10-CV-4254 (PAC), 2013 WL 1195114, at *4 (S.D.N.Y. Mar. 25, 2013) ("A plaintiff may allege that a corporate entity violated Section 10(b) based on the misrepresentations of its agents or employees.").

"To be 'material' within the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to reasonably rely on that statement as a guarantee of some concrete fact or outcome." *City of Pontiac Policemen's and Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014). "The materiality of a misleading statement or omission for § 10(b) purposes is a mixed question of law and fact[.]" *Operating Loc. 649 Annuity Tr. Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010); *Basic Inc. v. Levinson*, 485 U.S. 224, 236 (1988) (acknowledging that materiality in securities actions is "inherently fact-specific"). An omitted fact is material if "there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Basic Inc.*, 485 U.S. at 231-32; *United States v. Gramins*, 939 F.3d 429, 445 (2d Cir. 2019) (applying same standard to misstatements). It follows then that a complaint may not be dismissed "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) ("*JP Morgan Chase*").

Mindful of the context in which the Defendants made the relevant statements, the court discusses each category of statements in turn.

> a. *Category 1: Statements about Virtu's commitment to transparency and safeguarding client information*

Plaintiff adequately alleges that the Category 1 statements are actionable material misrepresentations and not mere puffery or corporate optimism. This category includes statements concerning Virtu's commitment to transparency and safeguarding client information. For example, in relevant part, the Consolidated

Complaint alleges that on the first day of the Class Period, during the earnings call for the third quarter of 2018 ("2018 Q3 Call"), "Defendants Cifu and Molluso gave a presentation to investors about the impending ITG acquisition," during which Defendant Cifu stated as follows:

> Turning to Slide 6. ***You see the importance we place on protecting client information in all aspects of our business. We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have.*** . . . Clients have entrusted their most sensitive confidential information to ITG in POSIT, in Triton, in the analytics segment. Rest assured that we will be vigilant in protecting that information. We will build on the existing safeguards ITG has employed and ensure that going forward, there continues to be physical and logical separation, monitoring, testing and training.
>
> Let's discuss the analytics or POSIT Alert businesses, for example. They will be located in separate physical spaces. Access will be restricted by keycard to only authorized [e]nd personnel and monitor. Technology controls will restrict logical access. Personnel will be trained to ensure adherence.

(Compl. ¶ 102 (challenged portion in italics); *see also* 2018 Q3 Call Tr. (Dkt. 44-14) at ECF p. 6.) Plaintiff alleges that the italicized statements were materially false and misleading "because they misrepresented and failed to disclose that, at the time this statement was made, the confidential post-trade information of VAM's execution services customers was ***not*** being protected, as it was readily accessible to essentially everyone" at Virtu. (Compl. ¶ 103 (emphasis in original); *see also id.* ¶ 106 (alleging that Defendants "misrepresented and failed to disclose that Virtu's failure to protect confidential client trading information in the FS Database exposed Virtu to significant financial, regulatory, and

litigation risks").) Likewise, the Consolidated Complaint also alleges that during the earnings call for the first quarter of 2019 ("2019 Q1 Call"), held on May 3, 2019, Defendant Cifu made the following statements in his prepared remarks:

> Also, as you may recall, when the deal was announced, **we promised to provide unparalleled transparency into how we protect client information**. I'm pleased to report that on April 9 and April 30, we held our first client information security forums in New York and London, respectively. We had over 100 clients and prospective clients attend in person or participate via telephone and Webex. These forums are one element of our continuous commitment to our clients, and we look forward to similar engagements in other regions.

(Compl. ¶ 133 (challenged portion in italics); *see also* 2019 Q1 Call Tr. (Dkt. 44-17) at ECF p. 6.) Again, Plaintiff alleges that the italicized statements were materially false and misleading "because speaking about this specific issue created a duty to disclose that Virtu's proprietary traders, among others, had unrestricted access into execution services customers' material non-public post-trade information for a period of *at least* 15 months." (Compl. ¶ 134 (emphasis in original); Pl.'s Opp. at 11 (adding that "Defendants made these statements in the context of addressing widespread concerns about Virtu's ability to protect client trading information within its business lines – in particular, from its own proprietary traders").) The remaining Category 1 statements include similar sentiments and were made during

other earnings calls,[7] at an investor conference,[8] and in interviews later published in news articles.[9]

---

[7] On November 7, 2018, during the 2018 Q3 Call, responding to a question about the concerns regarding Virtu's acquisition of ITG, Defendant Cifu, in relevant part, stated as follows: "I think the issue in 2015 was that they were engaged in prop trading and candidly hadn't been upfront with their clients. That's really ultimately what the issue is and Virtu, and it starts with me, is all about transparency and being very upfront and direct with our - with any counterparty, not just a customer, any counterparty that we deal with." (2018 Q3 Call Tr. ECF p. 14; *see also* Compl. ¶ 109.) Similarly, on February 7, 2019, during the earnings call for the fourth quarter of 2018 ("2018 Q4 Call"), Defendant Cifu stated, in relevant part, the following about the ITG customers: "We've been out there, we've talked to dozens and dozens of ITG customers, both here in Canada and in Europe, and I think this is obviously the initial concern around we're adding an additional conflict because ITG, historically has been an agency business. And we're -- we get that, we are very sensitive to that, and we're very direct and transparent about that. *I think they like the transparency and the directness of Virtu. We have no other way of conducting business. There's no gray area at Virtu.*" (Compl. ¶ 123 (challenged portion in italics); *see also* 2018 Q4 Call Tr. (Dkt. 44-16) at ECF p. 10.)

[8] On June 5, 2019, at the Sandler O'Neill Global Exchange and Brokerage Conference, representing Virtu, Defendant Cifu stated, in relevant part, the following in response to a question about potential "revenue dis-synergies" from the ITG acquisition: "[T]he large asset managers in the fashion forward, if you will, hedge funds and others and quant firms that kind of understand what we are and recognize. We didn't buy ITG to steal customer information. It's kind of preposterous and borderline insulting to suggest we would do that. We would never do that." (Conference Presentation Tr. (Dkt. 44-18) at ECF p. 9; *see also* Compl. ¶ 137.)

[9] A Bloomberg article regarding Virtu's acquisition of ITG, published on November 14, 2018, quoted the following statements, in relevant part, Defendant Cifu made during an interview: *"If you're upfront about things and transparent about how you do things, not only does it eliminate the bogeyman factor, it's the best sales pitch we have."* (Compl. ¶ 113; Bloomberg Article (Dkt. 44-19) at ECF p. 2.) The article also added the following: *"Virtu's proprietary traders . . . won't have the key cards needed to enter the workspace of the division that has outside clients, Cifu said. Software will block proprietary traders from viewing client*

Defendants argue that these statements are not materially false or misleading for two independent reasons: (1) they are not adequately alleged to be false or misleading and (2) they are inactionable statements of corporate optimism. (Mot. at 12-13.)

The Second Circuit has recognized that "expressions of puffery and corporate optimism do not give rise to securities violations." *Rombach*, 355 F.3d at 174 (affirming the district court's assessment that plaintiffs "fail[ed] to allege with particularity any actual falsity in defendants' press releases"). That is because "[u]p to a point, companies must be permitted to operate with a hopeful outlook[.]" *Id.* To ascertain whether the challenged statements are "determinate, verifiable statements," as opposed to puffery, courts look for an "objective, black-and-white standard." *See In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023) (holding that the statements were not actionable where "the Investors [could not] point to any objective, black-and-white standard by which to verify" them); *see also Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (explaining, as a hypothetical, that it "would

---

*data. An outside auditor will vet the safeguards.* And Cifu mentioned a few hypothetical high-tech solutions that the governance committee could ask Virtu to deploy, like *biometric scanners or facial-recognition software* for unlocking doors." (Compl. ¶ 113; *see also* Bloomberg Article at ECF p. 2.) Similarly, on the same day, a Business Insider article quoted the following statements, in relevant part, Defendant Cifu made: "*I can't overstate how important it is to me personally that client information is properly protected and, to that end, we're talking to the buy-side about establishing a client data governance committee made up of clients from all over the globe to assist in the oversight, design, implementation, and integrity of logical and physical barriers. . . .* The committee concept is an extension of our history of always pushing for more transparency and using technology to deliver more transparency. *This is a good thing – no other firm gives this much transparency to its clients into how their information is protected.*" (Compl. ¶ 117; *see also* Business Insider Article (Dkt. 44-20) ECF pp. 5-6.)

be an untrue statement of fact" if the CEO of a television company stated that "the TVs we manufacture have the highest resolution available on the market" while "a competitor had introduced a higher resolution TV a month before—even assuming the CEO had not yet learned of the new product"). And "the context in which [the statement] is made" is part of the inquiry. *See In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015) ("While some of the alleged statements, viewed in isolation, may be mere puffery, nonetheless, when . . . the statements were made repeatedly in an effort to reassure the investing public about the Company's integrity, a reasonable investor could rely on them as reflective of the true state of affairs at the Company."); *see also In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 660 (S.D.N.Y. 2017) (concluding that certain statements were actionable because "they were made in an effort to reassure the investing public about the Company's integrity . . . during a time of concern").

As an example, broad statements about a company's "remarkable progress towards [its] stated goal" or that the company is "confident about and prepared for what lays ahead" are non-actionable puffery. *See In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757-58, 766 (S.D.N.Y. 2018) (dismissing the amended complaint in its entirety, in part because plaintiffs failed to allege false statements); *see also Diabat v. Credit Suisse Grp. AG*, Nos. 23-CV-5874 (CM), 23-CV-6023 (CM), & 23-CV-6039 (CM), 2024 WL 4252502, at *106-07 (S.D.N.Y. Sept. 19, 2024) (concluding that statements made during a CNBC interview were inactionable because "the corporate puffery rule applies to loose optimism about both a company's current state of affairs and its future prospects"). Under the Second Circuit precedent, "[i]t is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable 'puffery,'" because "they are too general to cause a reasonable investor to rely upon them." *City of Pontiac*, 752 F.3d

at 183; *see also In re Liberty Tax, Inc. Sec. Litig.*, 435 F. Supp. 3d at 468 (concluding that "periodic, comprehensive reports" on the company's well-being were non-actionable puffery, in part because they "were not made to quell a controversy"). "This is particularly true where . . . qualifiers such as 'aims to,' 'wants to,' and 'should,'" accompany the challenged statements, making them "explicitly aspirational." *City of Pontiac*, 752 F.3d at 183 (holding that the generality of the statements "is what prevents them from rising to the level of materiality required to form the basis for assessing a potential investment").

But "[w]hile statements containing simple economic projections, expressions of optimism, and other puffery are insufficient" to plead a material misrepresentation of fact, defendants may face liability where "the complaint alleges that the defendants did more than just offer rosy predictions." *Novak*, 216 F.3d at 315 (concluding that the statements "were plainly false and misleading" because "the defendants stated that the inventory situation was 'in good shape' or 'under control' while they allegedly knew that the contrary was true"); *see also In re Moody's Corp. Sec. Litig.*, 599 F. Supp. 2d 493, 509 (S.D.N.Y. 2009) (concluding that challenged statements are not puffery where the company "does not couch [its] assertion in the language of optimisms or hope," but rather as "the 'raw materials' of its business, its 'operating, financial and regulatory strategies,' and the 'watchwords by which stakeholders' judged it"). Similarly, "it is clearly a material misrepresentation" for a financial services firm to boast about the "high quality" of its assets when those assets are "entirely worthless." *See Ark. Tchr. Ret. Sys. v. Bankrate, Inc.*, 18 F. Supp. 3d 482, 485 (S.D.N.Y. 2014). And statements made on a conference call, in investor presentations, or in response to direct questions by analysts are materially misleading when "made in an effort to soften the significant financial impact" of a development and "to reassure investors." *In re Dentsply Sirona, Inc. Sec. Litig.*, 665 F.

Supp. 3d 255, 284 (E.D.N.Y. 2023) (rejecting the puffery argument as a defense).

As a preliminary matter, with respect to each Category 1 statement, the Consolidated Complaint adequately "(1) specif[ies] the statements that the plaintiff contends were fraudulent, (2) identif[ies] the speaker, (3) state[s] where and when the statements were made, and (4) explain[s] why the statements were fraudulent." *Rombach*, 355 F.3d at 170; *see also Synchrony*, 988 F.3d at 167 (same). (*See, e.g.*, Compl. ¶ 102 (highlighting the challenged portion of the statements made by Defendant Cifu during the 2018 Q3 Call on November 7, 2018).)[10] Plaintiff also offers sufficient factual allegations supporting its claim that the Category 1 statements are materially false and misleading.

First, although "expressions of puffery and corporate optimism do not give rise to securities violations," *Rombach*, 355 F.3d at 174, here, Plaintiff alleges that Defendant Cifu "did more than just offer rosy predictions," *Novak*, 216 F.3d at 315. Rather than providing "simple economic projections, expressions of optimism, and other puffery," *see Novak*, 216 F.3d at 315, Defendant Cifu made certain statements set forth in Category 1 while addressing the market's concerns about Virtu's ability to protect client information. And, in doing so, Defendant Cifu "d[id] not couch [his] assertion in the language of optimism or hope," but as statements of fact, describing the standards by which Virtu operated. *See In re Moody's*, 599 F. Supp. 2d at 509 (concluding that statements about "independence as a cornerstone" of the defendant's business were not mere puffery). For example, the statements that "*no other firm* gives this much transparency to its clients into how their information is protected," (Compl. ¶ 117

---

[10] The court also finds that the Consolidated Complaint does the same with respect to each statement within the remaining categories of statements. (*See, e.g.*, Compl. ¶¶ 126, 127.)

(emphasis altered)), and that Virtu "ha[s] no other way of conducting business[,] [t]here's *no gray area* at Virtu," (Compl. ¶ 123 (emphasis altered)), exemplify Virtu's commitment to protecting client information in the face of real concerns about data protection. *See In re Moody's,* 599 F. Supp. 2d at 509 (rejecting that the statements were mere puffery because the defendant based its operations and strategy on "independence and a commitment to its ratings system").

Second, while some of the Category 1 statements may first appear to be mere puffery, (*see, e.g.,* Compl. ¶ 117 ("I can't overstate how important it is to me personally that client information is properly protected.") (emphasis omitted)), Plaintiff adequately alleges that, "taken together and in context," they were all materially misleading. *Rombach,* 355 F.3d at 172 n.7. The Consolidated Complaint emphasizes that Defendant Cifu "went on a campaign to proactively address Virtu's protection of [sensitive trading] information" in order "[t]o quell th[e] concerns." (Compl. ¶ 10.) In particular, the concerns related to "Virtu's proprietary traders being able to access its clients' 'end of the day trade file.'" (*Id.* ¶ 76.) The context in which these statements were made is relevant because "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task." *Iqbal,* 556 U.S. at 679; *see also In re Vivendi,* 838 F.3d at 250 ("The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself."); *In re Petrobras,* 116 F. Supp. 3d at 381 (noting that "the context in which [the statement] is made" is part of the inquiry).

The decisions in *In re Petrobras* and *In re Banco Bradesco* are particularly instructive here. In *In re Petrobras,* the court dismissed the defendant's arguments that certain statements were mere puffery. Rather, because "the statements were made repeatedly in an effort to reassure the investing public about the Company's

integrity," the court found it persuasive that "a reasonable investor could rely on them as reflective of the true state of affairs at the Company." *In re Petrobras*, 116 F. Supp. 3d at 381. The company's integrity was an important topic of discussion there because during an ongoing corruption scheme the company made "statements regarding the effectiveness of its internal controls[.]" *Id.* at 380. Likewise, here, Defendant Cifu's statements about Virtu's ability to protect its client information was not just puffery considering the ongoing FS Database Issue and investors' concerns about Virtu's acquisition of ITG—a company that had misused its client information.

Similarly, the court in *In re Banco Bradesco* rejected the defendants' arguments that some of their statements were inactionable puffery. Drawing comparisons to the reasoning of *In re Petrobras* and guided by Supreme Court precedent, the court decided that some of the allegedly misleading statements were actionable. *In re Banco Bradesco*, 277 F. Supp. 3d 600, 660 (reasoning that the statements at issue "were made in an effort to reassure the investing public about the Company's integrity . . . during a time of concern," and, therefore, "a reasonable investor could rely on them as reflective of the true state of affairs at the Company"); *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 450 (1976) ("The determination [of materiality] requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact."). Like in *In re Banco Bradesco*, Defendant Cifu made the Category 1 statements during a time of concern—when the market and investors were worried about Virtu's ability to protect client information. Given the context, these statements were not mere puffery or statements of corporate optimism. Instead, they were statements "made repeatedly in an effort to reassure the

investing public about [Virtu's] integrity," and "a reasonable investor could rely on them as reflective of the true state of affairs at [Virtu]." *See In re Petrobras*, 116 F. Supp. 3d at 381.

Third, it is true that the Second Circuit considers "general statements about reputation, integrity, and compliance with ethical norms" inactionable pufferies because "they are too general to cause a reasonable investor to rely upon them." *See City of Pontiac*, 752 F.3d at 183. But none of Defendant Cifu's Category 1 statements contained "explicitly aspirational" language like "'aims to,' 'wants to,' and 'should,'" such that these statements were nothing more than corporate optimism. *See id.* To the contrary, the statements discussed Virtu's then-existing practices. (*See, e.g.*, Compl. ¶ 123 (discussing how Virtu "ha[s] no other way of conducting business" and "[t]here's no gray area at Virtu") (emphases altered).) And instead of making general statements about "periodic, comprehensive reports," Defendant Cifu made very specific statements about Virtu's obligation to protect client information to "quell a controversy." *See In re Liberty Tax, Inc.*, 435 F. Supp. 3d at 468. (*See also* Compl. ¶ 102 ("You see the importance we *place* on protecting client information . . . [and] [w]e *take* this obligation seriously. . .") (emphases added).) Plaintiff sufficiently alleges that these statements are actionable.

In addition to claiming that the Category 1 statements are mere puffery, Defendants also argue that these statements are not adequately alleged to be false because they "were made in the context of addressing pre-acquisition misuse by ITG of confidential client information." (Mot. at 12.) Although Defendants claim that "Plaintiff ignores Defendants' falsity argument," (Reply at 3), Plaintiff indeed addresses that argument in its response brief. (*See* Pl.'s Opp. at 9-10.) As the court already explained above, and Plaintiff correctly points out, Defendant Cifu made the Category 1 statements "[a]gainst th[e] backdrop" of the FS Database

Issue in an attempt to "tout[] Virtu's protection of client trading data." (*See* Pl.'s Opp. at 9.) Defendants attempt to distort Plaintiff's argument by trying to distinguish between the purported fraud concerning the FS Database Issue and the one concerning ITG's pre-acquisition failure to protect confidential information. (Reply at 2; Oral Arg. Tr. (Dkt. 52) 20:3-7 ("[E]ven if there was something to this quelling argument, it doesn't make sense here because the market wasn't worried about the FS Database. That was the existing business. The market was asking questions about the ITG acquisition.").) The Consolidated Complaint alleges that the challenged statements were materially false because of the FS Database Issue, (*see* Compl. ¶¶ 102-52), and Defendant Cifu made the Category 1 statements "in the context of addressing widespread concerns about Virtu's ability to protect client trading information within its business lines," (Pl.'s Opp. at 11.) Plaintiff alleges that Defendant Cifu was addressing a more general concern—Virtu's ability to protect client information—and not a past issue about ITG as Defendants would have the court believe. (*See* Oral Arg. Tr. 51:25-52:3 ("[F]or example, defendant even talks about the importance we place on client information -- in protecting client information in all aspects of our business. Not just ITG.").) Accepting Plaintiff's allegations as true, as this court must, Defendant Cifu's "representations, taken together and in context, would have misled a reasonable investor." *Rombach*, 355 F.3d at 172 n.7.

Therefore, the court concludes that Plaintiff successfully pleads actionable misstatements of fact with respect to all the statements in Category 1.

> b. *Category 2: Descriptions of Virtu's policies and procedures designed to protect confidentiality*

Like the Category 1 statements, Plaintiff also adequately alleges that the Category 2 statements are actionable material misrepresentations. Statements in this category include those describing

Virtu's policies and procedures designed to protect client confidentiality. For instance, Plaintiff alleges that during the 2018 Q3 Call, Defendant Cifu made the following materially misleading statements:

> Turning to Slide 6. . . . *Virtu has established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind. These safeguards include physical separation, logical access control and entitlement reviews.* Clients have entrusted their most sensitive confidential information to ITG in POSIT, in Triton, in the analytics segment. Rest assured that we will be vigilant in protecting that information. We will build on the existing safeguards ITG has employed and ensure that going forward, there continues to be physical and logical separation, monitoring, testing and training.

(Compl. ¶ 102 (challenged portion in italics); *see also* 2018 Q3 Call Tr. at ECF p. 6).) Again, Plaintiff alleges that the italicized statements were materially false and misleading "because they misrepresented and failed to disclose that these safeguards were not currently in place to segregate and protect the confidential post-trade client information in connection with the agency brokerage business that Virtu was already operating." (Compl. ¶ 104; *see also id.* ¶ 106 (alleging that Defendants "misrepresented and failed to disclose that Virtu's failure to protect confidential client trading information in the FS Database exposed Virtu to significant financial, regulatory, and litigation risks")).) Similarly, Plaintiff also alleges that on March 1, 2019, Virtu posted a letter on its website from Defendant Cifu to Virtu's clients, which announced the completion of the ITG acquisition, and stated, in relevant part: *"Prior to merging, both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data."* (*Id.* ¶ 126 (emphasis in original).) According

to Plaintiff, this statement was materially false and misleading because the "'procedures to segregate and protect sensitive client data' Virtu claims to have had in place prior to acquiring ITG did *not* 'segregate and protect' its execution customers' post-trade information in the FS Database, which Defendants knew, or recklessly disregarded." (*Id.* ¶ 127.)

Next, the Consolidated Complaint also adds that Virtu's Form 8-K—filed with the SEC on March 13, 2019—included a slide as part of a presentation deck, stating the following: "Virtu has established policies and procedures designed to safeguard sensitive client information," such as "[p]hysical and logical safeguards of client information." (*Id.* ¶ 131; *see also* Form 8-K Dated March 13, 2019 (Dkt. 44-7) at ECF p. 23.) Like the above statements, this statement was also materially false and misleading, the Consolidated Complaint alleges, because "sensitive post-trade client information was accessible to essentially everyone at Virtu, including Virtu's proprietary traders, through logging into the FS Database via widely known and frequently shared generic usernames and passwords[.]" (Compl. ¶ 132.) In turn, Defendants argue that these statements are accurate, non-misleading statements about internal controls, and Plaintiff fails to adequately allege that the statements were false. (Mot. at 14-16; Reply at 3 (arguing that "Defendants' Motion demonstrated that the Complaint fails to plead falsity for Virtu's Category 2 statements").)

General statements about compliance policies, procedures, and mechanisms are not actionable in securities actions. *See Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 103-04 (2d Cir. 2021) (holding that the bank's vague statements in its Corporate Responsibility Reports that it "condemns . . . money laundering" and "takes the steps necessary to comply with internationally recognised standards, including Know Your Customer procedures," were inactionable); *see also*

*Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019) (holding that "a reasonable investor would not rely on the [company's] Form 10-K statements as representations of satisfactory compliance," where such statements are lacking in detail); *Arora v. HDFC Bank Ltd.*, 671 F. Supp. 3d 305, 313 (E.D.N.Y. 2023) (concluding that the defendant's "statements about its Code of Ethics, whistleblower policy, Fraud Monitoring Committee, and internal audit department are the sort of vague statements that the Second Circuit and district courts have held to be 'too general' for a reasonable investor to rely on"). However, "[a]ssertions of satisfactory regulatory compliance can be materially misleading if the descriptions of compliance efforts are detailed and specific." *Plumber & Steamfitters Loc. 773 Pension Fund*, 11 F.4th at 103. For example, in *Meyer v. Jinkosolar Holdings Co.*, the Second Circuit held that the defendant's detailed statements in SEC filings about its environmental compliance efforts were materially misleading because "the description of pollution-preventing equipment and 24-hour monitoring teams gave comfort to investors that reasonably effective steps were being taken to comply with applicable environmental regulations." 761 F.3d 245, 251-52 (2d Cir. 2014).

Notably, the Second Circuit's decision in *Cigna* did not change the landscape of this Circuit's puffery analysis. *See In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 229 (S.D.N.Y. 2019) ("Defendants argue . . . that *Cigna* wrought a sea change in the doctrine of puffery. . . . Defendants are wrong – both about the law and about the facts of *Cigna*."). Rather, it "expressly stated that context bears on materiality." *Id.* at 230. As such, "it does not follow from *Cigna* that a securities fraud claim can *never* rest on statements contained in a public company's code of conduct" or other regulatory filings or public statements. *Id.* (emphasis in original). Instead, "[m]ateriality depends upon a number of context-specific factors, including specificity, emphasis, and whether certain statements are designed to distinguish the company in

some fashion that is meaningful to the investing public." *Id.* at 230-31 (finding that the defendant's statements were not truthful because they "sought to reassure the investing public that [the company] did not . . . have a toxic workplace" when it was "fac[ing] . . . a credible accusation (by way of another lawsuit) that [the company] suffered from rampant sexual harassment").

As the court noted above, in its discussion of the Category 1 statements, the context—the ongoing FS Database Issue and concerns surrounding Virtu's acquisition of ITG—in which the Defendants made the relevant statements is extremely important here. Plaintiff has it right; Defendants' Category 2 statements are not isolated remarks about their policies and procedures. (*See* Pl.'s Opp. at 16-17). Defendants made these statements in the context of Virtu's merger with ITG to provide assurances to potential, as well as existing clients, and investors that Virtu had the necessary policies and procedures in place to protect client information. (*See* Compl. ¶ 102 (discussing Virtu's "policies and procedures . . . that are designed to safeguard sensitive client information" on the same day Virtu announced its plans to acquire ITG (emphasis omitted)); *see also id.* ¶ 126 (describing Virtu and ITG's "procedures to segregate and protect sensitive client data" in a letter to Virtu's clients, announcing the completion of the ITG acquisition (emphasis omitted)); *id.* ¶ 131 (including a slide from a presentation deck as an exhibit in a Form 8-K filing that Virtu "planned to use at the FIA International Futures Industry Conference" and "from time to time thereafter in connection with presentations to investors . . . clients and . . . industry analysts").)

Therefore, given the context, Plaintiff adequately alleges that these statements are materially misleading. *See In re Signet Jewelers*, 389 F. Supp. 3d at 230-31 (reminding that "context matters," because any conclusion to the contrary "would plainly violate the Supreme Court's seminal decisions in *TSC Industries*

and *Basic* . . . which hold that materiality turns on what a reasonable investor would consider important . . . in light of the total mix of information made available by the company"). At the same time Defendants made the Category 2 statements about the existing policies and procedures that were supposed to protect sensitive client information by creating separation between Virtu's lines of business, the FS Database Issue was well underway. While Defendants correctly point out that "Virtu never warranted that its policies and procedures would protect against any and all oversights," (Mot. at 14), that is not what Plaintiff alleges, (*see* Pl.'s Opp. at 17 (recognizing that such warranty would be unrealistic and arguing instead that "the[] statements – each made while access to the FS Database was unrestricted within Virtu – misled investors about the ***ongoing*** failures to keep proprietary traders away from customer trading data").) *See also Meyer*, 761 F.3d at 251 (acknowledging that total compliance all the time "may often be unobtainable," but clarifying that the specific statements were misleading in that they contradicted the reality about the specific compliance procedures that "were then failing to prevent substantial violations of . . . regulations"). Plaintiff's allegation is much more specific: the Category 2 statements are materially false and misleading because if Virtu had the kinds of policies and procedures in place—and implemented—that are described in these statements, the FS Database Issue would not have occurred. It logically follows that because the FS Database Issue was taking place at the same time these statements were made, the statements about the existence and implementation of such policies and procedures must be false. As such, Plaintiff alleges enough with respect to the Category 2 statements to survive the motion to dismiss.

In concluding that Plaintiff adequately alleges that these statements were materially misleading, the court underlines that the level of detail and specificity of the Defendants' Category 2 statements is also crucial. Instead of making generic references to

Virtu's policies and procedures, the relevant statements here specifically discussed Virtu's safeguards, "includ[ing] physical separation, logical access control," (Compl. ¶ 102 (emphasis omitted)), its "procedures to segregate and protect sensitive client data," (*id.* ¶ 126 (emphasis omitted)), and "[p]hysical and logical safeguards of client information" that were "designed to safeguard sensitive client information," (*id.* ¶ 131 (mentioning that "Trading Analytics, POSIT, and POSIT Alert segments in particular will continue to be in a segregated area with restricted access").) That level of detail and specificity "g[ives] comfort to investors that reasonably effective steps were being taken" to protect client information. *Meyer*, 761 F.3d at 251 (holding that detailed statements about specific equipment and monitoring efforts were actionable in connection with failure to disclose certain problems that "could be found by a trier of fact to be an omission that renders misleading the comforting statements in the prospectus"). Moreover, Defendants provided these statements to assure the market and investors that Virtu had specific safeguards in place to protect client information. *See In re Signet Jewelers*, 389 F. Supp. 3d at 231 (concluding that the statements about the company's code of conduct were not truthful where "Defendants sought to reassure the investing public that [the company] did not, in fact, have a toxic workplace" despite the ongoing lawsuit concerning such conduct). Therefore, "a reasonable investor – who otherwise would be concerned about how [failure to protect sensitive information] might affect her investment in [Virtu] – took Defendants at their word." *See id.* (denying motion to dismiss).

To be sure, generic statements about company policies are not materially misleading statements. *See Cigna*, 918 F.3d at 63 ("[A] reasonable investor would not rely on the [company's] Form 10-K statements as representations of satisfactory compliance.") But the Category 2 statements are not generic statements buried in regulatory filings. Defendant Cifu made one of the statements

during the 2018 Q3 Call—the same day Virtu announced its plans to acquire ITG—and another in Virtu's letter directly addressed to investors. And while the third statement was part of the company's SEC filing, the Consolidated Complaint alleges that Virtu "planned to use [the slide containing the statement] at [a conference], and 'from time to time thereafter in connection with presentations to investors and potential investors, clients and potential clients, industry analysts and others.'" (Compl. ¶ 131.) Thus, the Category 2 statements are not general "representations of satisfactory compliance" buried within SEC filings. *See Cigna*, 918 F.3d at 63. Instead, they are detailed descriptions of compliance efforts that "amount[] to actionable assurances of actual compliance." *Id.*

Although Defendants cite some cases in their briefs to argue that their statements were also generic in nature, those cases are easily distinguishable from the instant action based on their facts. *See Basic Inc.*, 485 U.S. at 236 (describing materiality analysis as "inherently fact-specific"). For instance, in *Ong. v. Chipotle Mexican Grill, Inc.*, the court concluded that Chipotle's statements regarding its food-safety programs and protocols were "either not demonstrably false or inactionable puffery." 294 F. Supp. 3d 199, 232 (S.D.N.Y. 2018). In reaching that conclusion, the court emphasized the difference between not having the programs and protocols in place—which would make the statements about their existence actionable—and having such programs and protocols in place but failing to execute them—which would make the same statements inactionable. *See id.* (finding that the allegations in the complaint "do not conflict with Defendants' statements regarding the food-safety programs and procedures that Chipotle had in place, but merely quibble with Chipotle's execution of those programs and procedures"). That, however, is not the case here. The Category 2 statements made specific references to the existence of safeguards like "physical and logical separation" and "segregate[ion]" of sensitive client data. (*See,*

*e.g.*, Compl. ¶¶ 102, 126.) The Consolidated Complaint does not simply allege that those safeguards were in place but not adequately functioning; it alleges that they were completely absent at the time Defendants made the Category 2 statements. (*See, e.g.*, *id.* ¶ 104 (alleging that the relevant statements were false because the "safeguards were not currently in place to segregate and protect the confidential post-trade client information").) Defendants' reliance on *Barilli v. Sky Solar Holdings, Ltd.* is similarly misguided because, there, the alleged misstatements concerned weaknesses regarding existing internal controls—not the complete absence of the same. 389 F. Supp. 3d 232, 253-54 (S.D.N.Y. 2019) (clarifying that "the Prospectus disclosed [among other things] . . . weaknesses in its internal controls").

While Defendants apparently argue that the Category 2 statements are not alleged to be false, they do not argue that those statements constitute mere puffery. (*See* Defs.' Chart of Alleged Misstatements (Dkt. 44-3) at 3 (claiming that the Category 2 statements are not alleged to be false, without arguing that they are statements of corporate optimism or mere puffery).) Nevertheless, within the section of their opening brief addressing the Category 2 statements—and the first paragraph of the relevant section discussing the applicable law—Defendants quote *JP Morgan Chase* to claim that a "general statement about the existence of risk management policies and procedures [is] not a 'guarantee that Defendants' choices would prevent failures.'" (Mot. at 14 (quoting *JP Morgan Chase*, 553 F.3d at 206).) To the extent the Defendants attempt to rely on the relevant analysis in *JP Morgan Chase,* that analysis concerns the puffery doctrine. *See JP Morgan Chase*, 553 F.3d at 206 (explaining why "[t]he statements highlighted by Plaintiffs are no more than 'puffery' which does not give rise to securities violations"). And Defendants do not explicitly argue that the Category 2 statements constitute mere puffery or corporate optimism.

To the extent Defendants intend to argue that general statements about compliance policies are inactionable, they are arguing that the Category 2 statements are immaterial puffery without stating so. *See In re Signet Jewelers*, 389 F. Supp. 3d at 229 ("Certain statements are immaterial as a matter of law. 'Puffery' is one such type."). But as explained above, the Category 2 statements are not immaterial puffery; they identify in detail certain safeguards that Virtu claims it had in place to prevent its proprietary traders from accessing Virtu's execution services customers' information, which Plaintiff alleges were untruthful. Notably, the very same case that Defendants rely on in support of their puffery argument cautions courts within the Second Circuit to avoid dismissing a complaint "on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *JP Morgan Chase*, 553 F.3d at 197. This is not the proper phase of litigation for the court to make such a determination. Accordingly, the court finds that the Category 2 statements are sufficiently alleged to be materially false and misleading statements.

### c. *Category 3: Statements about Virtu's plans to enhance its safeguards post-ITG acquisition*

Next, the court finds that Plaintiff fails to sufficiently allege that the Category 3 statements are actionable. One of the Category 3 statements contains a present-tense portion that is too vague to be actionable, while the rest of the statements, including the remainder of the aforementioned statement, are forward-looking statements protected by the PSLRA safe harbor. These statements concern Virtu's plans to enhance its safeguards after its acquisition of ITG. They include Defendant Cifu's statements from an investor conference, earnings calls (including a slide from a presentation deck discussed during an earnings call), and newspaper articles, as well as Virtu's press release and letter to investors. In particular, the Consolidated Complaint alleges that

during the 2018 Q3 Call, while Defendant Cifu was discussing, among other things, Virtu's protection of sensitive client information, he made the following statements:

> In addition to monitoring and testing our safeguards and policies through internal audits, we are also looking to contract an external independent auditing firm to regularly review *the effectiveness of our controls.* In addition to these safeguards, Virtu is a firm believer in using technology to enhance transparency to end customer. Our tools provide the ability for institutions to have unprecedented visibility into the complete life cycles of their orders. That includes importantly why their orders were routed, not just that they were routed.

(Compl. ¶ 102 (challenged portion in italics); *see also* 2018 Q3 Call Tr. at ECF p. 6.) Plaintiff contends that this statement "was materially false and misleading because speaking about the effectiveness of the Company's controls created a duty for defendant Cifu to speak fully and truthfully about then-existing failures in the effectiveness of the Company's controls," namely, the FS Database Issue, "which Defendants knew, or recklessly disregarded." (Compl. ¶ 105.) Plaintiff adds that the aforementioned statements "were materially false and misleading when made, because they misrepresented and failed to disclose that Virtu's failure to protect confidential client trading information in the FS Database exposed Virtu to significant financial, regulatory, and litigation risks, which Defendants knew, or recklessly disregarded." (*Id.* ¶ 106.)

Similarly, Plaintiff alleges that during the same call, Defendants Cifu and Molluso gave a presentation to investors about the impending ITG acquisition that included the following statements in one of the presentation slides: "Virtu to Enhance Existing Safeguards to Protect Client Information." (*Id.* ¶ 107.) According to Plaintiff, "that Virtu was going to *'Enhance Existing Safeguards*

*to Protect Client Information*' was materially false and misleading when made because it led investors to believe that Virtu's '*existing* safeguards' were adequately 'protecting client information.'" (*Id.* ¶ 108 (emphases in original).)[11]

Next, the Consolidated Complaint alleges that Virtu's Form 8-K filed on January 25, 2019, included a press release about the ongoing acquisition of ITG, containing the following language: "post-closing, Virtu intends to ***continue to maintain and enforce appropriate information barriers to segment and protect sensitive client data.***" (*Id.* ¶ 121 (challenged portion in italics); *see also* Form 8-K Dated January 25, 2019 ("January 2019 Form 8-K") (Dkt. 44-5) at ECF p. 5.) Plaintiff contends that this statement was materially false and misleading "because it led investors to believe that Virtu already maintained and enforced appropriate information barriers[.]" (Compl. ¶ 122.) Likewise, Plaintiff also alleges that on March 1, 2019, Virtu posted a letter on its website from Defendant Cifu to Virtu's clients that announced the completion of the ITG acquisition and stated, in pertinent part: "***As we integrate, we will draw on the best practices of our combined company to continue to ensure that our policies, procedures and tools remain designed to safeguard confidential client information.*** These safeguards will include physical and logical separations, where appropriate, between businesses and access control procedures." (*Id.* ¶ 126 (challenged portion in italics).) Again, the Consolidated Complaint alleges that this statement was materially false and misleading "because by

---

[11] Plaintiff also alleges that on February 7, 2019, during the 2018 Q4 Call, Defendant Cifu made the following false statement regarding ITG customers: "There's no gray area at Virtu. It's all black-and-white, and so we've been very upfront about how we will physically and virtually separate the businesses to ensure that we are good stewards of customer information, all the things you would expect that we do, and I think customers are encouraged to hear those words." (Compl. ¶ 123 (emphasis omitted); *see also* 2018 Q4 Call Tr. at ECF p. 10.)

speaking about Virtu's tools to safeguard confidential client information, it created a duty to disclose that Virtu's 'policies, procedures and tools' were *not* adequately safeguarding confidential client trading information in the FS Database, which Defendants knew, or recklessly disregarded." (*Id.* ¶ 128.) The rest of the allegedly false Category 3 statements are Defendant Cifu's statements—paraphrased or directly quoted—from interviews published in newspaper articles[12] and an investor conference.[13]

---

[12] On November 14, 2018, Bloomberg published an article regarding Virtu's acquisition of ITG, reporting, in pertinent part, the following statements Defendant Cifu made: "*Virtu's proprietary traders* -- who are based in a suburb of Austin, Texas, as well as Chicago and Dublin, far from ITG's customer-facing employees in New York and London -- *won't have the key cards needed to enter the workspace of the division that has outside clients, Cifu said. Software will block proprietary traders from viewing client data. An outside auditor will vet the safeguards.* And Cifu mentioned a few hypothetical high-tech solutions that the governance committee could ask Virtu to deploy, like *biometric scanners or facial-recognition software* for unlocking doors." (Compl. ¶ 113 (challenged portion in italics); *see also* Bloomberg Article at ECF p. 2.) Likewise, on the same day, a Business Insider article quoted the following statements, in pertinent part, Defendant Cifu made: "*[W]e're talking to the buy-side about establishing a client data governance committee made up of clients from all over the globe to assist in the oversight, design, implementation, and integrity of logical and physical barriers.* It's still early and we are engaging the buy-side, getting their input, but the idea is that clients would oversee the management of their data and be empowered to recommend and engage an outside auditing firm and the meetings will be open to . . . all clients." (Compl. ¶ 117 (challenged portion in italics); *see also* Business Insider Article ECF p. 5.)

[13] At the Goldman Sachs U.S. Financial Services Conference held on December 5, 2018, speaking on behalf of Virtu and responding to the market's concerns about Virtu's acquisition of ITG, Defendant Cifu made, in relevant part, the following statements: "I think the larger concern is, hey, ITG has historically been a valued analytics provider, right? I don't want you to send to Virtu, which is a prop Market Making firm, my end of the day trade file because somehow they are going to reverse engineer what I'm doing. . . . And we've educated the sales force at ITG to say, listen: . . . *three, there's*

35

Defendants contend that the Category 3 statements are forward-looking statements protected by the PSLRA's safe harbor and are otherwise not alleged to be false. (Mot. at 16-17; Reply at 4-5.)

The PSLRA created a safe harbor for forward-looking statements, subject to certain exclusions that are not relevant here. *See* 15 U.S.C. § 78u-5(c). In particular, "a defendant is not liable if (1) 'the forward-looking statement is identified and accompanied by meaningful cautionary language,' (2) the forward-looking statement 'is immaterial,' or (3) 'the plaintiff fails to prove that [the forward-looking statement] was made with actual knowledge that it was false or misleading.'" *See In re Vivendi*, 838 F.3d at 245 (quoting *Slayton v. Am. Express Co.*, 604 F.3d 758, 766 (2d Cir. 2010)); *see also* 15 U.S.C. § 78u-5(e) (instructing the court, "[o]n any motion to dismiss based upon subsection (c)(1)," to consider "any cautionary statement accompanying the forward-looking statement, which are not subject to material dispute, cited by the defendant"). "[A] forward-looking statements is protected . . . if any of the three prongs applies." *In re Vivendi*, 838 F.3d at 245-46.

Relevantly, the statute defines forward-looking statement as "a statement of the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer." 15 U.S.C. § 78u-5(i)(1)(B). As a threshold matter, forward-looking statements are "statements whose truth cannot be ascertained until some time after they are made." *Saskatchewan Healthcare Emp.'s Pension Plan v. KE Holdings Inc.*, 718 F. Supp. 3d 344, 386 (S.D.N.Y. 2024). In contrast, "statements about present or historical facts, whose accuracy can be determined at the time they were made, are not forward-looking

---

*going to be physical and virtual barriers, so prop folks can't get into it*[.]" (Compl. ¶ 119 (challenged portion in italics).)

statements[.]" *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 569 (S.D.N.Y. 2011).

Furthermore, where "defendants knowingly misrepresent[] present material facts as part of forward-looking statements . . . defendants are not immunized by the safe harbor provision." *See Manavazian v. Atec Grp.*, 160 F. Supp. 2d 468, 481-82 (E.D.N.Y. 2001) (concluding that the safe harbor provision did not cover statements because "plaintiffs allege[d] that defendants already knew that [the company's] core business was crumbling when they made misleading statements about [its] business health"). Thus, "[m]ixed present and future statements are not entitled to the safe harbor with respect to the part of the statement that refers to the present." *In re Supercom Inc. Sec. Litig.*, No. 15-CV-9650 (PGG), 2018 WL 4926442, at *21 (S.D.N.Y. Oct. 10, 2018). But "when the present-tense portion of mixed present and future statements does not provide specific information about the current situation, but merely says that, whatever the present situation is, it makes the future projection attainable, the present-tense portion of the statement is too vague to be actionable." *Maverick Fund, L.D.C. v. Comverse Tech., Inc.*, 801 F. Supp. 2d 41, 59 (E.D.N.Y. 2011); *see also City of Omaha Police and Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 398 (S.D.N.Y. 2020) (clarifying that "[c]ourts have consistently found . . . statements [like 'intending to continue'] to be protected"). And statements that contain forward-looking elements alongside present facts are severable. *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 144-45 (2d Cir. 2010) (remanding to the district court to analyze severable portions of statements separately).

Moreover, "[t]o avail themselves of safe harbor protection under the meaningful cautionary language prong, defendants must demonstrate that their cautionary language was not boilerplate and conveyed substantive information." *Slayton*, 604 F.3d at

772-73 (holding that the defendants did not include meaningful cautionary language in their Form 10-Q in part because the caution was vague and did not warn about the exact risk that had materialized); *see also In re Salix Pharms., Ltd.*, No. 14-CV-8925 (KMW), 2016 WL 1629341, at *11 (S.D.N.Y. Apr. 22, 2016) (rejecting the validity of cautionary language where the "statements included at the beginning of each conference call were brief and generic," with broad references to press releases and SEC filings, including a Form 10-K). And "the cautionary language itself also must not be misleading[.]" *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 304-05 (S.D.N.Y. 2013); *see also Slayton*, 604 F.3d at 770 (agreeing "with the SEC and the parties that cautionary language that is misleading in light of historical fact cannot be meaningful"). In other words, "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *Rombach*, 355 F.3d at 173; *see In re Facebook, Inc. IPO Sec. and Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("Courts in this Circuit have held that a company's purported risk disclosures are misleading where the company warns only that a risk may impact its business when that risk has already materialized.") (collecting cases). But the cautionary language does not have to immediately precede or follow the forward-looking statement. *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 213 (S.D.N.Y. 2022).

Significantly, "[t]he safe harbor provision also requires dismissal if the plaintiffs do not 'prove that the forward-looking statement . . . was . . . made or approved by [an executive officer] with *actual knowledge* by that officer that the statement was false or misleading." *Slayton*, 604 F.3d at 773 (quoting 15 U.S.C. § 78u-5(c)(1)(B)) (emphasis in original). To prove that the defendant made the forward-looking statement with actual knowledge, "the plaintiffs must 'state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendant's intention to deceive, manipulate, or defraud.'" *Id.* at

773 (quoting *Tellabs*, 551 U.S. at 313). Like the scienter require-ment under the PSLRA further discussed below, this prong of the PSLRA safe harbor also requires the plaintiff to "plead facts to support a *strong* inference of scienter[.]" *Id.* (emphasis in origi-nal). That means the "inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs*, 551 U.S. at 314. However, "because the safe harbor spec-ifies an actual knowledge standard for forward-looking statements, the scienter requirement for forward-looking state-ments is stricter than for statements of current fact." *Slayton*, 604 F.3d at 773 (explaining that liability for forward-looking state-ments requires proof of knowing falsity); *see also Golesorkhi v. Green Mountain Coffee Roasters, Inc.*, 973 F. Supp. 2d 541, 555-56 (D. Vt. 2013) (finding allegations of actual knowledge insuf-ficient where the plaintiffs claimed that company executives' attendance at certain meetings evidenced their actual knowledge).

Here, Plaintiff only challenges the non-forward-looking aspects of the Category 3 statements. (*See* Oral Arg. Tr. 60:22-23 (con-ceding that Plaintiff does not challenge "any forward-looking part of [the Category 3] statements").) Plaintiff argues that, to the extent these statements discuss "existing or present facts," they are materially false and misleading. (*See id.* 61:21-22.) As such, the court first determines which statements, or portions of statements, are forward-looking. To the extent any of the state-ments contain non-forward-looking portions, the court analyzes whether Plaintiff adequately alleges their falsity. Then, the court discusses whether the forward-looking statements are accompa-nied by meaningful cautionary language such that they are inactionable pursuant to the PSLRA safe harbor. And if such for-ward looking statements are not accompanied by meaningful cautionary language, the court also addresses whether Plaintiff

has sufficiently alleged that Defendants made those statements with actual knowledge of their falsity.

First, as a threshold matter, the court finds that all but one of the Category 3 statements are forward-looking. The statement that Virtu was going to "Enhance Existing Safeguards to Protect Client Information," (*see* Compl. ¶ 107), is a mix of present and future statements. The portion of the statement referring to Virtu's "existing safeguards" is a present-tense statement that is "not entitled to the safe harbor[.]" *See In re Supercom Inc.*, 2018 WL 4926442, at *21 (clarifying that safe harbor does not protect "the part of the statement that refers to the present" when the statement is "[m]ixed present and future statements"). In other words, because the veracity of the statement regarding Virtu's then-existing safeguards could have been ascertained at the time the statement was made, it is not a forward-looking statement. *See In re Vivendi Universal*, 765 F. Supp. 2d at 569 (explaining that "statements about present or historical facts . . . are not forward-looking statements"). And such statements can be analyzed separately from the remainder of the mixed statement. *See MF Glob., Ltd.*, 620 F.3d at 144-45. Doing so, the court concludes that this portion of the statement "does not provide specific information about the current situation," making it "too vague to be actionable[.]" *See Maverick Fund, L.D.C.*, 801 F. Supp. 2d at 59 (reasoning that merely describing the present situation without providing further information does not render the statement actionable "apart from the future projection"). And the rest of the statement—manifesting Virtu's plan to enhance its safeguards— is forward-looking because it is "a statement of [Virtu's] plans and objectives . . . relating to [its] . . . services," *see* 15 U.S.C. § 78u-5(i)(1)(B), the truth of which "cannot be ascertained until some time after [it was] made," *see Saskatchewan Healthcare*, 718 F. Supp. 3d at 386.

The court's reasoning regarding the forward-looking aspect of the above statement applies to the remaining Category 3 statements, making them inactionable forward-looking statements as well. (*See, e.g.*, Compl. ¶ 102 (describing Virtu's future plans to "contract an external independent auditing firm to regularly review the effectiveness of [Virtu's] controls" (emphasis omitted)); *id.* ¶ 123 (discussing Virtu's goal to "physically and virtually separate the businesses" (emphasis omitted)).) Plaintiff claims that Defendant Cifu's statements about Virtu's intentions to "continue to maintain and enforce appropriate information barriers" is an actionable statement because it led Virtu's investors to believe that Virtu already maintained and enforced such barriers. (Pl.'s Opp. at 14; *see also* Oral Arg. Tr. 61:23-62:2.) But "[c]ourts have consistently found" that "Defendants' use of the verb *continue* does not remove the[] statements from the bespeaks-caution doctrine's protective umbrella." *See City of Omaha*, 450 F. Supp. 3d at 398 (collecting cases and explaining that present-tense statements indicating that a company is on track to meet a future projection or analyzing future possibilities cannot be meaningfully distinguished from forecasts).[14] For that reason, the

---

[14] The court's analysis in *City of Omaha* within the context of the bespeaks caution doctrine is equally applicable in the PSLRA safe harbor context. *See In re Gilat Satellite Networks, Ltd.*, No. 2-CV-1510 (CPS), 2005 WL 2277476, at *11 (E.D.N.Y. Sept. 19, 2005) ("The PSLRA safe harbor is sufficiently similar to prior law that some courts and commentators have described it as 'codifying' the bespeaks caution doctrine. . . . Accordingly, the Second Circuit has at times applied the bespeaks caution doctrine in conjunction with the PSLRA safe harbor without distinguishing between the two."). While "[t]he two doctrines do not . . . completely overlap," the differences are not relevant in this case. *Id.* at *11; *see also* Erin M. Hardtke, Comment, *What's Wrong with the Safe Harbor for Forward-Looking Statements?*, 81 MARQ. L. REV. 133, 152-53 (1997) (explaining that, unlike the bespeaks caution doctrine, the PSLRA safe harbor does not cover, among other things, initial public offerings, partnership offerings, tender offers, and "going private" transactions).

statement in Virtu's letter discussing its plans "to continue to en-
sure that [Virtu's] policies, procedures and tools remain designed
to safeguard confidential client information" is also a forward-
looking statement. (*See* Compl. ¶ 126 (emphasis omitted).)

Second, the court finds that none of the forward-looking state-
ments above are accompanied by meaningful cautionary
language. Plaintiff alleges that "[t]o the extent there were any
forward-looking statements, there were no meaningful caution-
ary statements identifying important factors that could cause
actual results to differ materially from those in the purportedly
forward-looking statements." (*Id.* ¶ 196.) Defendants concede
this point with respect to all the Category 3 statements except for
the statements made during Virtu's relevant earnings calls and
the January 25, 2019 press release. (*See* Mot. at 16-17.) Both of
Virtu's relevant earnings calls—the 2018 Q3 Call and the 2018
Q4 Call—included almost identical purportedly cautionary state-
ments made by Andrew Smith, Virtu's SVP and Head of Investor
Relations and Corporate Strategy. (*See* 2018 Q3 Call Tr. at ECF
pp. 3-4 (providing generalized warnings about the potential for-
ward-looking statements and encouraging the listeners to review
Virtu's SEC filings); *see also* 2018 Q4 Call Tr. at ECF p. 5 (same).)
These were boilerplate statements that did not "convey[] sub-
stantive information" with respect to protecting client
information. *See Slayton*, 604 F.3d at 772-73 (holding that there
is no meaningful cautionary language where the defendant's cau-
tion is vague). Rather, they were "brief and generic" statements
"included at the beginning of each conference call." *See In re Salix
Pharms., Ltd.*, 2016 WL 1629341, at *11 (concluding that broad
references to press releases and SEC filings do not rise to the level
of meaningful cautionary statements).

Virtu's cautionary language included in the January 25, 2019
press release presents a closer question because it at least makes
a reference to "the acquisition of ITG and related integration and

synergy realization." (*See* January 2019 Form 8-K at ECF p. 5.) However, the court finds that it still falls short of "identifying important factors that could cause actual results to differ," *see* 15 U.S.C. § 78u-5(c)(1)(A)(i), because it includes no discussion of Virtu's efforts, or lack thereof, to separate its lines of business or protect client information. Moreover, even if the cautionary note combined with the reference to Virtu's acquisition of ITG was sufficiently meaningful, it "cannot insulate from liability the failure to disclose that the risk ha[d] transpired." *See Rombach*, 355 F.3d at 173. In other words, the Consolidated Complaint alleges that, at the time Virtu issued this press release, "sensitive client post-trade information was [already] accessible to essentially everyone" at Virtu, "including Virtu's proprietary traders[.]" (Compl. ¶ 122.) Therefore, to the extent the cautionary language was sufficiently meaningful, these "purported risk disclosures [were] misleading" because the "risk had already materialized." *See In re Facebook, Inc.*, 986 F. Supp. 2d at 516; *see also In re MF Glob. Holdings Ltd.*, 982 F. Supp. 2d at 304 ("[T]he cautionary language itself also must not be misleading[.]"). As such, the Category 3 forward-looking statements are not accompanied by meaningful cautionary language.

Although the Category 3 statements are not accompanied by meaningful cautionary language, the court concludes that Plaintiff fails to plead facts demonstrating that Defendants made the Category 3 statements with actual knowledge of their falsity. Again, the court emphasizes that "the scienter requirement for forward-looking statements is stricter than for statements of current fact" because "the safe harbor specifies an 'actual knowledge' standard for forward-looking statements." *Slayton*, 640 F.3d at 773; *see also* 15 U.S.C. § 78u-5(c)(1)(B). Here, the Consolidated Complaint does not plead any facts alleging that Defendant Cifu made any statements with actual knowledge of their falsity or that any Virtu executive approved any of Virtu's Category 3 statements with actual knowledge of their falsity. Rather, Plaintiff

only makes conclusory allegations that "Defendants knew," (*see, e.g.,* Compl. ¶¶ 105, 120), or "[i]n drafting, reviewing or commenting on press releases and SEC filings, and preparing for conference calls and investor presentations, . . . were either already knowledgeable, [or] became knowledgeable . . . [about] the underlying facts regarding Virtu's failure to protect confidential client trading information," (*see id.* ¶ 163.) *See also Iqbal,* 556 U.S. at 678 (holding that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice"); *Golesorkhi,* 973 F. Supp. 2d at 555-56 (rejecting the plaintiffs' generalized assertions that the company executives had actual knowledge because the complaint did not "identify[] [the] specific reports that would have indicated that to be the case"). These allegations reflect recklessness, which is further discussed below. That is not enough to adequately allege "proof of knowing falsity." *See Slayton,* 604 F.3d at 773. It follows then that these forward-looking statements are protected by the PSLRA safe harbor under 15 U.S.C. § 78u-5(c)(1)(B). *Id.* (noting that the safe harbor provision "requires dismissal if the plaintiffs do not prove that the forward-looking statement was made or approved . . . with actual knowledge . . . that the statement was false or misleading").

Thus, Plaintiff fails to adequately allege that the Category 3 statements are actionable. All but one of the statements are forward-looking statements protected by the PSLRA safe harbor. The remaining statement, as discussed above, contains a forward-looking portion that is also protected by the PSLRA, as well as a present-tense portion that is too vague to be actionable.

> d. *Category 4: Virtu's risk disclosures about any failure to protect confidential information*

The court next concludes that Plaintiff adequately alleges that the Category 4 statements are materially false and misleading statements of risk disclosures. These statements are Virtu's risk

disclosures in its quarterly and annual SEC filings concerning protection of confidential and proprietary information. In particular, Virtu filed 20 forms with the SEC, including Forms 10-Q and 10-K, between November 8, 2018, and July 28, 2023, all of which included, in pertinent part, the following similar, if not identical, (*see* Oral Arg. Tr. 25:13-15 (noting that "Virtu used two slightly different versions of th[e] warning")), risk disclosure:

> [M]any factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . the *failure to* maintain system security or *otherwise maintain confidential and proprietary information.*

(Compl. ¶ 111 (challenged portion in italics); *see also* 2018 Form 10-K (Dkt. 44-6) at ECF p. 4; Compl. ¶¶ 129, 135, 140, 144, 147, 150.) Plaintiff alleges that these risk disclosures were false and misleading because Virtu had already failed to protect client information and, "as a result of the[se] [disclosures], the market was unaware of [Virtu's] true exposure to financial, regulatory, and litigation risks arising from Virtu's failure to protect confidential client trading information in the FS Database." (Compl. ¶ 112; *see also* Pl.'s Opp. at 19 ("A reasonable investor would expect that if Virtu was *already* failing to protect [confidential client] information, Defendants would not cast that risk as potential." (emphasis in original)).) Defendants counter that these are forward-looking risk disclosures not alleged to be false. (Mot. at 17-18.)

"The main inquiry" in determining whether a risk disclosure contains a materially false and misleading statement "is whether a 'reasonable investor could have been misled about the nature of the risk when he invested.'" *Chapman v. Mueller Water Prods., Inc.*, 466 F. Supp. 3d 382, 406 (S.D.N.Y. 2020) (quoting *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 359 (2d Cir. 2002)). "In

many cases, general or boilerplate disclosures of future regula-
tory risk would not cause a reasonable investor to believe that
the company faced no current regulatory risks." *In re Mylan N.V.
Sec. Litig.*, No. 16-CV-7926 (JPO), 2018 WL 1595985, at *9-10
(S.D.N.Y. Mar. 28, 2018) (finding that specific risk disclosures
about a potential governmental investigation were misleading
because "[a] reasonable investor could have concluded from
[those] statement[s] that . . . such unfavorable events had not
yet occurred"). Thus, "the more specific the caution, the more
likely it is to mislead a reasonable investor." *Id.* at *9. Further-
more, within the Second Circuit, some courts "have held that a
risk disclosure can itself constitute a material misrepresentation
when it presents as a risk an event that has already transpired."
*Chapman*, 466 F. Supp. 3d at 405-06 (collecting cases); *see also
Rombach*, 355 F.3d at 173 ("Cautionary words about future risk
cannot insulate from liability the failure to disclose that the risk
has transpired.").

Virtu's risk disclosures are actionable because they were specific
and related to a risk that had already transpired. First, Virtu's risk
disclosures related to particular issues of "failure to protect con-
fidential and proprietary information," rather than, for instance,
discussing potential problems with implementing adequate safe-
guards. (2018 Form 10-K at ECF p. 4; *see also* Compl. ¶ 111.) And
such specific risk disclosures can mislead a reasonable investor
as to the status of current events. *See In re Mylan*, 2018 WL
1595985, at *9 (explaining the difference between "a caution
that 'input prices may rise next quarter,'" which "would not cause
a reasonable investor to conclude that the prices of all inputs had
remained flat or declined in the previous quarter[,]" and "a cau-
tion that 'the price of our primary input may rise above $5 next
quarter,'" which "could certainly cause a reasonable investor to
conclude that the price was, at present, $4.99 or less"). Second,
Virtu's risk disclosures about its failure to protect client infor-
mation "constitute a material misrepresentation" because they

"present[] as a risk an event"—the FS Database Issue—"that ha[d] already transpired." *See Chapman*, 466 F. Supp. 3d at 405; *see also Rombach*, 355 F.3d at 173 (emphasizing that "[c]autionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired"). Defendants' argument that Plaintiff "does not plead that the disclosed risk actually impacted financial results at all" is irrelevant. (*See* Mot. at 18; *see also* Reply at 5.) Plaintiff does not have to do so. As the court explained above, "a risk disclosure can itself constitute a material misrepresentation[.]" *Chapman*, 466 F. Supp. 3d at 405. As such, the court finds that Plaintiff adequately alleges that the Category 4 statements are materially false and misleading risk disclosures.[15]

> ### e. Category 5: Statements made post-April 2019, after the FS Database Issue was resolved

Finally, the court concludes that Plaintiff sufficiently alleges that the Category 5 statements are materially false and misleading. The Category 5 statements include Defendant Cifu's statements made in an earnings call and an investor conference, and Virtu's risk disclosures concerning protection of confidential and proprietary information included in Virtu's quarterly and annual SEC filings.[16] Specifically, in addition to the risk disclosures previously discussed as part of the court's analysis of the Category 4 statements, Plaintiff alleges that during 2019 Q1 Call held on May 3, 2019, Defendant Cifu, in relevant part, stated as follows:

---

[15] In opposition to Defendants' motion to dismiss, Plaintiff withdrew "its claims asserting a violation of Item 303 of SEC Regulation S-K." (*See* Pl.'s Opp. at 19 n.27; *see also* Compl. ¶¶ 153-58.)

[16] These risk disclosure statements overlap with all of the Category 4 statements, (*see* Compl. ¶¶ 135, 140, 144, 147, 150), except for two Category 4 statements not relevant here: those contained in Virtu's 2018 Q3 Form 10-Q, (*see id.* ¶ 111), and 2018 Form 10-K, (*see id.* ¶ 129), filings.

Also, as you may recall, when the deal was announced, *we promised to provide unparalleled transparency into how we protect client information*. I'm pleased to report that on April 9 and April 30, we held our first client information security forums in New York and London, respectively. We had over 100 clients and prospective clients attend in person or participate via telephone and Webex. These forums are one element of our continuous commitment to our clients, and we look forward to similar engagements in other regions.

(*See* Compl. ¶ 133 (challenged portion in italics); *see also* 2019 Q1 Call Tr. ECF p. 6.) Plaintiff alleges that the italicized statement was materially false and misleading "because speaking about this specific issue created a duty to disclose that Virtu's proprietary traders, among others, had unrestricted access into execution services customers' material non-public post-trade information for a period of *at least* 15 months[.]" (Compl. ¶ 134 (emphasis in original).) Plaintiff further alleges that on June 5, 2019, at the Sandler O'Neill Global Exchange and Brokerage Conference, representing Virtu, Defendant Cifu stated, in pertinent part, the following "[i]n response to a question about potential 'revenue dissynergies' from the ITG acquisition," (*id.* ¶ 137):

Yeah, I mean we had guided towards $10 million of revenue dis-synergies because people are running around with their hair on the fire that like, oh, all these analytics and Triton customers are going to turn us off. . . . And so, we had guided to that number. On our last earnings call and I'll repeat what I said. We're going to be within that number. I mean, there are certain customers that are doing a review of Virtu like we were a new broker and I'm totally fine with that as they should. A small handful of customers that who can't get themselves comfortable because we're 'market-making or HFT firm', but it's really going to be ultimately de minimis, *the large asset managers in the fashion forward, if you will, hedge funds and others and quant firms that kind of*

*understand what we are and recognize. We didn't buy ITG to steal customer information. It's kind of preposterous and borderline insulting to suggest we would do that. We would never do that.* So people are sticking with us and giving us the benefit of the doubt here.

(Conference Presentation Tr. at ECF p. 9 (emphasis added); *see also* Compl. ¶ 137.) The Consolidated Complaint alleges that Defendant Cifu's statement that "Virtu *'would never do that'* was materially false and misleading when made because it misrepresented and failed to disclose that for a period of at least 15 months Virtu allowed its proprietary traders to access . . . customer post-trade information stored in the FS Database[.]" (Compl. ¶ 138.) Defendants argue that these statements were not false or misleading *at the time they were made* because Defendants made these statements *after* resolving the FS Database Issue. (Mot. at 19; Reply at 6.)

In Section 10(b) and Rule 10b-5(b) actions, there is no independent duty "to disclose a fact merely because a reasonable investor would very much like to know that fact." *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). However, "once a company speaks on an issue or topic, there is a duty to tell the whole truth." *Meyer*, 761 F.3d at 250. And "[t]he literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 366 (2d Cir. 2010).

The court first notes that in analyzing the Category 1 and the Category 4 statements, it already determined that all the Category 5 statements are actionable. Regardless, the court provides further explanation and responds to Defendants' arguments with respect to some of the Category 5 statements while considering the additional context in which Defendants made these statements after resolving the FS Database Issue.

Under Second Circuit precedent, during the 2019 Q1 Call or the investor conference, Defendant Cifu or Virtu had no duty "to disclose [the FS Database Issue] merely because a reasonable investor would very much like to know" about it. *See In re Time Warner Inc.*, 9 F.3d at 267. But because Defendant Cifu discussed Virtu's "promise[] to provide unparalleled transparency into how [Virtu] protect[s] client information" during the 2019 Q1 Call, (*see* Compl. ¶ 133 (emphasis omitted)), he had "a duty to tell the whole truth." *Meyer*, 761 F.3d at 250-52 ("At the time the statements regarding pollution prevention and compliance measures were made, a reasonable investor could conclude that a substantial non-compliance," which the company did not disclose in its prospectus, "would constitute a substantial threat to earnings, if not to the entire venture."). The Consolidated Complaint adequately alleges that Defendant Cifu failed to tell the whole truth. In fact, Plaintiff contends that Defendant Cifu did not disclose that, for at least 15 months, Virtu had failed to separate its business lines and protect its client information. (*See* Compl. ¶ 134.)

Defendants' argument that the risk disclosures contained in the Category 5 statements are not false because the FS Database Issue was resolved in April 2019 is meritless. First, the court reemphasizes that "a risk disclosure can itself constitute a material misrepresentation when it presents as a risk an event that has already transpired." *Chapman*, 466 F. Supp. 3d at 405. Defendants do not point to any authority—nor is this court aware of one—indicating that a statement containing a risk disclosure can omit a past risk that was subsequently fixed. Even though Virtu resolved the FS Database Issue by April 2019, a "reasonable investor could have been misled about the nature of the risk when he invested" based on Virtu's failure to discuss the FS Database Issue. *See id.* at 406 (recognizing the reasonable investor inquiry). Similarly, Defendants' argument that Defendant Cifu's statement made at an investor conference was not false because "the Complaint does not allege" that Virtu acquired ITG to "steal

customer information" misses the point. (*See* Reply at 6.) As the court explained in its analysis of the Category 1 statements, the context in which a statement is made is relevant because "[d]etermining whether a complaint states a plausible claim for relief" is "a context-specific task[.]" *Iqbal*, 556 U.S. at 679; *see also In re Vivendi*, 838 F.3d at 250 ("The test for whether a statement is materially misleading under Section 10(b) is not whether the statement is misleading in and of itself, but whether the defendants' representations, *taken together and in context*, would have misled a reasonable investor."). And given the context of market concerns about Virtu's acquisition of ITG, which had misused its client information, Plaintiff adequately alleges that this statement was materially false and misleading because it failed to disclose the FS Database Issue. Thus, the court finds that Plaintiff sufficiently alleges that all the Category 5 statements are materially false and misleading statements.

### 2. Scienter

Plaintiff adequately pleads facts showing a strong inference of scienter—namely, recklessness—that is cogent and at least as compelling as any opposing inference of non-fraudulent intent. To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, in relevant part, "the complaint shall, with respect to each act or omission . . . state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. 78u-4(b)(2)(A); *see also Tellabs*, 551 U.S. at 313-14 ("[P]laintiffs [must] state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud."); *Ganino*, 228 F.3d at 168 (explaining that the requisite state of mind, scienter, in Section 10(b) actions is "an intent to deceive, manipulate or defraud"). Plaintiff can establish such an intent "by alleging facts (1) showing that the defendants had

both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI*, 493 F.3d at 99.

The Supreme Court in *Tellabs* clarified that "in determining whether the pleaded facts give rise to a 'strong' inference of scienter, the court must take into account plausible opposing inferences." 551 U.S. at 323 ("The strength of an inference cannot be decided in a vacuum."); *see id.* at 314 (noting that "Congress left the key term 'strong inference' undefined"). The Court in *Tellabs* further explained that the goal is to "capture the stricter demand Congress sought to convey in" the PSLRA. *Id.* at 314. To that end, *Tellabs* directs courts to "engage in a comparative evaluation; . . . consider, not only inferences urged by the plaintiff, . . . but also competing inferences rationally drawn from the facts alleged." *Id.* Therefore, "[t]o qualify as 'strong' within the intendment of [15 U.S.C. § 78u-4(b)(2)], . . . an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Id.* That standard, however, should not be confused with requiring the plaintiff to plead "irrefutable, *i.e.*, of the smoking-gun genre, or even the most plausible of competing inferences[.]" *Id.* at 324.

As relevant here, to allege recklessness, there must be a showing that "a defendant has engaged in conduct that was highly unreasonable, representing an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Gould v. Winstar Comms., Inc.*, 692 F.3d 148, 158-59 (2d Cir. 2012) (recognizing that the recklessness standard is satisfied "where a defendant failed to review or check information that it had a duty to monitor, or ignored obvious signs of fraud"); *see also Novak*, 216 F.3d at 308 (explaining that the complaint sufficiently alleges recklessness when it "specifically

allege[s] defendants' knowledge of facts or access to information contradicting their public statements"). Conscious recklessness is "a state of mind approximating actual intent, and not merely a heightened form of negligence[.]" *Novak*, 216 F.3d at 312. But it is not "actual intent" either. *Id.* It logically follows then, that recklessness requires alleging something more than a heightened form of negligence, but less than actual intent.

Relatedly, within the Second Circuit, it is not enough to plead recklessness "founded on nothing more than a defendant's corporate position[.]" *Plumbers & Steamfitters Loc. 773 Pension Fund v. Canadian Imperial Bank of Com.*, 694 F. Supp. 2d 287, 300 (S.D.N.Y. 2010); *see also City of N. Miami Beach Police Officers' & Firefighters' Ret. Plan v. Nat'l Gen. Holdings Corp.*, No. 19-CV-10825 (JPO), 2021 WL 212337, at *10 (S.D.N.Y. Jan. 21, 2021) (recognizing that "simply alleging that executive defendants are closely involved in running their business is not enough to show that they had access to contrary information"); *but see Stadium Cap. LLC v. Co-Diagnostics, Inc.*, No. 22-CV-6978 (AS), 2024 WL 456745, at *5-6 (S.D.N.Y. Feb. 5, 2024) (finding inference of recklessness where the defendant stated, "we are . . . able to monitor the daily influx of demand," because it allowed for the logical inference that the defendant "either knew that demand had fallen . . . or at least had access to that information"). But, "[a]n egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of recklessness." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 269 (2d Cir. 1996). And where the statements about an issue are specific, "[t]he specificity of [such] statements regarding [the issue] is strong circumstantial evidence that [Defendants] were receiving some form of specific information" regarding the relevant issue. *See City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 875 F. Supp. 2d 359, 372 (S.D.N.Y. 2012) (concluding that the defendants' specific statements about the issues sufficed to establish recklessness even though the complaint did not allege facts

showing that the defendants knew their statements were false); *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) (finding that scienter can be inferred based on circumstantial evidence like the defendant's specific statements about a specific issue); *San Antonio Fire and Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 320 (S.D.N.Y. 2024) ("Although Plaintiffs don't identify the specific document containing the contradiction, they don't need to.").

For example, "in preparing the offering documents," the defendant's "failure to mention [the] . . . conviction [of one of the relevant individuals] in the initial offering memorandum" could be considered reckless, as a matter of law. *Breard v. Sachnoff & Weaver, Ltd.*, 941 F.2d 142, 144 (2d Cir. 1991). Also, there may be an adequate showing of scienter through recklessness where the complaint alleges that the defendants had access to certain information or failed to check that information, which they had a duty to monitor, and supports those allegations with particular facts. *See In re Nio, Inc. Sec. Litig.*, No. 19-CV-1424 (NGG) (JRC), 2021 WL 3566300, at *9 (E.D.N.Y. Aug. 12, 2021) (rejecting the idea that the plaintiffs must always specifically identify the reports or statements that are contradictory to the statements made). Conversely, "[t]he fact that [the defendant] did not automatically equate record profits with misconduct cannot be said to be reckless" where the complaint does not allege enough facts "to support a finding that [the defendant] was faced with sufficient information such that its failure to further investigate [its subsidiary's] trading practices constituted recklessness." *Chill*, 101 F.3d at 270; *see also Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1129 (2d Cir. 1994) (holding that the plaintiff failed to allege recklessness where the allegations "couple[d] a factual statement with a conclusory allegation of fraudulent intent").

Significantly, under the PSLRA's scienter prong, "plaintiffs must plead circumstances providing a factual basis for scienter for each

defendant; guilt by association is impermissible." *In re DDAVP Direct Purchaser Antitrust Litig.*, 585 F.3d 677, 695 (2d Cir. 2009). Under the doctrine of "corporate scienter," however, employees' scienter can be imputed to the employer-company. *See In re Moody's*, 599 F. Supp. 2d at 515-16 ("There is no formulaic method or seniority prerequisite for employee scienter to be imputed to the corporation, but scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants.").

Similarly, "[u]nder the 'core operations' doctrine, where alleged misstatements concern information critical to the core function of a business, knowledge of such information is properly attributable to the company and its senior executives." *In re AT&T/DirecTV Now Sec. Litig.*, 480 F. Supp. 3d 507, 533 (S.D.N.Y. 2020) (emphasizing that it is unclear whether the "core operations" doctrine has survived the PSLRA and concluding that the theory fails where "the Amended Complaint does not contain other allegations of scienter"); *id.* (noting that the "core operations" doctrine is generally invoked "only to bolster other evidence of scienter, rather than [to provide] an independently sufficient basis" for scienter); *see also Liu v. Intercept Pharms., Inc.*, No. 17-CV-7371 (LAK), 2020 WL 1489831, at *19, *19 n.194 (S.D.N.Y. Mar. 26, 2020) (collecting cases and explaining that courts consider the "core operations" theory only "to bolster other substantial grounds for *scienter*" (emphasis in original)). Even where courts have applied the "core operations" doctrine, they have been inconsistent in determining what is considered "core" to a company's business. *Compare Reilly v. U.S. Physical Therapy, Inc.*, 17-CV-2347 (NRB), 2018 WL 3559089, at *18 (S.D.N.Y. July 23, 2018) (suggesting that the "core operations" doctrine "typically applies only where the operation in question constitutes nearly all of a company's business"), *with In re Avon Sec. Litig.*, No. 19-CV-1420 (CM), 2019 WL 6115349, at *20 (S.D.N.Y. Nov. 18, 2019) (finding that the company's operations

in its single largest market, Brazil—which "made up 21% of [its] revenues"—qualifies as part of the company's core operations and therefore "lends additional support [to] a strong inference of scienter").

Plaintiff's Consolidated Complaint alleges scienter based on, among other things, circumstantial evidence of recklessness. In particular, Plaintiff relies on the following sets of circumstantial evidence demonstrating scienter based on recklessness: (1) the Individual Defendants' high-level positions at Virtu, making them privy to confidential proprietary information at the company, (*see* Compl. ¶¶ 159-64)[17]; (2) Defendants' frequently issued statements about Virtu's protection of its clients' confidential trading information, (*see id.* ¶¶ 165-72); (3) Defendant Cifu's explicit admission that Virtu is a very small firm where everybody knows what is going on, (*see id.* ¶¶ 173-74); (4) the Individual Defendants' access to information regarding Virtu's core operations—its protection of confidential client trading information, (*see id.* ¶¶ 175-82); and (5) Virtu's corporate scienter based on the Individual Defendants' scienter, (*see id.* ¶ 183.) Defendants respond that "[t]he Complaint fails to allege *any* plausible theory of why Defendants would intentionally mislead the market about the FS Database Issue." (Mot. at 19-20 (emphasis in original).) Defendants further argue that any claim of intentionally misleading the market about the FS Database Issue "is belied by the fact that Virtu (1) identified the FS Database Issue, rectified it, and self-reported it to the SEC during a routine exam in 2019, and (2) continuously updated the market on the fact of and substance of the resultant SEC's investigation." (*Id.* at 20.) Thus, Defendants contend that it is "far more plausible" that "Virtu identified

---

[17] Plaintiff specifically pleads that the allegations regarding the Individuals Defendants' positions at Virtu support a strong inference of scienter for each of the Individual Defendants "*in conjunction with* the additional indicia of scienter" further detailed in the Consolidated Complaint. (*Id.* ¶ 164 (emphasis in original).)

the FS Database Issue and sought to be transparent with the market about the SEC investigation." (*Id.*; *see also* Reply at 10 (same).)

As an initial matter, the court addresses Defendants' argument that because Plaintiff has not alleged motive or opportunity, Plaintiff's "uphill battle to plead a strong inference of scienter becomes that much steeper." (Mot. at 20-21 (quoting *Nat'l Gen. Holdings Corp.*, 2021 WL 212337, at *11); *see also* Reply at 6 (arguing the same).) Defendants appear to rely on the reasoning from *Nat'l Gen. Holdings Corp.*, where the court characterized the Second Circuit's decision in *JP Morgan Chase* as "describing the higher bar plaintiffs must clear in pleading conscious misbehavior or recklessness without showing motive." 2021 WL 212337, at *11. However, the Second Circuit in *JP Morgan Chase* did not set a higher bar for pleading recklessness. Rather, it reemphasized that "recklessness is a sufficiently culpable mental state for securities fraud in this circuit." 553 F.3d at 198. The word "sufficient" means what it says: if Plaintiff can successfully plead the recklessness prong, that is enough to establish scienter. Obviously, relying solely on the recklessness prong—instead of making additional allegations of scienter based on the motive and opportunity prong—means that "the strength of the circumstantial allegations must be correspondingly greater." *JP Morgan Chase*, 553 F.3d at 198-99. That, however, does not raise the bar for allegations made under the recklessness prong alone, which remains sufficient for establishing scienter if pleaded adequately. *See id.* at 198.

Next, the court finds that Plaintiff successfully pleads facts supporting a strong inference of scienter by alleging various circumstantial evidence of recklessness. First, it is true that the Individual Defendants' corporate positions, standing alone, are not sufficient to show that they had access to relevant information about the FS Database Issue. *See Plumbers & Steamfitters*

*Loc. 773 Pension Fund.*, 694 F. Supp. 2d at 300. However, Plaintiff adequately alleges that the Individual Defendants "review[ed] or comment[ed] on press releases and SEC filings, and prepar[ed] for conference calls and investor presentations," which included statements and risk disclosures about Virtu's protection of client information. (*See* Compl. ¶ 163; *see also id.* ¶ 139 (listing Virtu's quarterly and annual reports filed with the SEC between August 9, 2019 and November 3, 2022, signed by the Individual Defendants, all of which included warnings about a potential failure to protect confidential and proprietary information).) As such, the Individual Defendants' "egregious refusal to see the obvious, or to investigate the doubtful,"—the FS Database Issue—"give[s] rise to an inference of recklessness." *See Chill*, 101 F.3d at 269; *see also In re Nio, Inc.*, 2021 WL 3566300, at *9 (finding adequate showing of scienter under the recklessness prong where the defendants had access to certain information or failed to check information that they had a duty to monitor). This court's ruling in *In re Nio* is particularly relevant here. There, this court emphasized that the defendants' statements about a purportedly ongoing construction project that had not "begun at all" was a much stronger indicator of recklessness than statements about "sales data which is prone to fluctuation and differing interpretations." *In re Nio, Inc.*, 2021 WL 3566300, at *9. That reasoning is squarely applicable here, because the Individual Defendants made statements about Virtu's protection of client information when the adequate safeguards were, at that time, missing. Given the allegations that the Individual Defendants were involved in reviewing and preparing press releases and SEC filings, this, at best, "was highly unreasonable, representing an extreme departure from the standards of ordinary care." *See Gould*, 692 F.3d at 158-59.

Second, the specificity of the Individual Defendants' statements further evidence their reckless state of mind. Although Plaintiff

does not plead any facts regarding "the specific document[s] containing the contradiction" regarding the FS Database Issue, *see Dentsply Sirona Inc.*, 732 F. Supp. 3d at 320, the Consolidated Complaint alleges that "the Individual Defendants signed quarterly and/or annual Company reports filed with the SEC . . . purporting to caution about the potential of '*the failure to*' maintain or protect '*confidential and proprietary information*,' when the Company had already failed in that regard," (Compl. ¶ 168 (emphases in original).) These are not some generic statements about Virtu's policies and procedures. They are very specific in addressing the very same issue—the FS Database Issue—that became the centerpiece of this litigation. And that level of specificity "is strong circumstantial evidence that" the Individual Defendants "were receiving some form of specific information" regarding the FS Database Issue. *See Lockheed Martin Corp.*, 875 F. Supp. 2d at 372; *see also In re Gen. Elec. Co.*, 857 F. Supp. 2d at 395-96 (inferring recklessness based on the specificity of the defendants' statements about a particular issue).

Third, Defendant Cifu's statement about the small size of Virtu, where individuals know what is happening at the firm, provides further circumstantial evidence of recklessness. Initially, it appears that Defendant Cifu's admission that Virtu is "*a very small firm where <u>everybody knows what's going on</u>,*" is too generic to support an inference of scienter. (Compl. ¶ 174 (emphasis in original).) For instance, unlike the statement in *Stadium Cap. LLC*, which specifically addressed the company's ability to monitor the daily influx of demand, Defendant Cifu's statement makes no reference to a specific issue. 2024 WL 456745, at *5-6 (concluding that the defendant "either knew that demand had fallen . . . or at least had access to that information" based on the statement that the defendant had the ability to monitor such information). However, the court's task is "context-specific" and "requires [it] to draw on its judicial experience and common sense" in determining the plausibility of the allegation. *See Iqbal*,

556 U.S. at 679. Defendant Cifu made this statement in the context of speaking about Virtu's acquisition of ITG and while providing assurances to potential, as well as existing clients, and investors that Virtu had the necessary policies and procedures in place to protect client information. (*See* Compl. ¶ 119.) Given the specific context, Plaintiff's allegation that the statement supports a strong inference that Defendant Cifu was reckless is plausible.

Fourth, the court finds that the "core operations" doctrine does not support an inference of recklessness with respect to the Individual Defendants. The court first acknowledges the uncertainty regarding the validity of this doctrine within the Second Circuit and that it can only "bolster other substantial grounds for *scienter*[.]" *Liu*, 2020 WL 1489831, at *19 (emphasis in original). Even then, Plaintiff's allegations fall short of explaining how adequate safeguarding of Virtu's clients' confidential information constituted a "core" component of Virtu's business. *See Reilly*, 2018 WL 3559089, at *18 (recognizing that the "core operations" is relevant when "the operation in question constitutes nearly all of a company's business"). For example, Plaintiff alleges that because "Virtu's venture into the agency execution business signified a major shift" in Virtu's traditional business approach, "Virtu's ability to adequately safeguard the confidential trading information . . . was critical to the Company's ability to develop its new business line." (Compl. ¶ 175.) But Plaintiff does not explain why this shift or the importance of safeguarding client information made it a "core" element of Virtu's business operations. Contrary to the Defendants' implications, Plaintiff need "not plead the amount of revenue Virtu made from execution services" to allege that it was part of Virtu's core operations. (*See* Mot. at 24.) *See also In re Avon*, 2019 WL 6115349, at *20 (finding a strong inference of scienter where the statements concerned the company's single largest market, constituting 21% of its revenues). Nevertheless, for the reasons described above,

Plaintiff's Consolidated Complaint is devoid of allegations showing that its ability to adequately safeguard confidential trading information or execution services was Virtu's core business operation.

Fifth, because the Consolidated Complaint pleads scienter with respect to the Individual Defendants who hold—or in the case of Defendant Ioffe, held—high-level positions at the company, their intent can be imputed to Virtu as well. *See In re Moody's*, 599 F. Supp. 2d at 515-16 (recognizing that "scienter by management-level employees is generally sufficient to attribute scienter to corporate defendants"). Here, the Consolidated Complaint sufficiently pleads corporate scienter on the basis that "[Virtu's] officers, management, and agents . . . acted with reckless disregard for the truth." (Compl. ¶ 183.) In a footnote, Defendants attempt to argue that the doctrine of "corporate scienter" only applies in "exceedingly rare" circumstances. (*See* Mot. at 25 n.8.) In support of their argument, Defendants cite *Jackson v. Abernathy*, which discusses the separate concept of "collective scienter." 960 F.3d 94, 98-99 (2d. Cir. 2020). "Collective corporate scienter" or "collective scienter" recognizes that a plaintiff "need not always identify the individuals responsible for the fraudulent statement" because "[i]n exceedingly rare instances, a statement may be so 'dramatic' that collective corporate scienter may be inferred." *Id.* (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Dynex Cap. Inc.*, 531 F.3d 190, 195-96 (2d Cir. 2008)). While the doctrine of "corporate scienter" imputes individual defendants' scienter to the company, the doctrine of "corporate collective scienter" endorses the view that "a corporate entity can act with an intent that is not derivative of the intent of one of its agents." *Dynex Cap.*, 531 F.3d at 195. These are not the same concepts. Thus, the court rejects the Defendants' argument that completely misrepresents the caselaw.

Lastly, in addition to finding that Plaintiff "plead[s] facts to support a *strong* inference of scienter," *Slayton*, 604 F.3d at 773 (emphasis in original), the court also concludes that Plaintiff's inference of scienter is at least as compelling as any opposing inference of non-fraudulent intent put forth by the Defendants. One of Plaintiff's most significant allegations supporting a strong inference of scienter is that "Virtu announced its plans to acquire ITG on the *same day* the SEC announced that . . . ITG failed to establish adequate safeguards and procedures to appropriately limit access to systems containing subscribers' confidential trading information." (Compl. ¶ 170.) The timing of these announcements makes the inference of recklessness as compelling as—if not more compelling than—Defendants' proposed non-culpable inference. (*See* Reply at 10 (arguing that Defendants were unaware of the FS Database Issue when the statements were made, rectified and self-reported it as soon as possible, and updated the market on the SEC investigation).) Critically, Defendants expressly conceded that they had actual knowledge of the FS Database Issue as of April 2019, when they discovered and fixed the issue. (Pl.'s Opp. at 25 (highlighting that "Defendants concede scienter for all misstatements after April 2019").) This, as Plaintiff's counsel correctly pointed out during oral argument, is an express concession of scienter for about 90 percent of the Class Period. (*See* Oral Arg. Tr. 70:25-71:3.)

In sum, having "assess[ed] all the allegations holistically," *see Tellabs*, 551 U.S. at 326, the court finds that Plaintiff sufficiently pleads that Defendants' conduct was "highly unreasonable, representing an extreme departure from the standards of ordinary care" given that the FS Database Issue "was either known to [Defendants] or so obvious that [Defendants] must have been aware

of it," *see Gould*, 692 F.3d at 158-59.[18] Furthermore, the court concludes that Plaintiff's "inference of scienter," supported by circumstantial evidence of Defendants' reckless failure to inform its investors about the FS Database Issue, is "cogent and at least as compelling as" Defendants' opposing inference that they identified the FS Database Issue, rectified it, and self-reported it to the SEC, while continuously updating the market on the fact of and substance of the resultant SEC investigation. *See Tellabs*, 551 U.S. at 314.

### B. Control Person Liability: Section 20(a) of the Exchange Act

Plaintiff also adequately alleges violations of Section 20(a) against the Individual Defendants. Under Section 20(a) of the Exchange Act, "[e]very person who, directly or indirectly, controls any person liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as such controlled person" unless the purported control person can demonstrate that he "acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." 15 U.S.C. § 78t(a). To that end, to successfully plead a Section 20(a) claim, "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant

---

[18] During oral argument, Defendants appeared to suggest that Plaintiff's scienter allegations were insufficient because Plaintiff did not show actual knowledge. (*See* Oral Arg. Tr. 37:14-17 ("You could always say senior executives should have asked more questions, but that's not enough to *plead that they actually knew* and were then deliberately lying to shareholders about some information security issue." (emphasis added)); *see also id.* 38:16 ("This doesn't show *Mr. Cifu knew* about it." (emphasis added)).) But, unlike the "actual knowledge" requirement under the PSLRA safe harbor discussed above, here, Plaintiff need not allege actual knowledge. That is because "a state of mind approximating actual intent," but short of "actual intent" is sufficient to show recklessness. *Novak*, 216 F.3d at 312. And that is exactly what Plaintiff adequately alleges here.

was, in some meaningful sense, a culpable participant in the controlled person's fraud." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 750 F.3d 227, 236 (2d Cir. 2014). "Control over a primary violator may be established by showing that the defendant possessed 'the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." *Sec. & Exch. Comm'n v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). Furthermore, "Section 20(a)'s culpable participation requirement is similar to the scienter requirement of Section 10(b)." *In re Refco, Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 661 (S.D.N.Y. 2007). As such, culpable participation "requires something more than negligence." *In re Alstom SA*, 406 F. Supp. 2d 433, 490 (S.D.N.Y. 2005). Defendants do not argue that they are not controlling persons within the meaning of the statute. (Mot. at 25.) For the reasons stated above, Plaintiff adequately alleges primary violation and scienter with respect to each Defendant. Therefore, Plaintiff sufficiently pleads control person liability against the Individual Defendants pursuant to Section 20(a).

## IV. LEAVE TO AMEND

Finally, the court grants Plaintiff leave to amend its Consolidated Complaint. Pursuant to Rule 15(a)(2), "[t]he court should freely give leave [to amend] when justice so requires." Fed. R. Civ. P. 15(a)(2). "A plaintiff need not be given leave to amend if it fails to specify either to the district court or to the court of appeals how amendment would cure the pleading deficiencies in its complaint." *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d 493, 505 (2d Cir. 2014). But "[c]omplaints dismissed under Rule 9(b) are almost always dismissed with leave to amend." *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986). As such, "[d]istrict courts typically grant plaintiffs at least one opportunity to plead fraud with greater specificity when they dismiss under Rule 9(b)." *ATSI*, 493

F.3d at 108; *see also Attestor Value Master Fund v. Republic of Arg.*, 940 F.3d 825, 833 (2d Cir. 2019) ("We have been particularly skeptical of denials of requests to amend when a plaintiff did not previously have a district court's ruling on a relevant issue[.]"). And the Second Circuit "ha[s] explained [that] the permissive standard of Rule 15 is consistent with [its] strong preference for resolving disputes on the merits." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 190 (2d Cir. 2015). Significantly, "[t]he decision to grant or deny leave to amend rests within the discretion of the trial court." *N. Assurance Co. of Am. v. Square D Co.*, 201 F.3d 84, 87 (2d Cir. 2000).

At the very end of its opposition brief, Plaintiff states that "[s]hould the Court find the Complaint to be deficient *in any respect*, Plaintiff respectfully requests leave to amend." (Pl.'s Opp. at 25 n.40 (emphasis added).) Defendants oppose Plaintiff's request. (*See* Reply at 10.) Here, for the first time, the court finds that Plaintiff's allegations regarding the falsity of the Category 3 statements are insufficient. It follows then that Plaintiff should have another "opportunity to plead fraud with greater specificity" with respect to those statements. *See ATSI*, 493 F.3d at 108; *see also Attestor Value Master Fund*, 940 F.3d at 833 (noting the Second Circuit's skepticism of "denials of requests to amend when a plaintiff did not previously have a district court's ruling on a relevant issue"). To that end, consistent with the Second Circuit's "strong preference for resolving disputes on the merits," *see Loreley Fin.*, 797 F.3d at 190, the court grants Plaintiff leave to amend the Consolidated Complaint with respect to its deficiencies concerning the Category 3 statements.

## V. CONCLUSION

For the foregoing reasons, the court GRANTS in part and DENIES in part Defendants' motion to dismiss. The court GRANTS Defendants' motion to dismiss with respect to the Category 3 statements because Plaintiff fails to allege that the Category 3

statements are materially false or misleading. The court otherwise DENIES Defendants' motion to dismiss. The court further GRANTS Plaintiff's request for leave to amend its Consolidated Complaint with respect to the Category 3 statements.

SO ORDERED.

Dated:     Brooklyn, New York
           March 17, 2025

                                        s/Nicholas G. Garaufis
                                   ———————————————————
                                   NICHOLAS G. GARAUFIS
                                   United States District Judge