1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------x

                                        23-CV-3770(CHK)
IN RE VIRTU FINANCIAL, INC.
SECURITIES LITIGATION,

                                        United States Courthouse
                                        Brooklyn, New York

                                        November 7, 2025
                                        3:00 p.m.


-------------------------------x

        TRANSCRIPT OF CIVIL CAUSE FOR DISCOVERY CONFERENCE
                ALL PRESENT VIA TELECONFERENCE
           BEFORE THE HONORABLE CLAY H. KAMINSKY
                UNITED STATES MAGISTRATE JUDGE


APPEARANCES

Attorney for Plaintiff:  ROBBINS GELLER RUDMAN & DOWD LLP
City of Birmingham        58 South Service Road
Retirement and Relief     Suite 200
System                    Melville, New York 11747
                          BY:  ROBERT D. GERSON, ESQ.
                               JOSHUA DENNIS FORGY, ESQ.
                               MAGDALENE ECONOMOU, ESQ.


Attorney for Defendant:  PAUL, WEISS, RIFKIND, WHARTON
Virtu Financial, Inc.    & GARRISON LLP
                         1285 Avenue of the Americas
                         New York, New York 10019-6064
                         BY:  ALISON R. GROSS BENEDON, ESQ.
                              JOHAN ERIK TATOY, ESQ.


Transcription Service:   LINDA D. DANELCZYK, RPR, CSR, CCR
                         Phone:  (201)452-5143
                         Email:  LindaDan226@gmail.com


Proceedings recorded by electronic sound recording, transcript produced by transcription service.

PROCEEDINGS                                   2

(In open court; all present via teleconference.)

THE COURT:  Start the recording and call the case.

THE COURTROOM DEPUTY:  Yes, Judge.

This is a civil cause for discovery conference, Docket Number 23-CV-3770, In re Virtu Financial, Inc. Securities Litigation.

Can the parties please state their appearance, starting with the plaintiff.

MR. GERSON:  Good afternoon, Your Honor.  This is Robert Gerson from Robbins Geller Rudman & Dowd on behalf of the lead plaintiff, City of Birmingham Retirement and Relief System.

Also on the line are my colleagues, Magdalene Economou and Joshua Forgy.

THE COURT:  Good afternoon.

MS. BENEDON:  Good afternoon, Your Honor.  This is Alison Benedon from Paul Weiss on behalf of the defendants.

And I'm joined by my colleague, Johan Tatoy.

THE COURT:  All right, good afternoon to you as well.

And I understand that we don't have anyone on the line for Ms. Hiebert; is that right?

MS. BENEDON:  Yes, that's correct.

So the way, Your Honor, these securities class actions work is that my clients, now that the Court appointed

PROCEEDINGS                                                      3

lead plaintiff, Ms. Hiebert, was the initial plaintiff, who

originally commenced the case, but the City of Birmingham is

the lead plaintiff on this.

THE COURT:  Understood.  Thank you.

All right, so this is -- I'm Magistrate Judge Clay

Kaminsky.  I'm new to your case.  And I understand that we

have a discovery dispute, which I hope we can resolve

informally today; if not, you'll be invited to submit further

briefing.  So let's get right to it.

Has there been any development on either of the two

issues that you raised since your October 29th letter?

I'll start with you, Mr. Gerson.

MR. GERSON:  There has not.

The defendants are still gathering documents for

other custodians, which we appreciate, but for the current

dispute that's before the Court, the issue remains the same.

THE COURT:  All right.  So let's --

MS. BENEDON:  And if I may, Your Honor.

THE COURT:  Please, Ms. Benedon.

MS. BENEDON:  This is Alison Benedon on behalf of

the defendants.

It's actually our view that quite a lot has changed,

in terms of the search term dispute, and from additional

information that we've learned, from the agreed-upon

custodians and the additional work that we've done, to collect

PROCEEDINGS                                                    4

and review documents.

But I'm happy to table that, if you'd like to get started on the custodians, in the first instance.

THE COURT:  I'm happy to take whichever issue the parties wish to take first.

Ms. Benedon, it sounds like you'd like to talk about the search terms.  We can take that first.

What has changed, in your view?

MS. BENEDON:  Sure.

So as is teed up in the plaintiffs' position, what is in dispute is the application of a broader search term for the FS search string with respect to two custodians.

But it's always been our view that it should be considered in the aggregate.  Burden isn't just discussed on a search-term-by-search-term basis.  And since the parties submitted the joint letter, we have been working with our client and with our relativity vendor and have now been in a position to actually test the search terms on, I'll call them, Custodians 8 and 9.

So we had six custodians --

THE COURT:  For my understanding, who are Custodians 8 and 9?

MS. BENEDON:  So custodians -- I'm sorry, I meant to say 9 and 10.

So we had six initial custodians that defendants

PROCEEDINGS                                            5

offered right off the bat.  So those included the four named individual defendants, plus the two individuals which we had disclosed as being the most intimately involved in the -- and you can't see my air quotes -- but the FS database issue.

So those six we were proactive in collecting their data, and those have always been the six agreed-upon custodians.

Then in the course of the parties' negotiations, we agreed to Custodians 7 and 8, who were Prasanna Jagtap and Tamir Nitzan.

THE COURT:  Okay.

MS. BENEDON:  And we worked with the client to collect that information and process it piecemeal.

And then since we've submitted the letter, we've been in the position to fully process Custodians 9 and 10, who are Nick Rupprecht and Ryan Hodgson.

And part of what has always animated defendant's position with respect to the search terms was that we couldn't yet assess the full burden when we were talking about the application of the search term to Custodians 1 through 6, because we still knew at that point in time that we would be collecting additional data.

THE COURT:  Uh-huh.

MS. BENEDON:  And we've now done so.

The analysis -- and just by way of background.

PROCEEDINGS                                    6

The parties have been in discussions about this, and for the most part, I think, have been working quite cooperatively and have been able to find reasonable solutions to problems that have arisen.  So I don't mean this to sound accusatory in any way, because the parties have actually had further discussions since submission of the letter.

But with respect to Nick Rupprecht in particular, he has, what I can only describe as an astronomical amount of data.

So for all ten of the custodians that we collected for, his data accounted for more than half.

THE COURT:  Okay.

MS. BENEDON:  And given his role at the company, we've since discovered that he is the recipient, the unlucky recipient, I would think, of tons and tons of system-generated reports and emails having to do with any time a trade is entered in the system, system updates, system checks.

And given the broad search strings that are at issue, even the modified version of the search string that we were using, it was bringing in tons of these system-generated reports that are very clearly not responsive.  They're just, largely, strings of code or other sort of -- I can't -- like computer-generated nonsense, from my perspective, that includes the word "FS" with any number of additional words.

THE COURT:  Let me -- can I stop you for a minute,

PROCEEDINGS                                        7

just to make sure that I understand.

MS. BENEDON:  Yes, of course, Judge.

THE COURT:  The data that we're talking about, is it mostly in the form of emails?

MS. BENEDON:  Yes.

THE COURT:  Okay.

And the -- I don't want to call them "junk emails," but the system-generated emails that you think are going to be not responsive in any event, and I'll hear, of course, from plaintiffs' counsel whether they think any of them are responsive, are they all from the same email address?

MS. BENEDON:  No.

So we spent quite a bit of time this week trying to understand what was driving the hits and if there was some sort of like easy fix to go through them.

But we actually -- the parties have, on our own, been able to come up with a sort of solution to the Rupprecht data.  So I don't -- that is actually not what's at issue for Your Honor.

I bring it up only to say that in doing that exercise, we have spent a lot more time looking at the sort of false hits that can be generated with even our modified version of the disputed terms.

So the reason for the search term dispute, from our perspective, has always been that the search term was

overbroad.  It's not a carefully crafted term.

So the company uses the FS database for all aspects of its business.  It's not something that was limited to whether or not the permissioning is appropriately limited.

It's so much bigger than that at this company.  And the work that we've been doing, since the submission of the letter just underscores, from our perspective, that there's no reason to further expand that search term, whether it brings in an additional 200 documents, 2,000 documents, or 200,000 documents, it's still not a good term.

And there are emails -- there are system email addresses that include the letters "FS" that --

THE COURT:  Let me ask you a couple other questions, because I do think it's relevant how many documents it's returning, in terms of the burden, whether or not it's a good term.

How many -- how many documents is it returning, and what is the hit rate for relevancy?

MS. BENEDON:  So when you say how many is it returning, for which custodians are referring to?

THE COURT:  Well, I mean, I guess that's the rub, right?

But I gave a sample that you understand well, maybe the first six custodians.  How many documents is it returning over those?

PROCEEDINGS                                    9

Or if you think that's not the right universe.  If there's a different universe you have your head around and want to tell me about, I'd hear that.

MS. BENEDON:  So I believe, and I'm happy to let Rob take this.

I believe that the disputed universe is 2300 documents.

THE COURT:  2,300.

MS. BENEDON:  Yes.

MR. TATOY:  That's right.

THE COURT:  Over all the custodians.

MS. BENEDON:  That is only with respect to some of the additional -- I'm sorry, some of the original custodians.

THE COURT:  I see.

And what is the -- you know, that's not in the grand scheme of things a huge number of documents.

What is the hit rate?

MS. BENEDON:  From the work that we've done thus far, the responsiveness rate for the FS documents has been exceptionally low.

So for the documents that we've actually conducted a document-by-document review, it was consistently below 5 percent responsiveness.

However, and here's where the recent happening has sort of informed our view.

PROCEEDINGS                                          10

With respect to Rupprecht documents, the -- a full set of terms for his documents returned 850,000 documents, 550 of which were hit on the FS term, as defendants had modified it.

And through the work that we did to sort of isolate the junk, only with respect to Rupprecht's data, we were able to cut it down by several hundred thousand, but even still, there were a lot of types that are going to be mostly nonresponsive but couldn't be excluded wholesale.

So we have -- and just to give one example.  The company, the way that they track sort of like help desk requests, like if someone puts in like "Can you fix this?", the system's called "zero".

And when you submit a ticket for something happening in the back end system, it's assigned a number.  And the number that's assigned begins "FS".  So it's FS-1234, for example, is the identification number for these various tickets.

And all of those are being brought in to the review, even though they're -- they're not response, unless they actually have to do with the, quote, FS database issue.

So just -- again, from our perspective, because "FS" is a word that is used in basically every aspect of Virtu's ordinary business, it makes it quite difficult to willingly agree to review more, and a further expanded universe of

PROCEEDINGS                                    11

documents, even if it's only 2300 when we're still working

through what is a ton of documents to review for these other

custodians.

THE COURT:  Let me ask you a related question, or

maybe it's not a related question.

These documents that are being pulled by the search

terms, are any of them privileged, and if so, how many?

MS. BENEDON:  We do have a subset of documents that

have been marked as privileged and are being withheld subject

to an ongoing second level privilege review.

I do not think that our review burden is

exceptionally high, but there are certainly a subset of

documents that are being at least flagged in the first

instance for privilege.  Some are certainly privileged,

others, I'm sure, will be redesignated when we come to

finalize our privilege log.  But it's not a giant universe of

documents.

THE COURT:  The reason I ask is, you know, if, you

know, documents involving counsel, for example, could be

removed, you know, one possible solution is to put the burden

on plaintiffs to go through all these, you know, and to give

them what they ask for and let them go through it.

Is that something that would be workable?

MS. BENEDON:  That's not something that we have

considered.  And I -- it's something I would have to discuss

PROCEEDINGS                                    12

with my client.  I'm not in the position to say that we could do that.

THE COURT:  All right, let me -- unless there's something else you want me to know right now on the search terms, I'll hear you, but then otherwise I think I'll hear from Mr. Gerson.

MS. BENEDON:  Nothing further on that issue, Your Honor.  Thank you.

THE COURT:  Mr. Gerson?

MR. GERSON:  Yes, good afternoon, Your Honor.  Again, Robert Gerson from Robbins Geller.

Just a quick bit of background here.

So as Your Honor's well aware, this is a securities fraud case in which my client alleges that the defendants made materially false and misleading statements over a five-year period.

So given that it's a securities fraud class action, my clients need to prove, among other things, what the defendants, you know, those who made the statements to investors, knew or should have known about this problem at the time.

So we need discussions inside the heart of the company and up to the C-suite that connective issue with what the defendants ultimately said.

So we have agreed, with the defendants -- as stated

PROCEEDINGS                                    13

in my letter, we have agreed with the defendants, from the beginning, that the numbers were outside for these software folks.

We completely agree with them.  We don't want the code.  We don't need the code.  But the numbers are not outside for, you know, in the original six defendants -- original six custodians includes the four individual defendants.

So there's 2,306 documents that hit with our original search term.  And we have, at every instance, been willing to narrow the term with respect to the software folks.

As I stated in my letter, at one point I was willing to go so far as to agree to such a limited term for the two developers, so the two developers in the first six, the effect of which would eliminate 10,000 documents from the pool, to the extent that the defendant gave over the 2300, and they still said "no".

So we understand, and we appreciate the effort that the defendants are making and all the documents that they're going through, but we think it's imminently reasonable to treat the sort of software-type issues different from the -- from the defendants themselves and those who reported directly to them.

We don't necessarily need the (indiscernible) tickets.  We don't want the code.  We're happy to keep further

PROCEEDINGS 14

narrowing it down.

But we think the defendants, with respect, are unfairly grouping this altogether, when it really should be treated as separate buckets.

There's no reason why we shouldn't be able to receive the 2,000 documents in this massive five-year securities fraud case for those custodians.

THE COURT:  So let me ask you a version of the question that I just asked your colleague, which is:  If they were to dump these on you without reviewing them for relevancy, would you be willing to bear the cost of doing the relevance review?

MR. GERSON:  Yes.

MS. BENEDON:  Your Honor, may I say something with one point of clarification, and I'm sorry, Rob.

But I'm now looking at the numbers, and I just want to clarify.  It hit on 2300 documents, but a parenthetical that makes clear would require review of 3,991 documents, including families.

So I just wanted to make that correction.

THE COURT:  Right.

And just so I understand it, and I did see the point in the letter about the families, of course.

Just so I can understand, are these -- this is the set of documents that we're talking about.  We're talking

PROCEEDINGS                                          15

about, you know, 2300 to, what, I think the families of this are 3991.

Those are the set from which you say less than 5 percent are responsive or that is the responsive set?

MS. BENEDON:  That is the set that the search terms hit on from the broader population that we collected.

What I described as the exceptionally low --

THE COURT:  Relevant -- responsiveness rate.

MS. BENEDON:  Yes.

So, I'm sorry.

So 3,991 are the documents that hit on the search terms that haven't yet been reviewed.

From our review of other custodians' documents, that's how we identified the exceptionally low responsive rate.

So of the documents that hit on terms for other people, we have reviewed them, and we'll only be producing, or already have produced, a small subset, given our responsiveness burden.

THE COURT:  All right.

I mean, I think my initial reaction here is that, you know, I'm sympathetic to Mr. Gerson's argument that this is, you know, a large multi-year securities fraud class action, and, you know, less than 4,000 documents, in that context, is not huge.

PROCEEDINGS 16

And if they're not privileged, I think your remedy, Ms. Benedon, is to just dump them on the plaintiffs and let them review it, which they've said they're happy to do, if you don't think it's worth defendant's time reviewing it.

MS. BENEDON:  Your Honor, if I may.

If we are ordered to turn over 4,000 documents, the technical reality is that we're going to have to review them.

It's -- we're going to have to review them for privilege.  And it's not -- it's not 4,000 documents.  We've reviewed 8,900 documents for the first set of custodians.

We've reviewed -- for Custodians 7 and 8, the search terms hit on 63,000 documents.

For Custodian 10, the search terms hit on 35,000 documents.

And we haven't yet finalized a set of search terms that work for Custodian 9, who is the one with the massive set of data.

So I -- to talk about the burden, in isolation of 4,000 documents, is prejudicial, from our perspective, but we will, of course, take Your Honor's thoughts into consideration.  And if we have to proceed to briefing, we certainly can do that.

THE COURT:  Understood.

And, of course, you're right that it's the overall burden.  But we're talking about a particular issue here, and

it doesn't seem to be a huge set of documents.

You know, there may also be, you know, half measures.  You haven't reviewed these documents at all.

Let me ask you.  You proposed running narrower search terms across that same set; is that right?

MS. BENEDON:  Not only did we propose it, Your Honor, we did so.

THE COURT:  And have you produced those documents to plaintiff?

MS. BENEDON:  We produced the small subset of those documents that were responsive.

THE COURT:  With your narrower search terms, what -- what percent was responsive?

MS. BENEDON:  The 5 percent that I quoted was like generally across the board.

I don't have more specific information, but we can certainly get that for the Court, if you're interested in that information.

THE COURT:  How many documents did your narrow search terms return that you had to review?

MS. BENEDON:  For the disputed term for the few custodians, I'm not -- I don't have that specific number in front of me.

THE COURT:  All right.

Well, let me turn to Mr. Gerson.

For that set of documents that you got from those custodians where defendant used the narrower search terms and then reviewed for responsiveness, Mr. Gerson, is there anything about that set that leads you to believe that there is more out there that you're missing if you'd run the wider search terms?

MR. GERSON:  Yes, Your Honor.

I think also -- in terms of the responsive, I mean the numbers can get skewed here because there are probably so many irrelevant documents from these software folks.  So it's hard to sort of, I think, calculate them in the aggregate versus a responsiveness for, you know, for example, the four individual defendants.

But the documents that they've produced to us, so far, certainly have been responsive and on point for some of the issues, and we have every reason to believe that there's even more specific discussions, but there's no one there.

We just -- we have tried so many times to be more reasonable and cut -- cut it for the other folks, and we're continuing to be willing to do so, but we just, frankly, feel we're entitled to those other documents.  There's no reason why they all have to be grouped together across the board.

MS. BENEDON:  If I can just respond to that, Your Honor.

THE COURT:  Yes.

PROCEEDINGS                                                    19

MS. BENEDON:  What you did not hear from my colleague on the other side is an actual explanation of why our modification is in position, just that they think that they should be entitled to more.

They have -- plaintiffs have never articulated an actual issue with our modification, they just don't like that we're reviewing a smaller set of documents than what they believe to be the normal amount of documents in a securities case.

THE COURT:  Well, thank you, Ms. Benedon, and I was -- it did not go unnoticed that you had not answered my question, Mr. Gerson.

So what leads you to believe that the wider search terms are going to return something that you missed -- that they missed?

MR. GERSON:  So the whole idea is that, you know, we need to establish the connection between these lower software people and the people at the top of the company.

And we've seen some documents in our, what we've seen so far that connects that link, but there has to be more out there because they haven't hit yet.

And these defendants are making (indiscernible) about these issues over a five-year period, so...

THE COURT:  Look, let me ask you this.  Let me ask you this question in a different way.

PROCEEDINGS                                    20

What's the difference between your proposed search term and there's?  And what are they going to miss with there's?

MR. GERSON:  So there's -- so our -- it's a lot.  If Your Honor has our letter there, it's in that footnote 1, right?

THE COURT:  Yes.

MR. GERSON:  So I think essentially this term, the FS -- within 50 is dropped within ten in the defendant's proposal.  So what happens is that obviously it's severely limited.

So when defendants originally gave us their revision, their first revision cut the pool of documents down from 60,000 to 131.  And then we went back to them and stated that that was obviously way too much.

So we've been working with them the whole time, and we got them to agree, and we appreciate, to go back to sort of using "FS" and not the "FS database" issue.

But the whole idea that we narrowly tailored our term, after we went through the 30,000 documents from the SEC reduction, and very carefully selected search terms, including many of which had different narrowed date range, so as to minimize the defendant's burden.

Search terms that we proposed can take four different date ranges.  Because based on the documents that

PROCEEDINGS                                21

we've seen, we're able to tell, you know, that there are certain things ended at certain times or certain issues didn't happen until later.  So we tried everything to give -- given our set, and we received the hit reports from them, and we have every reason to believe that the -- there's helpful documents for the plaintiff in this set of 2,000 documents.

THE COURT:  Is there a reason that you selected 50?

And, Ms. Benedon, is there a reason you selected ten?

I mean I -- those are quite different numbers.  Is there a compromise position of 30, or is the 50 meaningful to you?

MR. GERSON:  Well, I can compromise, just like we are with everything else.

Ten is too narrow.  The ten only gives us like a couple of hundred documents for the four individual defendants.

MS. BENEDON:  So -- and my colleague just sent me a message that our modified term for the four individual defendants hit on 854 documents.

But if Your Honor is looking at the actual search string.

THE COURT:  I am.

MS. BENEDON:  The FS, within ten, of permissions entitled trade access, the case is not about the FS database

PROCEEDINGS                                    22

at large, that is a tool that is used by the business to do every day work, to enter trades.

They are a very successful financial services company, and there are tons of every day reasons why those ordinary words would appear in documents.

The case is about a very specific permissioning issue in the FS database.

We did ten because we thought this was always unreasonable.  What you heard counsel mention that we initially pushed for a term that began with "FS database" within some number, and these other documents.

And we also, our proposal attempted to include words such as "disclose" or "transparent," because those are words that actually have to do with the claims at issue, which is whether anybody intended to mislead the market by hiding this information.  It's not just that Joe Schmo entered a trade in the FS database.

So --

THE COURT:  That's true.

MS. BENEDON:  -- compromise --

Sorry, go ahead, Your Honor.

THE COURT:  Right, no, no, no, it's not just -- it's not just the final step of misleading, it's also about knowledge.  It's the intermediate stuff, right?

MS. BENEDON:  Of course it's about knowledge, but

PROCEEDINGS                                        23

knowledge of what?  Not just knowledge of the FS database, it's knowledge of the very specific short-term issue that arose at the company.

And that's what our modifications -- our modification was an attempt at a compromise.

From right off the bat, from the very first discussion, we said that their FS search string was unreasonable entirely because it was not limited to the actual claims and defenses, and it was basically so broad as to bring in everyday communications untethered to the alleged fraud.

So we tried to put together other search terms relating to the FS database issue.  Permissioning issues. Disclosure issues.  The challenge statement relates to claims or statements that were to -- it's the most transparent with client data.

So we attempted to propose terms relating to transparency, client data, FS database issue.

Lowering it from 50 to ten, with our compromised position, if plaintiff were so passionate about this specific search string that we thought we had to make it more reasonable so that we weren't just bringing in every single communication with lines of coding that include the words "FS" and "trades".

So ten is not meaningful, vis-a-vis 12, 15, 20, it was just our view that this search string is unreasonable

PROCEEDINGS                                      24

entirely.

So if we're going to use an unreasonable search string, we're only going to do it for a small universe of documents.

THE COURT: All right. And your -- your modified search term returned 854 documents that then you reviewed; is that right?

MS. BENEDON: Correct. For the four initial custodians.

THE COURT: And how many did you end up -- of those, how many of those did you end of producing?

MS. BENEDON: I don't have that answer, but maybe my colleague will do some magic and send me that information shortly.

THE COURT: Mr. Gerson, do you know?

MR. GERSON: I don't, Your Honor.

THE COURT: Okay.

And just to be clear, what we're talking about now, this universe of the 2306 documents for families, or the 854, this is just for the four individual defendants?

MR. GERSON: Correct. I believe that's right.

But, Alison, there is that mark -- the bottom of the hit report also just says "Virtu Financial". So I guess that's sort of a company-wide bucket, but I -- as far as I'm aware, it's the four individual custodians, and I believe also

sort of the -- the custodian that says on the hit report "Virtu Financial".

MS. BENEDON:  I believe, and, Rob, I'm happy to follow up with you on this, but I believe those are the documents that we had collected through like our own targeted collection then were being turned over.

So I believe that's a mistake on the hit report, but I am happy to follow up on that.

THE COURT:  Okay, but we're mostly talking about the individual defendants?

Do I have that correct?

MS. BENEDON:  Yes, Your Honor.

THE COURT:  Okay.

All right, I would be interested in that number. While we're waiting for it, let's turn to the custodian issue.

So there's a Mr. Simons and a Mr. Fairclough.

So as I understand it, Mr. Simons is the current CEO but was the chief technology officer at the relevant time.

Ms. Benedon, Mr. Gerson in their letter says that you don't deny that Mr. Simons would have relevant information, and your objection is just that it would be duplicative.

Is that -- has he accurately stated your objection?

MS. BENEDON:  With respect to Mr. Simons, I don't think that's accurate.

PROCEEDINGS                                                          26

We have no reason to believe that he was involved in the underlying FS case -- FS database fix issue, any of that. And the -- the quote that the plaintiff had cited, just that's he a really senior guy at the company and who oversaw an integration.

There are two sort of mergers, acquisitions, that took place at Virtu, whose data from those companies was ultimately rolled into the FS database.

And that is not actually what this case is about. It's about permissioning of that database, which certainly was not happening at the (indiscernible) time.

And just as a point of clarification that we think is extremely important, the securities production -- I'm sorry, the production that was turned over to the plaintiffs that initiated in the SEC investigation, the way that that universe of documents came to be was by running a system-wide search across every single employee at the company.

And there were only two search terms that were used, but they were the two passwords that are the generic log-in credentials that are at the heart of the FS database issue.

And if Aaron Simons was involved in that, plaintiff has those documents already.

So we are talking about supplemental collections for many of these custodians, and plaintiff has not ever pointed to a single document in the, what is now probably

PROCEEDINGS                                    27

35,000-some-odd documents that we've produced, that would have included Aaron Simons documents if he ever talked about those generic log-in credentials.

And there's no reason -- there's no connection between him and the actual claims.  It's just that he's a senior guy.

But he's not one of the senior people who's alleged to have made a misstatement.  And if he was talking to any of the senior people who actually made the alleged misstatements, we'd get that from those defendants in (indiscernible).

So from our perspective, there's no basis whatsoever even to be talking about Aaron Simons.

THE COURT:  All right, let's stop there.

Mr. Gerson?

MR. GERSON:  Sure.

So Aaron Simons, the chief technology officer of the company in a case about a severe technology problem, who, according to the documents produced by the defendants, directly reported to the person who made almost all of the false statements to investors in this case.

So with respect to Ms. Benedon's point about how the search terms run, in the SEC case, they're different.  The SEC case is more about the sort of the existence of this issue.  A little bit more at the granular level.

Our case is about the statements.  Our case is about

what the defendants told investors.

And Virtu issued a press release three months ago that said, as the chief technology officer of Virtu, Mr. Simons' role included oversight of all technology and infrastructure, including the post-merger technology integrations of both KCG and ITG.

The FS database problem that this whole case is about came into existence with the KCG integration.

So Virtu put the new KCG client data in the same platform holding Virtu's existing proprietary same data.

So the person who was ultimately in charge of that integration is absolutely, and we submit, appropriate custodian, in this securities fraud case concerning defendant's statements.

THE COURT:  What about the argument that if he were involved you would have seen a document with his name on it already?

MR. GERSON:  Well, Your Honor, we don't know that he was -- I mean he -- again, as Ms. Benedon pointed out, the only terms that were used in the SEC search was a password. It was "view only" and "view only".

So if the issues were discussed in any other way, shape or form, they wouldn't have been a part of the SEC's production.  They searched across the board with only those two narrow search terms.

THE COURT:  And I -- and I suppose it's your argument that those passwords you'd expect to come out more at the individual computer scientist or engineer level, not at the chief technology officer level.

MR. GERSON:  That's correct, Your Honor.

We would envision that this issue would be spoken about and in a different dialect going up the chain.

THE COURT:  What do you say about that, Mr. Benedon -- or, sorry, Ms. Benedon?

MS. BENEDON:  I think it's completely speculative, and the federal rules do not allow plaintiff to go on sort of the fishing expedition that they're hoping to go on.

We have -- this is not a complicated securities case.  And I actually believe that it is plaintiff, in their opposition to our motion to dismiss, who in their very first sentence described this case as a straightforward one, and we agree.

There are less than a handful of people who are alleged to have made misstatements.  And there are a handful of people who were involved in the FS database fix.  Aaron Simons isn't one of them.

So he either was involved or he wasn't involved, and plaintiffs can't seem to get it straight.

If he was involved, like they think -- they apparently read that disclosure as him having been involved in

every single decision with respect to every single thing that needed to be integrated.

So if he was involved, then they would have seen those documents in the SEC data -- in the SEC collection, or he wasn't, and then there's no reason for us to be going on this journey.

It's just, from our perspective, it's nothing but pure speculation. And at this late stage in the case where they already have a lot of discovery, it's, we think, sort of an egregious position to be taken.

THE COURT: Have you already collected from Mr. Cifu, who Mr. Simons reported to?

MS. BENEDON: We have. And we've produced his responsive documents.

THE COURT: All right.

Mr. Gerson, does Mr. Simons appear in that responsive set?

MR. GERSON: On some. On some documents. But not as many as we had anticipated.

And to the extent that he spoke with -- you know, the way these cases often work, it sort of reaches a certain level of the corporate flagpole.

So if Mr. Simons is speaking about these issues with any of his underlings, we don't have those documents.

MS. BENEDON: And just to that point, Your Honor,

which was raised in the letter.

The fact that Mr. Simons' underlings are not custodians is exactly the point.

This whole issue was handled by people who sat elsewhere in the org chart.  It's completely speculative.

THE COURT:  Mr. -- I thought the underling issue was with respect to Mr. Fairclough.

MR. GERSON:  Yes.

THE COURT:  You know, Mr. Gerson, I haven't heard a strong reason, other than -- other than simply his position in the company, to think that Mr. Simons is a custodian.

Don't you think that if he were -- that if he were working on this, you'd have broader -- I mean, I understand your point about the SEC collection was pretty specific, but don't you think in the documents you're getting now from the other custodians, including Mr. Cifu, that you would see some evidence that Mr. Simons was involved, if it existed?

MR. GERSON:  Well, a part of it is sort of we're not entirely sure if, you know, what is in this sort of disputed bucket, in terms of the other documents, what is -- still remains out there.

Perhaps, you know, in this bucket of 2,000 documents that the defendants won't let us see that there's -- that he could be all over those documents.

So it's sort of we don't have the complete set yet,

PROCEEDINGS                                      32

so I understand Your Honor's question but we don't really have the complete set yet to make our determination as to our position on that.

THE COURT:  That's fair.

What about Mr. Fairclough?  Can I hear from the parties about Mr. Fairclough?

MR. GERSON:  Sure.

So Brett Fairclough, he was the copresident and COO. This is someone that was identified by the defendants, in their responses and objections to our interrogatories, about having been involved in the fix.

And Ms. Benedon mentioned the fix.  The fix is one mere issue in this case.  Again, this case only goes back to their statements.

So once we knew of his identity and knew that he would have responsive information, we had our reviewers do a deep dive and see documents that he was a part of.

And his documents did hit on some of the SEC materials for sure, including emails where he writes about physical information barriers and the agency desk, and he keeps all of those documents.

He's also on the document asking about lockdowns and restrictions in the FS database.  He seems to have been very involved.

So I think the defendant's argument is that there

would -- the information would be duplicative, but I think it's worth pointing out the idea that, as Ms. Benedon mentioned, they're working hand in hand with the vendor, who every time has produced to us these duplicated totals.

So the defendants have the ability to automatically de-duplicate. So we think that their burden argument here is entirely speculative.

THE COURT: Thank you.

MR. GERSON: In addition, Your Honor, we plan to take the depositions of both of these individuals, and respectfully submit that there's no reason why we shouldn't have access to their documents.

THE COURT: Let me hear from you, Ms. Benedon, on both of those issues.

MS. BENEDON: Sure.

And just before I get started, I've gotten a note from my colleague that the narrow modified terms to the initial -- for the four defendants, resulted in 44 documents. So 5 percent, just over 5 percent responsiveness for the 854 documents that we reviewed using our modified version.

THE COURT: Thank you.

MS. BENEDON: With respect to Mr. Fairclough, the plaintiffs keep coming back to the fact that we identified him in our interrogatory response. And we did. But we identified him in the context of a list of people.

So the interrogatories were all about the FS database problem.  Again, not about the disclosures, not about who spoke to the people who made the alleged misstatements, just about the actual identification of the FS database issue, and the manner in which it was fixed.

So what we identified was that the two people responsible for maintaining the segregation of customer trading information, and the company's trading data within the FS database, are two other people.  Those people are Desmond Carbery and David Karnowski, both of whom are custodians.

We then identified Prasanna Jagtap in response to a different interrogatory about who was responsible for making a change from 75 simultaneous users in the FS database to 125 simultaneous users in the database.  And Prasanna Jagtap is now an agreed-upon custodian.

And we've also identified, in response to a different interrogatory, that Tamir Nitzan was the chief information security officer, and that before that was formalized as a role, David Karnowski performed that function.  Those two people are custodians.

So what plaintiff turned to is a list of ten people that we identified as being involved in the set.  So we -- four of those people are custodians.  But Fairclough --

THE COURT:  Can you -- yes.

MS. BENEDON:  I'm sorry, go ahead.

PROCEEDINGS                                              35

THE COURT:  No, no, no, yes, I was just asking you to turn to Mr. Fairclough, yes.

So please continue.

MS. BENEDON:  So Mr. Fairclough was not actually doing the work.  He was -- and the emails and communications that plaintiff has, from the documents we've already produced, reflect that he has a senior role in that fix.

He was checking in with the other custodians, asking questions of the other custodians, who were actually doing the work.

And going back to how the documents came to be produced in the SEC investigation, the plaintiffs do have documents where Brett Fairclough is the custodian from that set.  Because we're not disputing that he was in some way involved, but what the SEC production shows, is that his involvement was limited to communications with people who were custodians already.

If Mr. Fairclough was speaking to other people at the company who weren't custodians, that, I think, would be a very different story, and we'd probably be having a different conversation.

But just given Mr. Fairclough's role, which is a very senior person at the company.  He's co-president and co-COO.  So just like Aaron Simons, we're talking about number one and number two at the company.  And his role was one of

PROCEEDINGS                                    36

oversight, and the people that he was overseeing are custodians.

So that's -- that's why, from our perspective, it is entirely duplicative. And it is always the case, in a custodian negotiation, that you don't -- you don't just look -- if there are 40 people in a specific function at a company, you don't ever take all 40, you pick the ones who matter the most.

So Mr. Fairclough is not one of the speakers of any of the alleged misstatements. And if he spoke to any of the people who made the alleged misstatements, we'd get that from those custodians.

And given his oversight role and the fact that the people who knew was overseeing with the fix are custodians, that's why, from our perspective, this is sort of just overkill, given the program that we've already agreed to do.

THE COURT: All right. Thank you.

Let me tell you both where I see this going, and then I can hear from you on what you want to do. But I'll --

MS. BENEDON: Before you do that, Your Honor, I realize there's one piece of information that it may be relevant to your consideration and hasn't been raised.

And that is just the practical implication for us. Because our client is not able to test search terms in-house, which has animated from the way that this dispute has

unfolded.

Because in order to even test the search terms and get a picture of burden, our client needs to be burdened, in the first instance, by downloading all of the custodian's information, exporting it to KLD, our relativity vendor, who then has to import the data, process it, and then test it.

So I wanted you to have that information.

THE COURT:  All right.  Thank you.  I appreciate that.

So taking the custodians -- or taking the search terms first, I'm persuaded that the plaintiffs are entitled to a little bit more than they've got.  And I don't see that the additional 2,306 documents, or 3,991 documents, including families, is disproportionate to their needs here.

It may be that, as the parties talk, it may be that a different search term could be crafted that is somewhere between ten and 50, but I think, given the numbers here and given the fact that these are the individual defendants, I would be inclined to let them have it.

With respect to Mr. Simons, I don't think that they have made the appropriate showing yet, that he has, you know, information.  It may be that something in those 300 -- 3,991 documents changes that.  But I don't think that they've made the showing yet.

And with respect to Mr. Fairclough, it seems to me

that if he has relevant information, and both parties agree that he does, and he did have 11 direct reports, who may not have worked on this but you never know what he might have tasked them with, I'm going to err on the side of allowing him to be a custodian and, you know, counting on the fact that I understand that there's a burden for collecting his documents, but since he does have relevant documents, and they can be viewed electronically, I think that that is a fair compromise there.

So I would say that the defendants should produce to the more added search terms, unless something in between can be negotiated, and they should produce from Brett Fairclough.

And for Aaron Simons, I would be disinclined to order that at this time but, of course, that could change.

So that is -- that's where I'm at.

I'm happy to hear from either party about that. If either party feels strongly that I've got it wrong and wants to file a formal motion or wants to appeal to Judge Garaufis, of course, they are entitled to do that, whichever way you feel.

So let me hear from -- let me hear from both parties on that sort of -- that tentative ruling, if you will.

Mr. Gerson?

MR. GERSON: Yes, Your Honor.

We thank the Court for your time today, and we're

willing to proceed as directed by the Court.

THE COURT:  All right.

Ms. Benedon?

MS. BENEDON:  Thank you, Your Honor.

I hear you.  I understand why the Court has ruled in that manner.

I will come back to the fact that we have an overall burden to consider, but if -- if the Court has directed us to begin collecting Brett Fairclough's documents, we certainly will go ahead and do so.

THE COURT:  All right, thank you.

And the search terms as well.

MS. BENEDON:  Understood.

THE COURT:  All right, is there anything else from either party today?

MR. GERSON:  Nothing from the plaintiffs, Your Honor.

MS. BENEDON:  The only thing, Your Honor, was that I don't think actually requires the Court's intervention, is that the schedule contemplated completion of document production by today, but allow the parties to extend any deadline that would not impact a filing deadline.

And the parties had discussed earlier in the week that we'd, of course, have to do so with -- in light of our latest issues with Nick Rupprecht's data, and then, of course,

PROCEEDINGS                                            40

pending Your Honor's ruling.

So we may have to come back to court at some point if we do bump up on a scheduling -- on a filing deadline, but just alerting the Court that that is going on in the background.

THE COURT:  All right.  Thank you for letting me know.

All right.  Thank you, both.  We're adjourned.  Have a good weekend.

MR. GERSON:  Thank you.

                    *     *     *     *     *


I certify that the foregoing is an accurate transcript from the official electronic sound recording of the proceedings in the above-entitled matter.


   s/ Linda D. Danelczyk                    February 11, 2026

   LINDA D. DANELCZYK                       DATE

*LINDA D. DANELCZYK, RPR, CSR, CCR*

| | | |
|---|---|---|
| MR. GERSON: [22]<br>MR. TATOY: [1]  9/10<br>MS. BENEDON: [50]<br>THE COURT: [66]<br>THE COURTROOM DEPUTY: [1]<br> 2/3<br><br>-<br><br>---------------------------<br>**-x [2]**  1/2 1/8<br><br>**1**<br><br>**10 [3]**  4/24 5/15 16/13<br>**10,000 [1]**  13/15<br>**10019-6064 [1]**  1/19<br>**11 [2]**  38/2 40/19<br>**11747 [1]**  1/14<br>**12 [1]**  23/24<br>**1234 [1]**  10/16<br>**125 [1]**  34/13<br>**1285 [1]**  1/19<br>**131 [1]**  20/14<br>**15 [1]**  23/24<br><br>**2**<br><br>**2,000 [4]**  8/9 14/6 21/6<br> 31/22<br>**2,300 [1]**  9/8<br>**2,306 [2]**  13/9 37/13<br>**20 [1]**  23/24<br>**200 [2]**  1/14 8/9<br>**200,000 [1]**  8/9<br>**201 [1]**  1/22<br>**2025 [1]**  1/6<br>**2026 [1]**  40/19<br>**23-CV-3770 [2]**  1/3 2/5<br>**2300 [5]**  9/6 11/1 13/16<br> 14/17 15/1<br>**2306 [1]**  24/19<br>**29th [1]**  3/11<br><br>**3**<br><br>**3,991 [4]**  14/18 15/11 37/13<br> 37/22<br>**30 [1]**  21/11<br>**30,000 [1]**  20/20<br>**300 [1]**  37/22<br>**35,000 [1]**  16/13<br>**35,000-some-odd [1]**  27/1<br>**3770 [2]**  1/3 2/5<br>**3991 [1]**  15/2<br>**3:00 [1]**  1/6<br><br>**4**<br><br>**4,000 [4]**  15/24 16/6 16/9<br> 16/19<br>**40 [2]**  36/6 36/7<br>**44 [1]**  33/18<br>**452-5143 [1]**  1/22<br><br>**5**<br><br>**5 percent [5]**  9/23 15/4<br> 17/14 33/19 33/19 | **50 [5]**  20/9 21/7 21/11 23/18<br> 37/17<br>**5143 [1]**  1/22<br>**550 [1]**  10/2<br>**58 [1]**  1/13<br><br>**6**<br><br>**60,000 [1]**  20/14<br>**6064 [1]**  1/19<br>**63,000 [1]**  16/12<br><br>**7**<br><br>**75 [1]**  34/13<br><br>**8**<br><br>**8,900 [1]**  16/10<br>**850,000 [1]**  10/2<br>**854 [4]**  21/20 24/6 24/19<br> 33/19<br><br>**A**<br><br>**Aaron [7]**  26/21 27/2 27/12<br> 27/16 29/20 35/24 38/13<br>**ability [1]**  33/5<br>**able [6]**  6/3 7/17 10/6 14/5<br> 21/1 36/24<br>**above-entitled [1]**  40/16<br>**absolutely [1]**  28/12<br>**access [2]**  21/25 33/12<br>**according [1]**  27/18<br>**accounted [1]**  6/11<br>**accurate [2]**  25/25 40/14<br>**accurately [1]**  25/23<br>**accusatory [1]**  6/5<br>**acquisitions [1]**  26/6<br>**action [2]**  12/17 15/24<br>**actions [1]**  2/25<br>**actual [6]**  19/2 19/6 21/21<br> 23/8 27/5 34/4<br>**added [1]**  38/11<br>**addition [1]**  33/9<br>**additional [7]**  3/23 3/25<br> 5/22 6/24 8/9 9/13 37/13<br>**address [1]**  7/11<br>**addresses [1]**  8/12<br>**adjourned [1]**  40/8<br>**afternoon [5]**  2/9 2/15 2/16<br> 2/19 12/10<br>**agency [1]**  32/20<br>**aggregate [2]**  4/14 18/11<br>**ago [1]**  28/2<br>**agree [6]**  10/25 13/4 13/13<br> 20/17 29/17 38/1<br>**agreed [7]**  3/24 5/6 5/9<br> 12/25 13/1 34/15 36/16<br>**agreed-upon [3]**  3/24 5/6<br> 34/15<br>**ahead [3]**  22/21 34/25 39/10<br>**air [1]**  5/4<br>**alerting [1]**  40/4<br>**ALISON [4]**  1/20 2/17 3/20<br> 24/22<br>**alleged [7]**  23/10 27/7 27/9<br> 29/19 34/3 36/10 36/11 | **alleges [1]**  12/14<br>**allow [2]**  29/11 39/21<br>**allowing [1]**  38/4<br>**almost [1]**  27/19<br>**altogether [1]**  14/3<br>**Americas [1]**  1/19<br>**amount [2]**  6/8 19/8<br>**analysis [1]**  5/25<br>**animated [2]**  5/17 36/25<br>**answer [1]**  24/12<br>**answered [1]**  19/11<br>**anticipated [1]**  30/19<br>**appeal [1]**  38/18<br>**appear [2]**  22/5 30/16<br>**appearance [1]**  2/7<br>**APPEARANCES [1]**  1/12<br>**application [2]**  4/11 5/20<br>**appointed [1]**  2/25<br>**appreciate [4]**  3/15 13/18<br> 20/17 37/8<br>**appropriate [2]**  28/12 37/21<br>**appropriately [1]**  8/4<br>**argument [5]**  15/22 28/15<br> 29/2 32/25 33/6<br>**arisen [1]**  6/4<br>**arose [1]**  23/3<br>**articulated [1]**  19/5<br>**aspect [1]**  10/23<br>**aspects [1]**  8/2<br>**assess [1]**  5/19<br>**assigned [2]**  10/15 10/16<br>**astronomical [1]**  6/8<br>**attempt [1]**  23/5<br>**attempted [2]**  22/12 23/16<br>**automatically [1]**  33/5<br>**Avenue [1]**  1/19<br>**aware [2]**  12/13 24/25<br><br>**B**<br><br>**background [3]**  5/25 12/12<br> 40/5<br>**barriers [1]**  32/20<br>**based [1]**  20/25<br>**basis [2]**  4/15 27/11<br>**bat [2]**  5/1 23/6<br>**bear [1]**  14/11<br>**because [13]**  5/21 6/5 8/14<br> 10/22 18/9 19/21 20/25 22/8<br> 22/13 23/8 35/14 36/24 37/2<br>**began [1]**  22/10<br>**beginning [1]**  13/2<br>**begins [1]**  10/16<br>**behalf [3]**  2/10 2/17 3/20<br>**below [1]**  9/22<br>**BENEDON [16]**  1/20 2/17 3/19<br> 3/20 4/6 16/2 19/10 21/8<br> 25/19 28/19 29/9 29/9 32/12<br> 33/2 33/13 39/3<br>**Benedon's [1]**  27/21<br>**bigger [1]**  8/5<br>**Birmingham [3]**  1/13 2/11 3/2<br>**bit [4]**  7/13 12/12 27/24<br> 37/12<br>**board [3]**  17/15 18/22 28/24 |

**B**

**bottom [1]**   24/22
**Brett [4]**   32/8 35/13 38/12
 39/9
**briefing [2]**   3/9 16/21
**bringing [2]**   6/20 23/21
**brings [1]**   8/8
**broad [2]**   6/18 23/9
**broader [3]**   4/11 15/6 31/13
**Brooklyn [1]**   1/5
**brought [1]**   10/19
**bucket [3]**   24/24 31/20 31/22
**buckets [1]**   14/4
**bump [1]**   40/3
**burden [13]**   4/14 5/19 8/15
 11/11 11/20 15/19 16/18
 16/25 20/23 33/6 37/3 38/6
 39/8
**burdened [1]**   37/3
**business [3]**   8/3 10/24 22/1

**C**

**C-suite [1]**   12/23
**calculate [1]**   18/11
**Carbery [1]**   34/10
**carefully [2]**   8/1 20/21
**case [24]**
**cases [1]**   30/21
**CCR [1]**   1/22
**CEO [1]**   25/17
**certain [4]**   21/2 21/2 21/2
 30/21
**certainly [7]**   11/12 11/14
 16/22 17/17 18/15 26/10 39/9
**certify [1]**   40/14
**chain [1]**   29/7
**challenge [1]**   23/13
**change [2]**   34/13 38/14
**changed [2]**   3/22 4/8
**changes [1]**   37/23
**charge [1]**   28/11
**chart [1]**   31/5
**checking [1]**   35/8
**checks [1]**   6/17
**chief [5]**   25/18 27/16 28/3
 29/4 34/17
**CHK [1]**   1/3
**Cifu [2]**   30/12 31/16
**cited [1]**   26/3
**City [3]**   1/13 2/11 3/2
**civil [2]**   1/9 2/4
**claims [4]**   22/14 23/9 23/13
 27/5
**clarification [2]**   14/15
 26/12
**clarify [1]**   14/17
**class [3]**   2/24 12/17 15/23
**CLAY [2]**   1/10 3/5
**clear [2]**   14/18 24/18
**clearly [1]**   6/21
**client [9]**   4/17 5/12 12/1
 12/14 23/15 23/17 28/9 36/24
 37/3
**clients [2]**   2/25 12/18

**co [2]**   35/23 35/24
**co-COO [1]**   35/24
**co-president [1]**   35/23
**code [4]**   6/22 13/5 13/5
 13/25
**coding [1]**   23/22
**colleague [6]**   2/18 14/9 19/2
 21/18 24/13 33/17
**colleagues [1]**   2/13
**collect [2]**   3/25 5/13
**collected [4]**   6/10 15/6 25/5
 30/11
**collecting [4]**   5/5 5/22 38/6
 39/9
**collection [3]**   25/6 30/4
 31/14
**collections [1]**   26/23
**coming [1]**   33/23
**commenced [1]**   3/2
**communication [1]**   23/22
**communications [3]**   23/10
 35/5 35/16
**companies [1]**   26/7
**company [17]**   6/13 8/2 8/5
 10/11 12/23 19/18 22/4 23/3
 24/24 26/4 26/17 27/17 31/11
 35/19 35/23 35/25 36/7
**company's [1]**   34/8
**company-wide [1]**   24/24
**complete [2]**   31/25 32/2
**completely [3]**   13/4 29/10
 31/5
**completion [1]**   39/20
**complicated [1]**   29/13
**compromise [5]**   21/11 21/13
 22/20 23/5 38/8
**compromised [1]**   23/18
**computer [2]**   6/23 29/3
**computer-generated [1]**   6/23
**concerning [1]**   28/13
**conducted [1]**   9/21
**conference [2]**   1/9 2/4
**connection [2]**   19/17 27/4
**connective [1]**   12/23
**connects [1]**   19/20
**consider [1]**   39/8
**consideration [2]**   16/21
 36/22
**considered [2]**   4/14 11/25
**consistently [1]**   9/22
**contemplated [1]**   39/20
**context [2]**   15/25 33/25
**continue [1]**   35/3
**continuing [1]**   18/20
**conversation [1]**   35/21
**COO [2]**   32/8 35/24
**cooperatively [1]**   6/3
**copresident [1]**   32/8
**corporate [1]**   30/22
**correct [5]**   2/23 24/8 24/21
 25/11 29/5
**correction [1]**   14/20
**cost [1]**   14/11
**counsel [3]**   7/10 11/19 22/9

**counting [1]**   38/5
**couple [2]**   8/13 21/16
**course [11]**   5/8 7/2 7/9
 14/23 16/20 16/24 22/25
 38/14 38/19 39/24 39/25
**Court's [1]**   39/19
**Courthouse [1]**   1/4
**crafted [2]**   8/1 37/16
**credentials [2]**   26/20 27/3
**CSR [1]**   1/22
**current [2]**   3/15 25/17
**custodian [10]**   16/13 16/16
 25/1 25/15 28/13 31/11 34/15
 35/13 36/5 38/5
**Custodian 10 [1]**   16/13
**Custodian 9 [1]**   16/16
**custodian's [1]**   37/4
**custodians [41]**
**Custodians 1 [1]**   5/20
**Custodians 7 [1]**   5/9
**Custodians 8 [2]**   4/19 4/22
**Custodians 9 [1]**   5/15
**custodians' [1]**   15/13
**customer [1]**   34/7
**cut [4]**   10/7 18/19 18/19
 20/13
**CV [2]**   1/3 2/5

**D**

**DANELCZYK [3]**   1/22 40/19
 40/20
**data [17]**   5/6 5/22 6/9 6/11
 7/3 7/18 10/6 16/17 23/15
 23/17 26/7 28/9 28/10 30/4
 34/8 37/6 39/25
**database [23]**
**date [3]**   20/22 20/25 40/20
**David [2]**   34/10 34/19
**de [1]**   33/6
**de-duplicate [1]**   33/6
**deadline [3]**   39/22 39/22
 40/3
**decision [1]**   30/1
**deep [1]**   32/17
**defendant [3]**   1/18 13/16
 18/2
**defendant's [6]**   5/17 16/4
 20/9 20/23 28/14 32/25
**defendants [32]**
**defenses [1]**   23/9
**DENNIS [1]**   1/15
**deny [1]**   25/20
**depositions [1]**   33/10
**describe [1]**   6/8
**described [2]**   15/7 29/16
**desk [2]**   10/11 32/20
**Desmond [1]**   34/9
**determination [1]**   32/2
**developers [2]**   13/14 13/14
**development [1]**   3/10
**dialect [1]**   29/7
**difference [1]**   20/1
**different [13]**   9/2 13/21
 19/25 20/22 20/25 21/10

**D**

**different... [7]** 27/22 29/7 34/12 34/17 35/20 35/20 37/16
**difficult [1]** 10/24
**direct [1]** 38/2
**directed [2]** 39/1 39/8
**directly [2]** 13/22 27/19
**disclose [1]** 22/13
**disclosed [1]** 5/3
**disclosure [2]** 23/13 29/25
**disclosures [1]** 34/2
**discovered [1]** 6/14
**discovery [4]** 1/9 2/4 3/7 30/9
**discuss [1]** 11/25
**discussed [3]** 4/14 28/22 39/23
**discussion [1]** 23/7
**discussions [4]** 6/1 6/6 12/22 18/17
**disinclined [1]** 38/13
**dismiss [1]** 29/15
**disproportionate [1]** 37/14
**dispute [6]** 3/7 3/16 3/23 4/11 7/24 36/25
**disputed [4]** 7/23 9/6 17/21 31/19
**disputing [1]** 35/14
**DISTRICT [2]** 1/1 1/1
**dive [1]** 32/17
**Docket [1]** 2/5
**document [6]** 9/22 9/22 26/25 28/16 32/22 39/20
**documents [92]**
**done [3]** 3/25 5/24 9/18
**DOWD [2]** 1/13 2/10
**down [3]** 10/7 14/1 20/13
**downloading [1]** 37/4
**driving [1]** 7/14
**dropped [1]** 20/9
**dump [2]** 14/10 16/2
**duplicate [1]** 33/6
**duplicated [1]** 33/4
**duplicative [3]** 25/22 33/1 36/4

**E**

**EASTERN [1]** 1/1
**easy [1]** 7/15
**ECONOMOU [2]** 1/16 2/14
**effect [1]** 13/14
**effort [1]** 13/18
**egregious [1]** 30/10
**either [5]** 3/10 29/22 38/16 38/17 39/15
**electronic [2]** 1/25 40/15
**electronically [1]** 38/8
**eliminate [1]** 13/15
**elsewhere [1]** 31/5
**email [3]** 1/23 7/11 8/11
**emails [7]** 6/16 7/4 7/7 7/8 8/11 32/19 35/5
**employee [1]** 26/17

**engineer [1]** 29/3
**enter [1]** 22/2
**entered [2]** 6/17 22/16
**entirely [5]** 23/8 24/1 31/19 33/7 36/4
**entitled [6]** 18/21 19/4 21/25 37/11 38/19 40/16
**envision [1]** 29/6
**ERIK [1]** 1/20
**err [1]** 38/4
**ESQ [5]** 1/15 1/15 1/16 1/20 1/20
**essentially [1]** 20/8
**establish [1]** 19/17
**event [1]** 7/9
**everyday [1]** 23/10
**evidence [1]** 31/17
**exactly [1]** 31/3
**example [4]** 10/10 10/17 11/19 18/12
**exceptionally [4]** 9/20 11/12 15/7 15/14
**excluded [1]** 10/9
**exercise [1]** 7/21
**existed [1]** 31/17
**existence [2]** 27/23 28/8
**existing [1]** 28/10
**expand [1]** 8/8
**expanded [1]** 10/25
**expect [1]** 29/2
**expedition [1]** 29/12
**explanation [1]** 19/2
**exporting [1]** 37/5
**extend [1]** 39/21
**extent [2]** 13/16 30/20
**extremely [1]** 26/13

**F**

**fact [6]** 31/2 33/23 36/13 37/18 38/5 39/7
**fair [2]** 32/4 38/8
**Fairclough [14]** 25/16 31/7 32/5 32/6 32/8 33/22 34/23 35/2 35/4 35/13 35/18 36/9 37/25 38/12
**Fairclough's [2]** 35/22 39/9
**false [3]** 7/22 12/15 27/20
**families [5]** 14/19 14/23 15/1 24/19 37/14
**far [5]** 9/19 13/13 18/15 19/20 24/24
**February [1]** 40/19
**federal [1]** 29/11
**few [1]** 17/21
**file [1]** 38/18
**filing [2]** 39/22 40/3
**final [1]** 22/23
**finalize [1]** 11/16
**finalized [1]** 16/15
**financial [6]** 1/3 1/18 2/5 22/3 24/23 25/2
**first [12]** 4/3 4/5 4/7 8/24 11/13 13/14 16/10 20/13 23/6 29/15 37/4 37/11

**fishing [1]** 29/12
**five [3]** 12/15 14/6 19/23
**five-year [3]** 12/15 14/6 19/23
**fix [9]** 7/15 10/12 26/2 29/20 32/11 32/12 32/12 35/7 36/14
**fixed [1]** 34/5
**flagged [1]** 11/13
**flagpole [1]** 30/22
**folks [4]** 13/3 13/11 18/10 18/19
**follow [2]** 25/4 25/8
**footnote [1]** 20/5
**footnote 1 [1]** 20/5
**foregoing [1]** 40/14
**FORGY [2]** 1/15 2/14
**form [2]** 7/4 28/23
**formal [1]** 38/18
**formalized [1]** 34/19
**four [11]** 5/1 13/7 18/12 20/24 21/16 21/19 24/8 24/20 24/25 33/18 34/23
**frankly [1]** 18/20
**fraud [6]** 12/14 12/17 14/7 15/23 23/10 28/13
**front [1]** 17/23
**FS [35]**
**FS-1234 [1]** 10/16
**full [2]** 5/19 10/1
**fully [1]** 5/15
**function [2]** 34/19 36/6

**G**

**Garaufis [1]** 38/18
**GARRISON [1]** 1/18
**gathering [1]** 3/14
**GELLER [3]** 1/13 2/10 12/11
**generally [1]** 17/15
**generated [5]** 6/15 6/20 6/23 7/8 7/22
**generic [2]** 26/19 27/3
**GERSON [15]** 1/15 2/10 3/12 12/6 12/9 12/11 17/25 18/3 19/12 24/15 25/19 27/14 30/16 31/9 38/23
**Gerson's [1]** 15/22
**giant [1]** 11/16
**given [10]** 6/13 6/18 12/17 15/18 21/3 35/22 36/13 36/16 37/17 37/18
**gmail.com [1]** 1/23
**grand [1]** 9/15
**granular [1]** 27/24
**GROSS [1]** 1/20
**grouped [1]** 18/22
**grouping [1]** 14/3
**guess [2]** 8/21 24/23
**guy [2]** 26/4 27/6

**H**

**half [2]** 6/11 17/2
**hand [2]** 33/3 33/3
**handful [2]** 29/18 29/19

**H**

**handled [1]**   31/4
**happy [8]**   4/2 4/4 9/4 13/25
  16/3 25/3 25/8 38/16
**hard [1]**   18/11
**head [1]**   9/2
**heard [2]**   22/9 31/9
**heart [2]**   12/22 26/20
**helpful [1]**   21/5
**hiding [1]**   22/15
**Hiebert [2]**   2/22 3/1
**high [1]**   11/12
**hit [17]**   8/18 9/17 10/3 13/9
  14/17 15/6 15/11 15/16 16/12
  16/13 19/21 21/4 21/20 24/23
  25/1 25/7 32/18
**hits [2]**   7/14 7/22
**Hodgson [1]**   5/16
**holding [1]**   28/10
**Honor [26]**
**Honor's [4]**   12/13 16/20 32/1
  40/1
**HONORABLE [1]**   1/10
**hope [1]**   3/7
**hoping [1]**   29/12
**house [1]**   36/24
**huge [3]**   9/16 15/25 17/1
**hundred [2]**   10/7 21/16

**I**

**idea [3]**   19/16 20/19 33/2
**identification [2]**   10/17
  34/4
**identified [8]**   15/14 32/9
  33/23 33/24 34/6 34/11 34/16
  34/22
**identity [1]**   32/15
**imminently [1]**   13/20
**impact [1]**   39/22
**implication [1]**   36/23
**import [1]**   37/6
**important [1]**   26/13
**in-house [1]**   36/24
**INC [3]**   1/3 1/18 2/5
**inclined [1]**   37/19
**include [3]**   8/12 22/12 23/22
**included [3]**   5/1 27/2 28/4
**includes [2]**   6/24 13/7
**including [6]**   14/19 20/21
  28/5 31/16 32/19 37/13
**indiscernible [4]**   13/24
  19/22 26/11 27/10
**individual [10]**   5/2 13/7
  18/13 21/16 21/19 24/20
  24/25 25/10 29/3 37/18
**individuals [2]**   5/2 33/10
**informally [1]**   3/8
**information [17]**   3/24 5/13
  17/16 17/18 22/16 24/13
  25/21 32/16 32/20 33/1 34/8
  34/18 36/21 37/5 37/7 37/22
  38/1
**informed [1]**   9/25
**infrastructure [1]**   28/5

**initial [5]**   3/1 4/25 15/21
  24/8 33/18
**initiated [1]**   26/15
**inside [1]**   12/22
**instance [4]**   4/3 11/14 13/10
  37/4
**integrated [1]**   30/2
**integration [3]**   26/5 28/8
  28/12
**integrations [1]**   28/6
**intended [1]**   22/15
**interested [2]**   17/17 25/14
**intermediate [1]**   22/24
**interrogatories [2]**   32/10
  34/1
**interrogatory [3]**   33/24
  34/12 34/17
**intervention [1]**   39/19
**intimately [1]**   5/3
**investigation [2]**   26/15
  35/12
**investors [3]**   12/20 27/20
  28/1
**invited [1]**   3/8
**involved [15]**   5/3 26/1 26/21
  28/16 29/20 29/22 29/22
  29/24 29/25 30/3 31/17 32/11
  32/24 34/22 35/15
**involvement [1]**   35/16
**involving [1]**   11/19
**irrelevant [1]**   18/10
**isolate [1]**   10/5
**isolation [1]**   16/18
**issue [25]**
**issued [1]**   28/2
**issues [11]**   3/11 13/21 18/16
  19/23 21/2 23/12 23/13 28/22
  30/23 33/14 39/25
**ITG [1]**   28/6

**J**

**Jagtap [3]**   5/9 34/11 34/14
**Joe [1]**   22/16
**JOHAN [2]**   1/20 2/18
**joined [1]**   2/18
**joint [1]**   4/16
**JOSHUA [2]**   1/15 2/14
**journey [1]**   30/6
**JUDGE [5]**   1/10 2/3 3/5 7/2
  38/18
**Judge Garaufis [1]**   38/18
**junk [2]**   7/7 10/6

**K**

**KAMINSKY [2]**   1/10 3/6
**Karnowski [2]**   34/10 34/19
**KCG [3]**   28/6 28/8 28/9
**keep [2]**   13/25 33/23
**keeps [1]**   32/21
**KLD [1]**   37/5
**knowledge [5]**   22/24 22/25
  23/1 23/1 23/2
**known [1]**   12/20

**L**

**large [2]**   15/23 22/1
**largely [1]**   6/22
**late [1]**   30/8
**latest [1]**   39/25
**lead [3]**   2/11 3/1 3/3
**leads [2]**   18/4 19/13
**learned [1]**   3/24
**least [1]**   11/13
**less [3]**   15/3 15/24 29/18
**letter [11]**   3/11 4/16 5/14
  6/6 8/7 13/1 13/12 14/23
  20/5 25/19 31/1
**letters [1]**   8/12
**letting [1]**   40/6
**level [5]**   11/10 27/24 29/3
  29/4 30/22
**light [1]**   39/24
**limited [6]**   8/3 8/4 13/13
  20/11 23/8 35/16
**LINDA [3]**   1/22 40/19 40/20
**LindaDan226 [1]**   1/23
**line [2]**   2/13 2/22
**lines [1]**   23/22
**link [1]**   19/20
**list [2]**   33/25 34/21
**LITIGATION [2]**   1/4 2/6
**LLP [2]**   1/13 1/18
**lockdowns [1]**   32/22
**log [3]**   11/16 26/19 27/3
**log-in [2]**   26/19 27/3
**low [3]**   9/20 15/7 15/14
**lower [1]**   19/17
**Lowering [1]**   23/18

**M**

**MAGDALENE [2]**   1/16 2/13
**magic [1]**   24/13
**MAGISTRATE [2]**   1/10 3/5
**maintaining [1]**   34/7
**manner [2]**   34/5 39/6
**mark [1]**   24/22
**marked [1]**   11/9
**market [1]**   22/15
**massive [2]**   14/6 16/16
**materially [1]**   12/15
**materials [1]**   32/19
**matter [2]**   36/8 40/16
**mean [7]**   6/4 8/21 15/21 18/8
  21/10 28/19 31/13
**meaningful [2]**   21/11 23/24
**meant [1]**   4/23
**measures [1]**   17/3
**Melville [1]**   1/14
**mention [1]**   22/9
**mentioned [2]**   32/12 33/3
**mere [1]**   32/13
**merger [1]**   28/5
**mergers [1]**   26/6
**message [1]**   21/19
**might [1]**   38/3
**minimize [1]**   20/23
**minute [1]**   6/25
**mislead [1]**   22/15

**M**

misleading **[2]**   12/15 22/23
missed **[2]**   19/14 19/15
missing **[1]**   18/5
misstatement **[1]**   27/8
misstatements **[5]**   27/9 29/19 34/3 36/10 36/11
mistake **[1]**   25/7
modification **[3]**   19/3 19/6 23/5
modifications **[1]**   23/4
modified **[7]**   6/19 7/22 10/3 21/19 24/5 33/17 33/20
months **[1]**   28/2
most **[4]**   5/3 6/2 23/14 36/8
mostly **[3]**   7/4 10/8 25/9
motion **[2]**   29/15 38/18
Mr. Benedon **[1]**   29/9
Mr. Cifu **[2]**   30/12 31/16
Mr. Fairclough **[10]**   25/16 31/7 32/5 32/6 33/22 35/2 35/4 35/18 36/9 37/25
Mr. Fairclough's **[1]**   35/22
Mr. Gerson **[12]**   3/12 12/6 12/9 17/25 18/3 19/12 24/15 25/19 27/14 30/16 31/9 38/23
Mr. Gerson's **[1]**   15/22
Mr. Simons **[10]**   25/16 25/17 25/20 25/24 30/12 30/16 30/23 31/11 31/17 37/20
Mr. Simons' **[2]**   28/4 31/2
Ms. Benedon **[12]**   3/19 4/6 16/2 19/10 21/8 25/19 28/19 29/9 32/12 33/2 33/13 39/3
Ms. Benedon's **[1]**   27/21
Ms. Hiebert **[2]**   2/22 3/1
multi **[1]**   15/23
multi-year **[1]**   15/23

**N**

name **[1]**   28/16
named **[1]**   5/1
narrow **[5]**   13/11 17/19 21/15 28/25 33/17
narrowed **[1]**   20/22
narrower **[3]**   17/4 17/12 18/2
narrowing **[1]**   14/1
narrowly **[1]**   20/19
necessarily **[1]**   13/24
need **[5]**   12/18 12/22 13/5 13/24 19/17
needed **[1]**   30/2
needs **[2]**   37/3 37/14
negotiated **[1]**   38/12
negotiation **[1]**   36/5
negotiations **[1]**   5/8
never **[2]**   19/5 38/3
Nick **[3]**   5/16 6/7 39/25
Nitzan **[2]**   5/10 34/17
nonresponsive **[1]**   10/9
nonsense **[1]**   6/23
normal **[1]**   19/8
note **[1]**   33/16
nothing **[3]**   12/7 30/7 39/16

November **[1]**   1/6
number **[11]**   2/5 6/24 9/16 10/15 10/16 10/17 17/22 22/11 25/14 35/24 35/25
numbers **[6]**   13/2 13/5 14/16 18/9 21/10 37/17

**O**

objection **[2]**   25/21 25/23
objections **[1]**   32/10
obviously **[2]**   20/10 20/15
October **[1]**   3/11
October 29th **[1]**   3/11
odd **[1]**   27/1
offered **[1]**   5/1
officer **[5]**   25/18 27/16 28/3 29/4 34/18
official **[1]**   40/15
often **[1]**   30/21
ongoing **[1]**   11/10
open **[1]**   2/1
opposition **[1]**   29/15
order **[2]**   37/2 38/14
ordered **[1]**   16/6
ordinary **[2]**   10/24 22/5
org **[1]**   31/5
original **[4]**   9/13 13/6 13/7 13/10
originally **[2]**   3/2 20/12
otherwise **[1]**   12/5
outside **[2]**   13/2 13/6
overall **[2]**   16/24 39/7
overbroad **[1]**   8/1
overkill **[1]**   36/16
oversaw **[1]**   26/4
overseeing **[2]**   36/1 36/14
oversight **[3]**   28/4 36/1 36/13
own **[2]**   7/16 25/5

**P**

p.m **[1]**   1/6
parenthetical **[1]**   14/17
part **[5]**   5/17 6/2 28/23 31/18 32/17
particular **[2]**   6/7 16/25
parties **[12]**   2/7 4/5 4/15 6/1 6/5 7/16 32/6 37/15 38/1 38/21 39/21 39/23
parties' **[1]**   5/8
party **[3]**   38/16 38/17 39/15
passionate **[1]**   23/19
password **[1]**   28/20
passwords **[2]**   26/19 29/2
PAUL **[2]**   1/18 2/17
pending **[1]**   40/1
percent **[6]**   9/23 15/4 17/13 17/14 33/19 33/19
performed **[1]**   34/19
Perhaps **[1]**   31/22
period **[2]**   12/16 19/23
permissioning **[4]**   8/4 22/6 23/12 26/10
permissions **[1]**   21/24

person **[3]**   27/19 28/11 35/23
perspective **[9]**   6/23 7/25 8/7 10/22 16/19 27/11 30/7 36/3 36/15
persuaded **[1]**   37/11
Phone **[1]**   1/22
physical **[1]**   32/20
pick **[1]**   36/7
picture **[1]**   37/3
piece **[1]**   36/21
piecemeal **[1]**   5/13
place **[1]**   26/7
plaintiff **[16]**   1/13 2/8 2/11 3/1 3/1 3/3 17/9 21/6 23/19 26/3 26/21 26/24 29/11 29/14 34/21 35/6
plaintiffs **[9]**   11/21 16/2 19/5 26/14 29/23 33/23 35/12 37/11 39/16
plaintiffs' **[2]**   4/10 7/10
plan **[1]**   33/9
platform **[1]**   28/10
plus **[1]**   5/2
point **[11]**   5/21 13/12 14/15 14/22 18/15 26/12 27/21 30/25 31/3 31/14 40/2
pointed **[2]**   26/24 28/19
pointing **[1]**   33/2
pool **[2]**   13/15 20/13
population **[1]**   15/6
position **[11]**   4/10 4/18 5/15 5/18 12/1 19/3 21/11 23/19 30/10 31/10 32/3
possible **[1]**   11/20
post **[1]**   28/5
post-merger **[1]**   28/5
practical **[1]**   36/23
Prasanna **[3]**   5/9 34/11 34/14
prejudicial **[1]**   16/19
present **[2]**   1/9 2/1
president **[1]**   35/23
press **[1]**   28/2
pretty **[1]**   31/14
privilege **[4]**   11/10 11/14 11/16 16/9
privileged **[4]**   11/7 11/9 11/14 16/1
proactive **[1]**   5/5
problem **[4]**   12/20 27/17 28/7 34/2
problems **[1]**   6/4
proceed **[2]**   16/21 39/1
proceedings **[2]**   1/25 40/16
process **[3]**   5/13 5/15 37/6
produce **[2]**   38/10 38/12
produced **[11]**   1/25 15/18 17/8 17/10 18/14 27/1 27/18 30/13 33/4 35/6 35/12
producing **[2]**   15/17 24/11
production **[5]**   26/13 26/14 28/24 35/15 39/21
program **[1]**   36/16
proposal **[2]**   20/10 22/12
propose **[2]**   17/6 23/16

**P**

proposed [3]   17/4 20/1 20/24
proprietary [1]   28/10
prove [1]   12/18
pulled [1]   11/6
pure [1]   30/8
pushed [1]   22/10
put [3]   11/20 23/11 28/9
puts [1]   10/12

**Q**

questions [2]   8/13 35/9
quick [1]   12/12
quite [5]   3/22 6/2 7/13 10/24 21/10
quote [2]   10/21 26/3
quoted [1]   17/14
quotes [1]   5/4

**R**

raised [3]   3/11 31/1 36/22
range [1]   20/22
ranges [1]   20/25
rate [5]   8/18 9/17 9/19 15/8 15/15
re [2]   1/3 2/5
reaches [1]   30/21
reaction [1]   15/21
read [1]   29/25
reality [1]   16/7
realize [1]   36/21
really [3]   14/3 26/4 32/1
reason [14]   7/24 8/8 11/18 14/5 18/16 18/21 21/5 21/7 21/8 26/1 27/4 30/5 31/10 33/11
reasonable [4]   6/3 13/20 18/19 23/21
reasons [1]   22/4
receive [1]   14/6
received [1]   21/4
recent [1]   9/24
recipient [2]   6/14 6/15
recorded [1]   1/25
recording [3]   1/25 2/2 40/15
redesignated [1]   11/15
reduction [1]   20/21
referring [1]   8/20
reflect [1]   35/7
related [2]   11/4 11/5
relates [1]   23/13
relating [2]   23/12 23/16
relativity [2]   4/17 37/5
release [1]   28/2
relevance [1]   14/12
relevancy [2]   8/18 14/11
relevant [7]   8/14 15/8 25/18 25/20 36/22 38/1 38/7
Relief [2]   1/14 2/11
remains [2]   3/16 31/21
remedy [1]   16/1
removed [1]   11/20
report [3]   24/23 25/1 25/7
reported [3]   13/22 27/19

30/12
reports [4]   6/16 6/21 21/4 38/2
requests [1]   10/12
require [1]   14/18
requires [1]   39/19
resolve [1]   3/7
respect [15]   4/12 5/18 6/7 9/12 10/1 10/6 13/11 14/2 25/24 27/21 30/1 31/7 33/22 37/20 37/25
respectfully [1]   33/11
respond [1]   18/23
response [4]   10/20 33/24 34/11 34/16
responses [1]   32/10
responsible [2]   34/7 34/12
responsive [13]   6/21 7/9 7/11 15/4 15/4 15/14 17/11 17/13 18/8 18/15 30/14 30/17 32/16
responsiveness [7]   9/19 9/23 15/8 15/19 18/3 18/12 33/19
restrictions [1]   32/23
resulted [1]   33/18
Retirement [2]   1/14 2/11
return [2]   17/20 19/14
returned [2]   10/2 24/6
returning [4]   8/15 8/17 8/20 8/24
review [14]   4/1 9/22 10/19 10/25 11/2 11/10 11/11 14/12 14/18 15/13 16/3 16/7 16/8 17/20
reviewed [8]   15/12 15/17 16/10 16/11 17/3 18/3 24/6 33/20
reviewers [1]   32/16
reviewing [3]   14/10 16/4 19/7
revision [2]   20/13 20/13
RIFKIND [1]   1/18
Road [1]   1/13
Rob [3]   9/4 14/15 25/3
ROBBINS [3]   1/13 2/10 12/11
ROBERT [3]   1/15 2/10 12/11
role [7]   6/13 28/4 34/19 35/7 35/22 35/25 36/13
rolled [1]   26/8
RPR [1]   1/22
rub [1]   8/21
RUDMAN [2]   1/13 2/10
ruled [1]   39/5
rules [1]   29/11
ruling [2]   38/22 40/1
run [2]   18/5 27/22
running [2]   17/4 26/16
Rupprecht [4]   5/16 6/7 7/17 10/1
Rupprecht's [2]   10/6 39/25
Ryan [1]   5/16

**S**

sample [1]   8/23

sat [1]   31/4
schedule [1]   39/20
scheduling [1]   40/3
scheme [1]   9/16
Schmo [1]   22/16
scientist [1]   29/3
search [49]
search-term-by-search-term [1]   4/15
searched [1]   28/24
SEC [11]   20/20 26/15 27/22 27/22 28/20 30/4 30/4 31/14 32/18 35/12 35/15
SEC's [1]   28/23
second [1]   11/10
securities [11]   1/4 2/6 2/24 12/13 12/17 14/7 15/23 19/8 26/13 28/13 29/13
security [1]   34/18
seem [2]   17/1 29/23
segregation [1]   34/7
selected [3]   20/21 21/7 21/8
senior [6]   26/4 27/6 27/7 27/9 35/7 35/23
sent [1]   21/18
sentence [1]   29/16
separate [1]   14/4
service [3]   1/13 1/22 1/25
services [1]   22/3
set [20]   10/2 14/25 15/3 15/4 15/5 16/10 16/15 16/16 17/1 17/5 18/1 18/4 19/7 21/4 21/6 30/17 31/25 32/2 34/22 35/14
several [1]   10/7
severe [1]   27/17
severely [1]   20/10
shape [1]   28/23
short [1]   23/2
short-term [1]   23/2
shortly [1]   24/14
side [2]   19/2 38/4
Simons [17]   25/16 25/17 25/20 25/24 26/21 27/2 27/12 27/16 29/21 30/12 30/16 30/23 31/11 31/17 35/24 37/20 38/13
Simons' [2]   28/4 31/2
simply [1]   31/10
simultaneous [2]   34/13 34/14
single [5]   23/21 26/17 26/25 30/1 30/1
six [8]   4/20 4/25 5/5 5/6 8/24 13/6 13/7 13/14
skewed [1]   18/9
small [3]   15/18 17/10 24/3
smaller [1]   19/7
software [5]   13/2 13/11 13/21 18/10 19/17
software-type [1]   13/21
solution [2]   7/17 11/20
solutions [1]   6/3
somewhere [1]   37/16
sort [22]

**S**

**sound [3]**   1/25 6/4 40/15
**sounds [1]**   4/6
**South [1]**   1/13
**speakers [1]**   36/9
**speaking [2]**   30/23 35/18
**specific [8]**   17/16 17/22 18/17 22/6 23/2 23/19 31/14 36/6
**speculation [1]**   30/8
**speculative [3]**   29/10 31/5 33/7
**spent [2]**   7/13 7/21
**spoken [1]**   29/6
**stage [1]**   30/8
**start [2]**   2/2 3/12
**started [2]**   4/3 33/16
**starting [1]**   2/8
**state [1]**   2/7
**statement [1]**   23/13
**statements [7]**   12/15 12/19 23/14 27/20 27/25 28/14 32/14
**STATES [3]**   1/1 1/4 1/10
**step [1]**   22/23
**stop [2]**   6/25 27/13
**story [1]**   35/20
**straight [1]**   29/23
**straightforward [1]**   29/16
**string [7]**   4/12 6/19 21/22 23/7 23/20 23/25 24/3
**strings [2]**   6/18 6/22
**strong [1]**   31/10
**strongly [1]**   38/17
**stuff [1]**   22/24
**subject [1]**   11/9
**submission [2]**   6/6 8/6
**submit [4]**   3/8 10/14 28/12 33/11
**submitted [2]**   4/16 5/14
**subset [4]**   11/8 11/12 15/18 17/10
**successful [1]**   22/3
**suite [2]**   1/14 12/23
**supplemental [1]**   26/23
**suppose [1]**   29/1
**sympathetic [1]**   15/22
**system [11]**   1/14 2/12 6/15 6/17 6/17 6/17 6/20 7/8 8/11 10/15 26/16
**system's [1]**   10/13
**system-generated [3]**   6/15 6/20 7/8
**system-wide [1]**   26/16

**T**

**table [1]**   4/2
**tailored [1]**   20/19
**Tamir [2]**   5/10 34/17
**targeted [1]**   25/5
**tasked [1]**   38/4
**TATOY [2]**   1/20 2/18
**technical [1]**   16/7
**technology [7]**   25/18 27/16

27/17 28/3 28/4 28/5 29/4
**teed [1]**   4/10
**teleconference [2]**   1/9 2/1
**ten [11]**   6/10 20/9 21/9 21/15 21/15 21/24 22/8 23/18 23/24 34/21 37/17
**tentative [1]**   38/22
**term [24]**
**terms [37]**
**test [4]**   4/18 36/24 37/2 37/6
**themselves [1]**   13/22
**they've [4]**   16/3 18/14 37/12 37/23
**thoughts [1]**   16/20
**thousand [1]**   10/7
**three [1]**   28/2
**ticket [1]**   10/14
**tickets [2]**   10/18 13/25
**today [4]**   3/8 38/25 39/15 39/21
**together [2]**   18/22 23/11
**ton [1]**   11/2
**tons [4]**   6/15 6/15 6/20 22/4
**tool [1]**   22/1
**top [1]**   19/18
**totals [1]**   33/4
**track [1]**   10/11
**trade [3]**   6/16 21/25 22/16
**trades [2]**   22/2 23/23
**trading [2]**   34/8 34/8
**transparency [1]**   23/17
**transparent [2]**   22/13 23/14
**treat [1]**   13/21
**treated [1]**   14/4
**true [1]**   22/19
**turn [4]**   16/6 17/25 25/15 35/2
**turned [3]**   25/6 26/14 34/21
**two [13]**   3/10 4/12 5/2 13/13 13/14 26/6 26/18 26/19 28/25 34/6 34/9 34/20 35/25
**type [1]**   13/21
**types [1]**   10/8

**U**

**ultimately [3]**   12/24 26/8 28/11
**underling [1]**   31/6
**underlings [2]**   30/24 31/2
**underlying [1]**   26/2
**underscores [1]**   8/7
**Understood [3]**   3/4 16/23 39/13
**unfairly [1]**   14/3
**unfolded [1]**   37/1
**UNITED [3]**   1/1 1/4 1/10
**universe [8]**   9/1 9/2 9/6 10/25 11/16 24/3 24/19 26/16
**unless [3]**   10/20 12/3 38/11
**unlucky [1]**   6/14
**unnoticed [1]**   19/11
**unreasonable [4]**   22/9 23/8 23/25 24/2

**untethered [1]**   23/10
**updates [1]**   6/17
**users [2]**   34/13 34/14
**uses [1]**   8/2

**V**

**various [1]**   10/17
**vendor [3]**   4/17 33/3 37/5
**version [4]**   6/19 7/23 14/8 33/20
**versus [1]**   18/12
**via [2]**   1/9 2/1
**view [7]**   3/22 4/8 4/13 9/25 23/25 28/21 28/21
**viewed [1]**   38/8
**VIRTU [9]**   1/3 1/18 2/5 24/23 25/2 26/7 28/2 28/3 28/9
**Virtu's [2]**   10/23 28/10
**vis [2]**   23/24 23/24

**W**

**waiting [1]**   25/15
**wants [2]**   38/17 38/18
**week [2]**   7/13 39/23
**weekend [1]**   40/9
**WEISS [2]**   1/18 2/17
**WHARTON [1]**   1/18
**whatsoever [1]**   27/11
**whichever [2]**   4/4 38/19
**whole [5]**   19/16 20/16 20/19 28/7 31/4
**wholesale [1]**   10/9
**wide [2]**   24/24 26/16
**wider [2]**   18/5 19/13
**willing [5]**   13/11 13/12 14/11 18/20 39/1
**willingly [1]**   10/24
**wish [1]**   4/5
**withheld [1]**   11/9
**word [2]**   6/24 10/23
**words [5]**   6/24 22/5 22/12 22/13 23/22
**workable [1]**   11/23
**worth [2]**   16/4 33/2
**writes [1]**   32/19

**Y**

**year [4]**   12/15 14/6 15/23 19/23
**YORK [5]**   1/1 1/5 1/14 1/19 1/19

**Z**

**zero [1]**   10/13