UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| | x | |
| In re VIRTU FINANCIAL, INC. SECURITIES LITIGATION | : : : | Master File No. 1:23-cv-03770-NGG-CHK CLASS ACTION |
| | : | |
| This Document Relates To: | : : | |
| ALL ACTIONS. | : : | |
| | : | |
| | x | |

**MEMORANDUM OF LAW IN SUPPORT OF LEAD PLAINTIFF'S
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS
REPRESENTATIVE AND CLASS COUNSEL**

Date of Service:  October 22, 2025

**TABLE OF CONTENTS**

**Page**

I.     INTRODUCTION ...........................................................................................................1

II.    STATEMENT OF FACTS COMMON TO THE CLASS ...................................................4

III.   THE ACTION AND THE PROPOSED CLASS REPRESENTATIVE .............................7

IV.   THE PROPOSED CLASS SATISFIES RULE 23 ............................................................8

       A.     Legal Standards on a Motion for Class Certification.................................................8

       B.     Certification Is Proper Under Rule 23(a)....................................................................9

             1.     The Proposed Class Is So Numerous that Joinder of All Members Is Impracticable.....................................................................................9

             2.     Common Questions of Law or Fact Exist for All Class Members ............10

             3.     Lead Plaintiff's Claims Are Typical of Those of the Class .......................11

             4.     Lead Plaintiff Will Fairly and Adequately Protect the Interests of the Class ...................................................................................................12

       C.     Certification Is Proper Under Rule 23(b)(3)............................................................14

             1.     Common Questions of Law or Fact Predominate Over Any Individualized Questions ..........................................................................14

                   a.     Lead Plaintiff Is Entitled to the Fraud-on-the-Market Presumption of Reliance ...............................................................15

                   b.     Virtu's NASDAQ Listing Is Strong Evidence of Market Efficiency....................................................................................16

                   c.     The *Cammer* and *Krogman* Factors Also Support Market Efficiency....................................................................................16

                       (1)     *Cammer* Factor 1: Virtu Common Stock's High Weekly Trading Volume Supports a Finding of Market Efficiency ...........................................................17

                       (2)     *Cammer* Factor 2: The Number of Financial Analysts Covering Virtu During the Class Period Supports a Finding of Market Efficiency...........................18

**Page**

(3)   *Cammer* Factor 3: The Presence of Market Makers and Institutional Investors Supports a Finding of Market Efficiency ...............................................................18

(4)   *Cammer* Factor 4: Virtu's Eligibility to File a Form S-3 Registration Statement Supports a Finding of Market Efficiency ...............................................................19

(5)   *Cammer* Factor 5: Virtu Common Stock Reacted to New Company-Specific Information, Demonstrating a Cause-and-Effect Relationship...............20

(6)   *Krogman* Factor 1: Virtu's Large Market Capitalization Supports Market Efficiency........................21

(7)   *Krogman* Factor 2: Virtu Common Stock's Narrow Bid-Ask Spread Supports Market Efficiency ....................21

(8)   *Krogman* Factor 3: The High Percentage of Market Float Supports Market Efficiency.....................................21

d.   Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology ...............................................22

2.   A Class Action Is Superior to Other Available Methods for Resolving This Controversy ....................................................23

D.   The Proposed Class Is Ascertainable................................................................24

E.   Robbins Geller Should Be Appointed Class Counsel..........................................25

V.   CONCLUSION...........................................................................................................25

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Affiliated Ute Citizens of Utah v. United States*,
  406 U.S. 128 (1972)..........................................................................................................22

*Amchem Products, Inc. v. Windsor*,
  521 U.S. 591 (1997)..........................................................................................................14

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013)........................................................................................................2, 16

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988).................................................................................................3, 15, 16, 22

*Billhofer v. Flamel Techs., S.A.*,
  281 F.R.D. 150 (S.D.N.Y. 2012) .......................................................................................16

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ............................................................................... *passim*

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
  310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................. *passim*

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013)............................................................................................................22

*Erickson v. Jernigan Cap., Inc.*,
  692 F. Supp. 3d 114 (S.D.N.Y. 2023)...................................................................8, 9, 13, 24

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014)......................................................................................................3, 15, 16

*Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*,
  338 F.R.D. 205 (S.D.N.Y. 2021) .......................................................................................12

*In re Allergan PLC Sec. Litig.*,
  2021 WL 4077942
  (S.D.N.Y. Sep. 8, 2021)................................................................................................9, 18, 20

*In re Alstom SA Sec. Litig.*,
  253 F.R.D. 266 (S.D.N.Y. 2008) ...................................................................................14, 15

*In re Aphria, Inc. Sec. Litig.*,
  342 F.R.D. 199 (S.D.N.Y. 2022) .......................................................................................18

**Page**

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................................23

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
   2020 WL 1329354
   (S.D.N.Y. Mar. 23, 2020) ...............................................................................2

*In re Credit Suisse Sec. Fraud Class Actions*,
   2025 WL 1866293
   (S.D.N.Y. July 7, 2025) ..................................................................................2

*In re Facebook, Inc., IPO Sec. & Derivative Litig.*,
   312 F.R.D. 332 (S.D.N.Y. 2015) ....................................................................24

*In re MF Glob. Holdings Ltd. Inv. Litig.*,
   310 F.R.D. 230 (S.D.N.Y. 2015) ..........................................................12, 23, 24

*In re NIO, Inc. Sec. Litig.*,
   2023 WL 5048615
   (E.D.N.Y. Aug. 8, 2023)............................................................................ *passim*

*In re Petrobras Sec.*,
   862 F.3d 250 (2d Cir. 2017).....................................................................20, 21, 24

*In re Signet Jewelers Ltd. Sec. Litig.*,
   2019 WL 3001084
   (S.D.N.Y. July 10, 2019) ...........................................................................10, 25

*In re Vale S.A. Sec. Litig.*,
   2022 WL 122593
   (E.D.N.Y. Jan. 11, 2022) ...............................................................................11

*In re Virtu Fin., Inc. Sec. Litig.*,
   770 F. Supp. 3d 482 (E.D.N.Y. 2025) ........................................................8, 15, 16

*In re Virtus Inv. Partners, Inc. Sec. Litig.*,
   2017 WL 2062985
   (S.D.N.Y. May 15, 2017)............................................................................10, 11

*In re Winstar Commc'ns Sec. Litig.*,
   290 F.R.D. 437 (S.D.N.Y. 2013) ........................................................11, 18, 19, 20

**Page**

*Iowa Pub. Emps.' Ret. Sys v. Bank of Am. Corp.*,
2022 WL 2829880
(S.D.N.Y. June 30, 2022)..............................................................................................12, 13

*Krogman v. Sterritt*,
202 F.R.D. 467 (N.D. Tex. 2001) ................................................................... *passim*

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014).........................................................17, 18, 22

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
328 F.R.D. 86 (S.D.N.Y. 2018) ......................................................................18, 19

*ODS Cap. LLC v. JA Solar Holdings Co.*,
2020 WL 7028639
(S.D.N.Y. Nov. 30, 2020) ....................................................................................16

*Passman v. Peloton Interactive, Inc.*,
671 F. Supp. 3d 417 (S.D.N.Y. 2023)....................................................................11

*Pearlstein v. BlackBerry Ltd.*,
2021 WL 253453
(S.D.N.Y. Jan. 26, 2021)..................................................................19, 20, 24, 25

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
277 F.R.D. 97 (S.D.N.Y. 2011) ......................................................................11, 12

*Puddu v. NYGG (Asia) Ltd.*,
2022 WL 2304248
(S.D.N.Y. June 27, 2022).......................................................................................9

*Roach v. T.L. Cannon Corp.*,
778 F.3d 401 (2d Cir. 2015).........................................................................14, 22

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
349 F.R.D. 606 (S.D.N.Y. 2025) .........................................................................24

*Set Cap. LLC v. Credit Suisse Grp. AG*,
2023 WL 2535175
(S.D.N.Y. Mar. 16, 2023) ................................................................................9, 13

*Set Cap. LLC v. Credit Suisse Grp. AG*,
2025 WL 486254
(S.D.N.Y. Feb. 11, 2025)........................................................................................8

**Page**

*Strougo v. Barclays PLC*,
 312 F.R.D. 307 (S.D.N.Y. 2016) ...................................................................17, 21, 22

*Sykes v. Mel S. Harris & Assocs. LLC*,
 780 F.3d 70 (2d Cir. 2015)...................................................................................22

*Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*,
 546 F.3d 196 (2d Cir. 2008)..................................................................................21

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
 551 U.S. 308 (2007)................................................................................................8

*UFCW Loc. 1776 v. Eli Lilly & Co.*,
 620 F.3d 121 (2d Cir. 2010)..................................................................................14

*Venkataraman v. Kandi Techs. Grp., Inc.*,
 2024 WL 4345571
 (S.D.N.Y. Sep. 30, 2024) .......................................................................................9

*Waggoner v. Barclays PLC*,
 875 F.3d 79 (2d Cir. 2017)..............................................................................16, 20

*Wilson v. LSB Indus., Inc.*,
 2018 WL 3913115
 (S.D.N.Y. Aug. 13, 2018) .....................................................................................19

*Yi Xiang v. Inovalon Holdings, Inc.*,
 327 F.R.D. 510 (S.D.N.Y. 2018) ...........................................................................9

## STATUTES, RULES, AND REGULATIONS

15 U.S.C.
 §78j(b).........................................................................................................2,11, 23
 §78t(a) ......................................................................................................2, 8, 11

**Page**

Federal Rules of Civil Procedure
Rule 23 ................................................................................................1, 2, 8, 9
Rule 23(a)...............................................................................................8, 9, 25
Rule 23(a)(1) .................................................................................................9
Rule 23(a)(2) ...............................................................................................10
Rule 23(a)(3) ...............................................................................................11
Rule 23(a)(4) ...........................................................................................12, 14
Rule 23(b)(3).........................................................................................*passim*
Rule 23(b)(3)(A)-(D) ....................................................................................23
Rule 23(g)(1)...............................................................................................25
Rule 23(g)(1)(A)(i)-(iv) .................................................................................25

17 C.F.R.
§239.13.......................................................................................................19
§240.10b-5 .............................................................................................11, 15

Lead Plaintiff City of Birmingham Retirement and Relief System ("Lead Plaintiff" or "Proposed Class Representative") respectfully submits this memorandum of law in support of its motion for an order: (1) certifying this action as a class action under Federal Rule of Civil Procedure 23; (2) appointing Lead Plaintiff as the Class Representative; and (3) appointing Robbins Geller Rudman & Dowd LLP ("Robbins Geller") as Class Counsel.  In further support of the motion, Lead Plaintiff submits the Declaration of Robert D. Gerson, dated October 22, 2025 (the "Gerson Decl."), attaching, *inter alia*, the Expert Report of Matthew D. Cain, Ph.D. as Ex. A (the "Cain Rpt."), the Declaration of Jay P. Turner, the Deputy Director of Human Resources of City of Birmingham, Alabama and General Counsel to the City of Birmingham Retirement and Relief System as Ex. B (the "Turner Decl."), and a [Proposed] Order, filed concurrently herewith.[1]

## I.      INTRODUCTION

This case centers on Defendants'[2] uniform misrepresentations and omissions to all Class members and the investing public during the Class Period.  The Consolidated Complaint alleges that Defendants made numerous materially false and misleading statements to investors about Virtu's protection of client trading information, including statements about Virtu's commitment to safeguarding client information and its policies and procedures designed to protect client confidentiality, as well as Virtu's risk disclosures about any failure to protect confidential information.  When the truth about Defendants' Class Period statements and omissions was revealed

---

[1]    Capitalized terms not defined herein have the meanings given in the Consolidated Complaint for Violations of the Federal Securities Laws (the "Consolidated Complaint," or "CC"), filed on January 22, 2024.  ECF No. 39.  Unless otherwise noted, "¶" or "¶¶" are references to paragraphs of the CC.  References to the exhibits attached to the Gerson Decl. appear herein as "Ex."  Unless otherwise noted, emphasis is added and internal citations and quotation marks are omitted.

[2]    "Defendants" are Virtu Financial, Inc. ("Virtu" or the "Company"), and Douglas Cifu ("Cifu"), Joseph Molluso ("Molluso"), Alex Ioffe ("Ioffe"), and Sean Galvin ("Galvin") (collectively, the "Individual Defendants").

through a series of partial disclosures, the price of Virtu common stock fell precipitously, resulting in enormous losses for the Class.

Lead Plaintiff now respectfully requests certification of this case as a class action pursuant to Rule 23 consisting of:

> All purchasers of Virtu Class A common stock during the period between November 7, 2018 and September 12, 2023, inclusive (the "Class Period"). Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.[3]

As set forth herein, class certification in this securities action is consistent with U.S. Supreme Court and Second Circuit precedent, which has expressed a clear preference for certifying such actions. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013); *see also In re Credit Suisse Sec. Fraud Class Actions*, 2025 WL 1866293, at *11 (S.D.N.Y. July 7, 2025) ("Courts have long recognized that class actions are a desirable means for resolving claims based on securities laws."); *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *2 (S.D.N.Y. Mar. 23, 2020) ("Courts have consistently held that claims alleging violations of Sections 10(b) and 20(a) of the Exchange Act are especially amenable to class certification.").

Here, the proposed Class readily satisfies *all* the elements of Rule 23. First, numerosity cannot be disputed, with between 94.05 million to 122.92 million shares of Virtu common stock outstanding and actively traded on the Nasdaq Global Select Market ("NASDAQ"), an average of 5.97 million shares traded weekly, and at least 830 unique institutional investors owning Virtu

---

[3] As noted in the Cain Rpt., Virtu also had outstanding shares of Class B, C, and D common stock during the Class Period, but those shares "were issued solely to provide additional voting rights to holders and did not trade on any public market." Cain Rpt. ¶1, n.2. Accordingly all references herein to "Virtu common stock" refer only to its Class A shares.

common stock during the Class Period.  In addition, there are likely thousands of smaller investors who also invested in Virtu common stock during the Class Period.

*Second*, this action involves many common issues of law and fact.  As the CC details, questions of law and fact common to the Class include whether: (i) Defendants' conduct violated the Securities Exchange Act of 1934 (the "Exchange Act"); (ii) Defendants publicly misrepresented material facts or omitted material facts they were required to disclose; (iii) Defendants knowingly or recklessly disregarded that the alleged misstatements and omissions were false and/or misleading; (iv) the price of Virtu common stock was artificially inflated as a result of Defendants' alleged misconduct; and (v) the Class suffered damages when the artificial inflation of Virtu common stock dissipated upon revelation of the truth.

*Third*, the claims of the Proposed Class Representative (Lead Plaintiff) are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the Exchange Act.

*Fourth*, Lead Plaintiff will fairly and adequately protect the interests of the members of the Class.  No antagonism exists between Lead Plaintiff and the Class, and proposed Class Counsel, Robbins Geller, is competent and experienced in class actions and securities litigation.

*Fifth*, the case satisfies the predominance requirement of Rule 23(b)(3).  Namely, common issues of fact and law – including falsity, materiality, causation, scienter, and damages – are subject to common proof and plainly predominate over individual issues.  And because the market for Virtu common stock, which traded on the NASDAQ, was efficient during the Class Period, the Class is entitled to the "fraud-on-the-market" presumption of class-wide reliance under *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988), and *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 277-78 (2014) ("*Halliburton II*").  *See* Cain Rpt. ¶¶26-97.

*Finally*, the "superiority" requirement under Rule 23(b)(3) is satisfied because: (1) thousands of geographically-dispersed investors were harmed by Defendants' misconduct; (2) due to litigation costs, it is highly unlikely that investors who lost relatively small amounts of money would file individual actions; (3) it is desirable to hear all such claims in one court; and (4) there is no difficulty in maintaining this case as a class action.

Because each requirement for class certification is easily met in this instance, Lead Plaintiff respectfully requests that the Class be certified and its motion be granted in full.

## II.   STATEMENT OF FACTS COMMON TO THE CLASS

Virtu is a global financial firm co-founded by defendant Cifu. ¶¶3, 28. Virtu started as a high frequency trading firm engaged in market making, ¶31, with a proprietary trading business where traders bought and sold securities in Virtu's own account for its own benefit. ¶5. On April 20, 2017, Virtu announced a transformative transaction by reaching an agreement to acquire KCG Holdings Inc. ("KCG") for approximately $1.4 billion, taking on KCG's extensive agency brokerage business which executed trades for a roster of institutional clients and major retail brokerages. ¶¶34, 36, 37. After the deal closed in July 2017, Virtu formed Virtu Americas, LLC ("VAM"), which operated the client trade execution business acquired from KCG and some of KCG's proprietary trading business. ¶¶43, 45.

The addition of KCG's agency execution business gave rise to a major conflict within Virtu, as the non-public trading information generated within its systems, if not protected, could be exploited by proprietary traders on the other side of the Company, for Virtu's own financial benefit. ¶46. As such, the need to keep this private trade execution information separate from Virtu's proprietary traders was paramount. ¶¶55-61.

But, in January 2018, VAM began storing extremely sensitive trade execution details in the *__same database__* that also held Virtu's proprietary trading data. ¶47. The information stored in

- 4 -

VAM's primary database for daily business operations and a backup database (together, the "FS Database") consisted of: (i) specific customer-identifying information; (ii) the security name; (iii) the side of the transaction (buy or sell); (iv) execution volume; (v) execution price; and (vi) the trading algorithm used for each order.  ¶48.  This data would be very valuable to a proprietary trader – and could be used to engage in numerous trading abuses.  ¶¶55-61.  Cifu even publicly described the client trading information Virtu received as "*literally the secret sauce of [] large asset managers*." ¶56.

From at least January 2018 through April 2019 (*i.e.*, a period of *fifteen months*), essentially any employee at Virtu, including proprietary traders, could directly access the FS Database and *all of its data*, by using widely known and frequently shared rudimentary usernames and passwords (the "FS Database Problem").  ¶¶49, 51.  The primary FS Database could be accessed simply by entering the username and password "viewonly" and the backup FS Database with the username and password "fsviewonly."  ¶50.  During this time, Virtu had no ability to monitor which employees were accessing the FS Database, or what information was viewed, or used.  ¶52.

On November 7, 2018 – the first day of the Class Period – Virtu announced an agreement to acquire global financial technology company Investment Technology Group ("ITG"), which had a large independent agency brokerage business, for approximately $1 billion.  ¶¶63-64.  That **_same day_**, the SEC issued a Cease-and-Desist Order against ITG, finding, among other things, that "*[f]rom 2010 until 2017, ITG failed to establish adequate safeguards and procedures to appropriately limit access to systems containing . . . confidential trading information*."  ¶65.  ITG consented to the entry of the SEC's Order finding violations of the antifraud provisions of the federal securities laws and agreed to pay a penalty of $12 million.  ¶66.

The SEC's findings ignited significant concerns in the market about Virtu's own ability to safeguard the sensitive trading information generated and/or maintained within its different business groups. ¶67. Recognizing how vital this issue was, Defendants embarked on a campaign to proactively address Virtu's protection of this ultra-sensitive data. ¶¶67-77. For example, on Virtu's earnings call held the same day, defendants Cifu and Molluso gave a presentation to investors and highlighted "*the importance we place on protecting client information in all aspects of our business. We take this obligation seriously*[.]" ¶¶102, 107. When analysts also asked about acquiring ITG in the wake of the SEC's findings, Cifu sought to distinguish Virtu from ITG, claiming that "*Virtu, and it starts with me, is all about transparency and being very upfront and direct with . . . not just the customer, any kind of party that we deal with*." ¶109.

To calm the concerns in the market, Cifu sat for media interviews to address the issue head-on. ¶¶67-77. For example, *Business Insider* interviewed Cifu for an article titled "*Wall Street is worried that a $1 billion acquisition will allow Virtu to spy on clients, but the firm has a big plan to quell those anxieties*[.]" ¶116. In the interview, Cifu stated that he "*can't overstate how important it is to me personally that client information is properly protected*," and that "*no other firm gives this much transparency to its clients into how their information is protected*." ¶117. Unbeknownst to its investors and customers, however, at that very moment, essentially all Virtu employees, including its proprietary traders, *already had* unfettered access to a database containing sensitive post-trade information from its agency execution business. ¶¶78-81. Despite repeated claims of being "*transparen[t]*" and "*very upfront and direct*" about protecting client trading data, Defendants withheld the existence of the FS Database Problem from investors and continued to promote Virtu's safeguarding of client data for nearly five years. ¶85.

- 6 -

On February 17, 2023, Virtu announced that it had been responding to requests for information from the SEC "in connection with an investigation of aspects of the Company's information access barriers." ¶142. As details about Defendants' fraud were gradually revealed through a series of partial disclosures about the SEC's investigation into Virtu and VAM for the misconduct described herein, the price of Virtu common stock declined precipitously. ¶¶186-195. Ultimately, on September 12, 2023, the SEC announced it had filed charges against Virtu and VAM "for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information." ¶151. In response, the price of Virtu common stock fell to a low of more than 54% below the Class Period high. ¶14.

## III.   THE ACTION AND THE PROPOSED CLASS REPRESENTATIVE

The initial complaint in this matter was filed on May 19, 2023. ECF No. 1. On October 31, 2023, while its motion for lead plaintiff appointment was pending, Lead Plaintiff filed an initial complaint in a separate action, specifically to prevent certain timeliness arguments being made by Defendants at a later time. *See City of Birmingham Ret. & Relief Sys. v. Virtu Fin., Inc. et al.*, No. 1:23-cv-08123 (E.D.N.Y.) ("*City of Birmingham*"), ECF No. 1. On November 3, 2023, Lead Plaintiff moved to consolidate the two cases. ECF Nos. 32-33. On November 21, 2023, the Court consolidated the cases and appointed City of Birmingham Retirement and Relief System as lead plaintiff and approved Robbins Geller as Lead Counsel. ECF No. 34.

On January 22, 2024, Lead Plaintiff filed the CC. ECF No. 39. On April 12, 2024, Defendants served their motion to dismiss; on June 4, 2024, Lead Plaintiff served its opposition to Defendants' motion to dismiss; and on July 3, 2024, Defendants filed their reply brief. ECF No. 44. On September 13, 2024, the parties appeared before the Court for oral argument on the motion to dismiss. On March 17, 2025, this Court largely denied Defendants' motion to dismiss, upholding four categories of alleged misstatements, including statements about Virtu's commitment to

transparency and safeguarding client information and its policies and procedures designed to protect client confidentiality, as well as Virtu's risk disclosures about any failure to protect confidential information. *See generally In re Virtu Fin., Inc. Sec. Litig.*, 770 F. Supp. 3d 482 (E.D.N.Y. 2025). The Court also found that Lead Plaintiff adequately pled facts showing a strong inference that Defendants' conduct was "'highly unreasonable, representing an extreme departure from the standards of ordinary care' given that the FS Database Issue 'was either known to [Defendants] or so obvious that [Defendants] must have been aware of it.'" *Id*. at 527 (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 326 (2007)). Finally, the Court found that Lead Plaintiff adequately alleged violations of Section 20(a) of the Exchange Act against the Individual Defendants. *Id*.

Because Lead Plaintiff purchased thousands of shares of Virtu common stock throughout the Class Period, it suffered damages as a result of Defendants' violations of the federal securities laws, as alleged in the CC. *See* ECF No. 39. As a result, Lead Plaintiff seeks appointment to serve as the Class Representative, and appointment of Robbins Geller as Class Counsel.

## IV.    THE PROPOSED CLASS SATISFIES RULE 23

### A.    Legal Standards on a Motion for Class Certification

To obtain class certification, Lead Plaintiff must show that the proposed Class meets the "numerosity, commonality, typicality, and adequacy requirements of Rule 23(a), as well as the predominance and superiority requirements of Rule 23(b)(3)." *Set Cap. LLC v. Credit Suisse Grp. AG*, 2025 WL 486254, at \*4 (S.D.N.Y. Feb. 11, 2025). While Lead Plaintiff must demonstrate compliance with the requirements of Rule 23 "by a preponderance of the evidence," *id.*, courts have cautioned against viewing a request for certification as a "minitrial of the merits." *Erickson v. Jernigan Cap., Inc.*, 692 F. Supp. 3d 114, 125 (S.D.N.Y. 2023). Thus, "[t]he question before the Court is whether the plaintiff meets Rule 23's requirements, not whether the plaintiff will prevail on

- 8 -

the merits." *Id.* Any "[d]oubts concerning the propriety of class certification should be resolved in favor of class certification." *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 519 (S.D.N.Y. 2018); *In re Allergan PLC Sec. Litig.*, 2021 WL 4077942, at *5 (S.D.N.Y. Sep. 8, 2021) ("the requirements of Rule 23 must be construed liberally").

## B. Certification Is Proper Under Rule 23(a)

### 1. The Proposed Class Is So Numerous that Joinder of All Members Is Impracticable

Rule 23(a)(1) requires "the class [to be] so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Courts in this Circuit have found that a "proposed class with more than forty members presumably satisfies the numerosity requirement." *Set Cap. LLC v. Credit Suisse Grp. AG*, 2023 WL 2535175, at *7 (S.D.N.Y. Mar. 16, 2023). Further, "courts have acknowledged that numerosity in securities actions may be premised on a showing that a large number of shares were outstanding and traded during the relevant period." *Venkataraman v. Kandi Techs. Grp., Inc.*, 2024 WL 4345571, at *2 (S.D.N.Y. Sep. 30, 2024). Here, the proposed Class is so numerous that joinder would be impracticable.

During the Class Period, over 830 unique institutional investors were invested in Virtu common stock, an average of 5.97 million shares traded weekly, and the Company had between 94.05 million and 122.92 million shares outstanding during the Class Period. *See* Cain Rpt. ¶¶42, 55, 94. As these numbers reflect, thousands of proposed Class members were harmed by Defendants' misconduct, satisfying the numerosity requirement. *See, e.g.*, *Puddu v. NYGG (Asia) Ltd.*, 2022 WL 2304248, at *3 (S.D.N.Y. June 27, 2022) ("The numerosity requirement is satisfied, as there were around 19.5 million shares . . . held by the public at the end of the class period.").

**2.   Common Questions of Law or Fact Exist for All Class Members**

Rule 23(a)(2) requires that there be "questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(2).  As this Court has noted, commonality is considered a "low hurdle that requires only a showing that Plaintiff's claims depend upon a common contention that is of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *In re NIO, Inc. Sec. Litig.*, 2023 WL 5048615, at *5 (E.D.N.Y. Aug. 8, 2023) (Garaufis, J.).  Notably, "[t]he standard is particularly permissive in the context of securities fraud litigation." *Id*.

Essentially all of the questions of law and fact raised in this case are common to the Class. These questions include, *inter alia*, whether: (i) Defendants' conduct violated the Exchange Act; (ii) Defendants publicly misrepresented material facts or omitted material facts they were required to disclose; (iii) Defendants knowingly or recklessly disregarded that the alleged misstatements and omissions were false and/or misleading; (iv) the price of Virtu common stock was artificially inflated as a result of Defendants' alleged misconduct; and (v) the Class suffered damages when the artificial inflation of Virtu common stock's price dissipated upon revelation of the truth.

The answers to these common questions are likewise common and susceptible to generalized class-wide proof. *See, e.g.*, *In re Signet Jewelers Ltd. Sec. Litig.*, 2019 WL 3001084, at *8 (S.D.N.Y. July 10, 2019) (finding commonality in securities fraud case where common questions included "whether (i) statements disseminated to the Class by Defendants during the Class Period misrepresented or omitted material facts; (ii) the alleged fraud was material to the putative Class; and (iii) Defendants acted knowingly or recklessly"); *see also In re Virtus Inv. Partners, Inc. Sec. Litig.*, 2017 WL 2062985, at *2 (S.D.N.Y. May 15, 2017) ("Courts in this Circuit find commonality satisfied where there are common issues relating to violations of federal securities laws,

misrepresentations of material fact, scienter, and damages."). Accordingly, commonality is established.

### 3.    Lead Plaintiff's Claims Are Typical of Those of the Class

Rule 23(a)(3) requires the "claims or defenses of the representative parties [to be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "The typicality requirement is satisfied when each class member's claim arises from the same course of events and each class member makes similar legal arguments to prove the defendant's liability." *In re Vale S.A. Sec. Litig.*, 2022 WL 122593, at *4 (E.D.N.Y. Jan. 11, 2022). "Since the claims only need to share the same essential characteristics, and need not be identical, the typicality requirement is not highly demanding." *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 441 (S.D.N.Y. 2023). "In securities cases alleging dissemination of allegedly false or misleading statements, the nature of the common injury generally satisf[ies] typicality." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 443 (S.D.N.Y. 2013).

Lead Plaintiff's claims, like the Class's claims, are based on the same legal theories: Defendants' violations of Section 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder. Here, neither the facts nor the legal theories on which this action is based are unique to Lead Plaintiff; all Class members' claims arise from Defendants' wrongful course of conduct as alleged in the CC. Lead Plaintiff and all other Class members allege that they purchased Virtu common stock at artificially inflated prices during the Class Period as a result of Defendants' material misrepresentations and omissions, and were damaged upon the revelation of the alleged corrective disclosures and/or materialization of the undisclosed risks as alleged in the CC. As such, Lead Plaintiff's claims are typical of other class members. *See Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 109 (S.D.N.Y. 2011) ("'As long as plaintiffs assert, as they do

- 11 -

here, that defendants committed the same wrongful acts in the same manner, against all members of the class, they establish [the] necessary typicality.'").

Further, Lead Plaintiff is not subject to any unique defenses rendering it atypical of other class members. But "[e]ven if Defendants can show a potential unique defense as to [Lead Plaintiff], it should not prevent certification if it does not go to the heart of Plaintiff's case and will not require considerable time and effort to rebut." *In re MF Glob. Holdings Ltd. Inv. Litig.*, 310 F.R.D. 230, 236 (S.D.N.Y. 2015).

### 4. Lead Plaintiff Will Fairly and Adequately Protect the Interests of the Class

Rule 23(a)(4) requires "the representative parties [to] fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "Generally, adequacy of representation entails inquiry as to whether: 1) plaintiff's interests are antagonistic to the interest of other members of the class and 2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *NIO*, 2023 WL 5048615, at *8.

First, Lead Plaintiff's claims are entirely aligned with those of the proposed Class and there is no conflict of interest between it and absent Class members. Courts recognize that "'denial of class certification on the grounds of inadequacy should only occur in the most extreme instances.'" *Iowa Pub. Emps.' Ret. Sys. v. Bank of Am. Corp.*, 2022 WL 2829880, at *19 (S.D.N.Y. June 30, 2022); *see also Hawaii Structural Ironworkers Pension Tr. Fund, Inc. v. AMC Ent. Holdings, Inc.*, 338 F.R.D. 205, 212 (S.D.N.Y. 2021) ("Courts rarely deny class certification on the basis of the inadequacy of class representatives," and will do so "only in flagrant cases, where the putative class representatives display an alarming unfamiliarity with the suit, display an unwillingness to learn about the facts underlying their claims, or are so lacking in credibility that they are likely to harm their case."). To defeat certification, a conflict between the proposed class representative and the

- 12 -

proposed class must be "fundamental" and "go to the very heart of the litigation." *Bank of Am.*, 2022 WL 2829880, at *19. Courts often find adequacy met where, as demonstrated above, "[p]laintiffs' claims and the proposed class' claims arise from the same misconduct and involve the same legal theories." *Set Cap.*, 2023 WL 2535175, at *9.

Lead Plaintiff has also demonstrated its willingness and ability to vigorously prosecute this action by: (1) successfully moving for appointment as lead plaintiff; (2) preparing, filing, and defending the CC; (3) vigorously pursuing discovery; (4) consulting with Robbins Geller regarding key case events; (5) reviewing court filings and other key documents; and (6) complying with its discovery obligations. *See* Turner Decl. ¶6. Indeed, for nearly two years, Lead Plaintiff has taken its role and obligations to the putative Class seriously, and, if appointed as Class Representative, will continue to actively monitor and direct this litigation to maximize the recovery for the proposed Class. *See id*. ¶¶7-8.

In addition, Lead Plaintiff has ensured that the interests of the Class will continue to be protected by retaining counsel fully capable of prosecuting this litigation. "Courts within this Circuit have repeatedly found Robbins Geller to be adequate and well-qualified for the purpose of litigating class action lawsuits." *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 100 (S.D.N.Y. 2015); *see also Erickson*, 692 F. Supp. 3d at 127 ("[Robbins Geller] has substantial experience in securities class actions . . . and has been found adequate in a multitude of cases."); *In re Am. Realty Cap. Props., Inc. Litig.*, No. 1:15-mc-00040-AKH, ECF No. 1316 (Fairness Hearing Transcript) at 55 (S.D.N.Y. Jan. 21, 2019) ("[T]he role of lead counsel was fulfilled in an extremely fine fashion by [Robbins Geller]. At every juncture, the representations made to me were reliable, the arguments were cogent, and the representation of their client was zealous."). In short, Robbins

Geller is qualified and able to prosecute this action on behalf of the proposed class.  *See also* Ex. C (Robbins Geller firm résumé).

Accordingly, Lead Plaintiff is well-suited to represent the Class and, like other Class members, has been injured by Defendants' wrongful course of conduct.  Lead Plaintiff and Lead Counsel are willing and able to prosecute this action on behalf of absent Class members and "will fairly and adequately protect" their interests.  Fed. R. Civ. P. 23(a)(4).

### C.       Certification Is Proper Under Rule 23(b)(3)

Lead Plaintiff has also satisfied the conditions of Rule 23(b)(3), which requires that: (1) common questions of law or fact predominate over individual questions; and (2) a class action is superior to alternative methods of resolving the dispute.  *See* Fed. R. Civ. P. 23(b)(3).  As discussed below, this case meets both criteria.

#### 1.       Common Questions of Law or Fact Predominate Over Any Individualized Questions

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015); *see also UFCW Loc. 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 131 (2d Cir. 2010) (same).  As the Supreme Court stated in *Amchem Products, Inc. v. Windsor*, "[p]redominance is a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws."  521 U.S. 591, 625 (1997).

Here, Defendants' liability turns predominantly on issues common to the class – *i.e.*, whether Defendants made materially false and misleading statements (or omitted material information) concerning Virtu's protection of confidential client information with the requisite scienter through a uniform course of conduct and to the detriment of class members.  *See, e.g., In re Alstom SA Sec.*

- 14 -

*Litig.*, 253 F.R.D. 266, 281 (S.D.N.Y. 2008).[4]  Accordingly, each of the factual and legal arguments concerning liability is common to all members of the proposed Class.

Moreover, in securities fraud cases, plaintiffs may avail themselves of a class-wide presumption of reliance under a doctrine established by the Supreme Court in *Basic*: the fraud-on-the-market theory.  Under that theory, "'the market price of shares traded on well-developed markets reflects all publicly available information, and, hence, any material misrepresentations'"; thus, whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'"  *Halliburton II*, 573 U.S. at 268 (quoting *Basic*, 485 U.S. at 246-47).  As the Supreme Court also observed, "[e]ven the foremost critics of the efficient-capital-markets hypothesis acknowledge that public information generally affects stock prices."  *Id.* at 272.

### a.      Lead Plaintiff Is Entitled to the Fraud-on-the-Market Presumption of Reliance

To invoke the presumption of reliance under this theory, a plaintiff must demonstrate: (1) that the alleged misrepresentations were publicly known; (2) that they were material; (3) that the stock traded in an efficient market; and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed.  *Halliburton II*, 573 U.S. at 268, 277-78.  These requirements are all satisfied.

*First*, the misrepresentations alleged were publicly known, made on earnings calls, in media interviews, documents filed with the SEC, and in press releases.  *Second*, the Court concluded that, at the pleading stage, "Plaintiff adequately pleads facts evidencing that Defendants made materially

---

[4]   "The critical issues for establishing liability in this case include whether Defendants . . . made the false and misleading statements and omissions, whether those statements and omissions were material, whether Defendants acted with scienter, and whether Defendants' conduct injured those who purchased Alstom shares during the Proposed Class Period."  *Id.* (finding predominance requirement satisfied).

false and misleading statements[.]" *Virtu*, 770 F. Supp. 3d at 497. In any event, although materiality must be proved at trial to invoke the *Basic* presumption, it "is not a prerequisite to class certification." *Amgen*, 568 U.S. at 459; *Halliburton II*, 573 U.S. at 282 (materiality, which "is an objective issue susceptible to common, classwide proof," "should be left to the merits stage, because it does not bear on the predominance requirement of Rule 23(b)(3)"). *Third*, Lead Plaintiff purchased Virtu common stock between the time the misrepresentations were made and the end of the Class Period. *See City of Birmingham* ECF No. 1 at PDF page 43 (Schedule A of Securities Transactions). *Finally*, for all the reasons below, the market for Virtu common stock was efficient during the Class Period (*see* Cain Rpt. ¶¶26-97), satisfying the last of *Basic's* requirements. *See Basic*, 485 U.S. at 248 n.27.

### b.     Virtu's NASDAQ Listing Is Strong Evidence of Market Efficiency

At the outset, because Virtu common stock was listed on the NASDAQ during the Class Period, the market for Virtu common stock is "'presumed to be efficient.'" *Billhofer v. Flamel Techs., S.A.*, 281 F.R.D. 150, 159 (S.D.N.Y. 2012). *See, e.g.*, *ODS Cap. LLC v. JA Solar Holdings Co.*, 2020 WL 7028639, at *14 (S.D.N.Y. Nov. 30, 2020) ("[T]he federal courts are unanimous in their agreement that a listing on the NASDAQ . . . is a good indicator of efficiency.").

### c.     The *Cammer* and *Krogman* Factors Also Support Market Efficiency

In evaluating market efficiency, courts consider the factors outlined in both *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). *See Waggoner v. Barclays PLC*, 875 F.3d 79, 94 (2d Cir. 2017) ("district courts in this and other Circuits regularly consider five factors first set forth in *Cammer* . . . and the three factors identified in *Krogman*"); *NIO*, 2023 WL 5048615, at *11-*12 (analyzing the *Cammer* and *Krogman* factors). The *Cammer* factors are: "(1) the average weekly trading volume of the security; (2) the number of

analysts following the security; (3) the extent to which market makers traded in the security; (4) the eligibility of the issuer to file an SEC Form S-3 or F-3; and (5) a demonstrated cause-and-effect relationship between unexpected, material disclosures about the company and changes in the security's price." *NIO*, 2023 WL 5048615, at \*11. The *Krogman* factors are "(1) market capitalization of the company; (2) bid-ask spread of the security; and (3) percentage of the security not held by insiders, also known as the float." *Id.*

All of the *Cammer* and *Krogman* factors are readily satisfied here, as discussed below. In support of this conclusion, Lead Plaintiff offers the Cain Report. Dr. Cain analyzes each of the *Cammer* and *Krogman* factors and concludes that the market for Virtu common stock was efficient throughout the Class Period. *See* Cain Rpt. ¶¶33-95.

> **(1)** **_Cammer_ Factor 1: Virtu Common Stock's High Weekly Trading Volume Supports a Finding of Market Efficiency**

The existence of an actively traded market, as evidenced by large weekly trading volume, "suggests efficiency 'because it implies significant investor interest in the company . . . [which], in turn, implies a likelihood that many investors are executing trades on the basis of newly available or disseminated corporate information.'" *Strougo v. Barclays PLC*, 312 F.R.D. 307, 316 (S.D.N.Y. 2016). Here, Virtu common stock's average weekly trading volume was 5.33% of the outstanding common stock over the Class Period. Cain Rpt. ¶41. In addition, the average weekly trading volume over the Class Period was 5.97 million shares on the NASDAQ. *Id.* ¶42. The large volume of trading in Virtu common stock supports the strong presumption that it traded in an efficient market during the Class Period. *Id.*; *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 431 (S.D.N.Y. 2014) ("'Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient

- 17 -

one.'") (quoting *Cammer*, 711 F. Supp. at 1293); *see also Allergan*, 2021 WL 4077942, at *10 (weekly trading volume of 3.9% supports market efficiency).

        **(2)**       ***Cammer* Factor 2: The Number of Financial Analysts Covering Virtu During the Class Period Supports a Finding of Market Efficiency**

Analyst coverage "supports a finding of market efficiency" because it shows that "investment professionals" are "inject[ing] their views on the . . . security into the market." *Winstar*, 290 F.R.D. at 446. "This factor is commonly met where multiple large brokerage firms produce . . . reports on the financial condition of a company[.]" *McIntire*, 38 F. Supp. 3d at 431. At least 30 analyst firms issued reports about Virtu during the Class Period, including, among others, Piper Sandler, J.P. Morgan, and Morgan Stanley, and collectively published over 900 reports. Cain Rpt. ¶45. This level of analyst coverage is more than enough to demonstrate market efficiency. *See, e.g.*, *NIO*, 2023 WL 5048615, at *11 (fact of five analysts supports efficiency); *Winstar*, 290 F.R.D. at 446 (finding market efficient where three analysts followed security at issue); *In re Aphria, Inc. Sec. Litig.*, 342 F.R.D. 199, 206 (S.D.N.Y. 2022) (fact of over 100 reports indicates efficiency).

Courts also recognize that widespread media coverage is indicative of market efficiency. *See Carpenters*, 310 F.R.D. at 92 ("regular press coverage throughout the Class Period" weighed in favor of finding market efficiency). Information about Virtu was widely disseminated in the form of news coverage. Cain Rpt. ¶47. Thus, the number of analyst reports and the substantial dissemination of news and other information regarding Virtu evidences the robust and active market for public information about the Company and supports market efficiency. *Id*. ¶¶45-49.

        **(3)**       ***Cammer* Factor 3: The Presence of Market Makers and Institutional Investors Supports a Finding of Market Efficiency**

Market makers support efficiency because they "react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Menaldi v. Och-*

*Ziff Cap. Mgmt. Grp. LLC*, 328 F.R.D. 86, 95 (S.D.N.Y. 2018). Here, the number of market makers provides additional evidence of market efficiency for Virtu common stock. During the Class Period, there were at least 120 market makers for Virtu – more than enough to support a finding of efficiency. Cain Rpt. ¶53; *NIO*, 2023 WL 5048615, at *12 (third *Cammer* factor satisfied where 77 market makers identified); *see also Carpenters*, 310 F.R.D. at 92 (51 market makers evidenced market efficiency).

In addition, during the Class Period, there were over 830 unique institutional investors, who owned an average of 69.42% of outstanding Virtu common stock. Cain Rpt. ¶55. The presence of institutional investors in Virtu, who were able to evaluate and trade Virtu shares based on new, material information, strongly supports a finding of market efficiency. *See id.*; *see also Pearlstein v. BlackBerry Ltd.*, 2021 WL 253453, at *16 (S.D.N.Y. Jan. 26, 2021) (finding efficiency where more than 450 institutions held stock); *Wilson v. LSB Indus., Inc.*, 2018 WL 3913115, at *12 (S.D.N.Y. Aug. 13, 2018) ("at least 251 major institutions" owning stock supported efficiency).

### (4) *Cammer* Factor 4: Virtu's Eligibility to File a Form S-3 Registration Statement Supports a Finding of Market Efficiency

"[T]he existence of Form S-3 status is an important factor weighing in favor of a finding that a market is efficient." *Cammer*, 711 F. Supp. at 1285. A company is generally eligible to file a Form S-3 registration statement if it has filed reports with the SEC for twelve consecutive months and has $75 million in stock held by non-affiliates. *See* 17 C.F.R. §239.13; Cain Rpt. ¶58. As Dr. Cain notes, Virtu satisfied both requirements throughout the Class Period. Virtu regularly filed financial reports with the SEC during the Class Period. *Id*. ¶60. In fact, the Company filed a Form S-3ASR (Automatic Shelf Registration) during the Class Period. *Id*. Moreover, Virtu's public float far exceeded the size required for S-3 eligibility, at an average of $1.99 billion, compared to the required $75 million. *Id*. ¶59. *See Winstar*, 290 F.R.D. at 447 ("[t]he ability to file this form [S-3]"

- 19 -

is evidence of market efficiency because it "indicates that the company is easily able to issue new securities"). This factor further supports market efficiency.

> **(5)    *Cammer* Factor 5: Virtu Common Stock Reacted to New Company-Specific Information, Demonstrating a Cause-and-Effect Relationship**

The fifth *Cammer* factor permits, but does not require, a plaintiff to submit "direct evidence" demonstrating a "cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Waggoner*, 875 F.3d at 94. The Second Circuit has held that "a plaintiff seeking to demonstrate market efficiency need not always present direct evidence of price impact through event studies" – particularly where the other, "indirect" *Cammer* and *Krogman* factors provide compelling evidence of market efficiency. *Id*. at 96-98. Here, the first four *Cammer* factors and all of the *Krogman* factors, discussed below, support market efficiency, rendering unnecessary the need to analyze the fifth *Cammer* factor. *See Allergan*, 2021 WL 4077942, at *10 ("All together, these factors so strongly support a presumption of market efficiency, that it obviates the need to examine the empirical evidence necessary to evaluate the fifth *Cammer* factor."); *see also BlackBerry*, 2021 WL 253453, at *16 ("As the Second Circuit noted in *Waggoner*, where the remaining four *Cammer* factors and the three *Krogman* factors all point toward market efficiency, a court can dispense with the fifth *Cammer* factor completely.").

Nonetheless, to test Virtu's responsiveness to new information, Lead Plaintiff submitted an event study from its expert, Dr. Matthew D. Cain, who holds a Ph.D. in finance and teaches at the New York University School of Law, analyzing Virtu common stock's price movements on days that Company-specific news was publicly released and comparing those movements to other days in the Class Period. Cain Rpt. ¶¶5, 65-72. "'[A]n event study that correlates the disclosures of unanticipated, material information about a security with corresponding fluctuations in price has been considered prima facie evidence of the existence of such a causal relationship.'" *In re*

- 20 -

*Petrobras Sec.*, 862 F.3d 250, 278 (2d Cir. 2017) (quoting *Teamsters Loc. 445 Freight Div. Pension Fund v. Bombardier Inc.*, 546 F.3d 196, 207-08 (2d Cir. 2008)).  As detailed in his report, Dr. Cain's event study identified a cause-and-effect relationship between the release of new, Virtu-specific information and the movement in the price of Virtu common stock, evidencing that Virtu common stock traded in an efficient market during the Class Period.  Cain Rpt. ¶¶76-82.

### (6)    *Krogman* Factor 1: Virtu's Large Market Capitalization Supports Market Efficiency

Market capitalization is an indicator of market efficiency because "investors tend to be more interested in companies with higher market capitalizations, thus leading to more efficiency." *Strougo*, 312 F.R.D. at 315.  During the Class Period, Virtu's market capitalization averaged $2.66 billion (Cain Rpt. ¶85), which strongly supports market efficiency.  *See NIO*, 2023 WL 5048615, at *12 (average market capitalization of $1.33 billion favored finding of efficiency). *Carpenters*, 310 F.R.D. at 92 ($0.5 to $3.2 billion market capitalization supported efficiency).

### (7)    *Krogman* Factor 2: Virtu Common Stock's Narrow Bid-Ask Spread Supports Market Efficiency

The bid-ask spread is the difference between the prices at which investors are willing to buy and current stockholders are willing to sell shares; a low bid-ask spread indicates a more efficient market. *See Krogman*, 202 F.R.D. at 478.  The bid-ask spread for Virtu common stock averaged just 0.07% during the Class Period, which further supports market efficiency.  Cain Rpt. ¶89; *NIO*, 2023 WL 5048615, at *12 (bid-ask spread of 0.17% fell "below bid-ask spreads which have shown efficiency in prior cases").

### (8)    *Krogman* Factor 3: The High Percentage of Market Float Supports Market Efficiency

A stock's "float" is the number of shares outstanding, excluding shares held by insiders and affiliated corporate entities.  A higher float indicates greater market efficiency, *see Krogman*, 202

- 21 -

F.R.D. at 478, because when insiders with private information hold large portions of the security, "the price is less likely to reflect only the total of all public information." *Strougo*, 312 F.R.D. at 316-17. During the Class Period, over 72% of Virtu common stock shares were held by non-insiders, resulting in an average public float of $1.99 billion during the Class Period, supporting market efficiency. Cain Rpt. ¶94. *See, e.g.*, *McIntire*, 38 F. Supp. 3d at 433 (finding that float of between 57% and 69% of shares outstanding supported efficiency).

*    *    *

In sum, **all** of the *Cammer* and *Krogman* factors support a finding that the market for Virtu common stock was efficient during the Class Period. Thus, class-wide reliance may be presumed under the *Basic* fraud-on-the-market doctrine.[5]

### d.    Damages May Be Calculated on a Class-Wide Basis Using a Common Methodology

In *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), the Supreme Court held that "a model for determining classwide damages relied upon to certify a class under Rule 23(b)(3) must actually measure damages that result from the class'[] asserted theory of injury[.]" *Roach*, 778 F.3d at 407. The Second Circuit has made clear that "*Comcast* does not mandate that certification pursuant to Rule 23(b)(3) requires a finding that damages are capable of measurement on a classwide basis." *Id.* at 402. "All that is required at class certification is that the plaintiffs must be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015); *see also Carpenters*, 310 F.R.D. at 74

---

[5]    Class members are also presumed to rely on Defendants' omissions, as set forth in the Supreme Court's decision in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972). Under *Affiliated Ute*, reliance is presumed when the claim rests on the omission of a material fact. *Id.* at 153-54.

("Issues and facts surrounding damages have rarely been an obstacle to establishing predominance in section 10(b) cases.").

As described in Dr. Cain's report, damages can be calculated using the same methodology – the out-of-pocket measure – for all proposed Class members. Cain Rpt. ¶¶98-120. Courts routinely find that this methodology is consistent with §10(b) liability and capable of calculating damages on a class-wide basis. *See In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 105-06 (S.D.N.Y. 2016) (finding out-of-pocket methodology "entirely consistent with [Lead Plaintiff's] theory of Section 10(b) liability and would be measurable on a class-wide basis" and noting "securities class actions routinely seek out-of-pocket damages for fraudulent misrepresentations"). In sum, the calculation of each Class member's damages will be a mechanical arithmetic exercise for all Class members who sold Virtu common stock during the Class Period, and therefore is readily applicable on a class-wide basis. Because the methodology for calculating per-share damages will be the same for each proposed Class member, damages constitute a common question, and predominance is satisfied.

### 2. A Class Action Is Superior to Other Available Methods for Resolving This Controversy

Rule 23(b)(3) also requires that class treatment be "superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). It is widely recognized that "[s]ecurities suits easily satisfy the Superiority Requirement of Rule 23(b)(3)." *MF Glob.*, 310 F.R.D. at 239; *NIO*, 2023 WL 5048615, at *17 ("this case, like many other securities actions, would be best adjudicated as a class action"). When assessing superiority, courts consider: (1) class members' interests in individually controlling separate actions; (2) whether other litigation has already commenced; (3) the desirability of concentrating claims in one forum; and (4) the likely difficulties in managing a class action. Fed. R. Civ. P. 23(b)(3)(A)-(D).

Here, interest in individually prosecuting separate actions is minimal, as the expense of doing so would be prohibitive when weighed against potential recoveries. The Class consists of a large number of geographically dispersed purchasers of Virtu common stock whose individual damages likely are too small to make individual litigation economically worthwhile. Moreover, Lead Plaintiff is not aware of any other active securities fraud litigation commenced by any Class member regarding the alleged fraud. In addition, class treatment of this action removes the "risk of inconsistent judgments" emanating from other proceedings. *Erickson*, 692 F. Supp. 3d at 134. Finally, Lead Plaintiff does not foresee any management difficulties that would preclude proceeding as a class action.

In short, a class action is the superior method for litigating the proposed class's claims. *See MF Glob.*, 310 F.R.D. at 239 ("Securities suits easily satisfy the Superiority Requirement of Rule 23(b)(3) because 'the alternatives are either no recourse for thousands of stockholders' or 'a multiplicity and scattering of suits with the inefficient administration of litigation which follows in its wake.'"); *see also San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 349 F.R.D. 606, 614 (S.D.N.Y. 2025) ("Like most other securities actions, a class action efficiently and effectively provides recourse to Dentsply's many stockholders, while avoiding inconsistent rulings and proliferating litigation.").

### D.    The Proposed Class Is Ascertainable

The "Second Circuit has [also] recognized an implied requirement that the class be 'ascertainable.'" *BlackBerry*, 2021 WL 253453, at *5 (quoting *Petrobras*, 862 F.3d at 264). The requirement "is not demanding," and is meant "only to prevent the certification of a class whose membership is truly indeterminable." *In re Facebook, Inc., IPO Sec. & Derivative Litig.*, 312 F.R.D. 332, 353 (S.D.N.Y. 2015). The proposed Class here is ascertainable because it "clearly delineates the class's boundaries by the dates of investors' transactions in [Virtu common] stock. Ascertaining

- 24 -

the members of the class will be easily administrable by references to investor records." *BlackBerry*, 2021 WL 253453, at *13; *see also Signet Jewelers*, 2019 WL 3001084, at *9 (same).

### E. Robbins Geller Should Be Appointed Class Counsel

A "court that certifies a class must appoint class counsel." Fed. R. Civ. P. 23(g)(1). In appointing class counsel, courts consider: (i) counsel's work in "identifying or investigating potential claims"; (ii) "experience in handling class actions"; (iii) "knowledge of the applicable law"; and (iv) "the resources that counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv). Lead Plaintiff's chosen counsel, Robbins Geller, satisfies these requirements and has successfully prosecuted numerous securities fraud class actions on behalf of injured investors, including in this District. *See* Ex. C; *see also supra* at 13. Robbins Geller has also already vigorously prosecuted this action, including extensively investigating the claims and drafting the CC, opposing Defendants' motion to dismiss, engaging in discovery, and now pursuing class certification. Lead Plaintiff respectfully requests that the Court appoint Robbins Geller as Class Counsel.

### V. CONCLUSION

For the foregoing reasons, Lead Plaintiff respectfully requests that the Court: (i) certify this action as a class action pursuant to Rule 23(a) and 23(b)(3); (ii) appoint Lead Plaintiff as the Class Representative; and (iii) appoint Robbins Geller as Class Counsel.

DATED: October 22, 2025        Respectfully submitted,

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
DAVID A. ROSENFELD
MARIO ALBA JR.
ROBERT D. GERSON
MAGDALENE ECONOMOU
JOSHUA D. FORGY

/s/ Robert D. Gerson
ROBERT D. GERSON

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
drosenfeld@rgrdlaw.com
malba@rgrdlaw.com
rgerson@rgrdlaw.com
meconomou@rgrdlaw.com
jforgy@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule IV.B. of the Honorable Nicholas G. Garaufis' Individual Rules, I hereby certify that on October 22, 2025, I caused a true and correct copy of the foregoing document to be served on all counsel of record by providing them with copies via electronic mail.

*/s/ Magdalene Economou*
MAGDALENE ECONOMOU