**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE VIRTU FINANCIAL, INC. SECURITIES LITIGATION | Case No. 1:23-cv-03770-NGG-CHK |

**MEMORANDUM OF LAW IN OPPOSITION TO
LEAD PLAINTIFF'S MOTION FOR CLASS CERTIFICATION
AND APPOINTMENT OF CLASS REPRESENTATIVE AND CLASS COUNSEL**

ORAL ARGUMENT REQUESTED

PAUL, WEISS, RIFKIND,
WHARTON & GARRISON LLP

1285 Avenue of the Americas
New York, NY 10019-6064
Phone: (212) 373-3000

*Attorneys for Defendants Virtu Financial, Inc.,
Douglas Cifu, Joseph Molluso, Alex Ioffe, and Sean
Galvin*

Dated: January 22, 2026

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ........................................................................................1

BACKGROUND ...........................................................................................................4

      A.      Virtu Acquires Another Established Market Maker (KCG) ...................................4

      B.      Alleged Permissioning Issue Arises While Integrating KCG's Systems.................5

      C.      Virtu Acquires Broker Dealer With No Proprietary Trading Business (ITG) ..............................................................................................................5

      D.      The Alleged Misstatements and Corrective Disclosures ........................................7

LEGAL STANDARD.....................................................................................................8

ARGUMENT .................................................................................................................9

I.      THE EVIDENCE SHOWS LACK OF PRICE IMPACT, REBUTTING THE *BASIC* PRESUMPTION OF RELIANCE. ....................................................................9

      A.      Plaintiff Has Not Articulated a Theory of Price Impact .........................................9

      B.      The Alleged Misstatements Had No Front-End Price Impact ...............................10

      C.      The Alleged Misstatements Did Not Have Price Impact Under a Price Maintenance Theory ............................................................................................12

            1.      None of the Four Alleged Corrective Disclosures Caused a Back-End Stock Price Decline That Can Serve as a Proxy for Front-End Inflation..............................................................................................13

            2.      *ATRS* and Additional Evidence Demonstrates Lack of Price Impact ........16

II.      PLAINTIFF IS INADEQUATE AND ATYPICAL.........................................................21

III.      CAIN PROFFERS NO CLASS-WIDE DAMAGES MODEL ........................................23

IV.      IF A CLASS IS CERTIFIED, THE CLASS DEFINITION SHOULD BE LIMITED ...................................................................................................................24

CONCLUSION.............................................................................................................25

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Affiliated Ute Citizens of Utah* v. *United States*,
406 U.S. 128 (1972) ................................................................................................10

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
265 F.R.D. 157 (S.D.N.Y. 2010), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012) ................................................................................................................13

*Ark. Tchr. Ret. Sys* v. *Goldman Sachs Group, Inc.*,
77 F.4th 74 (2d Cir. Aug. 10, 2023) ................................................................*passim*

*Basic Inc.* v. *Levinson*,
485 U.S. 224 (1988) ..................................................................................................1

*Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ...............................................................................25

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2020 WL 1329354 (S.D.N.Y. Mar. 23, 2020) .........................................................15

*Cohen* v. *Laiti*,
98 F.R.D. 581 (E.D.N.Y.1983) .................................................................................22

*Comcast Corp.* v. *Behrend*,
569 U.S. 27 (2013) ...............................................................................................8, 23

*Darvin* v. *Int'l Harvester Co.*,
610 F. Supp. 255 (S.D.N.Y. 1985) ...........................................................................22

*In re FibroGen Sec. Litig.*,
2024 WL 1064665 (N.D. Cal. Mar. 11, 2024) ........................................................24

*In re Finisar Corp. Sec. Litig.*,
2017 WL 6026244 (N.D. Cal. Dec. 5, 2017) ...........................................................12

*In re FirstEnergy Corp. Sec. Litig.*,
149 F.4th 587 (6th Cir. 2025) ..................................................................................23

*Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
903 F.2d 176 (2d Cir. 1990), *abrogated on other grounds by Microsoft* v. *Baker*, 582 U.S. 23 (2017) ...................................................................................21

*Georgia Firefighters' Pension Fund* v. *Anadarko Petroleum Corp.*,
99 F.4th 770 (5th Cir. 2024) ....................................................................................10

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Goldkrantz* v. *Griffin*,
  1999 WL 191540 (S.D.N.Y. Apr. 6, 1999), *aff'd*, 201 F.3d 431 (2d Cir. 1999) .....................20

*Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*,
  594 U.S. 113 (2021) ...................................................................................................*passim*

*Grigsby* v. *BofI Holding, Inc.*,
  979 F.3d 1198 (9th Cir. 2020) ...............................................................................................11

*Halliburton Co.* v. *Erica P. John Fund, Inc.*,
  573 U.S. 258 (2014) ..............................................................................................................1, 9

*IBEW Loc. 98 Pension Fund* v. *Best Buy Co., Inc.*,
  818 F.3d 775 (8th Cir. 2016) ..................................................................................................12

*In re Kirkland Lake Gold Ltd. Sec. Litig.*,
  2024 WL 1342800 (S.D.N.Y. Mar. 29, 2024) ........................................................10, 16, 19, 20

*Kline* v. *Wolf*,
  702 F.2d 400 (2d Cir. 1983)....................................................................................................22

*In re Literacy Works in Elec. Databases Copyright Litig.*,
  654 F.3d 242 (2d Cir. 2011).....................................................................................................21

*Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*,
  601 U.S. 257 (2024).................................................................................................................10

*In re Moody's Corp. Sec. Litig.*,
  274 F.R.D. 480 (S.D.N.Y. 2011) .............................................................................................13

*In re Nissan N. Am., Inc. Litig.*,
  122 F.4th 239 (6th Cir. 2024) ..................................................................................................23

*In re Philip Morris Int'l Inc. Sec. Litig.*,
  89 F.4th 408 (2d Cir. 2023) .....................................................................................................23

*In re Qualcomm*,
  2023 WL 2583306 (S.D. Cal Mar. 20, 2023) ......................................................................15, 18

*Ramirez v. Exxon Mobil Corp.*,
  2023 WL 5415315 (N.D. Tex. Aug. 21, 2023)......................................................................14, 25

*Ret. Fund* v. *J.P. Morgan Chase & Co.*,
  301 F.R.D. 116 (S.D.N.Y. 2014) .............................................................................................24

## TABLE OF AUTHORITIES
### (Continued)

**Page(s)**

*Savino* v. *Comput. Credit, Inc.*,
  164 F.3d 81 (2d Cir. 1998)......................................................................................22

*Shupe* v. *Rocket Companies, Inc.*,
  752 F. Supp. 3d 735 (E.D. Mich. 2024)..........................................................18, 20

*Sjunde AP-Fonden* v. *Goldman Sachs Grp., Inc.*,
  1:18-cv-12084, ECF No. 329 (S.D.N.Y. Apr. 5, 2024).........................................25

*Waggoner* v. *Barclays PLC*,
  875 F.3d 79 (2d Cir. 2017)......................................................................................10

*Ward* v. *Apple Inc.*,
  784 F. App'x 539 (9th Cir. 2019)............................................................................23

**Statutes**

15 U.S.C. § 78j...................................................................................................9, 10

15 U.S.C. § 78o(g) .....................................................................................................8

**Other Authorities**

Fed. R. Civ. P. 23.............................................................................................*passim*

Defendants Virtu Financial, Inc. ("Virtu" or the "Company"), Cifu, Molluso, Ioffe, and Galvin respectfully submit this memorandum of law in opposition to Plaintiff City of Birmingham Retirement and Relief System's October 22, 2025 Motion for Class Certification and Appointment of Class Representative and Class Counsel (the "Motion" or "Mot.").

## PRELIMINARY STATEMENT

Under recent United States Supreme Court and Second Circuit decisions, class certification in securities cases requires a rigorous analysis of all evidence relevant to price impact, *i.e.* whether alleged misstatements had an impact on the stock price. Plaintiff here has submitted no evidence of price impact at all. That is unsurprising, since the evidence and controlling cases make clear that a class cannot be certified in this securities action.

By way of background, reliance is an element of Plaintiff's fraud claim, but Plaintiff does not contend that it (or any absent class members) actually read and relied on the alleged false statements. So, to establish class-wide reliance, Plaintiff relies on the presumption established by *Basic Inc.* v. *Levinson*, 485 U.S. 224 (1988), that stock prices in an efficient market rapidly incorporate new information. An investor can thus "rely" on a misrepresentation by relying on the integrity of the market price. That presumption is rebutted, however, where defendants show the "alleged misrepresentation[s] did not actually affect the market price of the stock"—*i.e.*, lack of "price impact." *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 264, 284 (2014). Courts must assess "all" relevant evidence and "determine whether it is more likely than not that the alleged misrepresentations had a price impact." *Goldman Sachs Grp., Inc.* v. *Ark. Tchr. Ret. Sys.*, 594 U.S. 113, 126-27 (2021) ("*Goldman*"). Plaintiff has offered no evidence supporting price impact, and has not even articulated a theory of price impact.

The evidence shows that the alleged misstatements neither (i) caused Virtu's stock price to increase when they were made, often referred to as "front-end" price impact, nor (ii) "maintained"

preexisting artificial inflation in Virtu's stock price, referred to as "inflation maintenance."

**No Front-End Price Impact:**  Defendants' financial economics expert, Dr. René Stulz, analyzed Virtu's stock price and related evidence and determined that none of the 31 challenged statements, issued on 26 dates, caused Virtu's stock price to increase.  Since the alleged misstatements did not cause price increases, Plaintiff may not establish price impact through front-end inflation.  *Infra* I.B.

**No Price Impact from Inflation Maintenance:**  Lacking front-end inflation, Plaintiff may pivot to an inflation maintenance theory.  Under this theory, Plaintiff may seek an inference that the back-end stock price declines (*i.e.*, stock drops that follow the four alleged corrective disclosures) serve as a proxy for artificial inflation in Virtu's stock price that was "maintained" by the alleged misstatements.  This argument also fails:  Three of the four alleged corrective disclosures are not associated with a statistically significant stock price decline at all, which disproves back-end price impact.  And the remaining alleged corrective disclosure did not reveal any new information correcting the purported falsity of the alleged misstatements, which further disproves price impact.  These problems are dispositive, not curable, and demonstrate lack of back-end price impact under a maintenance theory.  *Infra* I.C.1.

But there are more problems.  This case is strikingly similar to *Arkansas Teachers Retirement System* v. *Goldman Sachs Group, Inc.,* where the Second Circuit decertified a class based on similar alleged misstatements and a similar alleged corrective disclosure.  77 F.4th 74 (2d Cir. Aug. 10, 2023) ("*ATRS*").  *ATRS* addressed price impact where there was a "mismatch" between the specificity of the highly general front-end alleged misstatements and the more specific back-end corrective disclosures.  *Id*. at 81.  Such a "mismatch" undermines the plaintiff's proposed inference that a back-end decline is a proxy for front-end inflation.  *ATRS* also instructed courts to

evaluate all other evidence relevant to whether the alleged misstatements were "propping up" the stock, such as, for example, whether securities analysts discussed the alleged false statements. *Id*. at 102-3.

Applying *ATRS,* class certification must be denied here:

For one, there is a clear "mismatch" between the alleged misstatements and alleged corrective disclosures.  The alleged misstatements at issue, like those in *ATRS,* are highly generic representations about the company's "transparency," its "policies and procedures . . . to safeguard sensitive client information," and repeated warnings about business risk from potential breaches. The alleged corrective disclosures, also like *ATRS*, are far more specific: they reveal SEC enforcement investigative activity with respect to a specific alleged violation of policies and practices (an information barrier access issue).  Accordingly there is a "gap" in the genericness of the alleged misstatements and the specificity of the alleged corrective disclosures.  There is also a substantive mismatch in content: many of the front-end statements concern Virtu's acquisition of ITG, but the alleged corrective disclosures concern a totally different acquisition of KCG.

Moreover, other evidence relied on by the *ATRS* court disproves price impact here: the alleged misstatements did not themselves cause the stock price to increase; when truthful information was revealed about the alleged misstatements, the stock price did not decrease; and securities analysts did not contemporaneously cite the alleged misstatements, showing that investors were not relying on them and they were not "propping up" the stock price.

As such, the alleged misstatements did not impact Virtu's stock price under the analysis required by *ATRS*, thereby rebutting the presumption of reliance.  *Infra* I.C.2.

The Court should deny class certification for two additional, independent reasons:

**<u>Plaintiff Is Atypical and Inadequate.</u>**  The proposed class representative does not satisfy

Rule 23(a)'s requirements that a class representative's claims or defenses be "typical" of the class and that the representative "adequately" protect the class's interests. Fed. R. Civ. P. 23(a). Plaintiff gave testimony that undermines both its ability to prove loss causation and falsity. Because it holds positions that are at odds with the putative class claims, it is neither adequate nor typical to serve as a representative.

**No Class-wide Damages Method.** Plaintiff is also required to establish a workable method for class-wide determination of damages consistent with Plaintiff's liability theory, which its expert fails to offer.

**Additional Obstacles to Proposed Class.** Class certification should be denied, but if the Court certifies any class, the class definition should exclude: (a) alleged corrective disclosures that did not cause statistically significant stock price declines; (b) any alleged misstatements that do not satisfy *ATRS*; and (c) shareholders who purchased securities after Virtu disclosed the substance of the FS Database Issue, which would shorten the proposed five-year class period.

## BACKGROUND

### A.     Virtu Acquires Another Established Market Maker (KCG)

Virtu is a global financial services firm. (¶ 21.)[1] It initially operated solely as a market-maker. (¶¶ 31-32.) In 2016, Virtu began executing trades on behalf of "a select few" clients. Ex. A at 7. At the time, Cifu announced that Virtu would "keep the order flow from the buy-side institutions [*i.e.*, the execution services business] separate, in a separate broker-dealer." Ex. B at 13. Virtu simultaneously cautioned (as it did in every subsequent quarterly SEC filing) of the risk that Virtu could fail to "maintain system security or otherwise maintain confidential and

---

[1] References to "Ex. _" refer to the exhibits to the Declaration of Alison R. Benedon in Support of Defendants' Opposition to Lead Plaintiff's Motion For Class Certification. References to "(¶ _)" on their own refer to paragraphs in the Consolidated Complaint (the "Complaint"). ECF No. 39. All emphasis is added and internal quotation marks omitted unless noted.

4

proprietary information." Ex. C at 32; Ex. D at 49-50 (similar); Ex. E ("RS Rep.") ¶ 81.

In July 2017, Virtu acquired KCG, a large market-maker that also had an established execution services business. (¶¶ 34, 36-39.) While KCG's core business was market making, it also had an execution business that was significantly more developed than Virtu's. *Id.*; Ex. F at 8; Ex. G at 7. Consistent with Virtu's longstanding commitment to transparency, Cifu spent months meeting with KCG's "top 50 to 60 [execution] customers" as part of the integration. Ex. H at 13.

Virtu disclosed the risks associated with the KCG integration, warning that "the continued integration of legacy systems and the development of new systems could result in disruptions to our ongoing businesses and relationships or cause issues with standards, controls, procedures and policies that adversely affect our ability to maintain relationships with customers." Ex. I at 78.

### B.    Alleged Permissioning Issue Arises While Integrating KCG's Systems

After the KCG merger closed, Virtu began migrating historical, post-trade execution data from KCG into Virtu's back-office database (and its backup)—together, the "FS Database." Ex. J. The FS Database also stored Virtu's proprietary post-trade data. (¶ 47.)

Plaintiff alleges that between January 2018 and April 2019, the FS Database could be accessed using the generic usernames and passwords "viewonly" and "fsviewonly." (¶ 50.) Plaintiff acknowledges that Virtu's policies and procedures prohibited employees from accessing confidential customer data, but alleges that employees *hypothetically* could use those generic credentials to access historical, post-trade data. (¶ 49.) Plaintiff does not allege that anyone from Virtu *actually misused* any client data. Ex. K ("Pltf. Tr.") at 28:14-18, 110:4-7.

### C.    Virtu Acquires Broker Dealer With No Proprietary Trading Business (ITG)

On October 4, 2018, *Bloomberg* leaked that Virtu may acquire ITG, a global financial technology company. Ex. L. Unlike KCG, ITG's business was 100% execution services (*i.e.*, no proprietary trading). Ex. G at 7. As a Goldman Sachs analyst explained the following day: "[w]e

5

view ITG's core business as fundamentally different to KCG's, as ITG revenues largely come from execution services (dark pool operator and algo provider, among other solutions) while KCG's core business has been largely retail market making." Ex. M at 1. That same analyst remarked that acquiring ITG would create "operational complexities" given ITG's and Virtu's different business models. *Id.* at 6.

*Bloomberg* later wrote that ITG customers were concerned that Virtu would "snoop on its **soon-to-be clients'** orders, leveraging that knowledge to place winning trades before they do." Ex. N at 1. *Business Insider* likewise explained the concern that Virtu proprietary traders could "peek[] into its **new** broker-dealer business" and "trade against clients." Ex. O at 2. In sum, the market expressed concern was that Virtu would lose **ITG customers** on the fear that Virtu traders could access **pre-execution** data from **ITG**. The market did not express concern about **KCG customers,** or about Virtu's handling of **post-execution** data from **KCG**—the issue at the heart of Plaintiff's case. *See* RS Rep. ¶¶ 89-96 (reviewing analyst commentary).

On November 7, 2018, Virtu announced at 6:00am ET that it had signed an agreement to acquire ITG. *Id*. ¶¶ 66, 73, 76. Virtu's stock immediately rose in pre-market trading. *Id*. ¶¶ 75-77. Virtu held an investor call at 7:30am ET that morning. Ex. P. On that call, Cifu explained that Virtu has "established policies and procedures for our existing client and market making businesses that are designed to safeguard sensitive client information." *Id*. at 5. An analyst on that call asked about "potential revenue dis-synergies," particularly in light of ITG's "omega issue"— a reference to ITG's resolution, years earlier in 2015, of SEC claims for secretly engaging in proprietary trading (*i.e.*, market making). *Id*. at 9; Ex. Q. Cifu explained that ITG's "issue in 2015 was that they were engaged in prop trading and candidly hadn't been upfront with their clients." Ex. P. at 9. By contrast, Cifu explained, Virtu was transparent about its business model,

6

explaining that "the universe is going to know and clients will know that we are a very significant prop and retail market making firm." *Id*.

Later that afternoon, at 1:11pm, ITG announced that it had entered into another settlement with the SEC. RS Rep. ¶ 72. That settlement was unrelated to its settlement in 2015 (the SEC was not claiming that ITG had misused any client data or had hidden a conflict of interest from clients). Ex. R. Plaintiff's Complaint and Motion incorrectly conflate ITG's 2015 settlement with its 2018 settlement, leading Plaintiff to mistakenly assert that Defendants' false statements were seeking to quell concerns about customer data misuse from the settlement announced on November 7, which is actually not relevant to Plaintiff's case. (¶ 10; Mot. 5-6).

On March 1, 2019, the acquisition closed and Virtu acquired ITG. After the acquisition closed, Cifu delivered on the earlier commitment to hold "client information security forums," which were attended by "over 100" current and prospective clients. Ex. S at 5.

### D.    The Alleged Misstatements and Corrective Disclosures

The Complaint challenges Defendants' statements beginning on November 7, 2018 and for almost five years thereafter. The remaining challenged statements fall into three categories[2]:

- **The Transparency Statements:**  Describing "the importance [Virtu] place[s] in protecting client information," its "promise[ ] to provide unparalleled transparency into how we protect client information," and similar sentiments. (¶¶ 102, 109, 113, 117, 123, 133, 137.)

- **The Existing Procedures Statements:**  Explaining that Virtu has "established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information," and "[t]hese safeguards include physical separation, logical access control and entitlement reviews." (¶¶ 102, 126, 131)

---

[2]  Plaintiff also alleged a category of misstatements that concerned Virtu's future plans to enhance the safeguards at ITG post-acquisition, but the Court dismissed those on the motion to dismiss. ECF No. 58 at 32-44. Defendants' motion to dismiss also discussed the category of all alleged misstatements made after April 2019, when the FS Database Issue was fixed, but each of those statements is included in the three remaining categories.

- **The Risk Disclosures:** Warnings in its SEC filings that Virtu's financial results could be affected by a failure to "protect confidential and proprietary information." (¶¶ 111, 129, 135, 140, 144, 147, 150.)

Plaintiff alleges that the truth about the alleged misrepresentations was revealed to the market in a series of four alleged "corrective" disclosures:

1. **February 17, 2023 ("February Disclosure"):** Virtu reported in its 2022 Form 10-K that "the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers." (¶ 188); Ex. T at 119.

2. **April 28, 2023 ("April Disclosure"):** Virtu reported in its 1Q23 Form 10-Q that "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC[,]" and "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period." (¶ 190); Ex. U at 31.

3. **July 28, 2023 ("July Disclosure"):** Virtu reported in its 2Q23 Form 10-Q that Virtu "has received a Wells Notice from the SEC" and "expects the SEC to file an action against" it. (¶ 192); Ex. V at 34.

4. **September 12, 2023 ("September Disclosure"):** The SEC filed a press release announcing that it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. (collectively, Virtu), for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information." (¶ 194); Ex. W.

The SEC case has since settled for a mere $2.5 million in resolution of a Section 15(g) claim regarding Virtu's internal procedures, with no admission of wrongdoing by Virtu. Ex. X. The SEC's claims based on alleged false statements were dismissed with prejudice by the SEC. *Id.* at 3. Plaintiff conceded at his deposition that this development would be relevant to its assessment of whether to get involved in this lawsuit in the first place. Pltf. Tr. 156:21-157:4.

## LEGAL STANDARD

Plaintiff bears the burden to "affirmatively demonstrate his compliance with Rule 23." *Comcast Corp.* v. *Behrend*, 569 U.S. 27, 33 (2013). Courts must conduct a "rigorous analysis," *id.* at 27, and "determin[e] that Rule 23 is satisfied, even when that requires inquiry into the

8

merits." *Goldman*, 594 U.S. at 122. To certify a class, Plaintiff must demonstrate (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation, and establish that "questions of law or fact common to class members predominate." Fed. R. Civ. P. 23.

Because reliance is an essential element of Plaintiff's section 10(b) claim, Plaintiff must also establish that it relied on the alleged misstatements. *Halliburton Co.* v. *Erica P. John Fund, Inc.*, 573 U.S. 258, 263 (2014). Plaintiff here relies on the *Basic* presumption of reliance (Mot. 15), which is "premised on the theory that investors rely on the market price of a company's security, which in an efficient market incorporates all of the company's public misrepresentations." *Goldman*, 594 U.S. at 117. "[W]ithout the *Basic* presumption, individualized issues of reliance ordinarily would defeat predominance and preclude certification." *Id*. at 119.

The *Basic* presumption, however, is rebuttable. Defendants can rebut it by showing "that an alleged misrepresentation did not actually affect the market price of the stock," because "[i]f a misrepresentation had no price impact, then *Basic*'s fundamental premise completely collapses, rendering class certification inappropriate." *Id*. While Defendants bear the burden to rebut the presumption, "the allocation of the burden is unlikely to make much difference" unless the Court finds the competing evidence relative to price impact to be equally as persuasive. *Id*. at 126-7.

**ARGUMENT**

**I.     THE EVIDENCE SHOWS LACK OF PRICE IMPACT, REBUTTING THE *BASIC* PRESUMPTION OF RELIANCE.**

Defendants may show lack of price impact "through [a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price." *Id*. at 118. Courts must "assess all the evidence of price impact—direct and indirect," including "competing expert evidence on price impact," aided by the court's own "common sense," to "determine whether it is more likely than not that the

alleged misrepresentations had a price impact." *Id*. at 122, 126-27.

### A.    Plaintiff Has Not Articulated a Theory of Price Impact

A "threshold question for the Court" is "determining Plaintiff's theory of price impact." *In re Kirkland Lake Gold Ltd. Sec. Litig.*, 2024 WL 1342800, at *6 (S.D.N.Y. Mar. 29, 2024). A misrepresentation can have price impact either by (i) causing the company's stock price to increase (*i.e.*, a front-end price increase), or (ii) "maintaining inflation that is already built into the stock price" and preventing it from falling. *ATRS*, 77 F.4th at 80.[3]

Plaintiff's Motion does not articulate its theory of price impact, and Plaintiff's expert, Matthew Cain, admits that he has "not attempted to assess or form any opinions" on that subject. Ex. Y ("Cain Tr.") 52:23-53:5. In fact, Cain testified that he has not given that subject any thought whatsoever, even before accepting this engagement. *Id*. 53:6-57:20. This leaves Defendants in the unenviable position of trying to anticipate the arguments Plaintiff may make—improperly, for the first time on reply—to address this critical issue.[4]

In any event, the evidence shows that the alleged false statements did not have price impact.

### B.    The Alleged Misstatements Had No Front-End Price Impact

One way alleged misrepresentations may have price impact is if they "caus[ed] the stock to trade at an inflated price." *ATRS*, 77 F.4th at 80. That theory fails here because the alleged misrepresentations did not cause Virtu's stock price to increase, as Stulz finds in his analysis.

---

[3] In a two-sentence footnote, Plaintiff also purports to invoke the presumption of reliance applicable in omissions cases that was first established in *Affiliated Ute Citizens of Utah* v. *United States*, 406 U.S. 128 (1972). Mot. 22 n.5. But *Affiliated Ute* is plainly inapplicable where, as here, a plaintiff alleges "half-truths" or "misstatements whose only omission is the truth that the statement misrepresents." *Waggoner* v. *Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017). In any event, even if Plaintiff had pleaded an omissions theory, it is clear that *Affiliated Ute* does not apply in section 10(b) cases following the Supreme Court's ruling in *Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*, 601 U.S. 257 (2024) (holding that pure omissions cannot give rise to claims under section 10(b)).

[4] Of course, Plaintiff should not be permitted to offer a new theory in its reply brief. And if Plaintiff does so with an additional expert report, Defendants should be permitted an opportunity to address any such arguments. *Georgia Firefighters' Pension Fund* v. *Anadarko Petroleum Corp*., 99 F.4th 770, 774 (5th Cir. 2024) (abuse of discretion to consider plaintiff's new price impact analysis submitted on reply without a sur-reply).

Stock prices move constantly, including due to "market and industry factors," "normal volatility," and "random fluctuations."  RS Rep. ¶¶ 58-60, 74.  Accordingly, as the Second Circuit has held, courts must assess whether any particular price movement was caused by a company-specific announcement that was statistically significant.  *ATRS*, 77 F.4th at 86 n.5.  A lack of statistical significance is strong evidence that there was no price impact, as any non-significant price movement is "indistinguishable from random price fluctuations" and therefore "cannot be attributed to company-specific information."  *Id*.

Defendants' expert, Stulz, performed a regression analysis that analyzed Virtu's stock price movement for the 26 dates on which the remaining alleged misrepresentations were made.  RS Rep. ¶¶ 58-60, 65-115.  Stulz found no statistically significant stock price increase for 22 dates.  *Id*. ¶¶ 74, 97-99.  For four dates, Stulz found stock price increases, but concluded that they were not caused by the alleged misstatements.  *Id*. ¶¶ 100-15.  Specifically, in an efficient market, a stock price does not move following the repetition of previously disclosed information.  *Id*. ¶¶ 13, 56-57, 78; *Grigsby* v. *BofI Holding, Inc.*, 979 F.3d 1198, 1205 (9th Cir. 2020) ("[T]he disclosure of . . . information already known by the market [] will not cause a change in stock price.").  On all four of dates with increases, the challenged statements merely repeated the exact same or substantively identical statements that had previously been made, and did not provide new information relevant to the alleged fraud.  RS Rep. ¶¶ 101, 105, 109, 113.

Cain did not analyze price impact, and thus offers no opinion to rebut Stulz's finding of no front-end price impact.  But Cain did perform a regression that tested market efficiency, and his regression is consistent with Stulz's finding of no front-end price impact.  Cain finds that the vast majority of the alleged misstatements occurred on dates with no statistically significant stock price increase.  *Id*. ¶ 99.  Stulz examined the dates on which Cain's regression finds statistical

11

significance, and none support a showing of front-end price impact:

Cain's regression finds a statistically significant stock price increase on November 7, 2018. However, as shown by after-hours trading data, the increase in Virtu's stock price on that date occurred immediately after the ITG acquisition was announced, *before* the alleged misstatements were made. *Id*. ¶¶ 75-76. Plainly, the alleged misstatements cannot have caused this increase because they had not yet been uttered. The only other dates on which Cain's regression identifies a statistically significant stock price increase are the same dates analyzed by Stulz, which are mere repetitions of previous statements. *Id*. ¶¶ 97-115.

This evidence dispositively establishes that Plaintiff cannot establish price impact from front-end increases in Virtu's stock. *See IBEW Loc. 98 Pension Fund* v. *Best Buy Co., Inc.*, 818 F.3d 775, 782 (8th Cir. 2016) ("overwhelming evidence of no front-end price impact rebut[s] the *Basic* presumption"); *In re Finisar Corp. Sec. Litig.*, 2017 WL 6026244, at *9 (N.D. Cal. Dec. 5, 2017) (*Basic* presumption rebutted by lack of front-end price impact).

## C. The Alleged Misstatements Did Not Have Price Impact Under a Price Maintenance Theory

Lacking front-end price impact, Plaintiff will likely invoke a price maintenance theory. Under that theory, the Plaintiff must identify a "back-end price drop," *i.e.* a decline that "happens when the truth is finally disclosed," that serves as "an indirect proxy for the front-end inflation, or the amount that the misrepresentation fraudulently propped up the stock price." *ATRS*, 77 F.4th at 80. In short, the theory posits that "back-end price drop equals front-end inflation." *Id.*

The Supreme Court and Second Circuit have directed courts to conduct a rigorous analysis in price maintenance cases. As *ATRS* instructs, a plaintiff cannot simply "(a) identify a specific back-end, price-dropping event, (b) find a front-end disclosure bearing on the same subject, and then (c) assert securities fraud." *Id.* at 102. Rather, the Court must examine a plaintiff's theory

12

and evaluate whether there "are grounds to infer that the back-end news actually corrected the front-end misstatements." *Id*. at 91.  In this case, the evidence shows that the back-end drops cannot serve as proxies for inflation allegedly "maintained" by the challenged statements.

### 1.  None of the Four Alleged Corrective Disclosures Caused a Back-End Stock Price Decline That Can Serve as a Proxy for Front-End Inflation

Plaintiff's Complaint cites four alleged corrective disclosures that purportedly revealed new, fraud-related information and caused Virtu's stock price to drop.  (¶¶ 186-95); Mot. 7.  But the evidence disproves that allegation.  For three of the four alleged corrective disclosures, there was no statistically significant stock price decline.  And, the remaining alleged corrective disclosure did not disclose any new, value-relevant information that corrected the purported falsity of the challenged statements.  As such, there is no back-end decline to support price impact.

**February and July Alleged Corrective Disclosures.**  The February Disclosure revealed that the SEC was investigating Virtu's information access barriers, and the July Disclosure revealed that Virtu had received a Wells Notice and expected the SEC to file an action.  Exs. T, V. For both of these alleged corrective disclosures, Stulz finds no statistically significant stock price declines following the disclosures.  RS Rep. ¶¶ 117-20, 134-39.  While Cain offers no opinion at all, his regression analysis also finds no statistically significant price decline.  *Id*.

Under *ATRS*, the lack of statistically significant stock price declines is dispositive because it means the stock price movement "cannot be attributed to company-specific information announced on the event date."  *ATRS*, 77 F.4th at 86 n.5; RS Rep. ¶¶ 118, 136.  Courts routinely deny class certification, in whole or in part, for alleged corrective disclosures that are not followed by a statistically significant price decline.  *See, e.g.*, *In re Moody's Corp. Sec. Litig.*, 274 F.R.D. 480, 493 (S.D.N.Y. 2011) (no price impact where "there is no period within the proposed class period where . . . a corrective disclosure caused a statistically significant decline in the price"); *In*

13

*re Am. Int'l Grp., Inc. Sec. Litig.*, 265 F.R.D. 157, 186-87 (S.D.N.Y. 2010) (no price impact where there was no statistically significant price decline on two disclosure dates, measured at the 95% level), *vacated on other grounds*, 689 F.3d 229 (2d Cir. 2012); *Ramirez v. Exxon Mobil Corp.*, 2023 WL 5415315, at \*15-22 (N.D. Tex. Aug. 21, 2023) (defendants rebutted price impact for subset of alleged corrective disclosures not associated with a "statistically significant negative price reaction"). Accordingly, given the undisputed expert evidence that neither the February Disclosure nor July Disclosure caused a stock price decline, price impact is rebutted.

**April Alleged Corrective Disclosure.** The April Disclosure revealed that Virtu anticipated receipt of a Wells Notice, and that the SEC's proposed suit would allege violations of federal securities laws concerning Virtu's information barriers and related statements. Ex. U. Stulz again finds no statistically significant stock price decline following that disclosure, again rebutting price impact. RS Rep. ¶ 130. Cain offers no opinion on this question. His regression identifies statistical significance at the 95% confidence level, but it is selectively designed to increase the likelihood of a finding of statistical significance.[5] *Id.*

But even (incorrectly) assuming statistical significance, the April Disclosure suffers another fatal defect for price impact purposes: it does not disclose ***new***, ***corrective*** information that would reveal the falsity of the alleged misstatements. As Plaintiff concedes, the market already knew as of February that the SEC was investigating an issue with Virtu's information barriers. (¶¶ 14, 87.) The new information included in the April Disclosure concerned the SEC, not Virtu: that the SEC was likely to bring claims based on the earlier-announced investigation. Indeed, Plaintiff testified that the only new "incremental information" disclosed on April 28 was

---

[5] Cain specifically excluded Virtu's earnings releases from the "estimation window" underpinning his regression analysis, which "makes it more likely that a residual return being tested will be statistically significant." *Id.* ¶ 64. Because Dr. Stulz's regression analysis is superior, it should be credited. *Id.*

14

"that the company believed it was about to receive a Wells notice."  Pltf. Tr. 125:4-22, 129:7-17. That Wells Notice is not the subject of the alleged fraud—indeed, the anticipated Wells Notice is not something that Virtu could possibly have disclosed at the start of the class period.  Because the April Disclosure did not reveal new information that corrected the alleged misrepresentations, any stock price movement (even if statistically significant) cannot serve as a proxy for front-end inflation.  *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2020 WL 1329354, at *7 n.5 (S.D.N.Y. Mar. 23, 2020) ("a court should review the newness of a corrective disclosure [to assess price impact] at the class certification stage."); *In re Qualcomm*, 2023 WL 2583306, at **12-13 (S.D. Cal Mar. 20, 2023) (that "corrective disclosures did not actually contain new information correcting the alleged misrepresentations" makes it "less reasonable to assume that Defendants' alleged misrepresentations caused front-end inflation.").

**September Alleged Corrective Disclosure**.  The final alleged corrective disclosure, the September Disclosure, is the SEC's press release announcing that it had filed charges against Virtu. Ex. W.  While Stulz finds a statistically significant decline following this Disclosure, that decline is attributable to the SEC announcement, and not to any new corrective information.  By this time, the market was well aware of the information barrier access issue.  RS Rep. ¶ 147.  Indeed, as addressed *supra,* the market was aware of the information access barrier issue by February due to Virtu's own disclosures.  And Virtu had commented publicly on April 28 and May 1 about the "access controls weakness in one of our internal back office systems containing post trade information that theoretically could allow certain system users access greater than what was intended by our policies" and disclosed that it had been fixed as of April 2019.  Exs. U, Z, AA. And, as Plaintiff conceded at deposition, the new information in the September Disclosure—that the SEC brought charges—could not have been revealed earlier and is not what was allegedly

15

concealed from the market.  Pltf. Tr. 143:7-18.  As such, there was nothing new in the September Disclosure that corrected the alleged misstatements.

Plaintiff can hardly contend otherwise.  Take, for example, an investor who bought Virtu stock in August 2023—who would be included in Plaintiff's proposed class.  That investor (like the rest of the market) unquestionably knew the substance of the FS Database Issue that had occurred and been fixed *four years prior*.  The shares purchased by that investor could not possibly be inflated by the alleged concealment of those public facts—which necessarily means that the back-end decline in September cannot serve as a proxy for front-end inflation "maintained" by the alleged concealment of those facts.  RS Rep. ¶¶ 155, 171.

### 2. *ATRS* **and Additional Evidence Demonstrates Lack of Price Impact**

There are additional defects that establish lack of price impact.  To assess the strength of the inference that a back-end drop equals front-end inflation, *ATRS* instructs courts to consider: (1)  whether there is a "gap" or "mismatch" between the content and specificity of the front-end and back-end statements; (2) whether a "truthful—but equally generic—substitute" for the alleged misstatement would impact the stock price; and (3) contemporaneous evidence (or lack thereof) that the market relied on the alleged misstatements.  *ATRS*, 77 F.4th at 102–03.  Each factor here strongly supports lack of price impact.  In fact, the parallels between *ATRS* and this case are numerous, and strongly support denial of class certification.

**Mismatch Analysis:**  In *Goldman*, the Supreme Court explained that the inference that the back-end price drop equals front-end inflation "starts to break down" when there is a "mismatch between the contents of the [alleged] misrepresentation and the corrective disclosure." 594 U.S. at 123.  This may occur when there is a "substantive mismatch," *Kirkland*, 2024 WL 1342800, at *11, or "when the earlier misrepresentation is generic" and "the later corrective disclosure is specific." *Goldman*, 594 U.S. at 123.  This analysis requires a "closer fit" than loss causation.

16

*ATRS*, 77 F.4th at 99 n.11. Moreover, *ATRS* specifically cautions district courts to be "skeptical" that a "generic, front-end statement propped up the price to the same extent" as a stock price decline that follows a "highly detailed corrective disclosure" such as the disclosure of an enforcement action. *Id*. at 102. In this scenario, the "details and severity" of the conduct disclosed on the back-end cannot be substituted in place of "the challenged, more generic statements" on the front end. *Id.* at 100.

Here, there is both a gap in genericism and a substantive mismatch:

(1) As to the generic nature of the alleged misstatements, the front-end statements are remarkably similar to those at issue in *Goldman* and *ATRS,* and the generic nature of the front-end statements is "important evidence of a lack of price impact." *Goldman*, 594 U.S. at 122-23 ("[A]s a rule of thumb, a more-general statement will affect a security's price less than a more-specific statement."). In *ATRS*, the plaintiffs claimed that the defendants made misstatements about Goldman's business principles and management of conflicts of interest, which were false because Goldman had engaged in allegedly conflicted transactions, as revealed when the SEC brought an enforcement action. *ATRS*, 77 F.4th at 82-83. The Second Circuit found that the generic nature of these statements supported a finding that they did not impact Goldman's stock price. *Id.* at 105.

The "generic statements" in *ATRS* are extremely similar to the Transparency Statements and the Existing Procedure Statements at issue here:

| Challenged Statements in *ATRS* | Challenged Statements in This Case |
|---|---|
| "Integrity and honesty are at the heart of our business" and "[o]ur clients' interests always come first. Our experience shows that if we serve our clients well, our own success will follow[.]" *Id.* at 82. | "You see the importance we place on protecting client information in all aspects of our business" and "Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any counterparty[.]" |
| "We have extensive procedures and controls that are designed to identify and address conflicts of interest." *Id.* | "Virtu has established policies and procedures for our existing client and market-making businesses |

17

| | . . . includ[ing] physical separation, logical access control and entitlement reviews[.]" |
| --- | --- |

Likewise, more than half of the challenged statements here are the Risk Disclosures, warning about potential business harm from failures to "protect confidential and proprietary information." *Supra* at 7.  These are unquestionably generic as well.  *ATRS*, 77 F.4th at 101 (risk disclosures are only misleading when "detailed" and "specific").

The challenged statements are undoubtedly generic and are therefore unlikely to impact Virtu's stock price.  Courts in other cases have reached the same conclusion.  *Qualcomm.,* 2023 WL 2583306 at *12 ("[T]he generic nature of the alleged misrepresentations" containing the adjectives "broad," "fair," "reasonable," and "non-discriminatory" "makes it less likely that those misrepresentations deceived the market"); *Shupe* v. *Rocket Companies, Inc.*, 752 F. Supp. 3d 735, 778, 781-82 (E.D. Mich. 2024) ("[t]he generic nature" of statements, including references to "strong consumer demand" and an "opportunity to grow market share," "presents important evidence that [the] alleged misrepresentations had no price impact.")

(2) There is also a substantive mismatch in this case.  All four of the alleged corrective disclosures describe a specific information barrier access issue that arose from the integration of post-execution trade data following Virtu's acquisition of *KCG*.  By contrast, the front-end statements largely related to Virtu's acquisition of *ITG*, describe safeguards for *ITG* customer data, and address investor questions about future segregation of *ITG* customer information from Virtu's proprietary traders.  In other words, there is a mismatch between the problem that allegedly caused the back-end declines (a KCG acquisition integration issue) and the alleged false statements (concerns that ITG customers would leave Virtu following the acquisition).  And while the mismatch is clear on its face, it is also supported by market commentary showing that the market was concerned with the *new* risks posed by the ITG acquisition (namely, that ITG would lose

18

customers due to data confidentiality concerns) and not the well-established KCG execution business (or the related FS Database integration).

This "mismatch in content between the statement and the corrective disclosure" undermines any inference that the back-end decline serves as a proxy for the amount of artificial inflation in Virtu's stock price. *Kirkland*, 2024 WL 1342800, at *11.

**Truthful Substitute:** *ATRS* also directs that, where, as here, there is a gap in "front-end-back-end genericness," courts should consider "whether a truthful—but equally generic—substitute for the alleged misrepresentations would have impacted the stock price." *ATRS*, 77 F.4th at 102. The question is not whether the market would have reacted if a more detailed corrective disclosure (*e.g.*, a detailed SEC complaint) had been released earlier, but rather "'what would have happened if [the company] had spoken *truthfully*,' at an *equally generic level*." *Id*. at 99 (quoting *In re Vivendi, S.A. Sec. Litig.,* 838 F.3d 223, 258 (2d Cir. 2016)).

In this case, we need not address this question in the hypothetical because Virtu's stock did not drop on dates when, under Plaintiff's theory, truthful information was revealed. *See Kirkland*, 2024 WL 1342800, at **8-9 (analyzing actual substitute that did not cause back-end price decline). As noted above, even the specific corrective disclosures that Plaintiff invokes in February, April and July did not cause Virtu's stock price to drop. *Supra* at 13-16. In the February Disclosure, in particular, the market learned that Virtu was under investigation for an issue relating to information barriers—the very fact that Plaintiff claims was misrepresented. Yet Virtu's stock undisputedly did not drop. *Supra* at 13-14. Under *ATRS*, when the disclosure of truthful information does not cause a stock drop, this shows that the alleged false statements were not "propping up" Virtu's stock price. *ATRS*, 77 F.4th at 100.

**Analyst Commentary:** *ATRS* also directs courts to assess whether securities analysts discussed or referenced any of the alleged misstatements. Here, analysts did not discuss or reference *any* of them, RS Rep. ¶¶ 89-96, 101, 105, 109, 113, which is powerful evidence that the "misrepresentation[s] did not impact [Virtu's] stock price." *ATRS*, 77 F.4th at 104-05. As in *Shupe*, it is "fatal[]" to Plaintiffs' claims that "Defendants have produced expert testimony suggesting that no analyst referenced [the] alleged misrepresentations in reports issued throughout the Class Period." 752 F. Supp. 3d 735 at 781; *see also Goldkrantz* v. *Griffin*, 1999 WL 191540, at *5 (S.D.N.Y. Apr. 6, 1999), (finding the fact that "there was a complete lack of reaction in the financial press . . . [to be] nearly sufficient, by itself, to carry [Defendants'] burden" on price impact), *aff'd*, 201 F.3d 431 (2d Cir. 1999).[6]

Additionally, even after the so-called corrective disclosures, when the "truth" was revealed, no analyst connected the alleged corrective disclosures to any of the alleged misstatements. *See Kirkland*, 2024 WL 1342800 at *12 (no price impact where "no analyst" "referred back" to the alleged misstatement). No analyst wrote about the February Disclosure at all. RS Rep. ¶ 119. The only analyst who wrote about the April Disclosure *positively* remarked that because "[t]he investigation covers a period spanning from January 2018 to April 2019," it "effectively pre-dat[es] VIRT's acquisition of ITG (which occurred on March 31, 2019)." Ex. BB at 1; RS Rep. ¶¶ 127-29. If anything, this demonstrates that the market's focus was on the *ITG* business, undermining any contention that a stock price decline following a *KCG*-related information barrier issue could serve as a proxy for front-end inflation. RS Rep. ¶¶ 127-33. The only analyst who wrote about the July Disclosure concluded that "it does not appear . . . [that] anything has changed

---

[6] Analysts did note "Virtu's plans to enhance its safeguards post-ITG acquisition," RS Rep. ¶ 85, but the Court dismissed Virtu's forward-looking statements on this subject at the motion to dismiss stage. *Supra* 7. In any event, analyst commentary that merely "touches on the subject" of the alleged misstatements is not enough to "suggest that the market relied" on the alleged misstatements. *ATRS*, 77 F.4th at 103.

regarding the underlying focus of the investigation/claims." Ex. CC at 1; RS Rep. ¶¶ 137-39. And while analysts covered the September Disclosure, none focus on, or even mention, the alleged misstatements. RS Rep. ¶¶ 148-156. Instead, analysts mused that this development was the "[l]atest volley in [Virtu's] ongoing tussle with the SEC" about unrelated issues, as Stulz explains. *Id*. ¶¶ 27-39, 149-52. The lack of market attention on the alleged misstatements shows that they were not "propping up" or maintaining inflation in Virtu's stock price.

**No Front-End Price Increases:** The ATRS court also relied on the lack of front-end price impact, which also undermined the inference that investors were relying on the alleged misstatements. *ATRS*, 77 F.4th at 86. So too here. *Supra* at 10-12.

*    *    *

In sum, the evidence in this case strongly demonstrates lack of price impact: (a) the alleged misstatements did not cause front-end inflation, (b) the alleged corrective disclosures did not cause statistically-significant price declines and/or did not reveal new corrective information that reveals the falsity of the front-end statements; and (c) applying *ATRS,* any back-end price decline (even if proven) is not a proxy for front-end inflation given the front-end-back-end mismatch and other relevant evidence. The *Basic* presumption is therefore rebutted, and class certification should be denied.

## II.    PLAINTIFF IS INADEQUATE AND ATYPICAL

Rule 23(a) requires that a class representative's claims or defenses be "typical" of those of the class and that it "adequately" protect the class's interests. Fed. R. Civ. P. 23(a). The class representative "must have no interests antagonistic to the interests of other class members." *In re Literacy Works in Elec. Databases Copyright Litig.*, 654 F.3d 242, 249 (2d Cir. 2011). A class representative is atypical if he is "subject to unique defenses which threaten to become the focus of the litigation." *Gary Plastic Packaging Corp.* v. *Merrill Lynch, Pierce, Fenner & Smith, Inc.*,

21

903 F.2d 176, 180 (2d Cir. 1990), *abrogated on other grounds by Microsoft* v. *Baker*, 582 U.S. 23 (2017).

During its Rule 30(b)(6) deposition, Plaintiff's corporate representative made a number of critical concessions directly contrary to Plaintiff's pleaded case, which give rise to disabling conflicts between Plaintiff and the proposed class, and make Plaintiff inadequate and atypical.

*First*, Plaintiff's deposition testimony undermines the Complaint's theory of loss causation. Directly contrary to the pleaded case, Plaintiff testified that the fraud was revealed when the SEC's investigation was announced in February 2023. Pltf. Tr. 115:11-17. Plaintiff also testified that it discovered the alleged fraud in June 2023. *Id*. at 18:21-25. Plaintiff then conceded that the alleged corrective disclosures either did not reveal new information to the market, or revealed information that had not been implicated by the alleged misstatements or could not have been disclosed on the first day of the class period. *Id*. at 120:5-121:5, 125:4-129:17, 134:6-17, 136:3-141:7, 143:13-18.

Courts have held that a plaintiff's "inconsistent testimony could create serious problems" and "could become the focus of cross examination and unique defenses at trial, to the detriment of the class." *Darvin* v. *Int'l Harvester Co.*, 610 F. Supp. 255, 257 (S.D.N.Y. 1985); *see also Kline* v. *Wolf*, 702 F.2d 400, 403 (2d Cir. 1983) ("Since plaintiffs' testimony on an issue critical to one of their two causes of action was subject to sharp attack, the district court reasonably concluded that their credibility in general was sufficiently in doubt to justify denying them a fiduciary role as class representatives"). Courts have also refused to certify a class where the proposed class representative's deposition testimony is contrary to the pleaded case. *See e.g.*, *Savino* v. *Comput. Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998) (court's denial of motion to certify class did not constitute abuse of discretion when plaintiff's inconsistency concerned facts that form "the very basis for his lawsuit," creating credibility issue for trial); *Cohen* v. *Laiti*, 98 F.R.D. 581, 582-84

(E.D.N.Y.1983) (refusing to certify class in part because plaintiff's deposition testimony contradicted allegations in the complaint).

*Second*, Plaintiff conceded that a number of the challenged statements are inactionable statements of puffery. When confronted with the Transparency Statements, Plaintiff could not explain how "transparency" could be measured and conceded that whether Virtu is transparent "depends on who is asking." Pltf. Tr. 46:6-47:7. He made similar concessions regarding Defendants' statements about Virtu being "upfront" and that there is no "gray area at Virtu." *Id*. at 74:6-77:20, 102:18-103:21. Statements are not actionable where an investor cannot "point to any objective, black-and-white standard by which to verify" them. *In re Philip Morris Int'l Inc. Sec. Litig.*, 89 F.4th 408, 418 (2d Cir. 2023). If Plaintiff were appointed class representative, the class would be severely hampered in pursuing claims that Plaintiff has conceded are doomed.

## III.    CAIN PROFFERS NO CLASS-WIDE DAMAGES MODEL

The Motion should also be denied because Plaintiff failed to set forth a class-wide damages methodology as required by *Comcast*, 569 U.S. 27 at 33. Plaintiff must submit "evidentiary proof" of a class-wide damages methodology that "measure[s] only those damages attributable to [Plaintiff's] theory," and does not "identif[y] damages that are not the result of the wrong." *Id*. at 33, 35, 37. While "the classwide-damages calculation need not be exact, at both class certification and trial courts must conduct a rigorous analysis to determine whether a plaintiff's damages case is consistent with its liability case." *In re FirstEnergy Corp. Sec. Litig.*, 149 F.4th 587, 620 (6th Cir. 2025). Plaintiff's proposed damages model fails under *Comcast*.

*First*, Plaintiff's expert cannot "merely assert[] that he [will] be able to develop a model at some point in the future." *Ward* v. *Apple Inc.*, 784 F. App'x 539, 540 (9th Cir. 2019); *see In re Nissan N. Am., Inc. Litig.*, 122 F.4th 239, 253-54 (6th Cir. 2024) (rejecting expert's "bald statement" regarding methodology). But that is all Cain has done here, using a near word-for-

23

word recitation of the "methodology" included in reports he submitted in numerous other cases. *Compare* Exs. DD, EE Sections VI *with* Gerson Decl. Ex. A ("Cain Rpt") Section VI.  He opines that he would use the "'out-of-pocket' method of calculating damages" but does not explain how that can be applied consistent with Plaintiff's theory of liability.  Cain Rpt. ¶¶ 100, 108.  This bare bones approach does not satisfy *Comcast*.  *Fort Worth Emps.' Ret. Fund* v. *J.P. Morgan Chase & Co.*, 301 F.R.D. 116, 142 (S.D.N.Y. 2014)) ("[W]ithout assurance beyond [plaintiffs' proffered expert]'s say-so, the Court cannot conclude that there is a damages model that will permit the calculation of damages on a classwide basis.").

*Second*, Cain has not explained how he could use the stock price declines following the alleged corrective disclosures to measure front-end inflation.  As explained *supra* at 13-16, each alleged stock drop followed a disclosure of a SEC development—which is not the subject of the alleged misstatements.  And it is not surprising that a company's stock price would decline upon the announcement of an adverse regulatory action for reasons unrelated to fraud.  *See* RS Rep. ¶ 171.  Cain has not explained how he would "separate the portion of" Virtu's stock price decline "attributable to any corrective disclosures" from other negative news.  *In re FibroGen Sec. Litig.*, 2024 WL 1064665, at *16 (N.D. Cal. Mar. 11, 2024).

*Third*, Cain has not articulated how he will reliably measure inflation on each day of the lengthy five-year proposed class period.  In particular, Plaintiff challenges statements from November 2018 to September 2023, but concedes that the FS Database issue was fixed in April 2019.  Pltf. Tr. 114:24-115:4; Mot. 5.  Cain has not explained how he would measure inflation in Virtu's stock price after the FS Database was *fixed*. RS Rep. ¶¶ 174-76.

## IV.    IF A CLASS IS CERTIFIED, THE CLASS DEFINITION SHOULD BE LIMITED

Class certification should be denied, but to the extent that the Court grants class certification at all, the proposed class definition should be limited in at least three ways:

24

*First*, the class period should exclude any corrective disclosure that had no price impact and thus cannot "give rise to liability." *Carpenters Pension Tr. Fund of St. Louis* v. *Barclays PLC*, 310 F.R.D. 69, 96–97 (S.D.N.Y. 2015). Stulz found that the February, April, and July Disclosures did not cause statistically significant stock price declines, and the September Disclosure did not reveal new, corrective information. RS Rep. ¶¶ 116-156. Any certified claims may not include non-viable corrective disclosures. *E.g., Ramirez*, 2023 WL 5415315 at \*22 (denying class certification as to certain corrective disclosures).

*Second*, if the Court concludes that Defendants have rebutted price impact for certain alleged false statements but not others, the certification order should be limited in that fashion. *See Sjunde AP-Fonden* v. *Goldman Sachs Grp., Inc.*, 1:18-cv-12084, ECF No. 329 at 32 (S.D.N.Y. Apr. 5, 2024), *report and recommendation adopted* ECF No. 355 (S.D.N.Y. Sept. 4, 2025) (denying class certification in part where certain alleged false statements did not "match" the back-end corrective disclosure).

*Finally,* the class period must be shortened. "[A] class period ends when the truth has been disseminated to the market." *Carpenters*, 310 F.R.D. at 97. As explained *supra* at 15-16, the information barrier access issue was disclosed in February 2023, and by May 1, 2023, Virtu had provided more details. Under Plaintiff's theory, Virtu's statements about the "importance" it places on "protecting client information" and its "unparalleled transparency," its "established" pre-ITG "policies and procedures," and the risk of future failures to "protect confidential and proprietary information" were thus undoubtedly fully corrected well before September 2023.

## CONCLUSION

Plaintiff's class certification motion should be denied.

Dated: January 22, 2026
     New York, New York

        PAUL, WEISS, RIFKIND, WHARTON &
        GARRISON LLP

        By: */s/ Audra J. Soloway*
        Audra J. Soloway
        Andrew G. Gordon
        Alison R. Benedon
        1285 Avenue of the Americas
        New York, NY 10019-6064
        Phone: (212) 373-3000
        asoloway@paulweiss.com
        agordon@paulweiss.com
        abenedon@paulweiss.com

        *Attorneys for Defendants Virtu Financial, Inc.,*
        *Douglas Cifu, Joseph Molluso, Alex Ioffe, and Sean*
        *Galvin*

## CERTIFICATION

I, Audra J. Soloway, hereby certify that the foregoing Memorandum of Law complies with Local Civil Rule 7.1 and the Court's Individual Rule IV(C) in that the total number of words in this memorandum of law, exclusive of the caption, table of contents, table of authorities, and signature block is 8,322 words and 25 pages according to Microsoft Word, and therefore does not exceed 8,750 or 25 pages.

/s/ Audra J. Soloway
Audra J. Soloway

## CERTIFICATE OF SERVICE

Pursuant to Rule IV.B. of the Honorable Nicholas G. Garaufis' Individual Rules, I hereby certify that on January 22, 2026, I caused a true and correct copy of the foregoing document to be served on all counsel of record by providing them with copies via electronic mail.

*/s/ Audra J. Soloway*
Audra J. Soloway

28