# Exhibit E

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| In re VIRTU FINANCIAL, INC. SECURITIES LITIGATION | Case No. 1:23-cv-03770-NGG-CHK |

**EXPERT REPORT OF RENÉ STULZ, Ph.D.**

January 22, 2026

# Table of Contents

I.     Qualifications ................................................................................................................ 1

II.    Assignment .................................................................................................................... 2

III.   Summary of Opinions .................................................................................................... 3

IV.    Background .................................................................................................................... 7

       A.    Overview of Virtu ............................................................................................... 7

       B.    Overview of KCG Merger ................................................................................... 8

       C.    Overview of ITG Merger ..................................................................................... 9

       D.    Tensions Between the SEC and Virtu during the Proposed Class Period ............. 12

       E.    Summary of Allegations ...................................................................................... 17

V.     Event Study Analysis .................................................................................................... 20

       A.    Overview of Event Study Analysis ...................................................................... 20

       B.    Implications of Market Efficiency ....................................................................... 24

       C.    Event Study Analysis for Virtu's Common Stock................................................. 25

       D.    Dr. Cain's Event Study Analysis......................................................................... 26

VI.    There Is No Reliable Economic Evidence That Virtu's Stock Price Increased in Response
       to the Alleged Misrepresentations................................................................................. 28

       A.    November 7, 2018............................................................................................. 29

             1.    Overview................................................................................................. 29

             2.    Analysis of the Stock Price Movement on November 7, 2018................. 33

       B.    Analysis of Alleged Misrepresentations After November 7, 2018 ....................... 44

             1.    February 7, 2019 .................................................................................... 45

             2.    February 28, 2020 .................................................................................. 47

             3.    November 6, 2020................................................................................... 48

             4.    November 3, 2021.................................................................................. 50

VII.   The Stock Price Movements Following the Alleged Corrective Disclosures Cannot Serve
       as Reliable Evidence of the Impact of Prior Alleged Misrepresentations on Virtu's Stock
       Price .......................................................................................................................... 52

       A.    February 17, 2023 ............................................................................................. 52

       B.    April 28, 2023 ................................................................................................... 54

       C.    July 28, 2023..................................................................................................... 59

       D.    September 12, 2023 ............................................................................................ 62

VIII.  Dr. Cain Has Failed to Articulate a Damages Methodology That Can Measure Damages That Are Consistent with Plaintiff's Theory of Liability in This Case ............................ 73

   A.  Summary of Dr. Cain's Proposed Approach for Calculating Section 10(b) Damages.................................................................................................... 74

   B.  Dr. Cain Has Not Articulated How He Could Use Price Movements Following the Alleged Corrective Disclosures to Measure Inflation........................................... 76

   C.  Dr. Cain Has Not Articulated How He Would Account for the Changing Nature of the Implications of the Alleged Misrepresentations Throughout the Proposed Class Period ............................................................................................ 78

## I.  Qualifications

1.      I hold the Everett D. Reese Chair of Banking and Monetary Economics at The Ohio State University.  I am also Director of the Dice Center for Research in Financial Economics at The Ohio State University and a Research Associate of the National Bureau of Economic Research ("NBER") in Cambridge, Massachusetts.  Since receiving my Ph.D. in Economics from the Massachusetts Institute of Technology in 1980, I have taught at the Massachusetts Institute of Technology, the University of Rochester, the University of Chicago, and The Ohio State University.  I have taught courses to undergraduate students, graduate students, and executives on banking, risk management, securities pricing, investment, international finance, and corporate valuation.  I was a Bower Fellow at the Harvard Business School from 1996 to 1997.

2.      I am a past president of the American Finance Association and the Western Finance Association, and a fellow of the American Finance Association, the Financial Management Association, the European Corporate Governance Institute, and the Wharton Financial Institutions Center.  I received a Doctorate Honoris Causa from the University of Neuchâtel in Switzerland, an Honorary Doctorate of Laws from University College Dublin, and the Risk Manager of the Year award from the Global Association of Risk Professionals.  I have also been recognized by many organizations for my contributions to financial economics by awards or by invitations to be a keynote speaker.

3.      I belong to the editorial boards of many academic and practitioner publications.  Further, I am a member of the NBER's Asset Pricing and Corporate Finance Programs and was the director of the NBER's Risk of Financial Institutions Group for more than 15 years.  I was editor of the *Journal of Finance* for 12 years and co-editor of the *Journal of Financial Economics* for five years (two of the top three journals in the field of financial economics).  Thomson Reuters has included me in its list of the world's most influential scientific minds, which identifies top researchers based on the number of authored publications that are highly cited by peers.[1]

---

[1] "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015, available at https://www.ludwigcancerresearch.org/wp-content/uploads/2018/09/37a987a9-e378-4888-8baa-d4ba20efdbfd_tr_scientific_minds_online_final.pdf, pp. 3, 46.

4.    I have published more than 100 studies in finance and economics journals, including the *Journal of Political Economy*, the *Journal of Financial Economics*, the *Journal of Finance*, and the *Review of Financial Studies*.  I am the author of a textbook titled *Risk Management and Derivatives*, a co-author of *The Squam Lake Report: Fixing the Financial System*, and have edited several books, including the *Handbook of the Economics of Finance and International Capital Markets*.

5.    I have taught in executive development programs in North America, Europe, and Asia.  I have consulted for major corporations, law firms, the New York Stock Exchange, the International Monetary Fund, and the World Bank.  I have testified in numerous securities class actions and other matters as an expert witness.  I also served as a member of advisory boards of the U.S. Treasury and of the Federal Reserve Bank of New York, and as a director of several banks and of an asset management firm.  I have extensive experience in risk management and have been involved in various roles associated with the Global Association of Risk Professionals.

6.    A copy of my curriculum vitae is attached as **Appendix A**.  Additionally, a list of my testimony over the last four years is attached as **Appendix B**.

## II.    Assignment

7.    I have been retained by Paul, Weiss, Rifkind, Wharton & Garrison LLP, counsel ("Counsel") for Virtu Financial, Inc. ("Virtu" or "the Company"), Douglas Cifu, Joseph Molluso, Alex Ioffe, and Sean Galvin (together, "Defendants").

8.    I have been asked to assess (i) whether Defendants' alleged misrepresentations made during the period from November 7, 2018 and September 12, 2023 (the "Proposed Class Period") inflated the price of Virtu's common stock by increasing the price following these alleged misrepresentations and (ii) whether the stock price drops following the alleged corrective disclosures constitute economic evidence of price impact of the alleged misrepresentations on Virtu's common stock.

9.    Additionally, I have been asked to review and respond to the expert report of Matthew D. Cain, Ph.D., dated October 22, 2025 ("Cain Report").  Specifically, I have been asked to address whether Dr. Cain has put forth a methodology capable of reliably measuring class-wide damages in a manner consistent with Plaintiff's theory of liability.

10.     The analyses and opinions expressed in this report are my own.  I am being compensated for my time and services at a rate of $1,550.  I have been assisted in this matter by staff of Cornerstone Research, who worked under my direction.  I receive compensation from Cornerstone Research based on its collected staff billings for its support of me in this matter.  Neither my compensation in this matter nor my compensation from Cornerstone Research is in any way contingent or based on the content of my opinions or the outcome of this or any other matter.

11.     In undertaking this assignment, I have relied on documents and data related to the issues in this matter.  In **Appendix C**, I have listed the documents I have considered for this report.  My work in this matter is ongoing, and I reserve the right to supplement my opinions if additional information or arguments are provided to me or submitted in connection with this matter.

### III.    Summary of Opinions

12.     I summarize my opinions in this section, which are based on my analyses, a review of relevant materials, as well as my expertise and training in financial economics.  The bases for my opinions are detailed in the sections that follow.

13.     *First*, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to the alleged misrepresentations.  As discussed below in **Section VI.A**, on November 7, 2018, the first day of the Proposed Class Period, this conclusion is supported by the following findings:

     a.  There is a lack of robust, positive, and statistically significant residual return for Virtu's stock on November 7, 2018.

     b.  Virtu's stock price on November 7, 2018 increased after the 6:00 AM ET press release but *before* the alleged misrepresentations were made on the Company's 7:30 AM ET conference call.

     c.  The alleged misrepresentations addressed topics that were the subject of prior Company statements.  To the extent any specific alleged misrepresentations did not exactly replicate the prior Company statements, securities analysts did not comment on the alleged misrepresentations, which is consistent with the notion that there was no new, value-relevant

information contained in the alleged misrepresentations. If Virtu stock traded in an efficient market as Dr. Cain claims, Virtu's stock price would not be expected to increase in response to alleged misrepresentations that did not contain incremental, value-relevant information.

d.  Instead of focusing on the alleged misrepresentations, the analyst commentary discussed the expected benefits associated with Virtu's acquisition of ITG, a transaction that had previously been associated with a positive market price reaction when the press leaked news of the potential transaction.

14.    As discussed below in **Section VI.B**, alleged misrepresentations on four days after November 7, 2018 were followed by a residual return that was positive and statistically significant. The alleged misrepresentations addressed topics that were the subject of prior Company statements. For each of these days, I conclude that, to the extent the specific alleged misrepresentations do not exactly replicate prior Company statements, based on my review of analyst reports published following the alleged misrepresentations, securities analysts did not comment on the alleged misrepresentations, which is consistent with a lack of new, value-relevant information contained in the alleged misrepresentations. Moreover, on each day with alleged misrepresentations followed by positive and statistically significant residual returns, I identify other positive news that was released on those days.

15.    For the remaining days that do not have statistically significant residual returns, Virtu's stock return cannot be reliably distinguished from the normal volatility and random fluctuations in Virtu's stock price on a daily basis. Additionally, all of these alleged misrepresentations addressed topics that were the subject of prior Company statements. To the extent the specific alleged misstatements did not exactly replicate prior Company statements, securities analysts did not comment on the alleged misrepresentations. Thus, I conclude that there was no new, value-relevant information contained in the alleged misrepresentations.

16.    *Second*, as discussed below in **Section VII**, based on my analysis of the alleged corrective disclosures, I have concluded that the stock price movements following the alleged corrective disclosures cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

a. **February 17, 2023:**  As discussed below, on this day, Virtu disclosed in its 2022 Form 10-K the presence of an SEC investigation into the Company's information access barriers.  Given the lack of a negative and statistically significant residual return, the lack of analyst discussion of the allegedly corrective information, and the lack of positive confounding information that would have offset an otherwise negative and statistically significant residual return, I conclude that the stock price movement following the February 17, 2023 alleged corrective disclosure cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

b. **April 28, 2023:**  As discussed below, on this day, Virtu disclosed in its Q1 2023 Form 10-Q that "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice."  Given the lack of reliable evidence of a negative and statistically significant residual return, the analyst focus on the SEC action itself, as opposed to the underlying allegations concerning information barriers and any alleged misstatements, and the lack of any information not associated with the SEC action itself that would have offset an otherwise negative and statistically significant residual return, I conclude that the stock price movement following the April 28, 2023 alleged corrective disclosure cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

c. **July 28, 2023:**  As discussed below, on this day, Virtu disclosed in its Q1 2023 Form 10-Q that it had received a Wells Notice from the SEC.  Given the lack of a negative and statistically significant residual return, that analyst commentary described the information as not suggesting "anything has changed," and the lack of positive confounding information that would have offset an otherwise negative and statistically significant residual return, I conclude that the stock price movement following the July 28,

2023 alleged corrective disclosures cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

d. **September 12, 2023:**  As discussed below, on this day, the SEC announced the filing of a complaint against Virtu.  Given that the elevated risk of an SEC lawsuit related to information barrier issues had already been disclosed following the Wells Notice, that substantial information about the information barrier allegations was already available to investors, that analysts did not describe any incremental details about the allegations negatively, I conclude that the stock price movement following the September 12, 2023 alleged corrective disclosures cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.  Based on my review of the analyst commentary, the decline instead is consistent with the inability of Virtu to come to a favorable resolution with the SEC, which at least certain analysts viewed as signaling an escalation in Virtu's ongoing tensions with the SEC having to do with Virtu's use of payment for order flow discussed in **Section IV**.

17.    *Third*, as discussed in **Section VIII**, Dr. Cain has failed to put forth a damages methodology that can measure damages that are consistent with Plaintiff's theory of liability in this case.  Specifically:

a. Dr. Cain's approach is generic and does not address any specific complications related to measuring damages for the case at hand.

b. Dr. Cain states that his damages calculation would "begin" from the price movements following the alleged corrective disclosures.  To the extent Plaintiff claims that the stock price declined following "the materializations of the risks that had been concealed by Defendants' fraud," Dr. Cain has not articulated a way to use the price movements following the alleged corrective disclosures to measure inflation.  Dr. Cain fails to address to what extent the alleged corrective disclosures represent materializations of previously disclosed risks and fails to put forth a methodology that can calculate inflation based on price movements

following the alleged corrective disclosures.  From an economic perspective, price declines following materializations of risk are not measures of artificial inflation (to the extent there was any) earlier in the Proposed Class Period.  In particular, the alleged corrective disclosures in this matter relate to new developments in an ongoing SEC investigation.  Dr. Cain has not shown how he would establish that Virtu could have disclosed these new developments years before they transpired.

c.  Dr. Cain has not articulated how he would account for the changing nature of the implications of the alleged misrepresentations throughout the Proposed Class Period.

## IV.    Background

### A.    Overview of Virtu

18.    Virtu is a broker-dealer registered with the Securities and Exchange Commission ("SEC").  Virtu organized its business into two operating segments during the Proposed Class Period:  market making and execution services.[2]  As a market maker, Virtu provides liquidity in the marketplace, by "commit[ing] capital on a principal basis by offering to buy securities from, or sell securities to, broker dealers, banks and institutions."[3]  As a wholesale market maker, Virtu interacts with retail brokers, investment advisors, private client networks, sell-side brokers, and buy-side institutions.[4]  Virtu's wholesale market making business utilizes the so-called "payment for order flow" model, which is defined "to include any monetary payment, service, property, or any other benefit that results in remuneration, compensation or consideration to a broker or

---

[2] Prior to the acquisition of KCG Holdings, Inc., Virtu operated as a single reportable business segment.  Starting Q3 2017, Virtu had two operating segments: Market Making and Execution Services in addition to Corporate, a non-operating segment. Virtu Financial, Inc., Form 10-K for Fiscal Year Ended December 31, 2019, filed February 28, 2020 ("Virtu Financial, Inc., 2019 10-K"), p. 5.

[3] Virtu Financial, Inc., Form 10-K for Fiscal Year Ended December 31, 2023, filed February 16, 2024 ("Virtu Financial, Inc., 2023 10-K"), p. 6.

[4] Beyond its wholesale market making operations, Virtu also engages in exchange-facing market making by trading "in a supplemental capacity" on exchanges and other trading venues.  *See* Virtu Financial, Inc., 2023 10-K, p. 5–6.

dealer in return for the routing of customer orders."[5]  Namely, Virtu pays retail broker-dealer clients for directing their order flow in U.S. equities to the Company.

19.      Virtu also has an "execution services" business.[6]  In contrast to the market making business where Virtu acts as a "principal," the execution business mostly involves Virtu acting in an "agency" basis directing client orders for best execution.[7]  Specifically, that part of the business involves "earn[ing] commissions when transacting as an agent when executing orders for [Virtu's] clients."[8]  Virtu's execution services are offered to mutual funds, pension plans, hedge funds, endowments, broker dealers, and banks.[9]  Prior to the acquisitions of KCG Holdings, Inc. ("KCG") in 2017,[10] and Investment Technology Group ("ITG") in 2019,[11] Virtu's execution services business was minimal.

### B.      Overview of KCG Merger

20.      On March 15, 2017, before the Proposed Class Period, Virtu made a preliminary bid to acquire KCG, a rival financial services firm engaging in market making, high-frequency trading, electronic execution, and other trading.[12]  On April 20, 2017, Virtu announced that it had reached an agreement to acquire KCG for approximately $1.4 billion to "extend Virtu's scaled operating model to KCG's wholesale market making businesses and broaden the distribution of Virtu's technology and execution services to KCG's extensive institutional client base."[13]  In addition to

---

[5] "Payment for Order Flow," Federal Register Release No. 34-34902, November 2, 1994, 59 F. R. 211 (Nov. 2, 1994), available at https://www.govinfo.gov/content/pkg/FR-1994-11-02/html/94-27109.htm, p. 6.

[6] "Virtu Enters into Definitive Agreement to Acquire ITG," Conference Call Presentation, *Virtu Financial, Inc.,* November 7, 2018; Virtu Press Release, "Virtu Financial, Inc. Completes Acquisition of ITG to Create Premier Agency and Broker Neutral Franchise," March 1, 2019, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-inc-completes-acquisition-itg-create-premier.

[7] Virtu Financial, Inc., 2023 10-K, p. 8.

[8] Virtu Financial, Inc., 2023 10-K, p. 8.

[9] Virtu Financial, Inc., 2023 10-K, p. 8.

[10] "Virtu Financial Agrees to Acquire KCG Holdings," Conference Call Presentation, *Virtu Financial, Inc.*, April 20, 2017; "Virtu Financial, Inc. Completes Acquisition of KCG Holdings, Inc.," Conference Call Presentation, *Virtu Financial, Inc.*, July 20, 2017.

[11] Virtu Press Release, "Virtu Financial, Inc. Completes Acquisition of ITG to Create Premier Agency and Broker Neutral Franchise," March 1, 2019, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-inc-completes-acquisition-itg-create-premier.

[12] "Virtu Financial Makes Bid to Acquire KCG Holdings," *Wall Street Journal*, March 15, 2017.

[13] Virtu Press Release, "Virtu Financial, Inc. Agrees to Acquire KCG Holdings, Inc. to Create a Premier Market Maker and Agency Execution Firm," April 20, 2017, available at https://www.globenewswire.com/news-release/2017/04/20/962583/0/en/Virtu-Financial-Inc-Agrees-to-Acquire-KCG-Holdings-Inc-to-Create-a-Premier-Market-Maker-and-Agency-Execution-Firm.html.

its wholesale market making segment, KCG had an established agency execution business, in which it executed trades for both large money managers and major retail brokerages.[14] Virtu's management described the acquisition as "transformative" for the Company, combining "efficiency and advanced order routing capabilities" of Virtu with "KCG's extraordinary client franchise."[15]

21.    With the acquisition of KCG, Virtu acquired KCG's execution business—described by Virtu's management as a "marquee franchise in global execution services with connectivity to hundreds of buy-side and sell-side financial institutions"—alongside KCG's wholesale market making business.[16] However, execution was not the main business of KCG—it represented 29% of KCG's net revenues in 2016, compared to 66% for KCG's market making segment.[17] Accordingly, execution represented approximately 10% of Virtu's revenue until the ITG acquisition.[18] I understand that it was Virtu's subsequent post-acquisition integration of KCG that led to the information barriers access issue that is the focus of this action.[19]

## C.    Overview of ITG Merger

22.    On October 4, 2018, before the Proposed Class Period, *Bloomberg* reported that Virtu was "seeking to acquire" ITG, a global financial technology company providing agency execution services and trading analytics.[20] On November 7, 2018, the first day of the Proposed Class Period, Virtu announced that it had reached an agreement to acquire ITG in a cash

---

[14] KCG Holdings, Inc., Form 8-K, filed April 20, 2017, Exhibit 99.1, p. 4 ("[KCG] combines advanced technology with specialized client service across market making, agency execution and venues and also engages in principal trading via exchange-based market making."). *See also* "Virtu to Handle One-Fifth of US Equity Trades After KCG Deal," *Financial Times*, April 20, 2017 ("KCG is one of the largest players in wholesale trading where companies execute trades for retail houses such as Charles Schwab and TD Ameritrade.").

[15] "KCG Holdings, Inc., Virtu Financial, Inc. - M&A Call – Edited Transcript," *Thompson Reuters*, April 20, 2017.

[16] "Virtu Financial Agrees to Acquire KCG Holdings," Conference Call Presentation, *Virtu Financial, Inc.*, April 20, 2017, pp. 4, 7; "KCG Holdings, Inc., Virtu Financial, Inc. - M&A Call – Edited Transcript," *Thompson Reuters*, April 20, 2017.

[17] "Virtu Financial Agrees to Acquire KCG Holdings," Conference Call Presentation, *Virtu Financial, Inc.*, April 20, 2017, p. 8.

[18] "Virtu Enters into Definitive Agreement to Acquire ITG," Conference Call Presentation, *Virtu Financial, Inc.*, November 7, 2018, p. 7.

[19] Complaint, *Securities and Exchange Commission v. Virtu Financial Inc. and Virtu Americas LLC*, September 12, 2023 ("SEC Complaint"), ¶¶ 19–22. *See also*, Consolidated Complaint for Violations of the Federal Securities Laws, *In re Virtu Financial, Inc. Securities Litigation*, January 22, 2024 ("Consolidated Complaint"), ¶¶ 5, 46–47.

[20] "Virtu Is Said to Pursue Takeover of Investment Technology Group," *Bloomberg*, October 4, 2018.

transaction valued at $30.30 per ITG share, or a total of $1.0 billion.[21]  According to Virtu's press release, "[ITG's] Technology and Execution Services [was] highly complementary to Virtu's core market making business, providing further opportunities to organically grow revenue with existing clients and technology."[22]

23.     ITG's shareholders approved the transaction at ITG's special meeting of stockholders on January 24, 2019.[23]  At the time of the announcement, the ITG acquisition "was expected to close during the first half of 2019 after receipt of all required regulatory approvals and ITG shareholder approval."[24]  On January 25, 2019, Virtu confirmed that it had obtained "[c]ertain key regulatory approvals required to consummate the transaction."[25]  Virtu announced the completion of the acquisition on March 1, 2019.[26]  I understand that the integration of the systems and databases of ITG into Virtu took place subsequently.[27]

---

[21] Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," November 7, 2018; *See also* Virtu Financial, Inc., "Virtu Announces Third Quarter 2018 Results," Form 8-K filed November 7, 2018, Exhibit 99.1.

[22] Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," November 7, 2018.

[23] Virtu Press Release, "Virtu Provides Update Regarding Acquisition of ITG," January 25, 2019, available at https://ir.virtu.com/news-releases/news-release-details/virtu-provides-update-regarding-acquisition-itg.

[24] Virtu Financial, Inc., "Virtu Announces Third Quarter 2018 Results," Form 8-K filed November 7, 2018, Exhibit 99.1.  *See also* Virtu Financial, Inc. "Virtu Announces Fourth Quarter and Full Year 2018 Results," Form 8-K filed February 7, 2019 ("The ITG Acquisition is expected to close during the first quarter of 2019 after receipt of all required regulatory approvals and satisfaction of other customary closing conditions.").

[25] Virtu Press Release, "Virtu Provides Update Regarding Acquisition of ITG," January 25, 2019, available at https://ir.virtu.com/news-releases/news-release-details/virtu-provides-update-regarding-acquisition-itg.

[26] Virtu Press Release, "Virtu Financial, Inc. Completes Acquisition of ITG to Create Premier Agency and Broker Neutral Franchise," March 1, 2019, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-inc-completes-acquisition-itg-create-premier.

[27] Virtu Press Release, "Virtu Financial, Inc. Completes Acquisition of ITG to Create Premier Agency and Broker Neutral Franchise," March 1, 2019, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-inc-completes-acquisition-itg-create-premier ("'Over the past four months, the dedicated leadership teams of both firms have developed a detailed integration plan.  In the coming days we will begin to execute that plan to bring Virtu's leading technology, risk management and operational efficiency to ITG's array of agency solutions to better serve a global client franchise.  We are excited to welcome our new colleagues to execute and deliver on this plan,' said Douglas Cifu, Virtu Financial, Inc. Chief Executive Officer.  Mr. Cifu continued, 'ITG has a long history of providing clients with superior service and value-added products.  We look forward to creating the premier technology-enabled market making and execution services franchise.'"); "Q2 2019 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, August 8, 2019, 7:30 AM ("While expense management is a clear driver of our expeditious approach to integration, integration also enables us to execute on our organic growth initiatives to capture significant revenue synergies… Simply put, we are enhancing client experience by upgrading technology, improving client interfaces and support interactions and expanding product and service offerings by delivering global, multi-asset class experiences to our clients, including integrating ITG's dynamic and globally distributed set of products with each other to deliver more products to more clients in a more scalable and performance manner, to drive growth in a recurring and reoccurring revenue."); "Virtu Financial Provides an Update on Ongoing SEC Matter," *Virtu Financial*, September 12, 2023 ("As described in recent public filings, Virtu has responded to

24.     Prior to the acquisition by Virtu, ITG operated as a global financial technology company and independent agency broker, focusing on delivering execution services to institutional clients.[28]  The firm's business model was to "empower traders to reduce the end-to-end cost of implementing investments via liquidity, execution, analytics and workflow technology solutions."[29]

25.     In 2015, ITG settled charges with the SEC related to "Project Omega," an undisclosed proprietary trading desk that improperly accessed confidential customer trading information of subscribers of ITG's dark pool, known as POSIT.[30]  As a dark pool, POSIT accepted and matched orders without displaying pre-trade information—such as the identity of the subscriber or the size of the order—to the public, thereby allowing institutional investors to trade large blocks of securities in a way that minimizes the price impact of their orders and executions.[31] According to the SEC, "Project Omega accessed live feeds of ITG customer and POSIT subscriber order and execution information and traded algorithmically based on that information in POSIT and in other market centers."[32]  To settle charges, ITG (and its affiliate, AlterNet Securities, Inc., "AlterNet")[33] agreed to pay $20.3 million.[34]

---

requests for information from the U.S. Securities and Exchange Commission (SEC) in connection with an investigation of aspects of its internal information barriers from January 2018 to April 2019, a period that predates Virtu's integration of post-trade data from Investment Technology Group Inc. (ITG), and has engaged in discussions to settle the matter.  As an update, Virtu has been unable to reach an acceptable settlement and today the SEC initiated a civil lawsuit against Virtu.").

[28] Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," November 7, 2018.

[29] Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," November 7, 2018.

[30] SEC Press Release, "SEC Charges ITG With Operating Secret Trading Desk and Misusing Dark Pool Subscriber Trading Information," August 12, 2015, available at https://www.sec.gov/newsroom/press-releases/2015-164.

[31] Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order, *In re ITG Inc. and AlterNet Securities, Inc.*, November 7, 2018 ("November 7, 2018 SEC Order"), ¶¶ 1, 17, 18.

[32] Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order, *In re ITG Inc. and AlterNet Securities, Inc.*, August 12, 2015 ("August 12, 2015 SEC Order"), ¶ 4.

[33] August 12, 2015 SEC Order, ¶ 15 ("For the most part, ITG's sell-side customers are serviced as customers of AlterNet, while buy-side customers are serviced as customers of ITG Inc. For all practical purposes, AlterNet and ITG Inc. operate internally as the same entity, sharing the same office space and technology infrastructure, as well as the same employees, including members of the firms' senior management and compliance departments, most of whom work on business initiatives applicable to both ITG Inc. and AlterNet.").

[34] SEC Press Release, "SEC Charges ITG With Operating Secret Trading Desk and Misusing Dark Pool Subscriber Trading Information," August 12, 2015, available at https://www.sec.gov/newsroom/press-releases/2015-164.

26.     On November 7, 2018, the first day of the Proposed Class Period, the SEC announced a different and new settlement.[35]  ITG agreed to pay $12 million to resolve charges that it had misled dark pool subscribers.[36]  The SEC found that, despite assurances that POSIT "help[ed] protect [ITG's] institutional clients in the U.S. from signaling their trading intentions," ITG had disseminated information regarding dark pool trading activity to "approximately seven subscribers and three firms that were not subscribers, all of which engaged in high-frequency trading."[37]  Furthermore, the SEC found ITG had failed to disclose material operational features of POSIT, such as the existence of "two physically separated pools of liquidity within POSIT" and the implementation of a "delay or 'speedbump' to slow down interactions involving orders from certain HFT subscribers."[38]

### D.     Tensions Between the SEC and Virtu during the Proposed Class Period

27.     As described in this section, during the Proposed Class Period, there was market and securities analyst commentary on the substantial tensions between the SEC, after the appointment of Gary Gensler as the SEC chair, and Virtu related to Virtu's business model based on payment-for-order-flow ("PFOF").  It is in this context the allegations pertaining to information barriers (discussed below in **Section IV.E**) occurred.  As I show, analysts noted that regulatory changes supported by Chair Gensler could have had a substantial adverse impact on Virtu's business prospects.  Virtu and its CEO, Mr. Cifu, criticized the SEC's potential regulatory changes, which, according to securities analysts and market commentators, created tension between Virtu and the SEC.

28.     For example, on June 9, 2021, at the Piper Sandler Global Exchange and Fintech Conference, Chair Gensler announced that he had asked the SEC staff to make recommendations on best execution and payment for order flow, among other issues, stating:

> Payment for order flow raises a number of important questions.  Do broker-dealers have inherent conflicts of interest?  If so, are customers

---

[35] SEC Press Release, "SEC Charges ITG With Misleading Dark Pool Subscribers," November 7, 2018, available at https://www.sec.gov/newsroom/press-releases/2018-256.

[36] SEC Press Release, "SEC Charges ITG With Misleading Dark Pool Subscribers," November 7, 2018, available at https://www.sec.gov/newsroom/press-releases/2018-256.

[37] November 7, 2018 SEC Order, ¶¶ 3, 8, 19.

[38] November 7, 2018 SEC Order, ¶¶ 9, 45.

getting best execution in the context of that conflict?  Are broker-dealers incentivized to encourage customers to trade more frequently than is in those customers' best interest?[39]

29.     Chair Gensler's remarks also appeared in his testimony on trading gamification, PFOF, equity market structure, and other topics before the House Committee on Financial Services.[40]  In an analyst report the next day covering Virtu, J.P. Morgan stated:

> Chair Gensler has spoken a number of times since his appointment as SEC Chair about his concerns with payment for orderflow (pfof).  He has questioned whether retail investors are getting the best execution in the current system and questioned the conflict of interests by broker dealers.  He has also highlighted the value of the information market makers might get from wholesaling retail trading volumes that could help it profit elsewhere.[41]

30.     According to a *Dow Jones* article, Virtu's stock price responded negatively to the SEC Chair's remarks made on June 9, 2021:[42]

> Shares of high-speed trader Virtu Financial abruptly tumbled more than 7% after the new head of the SEC called for a review of the structure of US equity markets.  Virtu is among the largest players in the business of executing stock orders entered by individual investors.  SEC chairman Gary Gensler said in a speech that the SEC's review would encompass payment for order flow, the controversial practice in which trading firms like Virtu and Citadel Securities pay brokerages like Robinhood for the right to execute their customers' orders.[43]

---

[39] He further states "I've asked staff to make recommendations for the Commission's consideration on best execution, Regulation NMS [National Market System], payment for order flow (both on-exchange and off-exchange), minimum pricing increments, and the NBBO [National Best Bid and Offer], with the aim of continuing to make our markets as efficient as possible."  *See* SEC Press Release, "Prepared Remarks at the Global Exchange and FinTech Conference," June 9, 2021, available at https://www.sec.gov/newsroom/speeches-statements/gensler-global-exchange-fintech-2021-06-09.

[40] "Testimony of Gary Gensler Chair, Securities and Exchange Commission Before the House Committee on Financial Services," *United States House of Representatives*, May 6, 2021, available at https://docs.house.gov/meetings/BA/BA00/20210506/112590/HHRG-117-BA00-Wstate-GenslerG-20210506.pdf.

[41] "SEC Chair Gensler Comments Spark Selloff, but CEO Cifu Highlights Virtu Value for Retail," *J.P. Morgan*, June 10, 2021.

[42] Based on my event study analysis described in **Section V**, the residual return on June 9, 2021 was -7.83%, which is statistically significant at the 95% confidence level.

[43] "Virtu Stock Drops on SEC Chairman's Comments," *Dow Jones Institutional News*, June 9, 2021.

31.     On June 8, 2022, at the subsequent Piper Sandler Global Exchange Conference, where Chair Gensler delivered remarks on equity market structure, he further stated that "[p]ayment for order flow can raise real issues around conflicts of interest," "can distort routing decisions," and can "incentivize broker-dealers to use digital engagement practices, such as gamification," such that the "European Union is actively considering banning payment for order flow."[44]

32.     Chair Gensler also stated that he had therefore "asked staff to make recommendations around how we can mitigate conflicts with respect to payment for order flow."[45]  In contrast, Virtu's CEO, Mr. Cifu publicly opposed the proposed regulatory changes related to PFOF. Specifically, on a July 28, 2022 earnings call, following Chair Gensler's remarks at the Piper Sandler conference, Mr. Cifu stated:

> [W]e continue to believe that if the SEC moved forward with [a] proposal along the lines of the Chair [Gensler]'s [June 8, 2022] public statement, it would continue to be met with substantial industry-wide universal resistance, including potentially in the form of litigation, an overwhelmingly amount of credible evidence from numerous diverse sources demonstrates that the current market structure and infrastructure enhanced with some of the sensible reforms which we support does an incredible job of serving retail investors.[46]

33.     Commenting on Virtu's Q2 2022 earnings call, J.P. Morgan noted:

> Virtu CEO Doug Cifu continues to voice his assessment of the SEC Chair's recent remarks regarding potential market structure reform (payment for order flow/auction markets/among others).  While there are certain areas that Virtu hopes will see market reforms, Virtu clearly believes that the remarked proposals, as it stands today, would be detrimental to the current market system today.  We acknowledge that

---

[44] SEC Press Release, "'Market Structure and the Retail Investor:' Remarks Before the Piper Sandler Global Exchange Conference," June 8, 2022, available at https://www.sec.gov/newsroom/speeches-statements/gensler-remarks-piper-sandler-global-exchange-conference-060822.

[45] SEC Press Release, "'Market Structure and the Retail Investor:' Remarks Before the Piper Sandler Global Exchange Conference," June 8, 2022, available at https://www.sec.gov/newsroom/speeches-statements/gensler-remarks-piper-sandler-global-exchange-conference-060822.

[46] "Q2 2022 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, July 28, 2022, 7:30 AM ET.

headline risk is notable while the debate and data analysis continue across the industry and regulators.[47]

34.     On November 29, 2022, Virtu announced that it "took the extraordinary step of commencing a Freedom of Information Act (FOIA) lawsuit today to compel the Securities and Exchange Commission to comply with its statutory obligations to provide information about its rulemaking process and the interactions of the Chair of the SEC with interested parties."[48] According to press release, "[i]n June of 2022, Virtu submitted a FOIA request to determine whether the SEC's rulemaking process included the legally required evaluation of potential investor harm and market risks, whether the SEC has solicited input from sufficiently broad sources and whether it had considered objective data before the Chair instructed the SEC staff to prepare new rule proposals for retail stock order handling and execution" while "the SEC has failed to produce a single responsive document."[49]  In the press release, Virtu's CEO stated: "[w]e do not take lightly the step of suing our primary regulator, but it has become clear that the Chair of the SEC is more focused on politics and regulation by innuendo and hypothesis than earnestly engaging with an industry that has created the most fair and competitive equity markets for retail investors globally."[50]

35.     On December 14, 2022, the SEC proposed a number of changes to regulation around equity market structure, including a rule to "require certain orders of individual investors to be exposed to competition in fair and open auctions before such orders could be executed internally by any trading center that restricts order-by-order competition."[51]  The SEC also proposed "Regulation Best Execution, which would establish through Commission rules a best execution regulatory framework" that would according to the SEC Chair Gary Gensler, "lead to better

---

[47] "Lower Retail Engagement and Concentrated Volatility Weaken Results, but Options/Crypto Builds Remain Opportunities," *J.P. Morgan*, August 1, 2022.
[48] Virtu Press Release, "Virtu Financial Announces Commencement of Lawsuit Against the Securities and Exchange Commission to Compel Compliance with Freedom of Information Act Request," November 29, 2022, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-announces-commencement-lawsuit-against.
[49] Virtu Press Release, "Virtu Financial Announces Commencement of Lawsuit Against the Securities and Exchange Commission to Compel Compliance with Freedom of Information Act Request," November 29, 2022, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-announces-commencement-lawsuit-against.
[50] Virtu Press Release, "Virtu Financial Announces Commencement of Lawsuit Against the Securities and Exchange Commission to Compel Compliance with Freedom of Information Act Request," November 29, 2022, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-announces-commencement-lawsuit-against.
[51] SEC Press Release, "SEC Proposes Rule to Enhance Competition for Individual Investor Order Execution," December 14, 2022, available at https://www.sec.gov/newsroom/press-releases/2022-225.

execution for retail and institutional investors."[52]   Securities analysts commented that the proposed reforms could have "disrupt[ed] [Virtu's] business model."  As noted by Morgan Stanley:

> Regulatory risk has hung over VIRT ever since the SEC Chair flagged the conflict of interest challenges that he saw inherent in PFOF.  The SEC on Dec. 14, 2022, published a set of four interrelated proposals that do not include an outright ban on PFOF, but that could, taken together, disrupt the business model of market makers such as VIRT…[53]

36.     Accordingly, market participants noted that Virtu's stock price responded negatively to the SEC proposal made on December 14, 2022.[54]  According to the *Barron's* article, "proposals largely reflect provocative ideas floated six months ago by SEC Chair Gary Gensler:"

> While the new rules don't include a ban on order flow payments (which subsidize the industry's commission-free trading), some of the proposed rules could threaten the key role now played by half a dozen market makers, including Citadel Securities and Virtu Financial (ticker: VIRT), in completing the trades of individual investors.
>
> Virtu shares dropped 7%, to $20.40.  The S&P 500 was down 0.5%.[55]

37.     After the proposal, Virtu continued opposing the changes.  For instance, on a January 26, 2023 earnings call, Mr. Cifu stated:

> It is more clear than ever that the SEC's proposal would directly hurt individual investors and reduce their engagement in our capital markets. In addition to a less transparent and less fair landscape for the average retail investor, on top of increased cost and worse execution quality, the

---

[52] SEC Press Release, "SEC Proposes Regulation Best Execution," December 14, 2022, available at https://www.sec.gov/newsroom/press-releases/2022-226.

[53] "Prefer Transaction-Skewed Revs; Move VIRT and NDAQ to EW," *Morgan Stanley*, April 11, 2023.

[54] Based on my event study analysis described in **Section V**, the residual return on December 14, 2022 was -5.43%, which is statistically significant at the 95% confidence level.

[55] "SEC Proposes Biggest Trading Reforms in Decades," *Barrons*, December 14, 2022.

SEC's proposals would also harm liquidity and increase costs for institutional investors and issuers.[56]

38.    On the subsequent earnings call on April 20, 2023, Mr. Cifu again continued to publicly criticize the SEC's regulatory stance, stating that "Virtu has been outspoken to say the least, publicly in commenting on the significant overhaul of the U.S. equity market proposal," that Chair Gensler and the SEC were "dismissive of industry comments," and that "rush ill-conceived proposals [on equity market structure] don't integrate very well."[57]

39.    Against the background of Mr. Cifu's sustained critique of the SEC, Piper Sandler described Virtu's CEO as "outspoken" against the SEC rule proposals:

> **Strongly outspoken against SEC rule proposals.**  CEO Doug Cifu continued to speak out strongly against the market structure rules proposed by the SEC in December 2022.  He feels the SEC Chair's approach is wholly political, lacking in substantive data, and casts aspersions on an industry when there is no need to do so.  CEO Cifu feels the Chair is doing a disservice to the country and to the pioneers of electronic trading who have helped make US markets the most fair, transparent, efficient, and frictionless markets in the world.[58]

### E.    Summary of Allegations

40.    Plaintiff alleges claims under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 on behalf of all purchasers of common stock of Virtu during the Proposed Class Period.[59] The litigation arises from what Plaintiff alleges is the Company's "failure to restrict access to extremely sensitive and confidential client trading information within its own business lines, and the numerous materially false and misleading statements Defendants made about Virtu's supposed protection of such client data" during the Proposed Class Period.[60]

---

[56] "Q4 2022 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, January 26, 2023, 7:30 AM ET.

[57] "Q1 2023 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, April 20, 2023, 8:30 AM ET.

[58] "2023 Global Exchange & Fintech Conference Recap," *Piper Sandler*, June 11, 2023 (emphasis in original).

[59] Consolidated Complaint for Violations of the Federal Securities Laws, *In re Virtu Financial, Inc. Securities Litigation*, January 22, 2024, ¶ 1.

[60] Consolidated Complaint, ¶¶ 1–2.

41.    The Proposed Class Period begins on November 7, 2018.  On that day, Virtu announced its acquisition of ITG before market open.  Later that same day, the SEC issued an order against ITG for, among other things, its "failure to establish adequate safeguards" for "confidential trading information."[61]  According to the Consolidated Complaint, "[t]he SEC's findings about ITG's failure to protect confidential client trading information raised concerns in the market about Virtu's ability to protect the sensitive trading information generated and/or maintained within its business groups."[62]

42.    Plaintiff alleges that "[t]o quell these concerns, defendant Cifu went on a campaign to proactively address Virtu's protection of such information," while failing to disclose that "Virtu's proprietary traders had unrestricted access to execution services customers' material non-public trading information."[63]  Plaintiff further asserts that Cifu made numerous "materially false and misleading statements" claiming Virtu had "physical separation, logical access control and entitlement reviews" when, in fact, "[t]here were no 'appropriate information barriers' in place."[64]  I note at the outset that the November 7, 2018 alleged misstatements were made on Virtu's earnings call, which took place before the ITG settlement was announced.

43.    I understand from the Order on Motion to Dismiss[65] and from Counsel that there are four categories of misrepresentations alleged in the Consolidated Complaint that remain in the case. Specifically, I understand that out of the five categories of alleged misrepresentations listed below, all except Category #3 remain actionable:[66]

>    a.  Category #1:  Statements describing "the importance [Virtu] place[s] in protecting client information," its "promise[ ] to provide unparalleled transparency into how we protect client information," and similar sentiments.[67]
>
>    b.  Category #2:  Statements explaining that Virtu has "established policies and procedures for our existing client and market-making businesses that

---

[61] Consolidated Complaint, ¶ 9.
[62] Consolidated Complaint, ¶ 10.
[63] Consolidated Complaint, ¶ 10.
[64] Consolidated Complaint, ¶¶ 10–11.
[65] Memorandum and Order, *In re Virtu Financial, Inc. Securities Litigation*, March 17, 2025 ("Order on Motion to Dismiss").
[66] Order on Motion to Dismiss, pp. 10–11.
[67] Order on Motion to Dismiss, pp. 13–14.

are designed to safeguard sensitive client information," and "[t]hese safeguards include physical separation, logical access control and entitlement reviews."[68]

c. <u>Category #3:</u>  Statements about Virtu's plans to enhance its safeguards post-ITG acquisition.

d. <u>Category #4:</u>  Warnings in its SEC filings that Virtu's financial results could be affected by a failure to "protect confidential and proprietary information."[69]

e. <u>Category #5:</u>  Statements made post-April 2019, after the FS Database issue was resolved.[70]

44.    Plaintiff alleges that the "truth began to emerge" on February 17, 2023, when Virtu revealed it was "responding to requests for information from the SEC 'in connection with an investigation of aspects of the Company's information access barriers.'"[71]  Plaintiff further alleges that "information about Defendants' fraud was gradually revealed to investors through a series of partial disclosures about the SEC's investigation into and eventual commencement of litigation against the Company and [Virtu Americas, LLC]."[72]  Plaintiff identifies the following specific alleged corrective disclosures and associated stock price drops in the Consolidated Complaint:

a. <u>February 17, 2023:</u>  Virtu disclosed the SEC investigation in its 2023 Form 10-K.[73]  Plaintiff states that the alleged corrective disclosure caused Virtu's stock price to decline on February 21, 2023.[74]

b. <u>April 28, 2023:</u>  Virtu disclosed settlement progress and Wells Notice risk in its Q1 2023 Form 10-Q.[75]  Plaintiff states that the alleged corrective

---

[68] Order on Motion to Dismiss, pp. 23–24.
[69] Order on Motion to Dismiss, p. 46.
[70] I understand that all challenged statements in Category #5 also appear in other categories, as a statements' inclusion in Category #5 depends on the date on which the statement was made.
[71] Consolidated Complaint, ¶¶ 14, 87.
[72] Consolidated Complaint, ¶ 14.
[73] Consolidated Complaint, ¶ 87.
[74] Consolidated Complaint, ¶ 143.
[75] Consolidated Complaint, ¶ 89.

disclosure caused Virtu's stock price to decline over the next four trading days, until May 4, 2023.[76]

c. <u>July 28, 2023:</u>  Virtu announced receipt of a Wells Notice in its Q2 2023 Form 10-Q.[77]  Plaintiff states that the alleged corrective disclosure caused Virtu's stock price to decline on July 31, 2023.[78]

d. <u>September 12, 2023:</u>  SEC issued press release and filed a complaint against Virtu.[79]  Plaintiff states that the alleged corrective disclosure caused Virtu's stock price to decline over the next four trading days, until September 18, 2023.[80]

## V.   Event Study Analysis

### A.   Overview of Event Study Analysis

45.   Event studies have been widely used for more than fifty years to measure the impact of new information that enters the marketplace on security prices.  I have employed this technique numerous times in my peer-reviewed research[81] and as an expert in various assignments.  Professor Craig MacKinlay summarizes the essence of the event study approach as follows: "Using financial market data, an event study measures the impact of a specific event on the value of a firm."[82]

46.   Typically, event studies use a regression model to isolate the firm-specific stock price change ("return") after controlling for market-wide and/or industry-wide factors.  To properly conduct an event study, a financial economist selects the appropriate market and/or industry indices and typically assumes that there exists a stable linear relationship between the firm's

---

[76] Consolidated Complaint, ¶ 146.
[77] Consolidated Complaint, ¶ 95.
[78] Consolidated Complaint, ¶ 149.
[79] Consolidated Complaint, ¶ 98.
[80] Consolidated Complaint, ¶ 152.
[81] **Appendix A** lists my publications.  The first event study listed on my CV is Kim, Yong Cheol and René M. Stulz, "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics* 22, no. 2, 1988, pp. 189–205.
[82] MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1, 1997, pp. 13–39 ("MacKinlay (1997)") at p. 13.

stock return and the returns of the market and/or industry-wide indices.[83]  Such a relationship between the firm's stock return and these indices can be estimated over an "estimation window."[84]

47.     Using this estimated relationship, it is possible to calculate the firm's expected return on any given day based on that day's market and/or industry index returns.  Intuitively, the firm's expected return is the return one would predict on a particular day based on the typical relationship between the stock's return and the market and industry indices.  Because financial economists are interested in the "typical" relationship, they often exclude from the estimation window the events being tested to ensure that the returns on the event dates do not affect the measurement of the typical relationship.[85]

48.     The difference between a stock's actual ("raw" or "observed") return and its expected return estimated from the regression model is called the stock's "residual" return.[86]  The period over which the stock's return is analyzed is called the "event window" (e.g., one day).[87] Financial economists use statistical measures to determine whether a return is statistically distinguishable from zero, that is, whether the return is greater in magnitude than the typical variation in the residual returns of that stock during the estimation window.  Residual returns that exceed the threshold are "statistically significant."

49.     The statistical significance of a residual return is generally evaluated using a t-statistic.  A t-statistic is defined as the ratio between the residual return on a particular date of interest and the volatility of that residual return.  A residual return is "statistically significant" using a two-sided test at the 95% confidence level (also known as the 5% significance level) when the absolute value of the t-statistic is greater than 1.96.[88]  Thus, when the t-statistic for a particular date is

---

[83] MacKinlay (1997), p. 15.

[84] MacKinlay (1997), p. 15.

[85] *See, e.g.,* MacKinlay (1997), p. 20.

[86] The residual return is also sometimes called the abnormal return.  Dr. Cain uses "abnormal" return.  *See* Expert Report of Matthew D. Cain, October 22, 2025 ("Cain Report"), ¶ 66.

[87] *See, e.g.,* Mackinlay (1997), p. 14.

[88] *See, e.g.,* Mitchell, Mark L. and Jeffrey M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, no. 2, 1994, pp. 545–590 at p. 564 ("An often used convention is the five percent rule – values greater than or equal to 1.96 standard deviations from the mean value are considered significantly different from the typical value because there is only a five percent chance that a randomly selected value will be 1.96 or more standard deviations from the true mean.").  *See also* Kaye, David H. and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific*

greater than 1.96 (in absolute value), the residual return is considered statistically significant relative to the typical range of residual returns that one would expect to observe on that date.

50.      In an event study, a statistically significant residual return over a given event window reflects the estimated stock price impact of the firm specific information released during that event window.  The typical null hypothesis being tested is that the residual return over a particular event window is equal to zero.  In other words, in an efficient market, a residual return that is statistically significant on an event date indicates the arrival of new, value-relevant firm-specific information to the market.

51.      I am aware that Dr. Cain has previously asserted that a 50% confidence level of statistical significance may be applicable for analyses of price impact, stating in an article he co-authored that "[b]ecause the preponderance of the evidence standard in civil law means something is 'more likely than not' to have occurred—at least a 50% chance—this standard arguably implies a lower bar for statistical significance than the 90%, 95%, and 99% levels commonly used in the social sciences."[89]  He continues that "the level of statistical significance that most closely aligns with the preponderance of the evidence standard is 50%" because "if a stock price movement has at least a 50% likelihood of being caused by the challenged statements—or their related corrective disclosures—then the movement would weigh in favor of price impact."[90]

52.      As an economics expert, I have no opinion on the appropriate legal standard applicable for a price impact determination.  My understanding is that "[a]lthough tests of statistical significance and legal standards of proof are, in theory, each concerned with similar considerations regarding the types and frequency of inferential errors … they are analytically distinct and … one cannot be mapped onto the other in a straightforward matter."[91]

---

*Evidence*, Third Edition (Washington, DC: National Academies Press, 2011), 211–302 at pp. 251–252 ("In practice, statistical analysts typically use levels of 5% and 1% [which correspond to confidence levels of 95% and 99%].  The 5% level is the most common in social science, and an analyst who speaks of significant results without specifying the threshold probably is using this figure.  An unexplained reference to highly significant results probably means that *p* is less than 1%.  These levels of 5% and 1% have become icons of science and the legal process.").  Dr. Cain also uses the 95% confidence level to test for statistical significance.  *See* Cain Report, ¶ 82.

[89] Axelson, Per and Matthew D. Cain, "What is Price Impact? How the Goldman Decisions are Reshaping Shareholder Class Actions," *Berkeley Business Law Journal* 22, no. 2, 2025, pp. 441–465 ("Axelson and Cain (2025)"), p. 461.

[90] Axelson and Cain (2025), p. 462.

[91] Pardo, Michael S., "A Comment on Statistical Significance and Standards of Proof," *Supreme Court Economic Review* 25, 2017, pp. 59–63, p. 59.

53.     Hypothesis testing is performed under the assumption that the null hypothesis is true.  In the context of price impact analysis, the null hypothesis (i.e., the default assumption made) is that the residual return is zero.  If a residual return is large enough compared to the level that could be attributed to random fluctuation, the null hypothesis (i.e., that the residual return is zero) can be rejected.  Said differently, when a residual return is evaluated for statistical significance, the question asked is: What is the probability of getting a residual return of a certain magnitude by random chance when the residual return is zero?  A residual return is "statistically significant" when this probability is below a certain threshold, typically 5% (i.e., corresponding to 95% confidence level) as most commonly used in academic research.  This means one can be quite confident that the observed return is not due to random chance.

54.     Under Dr. Cain's approach, he would consider a residual return to be statistically significant if there is a less than 50% chance of observing that residual return (or a residual return of greater magnitude) given normal fluctuations in the return.  This means that Dr. Cain would claim a residual return is statistically significant when it is a "coin toss" whether the observed return is entirely due to random chance.  Dr. Cain's threshold for statistical significance is not one that is acceptable in peer-reviewed research in financial economics.  In my more than 40-year academic career (including as an editor for two top academic journals), I have not seen any peer-reviewed economic research adopt such a lenient statistical significance threshold.  As editor of the *Journal of Finance*, which was the top journal in my field at the end of my twelve-year editorship, I was responsible for more than 10,000 editorial decisions.  I never accepted for publication a study that used a 50% confidence level and have no recollection of seeing such a study.  In my experience, an academic study accepted for publication with findings based only on a confidence level below 95% would be atypical.

55.     Finally, even when a negative and statistically significant residual return is identified following an alleged corrective disclosure using an event study model, such declines must be further evaluated to assess whether they are evidence of price impact of prior alleged misrepresentations.  Such further assessments would include, among other things, the extent to which the statistical result is robust to different model specifications, and whether the residual return was attributable to price impact of the alleged misrepresentations instead of other information.  For example, when multiple pieces of firm-specific information are released

simultaneously, the event study regression cannot measure what portion of the firm-specific (or residual) return was caused by each of the different pieces of information. Moreover, even if a negative and statistically significant residual return following an alleged corrective disclosure is reliably linked to information purportedly revealing the alleged truth underlying the alleged misrepresentations, one cannot necessarily conclude that the residual stock price decline is a reliable estimate of the price impact of the prior alleged misrepresentations.

### B.      Implications of Market Efficiency

56.     Financial economists consider three forms of market efficiency, which differ based on the nature of information that is incorporated into security prices: weak form, semi-strong form, and strong form.[92] Under semi-strong form market efficiency, the efficient market hypothesis holds that stock prices adjust *quickly and fully* to new, value-relevant public information about the stock.[93] For example, Nobel Laureate Eugene Fama has written:

> The typical result in event studies on daily data is that, on average, stock prices seem to adjust within a day to event announcements. The result is so common that this work now devotes little space to market efficiency. The fact that quick adjustment is consistent with efficiency is noted, and then studies move on to other issues.[94]

57.     Dr. Cain has concluded that "[t]he market for Virtu's Common Stock was efficient throughout the [proposed] Class Period."[95] While Dr. Cain references the work of Professor

---

[92] Ross, Stephen A. et al., *Corporate Finance*, Tenth Edition (New York, NY: McGraw-Hill Irwin, 2013) ("Ross et al. (2013)"), pp. 441–442 (emphasis removed) ("A capital market is said to be weakly efficient, or to satisfy weak form efficiency, if it fully incorporates the information in past stock prices. … A market is semistrong form efficient if prices reflect (incorporate) all publicly available information, including information such as published accounting statements for the firm, as well as historical price information. A market is strong form efficient if prices reflect all information, public or private.").

[93] Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617 ("Fama (1991)") at pp. 1576–1577; Ross et al. (2013), p. 442 ("A market is semistrong form efficient if prices reflect (incorporate) all publicly available information, including information such as published accounting statements for the firm, as well as historical price information. … However, if the market is semistrong form efficient, the price should rise immediately upon the news release."). *See also* Greene, Jason T. and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1, 1996, pp. 19–42 at pp. 34–37; Busse, Jeffrey A. and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3, 2002, pp. 415–437 at p. 415.

[94] Fama (1991), pp. 1601–1602.

[95] Cain Report, ¶ 3(a).

Fama, unlike Professor Fama,[96] Dr. Cain defines a market as efficient if "the market price of securities *begins to respond* quickly to publicly available information" (emphasis added).[97] At deposition, Dr. Cain testified that in his assessment of market efficiency, he does not assume "information is fully impounded by the end of [the] first trading day."[98] In contrast to Dr. Cain, when I refer to market efficiency in this report I am referring to the semi-strong form of market efficiency as defined by Professor Fama and as commonly accepted in the field of financial economics.

### C.      Event Study Analysis for Virtu's Common Stock

58.      To assess whether information affected the price of Virtu's stock, I performed an event study to evaluate the movement of Virtu's stock on the impact dates (i.e., the impact date is the first trading day when a given disclosure could have affected the stock price) associated with the alleged misrepresentations and alleged corrective disclosures. An event study requires (i) defining the estimation window, and (ii) selecting appropriate market and/or industry indices to account for market- and/or industry-wide factors.[99]

59.      I used "rolling" estimation periods consisting of the 120 trading days immediately before each event date, which allows for variation over time in the estimated relationship between Virtu's stock return and market-wide and/or industry-wide factors.[100] I excluded from each "rolling" estimation window any stock return corresponding to (i) the impact dates on which Plaintiff identifies an alleged misrepresentation, and (ii) the impact dates on which Plaintiff identifies an alleged corrective disclosure.[101]

---

[96] Fama (1991), p. 1575; Ross et al. (2013), p. 442 ("A market is semistrong form efficient if prices reflect (incorporate) all publicly available information, including information such as published accounting statements for the firm, as well as historical price information. … However, if the market is semistrong form efficient, the price should rise immediately upon the news release.").

[97] Cain Report, ¶ 29.

[98] Deposition of Matthew D. Cain, December 9, 2025, pp. 101:10–102:7.

[99] *See, e.g.*, MacKinlay (1997), pp. 14–15, 18.

[100] For use of rolling regressions when the parameters of the market model change over time, *see, e.g.*, Fama, Eugene F. and Kenneth R. French, "Industry Costs of Equity," *Journal of Financial Economics* 43, no. 2, 1997, pp. 153–193 at p. 158.

[101] Specifically, the dates excluded from the regressions are the relevant impact dates for each alleged misrepresentation and alleged corrective disclosure, that is, for alleged misrepresentations and alleged corrective disclosures that occur after market hours or on weekends, the relevant impact date would be the following trading date. Each estimation window was set to include exactly 120 trading days after accounting for the excluded impact dates by adjusting the start date accordingly.

60.     In order to estimate the relationship between Virtu's stock return and market and industry factors, I used the total returns on the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index to control for market movements and total returns on the NYSE ARCA Securities Broker/Dealer Index to control for industry movements.[102]  The NYSE ARCA Securities Broker/Dealer Index is a broad industry index of broker-dealers,[103] and the Company compared its stock performance to the NYSE ARCA Securities Broker/Dealer Index in the 2019–2023 SEC Form 10-Ks.[104] **Exhibit 1** provides information about the regression models used to estimate the residual returns for each day.  **Exhibit 2** shows the firm-specific (residual) return for Virtu's stock on each impact date associated with the alleged misrepresentations and corrective disclosures.[105]

### D.     Dr. Cain's Event Study Analysis

61.     As part of his market efficiency analysis, to purportedly assess cause-and-effect between the disclosure of new, value-relevant Company information and the Company's stock price response, Dr. Cain "compare[s] [Virtu's] stock[] behavior on days when potential value-relevant company specific news is disclosed ('[N]ews [D]ays') with its behavior on other days with relatively little or no such news."[106]  As part of this analysis, to isolate the impact of Company-specific news on the Company's stock and determine whether the Company's stock price "move[d] more significantly on News Days than on No News Trading Days,"[107] Dr. Cain uses a

---

[102] For my event study analysis, I reconstructed the NYSE ARCA Securities Broker/Dealer Index to exclude Virtu.

[103] "The NYSE® Arca Securities Broker Dealer Index™ (XBD) is an equal-dollar weighted index designed to measure highly-capitalized companies in the United States (U.S.) securities broker/dealer industry. The XBD Index tracks the price performance of selected stocks or ADRs of major companies in the U.S. which provide securities brokerage services, market making, U.S. Treasury Primary Dealer functions and other functions dealing with U.S and international securities." *See* "NYSE® Arca Securities Broker Dealer Index™ (XBD)," *NYSE*, April 30, 2018, available at https://www.ice.com/publicdocs/data/NYSE_Arca_Broker_Dealer_Index_Methodology.pdf.

[104] Virtu Financial, Inc., 2019 10-K, p. 39; Virtu Financial, Inc., Form 10-K for Fiscal Year Ended December 31, 2020, filed February 25, 2021, pp. 43–44; Virtu Financial, Inc., Form 10-K for Fiscal Year Ended December 31, 2021, filed February 18, 2022, pp. 42–43; Virtu Financial, Inc., 2022 Form 10-K, February 17, 2023, pp. 45–46; Virtu Financial, Inc., 2023 10-K, pp. 45–46.

[105] For completeness, **Exhibit 1** and **Exhibit 2** also include impact dates (beyond one day) identified by Plaintiff in the Consolidated Complaint.

[106] Cain Report, ¶ 73.  Dr. Cain defines "News Days" as the days during the Proposed Class Period with quarterly earnings releases and preliminary earnings releases.  He defines "No News Trading Days" as "days on which there were no News Day events, no alleged revelations of the relevant truth, no SEC filings, and no Dow Jones Newswires articles on Factiva tagged to Virtu."  He states that "[i]f Virtu's Common Stock prices tend to move more significantly on News Days than on No News Trading Days, this would support a conclusion of market efficiency."  *See* Cain Report, ¶¶ 77–78.

[107] Cain Report, ¶ 78.

regression model to "isolate the impact of company-specific news on Virtu's Common Stock price during the Class Period."[108]

62.    Dr. Cain's regression model is based on the relationship between Virtu's stock price return and the return on a market index (S&P 500 Index) and an industry index (NYSE ARCA Securities Broker/Dealer Index).[109]  Dr. Cain uses data from the prior 120 trading days, excluding "the trading days with price drops associated with revelations of the relevant truth alleged in the Complaint, and earnings dates, including the News Days,"[110] to estimate the "typical relationship between the price of the relevant security and market and industry indices" on any given date.[111]

63.    Dr. Cain uses his model to measure the stock price response to Company-specific news, that is, news that is not captured by changes in the market and/or industry indices.  He tests the statistical significance of residual returns using a t-test.[112]  Using these results, Dr. Cain tests whether his set of 26 News Days had a higher proportion of statistically significant residual stock price movements than the No News Trading Days.[113]

64.    While my event study analysis (as described in **Section V.C** above) shares some similarities with Dr. Cain's, there are also notable differences:

> a.  Dr. Cain excludes alleged corrective disclosure and earnings dates from the estimation windows.  In my event study analysis, I exclude from the estimation window (i) the impact dates for alleged misrepresentations identified by the Plaintiff that remain actionable following the Order on Motion to Dismiss, and (ii) the impact dates for the alleged corrective disclosures identified by the Plaintiff, as explained above.  In my analysis, I exclude only the days that I am analyzing from the estimation windows.  Excluding days with large returns (e.g., earnings days) would render the estimated "normal" level of stock price fluctuation lower, and therefore

---

[108] Cain Report, ¶ 67.
[109] Cain Report, ¶ 69.
[110] Cain Report, ¶ 68, footnote 71.
[111] Cain Report, ¶ 65.  Dr. Cain uses the S&P 500 Index as his market index and the NYSE ARCA Securities Broker/Dealer Index as an industry index.  *See* Cain Report, ¶ 69.
[112] Cain Report Backup Materials, results.py.
[113] Cain Report, ¶¶ 78, 80.

makes it more likely that a residual return being tested will be statistically significant.[114]

b. While we both use the same industry index, Dr. Cain uses the S&P 500 as a market index. In my event study analysis, I use a broader CRSP NYSE/AMEX/NASDAQ/ARCA Market Index, which includes companies (such as Virtu) that are smaller than firms included in the narrower S&P 500.[115]

c. Dr. Cain's analysis of statistical significance is based on the t-statistic constructed as a ratio of the residual return and the root mean square error ("RMSE"). In my event study analysis, I construct t-statistics based on a standard error that, in addition to the RMSE component, also accounts for the standard error of prediction.[116] That is, Dr. Cain inappropriately uses a simplification in his analysis that does not account for uncertainty in the estimated model.

## VI. There Is No Reliable Economic Evidence That Virtu's Stock Price Increased in Response to the Alleged Misrepresentations

65.     In this section, I analyze the alleged misrepresentations and the stock price movements on dates when these alleged misrepresentations were made. In **Section VI.A** below, I first discuss the alleged misrepresentations made on November 7, 2018, the first day of the Proposed Class Period, when Virtu announced its Q3 2018 financial results and the acquisition of ITG, and the stock price movement on that date. In **Section VI.B** below, I discuss the alleged

---

[114] Likewise, in the event study example studying the information content of an earnings announcement, MacKinlay uses 120-day estimation window without excluding prior earnings announcement days. *See* MacKinlay (1997), pp. 14–15 ("For example, if one is looking at the information content of an earnings with daily data, the event will be the earnings announcement and the event window will include the one day of the announcement. … Given the selection of a normal performance model, the estimation window needs to be defined. The most common choice, when feasible, is using the period prior to the event window for the estimation window. For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event. Generally the event period itself is not included in the estimation period to prevent the event from influencing the normal performance model parameter estimates.").

[115] Virtu was not part of the S&P 500 index. *See Bloomberg*, S&P 500 Index, Function MEMB.

[116] *See, e.g.,* Kutner, Michael H. et al., *Applied Linear Statistical Models*, Fifth Edition (New York, NY: McGraw-Hill Irwin, 2005), pp. 52–59.

misrepresentations during the remainder of the Proposed Class Period and the stock price movements on dates when those alleged misrepresentations were made.  As described below, based on my analysis, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to the alleged misrepresentations.

### A.    November 7, 2018

#### 1.    Overview

66.    On November 7, 2018, at 6:00 AM ET, before market open, Virtu issued a press release announcing its Q3 2018 financial results.[117]  The Company reported:

a.    "Total revenues increased 8.8% to $295.1 million for this quarter, compared to $271.3 million for the same period in 2017."[118]

b.    "Net income increased to $15.6 million for this quarter, compared to a net loss of $40.0 million for the same period in 2017."[119]

c.    "Basic and diluted earnings per share for this quarter were both $0.08, respectively, compared to loss per share of $0.17 each for the same period in 2017."[120]

67.    At the same time it released its financial results, Virtu announced its "[entry] into a definitive agreement [to] acquire ITG in a cash transaction valued at $30.30 per ITG share, or a total of approximately $1.0 billion."[121]  Virtu announced that the ITG acquisition was "expected

---

[117] ITG Press Release, "ITG Agrees to be Acquired by Virtu Financial, Inc. for $30.30 per Share, Also Reports Third Quarter 2018 Results," November 7, 2018, 6:00 AM ET, available at https://www.globenewswire.com/news-release/2018/11/07/1646761/1657/en/ITG-Agrees-to-be-Acquired-by-Virtu-Financial-Inc-for-30-30-per-Share.html. *See also* Virtu Financial, Inc., "Virtu Announces Third Quarter 2018 Results," Form 8-K filed November 7, 2018, Exhibit 99.1.  The EDGAR timestamp of the 8-K is 6:05 AM ET.

[118] Virtu Financial, Inc., "Virtu Announces Third Quarter 2018 Results," Form 8-K filed November 7, 2018, Exhibit 99.1.

[119] Virtu Financial, Inc., "Virtu Announces Third Quarter 2018 Results," Form 8-K filed November 7, 2018, Exhibit 99.1.

[120] Virtu Financial, Inc., "Virtu Announces Third Quarter 2018 Results," Form 8-K filed November 7, 2018, Exhibit 99.1.

[121] Virtu Financial, Inc., "Virtu Announces Third Quarter 2018 Results," Form 8-K filed November 7, 2018, Exhibit 99.1.  Virtu released a second 8-K with a 7:02 AM timestamp focused on the merger.  *See* Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," Form 8-K filed November 7, 2018, Exhibit 99.1.

to close during the first half of 2019 after receipt of all required regulatory approvals and ITG shareholder approval."[122]

68.      Starting at 7:30 AM ET on that date, Virtu held a conference call with analysts.[123]  During the call, Virtu's management discussed both the Company's Q3 2018 financial results and the ITG acquisition.[124]

69.      In announcing the acquisition, Virtu stated that it expected its clients to "benefit from the combination of ITG's world-class execution services, workflow solutions, and analytics offerings with Virtu's technological excellence, operational efficiency, and deep liquidity."[125] Through this acquisition, Virtu also stated that it expected "lower quarter-to-quarter earnings volatility," and to create "opportunities to organically grow revenue with existing clients and technology."[126]  From the acquisition, Virtu noted that it anticipated "$123 million of annual net cost savings and $125 million of capital synergies,"[127] to be achieved in "18-24 months."[128]  The $123 million of cost synergies[129] included $18 million of "[s]avings associated with harmonizing technology; includ[ing] savings from elimination of redundant infrastructure and market data" and $115 million of "[i]ntegration of support functions" and "[o]ptimization of real estate and other costs," less $10 million of estimated dis-synergies.[130]  On the earnings call, Virtu

---

[122] Virtu Financial, Inc., "Virtu Announces Third Quarter 2018 Results," Form 8-K filed November 7, 2018, Exhibit 99.1.

[123]"Q3 2018 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, November 7, 2018, 7:30 AM ET.

[124] "Q3 2018 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, November 7, 2018, 7:30 AM ET.

[125] Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," Form 8-K filed November 7, 2018, Exhibit 99.1.

[126] Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," Form 8-K filed November 7, 2018, Exhibit 99.1.

[127] Capital synergies refer to Virtu "unlocking capital" (i.e., using less capital to operate its business) through combining "broker-dealers and trading operations." *See* "Virtu Enters into Definitive Agreement to Acquire ITG," Conference Call Presentation, *Virtu Financial, Inc.*, November 7, 2018, p. 9.

[128] "Virtu Enters into Definitive Agreement to Acquire ITG," Conference Call Presentation, *Virtu Financial, Inc.*, November 7, 2018, p. 9.

[129] The expected cost synergies represented expected savings from "harmonizing technology; includ[ing] savings from elimination of redundant infrastructure and market data," "[i]ntegration of support functions," and "[o]ptimization of real estate and other costs." *See* "Virtu Enters into Definitive Agreement to Acquire ITG," Conference Call Presentation, *Virtu Financial, Inc.*, November 7, 2018, p. 9.

[130] "Virtu Enters into Definitive Agreement to Acquire ITG," Conference Call Presentation, *Virtu Financial, Inc.*, November 7, 2018, p. 9.  "Dis-synergies" refers to the negative financial impact of combining the two companies, just as loss of customers.  *See* "Where Mergers Go Wrong," *McKinsey Quarterly*, May 1, 2004, p. 94 ("[Executives] should also try to anticipate common 'dis-synergies' (such as the loss of customers and difficulties reconciling different service terms) … These dis-synergies sometimes result from the disruption of a company's ability to execute and sometimes directly from efforts to reduce costs.").

management described the dis-synergies as associated with customer overlap and potential attrition. That is, given that Virtu "cover[s] the same customers that ITG does," the Company "modeled $10 million of synergies, which is around 4%, 5% of [ITG's] institutional business."[131]

70.    Plaintiff alleges misstatements were made during the earnings call, but not in the 6:00AM press release. Specifically, Plaintiff alleges that "on Virtu's November 7, 2018 earnings call, defendants Cifu and Molluso gave a presentation about the ITG acquisition, during which defendant Cifu discussed Virtu's protection of sensitive client data, including keeping such information segregated between its different business groups" and that certain of those statements were "materially false and misleading."[132] In particular, Plaintiff identifies the following statements made on the conference call as alleged misrepresentations that I understand from Counsel remain actionable following the Order on Motion to Dismiss:[133]

- You see the importance we place on protecting client information in all aspects of our business. We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have.[134]

- Virtu has established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind. These safeguards include physical separation, logical access control and entitlement reviews.[135]

71.    Plaintiff also identifies the below bolded and italicized statement from that same November 7, 2018 earnings call, made in response to an analyst's question about ITG's 2015 settlement with the SEC, as an alleged misrepresentation that I understand from Counsel remains actionable following the Order on Motion to Dismiss:[136]

---

[131] "Q3 2018 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, November 7, 2018, 7:30 AM ET.

[132] Consolidated Complaint, ¶¶ 68, 103.

[133] Order on Motion to Dismiss, pp. 10–11.

[134] Consolidated Complaint, ¶ 102 (emphasis removed), 103, 106.

[135] Consolidated Complaint, ¶ 102 (emphasis removed), 104, 106.

[136] Plaintiff also alleges additional misrepresentations on November 7, 2018 related to "Virtu's plans to enhance its safeguards post-ITG acquisition" that I understand are no longer actionable. *See* Order on Motion to Dismiss, pp. 10–11, 32–33.

**Christopher John Allen - Compass Point Research & Trading, LLC, Research Division – Analyst**

Just wanted to ask, ITG's core brand has been as an independent agency broker.  Obviously, Virtu is a market maker, a little bit different business.  And just how do you kind of reconcile potential customer dis-synergies?  What's the level of customer overlap?  The onetime ITG has gotten in trouble with its customers, obviously, was the project, the Omega issue, where it was kind of hooking in to market making and arguably damage its brands were digging out from there.  So just trying to think about how you guys are thinking about potential revenue dis-synergies moving forward.  I know you guys have talked about the percent of revenues synergies.  But I think the assumption out there for the market, is there going to be at decent level of revenue dis-synergies?

**Douglas A. Cifu - Virtu Financial, Inc. - CEO & Director**

Yes, absolutely.  It's a great question.  Obviously, we are cognizant of it, and we have great respect for ITG brand as an independent and we're obviously very aware of the foot fault or more that they had in 2015.  *I think the issue in 2015 was that they were engaged in prop trading and candidly hadn't been upfront with their clients.  That's really ultimately what the issue is.  And Virtu, and it starts with me, is all about transparency and being very upfront and direct with our -- with any kind of party, not just the customer, any kind of party that we deal with.*  And so obviously, the universe is going to know and clients will know that we are a very significant prop and retail market making firm, and we always will be.  We have been in this business, the institutional business, since 2015 on a legacy Virtu basis.  When we acquired Knight in 2017, they had been in business for over 20 years.  So this is not a new phenomena.  It's also not a new phenomenon that sell side, every bank that we deal with that you are very well aware, has this conflict as well.  They've got prop market making.  They've got customers and whatnot.  And so there are mechanisms in place to make that happen.  I would argue this actually makes the offering that much better for a couple of reasons . . . So I'm aware that customers will be concerned. I will do my best to be out there and to be transparent and talk to customers as will our entire institutional team.  I think ultimately customers will see the value proposition of having a firm like Virtu and its skill set, married with a great firm like ITG.[137]

---

[137] Consolidated Complaint, ¶¶ 109 (emphasis removed), 110.

72.     Later in the day, at 1:11 PM, during trading hours on November 7, 2018, the SEC announced a settlement with ITG, in which ITG agreed to pay $12 million "to settle charges arising from ITG's misstatements and omissions about the operation of the firm's dark pool, POSIT, and ITG's failure to establish adequate safeguards and procedures to protect POSIT subscribers' confidential trading information."[138]  Specifically, the SEC found that: (i) "ITG and AlterNet [ITG's affiliate] [m]ade [m]isrepresentations and [o]missions to [s]ubscribers and [p]otential [s]ubscribers," and (ii) "ITG [f]ailed to [p]rotect [dark pool] [s]ubscriber [c]onfidential [t]rading [i]nformation," in addition to other alleged violations.[139]

## 2.     Analysis of the Stock Price Movement on November 7, 2018

73.     As discussed in this section, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to the alleged misrepresentations on November 7, 2018. As explained further below, I find that:

a.   There is a lack of robust, positive, and statistically significant residual return for Virtu's stock on November 7, 2018.

b.   Virtu's stock price on November 7, 2018 increased after the 6:00 AM ET press release but *before* the alleged misrepresentations were made on the Company's 7:30 AM ET conference call.

c.   The alleged misrepresentations addressed topics that were the subject of prior Company disclosures.  To the extent any specific alleged misrepresentations did not exactly replicate the prior Company statements, securities analysts did not comment on the alleged misrepresentations, which is consistent with the notion that there was no new, value-relevant information contained in the alleged misrepresentations.  If Virtu stock traded in an efficient market as Dr. Cain claims, Virtu's stock price would not be expected to increase in response to alleged misrepresentations that did not contain incremental, value-relevant information.

---

[138] SEC Press Release, "SEC Charges ITG With Misleading Dark Pool Subscribers," November 7, 2018, available at https://www.sec.gov/newsroom/press-releases/2018-256.  The earliest timestamp with the news containing SEC charges was 1:11 PM ET, which was after Virtu's disclosures containing alleged misrepresentations on that day.
[139] November 7, 2018 SEC Order, ¶¶ 46–50.

d.  Instead of focusing on the alleged misrepresentations, the analyst commentary focused on the expected benefits associated with Virtu's acquisition of ITG, a transaction that had previously been associated with a positive market price reaction when first announced.

### a)  Virtu's Residual Return on November 7, 2018 Is Not Statistically Significant Based on My Event Study

74.  Based on my event study analysis, Virtu's residual return on November 7, 2018 was 4.18%, which is not statistically significant at the 95% confidence level.[140]  In other words, after controlling for market and industry factors, Virtu's stock return on November 7, 2018 cannot be reliably distinguished from normal volatility and random fluctuations in Virtu's stock price on a daily basis.  I note that based on Dr. Cain's event study analysis, the residual return was 4.61%, which is statistically significant at the 95% confidence level.[141]  I discuss differences between Dr. Cain's event study and my event study in **Section V.D** above.  My analysis therefore shows that there is a lack of robust, positive, and statistically significant residual return on that date.

### b)  Virtu's Stock Price Increase on November 7, 2018 Occurred _Before_ the Alleged Misrepresentations

75.  On November 7, 2018, Virtu's stock price increased to $25.59 from a closing price of $24.64 the prior trading day (an increase of $0.95 or 3.86%).  As discussed above, there is no reliable evidence of a robust, positive, and statistically significant residual return on that day. My analysis of the intra-day trading data, furthermore, shows that the stock price increase occurred *before* the alleged misrepresentations were made during the conference call, which began at 7:30 AM ET.

76.  Specifically, as shown in **Exhibit 3**, Virtu stock traded at $26.25 immediately following the 6:00 AM ET release of financial results for Q3 2018 and the announcement of the ITG acquisition.  By the time the conference call started at 7:30 AM ET, Virtu's stock price was

---

[140] **Exhibit 2**.
[141] Cain Report Backup Materials, Cammer 5.xlsx.

oscillating around $26.00 (i.e., above its eventual close at $25.59).  Any price increase before the alleged misrepresentations were made cannot be due to the alleged misrepresentations.

77.    Indeed, comparing the stock price at the start of the conference call with that at the close of trading on that day, the Company's stock price *decreased*.  Moreover, as shown on **Exhibit 3** the market overall *increased* during this period (as represented by the S&P 500).[142]  This price decrease of Virtu stock after the start of the conference call is *inconsistent* with the notion that the stock price increase on that day was attributable to the alleged misrepresentations.

### c)    Evidence Suggests That the Alleged Misrepresentations Did Not Incorporate New, Value-Relevant Information

78.    To the extent that the market for Virtu's stock was efficient as Plaintiff claims and Dr. Cain opines,[143] only new, value relevant information would be expected to impact the stock price.[144]  As such, the repetition of previously reported information or disclosure of information that is otherwise not value-relevant would not be expected to cause stock price changes.  Thus, as explained in this section, because the alleged misrepresentations concerned the same topics as prior Company disclosures and because securities analysts did not comment on the alleged misrepresentations, in an efficient market, Virtu's stock price would not be expected to increase in response to the alleged misrepresentations.

79.    As discussed above, Defendants allegedly made misrepresentations during the conference call on November 7, 2018 about "the importance… [Virtu] place[s] on protecting client information in all aspects of our business," and Virtu "recognize[s] and appreciate[s] the natural concerns customers will no doubt have;"[145] that "Virtu has established policies and procedures… to safeguard sensitive client information;"[146] and that "the issue in 2015 [for ITG] was…prop

---

[142] To capture intraday prices, in **Exhibit 3**, I plot the SPDR S&P 500 ETF, an exchange traded fund that tracks the S&P 500 index.

[143] Consolidated Complaint, ¶ 197; Cain Report, ¶ 3(a).

[144] *See, e.g.,* Tetlock, Paul C., "All of News That's Fit to Reprint: Do Investors React to Stale Information," *The Review of Financial Studies* 24, no. 5, 2011, pp. 1481–1512 ("Tetlock (2011)") at pp. 1481, 1507 ("[A]n efficient market where firms' stock prices rapidly incorporate all value-relevant signals, new information becomes stale information almost instantly.").

[145] Consolidated Complaint, ¶ 102 (emphasis removed), 103, 106.

[146] Consolidated Complaint, ¶ 102 (emphasis removed), 104, 106.

trading [that it] hadn't been upfront with their clients," whereas "Virtu… is all about transparency."[147]

80.     However, Virtu had discussed these same topics before November 7, 2018.  For example, on an earnings conference call in 2016, Virtu management had discussed how it protected client information by keeping order flow separate due to "contractual and confidentiality concerns" stating that:

> [We're] obviously cognizant of our contractual and confidentiality concerns… and we keep the order flow from the buy-side institutions separate, in a separate broker-dealer… We are purely about execution in a non-conflicted very efficient cost-effective manner.[148]

81.     Similarly, Virtu had previously noted the importance of protecting confidential and proprietary information to its business, and its internal practices, procedures and controls in its SEC filings:

> [M]any factors … could affect our actual financial results or results of operations and cash flows … including … failure to maintain system security or otherwise maintain confidential and proprietary information.[149]
>
> Regulated entities are subject to regulations concerning … handling of material non-public information, safeguarding data … These increased obligations require the implementation and maintenance of internal practices, procedures and controls which have increased our costs and may subject us to government and regulatory inquiries, claims or penalties.[150]

---

[147] Consolidated Complaint, ¶ 109 (emphasis removed), 110.

[148] "Q2 2016 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, August 3, 2016, 7:30 AM ET.

[149] Virtu Financial, Inc., Form 10-Q for Quarterly Period Ended June 30, 2018, filed August 6, 2018.  The EDGAR timestamp of the 10-Q is 4:30 PM ET.  Virtu made this same disclosure, warning of the risks of  a "failure to maintain system security or otherwise maintain confidential and proprietary information," or "failure to protect confidential and proprietary information" in the S-1 registration statement filed November 6, 2015 in connection with Virtu's public offering, as well as in every annual and quarterly SEC filing since 2016.  *See* Virtu Financial, Inc., Form S-1, filed November 6, 2015; Company's 10-K and 10-Q filings from March 25, 2016 – November 2, 2023.

[150] Virtu Financial, Inc., Form 10-K for Fiscal Year Ended December 31, 2016, filed March 14, 2017.  The EDGAR timestamp of the 10-K is 6:40 PM ET.  *See also* Virtu Financial, Inc., Form 10-K for Fiscal Year Ended December 31, 2017, filed March 13, 2018.  The EDGAR timestamp of the 10-K is 5:14 PM ET.

82.     Likewise, Virtu management had repeatedly described the Company and the various aspects of services it provided as "transparent":

> I think the way we do business is to be transparent and collaborative with our business partners.  We've done that throughout, since we started Virtu.[151]

> Virtu is a leading financial firm that leverages cutting edge technology to deliver liquidity to the global markets and innovative, transparent trading solutions to our clients.[152]

> We believe that we will able to... provide customers with unprecedented transparency into their orders and most importantly, better execution quality.[153]

> [Virtu's execution product is] very, very transparent... so it answers all the silliness around conflicted brokers routing orders.[154]

83.     Finally, there had been prior disclosures regarding ITG's "issue in 2015."  For example, as discussed above in **Section IV.C**, in 2015, it had been disclosed that ITG settled charges with the SEC related to "Project Omega," an undisclosed proprietary trading desk that allegedly improperly accessed confidential customer trading information of POSIT subscribers.[155]

84.     To the extent that the specific disclosures that are alleged as misrepresentations do not exactly replicate the prior Company statements, despite addressing the same topics, securities analysts did not comment on the alleged misrepresentations.  Academic research has found that analysts serve as important intermediaries, and help disseminate and evaluate new, value-relevant, company-specific information.[156]  As Dr. Cain recognizes himself in his report,

---

[151] "KCG Holdings, Inc., Virtu Financial, Inc. - M&A Call – Edited Transcript," *Thompson Reuters*, April 20, 2017, 8:00 AM ET.

[152] Virtu Financial, Inc., Form 8-K filed November 7, 2017, Exhibit 99.1.

[153] "Q2 2017 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, August 8, 2017, 8:00 AM ET.

[154] "Q4 2017 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, February 8, 2018, 8:00 AM ET.

[155] SEC Press Release, "SEC Charges ITG With Operating Secret Trading Desk and Misusing Dark Pool Subscriber Trading Information," August 12, 2015, available at https://www.sec.gov/newsroom/press-releases/2015-164.

[156] For example, academic research has found that "[a]nalysts process numerous information triggers, such as market prices, financial metrics, and management disclosures" and "provide information to their clients by synthesizing

"research analysts help to disseminate new important company-specific information to investors, thus impounding new information into stock prices quickly and efficiently."[157]  Consequently, while not every piece of information discussed by analysts is necessarily new or value-relevant, the lack of analyst discussion of a piece of information is consistent with that information not being new and/or not being value relevant to investors.

85.    Based on my review of available analyst reports, I did not find analyst discussion of the alleged misrepresentations made on November 7, 2018 that I understand remain in this matter. Some analysts did discuss "Virtu's plans to enhance its safeguards post-ITG acquisition," but I understand from Counsel that such "forward-looking" statements are no longer actionable following the Order on Motion to Dismiss.[158]

86.    I also note that while I understand that Plaintiff alleges that Virtu's management made misrepresentations in the morning of November 7, 2018 to purportedly "quell" concerns raised by ITG's SEC settlement that would be announced later that day, the alleged misrepresentations made on the Company's conference call pertained to different issues.  Specifically, the alleged misrepresentation was in response analyst's question about the Company's 2015 "Project Omega" issue (as discussed above in **Section IV.C**), not the November 2018 settlement that had yet to be announced later that day.[159]  Consistent with this, I did not find analyst commentary that linked the alleged misstatements on the conference call to the ITG SEC settlement announced in the afternoon on November 7, 2018.

87.    Similarly, to the extent that the alleged misrepresentations that "Virtu… is all about transparency" pertain to the "transparency" of the firm's business model (as Mr. Cifu stated, "in 2015 [ITG] was…prop trading [and] hadn't been upfront with their clients"), I also did not find

---

multiple information sources."  *See* Bradshaw, Mark T. et al., "Soft Information in the Financial Press and Analyst Revisions," *The Accounting Review* 96, no. 5, 2021, pp. 107–132, p. 108.  *See also* Bodie, Zvi et al., *Investments*, Eleventh Edition (New York, NY: McGraw Hill Education, 2018), p. 7 ("[S]ecurity analysts … monitor the firm closely"), p. 23 ("Competition among security analysts also promotes financial markets that are nearly informationally efficient, meaning that prices reflect all available information concerning the value of the security.").

[157] Cain Report, ¶ 44.  Dr. Cain also notes that Virtu has "significant analyst coverage."  *See* Cain Report, ¶ 47.

[158] I identified commentary in two analyst reports related to the dismissed allegations.  *See* "Off the (3Q18) Call — ITG Acquisition to Drive Substantial Earnings Accretion," *Citi*, November 8, 2018 ("VIRT believes it can avoid more significant revenue dis-synergies through ITG integration with substantial client outreach, security measures and transparency."); "Almost an Instant Replay: Announces HIGHLY ACCRETIVE Acquisition of ITG," *Sandler, O'Neill + Partners*, November 9, 2018 ("VIRT expects to (1) to provide physical & logical safeguards (and audits of such) and (2) work diligently from a sales standpoint to minimize customer disruption.").

[159] See discussion in **Section VI.A.1** above.

analyst commentary that linked the alleged misstatement regarding transparency to the ITG SEC settlement or the safeguarding client information issue that I understand to be the focus of the allegations.

88.     The lack of analyst commentary on the actionable alleged misrepresentations is therefore consistent with the lack of no new, value-relevant information contained in the alleged misrepresentations. If Virtu's stock traded in an efficient market as Dr. Cain claims, its stock price would not be expected to increase in response to alleged misrepresentations that do not contain incremental, value-relevant information.

> **d)      Securities Analysts Focused on the Favorable Aspects of the ITG Acquisition, Not the Alleged Misrepresentations**

89.     Instead of focusing on the alleged misrepresentations, analyst commentary discussed the favorable aspects of the ITG acquisition itself. In fact, when the potential for the acquisition was first disclosed approximately a month before the start of the Proposed Class Period through a *Bloomberg* article on October 4, 2018 speculating on the potential takeover,[160] the stock price experienced a residual return of 9.54%, which is statistically significant at the 95% confidence level. Consistent with this increase, after the publication of the *Bloomberg* article, analysts commented favorably on the potential acquisition:

> Citi (October 5, 2018): We view the potential deal favorably for VIRT given our belief standalone earnings growth may remain challenged against the current environment and after working through our initial accretion analysis below.[161]

> Sandler O'Neill + Partners (October 5, 2018): ITG is a somewhat unique property that could fit with VIRT. … Our (conservative) assumptions yield solid accretion, though sensitive to the level of revenue attrition.[162]

> Morgan Stanley (October 9, 2018): Our initial analysis, assuming the reports are accurate, indicates ~20% potential EPS accretion to VIRT, worth $3.75 to the stock price. VIRT shares are up $1.77 or 9% since the

---

[160] "Virtu Is Pursuing Takeover of Investment Technology Group," *Bloomberg*, October 4, 2018.
[161] "Potential ITG Deal Points To Solid Upside, Aligns With Strategic Playbook," *Citi*, October 5, 2018.
[162] "An 18 Month Replay; Press Reports Possible Interest in ITG," *Sandler O'Neill + Partners*, October 5, 2018.

headline was reported in the press on 10/4, implying ~50% is roughly priced in at this point.[163]

90.     While the commentary after the *Bloomberg* article was favorable, analysts acknowledged that there was still uncertainty regarding whether the acquisition would occur, suggesting the *full* impact of the acquisition might not have been incorporated into the price at the time and would be incorporated as the acquisition completion became more likely:

> UBS (October 4, 2018):  A deal or even discussions have yet to be confirmed.[164]

> Sandler O'Neill + Partners (October 5, 2018):  According to the [Bloomberg] article, the two companies have been in talks but no decision has been made.[165]

> Goldman Sachs (October 5, 2018):  [W]e do not take a view on the likelihood of a transaction occurring … [W]e acknowledge that a range of [accretion/dilution] outcomes exists outside those we present.[166]

> Morgan Stanley (October 9, 2018):  To our knowledge the companies have not commented on the [media] reports and we are not aware of any potential deals … VIRT shares are up $1.77 or 9% since the headline was reported in the press on 10/4, implying ~50% is roughly priced in at this point.[167]

91.     Consistent with this, when the acquisition was announced by the Company on November 7, 2018, analysts also expressed a favorable view of the ITG acquisition.  At that time, as discussed above, management provided, for the first time, guidance on the expected deal synergies, which included: (i) $123 million of cost synergies, (ii) $125 million capital synergies,

---

[163] "3Q18 Preview: Buy ETFC and APO Into The Print," *Morgan Stanley,* October 9, 2018.

[164] "Could ITG Be the Next KCG for VIRT?" *UBS*, October 4, 2018, p. 1.

[165] "An 18 Month Replay; Press Reports Possible Interest in ITG," *Sandler O'Neill + Partners*, October 5, 2018, p. 1.

[166] "Virtu Financial Inc. (VIRT): Reported to Be in Talks to Acquire ITG; Hypothetical Accretion Analysis," *Goldman Sachs*, October 5, 2018, p. 3.

[167] "3Q18 Preview: Buy ETFC and APO Into The Print," *Morgan Stanley*, October 9, 2018, p. 3. (Emphasis removed).

and (iii) $10 million of revenue dis-synergies.[168]  Some analysts updated their estimates to reflect synergies that were not initially accounted for (e.g., the $125 million capital synergies).  For example:

> Citi (November 7, 2018):  In concert with the 3Q18 earnings release, VIRT also announced it will acquire ITG (not covered) for $1B of Equity value in an all cash deal. We took a favorable view of the transaction when news of the potential deal first surfaced (see also 10/5: Potential ITG Deal Points To Solid Upside, Aligns With Strategic Playbook), and our initial view indicates deal specifics are roughly in line with a slightly higher purchase price of $30.30 vs. our $29.65-E somewhat offset by $125M of capital synergies, which we did not factor.[169]

> Compass Point (November 7, 2018):  [ITG acquisition] is a good financial deal for VIRT, which we estimate paid —10.5x our 2018 EBITDA estimate for ITG, and on an adjusted basis paid —6-9x depending on the level of revenue dis-synergies one assumes.  And above does not factor in the $125M in releasable capital.  The deal will give VIRT increased scale in the agency business and should smooth volatility.[170]

> UBS (November 7, 2018):  While the expense synergies are a bit shy of our original estimate, they are complemented by $125mm of capital synergies. Additionally, the company noted that the deal is expected to generate $127mm of after-tax contribution, which is in line with our accretion math.  We think the shares will react positively on the

---

[168] Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," November 7, 2018.  *See also* "Q3 2018 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, November 7, 2018 ("From a value standpoint, as with KCG, we believe this transaction will be meaningfully accretive to Virtu's shareholders. We have modeled $123 million of overall net synergies, which we expect to achieve over a 2-year period. We believe our track record with KCG demonstrates our ability to integrate these companies successfully. We have identified $125 million of capital synergies, a portion of which will be used at closing to fund the transaction and the rest will be used over time to pay debt.").

[169] "Results: 3Q18 Adjusted EPS Miss to US Offset by Initial Favorable View of ITG Deal," *Citi*, November 7, 2018.

[170] "Virtu Acquires ITG," *Compass Point Research and Training*, November 7, 2018.  *See also* "Adjusting Estimates for ITG," *Compass Point Research and Training*, November 7, 2018, p. 1 ("Overall, we are fans of the ITG deal as it helps builds scale and bring regional diversity to VIRT's execution services business.  VIRT paid ~11 x our est. of 2018 EBITDA for ITG.  Adjusting for capital efficiencies, expense synergies, and our estimates of revenue dis-synergies, we estimate VTRT paid ~7x 2018 adj. EBITDA. We are adjusting our 2020 EPS estimate to $2.13 from $1.86 to reflect the expected impact of the deal. … We are raising our PT to $27, which equates to a multiple of 13x our 2020 EPS estimate and 5% upside from here (8.7% total return once the 3.7% dividend yield is factored in).").

combination of a decent quarter, a nicely accretive deal, and what is likely a strong start to the 4Q, which may or may not be discussed.[171]

Citi (November 9, 2018):  $125M of capital synergies positive variance to our initial assumptions.[172]

Goldman Sachs (November 7, 2018):  Importantly, management guidance assumes no benefits from de-leveraging in its accretion estimates (which we estimate could add another 4%-5% to 2020 earnings accretion assuming VIRT delevers to its states goal of 2-2.25x EBITDA per management) or potential reductions in brokerage clearing expenses for the combined business, which are likely based on prior transactions.[173]

UBS (November 7, 2018):  [T]here may be significant revenue synergies between natural crossing opportunities (given crossing opportunities with retail/institutional flow) and cross-selling algos and technology.  The company also discussed enhancing the analytics offering from ITG with its own trading systems to provide a superior product to clients.  All of these revenue synergies represent upside opportunities that are far from being priced in.[174]

92.    After management provided, for the first time, the guidance of $10 million of expected dis-synergies on November 7, 2018, some of the same analysts reacted by reducing their prior dis-synergy estimates (i.e., assuming a less negative impact on the Company's financial performance).  Specifically on November 7, 2018, Compass Point reduced their dis-synergy estimate to $75 million from a prior estimate of $84 to $141 million:[175]

We are [] assuming $75M of revenue dis-synergies. This may prove overly conservative, but given the history of brokerage mergers and the current operating environment for the core customer base in the agency execution business, we believe it is prudent to err on the side of caution for now. … [G]iven the structural challenges facing the buy and sell side, we expect to see some level of customer attrition.  We are building in

---

[171] "ITG Deal Official and Could Drive ~30% Accretion; Merger Model Attached," *UBS*, November 7, 2018. *See also* "ITG Changing the VIRT Story, But It Still Drives Significant Upside," *UBS*, November 7, 2018, p. 1 ("VIRT shares outperformed following the announcement it would acquire ITG and 3Q results.").

[172] "Virtu Financial, Inc. (VIRT): Results: 3Q18 Adjusted EPS Miss to Offset by Initial Favorable View of ITG Deal," *Citi*, November 7, 2018, p. 1.

[173] "Virtu Financial Inc. (VIRT): Announces Acquisition of ITG; Roughly In-Line 3Q EPS," *Goldman Sachs*, November 7, 2018, p. 1.

[174] "ITG Changing the VIRT Story, But It Still Drives Significant Upside," *UBS*, November 7, 2018, p. 4.

[175] "Virtu Acquires ITG," *Compass Point Research and Training*, November 7, 2018.

> $75M in revenue dis-synergies for now, which equates to ~16% of the combined execution businesses.[176]

93.     Similarly, after the acquisition was announced, Sandler O'Neill + Partners reduced its dis-synergy estimate to $50 million from a prior estimate of $83 to $117 million:[177]

> [I]f we conservatively assume $50 million in revenue attrition and only $87 million in cost synergies, we estimate pro-forma fully synergized EPS for 2019 of $2.00.[178]

94.     Analyst commentary also explicitly tied the price increase on November 7, 2018 to the ITG acquisition:

> UBS (November 7, 2018):  VIRT shares moved higher after 3Q results and the announcement of the acquisition of ITG.  We believe investors were encouraged by the success the company has already had in integrating KCG.[179]

> Evercore (November 7, 2018):  Mgmt. expects the deal to be highly accretive based on $123mm of identified net synergies to be achieved over the next 2 yrs. … Furthermore, the deal diversifies VIRT with a greater mix from market making to agency execution (from 90%/10% to pro forma 63%/37% market making/tech & execution) which should give more stability to earnings.  We think the market has already priced a good portion of that given that the stock is up ~24% since the news on the potential deal first broke in early Oct. (VIRT closed up 5% on Wed. [November 7, 2018]) and ITG stock is trading at a <1% discount to the deal offer price of $30.30.[180]

---

[176] "Adjusting Estimates for ITG," *Compass Point Research and Training*, November 7, 2018.

[177] "An 18 Month Replay; Press Reports Possible Interest in ITG," *Sandler O'Neill + Partners*, October 5, 2018. Sandler O'Neill + Partners stated that "we incorporate 15-20% revenue dis-synergies."  In the merger models included in the report, dis-synergies are calculated based on the 15% figure as $83 million and $88 million for analyses based on 2019 and 2020 estimates, respectively.  While Sandler O'Neill + Partners does not incorporate the 20% estimate in the primary models it presents in the report, based on included sensitivity tables, it calculates these dis-synergies as $111 million and $117 million, based on 2019 and 2020 estimates, respectively.

[178] "Almost an Instant Replay: Announces HIGHLY ACCRETIVE Acquisition of ITG," *Sandler O'Neill + Partners*, November 9, 2018, p. 2.

[179] "ITG Changing the VIRT Story, But It Still Drives Significant Upside," *UBS*, November 7, 2018, p. 3.

[180] "Better Q4 Environment and ITG Deal Benefits Sets Up for Better Earnings Ahead," *Evercore ISI*, November 7, 2018, p. 1.

95.     In addition to discussing the ITG acquisition, analysts also noted that the Company reported financial results that were generally in line with analyst expectations.  For example:

> Citi (November 7, 2018):  $0.22 3Q18 normalized adjusted EPS in line to Consensus but $0.03 light of us.[181]

> Compass Point (November 7, 2018):  VIRT reported 3Q18 EPS of $0.22 in-line with our estimate of $0.22 and consensus of $0.21.[182]

> Morgan Stanley (November 7, 2018):  VIRT reported $0.22 in EPS, in line with our $0.22 estimate, with adjusted net trading income per day of $2.8mn - modestly higher than our $2.7mn estimate and down -11% from 2Q amid a weak operating environment.[183]

> Sandler O'Neill + Partners (November 9, 2018):  VIRT reported adjusted 3Q18 EPS of $0.22, which was above our estimate $0.21 but inline with consensus.[184]

96.     In sum, instead of discussing the alleged misrepresentations or Virtu's information barriers relating to its business acquired from KCG, analyst commentary focused on the ITG acquisition itself, including the favorable aspects of the deal, such as a sizable capital synergy that previously had not been accounted for by analysts.  The analyst discussion is consistent with the observed stock price increase on that day, if any, being attributable to the ITG acquisition itself rather than the alleged misrepresentations.  Finally, based on my review, I also note that I observe no negative news that could offset an otherwise positive and statistically significant residual return.

## B.    Analysis of Alleged Misrepresentations After November 7, 2018

97.     In addition to the alleged misrepresentations on November 7, 2018, Plaintiff identifies alleged misrepresentations on 25 additional days during the Proposed Class Period that I

---

[181] "Results: 3Q18 Adjusted EPS Miss to US Offset by Initial Favorable View of ITG Deal," *Citi*, November 7, 2018.

[182] "Virtu Acquires ITG," *Compass Point Research and Training*, November 7, 2018.

[183] "Virtu Financial Inc. (VIRT): Announces Acquisition of ITG; Roughly In-Line 3Q EPS," *Goldman Sachs*, November 7, 2018.

[184] "Almost an Instant Replay: Announces HIGHLY ACCRETIVE Acquisition of ITG," *Sandler O'Neill + Partners*, November 9, 2018.

understand from Counsel remain actionable following the Order on Motion to Dismiss. Alleged misrepresentations on four days were followed by a residual return that was positive and statistically significant. I discuss these four days in the section below.

98. I address the remaining days that do not have positive and statistically significant residual returns in **Appendix D**. For days with residual returns that are not statistically significant, Virtu's stock return cannot be reliably distinguished from the normal volatility and random fluctuations in Virtu's stock price on a daily basis. Based on the analysis described in this section and **Appendix D**, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to these subsequent alleged misrepresentations.

99. I note that my conclusions do not depend on the use of my event study model as opposed to Dr. Cain's. Out of all the alleged misrepresentations, except for November 7, 2018, which is discussed above in **Section VI.A**, Dr. Cain identifies the same days with alleged misrepresentations as having a subsequent positive and statistically significant residual return (i.e., February 7, 2019, February 28, 2020, November 6, 2020, and November 3, 2021).

### 1. February 7, 2019

100. On this day, before market hours at 7:00 AM ET, Virtu held its Q4 2018 earnings call.[185] Plaintiff alleges that the following statement represents an alleged misrepresentation:

> We've been out there, we've talked to dozens and dozens of ITG customers . . . I think they like the transparency and the directness of Virtu. We have no other way of conducting business. There's no gray area at Virtu.[186]

101. As discussed previously in **Section VI.A** above with respect to November 7, 2018, the Company had previously made disclosures regarding the planned outreach to ITG customers and Virtu being "transparent." To the extent this specific alleged misrepresentation does not exactly replicate prior Company statements, based on my review of analyst reports published following

---

[185] "Q4 2018 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, February 7, 2019, 7:00 AM ET.

[186] Consolidated Complaint, ¶ 123; Motion to Dismiss, Exhibit 1.

the alleged misrepresentation,[187] securities analysts did not comment on the alleged misrepresentation, which is consistent with a lack of new, value-relevant information contained in the alleged misrepresentation.

102.    The residual return on February 7, 2019 was 5.13%, which is statistically significant at the 95% confidence level.[188]  On the same day, the Company released positive Q4 2018 financial results, which were revealed through a press release issued on the same day at 6:21 AM ET.[189]  Analysts described the reported financial results favorably:

> Compass Point (February 7, 2019):  VIRT reported 4Q18 EPS of $0.67, $0.05 above our est. of $0.62.  The beat was driven primarily on the revenue side, where VIRT reported $299M in adjusted net trading income for the quarter, which was above our est. of $293M and slightly above the range provided in the 4Q18 pre-announcement ($285-298M).  Also adding to the beat was slightly better adjusted opex than expected (118M vs. our est. of $122M).  Adjusted EBITDA came in at $195M, above our estimate of $190M, and at the high end of the pre-announced range ($180-195M).[190]

> Goldman Sachs (February 7, 2019):  VIRT reported 4Q18 EPS of $0.67 beating our and Street's (VisibleAlpha) estimate of $0.59/$0.63 on better than expected revenues and lower tax rate.[191]

> UBS (February 11, 2019):  VIRT shares outperformed following 4Q18 results that demonstrated its leverage to a strong volume and volatility environment, while management was incrementally bullish on the pending ITG deal.[192]

103.    Based on the above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to the alleged misrepresentation on February 7, 2019.

---

[187] I have reviewed analyst reports within one week of each alleged misrepresentation.  For February 7, 2019, I reviewed analyst reports from February 7, 2019 – February 14, 2019.

[188] **Exhibit 2**.

[189] Virtu Financial, Inc., Form 8-K filed February 7, 2019, Exhibit 99.1.

[190] "Strong Qtr. As Expected," *Compass Point Research and Training*, February 7, 2019.

[191] "EPS Beat on Higher than Expected Review and Lower Tax Rate," *Goldman Sachs*, February 7, 2019.

[192] "Volume/Volatility Environment Slowing from 4Q, but ITG Upside Still on Deck," *UBS*, February 11, 2019.

### 2.      February 28, 2020

104.     On this day at 4:53 PM ET, after market hours, Virtu released its 2019 Form 10-K.[193] Plaintiff alleges that the following statement contained within Virtu's 2019 Form 10-K represents an alleged misrepresentation:

> [M]any factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] failure to protect confidential and proprietary information[.][194]

105.     This alleged misrepresentation represents an exact repetition of one of the prior alleged misrepresentations made by the Company on March 1, 2019, which was also repeated in other subsequent Company disclosures.[195]  Based on my review of analyst reports published following the alleged misrepresentation,[196] securities analysts did not comment on the alleged misrepresentation, consistent with a lack of new, value-relevant information contained in the alleged misrepresentation.

106.     The residual return on March 2, 2020, the first trading day following the alleged misrepresentation, was 4.68%, which is significant at the 95% confidence level.[197]  On the same day, an analyst announced a rating upgrade.  Specifically, on this day, before market hours in a report published at 5:03 AM ET, Compass Point upgraded Virtu to a "Buy" rating:

> Compass Point (March 2, 2020):  We are upgrading VIRT to a Buy.  VIRT is a clear defensive play in the current volatile environment, benefiting from both higher volumes and higher volatility, with significant strength in key asset classes, particularly equities.  The backdrop at present is exceptional for VIRT, and we expect the company to reap the rewards, but it will only last for so

---

[193] Virtu Financial, Inc., 2019 10-K.

[194] Consolidated Complaint, ¶ 140 (internal quotation marks omitted); Motion to Dismiss, Exhibit 1.

[195] *See e.g.,* Virtu Financial, Inc., Form 10-K for Fiscal Year Ended December 31, 2018, filed March 1, 2019 ("Virtu Financial, Inc. 2018 10-K"), p. 3; Virtu Financial, Inc., Form 10-Q for Quarterly Period Ended March 31, 2020, filed May 11, 2020 ("Virtu Financial, Inc. Q1 2020 10-Q"), pp. 54–55; Virtu Financial, Inc., Form 10-Q for Quarterly Period Ended June 30, 2020, filed August 7, 2020 ("Virtu Financial, Inc. Q2 2020 10-Q"), pp. 57–58.

[196] I have reviewed analyst reports within one week of each alleged misrepresentation.  For February 28, 2020, I reviewed analyst reports from February 28, 2020 – March 6, 2020.

[197] **Exhibit 2**.

> long. Importantly, post 4Q19 results (adj. EPS of $0.27, $1.04 annualized before coming expense synergies and interest expense savings) we have increased confidence in the underlying earnings trajectory in lower volume/volatility environments for the company, which we expect to see again down the line.[198]

107. Based on above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to this alleged misrepresentation on February 28, 2020.

### 3.  November 6, 2020

108. On this day, at 2:20 PM ET, during market hours, Virtu released its Q3 2020 Form 10-Q.[199] Plaintiff alleges that the following statement contained within Virtu's Q3 2020 Form 10-Q represents an alleged misrepresentation:

> [M]any factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] failure to protect confidential and proprietary information[.][200]

109. This alleged misrepresentation represents an exact repetition of one of the prior alleged misrepresentations made by the Company on March 1, 2019, which was also repeated in other subsequent Company disclosures.[201] Based on my review of analyst reports published following the alleged misrepresentation,[202] securities analysts did not comment on the alleged misrepresentation, which is consistent with a lack of no new, value-relevant information contained in the alleged misrepresentation.

---

[198] "Safest Port in the Storm - Upgrading to Buy," *Compass Point Research and Training*, March 2, 2020.

[199] Virtu Financial, Inc., Form 10-Q for Quarterly Period Ended September 30, 2020, filed November 6, 2020.

[200] Consolidated Complaint, ¶ 140 (internal quotation marks and emphasis omitted); Motion to Dismiss, Exhibit 1.

[201] *See e.g.,* Virtu Financial, Inc. 2018 10-K, p. 3; Virtu Financial, Inc. Q1 2020 10-Q, pp. 54–55; Virtu Financial, Inc. Q2 2020 10-Q, pp. 57–58.

[202] I have reviewed analyst reports within one week of each alleged misrepresentation. For November 6, 2020, I reviewed analyst reports from November 6, 2020 – November 13, 2020.

110.    The residual return on November 6, 2020 was 7.34%, which is statistically significant at the 95% confidence level.[203]  On the same day, the Company released positive Q3 2020 financial results at 7:00 AM ET.[204]  Analysts described the reported financial results favorably:

> Citi (November 6, 2020):  $0.81 3Q20 normalized adjusted EPS beat our $0.69-E and $0.72 Consensus … Expect stock to outperform on 11/6, pending call takeaways, given 3Q20 EPS beat, $2+ through cycle adjusted EPS guidance and 2021 OpEx and repurchase guidance.[205]

> Rosenblatt (November 6, 2020):  BMO (11/6), VIRT posted adj. EPS of $0.81, notably above consensus of $0.72 ahead of the report. The EPS beat was largely expense-driven, but adj net trading income also contributed … We would expect shares to move higher today following the 3Q results and forward outlook.[206]

> Compass Point (November 6, 2020):  VIRT reported 3Q20 adjusted EPS of $0.81 vs. our est. of $0.69 and consensus of $0.72, which was driven by a combination of better market making revenues ($257M vs. $220M est.) and adj. expenses ($130M vs. $143M est.).[207]

> Evercore ISI (November 6, 2020):  3Q20 EPS adj'd of $0.81 vs. Our/Street of $0.69/$0.72: Strong results with total revs (ex-MATCHNow sale gain) increasing -57% on higher realized volatility (+15% y/y) and bid-ask spreads across markets and asset classes.[208]

111.    Based on above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to this alleged misrepresentation on November 6, 2020.

---

[203] **Exhibit 2**.

[204] Virtu Financial, Inc., Form 8-K, filed November 6, 2020, Exhibit 99.1.

[205] "Results: 3Q20 Initial Look — Beat on ANTI and Comp, Favorable EPS and Buyback Guidance, 2021 Adjusted OpEx Guide ~In-Line," *Citi,* November 6, 2020.

[206] "VIRT: 3Q20 Initial Take - Strong Results and a Normalized Outlook Looks to Provide More Visibility," *Rosenblatt Securities*, November 6, 2020 (emphasis removed).

[207] "3Q20 First Take: Market Making/Exp. Driven Beat," *Compass Point Research and Training*, November 6, 2020.

[208] "Strong Q3 Results on Higher Revs & Expense Mgmt and in Position for Stock Buybacks," *Evercore ISI*, November 6, 2020 (emphasis removed).

### 4.      November 3, 2021

112.    On this day, at 2:17 PM ET, during market hours, Virtu released its Q3 2021 Form 10-Q.[209]  Plaintiff alleges that the following statement contained within Virtu's Q3 2021 Form 10-Q represents an alleged misrepresentation:

> [M]any factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] failure to protect confidential and proprietary information[.][210]

113.    As an initial matter, this alleged misrepresentation represents an exact repetition of one of the prior alleged misrepresentations made by the Company on March 1, 2019, which was also repeated in other subsequent Company disclosures.[211]  Based on my review of analyst reports published subsequent to the alleged misrepresentation,[212] securities analysts did not comment on the alleged misrepresentation, which is consistent with a lack of new, value-relevant information contained in the alleged misrepresentation.

114.    The residual return on November 3, 2021 was 9.98%, which is statistically significant at the 95% confidence level.[213]  On the same day, the Company released positive Q3 2021 financial results on this day at 7:01 AM ET.[214]  Analysts described the reported financial results favorably:

> Citi (November 3, 2021):  We expect the stock to outperform on 11/3 based on the strong beat against a more muted 3Q21 macro backdrop compared to 1H21. Keys for 8:30am call include any characterization of 3QTD market making environment; full-year 2021 expense comments and early indications on expense growth in '22; organic growth initiatives; and, thoughts on latest regulatory developments.[215]

---

[209] Virtu Financial, Inc., Form 10-Q for Quarterly Period Ended September 30, 2021, filed November 3, 2021.

[210] Consolidated Complaint, ¶ 140 (internal quotation marks and emphasis omitted); Motion to Dismiss, Exhibit 1.

[211] *See e.g.,* Virtu Financial, Inc. 2018 10-K, p. 3; Virtu Financial, Inc. Q1 2020 10-Q, pp. 54–55; Virtu Financial, Inc. Q2 2020 10-Q, pp. 57–58.

[212] I have reviewed analyst reports within one week of each alleged misrepresentation.  For November 3, 2021, I reviewed analyst reports from November 3, 2021 – November 10, 2021.

[213] **Exhibit 2**.

[214] Virtu Financial, Inc., Form 8-K, filed November 3, 2021, Exhibit 99.1.

[215] "3Q21 Initial Look — Strong Beat Led by Market Making ANTI," *Citi*, November 3, 2021.

Compass Point (November 3, 2021):  VIRT reported 3Q21 adjusted EPS of $0.70 vs. our est. of $0.59 and consensus of $0.62. The beat was mainly top line driven with adj. NTI of $354M (vs our est. of $313M). Also, share repurchases of $139M were well ahead of our est. of $70M, and boosted EPS by ~$0.02 relative to our est. It was a solid, all-around qtr. for VIRT, with better than expected revenues, good expense controls and accelerated capital returns to shareholders. … We expect the stock to react positively.[216]

J.P. Morgan (November 3, 2021):  Virtu reported 3Q21 adj. EPS of $0.70 per share, beating both the Bloomberg consensus of $0.62 and our estimate of $0.56. Despite flat volatility and lower volume, Virtu benefitted from new initiatives, somewhat higher equity revenue capture, and we think better energy and metals activity. With revenue improving, it was not a surprise to see costs tick higher in lockstep. Virtu is generating significant cash flow given good market conditions and its high margins, and it is aggressively returning the excess cash to shareholders via loftier buybacks. We continue to recommend the shares as we see meaningful opportunity in Virtu's buildout of option and crypto market making. We increase our Dec 2022 price target to $32.50 to account for new opportunities and resiliency in existing ventures. We note that with realized vol on the decline in recent days, 4Q21 may be just a so-so quarter. We nonetheless maintain our Overweight rating.[217]

Rosenblatt Securities (November 3, 2021):  We are raising our 12-month PT to $38 (from $35) for Buy-rated VIRT, our top-pick in market structure. EPS of $0.70 came in -12% ahead of consensus estimates of $0.62 and our $0.66. The beat reflects both execution and outperformance in the quarter. Share repurchases were a bright spot, contributing an est. ~1c to the ~8c EPS beat in 3Q, and VIRT authorized another $750mn. Looking ahead, we raise our 4Q EPS estimate to $0.70 (from $0.64), which contemplates a modest improvement in market conditions and FY21 expenses above the high-end of the guidance range. VIRT shares closed 10% higher following the 3Q report, and we expect it to continue as estimates are revised higher, headline risk wanes, and investors build confidence in VIRT's consistent execution (multiple expansion). Net/net, we see upside to consensus/our EPS estimates driven by: 1) organic

---

[216] "3Q21 First Take: Top-line Beat - Increased Buyback," *Compass Point Research and Training*, November 3, 2021.

[217] "Results Better Than Expectations -- We Remain Optimistic on Options/Crypto Initiatives," *J.P. Morgan*, November 3, 2021.

growth initiatives (crypto, options); 2) aggressive share repurchases; 3) multiple expansion (~10x forward P/E vs. >25x exchange avg.).[218]

115.    Based on the above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to this alleged misrepresentation on November 3, 2021.  More generally, based on analysis discussed in this section as well as in **Appendix D**, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to these subsequent alleged misrepresentations.

**VII.    The Stock Price Movements Following the Alleged Corrective Disclosures Cannot Serve as Reliable Evidence of the Impact of Prior Alleged Misrepresentations on Virtu's Stock Price**

116.    In this section, I discuss each of the four alleged corrective disclosures:  (i) the Company's disclosure in its 2022 Form 10-K on February 17, 2023 revealing the presence of an SEC investigation into the Company's information access barriers, (ii) the Company's disclosure in its Q1 2023 Form 10-Q on April 28, 2023 revealing that "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice," (iii) the Company's disclosure on July 28, 2023 in its Q1 2023 Form 10-Q that it had received a Wells Notice from the SEC, and (iv) the SEC's announcement of the filing of a complaint against Virtu on September 12, 2023. As discussed below, based on my analysis of these alleged corrective disclosures, I have concluded that the stock price movements following the alleged corrective disclosures cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

**A.    February 17, 2023**

117.    After market close on February 17, 2023, the Company filed its 2022 Form 10-K.[219]  In this filing, Virtu disclosed that "the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of

---

[218] "VIRT: 3Q21 Recap - Strong Execution (Finally) Receives a Vote of Confidence; Raise PT to $38," *Rosenblatt Securities*, November 3, 2021 (emphasis removed).

[219] Virtu Financial, Inc., Form 10-K for Fiscal Year Ended December 31, 2022, filed February 17, 2023 ("Virtu Financial, Inc. 2022 10-K").  The EDGAR timestamp of the 10-K is 4:30 PM ET.

aspects of the Company's information access barriers."[220]  The Complaint alleges that "in response to this announcement, Virtu's stock declined 1.6% from its closing price on February 17, 2023 of $20.27 per share, to close at $19.94 per share on February 21, 2023, the next trading day,"[221] and that this decline was "a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud."[222]

118.    Based on my regression analysis, the residual return on February 21, 2023 (the first trading day following the alleged corrective disclosure on February 17, 2023) was -0.45%, which is not statistically significant at the 95% confidence level.[223]  In other words, after controlling for market and industry factors, Virtu's stock return cannot be reliably distinguished from the normal volatility and random fluctuations in Virtu's stock price on a daily basis.  This finding is consistent with Dr. Cain's regression analysis, which also finds that the residual return on February 21, 2023 was not statistically significant.[224]

119.    In addition, I reviewed securities analyst commentary following this disclosure and identified no analyst reports that discussed the alleged corrective disclosure on February 17, 2023.[225]  As discussed previously, the lack of analyst commentary is consistent with a disclosure that is not news and/or not value relevant to investors.  Finally, based on my review of the Company's disclosures, public press, and analyst reports, I did not identify any positive confounding information that would have offset an otherwise negative and statistically significant residual return.[226]

120.    In sum, given the lack of a negative and statistically significant residual return, the lack of analyst discussion of the allegedly corrective information, and the lack of positive confounding information that would have offset an otherwise negative and statistically significant residual return, I conclude that the stock price movement following the February 17,

---

[220] Virtu Financial, Inc. 2022 10-K, p. 119.

[221] Consolidated Complaint, ¶ 88.

[222] Consolidated Complaint, ¶ 189.

[223] **Exhibit 2**.

[224] Dr. Cain's residual return was -0.40%, which was also not statistically significant at the 95% confidence level. *See* Cain Report Backup Materials, Cammer 5.xlsx.

[225] I have reviewed analyst reports within one week of each alleged corrective disclosure.  For February 17, 2023, I reviewed analyst reports from February 17, 2023 – February 24, 2023.

[226] I have reviewed analyst reports within one week of each alleged corrective disclosure.  For February 17, 2023, I reviewed analyst reports from February 17, 2023 – February 24, 2023.  I also reviewed the Company's disclosures and public press from February 17, 2023 – February 21, 2023.

2023 alleged corrective disclosure cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

### B.    April 28, 2023

121.    After market close on April 28, 2023, the Company filed its Q1 2023 Form 10-Q.[227]  In this filing, Virtu disclosed that:

> The Company and its subsidiaries are subject to … a matter in which the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers.  The Company is cooperating with this civil investigation and has engaged in settlement discussions in respect of the matter.  In the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC. The proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period.  The Company believes it would have meritorious defenses in the event of such an action and would plan to assert them.[228]

122.    The Complaint alleges that "[i]n response to this news, the price of Virtu Class A common stock fell $3.19 per share, or 15.9%, over the next four trading days from its closing price on April 28, 2023 of $20.05 per share, to close at $16.86 per share on May 4, 2023,"[229] and that this decline was "a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud."[230]

123.    Additionally, on April 28, 2023, after market hours and on May 1, 2023, during market hours, *Bloomberg* and the *Wall Street Journal*, respectively, published articles covering the

---

[227] Virtu Financial, Inc., Form 10-Q for Quarterly Period Ended March 31, 2023, filed April 28, 2023 ("Virtu Financial, Inc. Q1 2023 10-Q").  The EDGAR timestamp of the 10-K is 4:03 PM ET.
[228] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.
[229] Consolidated Complaint, ¶ 90.
[230] Consolidated Complaint, ¶ 189.

Company's disclosure.[231]  These articles contained information from a Virtu spokesperson not included in the Company's 10-Q filing.  Specifically:

> Bloomberg (April 28, 2023):  The probe focuses on whether there were possible weaknesses in the firm's back-office systems that theoretically could allow certain users access to post-trade data greater than what the firm said its policies allowed, a company spokesman said in a statement to Bloomberg News.
>
> "We have no reason to believe and have found no evidence that anyone ever made any improper use of any client information," the spokesman wrote. "Doing so is strictly forbidden under our policies."[232]
>
> Wall Street Journal (May 1, 2023):  A Virtu spokesman said the investigation was "primarily focused on an access controls weakness in one of our internal back office systems containing post trade information that theoretically could allow certain system users access greater than what was intended by our policies."
>
> "We have no reason to believe and have found no evidence that anyone ever made any improper use of any client information," he said.[233]

124.  I understand from Counsel that the two articles (i.e., *Bloomberg* article published on April 28, 2023 and the *Wall Street Journal* published on May 1, 2023) are neither alleged to contain corrective disclosures nor alleged misrepresentations.[234]

125.  Because of the earlier disclosure on February 17, 2023, the market was already aware that the "Company ha[d] been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers."[235]  The April 28, 2023 disclosure by the Company informed the

---

[231] "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg News*, April 28, 2023; "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," *The Wall Street Journal*, May 1, 2023.
[232] "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg News*, April 28, 2023.
[233] "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," *The Wall Street Journal*, May 1, 2023.
[234] Consolidated Complaint, ¶¶ 91, 93.
[235] Virtu Financial, Inc. 2022 10-K, p. 119.

investors that "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC."[236]  The disclosure also contained the following details:

    a.  "The Company is cooperating with this civil investigation and has engaged in settlement discussions in respect of the matter."[237]

    b.  "The proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures."[238]

    c.  The issues related to information barriers during "a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."[239]  The disclosure did not specify which of the Company's statements the SEC was investigating.

    d.  "The Company believes it would have meritorious defenses in the event of such an action and would plan to assert them."[240]

126.    The Company's statements through a spokesperson to *Bloomberg* and the *Wall Street Journal* also revealed the following new information:

    a.  "The probe focuses on whether there were possible weaknesses in the firm's back-office systems that theoretically could allow certain users access to post-trade data greater than what the firm said its policies allowed."[241]

    b.  Virtu had "no reason to believe and have found no evidence that anyone ever made any improper use of any client information … [and improper use of client information] is strictly forbidden under [Virtu's] policies."[242]

---

[236] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.
[237] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.
[238] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.
[239] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.
[240] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.
[241] "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg News*, April 28, 2023.  *See also* "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," *The Wall Street Journal*, May 1, 2023 ("[Investigation was] primarily focused on an access controls weakness in one of our internal back office systems containing post trade information that theoretically could allow certain system users access greater than what was intended by our policies.").
[242] "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg News*, April 28, 2023.  *See also* "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," *The Wall Street Journal*, May 1, 2023 ("We have no reason to believe and have found no evidence that anyone ever made any improper use of any client information.").

127.     I have identified only one publicly available analyst report following this alleged corrective disclosure that addressed the SEC investigation.[243]  This analyst report, by Piper Sandler, speculated that a decline in the Company's stock price since April 28, 2023 was "due to a disclosure in VIRT's 1Q23 10-Q filing … 'warning' of a potential Wells notice from the SEC."[244]

128.     This Piper Sandler analyst report also "highlight[ed]" the mitigating facts underlying the enforcement action such as the investigation period "pre-dating VIRT's acquisition of ITG" and that "[t]he investigation appears to focus on VIRT's internal access control ONLY & not on violation of any using the information," which was "distinct[ from] cases where firms intentionally violated and USED 'confidential information.'" Specifically:

> **• The investigation covers a period before VIRT acquired ITG.**  The investigation covers a period spanning from January 2018 to April 2019, effectively pre-dating VIRT's acquisition of ITG (which occurred on March 31, 2019) and its data analytics franchise.
>
> **• The investigation appears to focus on VIRT's internal access controls ONLY & not on violations of anyone using the information.**  According to a statement obtained by Bloomberg news from a VIRT spokesman, "The probe focuses on whether there were possible weaknesses in the firm's back-office systems that theoretically could allow certain users access to post-trade data greater than what the firm said its policies allowed."  A company spokesman also said in a statement to the Wall Street Journal that, "the investigation primarily focused on an access controls weakness in one of our internal back office systems containing post trade information that theoretically could allow certain system users access greater than what was intended by our policies".  We are not aware from the disclosures of any actual use of the information or data being investigated by SEC.
>
> **• Making a distinction of cases where firms intentionally violated and USED "confidential information".**  In an actual case where information access barriers were violated and USED for trading purposes, the SEC fined ITG $20.3 million in December 2015 not only because information disseminated related to the dark pool occurred but also because ITG

---

[243] I have reviewed analyst reports within one week of each alleged corrective disclosure.  For April 28, 2023, I reviewed analyst reports from April 28, 2023 – May 5, 2023.
[244] "Understanding Disclosures In Recent 10-Q," *Piper Sandler*, May 4, 2023.

operated an undisclosed proprietary trading desk which USED the confidential information.[245]

129.    The April 28, 2023 Piper Sandler report did not identify any prior statements that the Company had issued that the analysts believed would be part of the SEC investigation or otherwise represented alleged misrepresentations.

130.    Despite Plaintiff's assertions in the Consolidated Complaint and analyst speculation, to the extent that the market for Virtu's stock was efficient, as Plaintiff claims and Dr. Cain opines,[246] I would expect information to be incorporated into the stock price within one trading day.  Based on my event study analysis, the residual return on May 1, 2023 (the first trading day following the alleged corrective disclosure on April 28, 2023) was -3.42%, which is not statistically significant at the 95% confidence level.[247]  In other words, after controlling for market and industry factors, Virtu's stock return cannot be reliably distinguished from the normal volatility and random fluctuations in Virtu's stock price on a daily basis.  I note that based on Dr. Cain's event study analysis, the residual return was -3.49%, which is statistically significant at the 95% confidence level.[248]  I discuss differences between Dr. Cain's event study and my event study in **Section V.D** above.  My analysis therefore shows that there is a lack of robust, negative, and statistically significant residual return on that date.

131.    Further, for argument's sake, even if one assumes that there was a statically significant price decline on April 28, 2023, analyst commentary suggests that price movement would be attributed to the SEC enforcement action itself, especially in the context of the Company's ongoing tensions with the SEC (as described above in **Section IV**), not the alleged deficiencies in underling information barriers, and not that the market believed the Company had previously made any false or misleading statements about its information barriers.  As discussed above, only one analyst report was published following the disclosure, the May 4, 2023 Piper Sandler report, which attributed price movement to the regulatory development, and focused on the mitigating facts concerning the alleged information barrier deficiencies (e.g., that confidential information

---

[245] "Understanding Disclosures In Recent 10-Q," *Piper Sandler*, May 4, 2023 (emphasis in original).
[246] Consolidated Complaint, ¶ 197; Cain Report, ¶ 3(a).
[247] **Exhibit 2**.
[248] Cain Report Backup Materials, Cammer 5.xlsx.

was not actually used).[249]  The report also drew a distinction between the allegations at hand and the fine ITG paid in 2015 for, in fact, misusing information.[250]

132.    Finally, based on my review of the Company's disclosures, public press, and analyst reports, I did not identify any information *not* associated with the enforcement action that would have offset an otherwise negative and statistically significant residual return.[251]

133.    In sum, given the lack of reliable evidence of a negative and statistically significant residual return, the analyst focus on the SEC action itself, as opposed to the underlying allegations concerning information barriers and any alleged misstatements, and the lack of any information not associated with the enforcement action that would have offset an otherwise negative and statistically significant residual return, I conclude that the stock price movement following the April 28, 2023 alleged corrective disclosure cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

### C.    July 28, 2023

134.    After market close on July 28, 2023, the Company filed its Q2 2023 Form 10-Q.[252]  In this filing, Virtu disclosed that (emphasis added):

> The Company has continued to cooperate with [the SEC] civil investigation and engaged in settlement discussions.  ***The Company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded.  The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period.***  The Company believes it would have meritorious defenses in the event of such an action and intends to defend itself vigorously.  Specifically, the Company would plan to assert, among other defenses, that it maintained reasonable

---

[249] I have reviewed analyst reports within one week of each alleged corrective disclosure.  For April 28, 2023, I reviewed analyst reports from April 28, 2023 – May 5, 2023.

[250] "Understanding Disclosures In Recent 10-Q," *Piper Sandler*, May 4, 2023.

[251] I have reviewed the Company's analyst reports within one week of each alleged corrective disclosure.  For April 28, 2023, I reviewed April 28, 2023 – May 5, 2023.  I also reviewed the Company's disclosures and public press from April 28, 2023 – May 4, 2023.

[252] Virtu Financial, Inc., Form 10-Q for Quarterly Period Ended June 30, 2023, filed July 28, 2023 ("Virtu Financial, Inc. Q2 2023 10-Q").  The EDGAR timestamp of the 10-Q is 4:02 PM ET.

policies, procedures and controls to protect data during the period consistent with applicable law, that related statements made to clients and investors were true and accurate, and that the statute of limitations has expired with respect to certain claims. [253]

135.    The Complaint alleges that "[o]n this news, the price of Virtu Class A common stock declined $0.34 per share, or 1.8%, from its closing price on July 28, 2023 of $18.90 per share, to close at $18.56 per share on July 31, 2023,"[254] and that this decline was "a direct and proximate result of this partial corrective disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud."[255]

136.    Based on my regression analysis, the residual return on July 31, 2023 (the first trading day following the alleged corrective disclosure on July 28, 2023) was -1.88%, which is not statistically significant at the 95% confidence level.[256]  In other words, after controlling for market and industry factors, Virtu's stock return cannot be reliably distinguished from the normal volatility and random fluctuations in Virtu's stock price on a daily basis.  This finding is consistent with Dr. Cain's regression analysis, which also finds that the residual return on July 31, 2023 is not statistically significant.[257]

137.    In addition, I reviewed securities analyst commentary subsequent to this disclosure. Analyst commentary following the July 28, 2023 disclosure suggests that the information released on that day was not new and/or was not value-relevant.  For example, in a July 30, 2023 report, Piper Sandler cited Virtu's Form 10-Q disclosure from July 28, 2023[258] and "remind[ed]

---

[253] Virtu Financial, Inc. Q2 2023 10-Q, p. 34.

[254] Consolidated Complaint, ¶ 96.

[255] Consolidated Complaint, ¶ 193.

[256] **Exhibit 2**.

[257] Dr. Cain's residual return was -1.89%, which is also not statistically significant at the 95% confidence level.  *See* Cain Report Backup Materials, Cammer 5.xlsx.

[258] Specifically, in the July 30, 2023 report, Piper Sandler cited the section of Virtu's 10-K as follows: "Here is the text from the 'Legal and Regulatory Proceedings' section of VIRT's 2Q23 10-Q: '...the Company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's internal information access barriers.  The Company has continued to cooperate with this civil investigation and engaged in settlement discussions.  The Company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded.  The Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period. The Company believes it would have meritorious defenses in the event of such an action and intends to defend itself vigorously. Specifically, the Company would plan to assert, among other defenses, that it maintained reasonable

investors that in VIRT's 1Q23 10-Q [filed April 28, 2023] it had 'warned' of the potential receipt of a Wells Notice from the SEC regarding this same matter."[259]  The report concluded that "it does not appear from the disclosures anything has changed regarding the underlying focus of the investigation/claims."[260]  The same report also repeated select commentary from a May 4, 2023 report by Piper Sandler as follows:

> [I]t does not appear from the disclosures anything has changed regarding the underlying focus of the investigation/claims and we would again highlight the following 3 points from a note we published on May 4th [] in response to the 1Q23 10-Q disclosures:
>
> • (1) The investigation covers a period before VIRT acquired ITG. The investigation covers a period spanning from January 2018 to April 2019, effectively pre-dating VIRT's acquisition of ITG (which occurred on March 31, 2019) and its data analytics franchise.
>
> • (2) The investigation appears to focus on VIRT's internal access controls ONLY & not on violations of anyone using the information.  We are not aware from the disclosures of any actual use of the information or data being investigated by SEC.
>
> • (3) Making a distinction of cases where firms intentionally violated and USED "confidential information".  In an actual case where information access barriers were violated and USED for trading purposes, the SEC fined ITG $20.3 million in December 2015 not only because information disseminated related to the dark pool occurred but also because ITG operated an undisclosed proprietary trading desk which USED the confidential information.[261]

138.    No other analysts discussed the alleged corrective disclosure on July 28, 2023.  For example, the report by UBS published on August 1, 2023 discussed Virtu's Q2 performance

---

policies, procedures and controls to protect data during the period consistent with applicable law, that related statements made to clients and investors were true and accurate, and that the statute of limitations has expired with respect to certain claims.'"  *See* "Discloses Receipt of Previously 'Warned' About Wells Notice," *Piper Sandler*, July 30, 2023 (emphasis removed).

[259] "Discloses Receipt of Previously 'Warned' About Wells Notice," *Piper Sandler*, July 30, 2023 (emphasis removed).

[260] "Discloses Receipt of Previously 'Warned' About Wells Notice," *Piper Sandler*, July 30, 2023.

[261] "Discloses Receipt of Previously 'Warned' About Wells Notice," *Piper Sandler*, July 30, 2023 (emphasis removed).  *Cf.* "Understanding Disclosures In Recent 10-Q," *Piper Sandler*, May 4, 2023.

noting that "[UBS] estimates d[id] not change significantly and with limited confidence in VIRT's outlook, [UBS] remain[ed] on the sidelines."[262]  The report did not mention the Wells Notice or the SEC's investigation into Virtu's information access barriers.  Finally, based on my review of the Company's disclosures, public press, and analyst reports, I did not identify any positive confounding information that would have offset an otherwise negative and statistically significant residual return.[263]

139.     In sum, given the lack of a negative and statistically significant residual return, that analyst commentary described the information as not suggesting "anything has changed," and the lack of positive confounding information that would have offset an otherwise negative and statistically significant residual return, I conclude that the stock price movement following the July 28, 2023 alleged corrective disclosure cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

### D.      September 12, 2023

140.     After market hours on September 12, 2023,[264] the SEC issued a press release announcing it had "filed charges against broker-dealer Virtu Americas LLC and its parent company, Virtu Financial Inc. … for making materially false and misleading statements and omissions regarding information barriers to prevent the misuse of sensitive customer information."[265]  Plaintiff alleges that "[i]n response to this news, the price of Virtu Class A common stock fell $1.07 per share over the next four trading days, or 5.8%, from its closing price on September 12, 2023 of $18.46 per share, to close at $17.39 per share on September 18, 2023,"[266] and that this decline was "a direct and proximate result of this disclosure and/or materialization of foreseeable risks concealed by Defendants' fraud."[267]

---

[262] "Better Start to July But Outlook Remains Cloudy," *UBS*, August 1, 2023.

[263] I have reviewed analyst reports within one week of each alleged corrective disclosure.  For July 28, 2023, I reviewed analyst reports from July 28, 2023 – August 4, 2023.  I also reviewed the Company's disclosures and public press from July 28, 2023 – July 31, 2023.

[264] I identified the earliest public press article discussing the SEC charges as being released 4:52 PM ET.  *See* "SEC Sues Virtu Financial for Failing to Safeguard Customer Information," *Reuters News*, September 12, 2023.

[265] SEC Press Release, "SEC Charges Virtu for False and Misleading Disclosures Relating to Information Barriers," September 12, 2023, available at https://www.sec.gov/newsroom/press-releases/2023-176.

[266] Consolidated Complaint, ¶ 99.

[267] Consolidated Complaint, ¶ 195.

141.     Based on my event study analysis, the residual return on September 13, 2023 (the first trading day following the alleged corrective disclosure on September 12, 2023) was -8.71%, which is statistically significant at the 95% confidence level.  As noted above, to the extent that the market for Virtu's stock was efficient, as Plaintiff claims and Dr. Cain opines,[268] I would expect information to be incorporated into the stock price within one trading day.

142.     The SEC's September 12, 2023 complaint ("SEC Complaint") alleges that Virtu "[failed] to establish, maintain, and enforce policies and procedures reasonably designed to prevent the misuse of material, nonpublic information" and "repeatedly — and falsely — told their institutional customers and the public that VAL used 'information barriers' and 'systemic separation between business groups' in order to safeguard these customers' [material nonpublic information]."[269]  The SEC Complaint provides certain details on previous disclosed information control access issues.[270]  In addition to specific statements made to customers,[271] the SEC Complaint identified certain of Virtu's public statements related to the informational barriers as "materially false and misleading."[272]

---

[268] Consolidated Complaint, ¶ 197; Cain Report, ¶ 3(a).

[269] SEC Complaint, ¶¶ 1–2.

[270] SEC Complaint, ¶ 2 ("During a 15-month period, virtually all employees at VAL and its affiliate broker-dealers could access MNPI regarding its customers' trades."); SEC Complaint, ¶ 5 ("[A]nyone at [the Company] was able to directly access the FS Database and its MNPI using a widely known and frequently shared generic username and password."); SEC Complaint, ¶ 9 ("[The Company] could not track who logged into the system."); SEC Complaint, ¶ 45 ("FS Database became unresponsive because there were too many concurrent queries being run by employees using direct access.  Due to the volume of these concurrent direct-access logins, traders complained in internal chat messages that they ran into alerts stating that the system had exceeded the number of users allowed.").

[271] The SEC Complaint alleges that "[o]n or around March 1, 2019, Defendants widely disseminated a letter to existing VAL customers regarding the ITG merger that also contained a false and misleading statement" in two versions, both of which "were signed by [Virtu's] CEO and stated: 'Prior to merging both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data.'".  See SEC Complaint, ¶ 29.  In addition, SEC Complaint identified additional alleged misrepresentations made by Virtu in responding to customer due diligence questionnaires from March 2018, July 2018, August 2018, November 2018, and January 2019.  See SEC Complaint, ¶ 40 ("[Virtu] policies provide that only personnel whose job function requires access to real time and historical order and execution information are permissioned to see this information;" "[Virtu] maintain[s] information barriers between [their] aggregation units which are designed to prevent the sharing of customer order and trade information with individuals who are not authorized to receive and/or who have not [a] bona fide business purpose for accessing such data."); SEC Complaint, ¶ 39 ("[Virtu] maintains information barrier policies and procedures that are designed to segregate client orders to those business units within the firm that have a need to know of the information."); SEC Complaint, ¶ 38 ("Yes [confirming that] [o]nly employees with a need to access confidential information ... have access to such confidential information]."); SEC Complaint, ¶ 37 ("[Virtu] employs information barrier processes and procedures ... which include processes to approve and review systems entitlements."); SEC Complaint, ¶¶ 34–35 ("The Firm employs information barrier processes and procedures as part of its oversight functions, such as procedures to approve and review systems entitlements for all of the Firm's business units;" "[Virtu has] encryption/password protection [and] access controls [in place].").

[272] SEC Complaint, ¶¶ 27–28.

143.    I understand from Counsel that, out of all of the statements that are at issue in this case, the SEC Complaint challenged only three of the same statements:

    a.  <u>November 7, 2018:</u>  Mr. Cifu's statement that "[y]ou see the importance we place on protecting client information in all aspects of our business. We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have."[273]

    b.  <u>November 7, 2018:</u>  Mr. Cifu's statement that "Virtu has established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind. These safeguards include physical separation, logical access control and entitlement reviews."[274]

    c.  <u>March 1, 2019:</u> Virtu's statement that "[p]rior to merging both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data."[275]

144.    Plaintiff claims these three statements were false and misleading because Defendants failed to disclose that there had been an earlier access issue with its FS Database.[276]  In particular, with respect to the November 7, 2018 statements, Plaintiff claims the statements were false and misleading because:

    a.  "they misrepresented and failed to disclose that, at the time this statement was made, the confidential post-trade information of VAM's execution services customers was not being protected, as it was readily accessible to essentially everyone at the Company, through logging into the FS Database via widely known and frequently shared generic usernames and passwords, which Defendants knew, or recklessly disregarded,"[277] and

---

[273] Consolidated Complaint, ¶¶ 102–103 (emphasis removed); SEC Complaint, ¶ 28.
[274] Consolidated Complaint, ¶¶ 102–103 (emphasis removed); SEC Complaint, ¶ 28 (emphasis removed).
[275] Consolidated Complaint, ¶¶ 126–127 (emphasis removed); SEC Complaint, ¶ 29.
[276] Consolidated Complaint, ¶¶ 103, 127; SEC Complaint, ¶¶ 28–29.
[277] Consolidated Complaint, ¶ 103 (emphasis removed).

b. "they misrepresented and failed to disclose that these safeguards were not currently in place to segregate and protect the confidential post-trade client information in connection with the agency brokerage business that Virtu was already operating."[278]

145.    With respect to the March 1, 2019 statement, Plaintiff claims it was false and misleading because:

a. "by speaking about Virtu's segregation and protection of sensitive client data it created a duty to disclose that the 'procedures to segregate and protect sensitive client data' Virtu claims to have had in place prior to acquiring ITG did not 'segregate and protect' its execution customers' post-trade information in the FS Database."[279]

146.    Virtu responded to the SEC charges in the press release issued after market hours September 12, 2023.[280]  Virtu stated that "[the Company] has been unable to reach an acceptable settlement and today the SEC initiated a civil lawsuit against Virtu."[281]  The press release further stated that:

a. "SEC lawsuit focuses on hypothetical internal access to data – but importantly does not allege actual inappropriate access or use."[282]

b. "Virtu has continuously maintained reasonable policies, procedures and controls to protect data."[283]

---

[278] Consolidated Complaint, ¶ 104.

[279] Consolidated Complaint, ¶ 127 (emphasis removed).

[280] Virtu Press Release, "Virtu Financial Provides an Update on Ongoing SEC Matter," September 12, 2023, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-provides-update-ongoing-sec-matter.  The press release was issued at 5:29 PM ET, according to *Factiva*.  *See also* Virtu Financial, Inc., Form 8-K, filed September 12, 2023.  The EDGAR timestamp of the Form 8-K is 5:32 PM ET.

[281] Virtu Press Release, "Virtu Financial Provides an Update on Ongoing SEC Matter," September 12, 2023, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-provides-update-ongoing-sec-matter.

[282] Virtu Press Release, "Virtu Financial Provides an Update on Ongoing SEC Matter," September 12, 2023, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-provides-update-ongoing-sec-matter ("The SEC's complaint alleges that (i) Virtu's policies and procedures were not reasonably designed during the period to prevent the internal misuse of material nonpublic information and (ii) that certain of Virtu's statements made concerning these policies and procedures were false. Significantly, the SEC does not allege, and there is no evidence to indicate, that any data was ever accessed or used in an inappropriate manner.").

[283] Virtu Press Release, "Virtu Financial Provides an Update on Ongoing SEC Matter," September 12, 2023, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-provides-update-ongoing-sec-matter ("Virtu rejects the SEC's allegations and underlying theory that the temporary hypothetical possibility of

    c. "Hypothetical accessibility was self-identified and controls were enhanced consistent with Virtu's policies – details of the enhancement were voluntarily disclosed in an SEC exam."[284]

    d. "SEC posture and action follows Virtu's public criticism of rule proposals."[285]

147.    As described above, prior to the filing of the SEC Complaint, the Company had already previously revealed the presence of an underlying issue regarding information access barriers,[286] and thus the reason why Plaintiff alleges the statements are false and misleading had already been disclosed.  Additionally, at the time of the announcement of the SEC Complaint, investors already knew that the Company "expect[ed] the SEC to file an action against the Company alleging violations of federal securities laws."[287]  Specifically, to summarize:

    a. In its February 17, 2023 10-K filing, Virtu had previously disclosed that "the Company has been responding to requests for information from the

---

access by a broader group of Virtu employees rendered its policies and procedures 'unreasonable'.  Virtu has continuously maintained policies and procedures that were and are reasonably designed to prevent the misuse of confidential information — consistent with its obligations under applicable laws — and public statements made regarding its policies and procedures were true and accurate.").

[284] Virtu Press Release, "Virtu Financial Provides an Update on Ongoing SEC Matter," September 12, 2023, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-provides-update-ongoing-sec-matter ("In a routine SEC exam in 2019 Virtu voluntarily disclosed to SEC staff that for a limited period during 2018 and early 2019, certain post-trade data in its back-office database was hypothetically accessible to a broader group of employees than intended.  The period coincided with the migration of Virtu's then recently acquired KCG business to a consolidated Virtu back-office database, and predated Virtu's migration of data related to the ITG business to the database.  During this time, other controls and policies mitigated the risk of unauthorized access or use, and the firm developed and ultimately implemented controls enhancements to further restrict database access in accordance with its policies. Following the exam's conclusion, the SEC Enforcement Staff initiated an investigation with which Virtu has fully cooperated, supplying more than 30,000 documents over a three-year period, none of which indicate any improper use or access.").

[285] Virtu Press Release, "Virtu Financial Provides an Update on Ongoing SEC Matter," September 12, 2023, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-provides-update-ongoing-sec-matter ("Notably, the SEC's escalation of its years-long investigation follows Virtu's public criticism of SEC market structure rule proposals released in December 2022 and Virtu's lawsuit against the SEC to seek records under the Freedom of Informa on Act (FOIA) related to the rulemaking process. 'We are disappointed by the SEC's decision to bring this action. Despite our belief that these allegations are meritless, we engaged in good faith settlement discussions with the SEC to bring this matter to a reasonable resolution,' said Virtu's Chief Executive Officer, Mr. Douglas A. Cifu. 'Unfortunately, the SEC's position appears to be driven by politics and headlines rather than the facts and the law.  We will always seek to act rationally and manage risk and exposure responsibly on behalf of our firm and our investors. Therefore, under these circumstances, we look forward to vigorously defending ourselves in court against these meritless allegations while maintaining our focus on serving clients and markets globally and creating long-term value for our shareholders.'").

[286] Virtu Financial, Inc., Q1 2023 10-Q, p. 31; "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg News*, April 28, 2023; "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," *The Wall Street Journal*, May 1, 2023.

[287] Virtu Financial, Inc. Q2 2023 Form 10-Q, p. 34.

U.S. Securities and Exchange Commission in connection with an investigation of aspects of the Company's information access barriers."[288]

b. In its April 28, 2023 10-Q filing, Virtu reiterated prior disclosure and further disclosed that "[t]he proposed action would be expected to allege violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."[289]

c. On April 28, 2023, *Bloomberg* and the *Wall Street Journal* reported additional information regarding the SEC investigation as disclosed by Virtu's spokesperson:

> *Bloomberg*, April 28, 2023:  The probe focuses on whether there were possible weaknesses in the firm's back-office systems that theoretically could allow certain users access to post-trade data greater than what the firm said its policies allowed, a company spokesman said in a statement to Bloomberg News.
>
> "We have no reason to believe and have found no evidence that anyone ever made any improper use of any client information," the spokesman wrote. "Doing so is strictly forbidden under our policies."[290]
>
> Wall Street Journal (May 1, 2023):  A Virtu spokesman said the investigation was "primarily focused on an access controls weakness in one of our internal back office systems containing post trade information that theoretically could allow certain system users access greater than what was intended by our policies."

---

[288] Virtu Financial, Inc. 2022 Form 10-K, p. 119.
[289] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.
[290] "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg News*, April 28, 2023.

"We have no reason to believe and have found no evidence that anyone ever made any improper use of any client information," he said.[291]

d. In its July 28, 2023 10-Q filing, Virtu disclosed that "[t]he Company has been unable to reach a settlement [with the SEC] and, consistent with its previous disclosure, has received a Wells Notice from the SEC, to which it has responded" and that "[t]he Company expects the SEC to file an action against the Company alleging violations of federal securities laws with respect to the Company's information barriers policies and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the Company during such period."[292]

148. Several analysts commented on the SEC charges. Citi upgraded Virtu to a buy on September 14, 2023, characterizing the issue as "financially manageable" and noted the lack of "client reaction":

While the SEC case will remain an overhang for some time, given prior cases—the most egregious of which was ITG's which settled for $20M—we would expect any settlement/fine to be financially manageable. Based on our discussions with the company, there has been no client reaction from the SEC case, and we believe the business will not be impacted by the headlines. As we have seen numerous times over the years, regulatory headlines present opportunities with VIRT's stock and we see the current weakness as an attractive entry point.[293]

149. Citi further described the suit as the "latest volley" in an "ongoing tussle with the SEC" and that Citi did not see the suit as a "material risk":

Latest volley in ongoing tussle with SEC: The SEC suit against VIRT is the latest issue in what has been an ongoing battle with the SEC. This follows VIRT's FOIA suit against the SEC in Nov. 2022 and numerous public comments on the SEC's market structure proposals (which have been widely panned by the industry). We expect this suit to wind its way

---

[291] "Virtu Stock Falls Aft er Disclosure of Potential SEC Enforcement Action," *Wall Street Journal*, May 1, 2023.
[292] Virtu Financial, Inc. Q2 2023 10-Q, p. 34. The EDGAR timestamp of the 10-Q is 4:02 PM ET.
[293] "Upgrading to Buy - Sell Off Creates Opportunity, Well-Positioned for Any Tick Up in Volatility," *Citi*, September 14, 2023.

through the courts, which is expected to take quite some time.  But we do not see this as a material risk to the business given that it was self-reported, occurred quite some time ago, remedies have been put in place, there were no allegations of actual actions taken with the information, and no customers were harmed, in our view.  And if VIRT loses, we suspect any fine would be under $10M, given prior settlements.[294]

150.   Piper Sandler noted that while it was "surprised by the magnitude of the stock's decline" it was "overdone" given the market was aware of the issue:

> Following previously disclosed Wells notice, SEC files suit against VIRT. After yesterday's close, the SEC filed a civil lawsuit against VIRT (release) for "false & misleading disclosures" regarding the company's information access barriers.  We remind investors that in VIRT's 1Q23 10-Q it "warned" of the potential receipt of a Wells Notice from the SEC regarding this matter (PSC note) and disclosed the receipt of a Wells Notice in its 2Q23 10-Q filing (PSC note).  Bottomline, while an SEC lawsuit should not be taken lightly, we are surprised by the magnitude of the stock's decline today and think it is overdone, given (1) the market had fair warning that an enforcement action was imminent and (2) VIRT's previous comments about being unable to reach a settlement with the SEC and being committed to "vigorously" defending itself in court (which it reiterated in a press release yesterday).[295]

151.   CFRA's Washington Analysis published a note on the issue titled "SEC v. Virtu: Much Ado About Nothing?"  This note stated that "we are skeptical that Virtu faces significant risk stemming from this lawsuit," highlighting the that "there has been no finding that anyone used the information for nefarious purposes."[296]  The note also described the ongoing tensions between Virtu and the SEC:

> • The allegations focus on the failure of subsidiary Virtu Americas to protect material, nonpublic information within its trade execution services business from being accessed by its prop trading operations, and

---

[294] "Upgrading to Buy - Sell Off Creates Opportunity, Well-Positioned for Any Tick Up in Volatility," *Citi*, September 14, 2023 (emphasis removed).

[295] "Following Previously Disclosed Wells Notice, SEC Files Suit Against VIRT," *Piper Sandler*, September 13, 2023 (emphasis removed).

[296] "SEC v. Virtu: Much Ado About Nothing?" *Washington Analysis*, September 14, 2023.

misleading statements made to customers and the public about its safeguards.

• While Virtu clearly should have had better policies in place, context is important.  This was a post-acquisition compliance error that lasted at most 15 months, occurred more than four years ago, and was reportedly self-disclosed by Virtu to the agency.  Most importantly, there has been no finding that anyone used the information for nefarious purposes.

• If the same set of facts and allegations were lobbed at almost any other firm not named Virtu, we would have expected the parties to reach a settlement with monetary penalties that are likely non-material.  However, there is no love lost between the SEC and Virtu, and we find it hard to imagine those dynamics did not play a role in settlement talks and the decision to litigate.

• While Washington is much more like Veep than House of Cards, SEC v. Virtu has all the hallmarks of a political drama.  The agency has been highly critical of wholesalers, and CEO Doug Cifu has publicly and repeatedly blasted SEC Chairman Gary Gensler.  We expect these dynamics filtered into the settlement talks with the agency demanding significant penalties and Virtu unwilling to bend the knee.[297]

152.   These ongoing tensions, which related to PFOF (as discussed above in **Section IV.D**), are critical context for understanding the value relevance of information about the SEC's investigation into Virtu's information barriers.  This tension was the focus of the analyst commentary.  For example, as noted by Citi, the SEC's complaint reflected the "latest issue in what has been an ongoing battle with the SEC."[298]  As noted above, CFRA's Washington Analysis concluded that "[i]f the same set of facts and allegations were lobbed at almost any other firm not named Virtu, we would have expected the parties to reach a settlement with monetary penalties that are likely non-material."[299]  Consistent with analyst commentary's focus on this tension between Virtu and the Gensler-led SEC when discussing this enforcement, the

---

[297] "SEC v. Virtu: Much Ado About Nothing?" *Washington Analysis*, September 14, 2023.
[298] "Upgrading to Buy – Sell Off Creates Opportunity, Well-Positioned for Any Tick Up in Volatility," *Citi*, September 14, 2023.
[299] "SEC v. Virtu: Much Ado About Nothing?" *Washington Analysis*, September 14, 2023.

eventual settlement between Virtu and the SEC under the new administration was only $2.5 million.[300]

153.     In addition, the analyst commentary noted that the business implications of the alleged information barrier issues appeared to be limited.  As noted by Citi in its report upgrading its rating on Virtu's stock, there had been "no client reaction" to the investigation, and Citi "believe[d] the business [would] not be impacted."[301]  The lack of "client reaction" is consistent with the issues that were the subject of the SEC's action relating to a theoretical possibility of misuse of confidential client information that could have occurred, but that did not, more than four years earlier.

154.     Moreover, while the SEC Complaint and Company's press release includes specific details about the previously disclosed information access control issues, the analyst commentary following the alleged corrective disclosure does not focus on any of these new details.  Nor does the analyst commentary focus on, or even mention, any of the specific statements that the SEC challenged, nor any of the other statements at issue in Plaintiff's case.  For example, in a note summarizing the developments, Citi stated:

> 1) SEC complaint does not allege that any data was accessed or used in an inappropriate manner, 2) SEC complaint focuses on hypothetical access, not evidence of actual access.  3) VIRT self-reported this to the SEC.  4) The time period pre-dated VIRT's migration of data related to the ITG business, which is important from a customer perspective.  5) VIRT's controls, policies, and compensation framework would limit anyone's ability/incentive to actively access/trade on this information.[302]

---

[300] "SEC Obtains Final Consent Judgment as to Virtu Broker-Dealer Regarding Alleged Failure to Establish, Maintain, and Enforce Policies and Procedures Reasonably Designed to Prevent Misuse of Its Customers' Material Nonpublic Information," *SEC*, December 3, 2023, available at https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26427.  I understand from Counsel that the settlement was only related to the SEC's Section 15(g) claim (that Virtu Americas LLC ("VAL") "did not establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of VAL's business, to prevent the misuse of material, nonpublic information by VAL or any person associated with VAL") and that other claims (related to alleged misrepresentations) were dismissed with prejudice.  *See* Amended Complaint, *Securities and Exchange Commission v. Virtu Financial Inc. and Virtu Americas LLC*, January 12, 2024, ¶¶ 64–75.

[301] "Upgrading to Buy – Sell Off Creates Opportunity, Well-Positioned for Any Tick Up in Volatility," *Citi*, September 14, 2023.

[302] "Stock Reaction Appears Overdone on SEC Headlines," *Citi*, September 13, 2023.

Much of this information was already available to investors.  As discussed above, that the allegations did not relate to misuse of data and instead related to "hypothetical" rather than "actual" access had already been disclosed by the Company in its statements to *Bloomberg* and the *Wall Street Journal* that were published on April 28, 2023 and May 1, 2023.[303]  The Company had also previously disclosed in its Q1 2023 10-Q filed April 28, 2023 that the allegations related to a "specified time period in and around January 2018 to April 2019."[304]  Further, the April 28, 2023 *Bloomberg* article further noted the misuse of client data was "forbidden under [its] policies."[305]  In any event, such information was previously discussed by analysts as mitigating in nature.[306]  The incremental information, in particular, that the issue was "self-reported," is also not a negative piece of information that would be expected to decrease Virtu's stock price.

155.    If Virtu's stock traded in an efficient market as Dr. Cain claims, its stock price would not be expected to decrease following a disclosure that does not contain incremental, value-relevant information.  As applied here, in February 2023 the Company disclosed that the SEC was investigating an information barrier issue that was resolved four years prior and provided details about the substance of that alleged issue through subsequent disclosures on April 28, 2023 and May 1, 2023.  Thus, if the market is efficient as Dr. Cain claims, the existence of the alleged information barrier issue could not be the cause of the September 13, 2023 price decline.

156.    In sum, given that the elevated risk of an SEC lawsuit related to information barrier issues had already been disclosed following the Wells Notice, that substantial information about the information barrier allegations was already available to investors, that analysts did not describe any incremental details about the allegations negatively, I conclude that the stock price movement following the September 12, 2023 alleged corrective disclosures cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.  Based on my review of the analyst commentary, the decline instead is consistent with the disclosure of new information about the inability of Virtu to come to a favorable resolution with the SEC,

---

[303] "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg News*, April 28, 2023; "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," *The Wall Street Journal*, May 1, 2023.
[304] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.
[305] "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg News*, April 28, 2023.
[306] "Understanding Disclosures in Recent 10-Q," *Piper Sandler*, May 4, 2023; "Discloses Receipt of Previously 'Warned' About Wells Notice," *Piper Sandler*, July 30, 2023.

which at least certain analysts viewed as signaling an escalation in Virtu's ongoing tensions with the SEC as discussed above in **Section IV.D**.

**VIII.   Dr. Cain Has Failed to Articulate a Damages Methodology That Can Measure Damages That Are Consistent with Plaintiff's Theory of Liability in This Case**

157.    As described in this section, Dr. Cain has failed to put forth a damages methodology that can measure damages that are consistent with Plaintiff's theory of liability in this case. Specifically:

    a.  First, in **Section VIII.A** below, I discuss Dr. Cain's approach for calculating Section 10(b) damages.  As described in this section, Dr. Cain's approach is generic (setting aside a brief description of the alleged corrective disclosures) and does not address any specific complications related to measuring damages for the case at hand.

    b.  Second, Dr. Cain states that his damages calculation would "begin" from the price movements following the alleged corrective disclosures.  I have discussed in **Section VII** that the price movements following the alleged corrective disclosures cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.  In **Section VIII.B** below, I show further that to the extent Plaintiff claims that the stock price declined following "the materializations of the risks that had been concealed by Defendants' fraud,"[307] Dr. Cain has not articulated a way to use the price movements following the alleged corrective disclosures to measure inflation.  Dr. Cain fails to address to what extent the alleged corrective disclosures represent materializations of previously disclosed risks and fails to put forth a methodology that can calculate inflation based on price movements following the alleged corrective disclosures.  As I explain below, from an economic perspective, price declines following materializations of risk are not measures of artificial inflation (to the

---

[307] Consolidated Complaint, ¶ 187.

extent there was any) earlier in the Proposed Class Period. In particular, the alleged corrective disclosures in this matter relate to new developments in an ongoing SEC investigation. Dr. Cain has not shown how he would establish that Virtu could have disclosed these new developments years before they transpired.

c. Third, in **Section VIII.C** below, I discuss how Dr. Cain has not articulated how he would account for the changing nature of the implications of the alleged misrepresentations throughout the Proposed Class Period.

## A.   Summary of Dr. Cain's Proposed Approach for Calculating Section 10(b) Damages

158.   To assess Section 10(b) damages for the Company's common stock, Dr. Cain states that he will use the "out-of-pocket" method, which "calculates investor damages formulaically as the artificial inflation in the stock price at the time of purchase minus the artificial inflation in the stock price at the time of sale."[308] Dr. Cain asserts that this approach "represents a standard and well-accepted methodology under §10(b) of the Exchange Act."[309] However, while Dr. Cain's discussion of this "out-of-pocket" approach describes what he would use at a later stage of the case as a measure of damages (i.e., inflation at purchase less inflation at sale), it does not, in and of itself, describe a methodology for estimating damages (i.e., how inflation could be calculated).

159.   With respect to the "quantification of artificial inflation," Dr. Cain asserts that such quantification would be "based upon a detailed loss causation analysis" that he has "not been asked to perform … at this time."[310] However, while I understand that Dr. Cain is not required to implement a damages methodology or opine on loss causation at this time, my understanding from Counsel is that plaintiffs' experts are required at the class certification stage to articulate a methodology that would allow them to estimate damages consistent with plaintiffs' theory of liability.

160.   Instead of articulating how he might be able to reliably estimate inflation in a manner consistent with Plaintiff's theory of liability and the specific features of this case, Dr. Cain

---

[308] Cain Report, ¶ 100.
[309] Cain Report, ¶ 100.
[310] Cain Report, ¶ 102.

outlines a vague and superficial set of possible approaches.  In fact, setting aside a summary of what the alleged corrective disclosures are in this matter, it is entirely generic.[311]

161.    As a starting point, he states that his "calculation of the inputs to the out-of-pocket damages methodology would … begin with the declines in Virtu's Common Stock price following [the] alleged corrective disclosures."[312]  He further notes that he "would calculate [the] Company-specific return[s]" following the alleged corrective disclosures "with an event study."[313]

162.    While he does not state what methodology he would use at a later stage of the case, Dr. Cain states that a "common method for modeling the evolution of artificial inflation throughout the Class Period is called 'constant dollar inflation.'"[314]  Under this methodology, he "would calculate the dollar amount of per-share artificial inflation dissipated by the alleged revelations at the end of the Class Period … and then back-cast that amount of artificial inflation to the beginning of the Class Period."[315]

163.    I understand Dr. Cain's use of the term "back-cast" to mean using stock price declines on the alleged corrective disclosure dates as a measure of inflation throughout the Proposed Class Period.  Dr. Cain also references "constant percentage inflation," an approach that "calculates inflation as a constant percentage amount above the implied correct stock price over the Class Period."[316]  That is, under this approach, he "would calculate the percentage amount of per-share artificial inflation dissipated by the alleged revelations at the end of the Class Period … and then back-cast that amount of artificial inflation to the beginning of the Class Period."[317]

164.    Dr. Cain does acknowledge that "artificial inflation may have varied and could evolve throughout the Class Period based on the timing of specific information or statements," but does not provide a way of addressing this potential issue, beyond references to the potential use of "valuation techniques, event studies, published academic research studies, analyst research, or other case-specific documents."[318]

---

[311] Cain Report, ¶¶ 103–106.
[312] Cain Report, ¶ 107.
[313] Cain Report, ¶ 107.
[314] Cain Report, ¶ 110.
[315] Cain Report, ¶ 110.
[316] Cain Report, ¶ 111.
[317] Cain Report, ¶ 111.
[318] Cain Report, ¶ 112.

165.    To the extent Dr. Cain "were to conclude that a portion of the decline in Virtu's Common Stock price on any of the corrective disclosure dates was caused by non-fraud-related factors,"[319] he does not explain what methodology he would use but states that the impact of such confounding information could be determined on "a common, Class-wide basis using various accepted methodologies, such as valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research."[320]  According to Dr. Cain, he "would then subtract the value of any confounding information to calculate the amount of artificial inflation removed from Virtu's share price."[321]

166.    To be clear, I am not criticizing Dr. Cain for not having calculated damages or established loss causation.  Rather, my point is that his vague and generic references to the standard tools of financial economics and "back-casting" do not represent a methodology capable of reliably measuring damages in a manner consistent with Plaintiff's theory of liability in this matter.  Dr. Cain fails to show that he has put forth a reliable damages methodology that can adequately address the various complications that I discuss in more detail below.

### B.    Dr. Cain Has Not Articulated How He Could Use Price Movements Following the Alleged Corrective Disclosures to Measure Inflation

167.    As discussed in the prior section, Dr. Cain states that he would "begin" his analysis based on the declines following the alleged corrective disclosures.[322]  However, as I discuss above in **Section VII**, the stock price movements following the alleged corrective disclosures cannot serve as reliable evidence of the impact of prior alleged misrepresentations on Virtu's stock price.

168.    For argument's sake, I show further that to the extent Plaintiff claims that the stock price declined following "the materializations of the risks that had been concealed by Defendants' fraud,"[323] Dr. Cain fails to account for potential differences between the information disclosed as part of the alleged corrective disclosures and information that Virtu could have disclosed at the time of the alleged misrepresentations in an earlier hypothetical but-for disclosure (i.e., a

---

[319] Cain Report, ¶ 108.
[320] Cain Report, ¶ 108.
[321] Cain Report, ¶ 108.
[322] Cain Report, ¶ 107.
[323] Consolidated Complaint, ¶ 187.

disclosure revealing the alleged truth underlying the alleged misrepresentations at the time of the alleged misrepresentations).

169.     In particular, Dr. Cain fails to demonstrate that the alleged corrective disclosures were not materializations of risks that were previously disclosed.  That is, he fails to demonstrate that Virtu could have disclosed the ultimate outcomes (e.g., the specific developments in the SEC investigation and enforcement actions that were announced through the alleged corrective disclosures) with certainty at the time of the alleged misrepresentations.

170.     Additionally, Dr. Cain has not addressed that market participants would have been aware of the possibility that the SEC investigation could result in charges being brought against the Company.  As discussed above, as of February 17, 2023, the Company had disclosed that it was responding to SEC requests regarding an investigation into information access barriers.[324]  As of April 28, 2023, the Company had disclosed that "[i]n the absence of a settlement, the Company currently believes it may receive a Wells Notice from the SEC."[325]

171.     To illustrate why price declines following alleged corrective disclosures do not necessarily measure earlier inflation, consider the following stylized example.  Assume that investors believe, based on a company's public disclosures, that there is a 20% chance of an adverse regulatory action against a company that will result in a $1 million loss for the company.  Assume further that the company had disclosed the risk of regulatory actions and had not concealed any other information about its business.  At that time (i.e., prior to the adverse regulatory action transpiring), the company's market value would reflect the expected loss of $200,000 from the regulatory action (i.e., the 20% chance of a $1 million loss).  If the regulator then announced an action leading to a $1 million loss for the company, the company's stock price would decline to incorporate the additional $800,000 loss corresponding to the difference between the realized loss of $1 million (because of the regulatory action) and the previously expected loss of $200,000 (based on the 20% risk of the action).  In this example, the company disclosed the risk and the shareholders were informed of it.  The risk materialized, and the shareholders incurred a loss of $800,000.  However, the observed loss does not provide an economic basis for determining the stock price impact of any earlier alleged misrepresentations.

---

[324] Virtu Financial, Inc. 2022 10-K, p. 119.
[325] Virtu Financial, Inc. Q1 2023 10-Q, p. 31.

In fact, in this example, there were no misrepresentations and nevertheless a loss of $800,000 occurred.

172.    Suppose now that, in this example, instead of disclosing the true risk of the regulatory action, the company understated the risk by representing that there was only a 10% chance of such action (e.g., by not revealing information about its underlying business practices).  Under this scenario, the company's market value would reflect the expected loss of only $100,000 from the regulatory action prior to the risk materializing.  Once the $1 million loss resulting from the regulatory action is announced, the company's stock price would decline to incorporate not an $800,000 loss, but a $900,000 loss.  However, only the incremental loss of $100,000 would be caused by the company's understatement of the risk; in other words, without the risk being understated, there would still have been an $800,000 loss as above.

173.    As this example demonstrates, the impact of an earlier alleged misrepresentation cannot be measured from the decline in the stock price when the risk materializes and becomes a certainty (the $900,000 decline in this example), because that decline reflects both the price reaction to the materialization of the disclosed portion of the risk as well as the portion of the risk that was allegedly understated.  When an adverse outcome is not certain, the stock price decline following the materialization of the adverse outcome is not a measure of the stock price impact of any earlier hypothetical disclosure of the allegedly understated risk.  This is because the earlier disclosure could, at most, address the increased probability of the adverse outcome occurring, not the certainty of an outcome.

C.    **Dr. Cain Has Not Articulated How He Would Account for the Changing Nature of the Implications of the Alleged Misrepresentations Throughout the Proposed Class Period**

174.    As discussed in this section, Dr. Cain has not explained how he might calculate alleged inflation throughout the Proposed Class Period in a way that accounts for the evolving nature of the implications of the alleged misrepresentations.  In particular, he has not explained how a "constant dollar" or "constant percentage" ribbon that "begin[s]" from the price movements following the alleged corrective disclosures would address this challenge.[326]

---

[326] Cain Report ¶¶ 107, 110, 111.

175.     At the start of the Proposed Class Period, in November 2018, I understand that there was an alleged deficiency in the Company's information barriers (as alleged by the SEC in their September 2023 lawsuit),[327] however I also understand that the issue was fixed in April 2019, which is over four years before the end of the Proposed Class Period.[328]  An implication of the issue being remediated during the Proposed Class Period is that a hypothetical disclosure (and its value implications) prior to the remediation might differ from one after the remediation.  Dr. Cain is silent on this issue, and has not addressed whether Virtu fixing the information barrier issue would affect any purported artificial inflation, and how he would identify the impact of the alleged misrepresentations on Virtu's stock price before and after the underlying information barrier issue was fixed.

176.     Specifically, prior to April 2019, Virtu could hypothetically have disclosed, while the information barrier issue was ongoing, that there was a risk that proprietary traders could use confidential information for their own trading's benefits.  Conversely, after April 2019, any disclosure could hypothetically have been that (i) there was a risk of failure to protect client information, (ii) the risk was communicated to the SEC, (iii) the risk no longer exists after Virtu's remedial efforts, (iv) the risk never materialized, and (v) there is a risk that the SEC could pursue regulatory enforcement actions on this information.  Dr. Cain has not articulated a methodology for evaluating the effect of such a disclosure on Virtu's stock price.  As a result, Dr. Cain does not explain how he would calculate alleged inflation in Virtu's stock for shareholders who bought prior to April 2019, and those who bought after April 2019 when the FS Database issue was resolved.

Executed this 22nd of January, 2026

_____
René M. Stulz, Ph.D.

---

[327] SEC Press Release, "SEC Charges Virtu for False and Misleading Disclosures Relating to Information Barriers," September 12, 2023, available at https://www.sec.gov/newsroom/press-releases/2023-176.
[328] "Virtu Financial Provides an Update on Ongoing SEC Matter," *Virtu Financial*, September 12, 2023, Exhibit 99.1.

**Appendix A**

**René M. Stulz**

| | |
|---|---|
| Fisher College of Business | Home Address: |
| 806 Fisher Hall | 3419 River Seine Street |
| 2100 Neil Avenue | Columbus, OH 43221 |
| Columbus, OH 43210-1144 | Phone: (614) 771-1110 |
| Phone:  (614) 292-1970 | Cell:    (614) 206-0265 |
| Fax:     (614) 292-2359 | |
| E-mail: stulz.1@osu.edu | |
| Homepage | |
| Google Scholar | |

## UNDERGRADUATE STUDIES

University of Neuchâtel, Switzerland, Licence es Sciences Économiques, 1975.

## GRADUATE STUDIES

London School of Economics, 1975-1976, Visiting Graduate Student.

Massachusetts Institute of Technology (MIT), 1976-1980, Ph.D. in Economics.

## ACADEMIC APPOINTMENTS

Ohio State University, Everett D. Reese Chair of Banking and Monetary Economics, 1996 to present.

University of Southern California, Visiting Professor, 2007.

University of Chicago, Visiting Professor, Stigler Center, 2003-2004.

Northwestern University, Visiting Scholar, Kellogg School of Management, 2003-2004.

Harvard University, Business School, August 1996 to July 1997, Bower Fellow.

Ohio State University, Director of the Dice Center for Research in Financial Economics, 1995 to present.

Ohio State University, Ralph Kurtz Chair in Finance, 1993-1996.

Ohio State University, Riklis Chair in Business and its Environments, 1988-1993.

Ohio State University, Professor of Finance, 1985 to present.

**Appendix A**

University of Chicago, Visiting Professor of Finance, 1986-1987.

Massachusetts Institute of Technology, Visiting Associate Professor of Finance, Fall 1985.

Ohio State University, Associate Professor of Finance, 1983-1985.

University of Rochester, Assistant Professor of Finance and Economics, 1980-1983.


**OTHER POSITIONS**

Research Associate, National Bureau of Economic Research (Asset Pricing Group and Corporate Finance Group).

Director, NBER Group on the Risks of Financial Institutions, 2005 to 2023.

Chairman, Scientific Council, Swiss Finance Institute, 2006 to 2019.

Finance Research Advisory Committee, Office of Financial Research, U.S. Treasury, 2016 to 2019.

Board of Directors, American Finance Association, 1988 to 2000, 2002 to 2006.

Consultant to the World Bank, the IMF, the NYSE, Federal Reserve Bank of New York, corporations, and law firms.

Expert testimony in federal courts, state courts, and domestic and international arbitrations.

Taught executives in Europe, Asia and North America (open enrollment as well as for corporations, courses on risk management, banking, derivatives, corporate valuation, investments).

Advisory Committee, Morningstar, 2000-2002.

Director, Banque Bonhôte, 2002 to 2020.

Director, Wegelin Fund Management, 1999 to 2010.

President, Gamma Foundation, 2002 to 2013.

Director, Community First Financial Group, Inc., 2001 to 2010.

Director, Peninsula Banking Group, Inc., 2001 to 2010.

Trustee, Global Association of Risk Professionals, 2002-2020; executive committee, 2004-2011; chair of governance committee, 2011-2020; vice-chair, 2017-2019.

**Appendix A**

Vice-Chairman, Board of Trustees, Global Association of Risk Professionals, 2019-2020.

Chairman, Financial Risk Management Examination Certification Committee, Global Association of Risk Professionals, 2002 to 2020.

Chairman, New York Federal Reserve Bank/GARP Global Risk Forum (2011, 2013, 2016, 2019), Bank of England/GARP Global Risk Forum (2012, 2014, 2017, 2020), Hong Kong Monetary Authority/GARP Global Risk Forum (2013, 2015).

International Advisory Committee, NCCR, 2002 to 2011.

External Examiner: London Business School Finance Department, 2005; New York University Finance Department, 2022; Finance Department, Wharton School, University of Pennsylvania, 2024.

Financial Advisory Roundtable (FAR), Federal Reserve Bank of New York, 2006 to 2010.

Guest Contributor, Harvard Law School Corporate Governance Blog.

Squam Lake Group, member, 2008 to present.

Senior Academic Fellow, Asia Bureau of Finance and Economic Research, 2012 to 2023.

Fellow, Wharton Center for Financial Institutions, 2013 to present.

Nominating Committee, American Finance Association, 2004 (chair), 2016, 2018.


**HONORS, SCHOLARSHIPS AND FELLOWSHIPS**

Advanced Researcher Fellowship, Swiss National Science Foundation, 1978-1980.

Dean's Research Professorship, Ohio State University, Spring 1984.

Pacesetter Research Award, Ohio State University, April 1986.

President-Elect (1993) and President (1994), International Economics and Finance Society.

Docteur Honoris Causa, University of Neuchâtel, Switzerland, 1998.

Eastern Finance Association Scholar Award, 1998.

Selected keynote speeches: ABFER, Asia-Pacific Finance Association, Bank of the Netherlands Governance Conference, Bocconi Derivatives Annual Conference, Drexel Corporate Governance Conference, Eastern Finance Association, European Corporate Finance Institute, European Finance Association, European Financial Management Association, Financial Management

# Appendix A

Association, Financial Management Association European Conference, FDIC Annual Conference, Rising Stars Conference, Fourth Annual Conference on Asia-Pacific Financial Markets of the Korean Securities Association, French Finance Association, German Finance Association, Infiniti Conference, Notre Dame/SEC Conference, Northern Finance Association, Swiss Banking Association 100th Anniversary Conference, Western Finance Association, World Finance Conference, China International Conference in Finance, South Carolina Conference on Banking and Fixed Income, Asian Finance Association Conference, Seoul Asian Financial Forum, Oklahoma University Energy and Commodities Finance Research Conference, ECGI Roundtable Riga, ECGI Annual Meeting, Institutional Investor Private Markets Summit, 7th HEC Paris Workshop, Asian Pacific Risk and Insurance Association, Institute for Private Capital Annual Research Conference.

Assurant Lecture, Georgia Tech University, 2004.

Fellow, Financial Management Association, 2000.

Fellow, American Finance Association, 2005.

Fellow, European Corporate Governance Institute, 2005.

Vice-President (2002), Program Chair, (2003), President (2004), Western Finance Association.

Vice-President (2003), President-elect (2004), President (2005), American Finance Association.

Who's Who in Banking and Finance; Who's Who in Economics.

Jensen Prize for best article in Corporate Finance in the Journal of Financial Economics, 2000, 2008, 2017; runner-up, 2011.

William F. Sharpe Award for the best paper published in the Journal of Financial and Quantitative Analysis during the year 2003.

Selected by the magazine Treasury and Risk Management as one of the 100 most influential people in finance (June 2004).

René M. Stulz Scholar Development Fund, created in 2005 by former Ph.D. students.

Fama/DFA Prize for best article in Capital Markets and Asset Pricing in the Journal of Financial Economics, 2005.

Nominated for a Brattle Prize for best paper in Corporate Finance in the Journal of Finance in 2005.

Risk Who's Who, Charter Member, 2006.

Best paper, First Asian-Pacific Capital Markets Conference, Seoul, 2006.

# Appendix A

Outstanding Academic Contribution to Corporate Governance Award, Drexel University, 2009.

Risk Manager of the year award, Global Association of Risk Professionals, 2009.

Swiss Finance Institute/Banque Privée Espirito Santo Prize 2010.

Trailblazer in Finance Award, 2014.

Reuters, Highly-Cited Researchers, first time in 2014.

Ohio State University, Distinguished Scholar Award, 2016.

Special issue of the Journal of Applied Corporate Finance in honor of René M. Stulz, 2022.

Best Paper Award, Southern Finance Association Meeting, 2023.

Honorary Doctor of Laws, University College Dublin, 2023.

## CONGRESSIONAL TESTIMONY

"Over-the-Counter Derivatives Markets Act of 2009," testimony to the House of Representatives Committee on Financial Services, 2009.

"Oversight of the Mutual Fund Industry: Ensuring Market Stability and Investor Confidence," Subcommittee on Capital Markets and Government Sponsored Enterprises, House of Representatives Committee on Financial Services, 2011.

## BOOKS

Risk Management and Derivatives, Southwestern College Publishing, 2003.

Handbook of the Economics of Finance, volume 1, edited with George Constantinides and Milton Harris, North-Holland, 2003.

Handbook of the Economics of Finance, volume 2, edited with George Constantinides and Milton Harris, Elsevier, 2013.

International Capital Markets, 3 volumes, edited with Andrew Karolyi, Edward Elgar, 2003.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2004.

Readings for the Financial Risk Manager, edited with Richard Apostolik, Wiley, 2005.

The Risks of Financial Institutions, edited with Mark Carey, University of Chicago Press, 2006.

# Appendix A

The Squam Lake Report: Fixing the Financial System, co-authored with the Squam Lake Group, Princeton University Press, 2010.

Private markets, public markets, and the 21st century corporation, manuscript in progress.

## PUBLISHED PAPERS

"On the Effects of Barriers to International Investment," Journal of Finance, 1981, 36(4), 923-934; reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 1-36.

"A Model of International Asset Pricing," Journal of Financial Economics, 1981, 9(4), 383-406.

"The Forward Exchange Rate and Macroeconomics," Journal of International Economics, 1982, 12(3/4), 285-299.

"Options on the Minimum or the Maximum of Two Risky Assets: Analysis and Applications," Journal of Financial Economics, 1982, 10(2), 161-185, reprinted in Options Markets, vol. 2, George Constantinides and A. G. Malliaris, eds., Edward Elgar Publishing, 2001.

"On the Determinants of Net Foreign Investment," Journal of Finance, 1983, 38(2), 459-468.

"The Demand for Foreign Bonds," Journal of International Economics, 1983, 15(3/4), 225-238.

"Optimal Hedging Policies," Journal of Financial and Quantitative Analysis, 1984, 19(2), 127-140.

"Currency Preferences, Purchasing Power Risks and the Determination of Exchange Rates in an Optimizing Model," Journal of Money, Credit and Banking, 1984, 16(3), 302-316; reprinted in Monetary Policy and Uncertainty, Manfred J. M. Neumann, ed., Nomos, 1986.

"Pricing Capital Assets in an International Setting: An Introduction," Journal of International Business Studies (Winter 1984), 55-73; reprinted in International Financial Management: Theory and Applications, Donald R. Lessard, ed., John Wiley & Sons, 1985.

"Macroeconomic Time-Series, Business Cycles and Macroeconomic Policies," with Walter Wasserfallen, Carnegie-Rochester Conference Series on Public Policy (Spring 1985), 9-55.

"An Analysis of Secured Debt," with Herb Johnson, Journal of Financial Economics, 1985, 14(4), 501-522, reprinted in The Debt Market, vol. 3, Steve A. Ross, editor, Edward Elgar, 2000.

"The Determinants of Firm's Hedging Policies," with Clifford W. Smith, Journal of Financial and Quantitative Analysis, 1985, 20(4), 391-406; reprinted in Studies in Financial Institutions: Commercial Banks, C. James and C.W. Smith, eds., McGraw Hill, 1993, and in Corporate

# Appendix A

Hedging in Theory and Practice: Lessons from Metallgesellschaft, Christopher L. Culp and Merton H. Miller, eds., Risk Publications, London, 1999.

"Asset Pricing and Expected Inflation," Journal of Finance, 1986, 41(1), 209-224.

"Risk Bearing, Labor Contracts and Capital Markets," with Patricia B. Reagan, Research in Finance, 1986, 6, 217-232.

"Interest Rates and Monetary Policy Uncertainty," Journal of Monetary Economics, 1986, 17(3), 331-348.

"Time-Varying Risk Premia, Imperfect Information and the Forward Exchange Rate," International Journal of Forecasting, 1987, 3(1), 171-178.

"The Pricing of Options with Default Risk," with Herb Johnson, Journal of Finance, 1987, 42(2), 267-280.

"An Equilibrium Model of Exchange Rate Determination and Asset Pricing with Non-Traded Goods and Imperfect Information," Journal of Political Economy, 1987, 95(5), 1024-1040.

"Managerial Control of Voting Rights: Financing Policies and the Market for Corporate Control," Journal of Financial Economics, 1988, 20(1/2), 25-54, reprinted in M.C. Jensen and C.W. Smith, eds., The Modern Theory of Corporate Finance, McGraw-Hill, 1989 (second edition).

"Risk and the Economy: A Finance Perspective," with K.C. Chan, Risk and the Economy, in C.C. Stone, ed., Financial Risk: Theory, Evidence and Implications, Proceedings of the Eleventh Annual Economic Conference of the Federal Reserve Bank of St. Louis, Kluwer Academic Publishers, 1988.

"Capital Mobility and the Current Account," Journal of International Finance and Money, 1988, 7(2), 167-180.

"The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," with Yong Cheol Kim, Journal of Financial Economics, 1988, 22(2), 189-205.

"Contracts, Delivery Lags, and Currency Risks," with Patricia Reagan, Journal of International Money and Finance, 1989, 8(1), 89-104.

"The Pricing of Stock Index Options in General Equilibrium," with Warren Bailey, Journal of Financial and Quantitative Analysis, 1989, 24(1), 1-12.

"Managerial Performance, Tobin's q, and the Gains from Successful Tender Offers," with Larry Lang and Ralph Walkling, Journal of Financial Economics, 1989, 24(1), 137-154.

# Appendix A

"Real Exchange Rate Dynamics and the Financial Theory of the Trading Firm," in Recent Developments in International Banking and Finance, S. Khoury and A. Ghosh, eds., Probus Publishing Company,1989, 3, 247-262.

"Properties of Daily Stock Returns from the Pacific Rim Stock Markets: Evidence and Implications," with Warren Bailey and Edward Ng, in S.G. Rhee and R. Chang, eds., Pacific-Basin Capital Markets Research, North Holland, 1990, 155-171.

"The Pricing of Currency Options: A Review," in R. E. Schwartz and C. W. Smith, eds., Handbook of Currency and Interest Rate Risk Management, Simon & Schuster, 1990, 5/1-5/20.

"Stock Index Futures in Switzerland: Pricing and Hedging Performance," with Walter Wasserfallen and Thomas Stucki, Review of Futures Markets, 1990, 9(3), 576-592.

"The Distribution of Target Ownership and the Division of Gains in Successful Takeovers," with Ralph A. Walkling and Moon H. Song, Journal of Finance, 1990, 45(3), 817-834.

"Managerial Discretion and Optimal Financing Policies," Journal of Financial Economics, 1990, 26(1), 3-26, reprinted in The Theory of Corporate Finance, M.J. Brennan, ed., Edward Elgar, 1995.

"Benefits of International Diversification: The Case of Pacific Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management, 1990, 16(4), 57-61.

"A Test of the Free Cash Flow Hypothesis: The Case of Bidder Returns," with Ralph A.Walkling and Larry H. Lang, Journal of Financial Economics, 1991, 29(2), 315-335.

"Is There a Global Market for Convertible Bonds?" with Yong-Cheol Kim, Journal of Business, 1992, 65(1), 75-92.

"Industry Contagion Effects of Bankruptcy and Firm Size," with Larry Lang, in Ed Altman, ed., Bankruptcy and Distressed Restructurings, Business One Irwin, 1992, 215-221.

"Contagion and Competitive Intra-Industry Effects of Bankruptcy Announcements," with Larry Lang, Journal of Financial Economics, 1992, 32(1), 45-60.

"Global Financial Markets and the Risk Premium on U.S. Equity," with K.C. Chan and Andrew Karolyi, Journal of Financial Economics, 1992, 32(2), 137-168.

"Portfolio Management and Exchange Rate Risks: New Theoretical and Empirical Perspectives," with Warren Bailey and Edward Ng, S. Khoury and A. Ghosh, eds., Recent Developments in International Banking and Finance, 1992, 6, 230-248.

"Optimal Hedging of Stock Portfolios Against Foreign Exchange Risks: The Case of the Nikkei 225," with Warren Bailey and Edward Ng, Global Finance Journal, 1992, 3(2), 97-114.

## Appendix A

"Contracting Costs, Inflation and Relative Price Volatility," with Patricia Reagan, Journal of Money, Credit and Banking, 1993, 25(3), Part 2, 585-601.

"Tobin's q, Diversification, and Firm Performance," with Larry Lang, Journal of Political Economy, 1994, 102(6), 1248-1280, reprinted in Empirical Corporate Finance, vol. IV, Michael Brennan, ed., Edward Elgar, 2001.

"International Asset Pricing: An Integrative Survey," Handbook of Modern Finance, R. Jarrow, M. Maksimovic and W. Ziemba, eds., North Holland-Elsevier, 1995, 201-223.

"Asset Sales, Firm Performance and the Agency Costs of Managerial Discretion," with Larry Lang and Annette Poulsen, Journal of Financial Economics, 1994, 37(1), 3-37, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"The Cost of Capital in Internationally Integrated Markets," European Financial Management, European Financial Management, 1995, 11-22.

"An Analysis of the Wealth Effects of Japanese Offshore Dollar-Denominated Convertible and Warrant Bond Issues," with Jun-Koo Kang, Yong-Cheol Kim and Kyung-Joo Park, Journal of Financial and Quantitative Analysis, 1995, 30(2), 257-270.

"Globalization of Capital Markets and the Cost of Capital: The Case of Nestlé," Journal of Applied Corporate Finance, 1995, 8(3,Fall), 30-38.

"Foreign Equity Investment Restrictions, Capital Flight, and Shareholder Wealth Maximization," with Walter Wasserfallen, Review of Financial Studies, 1995, 8(4), 1019-1057.

"Leverage, Investment and Firm Growth," with Larry Lang and Eli Ofek, Journal of Financial Economics, 1996, 40(1), 3-29.

"How Different is Japanese Corporate Finance?", with Jun-Koo Kang, Review of Financial Studies, 1996, 9(1), 109-139.

"Information, Trading and Stock Returns: Lessons from Dually-Listed Securities," with K.C. Chan, Wai-Ming Fong, and Bong-Chan Kho, Journal of Banking and Finance,1996, 20(7), 1161-1187.

"Timing, Investment Opportunities, Managerial Discretion, and the Security Issue Decision," with Kooyul Jung and Yong-Cheol Kim, Journal of Financial Economics, 1996, 42(2), 159-185, reprinted in Empirical Corporate Finance, vol. III, Michael J. Brennan, ed., Edward Elgar, 2001.

"Why Do Markets Move Together? An Investigation of U.S.-Japan Stock Return Comovements," with G. Andrew Karolyi, Journal of Finance, 1996, 51(3), 951-986.

"Rethinking Risk Management," Journal of Applied Corporate Finance, 1996 (Fall), 8-24. Reprinted in Corporate Hedging in Theory and Practice: Lessons from Metallgesellschaft,

# Appendix A

Christopher L Culp and Merton H. Miller, eds., Risk Publications, London, 1999, and in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999.

"Why Is There a Home Bias? An Analysis of Foreign Portfolio Equity Ownership in Japan," with Jun-Koo Kang, Journal of Financial Economics, 1997, 46(1), 3-28.

"Are Internal Capital Market Efficient?" with Hyun-Han Shin, Quarterly Journal of Economics, 1998, 113(2), 531-552.

"The Determinants and Implications of Corporate Cash Holdings," with Tim Opler, Lee Pinkowitz, and Rohan Williamson, Journal of Financial Economics, 1999, 52(1), 3-46. A shortened version of this paper appeared as "Corporate Cash Holdings," Journal of Applied Corporate Finance, 2001, 14(1), 55-79.

"Do Foreign Investors Destabilize Stock Markets? The Korean Experience in 1997," with Hyuk Choe and Bong-Chan Kho, Journal of Financial Economics, 1999, 54(2), 227-264.

"The Underreaction Hypothesis and the New Issue Puzzle: Evidence from Japan," with Yong-Cheol Kim and Jun-Koo Kang, Review of Financial Studies, 1999, 12(3), 519-534.

"International Portfolio Flows and Security Markets," in International Capital Flows, edited by Martin Feldstein, University Chicago Press, 1999, 257-293, reprinted in Emerging Markets, Geert Bekaert and Campbell R. Harvey, ed., Edward Elgar Publishing, 2004, 387-423.

"Globalization, Corporate Finance and the Cost of Capital," Journal of Applied Corporate Finance, 1999, 12(3), 8-25.

"Do Banking Shocks Affect Firm Performance? An Analysis of the Japanese Experience," with Jun-Koo Kang, Journal of Business, 2000, 73(1), 1-23.

"Banks, the IMF, and the Asian crisis," with Bong-Chan Kho, Pacific Basin Finance Journal, 2000, 8(2), 177-216.

"U.S. Banks, Crises, and Bailouts: From Mexico to LTCM," with Bong-Chan Kho and Dong Lee, American Economic Review, 2000, 90(2), 28-31.

"Financial Structure, Corporate Finance and Economic Growth," International Review of Finance, 2000, 1(1), 11-38.

"Merton Miller and Modern Finance," Financial Management, 2000, 29(4), 119-131. Reprinted in the Journal of Applied Corporate Finance, 2001(Winter), 8-20.

"International Competition and Exchange Rate Shocks: A Cross-Country Industry Analysis of Stock Returns," with John Griffin, Review of Financial Studies, 2001, 14(1), 215-241.

**Appendix A**

"Divestitures and the Liquidity of the Market for Corporate Assets," with Frederick Schlingemann and Ralph A. Walkling, Journal of Financial Economics, 2002, 64(1), 117-144, reprinted in Corporate Restructuring, vol. 2, John Campbell and David J. Denis, ed., Edward Elgar Publishing, 2005.

"Should we Fear Capital Flows?" in International Financial Markets: The Challenge of Globalization, Leonardo Auernheimer (Editor), University of Chicago Press, 2003, Chicago, Ill.

"Corporate Governance, Investor Protection, and the Home Bias," with Magnus Dahlquist, Lee Pinkowitz, and Rohan Williamson, Journal of Financial and Quantitative Analysis, 2003, 38(1), 87-110.

"Equity Market Liberalizations as Country IPOs," with Rodolfo Martell, American Economic Review, Papers and Proceedings, 2003, 93(2), 97-101.

"Culture, Openness, and Finance," with Rohan Williamson, Journal of Financial Economics, 2003, 70(3), 313-349.

"A New Approach to Measuring Financial Contagion," with Kee-Hong Bae and Andrew Karolyi, Review of Financial Studies, 2003, 16, 717-763. Pre-publication Working Paper

"Are Assets Priced Locally or Globally?" with Andrew Karolyi, in Constantinides, George, Milton Harris and René Stulz (eds.), The Handbook of the Economics of Finance, North Holland, 2003.

"Why are Foreign Firms that List in the U.S. Worth More?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2004, 71(2), 205-238.

"Daily Cross-Border Flows: Pushed or Pulled?" with Federico Nardari and John Griffin, Review of Economics and Statistics, 2004, 86(3), 641-657.

"Firm Size and the Gains from Acquisitions," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Financial Economics, 2004, 73, 201-228.

"Should we Fear Derivatives?" Journal of Economic Perspectives, 2004, 18(3), 173-192; reprinted in The ICFAI Journal of Derivatives Markets, 2005, 2(1), 42-53.

"Wealth Destruction on a Massive Scale? A Study of Acquiring-Firm Returns in the Recent Merger Wave," with Sara B. Moeller and Frederik P. Schlingemann, Journal of Finance, 2005, 60(2), 757-782 (Reprinted in Mergers and Acquisitions, J. Harold Mulherin, ed., Edward Elgar Publishing, 2012).

"Do Domestic Investors have an Edge? The Trading Experience of Foreign Investors in Korea," with Hyuk Choe and Bong-Chan Kho, Review of Financial Studies, 2005, 18(3),795-829.

**Appendix A**

"The Limits of Financial Globalization," Journal of Finance, 2005, 60(4), 1595-1638; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 8-15.

"Does the Contribution of Corporate Cash Holdings and Dividends to Firm Value Depend on Governance? A Cross-Country Analysis," with Lee Pinkowitz and Rohan Williamson, Journal of Finance, 2006, 61(6) 2725-2751; reprinted in Journal of Applied Corporate Finance, 2007, 19(1), 81-87.

"Dividend Policy and the Earned/Contributed Capital Mix: A Test of the Life-cycle Theory," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2006, 81(2), 227-254.

"Enterprise Risk Management: Theory and Practice," with Brian W. Nocco, Journal of Applied Corporate Finance, Fall 2006, 18(8), 8-20.

"Do Investors Trade more when Stocks have Performed Well? Evidence from 46 Countries," with John M. Griffin and Federico Nardari, Review of Financial Studies, 2007, 20(3), 905-951.

"Why Do Firms Become Widely Held? An Analysis of the Dynamics of Corporate Ownership," with Jean Helwege and Christo Pirinsky, Journal of Finance, 2007, 62 (3), 995-1028.

"Hedge Funds: Past, Present, and Future," Journal of Economic Perspectives, 2007, 21(2), 175-194.

"The Economics of Conflicts of Interests in Financial Institutions," with Hamid Mehran, Journal of Financial Economics, 2007, 85(2), 267-296.

"Why Do Countries Matter so much for Corporate Governance?" with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2007, 86, 1-39.

"How do Diversity of Opinion and Information Asymmetry Affect Acquirer Returns?" with Sara B. Moeller and Frederik P. Schlingemann, Review of Financial Studies, 2007, 20(6), 2047-2078.

"Do Local Analysts know more? A Cross-Country Study of Performance of Local Analysts and Foreign Analysts," with Kee-Hong Bae and Hongping Tan, Journal of Financial Economics, 2008, 88(3), 581-606.

"Why Do Private Acquirer Pay so Little Compared to Public Acquirers?" with Leonce L. Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, Journal of Financial Economics, 2008, 89(3), 375-390

"Risk Management Failures: What Are They and When Do They Happen?" Journal of Applied Corporate Finance, 2008, 20(4), 39-48.

"Private Benefits of Control, Ownership, and the Cross-Listing Decision," with Craig Doidge, G. Andrew Karolyi, Karl V. Lins, and Darius P. Miller, Journal of Finance, 2009, 64(1), 425-466.

**Appendix A**

"Has New York Become Less Competitive than London in Global Markets?  Evaluating Foreign Listing Choices Over Time," with Craig Doidge, and G. Andrew Karolyi, Journal of Financial Economics, 2009, 91(3), 253-277.

"Differences in Governance Practices between U.S. and Foreign Firms: Measurement, Causes, and Consequences," with Reena Aggarwal, Isil Erel, and Rohan Williamson, Review of Financial Studies, 2009, 22(8), 3171-3209.

"Managerial Ownership Dynamics and Firm Value," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2009, 92(3), 342-361.

"How Much Do Banks Use Credit Derivatives to Hedge Loans?" with Bernadette Minton and Rohan Williamson, Journal of Financial Services Research, 2009, 35(1), 1-31.

"Securities Laws, Disclosure, and National Capital Markets in the Age of Financial Globalization," Journal of Accounting Research, 2009, 47(2), 349-390.

"Why Do U.S. Firms Hold so Much More Cash than they Used to?" with Thomas W. Bates, and Kathleen M. Kahle, Journal of Finance, 2009, 64(5), 1985-2021.

"Financial Globalization, Governance, and the Evolution of the Home Bias," with Bong-Chan Kho and Francis E. Warnock, Journal of Accounting Research, 2009, 47(2), 597-635.

"Seasoned Equity Offerings, Market Timing and the Corporate Lifecycle," with Harry DeAngelo and Linda DeAngelo, Journal of Financial Economics, 2010, 95(3), 275-295.

"Why do Firms Appoint CEOs as Outside Directors?" with Rüdiger Fahlenbrach and Angie Low, Journal of Financial Economics, 2010, 97(1), 12-32.

"Credit Default Swaps and the Credit Crisis," Journal of Economic Perspectives, 2010, 24(1), 73-92.

"Why Do Foreign Firms Leave U.S. Equity Markets?" with Craig Doidge and G. Andrew Karolyi, Journal of Finance, 2010, 65(4), 1507-1553.

"Hedge Fund Contagion and Liquidity Shocks," with Nicole M. Boyson and Christof W. Stahel, Journal of Finance, 2010, 65(5), 1789-1816.

"Bank CEO Incentives and the Credit Crisis," with Rüdiger Fahlenbrach, Journal of Financial Economics, 2011, 99, 11-26 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"When Are Analyst Recommendation Changes Influential?" with Roger K. Loh, Review of Financial Studies, 2011, 24(2), 593-627.

# Appendix A

"The Credit Crisis Around the Globe: Why Did Some Banks Perform Better?" with Andrea Beltratti, Journal of Financial Economics, 2012, 105(1), 1-17 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Why Are U.S. Stocks More Volatile?" with Söhnke M. Bartram and Gregory Brown, Journal of Finance, 2012, 67(4), 1329-1370.

"Market Institutions, Financial Market Risks, and The Financial Crisis," with Mark Carey, Anil K. Kashyap, and Raghuram Rajan, Journal of Financial Economics, 2012, 104(3),421-424.

"This Time Is the Same: Using Bank Performance in 1998 to Explain Bank Performance during the Recent Financial Crisis," with Rüdiger Fahlenbrach and Robert Prilmeier, Journal of Finance, 2012, 67(6), 2139-2185 (Reprinted in Regulations and Governance of Financial Institutions, James R. Barth and Ross Levine, eds., Edward Elgar Publishing, 2016).

"Access to Capital, Investment, and the Financial Crisis," with Kathleen Kahle, Journal of Financial Economics, 2013, 110(2), 280-299.

"The U.S. Left Behind? Financial Globalization and the Rise of IPOs Outside the U.S.," with Craig Doidge and G. Andrew Karolyi, Journal of Financial Economics, 2013, 110(3), 546-573.

"Why Did Holdings of Highly-Rated Securitization Tranches Differ So Much Across Banks?" with Isil Erel and Taylor Nadauld, The Review of Financial Studies, 2014, 27(2), 404-453.

"Liquid-Claim Production, Risk Management, and Bank Capital Structure: Why High Leverage is Optimal for Banks," with Harry DeAngelo, Journal of Financial Economics, 2015, 116, 219-236.

"Risk Management, Governance, Culture and Risk-Taking in Banks," Economic Policy Review, Federal Reserve Bank of New York, 2016, 22(1), 43-59 (A shorter version was published as "Risk-Taking and Risk Management by Banks," Journal of Applied Corporate Finance, 2015, 27(1), 8-18).

"Corporate Acquisitions, Diversification, and the Firm's Lifecycle" with Asli M. Arikan, Journal of Finance, 2016, 71(1), 139-194.

"Do U.S. Firms Hold More Cash than Foreign Firms?" with Lee Pinkowitz and Rohan Williamson, The Review of Financial Studies, 2016, 29(2), 309-348.

"Why Don't All Banks Practice Regulatory Arbitrage? Evidence from the Usage of Trust Preferred Securities," with Nicole Boyson and Rüdiger Fahlenbrach, The Review of Financial Studies, 2016, 29(7), 1821-1859.

# Appendix A

"Firm Rigidities and the Decline of Growth Opportunities," with Claudio Loderer and Urs Wälchli, Management Science, 2016, 63(9), 3000-3020.

"Portable Country Governance and Cross-Border Acquisitions," with Jesse A. Ellis, Sara B. Moeller, and Frederik P. Schlingemann, Journal of International Business Studies, 2017, 48(2), 148-173.

"The U.S. Listing Gap," with Craig Doidge and Andrew Karolyi, Journal of Financial Economics, 2017, 123, 464-487.

"Is the US Public Corporation in Trouble?" with Kathleen Kahle, Journal of Economic Perspectives, 2017, 31(3), 67-88.

"Do Independent Director Departures Predict Future Bad Events?" with Rüdiger Fahlenbrach, Angie Low, and René M. Stulz, The Review of Financial Studies, 2017, 30(7), 2313 – 2358.

"What Is the Shareholder Wealth Impact of Target CEO Retention in Private Equity Deals?" with Leonce Bargeron, Frederik P. Schlingemann, and Chad J. Zutter, 2017, Journal of Corporate Finance, 46, 186-206.

"Why Does Fast Loan Growth Predict Poor Performance for Banks?" with Rüdiger Fahlenbrach and Robert Prilmeier, The Review of Financial Studies, 2017, 31(3), 1014-1063.

"Corporate Deleveraging and Financial Flexibility," with Harry DeAngelo and Andrei S. Gonçalves, The Review of Financial Studies, 2018, 31(8), 3122-3174.

"Eclipse of the Public Corporation or Eclipse of the Public Markets?" with Craig Doidge, Kathleen Kahle, and Andrew Karolyi, Journal of Applied Corporate Finance, 2018, 30(1), 8-16.

"Is Sell-Side Research More Valuable in Bad Times?" with Roger K. Loh, Journal of Finance, 2018, 73(3), 959-1013.

"Do Firms Issue More Liquidity When Markets Become More Liquid?" with Rogier M. Hanselaar and Mathijs A. van Dijk, Journal of Financial Economics, 2019,133(1), 64-82.

"Are the Largest Banks Valued More Highly?" with Bernadette Minton and Alvaro Taboada, Review of Financial Studies, 2019, 32(12), 4604-4652.

"FinTech, BigTech, and the Future of Banks," Journal of Applied Corporate Finance, 2019, 31(4), 86-97.

"Why Is Contagion Asymmetric During the European Sovereign Crisis?" with Andrea Beltratti, Journal of International Money and Finance, 2019, 99.

**Appendix A**

"Does the Stock Market Make Firms More Productive?" with Ben Bennett and Zexi Wang, Journal of Financial Economics, 2020, 136(2), 281-306.

"Public Versus Private Equity," Oxford Economic Policy Review, 2020, 36(2), 275-290.

"Risk Management, Firm Reputation, and the Impact of Successful Cyberattacks on Target Firms," with Shinichi Kamiya, Jun-Koo Kang, Jungmin Kim, and Andreas Milidonis, Journal of Financial Economics, 2021, 139(3), 719-749.

"Why Does Equity Capital Flow Out of High Tobin's q Industries," with Dong Wook Lee and Hyun-Han Shin, Review of Financial Studies, 2021, 24(4), 1867-1906.

"Why Are Firms with More Managerial Ownership Worth Less?" with Kornelia Fabisik, Rüdiger Fahlenbrach, and Jérôme Taillard, Journal of Financial Economics, 2021, 140(3), 699-725.

"How Valuable is Financial Flexibility when Revenue Stops? Evidence from the COVID-19 Crisis" with Rüdiger Fahlenbrach and Kevin Rageth, Review of Financial Studies, 2021, 34(11), 5474-5521.

"Were there Fire Sales in the RMBS Market?" with Craig B. Merrill, Taylor D. Nadauld, and Shane M. Sherlund, Journal of Monetary Economics, 2021, 122, 12-37.

"Why Are Corporate Payouts So High in the 2000s?" with Kathleen Kahle, Journal of Financial Economics, 2021, 142 (3), 1359-1380.

"Have Exchange-Listed Firms Become Less Important for the Economy?" with Frederik P. Schlingemann, Journal of Financial Economics, 2022, 143(2), 927-958.

"Are Analyst Short-Term Trade Ideas Valuable?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Journal of Finance, 2022, 77(3), 1829-1875.

"Leverage and Cash Dynamics" with Harry DeAngelo and Andrei S. Gonçalves, Review of Finance, 2022, 26(5)1101-1144.

"Do Firms with Specialized M&A Staff Make Better Acquisitions?" with Sinan Gokkaya and Xi Liu, Journal of financial Economics, 2023, 147(1), 75-105.

"Crisis Risk and Risk Management," European Financial Management, 2023, 29, (5), 1377-1400.

"Are Analyst 'Top Picks' Informative?" with Justin Birru, Sinan Gokkaya, and Xi Liu, Review of Financial Studies, 2024, 37 (5), 1538-1583.

"Models Behaving Badly: The Limits of Data-Driven Lending" with Itzhak Ben-David and Mark J. Johnson, Review of Finance, forthcoming.



Appendix A

"Risk, the Limits of Financial Risk Management, and Corporate Resilience," Annual Review of Financial Economics, forthcoming.

"The Lessons of Michael C. Jensen," Journal of Financial Economics, forthcoming.

## PROFESSIONAL JOURNAL ARTICLES, BOOK REVIEWS, NOTES AND COMMENTS

Review of "Managing Foreign Exchange Risk," Richard J. Herring, ed., Journal of Money, Credit and Banking (February 1985), 124-125.

"On Capital Mobility in the World Economy," Carnegie-Rochester Conference Series on Public Policy (Spring, 1986), 105-114.

"Portfolio Management in International Capital Markets," Financial Markets and Portfolio Management (1, 1986), 18-23.

"Portfolio Insurance, Program Trading and the Crash of 1987," Financial Markets and Portfolio Management (1, 1988), 11-22.

"SMI Futures," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (4, 1989), 288-300.

"Benefits of International Diversification with Daily Data: The Case of Pacific-Basin Stock Markets," with Warren Bailey, Journal of Portfolio Management (4, 1990), 57-61.

"Portfolio Insurance with Options and Futures on the SMI," with T. Stucki and W. Wasserfallen, Financial Markets and Portfolio Management (2, 1990), 99-115.

"Securities Transaction Taxes: Lessons from the International Experience," in The Globalization of Equity Markets, Jeffrey Frankel, ed., University of Chicago Press, 1994.

"Identifying and Quantifying Exposures," with Rohan Williamson, in Financial Risk and the Corporate Treasury: New Developments in Strategy and Control, Robert Jameson, ed., Risk Publications, London, 1997, 33-51 (Reprinted in Corporate Risk: Strategies and Management, Gregory W. Brown and Donald H. Chew, eds., Risk Publications, London, 1999). Pre-publication Working Paper

"What's Wrong with Modern Capital Budgeting?" Financial Practice and Education, Fall/Winter 1999, p.5-9.

"Diminishing the Threats to Shareholder Wealth," Financial Times, Mastering Risk Series, April 25, 2000.

**Appendix A**
PageID #: 1895

"Why Risk Management is not Rocket Science," Financial Times, Mastering Risk Series, June 27, 2000.

"An Emotional High for Stocks?" a review of "Irrational Exuberance" by Robert J. Shiller, Science (June 30, 2000), 2323.

"Demystifying Financial Derivatives," The Milken Institute Review, Third Quarter 2005, 20-31.

"Merton Miller," New Palgrave Dictionary, 2006.

"Financial Derivatives: Lessons from the Subprime Crisis," The Milken Institute Review, First Quarter 2009, 59-70.

"Six Ways Companies Mismanage Risk," Harvard Business Review, February 2009, 87(3), 86-94.

"In Defense of Derivatives and How to Regulate Them," Wall Street Journal, April 7, 2009.

"Unicorns," with Rüdiger Fahlenbrach, in The Palgrave Encyclopedia of Private Equity, D.J. Cumming and B. Hammer (eds.), Springer, 2025.


**SELECTED RESEARCH IN PROGRESS AND WORKING PAPERS**

"Has the Bond Market Really Become Less Liquid?" with Mike Anderson.

"Creative Destruction, Stock Return Volatility, and the Number of Listed Firms" with Söhnke Bartram and Gregory Brown.

"Bank Payout Policy, Regulation, and Politics" with Rüdiger Fahlenbrach and Minsu Ko.

"The US Equity Valuation Premium, Globalization, and Climate Change Risks" with Craig Doidge and Andrew Karolyi.

"Why Do Bank Boards Have Risk Committees?" with James Tompkins, Rohan Williamson, and Zhongxia Ye.

"How Important is Moral Hazard for Distressed Banks?" with Itzhak Ben-David and Ajay A. Palvia.

"Bank Liquid Assets, the Portfolio Motive, and Capital Requirements" with Alvaro Taboada and Mathijs A. van Dijk.

"The Unicorn Puzzle," with Daria Davydova, Rüdiger Fahlenbrach, and Leandro Sanz.



**Appendix A**

"Public Scrutiny, Firm Performance, and Corporate Policies" with Benjamin Bennett and Zexi Wang.

"Is there Information in Corporate Acquisition Plans?" with Sinan Gokkaya and Xi Liu.

"Why Are Countries So Important for the Composition of Corporate Debt?" with Michela Altieri and Söhnke Bartram.

"Risk, the Limits of Financial Risk Management, and Corporate Resilience"

"The Lessons of Michael C. Jensen"

"Corporate Purpose Across the Globe," with Söhnke Bartram and Ingomar Krohn.


## EDITORIAL AND REFEREEING ACTIVITIES

Advisory Board, Journal of Risk and Financial Management, 2018 to present.

Editorial Board, Journal of Financial Intermediation, 2013 to present.

Advisory Editor, Journal of Investment Management, 2003 to present.

Advisory Editor, Journal of Financial Economics, 2000 to 2021.

Advisory Editor, Journal of Financial Services, 1999 to present.

Editor, Journal of Finance, 1988 to 2000.

Editor, Corporate Finance Abstracts, Social Science Research Network, 1998 to present.

Editor, Journal of Financial Economics, 1982 to 1987.

Board of Editors, Journal of Banking and Finance, 2008.

Co-Editor, Banking and Financial Institutions Abstracts, Social Science Research Network, 1998 to present.

Co-Editor, Financial Markets and Portfolio Management, 1999 to present.

Associate Editor, Journal of Risk, 2006 to present.

Board of Editors, Japan and the World Economy, 2006 to present.

Advisory Editor, The Review of Finance, 2003 to 2009.

**Appendix A**

Advisory Editor, Journal of Economic Perspectives, 2006 to 2008.

Associate Editor, Journal of Economic Perspectives, 2003 to 2005.

Associate Editor, Journal of Financial Abstracts, 1994 to 1998.

Associate Editor, Journal of Financial Economics, 1988 to 1999.

Associate Editor, Journal of International Finance and Accounting, 1988 to present.

Associate Editor, Global Finance Journal, 1988 to 2015.

Associate Editor, Journal of International Financial Markets, Institutions and Money, 1989 to present.

Associate Editor, Journal of Fixed Income, 1991 to present.

Associate Editor, Journal of International Trade and Finance, 1992 to present.

Associate Editor, Journal of Financial and Quantitative Analysis, 1983-1985.

Acted as an ad hoc referee for AER, JIE, JAE, JFE, JME, JMCB, JFQA, QJE, JF, JB, JPE, Canadian Journal of Economics, Management Science, Marketing Science, Journal of International Money and Finance, Journal of International Business Studies, the Canadian NSF and the NSF.

# Appendix B

# Deposition and Trial Testimony of René M. Stulz
# During the Past Four Years

| | |
|---|---|
| **Case Name:** | Boston Retirement System v. Uber Technologies, Inc. et al. |
| **Case No.:** | No. 3:19-cv-06361-RS, United State District Court, Northern District of California |
| **Date of Testimony:** | February 2022 (Deposition), April 2024 (Deposition) |

| | |
|---|---|
| **Case Name:** | Ahmad Odeh v. Immunomedics, Inc. et al. |
| **Case No.:** | No. 2:18-17645-MCA-ESK, United States District Court, District of New Jersey |
| **Date of Testimony:** | May 2022 (Deposition) |

| | |
|---|---|
| **Case Name:** | In re Qualcomm Incorporated Securities Litigation |
| **Case No.:** | No. 3:17-cv-00121-JAH-WVG, United States District Court, Southern District of California |
| **Date of Testimony:** | November 2022 (Deposition) |

| | |
|---|---|
| **Case Name:** | City of Birmingham Relief and Retirement System, et al. v. Acadia Pharmaceuticals Inc., et al. |
| **Case No.:** | No. 3:21-cv-00762-WQH-NLS, United States District Court, Southern District of California |
| **Date of Testimony:** | November 2023 (Deposition) |

| | |
|---|---|
| **Case Names:** | In re Alta Mesa Resources, Inc. Securities Litigation<br>Alyeska Master Fund, L.P., et al. v. Alta Mesa Resources, Inc., et al.<br>Orbis Global Equity LE Fund, et al., v. Alta Mesa Resources, Inc., et al. |
| **Case No.:** | No. 4:22-cv-1189, United States District Court, Southern District of Texas |
| **Date of Testimony:** | November 2023 (Depositions) |

| | |
|---|---|
| **Case Name:** | Carl Shupe, et al. v. Rocket Companies, Inc., et al. |
| **Case No.:** | No. 21-cv-11528, United States District Court, Eastern District of Michigan, Northern Division |
| **Date of Testimony:** | January 2024 (Deposition), June 2024 (Deposition) |

| | |
|---|---|
| **Case Name:** | William C. Theodore, et al. v. PureCycle Technologies, Inc., et al. |
| **Case No.:** | No. 6:21-cv-809-PGB-GJK, United States District Court, Middle District of Florida |
| **Date of Testimony:** | February 2024 (Deposition) |

# Appendix B

**Case Name:** Boston Retirement System v. Uber Technologies Inc., et al.
**Case No.:** No. 3:19-cv-06361-RS, United States District Court, Northern District of California, San Francisco Division
**Date of Testimony:** April 2024 (Deposition)

**Case Name:** In Re Cassava Sciences, Inc. Securities Litigation
**Case No.:** No. 1:21-cv-00751-DAE, United States District Court, Western District of Texas, Austin Division
**Date of Testimony:** August 2024 (Deposition)

**Case Name:** In Re The Boeing Company Securities Litigation
**Case No.:** No. 1:24-cv-151-LMB-LRV, United States District Court, Eastern District of Virginia, Alexandria Division
**Date of Testimony:** February 2025 (Deposition)

**Case Name:** Angela Parkin, et al. v. The Toronto-Dominion Bank, et al.
**Case No.:** No. CV-24-00720906-00CP, Ontario Superior Court of Justice
**Date of Testimony:** January 2026 (Deposition)

# Appendix C

# Documents Considered List

**Academic Articles**

- Axelson, Per and Matthew D. Cain, "What is Price Impact? How the Goldman Decisions are Reshaping Shareholder Class Actions," *Berkeley Business Law Journal* 22, no. 2, 2025, pp. 441–465

- Bradshaw, Mark T. et al., "Soft Information in the Financial Press and Analyst Revisions," *The Accounting Review* 96, no. 5, 2021, pp. 107–132

- Busse, Jeffrey A. and T. Clifton Green, "Market Efficiency in Real Time," *Journal of Financial Economics* 65, no. 3, 2002, pp. 415–437

- Fama, Eugene F. and Kenneth R. French, "Industry Costs of Equity," *Journal of Financial Economics* 43, no. 2, 1997, pp. 153–193

- Fama, Eugene F., "Efficient Capital Markets: II," *The Journal of Finance* 46, no. 5, 1991, pp. 1575–1617

- Greene, Jason T. and Susan G. Watts, "Price Discovery on the NYSE and the NASDAQ: The Case of Overnight and Daytime News Releases," *Financial Management* 25, no. 1, 1996, pp. 19–42

- Kim, Yong Cheol and René M. Stulz, "The Eurobond Market and Corporate Financial Policy: A Test of the Clientele Hypothesis," *Journal of Financial Economics* 22, no. 2, 1988, pp. 189–205

- MacKinlay, A. Craig, "Event Studies in Economics and Finance," *Journal of Economic Literature* 35, no. 1, 1997, pp. 13–39

- Mitchell, Mark L. and Jeffrey M. Netter, "The Role of Financial Economics in Securities Fraud Cases: Applications at the Securities and Exchange Commission," *The Business Lawyer* 49, no. 2, 1994, pp. 545–590

- Pardo, Michael S., "A Comment on Statistical Significance and Standards of Proof," *Supreme Court Economic Review* 25, 2017, pp. 59–63

- Tetlock, Paul C., "All of News That's Fit to Reprint: Do Investors React to Stale Information," *The Review of Financial Studies* 24, no. 5, 2011, pp. 1481–1512

**Books and Book Chapters**

- Bodie, Zvi et al., *Investments*, Eleventh Edition (New York, NY: McGraw Hill Education, 2018)

- Kaye, David H. and David A. Freedman, "Reference Guide on Statistics," in *Reference Manual on Scientific Evidence*, Third Edition (Washington, DC: National Academies Press, 2011), 211–302

# Appendix C

- Kutner, Michael H. et al., *Applied Linear Statistical Models*, Fifth Edition (New York, NY: McGraw-Hill Irwin, 2005)

- Ross, Stephen A. et al., *Corporate Finance*, Tenth Edition (New York, NY: McGraw-Hill Irwin, 2013)

**Analyst Reports**

- UBS, March 15, 2017

- Credit Suisse, March 16, 2017

- Evercore ISI, March 16, 2017

- J.P. Morgan, March 16, 2017

- Sandler O'Neill + Partners, March 20, 2017

- Buckingham Research Group, March 22, 2017

- UBS, April 18, 2017

- Buckingham Research Group, April 20, 2017 (2 reports)

- Evercore ISI, April 20, 2017

- UBS, April 20, 2017

- Evercore ISI, April 23, 2017

- Sandler O'Neill + Partners, April 24, 2017

- Evercore ISI, January 7, 2018

- Evercore ISI, February 8, 2018

- Evercore ISI, April 16, 2018

- Evercore ISI, May 4, 2018

- Jefferies, May 23, 2018

- Evercore ISI, July 23, 2018

- Evercore ISI, July 27, 2018

- Morgan Stanley, July 27, 2018

- Sandler O'Neill + Partners, August 8, 2018

- J.P. Morgan, August 9, 2018

- Sandler O'Neill + Partners, September 11, 2018

- J.P. Morgan, September 12, 2018

- UBS, September 13, 2018

- Sandler O'Neill + Partners, September 24, 2018

# Appendix C

- Goldman Sachs, October 1, 2018
- Compass Point Research & Trading, October 4, 2018
- UBS, October 4, 2018
- Citi, October 5, 2018
- Compass Point Research & Trading, October 5, 2018
- Goldman Sachs, October 5, 2018
- Sandler O'Neill + Partners, October 5, 2018
- Sandler O'Neill + Partners, October 8, 2018
- Morgan Stanley, October 9, 2018
- UBS, October 9, 2018
- Jefferies, October 10, 2018
- J.P. Morgan, October 11, 2018
- Sandler O'Neill + Partners, October 11, 2018
- Evercore ISI, October 14, 2018
- J.P. Morgan, October 17, 2018
- Citi, November 7, 2018
- Compass Point Research & Trading, November 7, 2018 (2 reports)
- Evercore ISI, November 7, 2018 (2 reports)
- Goldman Sachs, November 7, 2018 (4 reports)
- UBS, November 7, 2018 (2 reports)
- Citi, November 8, 2018
- J.P. Morgan, November 8, 2018
- Sandler O'Neill + Partners, November 9, 2018
- Morgan Stanley, November 14, 2018
- Goldman Sachs, December 5, 2018
- Goldman Sachs, January 4, 2019
- Morgan Stanley, January 4, 2019
- Sandler O'Neill + Partners, January 7, 2019
- Evercore ISI, January 8, 2019
- Fitch Ratings, January 8, 2019
- Goldman Sachs, January 8, 2019

# Appendix C

- Citi, January 9, 2019
- Compass Point Research & Trading, January 9, 2019
- Moody's Investors Services, January 9, 2019
- Morgan Stanley, January 9, 2019
- Sandler O'Neill + Partners, January 9, 2019
- J.P. Morgan, January 15, 2019
- UBS, January 17, 2019
- Citi, January 22, 2019
- Citi, February 7, 2019
- Compass Point Research & Trading, February 7, 2019 (3 reports)
- Evercore ISI, February 7, 2019 (2 reports)
- Goldman Sachs, February 7, 2019
- Sandler O'Neill + Partners, February 7, 2019 (2 reports)
- UBS, February 7, 2019
- Citi, February 8, 2019
- Compass Point Research & Trading, February 8, 2019
- Goldman Sachs, February 8, 2019
- UBS, February 11, 2019
- Sandler O'Neill + Partners, March 1, 2019
- Sandler O'Neill + Partners, March 15, 2019
- PriceTarget Research, March 19, 2019
- Watchdog Report, March 22, 2019
- Goldman Sachs, April 2, 2019
- Sandler O'Neill + Partners, April 8, 2019
- Jefferies, April 9, 2019
- Compass Point Research & Trading, April 10, 2019
- Evercore ISI, April 10, 2019
- Compass Point Research & Trading, April 15, 2019
- UBS, April 15, 2019
- Citi, April 18, 2019
- Citi, May 3, 2019

# Appendix C

- Compass Point Research & Trading, May 3, 2019 (3 reports)
- Evercore ISI, May 3, 2019 (2 reports)
- Jefferies, May 3, 2019
- Sandler O'Neill + Partners, May 3, 2019
- UBS, May 3, 2019
- Citi, May 6, 2019
- Compass Point Research & Trading, May 6, 2019
- Goldman Sachs, May 6, 2019
- Jefferies, May 6, 2019
- Morgan Stanley, May 6, 2019
- Compass Point Research & Trading, May 7, 2019
- UBS, May 7, 2019
- Citi, June 6, 2019
- Rosenblatt Securities, June 25, 2019
- Sandler O'Neill + Partners, July 3, 2019
- Watchdog Report, July 3, 2019
- Sandler O'Neill + Partners, July 8, 2019
- Jefferies, July 10, 2019
- Sandler O'Neill + Partners, July 10, 2019 (2 reports)
- Rosenblatt Securities, July 12, 2019
- Compass Point Research & Trading, July 16, 2019
- Jefferies, July 19, 2019
- Citi, July 22, 2019
- UBS, July 23, 2019
- Evercore ISI, July 28, 2019
- Jefferies, July 30, 2019
- Rosenblatt Securities, August 4, 2019
- Citi, August 8, 2019
- Compass Point Research & Trading, August 8, 2019 (3 reports)
- Evercore ISI, August 8, 2019 (2 reports)
- Goldman Sachs, August 8, 2019

# Appendix C

- Jefferies, August 8, 2019
- Rosenblatt Securities, August 8, 2019 (2 reports)
- Sandler O'Neill + Partners, August 8, 2019 (2 reports)
- UBS, August 8, 2019
- Citi, August 9, 2019
- Compass Point Research & Trading, August 9, 2019
- Goldman Sachs, August 9, 2019
- Morgan Stanley, August 9, 2019
- UBS, August 9, 2019
- Jefferies, August 11, 2019
- J.P. Morgan, September 3, 2019
- Citi, September 4, 2019
- Sandler O'Neill + Partners, September 4, 2019
- Rosenblatt Securities, September 19, 2019
- Sandler O'Neill + Partners, September 24, 2019
- Rosenblatt Securities, September 29, 2019
- Rosenblatt Securities, October 6, 2019
- Compass Point Research & Trading, October 8, 2019
- Sandler O'Neill + Partners, October 8, 2019
- Compass Point Research & Trading, October 9, 2019 (2 reports)
- Jefferies, October 9, 2019
- Sandler O'Neill + Partners, October 9, 2019
- Evercore ISI, October 10, 2019
- UBS, October 10, 2019
- Citi, October 21, 2019
- J.P. Morgan, October 24, 2019
- Evercore ISI, October 28, 2019
- Rosenblatt Securities, November 3, 2019
- Citi, November 5, 2019 (2 reports)
- Compass Point Research & Trading, November 5, 2019
- Evercore ISI, November 5, 2019

# Appendix C

- Goldman Sachs, November 5, 2019
- Jefferies, November 5, 2019
- J.P. Morgan, November 5, 2019
- Rosenblatt Securities, November 5, 2019 (2 reports)
- Sandler O'Neill + Partners, November 5, 2019 (2 reports)
- UBS, November 5, 2019
- Compass Point Research & Trading, November 6, 2019
- Jefferies, November 6, 2019
- J.P. Morgan, November 6, 2019
- Morgan Stanley, November 6, 2019
- UBS, November 8, 2019
- Goldman Sachs, December 11, 2019
- Sandler O'Neill + Partners, December 18, 2019 (2 reports)
- Rosenblatt Securities, January 5, 2020
- Goldman Sachs, January 6, 2020
- Compass Point Research & Trading, January 10, 2020 (2 reports)
- J.P. Morgan, January 10, 2020
- Morgan Stanley, January 10, 2020
- Piper Sandler, January 12, 2020
- Citi, January 27, 2020
- Piper Sandler, January 31, 2020
- Rosenblatt Securities, February 2, 2020
- Citi, February 3, 2020
- Evercore ISI, February 3, 2020
- Jefferies, February 3, 2020
- Moody's Investors Services, February 3, 2020
- Piper Sandler, February 3, 2020
- Rosenblatt Securities, February 3, 2020
- Compass Point Research & Trading, February 4, 2020 (2 reports)
- J.P. Morgan, February 4, 2020
- UBS, February 4, 2020

# Appendix C

- Citi, February 9, 2020
- Rosenblatt Securities, February 9, 2020
- Citi, February 11, 2020
- Compass Point Research & Trading, February 11, 2020 (2 reports)
- Evercore ISI, February 11, 2020
- Goldman Sachs, February 11, 2020
- Jefferies, February 11, 2020
- Piper Sandler, February 11, 2020 (2 reports)
- Rosenblatt Securities, February 11, 2020 (2 reports)
- UBS, February 11, 2020 (2 reports)
- Compass Point Research & Trading, February 12, 2020
- J.P. Morgan, February 12, 2020
- Compass Point Research & Trading, March 2, 2020
- Citi, March 3, 2020
- Compass Point Research & Trading, March 3, 2020
- Evercore ISI, March 3, 2020
- Jefferies, March 3, 2020
- Piper Sandler, March 3, 2020
- UBS, March 3, 2020
- J.P. Morgan, March 4, 2020
- Piper Sandler, March 9, 2020
- The Idea, March 10, 2020
- Piper Sandler, March 11, 2020
- Compass Point Research & Trading, March 20, 2020
- Jefferies, March 20, 2020
- Piper Sandler, March 20, 2020
- Rosenblatt Securities, March 20, 2020
- Compass Point Research & Trading, March 23, 2020
- J.P. Morgan, March 24, 2020
- Citi, April 3, 2020
- Jefferies, April 8, 2020

# Appendix C

- Piper Sandler, April 8, 2020
- Rosenblatt Securities, April 15, 2020
- UBS, April 15, 2020
- Citi, April 17, 2020
- Citi, May 7, 2020
- Compass Point Research & Trading, May 7, 2020 (2 reports)
- Evercore ISI, May 7, 2020 (2 reports)
- Jefferies, May 7, 2020 (2 reports)
- Piper Sandler, May 7, 2020 (2 reports)
- Rosenblatt Securities, May 7, 2020 (2 reports)
- UBS, May 7, 2020
- Citi, May 8, 2020
- Compass Point Research & Trading, May 8, 2020
- J.P. Morgan, May 8, 2020
- UBS, May 8, 2020
- Piper Sandler, May 10, 2020
- Compass Point Research & Trading, May 14, 2020 (2 reports)
- Morgan Stanley, May 14, 2020
- Compass Point Research & Trading, May 19, 2020
- Rosenblatt Securities, June 2, 2020
- Rosenblatt Securities, June 3, 2020
- Rosenblatt Securities, June 9, 2020
- Piper Sandler, June 12, 2020
- Rosenblatt Securities, June 15, 2020 (2 reports)
- Piper Sandler, June 18, 2020
- Jefferies, June 19, 2020
- Morgan Stanley, July 2, 2020 (2 reports)
- Piper Sandler, July 7, 2020
- Jefferies, July 8, 2020
- J.P. Morgan, July 8, 2020
- Compass Point Research & Trading, July 9, 2020 (2 reports)

# Appendix C

- J.P. Morgan, July 9, 2020
- UBS, July 14, 2020
- Citi, July 20, 2020
- Evercore ISI, July 21, 2020
- Piper Sandler, August 5, 2020 (2 reports)
- Citi, August 7, 2020
- Compass Point Research & Trading, August 7, 2020 (2 reports)
- Jefferies, August 7, 2020
- Piper Sandler, August 7, 2020 (2 reports)
- Rosenblatt Securities, August 7, 2020 (2 reports)
- UBS, August 7, 2020
- Evercore ISI, August 8, 2020
- UBS, August 9, 2020
- Citi, August 10, 2020
- Compass Point Research & Trading, August 10, 2020
- J.P. Morgan, August 10, 2020
- Morgan Stanley, August 10, 2020
- Piper Sandler, August 10, 2020 (2 reports)
- UBS, August 16, 2020
- Piper Sandler, September 11, 2020
- UBS, September 20, 2020
- Compass Point Research & Trading, September 23, 2020
- Jefferies, September 23, 2020
- Piper Sandler, September 23, 2020
- Rosenblatt Securities, September 23, 2020
- Compass Point Research & Trading, September 24, 2020
- J.P. Morgan, September 24, 2020
- UBS, October 6, 2020
- Rosenblatt Securities, October 9, 2020
- Citi, October 20, 2020
- Evercore ISI, October 27, 2020

# Appendix C

- CapitalCube, November 3, 2020

- Citi, November 6, 2020

- Compass Point Research & Trading, November 6, 2020

- Evercore ISI, November 6, 2020

- Goldman Sachs, November 6, 2020 (2 reports)

- Jefferies, November 6, 2020

- Piper Sandler, November 6, 2020 (2 reports)

- Rosenblatt Securities, November 6, 2020

- UBS, November 6, 2020

- Evercore ISI, November 8, 2020

- Loop Capital Markets, November 8, 2020

- Rosenblatt Securities, November 8, 2020

- Citi, November 9, 2020

- Compass Point Research & Trading, November 9, 2020

- Jefferies, November 9, 2020

- J.P. Morgan, November 9, 2020

- UBS, November 9, 2020

- Morgan Stanley, November 10, 2020

- Piper Sandler, November 12, 2020

- Goldman Sachs, December 9, 2020

- Piper Sandler, December 10, 2020

- Piper Sandler, December 17, 2020

- Morgan Stanley, January 1, 2021

- Jefferies, January 10, 2021

- Compass Point Research & Trading, January 13, 2021

- UBS, January 21, 2021

- Citi, January 25, 2021

- Evercore ISI, February 2, 2021

- J.P. Morgan, February 3, 2021

- Compass Point Research & Trading, February 11, 2021

- Evercore ISI, February 11, 2021 (2 reports)

# Appendix C

- Jefferies, February 11, 2021
- J.P. Morgan, February 11, 2021
- Loop, February 11, 2021
- Piper Sandler, February 11, 2021 (2 reports)
- Rosenblatt Securities, February 11, 2021
- UBS, February 11, 2021 (2 reports)
- Compass Point Research & Trading, February 12, 2021
- Jefferies, February 12, 2021
- J.P. Morgan, February 12, 2021
- Morgan Stanley, February 12, 2021
- Rosenblatt Securities, February 12, 2021
- Citi, February 16, 2021
- Rosenblatt Securities, February 18, 2021
- Compass Point Research & Trading, March 9, 2021
- Piper Sandler, March 11, 2021
- Rosenblatt Securities, March 12, 2021
- Morgan Stanley, March 31, 2021
- Rosenblatt Securities, March 31, 2021 (2 reports)
- Rosenblatt Securities, April 4, 2021
- CapitalCube, April 6, 2021
- UBS, April 9, 2021
- Jefferies, April 12, 2021
- Citi, April 19, 2021
- Evercore ISI, April 21, 2021
- Citi, May 4, 2021
- Compass Point Research & Trading, May 4, 2021 (2 reports)
- Jefferies, May 4, 2021 (2 reports)
- Loop Capital Markets, May 4, 2021
- Piper Sandler, May 4, 2021 (2 reports)
- Rosenblatt Securities, May 4, 2021 (2 reports)
- UBS, May 4, 2021

# Appendix C

- Evercore ISI, May 5, 2021
- J.P. Morgan, May 5, 2021
- UBS, May 6, 2021
- Morgan Stanley, May 7, 2021
- J.P. Morgan, June 10, 2021
- Piper Sandler, June 14, 2021
- Citi, June 21, 2021
- UBS, July 8, 2021
- Piper Sandler, July 12, 2021
- J.P. Morgan, July 14, 2021
- J.P. Morgan, July 15, 2021
- Evercore ISI, July 27, 2021
- Citi, August 3, 2021
- Compass Point Research & Trading, August 4, 2021
- Evercore ISI, August 4, 2021
- Jefferies, August 4, 2021 (2 reports)
- J.P. Morgan, August 4, 2021
- Piper Sandler, August 4, 2021 (2 reports)
- Rosenblatt Securities, August 4, 2021
- UBS, August 4, 2021
- Citi, August 5, 2021
- Compass Point Research & Trading, August 5, 2021
- Morgan Stanley, August 5, 2021
- UBS, August 5, 2021
- Morgan Stanley, September 16, 2021
- CapitalCube, September 22, 2021
- Rosenblatt Securities, September 23, 2021
- Piper Sandler, September 24, 2021
- Compass Point Research & Trading, October 14, 2021
- Piper Sandler, November 2, 2021
- Citi, November 3, 2021

# Appendix C

- Compass Point Research & Trading, November 3, 2021
- Evercore ISI, November 3, 2021
- Jefferies, November 3, 2021
- J.P. Morgan, November 3, 2021
- Piper Sandler, November 3, 2021 (2 reports)
- Rosenblatt Securities, November 3, 2021
- UBS, November 3, 2021
- Citi, November 4, 2021
- Compass Point Research & Trading, November 4, 2021
- Morgan Stanley, November 4, 2021
- Jefferies, November 5, 2021
- UBS, November 11, 2021
- Piper Sandler, December 14, 2021
- CapitalCube, January 10, 2022
- Jefferies, January 10, 2022
- Piper Sandler, January 11, 2022
- Compass Point Research & Trading, January 14, 2022
- UBS, January 19, 2022
- Citi, January 24, 2022
- J.P. Morgan, January 26, 2022
- Piper Sandler, February 1, 2022
- CapitalCube, February 4, 2022
- Citi, February 8, 2022
- Compass Point Research & Trading, February 8, 2022
- Jefferies, February 8, 2022
- J.P. Morgan, February 8, 2022
- Piper Sandler, February 8, 2022 (2 reports)
- Rosenblatt Securities, February 8, 2022 (2 reports)
- UBS, February 8, 2022
- Compass Point Research & Trading, February 9, 2022
- Evercore ISI, February 9, 2022

# Appendix C

- Jefferies, February 9, 2022
- J.P. Morgan, February 9, 2022
- Morgan Stanley, February 10, 2022
- CapitalCube, February 25, 2022
- Piper Sandler, March 1, 2022
- Piper Sandler, March 16, 2022
- J.P. Morgan, March 30, 2022
- Piper Sandler, April 1, 2022
- Compass Point Research & Trading, April 7, 2022
- Jefferies, April 11, 2022
- UBS, April 12, 2022
- Citi, April 13, 2022
- Morgan Stanley, April 13, 2022
- J.P. Morgan, April 18, 2022
- J.P. Morgan, April 19, 2022
- Evercore ISI, April 25, 2022
- Citi, April 28, 2022
- Compass Point Research & Trading, April 28, 2022
- Evercore ISI, April 28, 2022
- Piper Sandler, April 28, 2022 (2 reports)
- Rosenblatt Securities, April 28, 2022
- UBS, April 28, 2022
- Compass Point Research & Trading, April 29, 2022
- J.P. Morgan, April 29, 2022
- Morgan Stanley, May 2, 2022
- UBS, May 9, 2022
- Jefferies, July 11, 2022
- J.P. Morgan, July 18, 2022
- J.P. Morgan, July 19, 2022
- UBS, July 19, 2022
- Evercore ISI, July 20, 2022

# Appendix C

- J.P. Morgan, July 25, 2022
- Evercore ISI, July 28, 2022
- Jefferies, July 28, 2022
- Piper Sandler, July 28, 2022 (2 reports)
- UBS, July 28, 2022
- J.P. Morgan, August 1, 2022
- Morgan Stanley, August 1, 2022
- Morgan Stanley, August 10, 2022
- UBS, September 6, 2022
- J.P. Morgan, September 12, 2022
- Piper Sandler, September 30, 2022
- J.P. Morgan, October 10, 2022
- Jefferies, October 11, 2022
- Morgan Stanley, October 12, 2022
- Evercore ISI, October 19, 2022
- Evercore ISI, November 3, 2022 (2 reports)
- Piper Sandler, November 3, 2022 (2 reports)
- UBS, November 3, 2022
- J.P. Morgan, November 4, 2022
- Morgan Stanley, November 10, 2022
- UBS, January 5, 2023
- Jefferies, January 10, 2023
- Piper Sandler, January 10, 2023
- J.P. Morgan, January 17, 2023
- Evercore ISI, January 26, 2023
- Jefferies, January 26, 2023
- J.P. Morgan, January 26, 2023
- Piper Sandler, January 26, 2023 (3 reports)
- UBS, January 26, 2023
- Citi, January 27, 2023
- Evercore ISI, January 27, 2023

# Appendix C

- Jefferies, January 27, 2023
- Morgan Stanley, January 27, 2023
- UBS, January 30, 2023
- Credit Suisse, March 20, 2023
- Citi, April 4, 2023
- CapitalCube, April 10, 2023
- Jefferies, April 11, 2023
- Morgan Stanley, April 11, 2023
- Citi, April 20, 2023
- Evercore ISI, April 20, 2023
- Goldman Sachs, April 20, 2023
- Jefferies, April 20, 2023
- J.P. Morgan, April 20, 2023
- Piper Sandler, April 20, 2023 (2 reports)
- UBS, April 20, 2023
- Morgan Stanley, April 24, 2023
- UBS, April 24, 2023
- Piper Sandler, May 4, 2023
- Piper Sandler, June 11, 2023
- Citi, July 6, 2023
- J.P. Morgan, July 12, 2023
- UBS, July 12, 2023
- Goldman Sachs, July 19, 2023
- Evercore ISI, July 23, 2023
- Citi, July 26, 2023 (2 reports)
- Evercore ISI, July 26, 2023 (2 reports)
- Piper Sandler, July 26, 2023
- UBS, July 26, 2023 (2 reports)
- J.P. Morgan, July 27, 2023
- Morgan Stanley, July 27, 2023
- Piper Sandler, July 30, 2023

# Appendix C

- UBS, August 1, 2023

- Vermilion Technical Research, August 18, 2023

- Citi, September 13, 2023

- Piper Sandler, September 13, 2023

- Citi, September 14, 2023

- Washington Analysis, September 14, 2023

- CFRA Policy Research, September 15, 2023

**Laws, Regulations, Policies, and Rules**

- "Payment for Order Flow," Federal Register Release No. 34-34902, November 2, 1994, available at https://www.govinfo.gov/content/pkg/FR-1994-11-02/html/94-27109.htm

**Expert Reports**

- Expert Report of Matthew D. Cain, October 22, 2025, *In re Virtu Financial, Inc. Securities Litigation*, with backup materials

**Legal Documents**

- Amended Complaint, *Securities and Exchange Commission v. Virtu Financial Inc. and Virtu Americas LLC*, January 12, 2024

- Complaint, *Securities and Exchange Commission v. Virtu Financial Inc. and Virtu Americas LLC*, September 12, 2023

- Consolidated Complaint for Violations of the Federal Securities Laws, *In re Virtu Financial, Inc. Securities Litigation*, January 22, 2024

- Memorandum and Order, *In re Virtu Financial, Inc. Securities Litigation*, March 17, 2025

- Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order, *In re ITG Inc. and AlterNet Securities, Inc.*, August 12, 2015

- Order Instituting Administrative and Cease-and-Desist Proceedings, Pursuant to 8A of the Securities Act of 1933, and Sections 15(b) and 21C of the Securities Exchange Act of 1934, Making Findings and Imposing Remedial Sanctions and a Cease-and-Desist Order, *In re ITG Inc. and AlterNet Securities, Inc.*, November 7, 2018

**Data Sources**

- *Bloomberg*

# Appendix C

- *CRSP*

- *Factiva*

- *LSEG Workspace*

- *Tick*

**Depositions**

- Deposition of Matthew D. Cain, December 9, 2025, *In re Virtu Financial, Inc. Securities Litigation*

**Conference and Earnings Calls and Presentations**

- Transcripts and Conference Call Presentations Available from *LSEG* for Conference Calls Held by Virtu Financial, Inc. between February 2, 2017 (Q4 2016 Earnings Call) and November 2, 2023 (Q3 2023 Earnings Call)

- "Q2 2016 Virtu Financial Inc Earnings Call – Edited Transcript," *Thomson Reuters*, August 3, 2016

- "KCG Holdings, Inc., Virtu Financial, Inc. - M&A Call – Edited Transcript," *Thompson Reuters*, April 20, 2017

- "Virtu Financial Agrees to Acquire KCG Holdings," Conference Call Presentation, *Virtu Financial, Inc.,* April 20, 2017

- "Virtu Financial, Inc. Completes Acquisition of KCG Holdings, Inc.," Conference Call Presentation, *Virtu Financial, Inc.,* July 20, 2017

- "Virtu Enters into Definitive Agreement to Acquire ITG," Conference Call Presentation, *Virtu Financial, Inc.*, November 7, 2018

- "Virtu Financial Inc at Sandler O'Neill Global Exchange and Brokerage Conference," *Thomson Reuters*, June 5, 2019

**SEC Filings**

- Virtu Financial, Inc., SEC Forms 10-K filed between March 25, 2016 (FY 2015) and February 16, 2024 (FY 2023)

- Virtu Financial, Inc., SEC Forms 10-Q filed between May 13, 2016 (Q1 2016) and November 2, 2023 (Q3 2023)

- Virtu Financial, Inc., SEC Forms 8-K, Exhibit 99.1 with earnings press releases filed between May 4, 2017 (Q1 2017) and November 2, 2023 (Q3 2023)

- Virtu Financial, Inc., Form S-1, filed November 6, 2015

# Appendix C

- KCG Holdings, Inc., "Virtu Financial, Inc. Agrees to Acquire KCG Holdings, Inc. to Create a Premier Market Maker and Agency Execution Firm," Form 8-K, filed April 20, 2017, Exhibit 99.2

- Virtu Financial, Inc., "Virtu Financial, Inc. Agrees to Acquire ITG, a Leading Provider of Agency Execution Services and Trading Analytics," Form 8-K, filed November 7, 2018, Exhibit 99.1

- Virtu Financial, Inc., "Virtu Financial Provides an Update on Ongoing SEC Matter," Form 8-K, filed September 12, 2023, Exhibit 99.1


**Press Releases**

- ITG Press Release, "ITG Agrees to be Acquired by Virtu Financial, Inc. for $30.30 per Share, Also Reports Third Quarter 2018 Results," November 7, 2018, available at https://www.globenewswire.com/news-release/2018/11/07/1646761/1657/en/ITG-Agrees-to-be-Acquired-by-Virtu-Financial-Inc-for-30-30-per-Share.html

- SEC Press Release, "SEC Charges ITG With Operating Secret Trading Desk and Misusing Dark Pool Subscriber Trading Information," August 12, 2015, available at https://www.sec.gov/newsroom/press-releases/2015-164

- SEC Press Release, "SEC Charges ITG With Misleading Dark Pool Subscribers," November 7, 2018, available at https://www.sec.gov/newsroom/press-releases/2018-256

- SEC Press Release, "Prepared Remarks at the Global Exchange and FinTech Conference," June 9, 2021, available at https://www.sec.gov/newsroom/speeches-statements/gensler-global-exchange-fintech-2021-06-09

- SEC Press Release, "'Market Structure and the Retail Investor:' Remarks Before the Piper Sandler Global Exchange Conference," June 8, 2022, available at https://www.sec.gov/newsroom/speeches-statements/gensler-remarks-piper-sandler-global-exchange-conference-060822

- SEC Press Release, "SEC Proposes Regulation Best Execution," December 14, 2022, available at https://www.sec.gov/newsroom/press-releases/2022-226

- SEC Press Release, "SEC Proposes Rule to Enhance Competition for Individual Investor Order Execution," December 14, 2022, available at https://www.sec.gov/newsroom/press-releases/2022-225

- SEC Press Release, "SEC Charges Virtu for False and Misleading Disclosures Relating to Information Barriers," September 12, 2023, available at https://www.sec.gov/newsroom/press-releases/2023-176

- Virtu Press Release, "Virtu Financial, Inc. Agrees to Acquire KCG Holdings, Inc. to Create a Premier Market Maker and Agency Execution Firm," April 20, 2017, available at https://www.globenewswire.com/news-release/2017/04/20/962583/0/en/Virtu-Financial-Inc-Agrees-to-Acquire-KCG-Holdings-Inc-to-Create-a-Premier-Market-Maker-and-Agency-Execution-Firm.html

# Appendix C

- Virtu Press Release, "Virtu Provides Update Regarding Acquisition of ITG," January 25, 2019, available at https://ir.virtu.com/news-releases/news-release-details/virtu-provides-update-regarding-acquisition-itg

- Virtu Press Release, "Virtu Financial, Inc. Completes Acquisition of ITG to Create Premier Agency and Broker Neutral Franchise," March 1, 2019, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-inc-completes-acquisition-itg-create-premier

- Virtu Press Release, "Virtu Financial Announces Commencement of Lawsuit Against the Securities and Exchange Commission to Compel Compliance with Freedom of Information Act Request," November 29, 2022, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-announces-commencement-lawsuit-against

- Virtu Press Release, "Virtu Financial Provides an Update on Ongoing SEC Matter," *Virtu Financial, Inc.*, September 12, 2023, available at https://ir.virtu.com/news-releases/news-release-details/virtu-financial-provides-update-ongoing-sec-matter

**Public Press Articles**

- All public press articles available from *Factiva* for Virtu Financial, Inc. (VIRT) for the following dates:  February 17, 2023 – February 21, 2023, April 28, 2023 – May 4, 2023, July 28, 2023 – July 31, 2023, and September 12, 2023 – September 18, 2023

- "SEC Proposes Biggest Trading Reforms in Decades," *Barrons*, December 14, 2022

- "SEC Sues Virtu Financial for Failing to Safeguard Customer Information," *Reuters News*, September 12, 2023

- "Trader Virtu Seeks to Erase Its 'Bogeyman' Image in ITG Takeover," *Bloomberg*, November 14, 2018

- "Virtu Financial Makes Bid to Acquire KCG Holdings," *Wall Street Journal*, March 15, 2017

- "Virtu Is Pursuing Takeover of Investment Technology Group," *Bloomberg*, October 4, 2018

- "Virtu Is Said to Pursue Takeover of Investment Technology Group," *Bloomberg*, October 4, 2018

- "Virtu Shares Fall After Firm Reports Settlement Talks Over SEC Probe," *Bloomberg Law*, April 28, 2023

- "Virtu Stock Drops on SEC Chairman's Comments," *Dow Jones Institutional News*, June 9, 2021

- "Virtu Stock Falls After Disclosure of Potential SEC Enforcement Action," *The Wall Street Journal*, May 1, 2023

- "Virtu to Handle One-Fifth of US Equity Trades After KCG Deal," *Financial Times*, April 20, 2017

# Appendix C

- "Wall Street Is Worried That a $1 Billion Acquisition Will Allow Virtu to Spy on Clients, But the Firm Has a Big Plan to Quell Those Anxieties," *Business Insider*, November 14, 2018, available at: https://web.archive.org/web/20181114235007/https://www.businessinsider.com/virtus-acquisition-of-itg-interview-2018-11

**Websites**

- "NYSE® Arca Securities Broker Dealer Index™ (XBD)," *NYSE*, April 30, 2018, available at https://www.ice.com/publicdocs/data/NYSE_Arca_Broker_Dealer_Index_Methodology.pdf

- "SEC Obtains Final Consent Judgment as to Virtu Broker-Dealer Regarding Alleged Failure to Establish, Maintain, and Enforce Policies and Procedures Reasonably Designed to Prevent Misuse of Its Customers' Material Nonpublic Information," *SEC*, December 3, 2023, available at https://www.sec.gov/enforcement-litigation/litigation-releases/lr-26427

- "Testimony of Gary Gensler Chair, Securities and Exchange Commission Before the House Committee on Financial Services," *United States House of Representatives*, May 6, 2021, available at https://docs.house.gov/meetings/BA/BA00/20210506/112590/HHRG-117-BA00-Wstate-GenslerG-20210506.pdf

- "The World's Most Influential Scientific Minds," *Thomson Reuters*, December 2015, available at https://www.ludwigcancerresearch.org/wp-content/uploads/2018/09/37a987a9-e378-4888-8baa-d4ba20efdbfd_tr_scientific_minds_online_final.pdf

- "To Our Valued Clients," *Virtu Financial*, March 1, 2019, available at https://www.virtu.com/our-commitment/

- "Where Mergers Go Wrong," *McKinsey Quarterly*, May 1, 2004, available at https://www.mckinsey.com/capabilities/strategy-and-corporate-finance/our-insights/where-mergers-go-wrong

**Note:  In addition to the documents on this list, I considered all documents cited in my report and my exhibits to form my opinions.**

# Appendix D

### I.      Overview

1.       As described in this appendix, I have reviewed the alleged misrepresentations that were purportedly made during the Proposed Class Period after November 7, 2018 that were not associated with positive and statistically significant residual returns.  That is, after controlling for market and industry factors, Virtu's stock return cannot be reliably distinguished from normal volatility and random fluctuations in Virtu's stock price on a daily basis.

2.       As discussed below, the alleged misrepresentations addressed topics that were the subject of prior Company disclosures.  To the extent the specific disclosures differed from prior Company statements, securities analysts did not comment on the alleged misrepresentations. Thus, I conclude that there was no new, value-relevant information contained in the alleged misrepresentations.

3.       Based on this analysis, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to these alleged misrepresentations.  Note that I discuss only the alleged misrepresentations that I understand from Counsel remain actionable following the Order on Motion to Dismiss.[1]

### II.      November 8, 2018

4.       On this day, after market hours at 4:29 PM ET, Virtu filed its Q3 2018 Form 10-Q.[2] Plaintiff alleges that the following statement represents an alleged misrepresentation:

> [M]any factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including but not limited to . . . [the] failure to maintain system security or otherwise maintain confidential and proprietary information[.][3]

---

[1] Order on Motion to Dismiss, pp. 10–11.
[2] Virtu Financial, Inc., Q3 2018 Form 10-Q, November 8, 2018.
[3] Consolidated Complaint, ¶ 111 (internal quotation marks and emphasis omitted); Motion to Dismiss, Exhibit 1.

# Appendix D

5.     This alleged misrepresentation represents an exact repetition of the statements made by the Company in its S-1 registration statement filed on November 6, 2015 and in subsequent SEC filings.[4]  Based on my review of analyst reports published following the alleged misrepresentation,[5] securities analysts did not comment on the alleged misrepresentation, consistent with a lack of new, value-relevant information contained in the alleged misrepresentation.

6.     The residual return on November 9, 2018, the first trading day following the alleged misrepresentation on November 8, 2018, was -1.73%, which is not statistically significant at the 95% confidence level.[6]

7.     Based on the above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to this alleged misrepresentation.


## III.     November 14, 2018

8.     On this day, before and during market hours, *Bloomberg* and *Business Insider* published articles quoting interviews conducted with Mr. Cifu, Virtu's CEO.[7]  Plaintiff alleges that the following statements contained within these articles represent alleged misrepresentations:

> If you're upfront about things and transparent about how you do things, not only does it eliminate the bogeyman factor, it's the best sales pitch we have.[8]

---

[4] Virtu Financial, Inc., Form S-1, filed November 6, 2015, p. 60 ("[M]any factors could affect our actual our actual financial results or results of operations and could cause actual results to differ materially from those in such forward-looking statements, including but not limited to . . . [the] failure to maintain system security or otherwise maintain confidential and proprietary information."). *See also, e.g.,* Virtu Financial, Inc., 2015 Form 10-K, March 25, 2016, p. 3–4.

[5] I have reviewed analyst reports within one week of each alleged misrepresentation.  For November 8, 2018, I reviewed November 8, 2018 – November 15, 2018.

[6] **Exhibit 2**.

[7] "Trader Virtu Seeks to Erase Its 'Bogeyman' Image in ITG Takeover," *Bloomberg Law*, November 14, 2018, 5:00 AM ET; "Wall Street is Worried that a $1 Billion Acquisition Will Allow Virtu to Spy on Clients, But the Firm Has a Big Plan to Quell Those Anxieties," *Business Insider*, November 14, 2018, 2:44 PM ET, available at: https://web.archive.org/web/20181114235007/https://www.businessinsider.com/virtus-acquisition-of-itg-interview-2018-11.

[8] Consolidated Complaint, ¶ 113 (emphasis removed); Motion to Dismiss, Exhibit 1.

# Appendix D

> I can't overstate how important it is to me personally that client information is properly protected.[9]

> [W]e're talking to the buy-side about establishing a client data governance committee . . . The committee concept is an extension of our history of always pushing for more transparency and using technology to deliver more transparency.  This is a good thing – no other firm gives this much transparency to its clients into how their information is protected.[10]

9.     As discussed previously in **Section VI.A.1** of my report with respect to November 7, 2018, the Company had previously made disclosures regarding the importance of safeguarding confidential information, on established policies and procedures to protect client information, and on Virtu being "transparent."  To the extent these specific alleged misrepresentations do not exactly replicate prior Company statements, based on my review of analyst reports published following the alleged misrepresentations,[11] securities analysts did not comment on the alleged misrepresentations, which is consistent with a lack of new, value-relevant information contained in the alleged misrepresentations.

10.    The residual return on November 14, 2018 was 0.04%, which is not statistically significant at the 95% confidence level.[12]

11.    Based on the above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to these alleged misrepresentations.

## IV.     March 1, 2019

12.    On this day, Virtu posted a letter to its clients on its website.[13]  Also on the same day, after market hours at 5:14 PM ET, Virtu filed its 2018 Form 10-K.[14]  Plaintiff alleges that the following statements contained in those documents represent alleged misrepresentations:

---

[9] Consolidated Complaint, ¶ 117 (emphasis removed); Motion to Dismiss, Exhibit 1.

[10] "Wall Street is Worried that a $1 Billion Acquisition Will Allow Virtu to Spy on Clients, But the Firm has a Big Plan to Quell Those Anxieties," *Business Insider*, November 17, 2018; Consolidated Complaint, ¶ 117 (emphasis removed); Motion to Dismiss, Exhibit 1.

[11] I have reviewed analyst reports within one week of each alleged misrepresentation.  For November 14, 2018, I reviewed November 14, 2018 – November 21, 2018.

[12] **Exhibit 2**.

[13] Consolidated Complaint, ¶ 126; Motion to Dismiss, Exhibit 1.

[14] Virtu Financial, Inc., 2018 Form 10-K, March 1, 2019.

# Appendix D

> [M]any factors . . . could affect our actual financial results or results of operations and cash flows, and could cause actual results to differ materially from those in such forward-looking statements, including, but not limited to . . . [the] failure to protect confidential and proprietary information.[15]
>
> Prior to merging, both Virtu and ITG each maintained our own procedures to segregate and protect sensitive client data.[16]

13.     As discussed previously in **Section VI.A.1** of my report with respect to November 7, 2018, the Company had previously made disclosures regarding the importance of safeguarding confidential information and on established policies and procedures to protect client information. To the extent these specific alleged misrepresentations do not exactly replicate prior Company statements, based on my review of analyst reports published following the alleged misrepresentations,[17] securities analysts did not comment on the alleged misrepresentations, which is consistent with a lack of new, value-relevant information contained in the alleged misrepresentations.

14.     The residual return on March 1, 2019, the day of the alleged misrepresentation, was 1.01%, which is not statistically significant at the 95% level.[18]  The residual return on March 4, 2019, the first trading day following the publication of the 10-K, was 0.42%, which is also not statistically significant at the 95% confidence level.[19]

15.     Based on the above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to these alleged misrepresentations.

---

[15] Consolidated Complaint, ¶ 129; Motion to Dismiss, Exhibit 1.
[16] Consolidated Complaint, ¶ 126; Motion to Dismiss, Exhibit 1.
[17] I have reviewed analyst reports within one week of each alleged misrepresentation.  For March 1, 2019, I reviewed March 1, 2019 – March 8, 2019.
[18] I have not identified the time of the letter based on publicly available sources.  I examined residual returns on both March 1, 2019 and March 4, 2019.
[19] **Exhibit 2**.

# Appendix D

## V.    March 13, 2019

16.    On this day, before market hours at 6:02 AM, Virtu released a presentation as an attachment to a Form 8-K.[20]  Plaintiff alleges that the following statement represents an alleged misrepresentation:

> Virtu has established policies and procedures designed to safeguard sensitive client information including [p]hysical and logical safeguards of client information.[21]

17.    As discussed previously in **Section VI.A.1** of my report with respect to November 7, 2018, the Company had previously made disclosures regarding established policies and procedures to protect client information.  To the extent this specific alleged misrepresentation does not exactly replicate prior Company statements, based on my review of analyst reports published following the alleged misrepresentation,[22] securities analysts did not comment on the alleged misrepresentation, which is consistent with a lack of new, value-relevant information contained in the alleged misrepresentation.

18.    The residual return on March 13, 2019 was -0.57%, which is not statistically significant at the 95% confidence level.[23]

19.    Based on the above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to this alleged misrepresentation.

## VI.    May 3, 2019

20.    On this day, before market hours at 7:00 AM ET, Virtu held its Q1 2019 earnings call.[24] Plaintiff alleges that the following statement made on the call represented an alleged misrepresentation:

---

[20] Virtu Financial, Inc., "Virtu Financial A Global Leader in Market Making and Execution Services," Form 8-K filed March 13, 2019, Exhibit 99.1.

[21] Consolidated Complaint, ¶ 131–132 (internal quotation marks omitted); Motion to Dismiss, Exhibit 1.

[22] I have reviewed analyst reports within one week of each alleged misrepresentation.  For March 13, 2019, I reviewed March 13, 2019 – March 20, 2019.

[23] **Exhibit 2**.

[24] Q1 2019 Virtu Financial Inc Earnings Call, May 3, 2019, 7:00 AM ET.

# Appendix D

> Also, as you may recall, when the deal was announced, we promised to provide unparalleled transparency into how we protect client information.[25]

21.     As discussed previously in **Section VI.A.1** of my report with respect to November 7, 2018, the Company had previously made disclosures regarding Virtu being "transparent." To the extent this specific alleged misrepresentation does not exactly replicate prior Company statements, based on my review of analyst reports published following the alleged misrepresentation,[26] securities analysts did not comment on the alleged misrepresentation, which is consistent with a lack of new, value-relevant information contained in the alleged misrepresentation.

22.     The stock price declined on May 3, 2019, with residual return of -3.82%, which is statistically significant at the 95% confidence level.[27]

23.     Based on the above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to this alleged misrepresentation.

## VII.     June 5, 2019

24.     On this day, starting at 4:00 PM ET, after market hours, Mr. Cifu, Virtu's CEO, spoke at the Sandler O'Neill Global Exchange and Brokerage Conference.[28] Plaintiff alleges that the following statements made in response to an analyst question represented an alleged misrepresentation:

> The large asset managers and the fashion forward, if you will, hedge funds and others and quant firms that kind of understand what we are and recognize we didn't buy ITG to steal customer information. It's kind of

---

[25] Consolidated Complaint, ¶¶ 133–134 (internal quotation marks omitted); Motion to Dismiss, Exhibit 1.

[26] I have reviewed analyst reports within one week of each alleged misrepresentation. For May 3, 2019, I reviewed May 3, 2019 – May 10, 2019.

[27] **Exhibit 2**.

[28] "Virtu Financial Inc at Sandler O'Neill Global Exchange and Brokerage Conference," *Thomson Reuters*, June 5, 2019, 4:00 PM ET.

# Appendix D

preposterous and borderline insulting to suggest we would do that.  We
would never do that.[29]

25.     As discussed previously in **Section VI.A.1** of my report with respect to November 7,

2018, the Company had previously made disclosures regarding the importance of safeguarding

confidential information.  To the extent this specific alleged misrepresentation does not exactly

replicate prior Company statements, based on my review of analyst reports published following

the alleged misrepresentation,[30] securities analysts did not comment on the alleged

misrepresentation, which is consistent with a lack of new, value-relevant information contained

in the alleged misrepresentation.

26.     The residual return on June 6, 2019, the first trading day following the alleged

misrepresentation June 5, 2019, was -1.26%, which is not statistically significant at the 95%

confidence level.[31]

27.     Based on the above, I conclude that there is no reliable economic evidence that Virtu's

stock price increased in response to this alleged misrepresentation.

## VIII.   Days Associated with Virtu Form 10-Q and 10-K Filings

28.     Plaintiff alleges that the following statements contained within certain of Virtu's Form

10-Q and 10-K filings represent alleged misrepresentations: [32]

> [M]any factors . . . could affect our actual financial results or results of
> operations and cash flows, and could cause actual results to differ
> materially from those in such forward-looking statements, including, but

---

[29] Consolidated Complaint, ¶¶ 137–138 (emphasis removed); Motion to Dismiss, Exhibit 1.

[30] I have reviewed analyst reports within one week of each alleged misrepresentation.  For June 5, 2019, I reviewed June 5, 2019 – June 12, 2019.

[31] **Exhibit 2**.

[32] Virtu Financial, Inc., Q1 2019 Form 10-Q, May 10, 2019; Virtu Financial, Inc., Q2 2019 Form 10-Q, August 9, 2019; Virtu Financial, Inc., Q3 2019 Form 10-Q, November 8, 2019; Virtu Financial, Inc., Q1 2020 Form 10-Q, May 11, 2020; Virtu Financial, Inc., Q2 2020 Form 10-Q, August 7, 2020; Virtu Financial, Inc., 2020 Form 10-K, February 25, 2021; Virtu Financial, Inc., Q1 2021 Form 10-Q, May 7, 2021; Virtu Financial, Inc., Q2 2021 Form 10-Q, August 4, 2021; Virtu Financial, Inc., 2021 Form 10-K, February 18, 2022; Virtu Financial, Inc., Q1 2022 Form 10-Q, May 3, 2022; Virtu Financial, Inc., Q2 2022 Form 10-Q, August 2, 2022; Virtu Financial, Inc., Q3 2022 Form 10-Q, November 3, 2022; Virtu Financial, Inc., 2022 Form 10-K, February 17, 2023; Virtu Financial, Inc., Q1 2023 Form 10-Q, April 28, 2023; Virtu Financial, Inc., Q2 2023 Form 10-Q, July 28, 2023.

# Appendix D

not limited to . . . [the] failure to protect confidential and proprietary information.[33]

29.    These alleged misrepresentations represent an exact repetition of one of the prior alleged misrepresentations made by the Company on March 1, 2019.[34]  I have also reviewed the analyst reports following the alleged misrepresentations on these days and have found no commentary on the alleged misrepresentations from analysts,[35] consistent with a lack of new, value-relevant information contained in the alleged misrepresentations.

---

[33] Consolidated Complaint, ¶¶ 135–150 (internal quotation marks omitted); Motion to Dismiss, Exhibit 1.
[34] Virtu Financial, Inc., 2018 Form 10-K, March 1, 2019.
[35] I have reviewed analyst reports within one week of each alleged misrepresentation.

# Appendix D

30.   I summarize the residual returns on these days below.[36]

| Date | Impact Date | Event Description | Residual Return | Significant at 95% Confidence Level |
|------|-------------|-------------------|-----------------|-------------------------------------|
| 5/10/19 | 5/10/19 | Q1 2019 Form 10-Q | -1.84% | |
| 8/9/19 | 8/12/19 | Q2 2019 Form 10-Q | -0.30% | |
| 11/8/19 | 11/11/19 | Q3 2019 Form 10-Q | 0.82% | |
| 5/11/20 | 5/12/20 | Q1 2020 Form 10-Q | -1.99% | |
| 8/7/20 | 8/10/20 | Q2 2020 Form 10-Q | -4.32% | |
| 2/25/21 | 2/25/21 | 2020 Form 10-K | 5.28% | |
| 5/7/21 | 5/7/21 | Q1 2021 Form 10-Q | -2.07% | |
| 8/4/21 | 8/4/21 | Q2 2021 Form 10-Q | -4.90% | ✔ |
| 2/18/22 | 2/22/22 | 2021 Form 10-K | -0.45% | |
| 5/3/22 | 5/4/22 | Q1 2022 Form 10-Q | 1.67% | |
| 8/2/22 | 8/2/22 | Q2 2022 Form 10-Q | 0.44% | |
| 11/3/22 | 11/3/22 | Q3 2022 Form 10-Q | 1.53% | |
| 2/17/23 | 2/21/23 | 2022 Form 10-K | -0.45% | |
| 4/28/23 | 5/1/23 | Q1 2023 Form 10-Q | -3.42% | |
| 7/28/23 | 7/31/23 | Q2 2023 Form 10-Q | -1.88% | |

31.   Based on the above, I conclude that there is no reliable economic evidence that Virtu's stock price increased in response to the alleged misrepresentations in its 10-Q and 10-K filings.[37]

---

[36] For alleged misrepresentations, impact dates are based on the timestamp associated with the alleged misrepresentation's source.  If the source was published after market hours, the impact date is assumed to be the following trading day.  Residual returns are based on my event study analysis described in **Section V** of my report.

[37] Note that I discuss the disclosures on February 28, 2020, November 6, 2020 and November 3, 2021, which were followed by positive and statistically significant returns above in **Section VI.B** of my report.

**Exhibit 1**

# Virtu Financial, Inc.
# Summary of Event Study Regression Results[1]

| Impact Date[2] | Category[3] | Intercept Coefficient[4] | P-value | Market Index Coefficient[4] | P-value | Industry Index Coefficient[4] | P-value | Adjusted $R^2$ |
|---|---|---|---|---|---|---|---|---|
| 11/7/18 | Alleged Misrepresentation | -0.001 | 0.811 | -1.057 | 0.153 | 0.835 | 0.084 | 0.040 |
| 11/9/18 | Alleged Misrepresentation | -0.001 | 0.778 | -1.023 | 0.166 | 0.809 | 0.093 | 0.036 |
| 11/14/18 | Alleged Misrepresentation | 0.000 | 0.910 | -1.081 | 0.137 | 0.850 | 0.078 | 0.041 |
| 2/7/19 | Alleged Misrepresentation | 0.002 | 0.233 | -0.868 * | 0.049 | 0.954 * | 0.011 | 0.105 |
| 3/1/19 | Alleged Misrepresentation | 0.001 | 0.522 | -0.849 | 0.058 | 0.929 * | 0.015 | 0.097 |
| 3/4/19 | Alleged Misrepresentation | 0.001 | 0.522 | -0.849 | 0.058 | 0.929 * | 0.015 | 0.097 |
| 3/13/19 | Alleged Misrepresentation | 0.001 | 0.543 | -0.835 | 0.064 | 0.932 * | 0.016 | 0.101 |
| 5/3/19 | Alleged Misrepresentation | 0.000 | 0.907 | -0.192 | 0.444 | 0.434 * | 0.044 | 0.043 |
| 5/10/19 | Alleged Misrepresentation | 0.000 | 0.744 | -0.186 | 0.469 | 0.405 | 0.061 | 0.035 |
| 6/6/19 | Alleged Misrepresentation | -0.001 | 0.647 | -0.418 | 0.134 | 0.476 * | 0.026 | 0.030 |
| 8/12/19 | Alleged Misrepresentation | -0.001 | 0.404 | -2.270 * | 0.007 | 1.012 * | 0.003 | 0.188 |
| 11/11/19 | Alleged Misrepresentation | -0.002 | 0.247 | -2.024 * | 0.008 | 1.188 * | 0.000 | 0.153 |
| 3/2/20 | Alleged Misrepresentation | 0.000 | 0.976 | -0.702 | 0.064 | 0.630 * | 0.003 | 0.042 |
| 5/12/20 | Alleged Misrepresentation | 0.004 | 0.160 | -0.101 | 0.821 | 0.175 | 0.612 | 0.000 |
| 8/10/20 | Alleged Misrepresentation | 0.002 | 0.362 | 0.151 | 0.638 | -0.026 | 0.912 | -0.004 |
| 11/6/20 | Alleged Misrepresentation | 0.000 | 0.956 | 0.368 | 0.369 | -0.111 | 0.574 | -0.001 |
| 2/25/21 | Alleged Misrepresentation | 0.000 | 0.992 | 0.423 | 0.363 | -0.096 | 0.688 | 0.002 |
| 5/7/21 | Alleged Misrepresentation | 0.001 | 0.475 | 0.698 | 0.071 | -0.230 | 0.354 | 0.022 |
| 8/4/21 | Alleged Misrepresentation | -0.001 | 0.445 | 0.556 | 0.078 | 0.085 | 0.690 | 0.070 |
| 11/3/21 | Alleged Misrepresentation | 0.000 | 0.957 | -0.436 | 0.164 | 0.559 * | 0.008 | 0.078 |
| 2/22/22 | Alleged Misrepresentation | 0.002 | 0.217 | -0.304 | 0.287 | 0.416 | 0.058 | 0.032 |
| 5/4/22 | Alleged Misrepresentation | 0.001 | 0.608 | -0.105 | 0.739 | 0.329 | 0.086 | 0.034 |
| 8/2/22 | Alleged Misrepresentation | -0.002 | 0.288 | -0.075 | 0.762 | 0.462 * | 0.009 | 0.143 |
| 11/3/22 | Alleged Misrepresentation | -0.002 | 0.143 | -0.031 | 0.863 | 0.622 * | 0.000 | 0.317 |
| 2/21/23 | Both | -0.002 | 0.332 | 0.041 | 0.846 | 0.651 * | 0.005 | 0.207 |
| 5/1/23 | Both | -0.001 | 0.648 | 0.170 | 0.502 | 0.365 | 0.125 | 0.105 |
| 5/2/23 | Alleged Corrective Disclosure | -0.001 | 0.648 | 0.170 | 0.502 | 0.365 | 0.125 | 0.105 |
| 5/3/23 | Alleged Corrective Disclosure | -0.001 | 0.648 | 0.170 | 0.502 | 0.365 | 0.125 | 0.105 |

**Exhibit 1**

# Virtu Financial, Inc.
# Summary of Event Study Regression Results[1]

| Impact Date[2] | Category[3] | Intercept Coefficient[4] | P-value | Market Index Coefficient[4] | P-value | Industry Index Coefficient[4] | P-value | Adjusted $R^2$ |
|---|---|---|---|---|---|---|---|---|
| 5/4/23 | Alleged Corrective Disclosure | -0.001 | 0.648 | 0.170 | 0.502 | 0.365 | 0.125 | 0.105 |
| 7/31/23 | Both | 0.001 | 0.620 | 0.167 | 0.416 | 0.446 * | 0.015 | 0.179 |
| 9/13/23 | Alleged Corrective Disclosure | 0.002 | 0.210 | 0.047 | 0.807 | 0.462 * | 0.002 | 0.153 |
| 9/14/23 | Alleged Corrective Disclosure | 0.002 | 0.210 | 0.047 | 0.807 | 0.462 * | 0.002 | 0.153 |
| 9/15/23 | Alleged Corrective Disclosure | 0.002 | 0.210 | 0.047 | 0.807 | 0.462 * | 0.002 | 0.153 |
| 9/18/23 | Alleged Corrective Disclosure | 0.002 | 0.210 | 0.047 | 0.807 | 0.462 * | 0.002 | 0.153 |

Source: *Bloomberg*; *CRSP*; *LSEG Workspace*; Bloomberg Law; Business Insider; Consolidated Complaint; Order on Motion to Dismiss; SEC Edgar

Note:
[1] The regression model uses: (i) the CRSP NYSE/AMEX/NASDAQ/Arca Value-Weighted Index as the market index, (ii) the NYSE Arca Securities Broker/Dealer Index (reconstructed to exclude Virtu) as the industry index, and (iii) an estimation window of 120 trading days prior to the prediction date after excluding impact dates of alleged corrective disclosures and alleged misrepresentations that were not dismissed following the Order on Motion to Dismiss. All returns used in the regressions are dividend-adjusted.
[2] For alleged corrective disclosures, impact dates are based on the Consolidated Complaint. For alleged misrepresentations, impact dates are based on the timestamp associated with the alleged misrepresentation's source. If the source was published after market hours, the impact date is assumed to be the following trading day. For March 1, 2019 disclosures, both March 1, 2019 and March 4, 2019 (the following trading day) were assumed to be the impact dates.
[3] Categories are assigned based on the Consolidated Complaint.
[4] Coefficients marked with a single asterisk (*) are statistically significant at the 5% level using a two-tailed test.

**Exhibit 2**

# Virtu Financial, Inc.
# Summary of Residual Returns[1]

| Impact Date[2] | Category[3] | Virtu Total Return | Market Index Total Return[4] | Industry Index Total Return[5] | Residual Return[6] | Residual P-value[7] |
|---|---|---|---|---|---|---|
| 11/7/18 | Alleged Misrepresentation | 3.86% | 1.93% | 2.11% | 4.18% | 0.102 |
| 11/9/18 | Alleged Misrepresentation | -2.04% | -0.97% | -1.52% | -1.73% | 0.493 |
| 11/14/18 | Alleged Misrepresentation | -0.24% | -0.66% | -1.13% | 0.04% | 0.987 |
| 2/7/19 | Alleged Misrepresentation | 4.78% | -0.88% | -1.38% | 5.13% * | 0.007 |
| 3/1/19 | Alleged Misrepresentation | 1.79% | 0.61% | 1.28% | 1.01% | 0.601 |
| 3/4/19 | Alleged Misrepresentation | -0.27% | -0.42% | -1.25% | 0.42% | 0.826 |
| 3/13/19 | Alleged Misrepresentation | -0.39% | 0.64% | 0.66% | -0.57% | 0.761 |
| 5/3/19 | Alleged Misrepresentation | -3.17% | 1.09% | 2.02% | -3.82% * | 0.024 |
| 5/10/19 | Alleged Misrepresentation | -1.74% | 0.41% | 0.31% | -1.84% | 0.267 |
| 6/6/19 | Alleged Misrepresentation | -1.03% | 0.51% | 1.08% | -1.26% | 0.438 |
| 8/12/19 | Alleged Misrepresentation | -0.06% | -1.20% | -2.32% | -0.30% | 0.884 |
| 11/11/19 | Alleged Misrepresentation | 0.62% | -0.16% | -0.28% | 0.82% | 0.706 |
| 3/2/20 | Alleged Misrepresentation | 4.57% | 4.03% | 4.31% | 4.68% * | 0.038 |
| 5/12/20 | Alleged Misrepresentation | -2.01% | -2.04% | -3.41% | -1.99% | 0.493 |
| 8/10/20 | Alleged Misrepresentation | -4.03% | 0.27% | -0.08% | -4.32% | 0.155 |
| 11/6/20 | Alleged Misrepresentation | 7.52% | 0.00% | -1.47% | 7.34% * | 0.008 |
| 2/25/21 | Alleged Misrepresentation | 4.39% | -2.66% | -2.48% | 5.28% | 0.065 |
| 5/7/21 | Alleged Misrepresentation | -1.40% | 0.87% | 0.33% | -2.07% | 0.317 |
| 8/4/21 | Alleged Misrepresentation | -5.23% | -0.40% | 0.12% | -4.90% * | 0.007 |
| 11/3/21 | Alleged Misrepresentation | 10.12% | 0.73% | 0.82% | 9.98% * | 0.000 |
| 2/22/22 | Alleged Misrepresentation | -0.48% | -1.12% | -1.35% | -0.45% | 0.791 |
| 5/4/22 | Alleged Misrepresentation | 2.57% | 2.80% | 3.32% | 1.67% | 0.450 |
| 8/2/22 | Alleged Misrepresentation | 0.48% | -0.52% | 0.41% | 0.44% | 0.823 |
| 11/3/22 | Alleged Misrepresentation | 1.49% | -0.89% | 0.25% | 1.53% | 0.336 |
| 2/21/23 | Both | -1.63% | -2.05% | -1.41% | -0.45% | 0.813 |
| 5/1/23 | Both | -3.74% | -0.07% | -0.66% | -3.42% | 0.070 |
| 5/2/23 | Alleged Corrective Disclosure | -1.55% | -1.23% | -2.58% | -0.33% | 0.863 |
| 5/3/23 | Alleged Corrective Disclosure | -9.79% | -0.52% | -1.76% | -8.98% * | 0.000 |

**Exhibit 2**

# Virtu Financial, Inc.
# Summary of Residual Returns[1]

| Impact Date[2] | Category[3] | Virtu Total Return | Market Index Total Return[4] | Industry Index Total Return[5] | Residual Return[6] | Residual P-value[7] |
|---|---|---|---|---|---|---|
| 5/4/23 | Alleged Corrective Disclosure | -1.63% | -0.68% | -2.40% | -0.57% | 0.769 |
| 7/31/23 | Both | -1.80% | 0.32% | -0.09% | -1.88% | 0.212 |
| 9/13/23 | Alleged Corrective Disclosure | -8.50% | 0.00% | 0.10% | -8.71% * | 0.000 |
| 9/14/23 | Alleged Corrective Disclosure | 6.22% | 0.90% | 1.30% | 5.42% * | 0.000 |
| 9/15/23 | Alleged Corrective Disclosure | -4.57% | -1.05% | -0.33% | -4.53% * | 0.001 |
| 9/18/23 | Alleged Corrective Disclosure | 1.58% | -0.04% | -0.06% | 1.45% | 0.276 |

Source: *Bloomberg*; *CRSP*; *LSEG Workspace*; Bloomberg Law; Business Insider; Consolidated Complaint; Order on Motion to Dismiss; SEC Edgar

Note:

[1] The regression model uses: (i) the CRSP NYSE/AMEX/NASDAQ/Arca Value-Weighted Index as the market index, (ii) the NYSE Arca Securities Broker/Dealer Index (reconstructed to exclude Virtu) as the industry index, and (iii) an estimation window of 120 trading days prior to the prediction date after excluding impact dates of alleged corrective disclosures and alleged misrepresentations that were not dismissed following the Order on Motion to Dismiss. All returns used in the regressions are dividend-adjusted.

[2] For alleged corrective disclosures, impact dates are based on the Consolidated Complaint. For alleged misrepresentations, impact dates are based on the timestamp associated with the alleged misrepresentation's source. If the source was published after market hours, the impact date is assumed to be the following trading day. For March 1, 2019 disclosures, both March 1, 2019 and March 4, 2019 (the following trading day) were assumed to be the impact dates.

[3] Categories are assigned based on the Consolidated Complaint.

[4] The market index is the CRSP NYSE/AMEX/NASDAQ/ARCA Market Index.

[5] The industry index is the NYSE Arca Securities Broker/Dealer Index reconstructed to exclude Virtu.

[6] Residual returns marked with a single asterisk (*) are statistically significant at the 5% level using a two-tailed test.

[7] P-values for residuals are calculated based on the forecast standard error.

**Exhibit 3**

# Virtu Financial, Inc. (VIRT) Intraday Price
## 11/7/18



Source: *Factiva*; *LSEG Workspace*; *Tick Data*; *"Q3 2018 Virtu Financial Inc Earnings Call – Edited Transcript,"* *Thomson Reuters*, November 7, 2018

Note: Displayed prices are the volume-weighted average price of trades within each minute. SPDR S&P 500 ETF (SPY) prices have been pegged using VIRT's price directly prior to VIRT's Q3 Earnings Call release. SPY is an exchange traded fund that tracks the S&P 500 index.