# Exhibit K

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

CASE No. 1:23-cv-03770-NGG-PK (E.D.N.Y.)

- - - - - - - - - - - - - - - - - - - - - - - - - -x

In re:

VIRTU FINANCIAL, INC. SECURITIES

LITIGATION

Case No. 1:23-cv-03770

- - - - - - - - - - - - - - - - - - - - - - - - - -x


DEPOSITION OF JAY TURNER

NEW YORK, NEW YORK

FRIDAY, DECEMBER 12, 2025

8:30 a.m.


REPORTED BY:  DANIELLE GRANT

JOB NO.: 7772779

Page 2

DECEMBER 12, 2025
8:30 a.m.

Videotaped Deposition of JAY TURNER, held at the offices of Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York pursuant to Notice before DANIELLE GRANT, a Shorthand Reporter and Notary Public of the State of New York.

Page 3

APPEARANCES:
ROBBINS GELLER RUDMAN & DOWD LLP
Attorneys for the Plaintiffs
    58 South Service Road
    Melville, New York 11747
BY:  ROBERT D. GERSON, ESQ.
    rgerson@rgrdlaw.com
    MARIO ALBA, ESQ.
    malba@rgrdlaw.com
    MAGDALENE ECONOMOU, ESQ.
    meconomou@rgrdlaw.com

PAUL WEISS RIFKIND WHARTON & GARRISON LLP
Attorneys for the Defendants
    1285 Avenue of the Americas
    New York, New York 10019
BY:  ALISON R. BENEDON, ESQ.
    abenedon@paulweiss.com
    LEAH WEISER, ESQ.
    lweiser@paulweiss.com

ALSO PRESENT:
    MIGUEL MEDINA, Videographer

Page 4

FEDERAL STIPULATIONS

    IT IS STIPULATED AND AGREED by and between the attorneys for the respective parties herein that the filing, sealing, and certification of the within deposition be waived.
    IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of the trial.
    IT IS FURTHER STIPULATED AND AGREED that the within deposition may be sworn to and signed before any officer authorized to administer an oath, with the same force and effect as if signed to before the court.


        - oOo -

Page 5

    VIDEOGRAPHER:  Good morning.  We are going on the record at 8:30 a.m. on December 12, 2025.  Please note that the microphones are sensitive and may pick up whispering and private conversations.  Please mute your phones at this time.  Audio and video recording will continue to take place unless all parties agree to go off the record.
    This is Media Unit 1 of the video-recorded deposition of Jay Turner taken by counsel for defendant in the matter of in re:  Virtu Financial, Inc., Securities Litigation filed in the United States District Court for the Eastern District of New York, Case Number 1:23-cv-03770-NGG-PK.  The location of the deposition is Paul Weiss Rivkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019.
    My name is Miguel Medina.  The

Page 6

court reporter is Danielle Grant. We represent the firm Veritext. I'm not authorized to administer an oath; I'm not related to any party in this action nor am I financially interested in the outcome. If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record beginning with the noticing attorney.

MS. BENEDON: Good morning. Alison Benedon from Paul Weiss on behalf of the Defendants, and I'm joined by colleagues Alexi Polden and Kevin Chisolm.

MR. GERSON: Good morning. Robert Gerson from Robbins Geller Rudman & Dowd on behalf of the lead Plaintiff and the witness. And joining me this morning is my colleague Magdalene Economou.

Page 7

Jay Turner

VIDEOGRAPHER: Will the court reporter please swear in the witness and then counsel may proceed.

J A Y   T U R N E R, called as a witness, having been first duly sworn by Danielle Grant, a Notary Public within and for the State of New York, was examined and testified as follows:

DIRECT EXAMINATION BY MS. BENEDON:

Q Good morning, Mr. Turner. As you just heard, my name is Alison Benedon, and I represent all the Defendants in the Virtu Financial Securities class action.

Can you please state your full name for the record?

A Jay Philip Turner.

Q How are you feeling today, Mr. Turner?

A Very well. Thank you.

Q Okay. Are you aware of any reason why you can't testify truthfully today?

A No.

Page 8

Jay Turner

Q Are you taking any medications that may cloud your judgment or memory?

A No.

Q Okay. Where do you work, Mr. Turner?

A The City of Birmingham.

Q Okay. And what is your title?

A I serve as deputy director of human resources and general counsel to the City of Birmingham Retirement and Relief System and City of Birmingham Fireman and Policeman Supplemental Pension System.

Q Okay. Is the role of deputy director of human resources, does that extend beyond the retirement and relief system?

MR. GERSON: Objection.

A Yes.

Q Okay. Is there a shorthand I could use to refer to the City of Birmingham Retirement and Relief System that you'll know what I'm talking about?

A We refer to it as "the System."

Q Okay. I will do my best to refer

Page 9

Jay Turner

to it as such when I'm asking my questions. If there is any confusion about what I am talking about, please ask. But I will try to be clear.

Have you been deposed before?

A Yes.

Q How many times?

A Five.

Q Okay. When is the most recent time you were deposed?

A I believe it was February 2025.

Q And was that deposition in connection with your work for the City of Birmingham?

A Yes.

Q Okay. So have you been deposed previously as a corporate representative?

A Yes.

Q And, of those five instances that you were deposed, how many of those times were as a corporate representative?

A Four.

Q Okay. So I will skip over the ground rules, as it seems like you know the

3 (Pages 6 - 9)

Page 10

Jay Turner

rules of the road. But just, if at any point you don't know what I'm asking or have any confusion about my question, please ask me to rephrase it.

Can you tell me about your educational background?

A I have a bachelor's, master's, and law degree from the University of Louisville.

Q And when did you graduate -- well, what is the order in which you achieved your degrees?

A I received my bachelor's in 1996, my master's -- I believe the date was 1998, and I received my law degree in 2000.

Q And have you been practicing as a lawyer ever since?

A Yes.

Q Okay. I don't need chapter and verse, but can you just give me the general overview of your career since you graduated from law school?

A I spent the first ten years of my practice at a firm in Louisville, Kentucky.

Page 11

Jay Turner

Then moved to Birmingham, Alabama, where I was employed by three different law firms. And then I went in-house at a construction company as their director of compensation and benefits, and then joined the City of Birmingham.

Q When did you join the City of Birmingham?

A January the 8, 2018.

Q And what roles have you served in that time that you have been with the City of Birmingham?

A I was compensation and benefits director, assistant city attorney, and deputy director of human resources.

Q When did you start working for the System?

A May of 2020.

Q Okay. And what have you done for the -- what roles have you held for the System?

A General counsel.

Q Okay. Can you describe for me the duties that you have as general counsel

Page 12

Jay Turner

for the System?

We all sound excellent.

A Yes.

Q Please do so.

A I give them advice on all of the legal matters that come before the board, both from a transactional and a compliance standpoint. I also litigate on behalf of the System and I manage the outside firms hired by the System.

Q Do you have a team of people who work for you?

A No.

Q Okay. Are there any other lawyers employed by the System?

A No.

Q Okay. And who do you report to in connection with your work for the System?

A The mayor of the City of Birmingham.

Q And, to the extent that I don't specify that I'm talking about your work for the System, that is the focus of the

Page 13

Jay Turner

questioning today. But, again, if it's not clear, just let me know.

Do you have any involvement in the System's investment decisions?

A No.

Q Do you have any involvement in managing the relationship with the System's investment managers?

MR. GERSON: Objection.

A No.

Q Do you in any way interact with the System's investment managers?

A Yes.

Q In what capacity?

A I have negotiated the investment management agreements.

Q With whom?

A The various investment managers.

Q How many investment managers does the System have?

A Approximately ten.

Q Do you ever communicate with the System's investment consultants?

A Yes.

4 (Pages 10 - 13)

Page 14

Jay Turner

Q   How many investment consultants does the System have?

A   One.

Q   And who is that?

A   Morgan Stanley.

Q   And what is the nature of your communications with Morgan Stanley?

A   It's rare that I communicate with Morgan Stanley.  I see them monthly at the board meetings.

Q   Outside of the board meetings, do you have any regular touch points with Morgan Stanley?

A   No.

Q   Okay.

MS. BENEDON:  Let's mark the first exhibit, please.

(Whereupon, a 30(b)(6) Deposition Notice was marked as Turner Exhibit No. 1 for identification, as of this date.)

Q   Okay.  You should now have in front of you what we've labeled Turner Exhibit 1, which is a notice of deposition

Page 15

Jay Turner

for the System's 30(b)(6) deposition.

Have you seen this document before?

A   Yes.

Q   And do you understand that this is a document that lists the topics for discussion at the deposition today?

A   Yes.

Q   And you have been designated by the System to testify in response to all of these topics, correct?

A   Yes.

Q   Are you prepared to testify with respect to on all of the topics in the notice?

A   Yes.

Q   Okay.  What did you do to prepare for the deposition?

A   I reviewed the pleadings in the case.  I met with our attorneys via Zoom and in person, and reviewed some of the discovery produced in the case.

Q   Approximately how many documents would you say you reviewed in preparation

Page 16

Jay Turner

for the deposition?

A   I don't know.

Q   And, when you say you reviewed some of the discovery, are those documents that have been produced with Bates stamps?

A   Yes.

Q   Okay.  Other than pleadings and documents with Bates stamps, did you review any documents -- well, let me withdraw the question.

Other than your review of the pleadings, did you review any documents that had not been produced in discovery?

A   Emails between me and our attorneys.

Q   And are those documents for which the System has asserted the attorney-client privilege?

A   Yes.

Q   Okay.  You said you met with your attorneys.

Who are you referring to?

A   Robbins Geller.

Q   Okay.  And the -- you said you

Page 17

Jay Turner

met by Zoom?

A   Yes.

Q   On how many occasions?

A   Once.

Q   And for how many hours?

A   It was between 45 minutes and one hour.

Q   Okay.  And you had one in-person prep; is that right?

A   Yes.

Q   How long was that meeting?

A   Maybe four and a half hours, between -- between four and four and a half hours.

Q   Okay.  How long would you say you've spent preparing for today's deposition in total?

A   Maybe ten hours.

Q   Other than the conversations you had with your attorneys, have you spoken with anyone about the deposition?

A   No.

Q   The System is accusing my clients of committing fraud, correct?

5 (Pages 14 - 17)

Page 18

Jay Turner

MR. GERSON: Objection to the extent that calls for a legal conclusion.

You can answer.

A   Yes.

Q   What specifically does the System allege that my clients did wrong?

A   They made a series of statements claiming that they were completely transparent about their recordkeeping and data security, and that they were keeping client data confidential and the integrations with companies they purchased would not be to their detriment.

Q   You mentioned "integrations with companies."

Which companies are you referring to?

A   KCG.

Q   When did the System come to the conclusion that it had been defrauded by Virtu Financial?

MR. GERSON: Objection.

A   June of 2023.

Page 19

Jay Turner

Q   And how did the System come to that conclusion?

And at no point am I asking in my questions for you to disclose the substance of any confidential -- conversations that are protected by the attorney-client privilege.

A   It was a result of reviewing a memo relating the issues of the case and a conversation with our attorney at Robins Geller.

Q   The memo that you just referenced, is that a document to which the System has or will be asserting attorney-client privilege?

A   Yes.

Q   Who was the author of that memo?

A   Mario Alba.

Q   And who is that?

A   He's one of our attorneys at Robbins Geller.

(Whereupon, a Document entitled, City of Birmingham, Retirement & Relief System, Engagement Agreement

Page 20

Jay Turner

for Portfolio Monitoring was marked as Turner Exhibit No. 2 for identification, as of this date.)

MS. BENEDON: Turner Exhibit 2 is entitled "City of Birmingham, Retirement & Relief System, Engagement Agreement for Portfolio Monitoring," which is signed in June of 2015.

Have you seen this document before?

A   Yes.

Q   What is the purpose of this agreement?

A   To allow Robbins Geller Rudman & Dowd to more full -- monitor the System's investments.

Q   Is there any other purpose of this agreement?

A   No.

Q   Is this the System's only portfolio monitoring agreement, or does the System have similar arrangements with other plaintiffs' firms?

Page 21

Jay Turner

A   We have similar arrangements with other plaintiffs' firms.

Q   Which other firms?

A   Saxena White, Scott & Scott, and the Reeves Law Firm partnered with Grant & Eisenhofer.

Q   Are -- if you look at page 4 of Turner 2, are you able to identify for me the signatory of this document?

A   William Bell.

Q   Okay. And who is William Bell?

A   As of June 9, 2015, he was the mayor of the City of Birmingham serving as chair of the System.

Q   Okay. Is the current mayor of the City of Birmingham the chair of the System?

A   Yes.

Q   Okay. And who is that today?

A   Randall Woodfin.

Q   Okay. Who manages the relationship with Robbins Geller on behalf of the System?

A   I do.

6 (Pages 18 - 21)

Page 22

Jay Turner

Q    And what does that entail?

Again, I'm not asking for the substance of anything privileged, but to the extent you can describe the relationship without exposing any confidences, please do.

A    We communicate about investment losses of the System, and when appropriate, we will engage Robbins Geller to serve as our counsel in those cases. I communicate regularly with them about those matters.

Q    What are the benefits to the System of having a portfolio-monitoring arrangement with Robbins Geller?

MR. GERSON: Objection.

A    As a really large institutional fund, from time to time, we suffer losses on our investments, and we engage in this process to recover some of those losses.

Q    Does the System communicate with Robbins Geller or one of the other firms that engages in portfolio monitoring -- excuse me -- anytime the System's funds suffer a loss?

Page 23

Jay Turner

MR. GERSON: Objection. I'm just going to caution the witness not to reveal anything that's protected by the attorney-client privilege.

A    I'm not sure I understand your question.

Q    Sure. You said that you communicate about investment losses.

Does the System communicate with Robbins Geller whenever any of the companies in which the System is invested experiences a decline of its stock price?

MR. GERSON: Objection.

A    No.

Q    Okay. So under what circumstances does the System communicate with Robbins Geller regarding an investment loss?

MR. GERSON: Objection.

A    We receive regular client updates from Robbins Geller for losses in the System where there is fraud or corporate wrongdoing. Robbins Geller will notify us of those actions, and we will determine

Page 24

Jay Turner

whether or not it's a case that we should pursue.

Q    What are the criteria that the System considers in determining whether it's a case that it should pursue?

MR. GERSON: Objection. Calls for legal conclusion. Only answer that if you can do so without divulging attorney-client privileged information.

A    I can't answer that.

Q    You can't answer that because you're heeding your counsel's instruction?

A    Asserting attorney-client privilege.

Q    Okay. In your role as general counsel of the System, have you seen other engagement letters?

A    Yes.

Q    And in your role as general counsel of the System, do you have to review contracts?

A    Yes.

Q    Have you ever seen privileged

Page 25

Jay Turner

information contained in an engagement letter?

MR. GERSON: Objection.

A    Yes.

Q    Okay. Do you consider that to be a common occurrence?

MR. GERSON: Objection.

A    Yes.

Q    Okay. I'm not looking for the substance, but if you turn to page 2 -- and you can answer this yes or no. I'm sorry, page 2 of Turner 2.

Sitting here today, are you aware of why there is a redaction here for privilege?

A    It was redacted because of the attorney-client privilege.

Q    Understood. But are -- again, I'm not asking anything other than a yes or a no.

Without seeing the words on the page, are you aware of what in this document was privileged?

MR. GERSON: Objection.

7 (Pages 22 - 25)

Page 26

Jay Turner

A    Yes.

Q    Okay.  In the case of Virtu Financial, was the System aware that Virtu's stock had declined --

(Whereupon, the court reporter requested clarification.)

MS. BENEDON:  Sorry.  I'll start over.

Q    How did the System come to learn that Virtu's stock had declined?

A    I received a memo from Robbins Geller.

Q    Is that memo the same memo that you previously referenced?

A    Yes.

Q    Did any other plaintiffs' firms contact you about the stock price decline that Virtu's stock had experienced?

MR. GERSON:  Objection.

A    I don't recall.

Q    What does the System hope to gain from its involvement in this litigation?

A    We hope to recover the losses suffered by our fund and similarly situated

Page 27

Jay Turner

investors.

Q    What is the benefit to the System of acting in a lead plaintiff capacity?

MR. GERSON:  Objection.

A    We control the litigation.

Q    How is that a benefit?

A    We're able to direct the outcome of a case.

Q    What is the System's theory of liability under the Section 10(b) claim it's asserting?

MR. GERSON:  Objection.  Calls for a legal conclusion.

You can answer if you can do so without divulge attorney-client privileged information.

A    I can't answer that question.

Q    You filed a complaint.  If you think that was privileged, you've waived the privilege.

As reflected in the complaint, what is the System's theory of liability under Section 10(b)?

A    In the complaint, we allege that

Page 28

Jay Turner

the Defendants made statements that were false and fraudulent relating to their corporate practices.

Q    And do you know, as reflected in the complaint, what is the theory under Section 20(a)?

A    The defendants made false and fraudulent statements about their security practices, transparency, the confidentiality of client data.

Q    Have you completed your response?

A    Yes.

Q    Okay.  The System is not accusing Virtu of actually misusing any client data; is that correct?

MR. GERSON:  Objection.

A    Correct.

Q    Virtu acquired KCG in 2017.

How, if at all, is that acquisition relevant to the System's claims?

MR. GERSON:  Objection.

A    After acquiring KCG, all of the customer data from KCG was integrated into

Page 29

Jay Turner

Virtu's computer database, and all of that customer data was wide open to be viewed by anyone at Virtu.

Q    What is the basis for your assertion that it was wide open to be viewed by anyone at Virtu?

A    The primary database housing the information had a user ID and password of view only, and that was common knowledge, and the backup database had a user ID and password of FS view only.

Q    Do you know how many databases Virtu has?

A    No.

Q    So your assertion that it -- the FS database was the primary database, what is the basis for that assertion?

MR. GERSON:  Objection.

A    It's the database where all of the KCG client information was housed.

Q    Virtu announced that it was acquiring ITG in November of 2018.

How, if at all, is that acquisition relevant to the System's

8 (Pages 26 - 29)

Page 30

Jay Turner

claims?

MR. GERSON: Objection.

A   It was around that time -- I'm sorry. Could you repeat your question.

Q   Sure. Virtu announced that it was acquiring ITG in November of 2018. How, if at all, is that acquisition relevant to the System's claims?

MR. GERSON: Objection.

A   It was -- I don't recall. I would have to look at the complaint.

Q   Virtu's alleged failure to protect client data had nothing to do with ITG's data, correct?

MR. GERSON: Objection.

A   I would have to refer back to the complaint. I don't remember.

Q   Are you aware of how many individual defendants are named in the lawsuit?

A   Yes.

Q   How many?

A   There's the Virtu and then four

Page 31

Jay Turner

other defendants.

Q   Do you know who they are?

A   Yes.

Q   Who?

A   Mr. Cifu, Mr. Galvin, Mr. Ioffe, and Mr. Molluso.

Q   What does the System believe Doug Cifu did wrong?

MR. GERSON: Objection.

A   He made a series of statements that were false and fraudulent relating to Virtu's corporate practices.

Q   When you say "false and fraudulent," what -- are you distinguishing between those two words?

A   I'm emphasizing.

Q   Okay. What did Alex Ioffe do wrong in the System's view?

MR. GERSON: Objection.

A   He made statements and -- and disclosures that were false and fraudulent.

Q   What does the System believe Sean Galvin did wrong?

MR. GERSON: Objection.

Page 32

Jay Turner

A   He made statements and disclosures that were false and fraudulent.

Q   And what does the System believe Joseph Molluso did wrong?

MR. GERSON: Objection.

A   He made statements and disclosures that were false and fraudulent.

Q   Are you familiar with the term "class period"?

A   Yes.

Q   What is the proposed class period in this case?

A   November 2018 through September 2023.

Q   What is the relevance of November 2018?

MR. GERSON: Objection.

A   There was a whole series of statements made at that point in time relating to Virtu's corporate practices.

Q   And what is the significance of September 2023?

MR. GERSON: Objection.

A   That was when all of the fraud

Page 33

Jay Turner

was completely exposed.

MS. BENEDON: Let's mark the next exhibit, please.

(Whereupon, an Earnings Call Transcript from Virtu's Third Quarter of 2018 Earnings Call on November 7th of 2018 was marked as Turner Exhibit No. 3 for identification, as of this date.)

MS. BENEDON: Okay. You should now have Turner Exhibit 3, which is an Earnings Call Transcript from Virtu's Third Quarter of 2018 Earnings Call on November 7th of 2018.

Q   Have you seen this document before?

A   No.

Q   Have you seen any other version of the transcript from the same earnings call?

A   No.

Q   Do you understand the relevance of this earnings call to the case?

9 (Pages 30 - 33)

Page 34

Jay Turner

A   Yes.

Q   And what is it?

A   It was on this call that Mr. Cifu made statements that were false and fraudulent on behalf of Virtu.

Q   Did anyone at the System listen to this earning -- earnings call?

A   No.

Q   Has anyone at the System ever read the transcript of this earnings call?

A   No.

Q   If you could turn, please, to page 5?

The third full paragraph begins with "turning to Slide 6."

Do you see that?

A   Yes.

Q   And it reads -- well, before that, if you look at the prior page, you can see these are remarks from Doug Cifu.

Do you see that?

A   Yes.

Q   Okay.  And the paragraph on page 5 reads:  Turning to Slide 6, you see

Page 35

Jay Turner

the importance we place on protecting client information in all aspect of our business.  We take this obligation seriously, and we recognize and appreciate the natural concerns customers will no doubt have.  Virtu has established policies and procedures for our existing client and market-making businesses that are designed to safeguard sensitive client information and will continue to design our policies and procedures with our clients in mind. These safeguards include physical separation, logical access control, and entitlement reviews.

What specifically does the System believe is false or misleading about with this statement in particular?

MR. GERSON:  Objection. Calls for a legal conclusion.  He's not going to give his legal opinion.

But if you can answer as alleged in the complaint, go ahead.

A   I'm going to stand on what the complaint says.

Page 36

Jay Turner

Q   Which is what?

A   I would have to read the complaint.

Q   So, sitting here today, do you know what the System alleges is false or misleading about this statement?

A   It did not in any way reflect what was actually happening at Virtu.

Q   How so?

A   They didn't have these safeguards in place.

Q   They didn't have any safeguards in place?

A   They left all of this information wide open for anyone at Virtu to access it.

Q   What does the System believe should have been disclosed on this date to make this statement accurate?

MR. GERSON:  Objection.

A   I can't speculate.

Q   Well, it's not speculation.

The allegation is that Virtu -- well, or Mr. Cifu in particular misrepresented the true state of affairs,

Page 37

Jay Turner

correct?

MR. GERSON:  Objection.

A   He misrepresented what was actually happening at Virtu.  Yes.

Q   So what does the System believe should have been said by Mr. Cifu to make this statement accurate?

MR. GERSON:  Object.

You're asking for his legal opinion?

MS. BENEDON:  I'm not, at any point in this, asking for his legal opinion.  And the fact that the System has designated a lawyer doesn't change the fact that this is a routine question that happens in every single lead plaintiff deposition.  So I'm asking for the System's view about the allegations that the System is asserting against my clients.

A   I can't speculate about what he would have said or should have said.  He should not have said this.

10 (Pages 34 - 37)

Page 38

Jay Turner

Q   A few moments ago you said that the data was left wide open.

What is the basis for that assertion?

A   Knowing that anyone at Virtu could have accessed the database.

Q   Do you know how anyone at Virtu could have accessed the database?

A   It was widely known that the database was open, that the user ID and password were view only, and the back-up database user ID and password with FS view only.

Q   If you could turn, please, to page 9 in the same document?

Do you see there is a question in the middle of the page from Christopher John Allen of Compass Point Research & Trading?

A   Yes.

Q   Have you ever seen this question before?

A   No.

Q   Christopher John Allen asked:

Page 39

Jay Turner

Just wanted to ask.  ITG's core brand has been as an independent agency broker. Obviously, Virtu is a market maker, a little bit different business.  And just how do you kind of reconcile potential customer dis-synergies?  What is the level of customer overlap?  The one time ITG has gotten in trouble with its customers obviously was the project, the Omega issue, where it was kind of hooking into market making and arguably damage its brand -- its brands were digging out from there.  So just trying to think about how you guys are thinking about potential revenue dis-synergies moving forward.  I know you guys have talked about the percent of revenue synergies, but I think the assumption out there for the market is there going to be a decent level of revenue dis-synergies.

Did I read that correctly?

A   Yes.

Q   Do you agree with me that that's a question about whether the ITG

Page 40

Jay Turner

acquisition would cause customer and revenue dis-synergies?

MR. GERSON:  Objection.

A   I don't know.

Q   Well, what -- how do you interpret this question?

MR. GERSON:  Objection.

A   I really don't know what this means.

Q   Okay.  Do you understand what the Omega issue is that's referenced in that question?

A   No.

Q   Are you familiar -- or withdrawn.

Are you aware of whether ITG has been under investigation or been charged by the SEC?

A   I don't know.

MS. BENEDON:  Let's mark, please, Tab 5.  We'll come back to Turner 3 in a moment.

(Whereupon, a Press Release dated August 12 of 2015  was marked as Turner Exhibit No. 4 for

Page 41

Jay Turner

identification, as of this date.)

MS. BENEDON:  Turner 4 is a press release dated August 12 of 2015 entitled "SEC Charges ITG with Operating Secret Trading Desk and Misusing Dark Pool Subscriber Trading Information."

Q   Have you seen this press release before?

A   No.

Q   Are you aware that ITG settled charges with the SEC in 2015?

A   No.

Q   If I could ask you, sir, to please read the first two paragraphs?

You can read them to yourself.

A   I'm finished reading.

Q   Does seeing this SEC press release from 2015 inform your understanding of what Christopher John Allen was asking Mr. Cifu during the November 2018 earnings call?

MR. GERSON:  Objection.

A   Not really.  I'm not familiar

11 (Pages 38 - 41)

Page 42

Jay Turner

with this. I see Project Omega.

Q Okay. And that's the same reference as what Christopher John Allen asked about in the November 2018 earnings call, correct?

MR. GERSON: Objection.

A I don't know.

Q Okay. Are you aware of any other Project Omega relating to ITG?

A No.

Q You can put that aside.

And if you could turn back to what we previously marked as Turner 3?

I'd like to look now at Mr. Cifu's response to Christopher John Allen.

Mr. Cifu stated: Yes. Absolutely. It's a great question. Obviously, we are cognizant of it, and we have great respect ITG brand as an independent. And we are obviously very aware of the foot fault or more that they had in 2015. I think the issue in 2015 was that they were engaged in prop trading and

Page 43

Jay Turner

candidly hadn't been upfront with their clients. That's really ultimately what the issue is, and Virtu -- and it starts with me -- is all about transparency and being very upfront and direct with our -- with any kind of party. Not just the customer, any kind of party that we deal with.

Do you understand the relevance of this statement to the case?

A Yes.

Q And what is it?

A This is one of the statements that Mr. Cifu made that was false.

Q What specifically is false about this statement?

MR. GERSON: Objection.

A He asserts that Virtu is all about transparency and being very upfront and direct with our -- with any kind of party. Not just the customer, any kind of party that we deal with.

Q And is Virtu not transparent?

MR. GERSON: Objection. Vague.

A They were not being transparent

Page 44

Jay Turner

about the sharing of customer data.

Q How does the System assess whether a company is or is not being transparent?

MR. GERSON: Objection.

A We rely upon our lawyers.

Q Okay. Is the System transparent with its participants?

MR. GERSON: Objection. Beyond the --

A Yes.

MR. GERSON: -- scope of the deposition topics.

Q How is the System transparent with a participant?

A All of our meetings are open to the public. All of our records are subject to the State of Alabama overt records law.

Q Is your answer complete?

A Yes.

Q How would a participant know whether the System is being transparent?

MR. GERSON: Objection.

A They -- I guess they would have

Page 45

Jay Turner

to trust us.

Q Okay. Is transparency something that you can -- how do you measure transparency?

MR. GERSON: Objection.

Where is this in the deposition topics?

MS. BENEDON: It's straight out of the complaint.

MR. GERSON: The measure of transparency?

MS. BENEDON: You're accusing Virtu of lying about being transparent. I would like to understand how you know whether someone is lying about transparency.

MR. GERSON: But I'm saying which deposition topic refers to the System's transparency, which is about this --

MS. BENEDON: I'm now talking about the word "transparency." If you want to fight later about whether or not you can actually use --

12 (Pages 42 - 45)

Page 46

Jay Turner

whether we can use this testimony and bind the System, that's fine. But I'm going to continue asking my questions.

Q   Is transparency something that you can measure?

MR. GERSON:  Objection.

A   I believe so, yes.

Q   How?

A   Well, looking at the statements being made, looking at the disclosures being made.

Q   And how -- when you look at the disclosures, how do you assess whether it is transparent or not?

MR. GERSON:  Objection.

A   If it gives appropriate detail and scope.

Q   Appropriate according to whom?

MR. GERSON:  Objection.

A   Depends on who is asking.

Q   Okay.  So is transparency binary? Like, are you either, yes, transparent or not transparent?

Page 47

Jay Turner

MR. GERSON:  Objection.

A   No.

Q   Okay.  Is -- is there more of a spectrum of transparency?

MR. GERSON:  Objection.

A   I would hold to that opinion.

Q   Okay.  And whether someone is or is not transparent really depends on who is considering that question, correct?

MR. GERSON:  Objection. Leading.

MS. BENEDON:  I am allowed to lead him.  This is cross-examination.

MR. GERSON:  Oh, I didn't mean to say leading.  I meant to say objection, form.  I'm sorry.

MS. BENEDON:  Okay.

A   Could you repeat your question?

Q   Sure.

Do you agree that whether or not someone is being transparent really depends on the expectation of the person who is receiving the information?

MR. GERSON:  Objection.  Form.

Page 48

Jay Turner

A   Not really, no.

Q   Do you believe that transparency is capable of objective verification?

MR. GERSON:  Objection.

A   Yes.

Q   How?

A   Looking at the disclosures being made, whether they're factual, the scope of those disclosures, you know, looking at the big picture.

Q   If I can ask you to turn back to Mr. Cifu's response?

One, two, three -- four lines down, he states:  And Virtu -- and it starts with me -- is all about transparency and being very upfront and direct with our -- with any kind of party.  Not just the customer, any kind of party that we deal with.  And so, obviously, the universe is going to know and clients will know that we are a very significant prop and retail market making firm, and we always will be. We have been in this business, the institutional business since 2015 on a

Page 49

Jay Turner

legacy Virtu basis.

And then he goes on to discuss the KCG acquisition.

When Mr. Cifu referred to being transparent, what specifically do you think he was talking about?

MR. GERSON:  Objection.

Are you asking for his personal opinion or the System?

Q   I'm asking you in this case is the System as you are speaking on behalf of the System?

A   Well, I think he was talking about -- not -- he was talking about Virtu being transparent with its customers and the markets, with Virtu being transparent with everyone.

Q   And -- but if you read the sentence that immediately follows the reference to transparency, you see that he says: And so, obviously, the universe is going to know that we are operating in these two conflicting businesses.

Do you see that?

13 (Pages 46 - 49)

Page 50

Jay Turner

A   I do.

Q   Could that be what he was referring to when he said he was being transparent with everyone?

MR. GERSON:  Objection.  Calls for speculation.

A   I don't know.

Q   Okay.  So you don't know what he was referring to when he said he was being transparent?

MR. GERSON:  Objection.

A   I believe he was talking about Virtu's business practices being transparent with its customers and the markets.  I think it was a very -- very emphatic we're going to be transparent with everyone.

Q   About everything?

A   About everything.

Q   So is the System's expectation that Doug Cifu in that instance should have given a granular explanation of all of Virtu's policies and procedures?

MR. GERSON:  Objection.

Page 51

Jay Turner

A   I can't speculate about what he should have said on this call.

Q   Okay.  In the second line of this response, Mr. Cifu stated:  We're obviously very aware of the foot fault or more that they had in 2015.

What does the System understand the term "foot fault" to be in reference to?

MR. GERSON:  Objection.

A   I believe that's a reference to the omega issue with ITG.

Q   Okay.  And what does the term "foot fault" mean?

A   I know from playing tennis that it's when you step over the line.

Q   Okay.  Are there any connotations associated with that term?

MR. GERSON:  Objection.

A   That it was a mistake.

Q   Does the System -- well, withdrawn.

Does the System believe that Mr. Cifu intended to defraud the market

Page 52

Jay Turner

when making these statements?

MR. GERSON:  Objection.

A   Yes.

Q   On what basis?

A   He was making false and fraudulent statements about Virtu's business practices.

Q   Okay.  So even if we were to accept that the statement is false, on what basis does the System believe that Mr. Cifu actually intended to defraud shareholders?

MR. GERSON:  I'm going to object to the extent that it calls for a legal conclusion.

You can answer.

A   Could you repeat the question.

Q   Sure.  I'd like you to put the falsity aside for a second.

So even if we're assuming that the statement is false, what is the basis for the System's assertion that Mr. Cifu actually intended to defraud investors by making the statement?

MR. GERSON:  Objection.

Page 53

Jay Turner

A   That he never should have made that statement in the first place.

Q   You can put that aside.

We've been going an hour.  Do you want to take a break before I go to the next document, or are you okay for a bit?

A   I'm okay.

Q   Okay.

(Whereupon, an Excerpt from Virtu's Third Quarter of 2018 was marked as Turner Exhibit No. 5 for identification, as of this date.)

MS. BENEDON:  Turner 5 is an excerpt from Virtu's third quarter of 2018, Form 10-Q.

Q   Have you seen any part of this Form 10-Q before?

A   Yes.

Q   Okay.  Was that in preparation for the deposition?

A   No.

Q   When did you see this document?

A   They're excerpts from this document in our complaint.

14 (Pages 50 - 53)

Page 54

Jay Turner

Q   Okay.  Do you understand the relevance of this form 10-Q to the case?

MR. GERSON:  Objection.

A   Yes.

Q   And what is that?

A   These are public disclosures made to the SEC and the public on behalf of Virtu Financial.

Q   And if you could turn, please, to what is the second page of this exhibit, which is page 44 from the 10-Q, are you able to identify what is allegedly false and misleading here?

MR. GERSON:  Objection.

A   This is really hard for me to read.  It's going to take a minute.  This is very tiny type.

Sorry it took me a minute to read.  This is just really tiny type.

MR. GERSON:  Do you need to have a larger print or are you --

THE WITNESS:  No.  I should have not worn contacts and worn my glasses today.

Page 55

Jay Turner

A   What was your question again?

Q   My question is whether you are able to identify what on this page is alleged to be false or misleading?

A   Yes.

Q   What is it?

A   The second bullet from the bottom:  Failure to maintain system security or otherwise maintain confidential and proprietary information.

Q   What is false or misleading about that bullet point?

MR. GERSON:  Objection.

A   They -- they did fail to maintain system security and confidential and proprietary information.

Q   So if you -- if you look up before the bullet points, do you see that it says:  Many factors, including those described under the heading "Risk Factors."

And then in this quarterly report on Form 10-Q or in Part I, Item 1A:  Risk Factors, in our 2017, Form 10-K, as filed with the Securities and Exchange

Page 56

Jay Turner

Commission, SEC, on March 13, 2018, could affect our actual financial results or results of operations and cash flows and could cause actual results to differ materially from those in such forward-looking statements including, but not limited to.

And then the list of bullet points.

Do you see that?

A   I can barely see this.

Q   Okay.

A   I'm sorry.

Q   Why don't we take a break, and we can get like a laptop to display --

MR. GERSON:  Great.  That sounds.

MS. BENEDON:  Okay.

VIDEOGRAPHER:  Off the record at 9:35.  This is the end of Media Unit 1.

(Whereupon, at 9:35 a.m., a recess was taken to 9:46 a.m.)

(The proceeding resumed with all

Page 57

Jay Turner

parties present.)

VIDEOGRAPHER:  On the record at 9:46.  This is the start of Media Unit 2.

Q   Okay.  Mr. Turner, are you now able to see?

A   Yes.

Q   Okay.  So right before the break, I was directing your attention to the last few lines above the bullet point list?

A   What lines?

Q   Where it says that "Many factors."

And then two lines above the list:  Could affect our actual financial results or results of operations and cash flows and could cause actual results to differ materially from those in such forward-looking statements including but not limited to.

Do you see that?

A   Yes.

Q   And you previously identified the second-to-last bullet point as the one that

15 (Pages 54 - 57)

Page 58

Jay Turner

the System believes is false and misleading, correct?

A   Yes.

Q   Is the System asserting that Virtu's failure to maintain system security or otherwise maintain confidential and proprietary information did, in fact, affect Virtu's actual financial results?

MR. GERSON:  Object to the form.

A   Could you rephrase that question.

Q   Sure.  The -- I -- I'm -- do you -- let me withdraw.

The page that we're looking at is a list of risk factors, correct?

A   Yes.

Q   Okay.  And these are a list of risk factors that Virtu identified as potentially having the ability to affect Virtu's actual financial results.

Do you see that?

A   Yes.

Q   Okay.  So is it the System's position that a failure to maintain system security or otherwise maintain confidential

Page 59

Jay Turner

or proprietary information, which is the verbatim text of that second-to-last bullet point did, in fact, affect Virtu's actual financial results?

MR. GERSON:  Objection.

A   Yes.

Q   How so?

A   This was an absolute, you know, they were not maintaining system security or maintaining confidential information.

Q   My question is a little different.

How, from the System's perspective, did that alleged failure impact Virtu's actual financial results or results of operations and cash flows?

MR. GERSON:  Objection.

A   The assurances, the statements that Virtu was keeping this information secure inflated the stock price.  Once the revelations came out that they, in fact, weren't doing any of these things, that's when the stock dropped.

Q   Do you interpret the statement

Page 60

Jay Turner

"actual financial results" as being the same as stock price?

MR. GERSON:  Objection.

A   I don't -- I can't say.

Q   Okay.  What does the System believe should have -- withdrawn.

How does the System believe this statement should have been changed in order to make it not false or misleading?

MR. GERSON:  Objection.

A   I can't speculate about what they should have put in their 10-K.

Q   Does the System believe that information was omitted from this statement?

MR. GERSON:  Objection.

A   We believe it was false.

Q   What was false?

MR. GERSON:  Objection.

A   They actually were not in any way maintaining their System security or confidential information.

Q   So, but the statement that we've just been reading, which is a risk

Page 61

Jay Turner

disclosure, that a failure to maintain system security or otherwise maintain confidential and proprietary -- proprietary information and the impact that that could have on financial results, how is that -- how is this statement in particular false or misleading?

MR. GERSON:  Objection.

A   Could you repeat that question.

Q   Sure.  Do you see anywhere on page 44 an -- a representation by Virtu that it's system security is maintained perfectly a hundred percent of the time?

MR. GERSON:  Objection.

A   No.

Q   Okay.  Do you see any representations on this page describing the strength of Virtu's information barriers?

A   Yes.

Q   Where?

A   The second-to-last bullet on the page.

Q   Can you please read for me the second-to-last bullet on the page?

16 (Pages 58 - 61)

Page 62

Jay Turner

A    Failure to maintain system security or otherwise maintain confidential and proprietary information.

Q    And where in those words do you see an affirmative representation about the strength of the company's information barriers?

MR. GERSON:  Objection.  Form.

A    That is a statement that they are actually doing those things, that they are maintaining system security and confidential and proprietary information.

Q    And the System interprets that as a guarantee that there have never been any problems with those systems?

MR. GERSON:  Objection.

A    I can't speak to that.

Q    Okay.  Did anyone at the System review this Form 10-Q when it was released?

A    No.

Q    Did the System rely on the alleged misstatement in this document in making any trading decisions?

MR. GERSON:  Objection.

Page 63

Jay Turner

A    No.

Q    Does the System believe that Virtu intended to mislead the market in issuing this risk disclosure?

MR. GERSON:  Objection.

A    Yes.

Q    On what basis?

A    It was a fraudulent disclosure.

Q    What is your basis for that assertion?

A    We relied upon the advice of our attorneys.

MS. BENEDON:  You can put that aside.  Let's mark the next one.

THE WITNESS:  Thank you for the reading glasses.

MS. BENEDON:  You may need them again.

What number is that?

COURT REPORTER:  Six.

MS. BENEDON:  Six.

(Whereupon, a Bloomberg article from November 14, 2018 was marked as Turner Exhibit No. 6 for

Page 64

Jay Turner

identification, as of this date.)

MS. BENEDON:  Turner Exhibit 6 is a Bloomberg article from November 14th of 2018 entitled "Trader Virtu seeks to erase its boogeyman image in ITG takeover."

Have you seen this article before?

A    No.

Q    Do you understand its relevance for the case?

A    No.

Q    Okay.

MR. GERSON:  You can take your time to read it if you need it.

Q    We're going to do that together.  But, of course, if you ever need more time with a document, take whatever time you need.

So starting at the top of the article, it says:  High-speed trader Virtu Financial, Inc., wants Wall Street to know it's no fox poised to attack the $1 billion hen house it's acquiring.  Virtu,

Page 65

Jay Turner

originally founded to trade with its own money, agreed November 7th to buy Investment Technology Group, Inc., a broker-dealer that executes trades for more than 1,000 firms including mutual pension and hedge funds.

The ITG deal, valued at about $1 billion, has caused some to worry that Virtu, one of modern finance's most successful traders, will snoop on its soon-to-be clients' orders, leveraging that knowledge to place winning trades before they do.  Virtu denies it will do that and says it will erect barriers to keep those businesses separate and assuage critics' concerns.

The security regime will be overseen by a client data governance committee made up of representatives from investment firms, Virtu Chief Executive Officer Doug Cifu said in a recent interview.

In the second paragraph where it talks about the concern that Virtu would

17 (Pages 62 - 65)

Page 66

Jay Turner

snoop on its clients' orders, leveraging that knowledge to place winning trades before the clients do, do you understand that information to be information that is contained in the FS database?

MR. GERSON:  Objection.

A   What was the date of this article again?

Q   This is November 14th of 2018. If you see at the top --

A   Yes.

Q   -- it says 2018, dash, 11, dash, 14.

A   Yes.

Q   "Yes" you're -- in response to my question?

A   Repeat your question.

Q   Yeah.  Let's do it that way.

So do you see where, in the second paragraph, it refers to a concern that Virtu would snoop on its soon-to-be client's orders.

Do you understand the FS database to house information concerning orders that

Page 67

Jay Turner

have not yet been placed?

MR. GERSON:  Objection.

A   Yes.

Q   Okay.  What is that based on?

A   The description of the database received from counsel.

Q   Okay.  Do you understand the FS batadase -- the FS database to include both orders that have not yet been executed and post-execution trade information?

A   I don't know.

Q   Okay.  In the next paragraph, which is the third paragraph of this article, it says:  Virtu denies it will do that and says it will erect barriers.

Do you see that?

A   Yes.

Q   You would agree with me that that is a statement about what Virtu will do in the future, correct?

MR. GERSON:  Objection.

A   That's what it appears to be, yes.

Q   Okay.  And, in that paragraph,

Page 68

Jay Turner

Virtu -- there is no reference to Virtu relying upon preexisting barriers, correct?

MR. GERSON:  Objection.

A   I don't know that I can say. They state that they will not do that. Virtu denies it will do that.

Q   Right.

And, if you keep reading, it says -- it's talking about what Virtu will do in the future to ensure that it does not do that, correct?

A   And says it will erect barriers.

Q   Okay.  If you look at the following paragraph, it goes on with a quote from Mr. Cifu.

We're going to empower folks on the buy side, our clients, to assist us in how we design and implement these barriers, he said, declining to name potential members.  If you're upfront about things and transparent about how you do things, not only does it eliminate the boogeyman factor, it's the best sales pitch we have.

Do you see that?

Page 69

Jay Turner

A   Yes.

Q   So here Mr. Cifu is also talking about designing and implementing new barriers, correct?

MR. GERSON:  Objection.

A   I can't say that.

Q   Okay.  Do you see any reference here to preexisting barriers?

A   Yes.

Q   Where?

A   When he's talking about "if you're upfront about things and transparent about how you do things," I think he's talking about how Virtu does business.

Q   And how that is -- I'm sorry. Help me -- help me understand what you are describing.

So the reference to "if you're upfront about things and transparent about how you do things," what are you -- what does the System interpret that to be about?

MR. GERSON:  Objection.

A   Well, I think it -- it means we're going to be upfront and transparent

18 (Pages 66 - 69)

Page 70

Jay Turner

about how it -- Cifu was talking about how Virtu would be upfront and transparent about how they do things.

Q    And that is a reference to the fact that they were setting up a group of clients to help create new barriers, correct?

MR. GERSON:  Objection.

A    I can't say that.

Q    Okay.  But the sentence that you're focused on follows immediately a discussion of setting up a committee of clients to design new barriers, correct?

A    That statement does follow that sentence.

Q    Okay.  And nowhere is there a reference to relying upon the preexisting information barriers, correct?

MR. GERSON:  Objection.

A    It doesn't specifically talk about pre-existing information barriers.

Q    Do you see any reference here to the way in which Virtu had handled KCG's data?

Page 71

Jay Turner

MR. GERSON:  Objection.

A    I can only read the words on the page.

Q    Okay.  And the words on the page don't include any reference to the manner in which Virtu handled KCG's data, correct?

MR. GERSON:  Objection.

A    There is no mention of KCG in this document where -- oh, well, over on the next page, page 2, it talks about KCG.

Q    The reference on page 2 to KCG, is it just about the fact that it acquired KCG, correct?

A    The document reads:  The company's 2017 purchase of KCG Holdings, Inc., got it into executing trades for retail brokers, another client-facing business.  Between ITG and KCG, Virtu will have spent almost 2.5 billion transforming itself into a bigger Wall Street player.

Q    Okay.  And, if you actually read the following paragraph, it says:  Concerns about Virtu's use of ITG were raised a few months ago when rumors of the planned

Page 72

Jay Turner

transaction emerged, said Mehmet Kinak of mutual fund company T. Rowe Price Group, Inc., a current ITG customer.  People freaked out, he said.

Q    Do you see that?

A    Yes.

Q    And do you understand that the ITG acquisition posed a new set of risks for Virtu than the KCG acquisition had posed?

MR. GERSON:  Objection.

A    I can't say that.

Q    Okay.  But, again, even with the reference to KCG in this article, there is no reference at all to the fact that Virtu was planning to simply rely upon on what it had done with respect to KCG's data, correct?

MR. GERSON:  Objection.

A    I don't understand your question.

Q    What do you understand the reference to KCG in this article to be?

A    I mean, I can -- I can just read the words on the page.

Page 73

Jay Turner

Q    Okay.

A    It's a discussion about Virtu's 2017 purchase of KCG Holdings, and how that got it into the -- into executing trades for retail brokers and other client-facing business.

Q    Okay.  But there is no comparison or reference made to the risk that the KCG acquisition had posed in terms of Virtu needing to erect barriers in that instance, correct?

MR. GERSON:  Objection.

A    I don't see those words on this page.

Q    Okay.  What specifically in this article does the System believe is false or misleading?

MR. GERSON:  Objection.

A    It references statements made by Doug Cifu:  If you're upfront about things and transparent about how you do things, not only does it eliminate the boogeyman factor it's the best pitch we have.

Q    Okay.  How -- how did -- how does

19 (Pages 70 - 73)

Page 74

Jay Turner

the System measure whether it's true or false that Virtu is upfront?

MR. GERSON: Objection.

A   Well, we rely upon our lawyers.

Q   Okay. The word "upfront" is not actually capable of objective verification, correct?

MR. GERSON: Objection.

A   I can't say.

Q   Okay. Whether Mr. Cifu or Virtu is being upfront really depends on the expectations of the person hearing that statement, correct?

MR. GERSON: Objection.

A   I can't say that.

Q   Okay. Why not?

A   I think it depends upon a lot of different factors.

Q   Such as?

A   Whether or not you are being truthful about what you're doing; whether or not you're revealing information about what you're doing.

Q   The System -- you understand that

Page 75

Jay Turner

companies are not obligated to provide shareholders with any and all information, correct?

MR. GERSON: Objection.

A   Yes.

Q   Okay. So, with that understanding, how can you confirm whether Virtu is being upfront?

MR. GERSON: Objection.

A   Well, it's -- they don't have to tell every piece of information about the company, but they can't be making false statements about how they're doing business.

Q   Okay. So is it the System's belief that this statement, "if you're upfront about things and transparent about how you do things," is false because the company had made some other false statement without, like, blowing the whistle on itself?

MR. GERSON: Objection.

A   Could you repeat your question?

Q   Sure. A moment ago, when I asked

Page 76

Jay Turner

you to explain how you measure whether you're actually being upfront, you said that, while they're certainly not required to provide all information, you're not being upfront if you're lying.

So this statement that Virtu is upfront and transparent, is it a false statement, in the System's view, because there's some other false statement that Virtu made?

MR. GERSON: Objection.

A   I don't think they're being upfront or transparent.

Q   Because it's the System view that there were other false statements that were made?

MR. GERSON: Object to the form.

A   There were a whole lot of false statements in this case, yes.

Q   Okay. So it's the System's view that, because there were other false statements, claiming to upfront and transparent also becomes a false statement?

MR. GERSON: Objection.

Page 77

Jay Turner

Misstates his testimony.

A   Could you rephrase that question?

Q   Sure.

Is it the System's view that, because there are other false statements, that the statement that Virtu is being upfront and transparent is therefore rendered false because of the existence of other false statements?

MR. GERSON: Objection.

A   Yeah. They made a whole series of false statements.

Q   Okay.

A   Yes.

Q   Did anyone -- did the System make any transaction decisions in reliance upon this article?

MR. GERSON: Objection.

A   No.

Q   Okay. You can put that aside.

MS. BENEDON: Let's use Tab 7. This is 7.

(Whereupon, a Letter was marked as Turner Exhibit No. 7 for

20 (Pages 74 - 77)

Page 78

Jay Turner

identification, as of this date.)

MS. BENEDON: Turner 7 is an article -- not an article. Pardon me.

Turner 7 is a letter from Randall Woodfin, mayor of Birmingham. This version is not dated, but it's -- there is a reference in the first paragraph to the 2018-2019 operating budget. And it is our understanding that this was published in or around 2018.

Q   Does that time frame make sense to you in light of when the City of Birmingham prepares it's operating budget?

A   We work on our operating budgets in the winter and spring with the goal of having a budget approved by the start of the fiscal year, which begins July 1.

Q   Okay.  So in this -- and Randall Woodfin is, I believe you testified previously, the current mayor, correct?

A   Yes.

Q   Okay.  Do you know when he became

Page 79

Jay Turner

the mayor?

A   He was elected in 2017.  He became mayor in November of 2017.

Q   Do you believe that the City of Birmingham has perpetrated a fraud on the System's members?

MR. GERSON:  Objection.

A   No.

Q   If I could ask you to please review the first few paragraphs of this letter?

Mr. Woodfin states:  Over the last few months, we have identified serious challenges related to the future of the City's retirement and relief pension system.  This year, with the approval of the 2018-2019 operating budget, the council joined me in addressing our annual obligation to the pension plan by increasing the payment by $2.9 million in the current budget.  It was our first step in a long-term plan to deal with a problem that is 17 years in the making.  Being the son of public servants and personally

Page 80

Jay Turner

serving the City of Birmingham as an employee for many years, I know the importance of a pension.  I understand the confidence it brings to all of you as you think about the day you retire.  That is why, in a commitment to transparency, I'm sharing this with you and the need to address our pension problem now.

Q   How do you assess whether Mr. Woodfin was perpetrating a fraud on the System when he referred to himself as "transparent"?

MR. GERSON:  Objection.

A   I don't believe the mayor was perpetrating a fraud -- a fraud against the System.

Q   Okay.  This letter is revealing a problem that was 17 years in the making.

Do you see that?

A   I see that.

Q   Is that being transparent?

MR. GERSON:  Objection.

A   Yes.

Q   In the System's view, disclosing

Page 81

Jay Turner

something that has been ongoing for 17 years is consistent with being transparent?

MR. GERSON:  Objection.

A   Yes.

Q   Okay.  And the letter begins: Over the last few months, we've identified serious challenges.

Do you believe that it's consistent with being transparent that the System, and Mr. Woodfin in particular, was aware of something for several months before he published this letter?

MR. GERSON:  Objection.

A   I believe the mayor's actions were appropriate.

Q   How do you measure that?

A   I know that as soon as the mayor took office and, you know, this -- the mayor serves in two separate and distinct roles.  He serves as the mayor of the City of Birmingham, but he also serves as chairman of the Retirement & Relief System.

In his role as mayor, he's

21 (Pages 78 - 81)

Page 82

Jay Turner

responsible for proposing a budget to the city council, and the city council ultimately approves that budget. And upon taking office, he started looking at the city budget, he started looking at the Retirement & Relief system budget. I cannot speak in any way to what the mayor was doing in his role as mayor. I can only speak to what the System was doing.

Q   And the System was underfunded for a period of years, correct?

A   The System is still underfunded.

Q   Okay. And when the System and Mr. Woodfin published this letter, were any participants in the plan or in the System upset?

A   I don't know.

Q   Okay. While Mr. Woodfin believed that he was being transparent, do you know if a hundred percent of the System's plan participants agreed that he was being transparent?

MR. GERSON:  Objection.

A   I don't know.

Page 83

Jay Turner

Q   Okay. Would it surprise you if certain plan participants received this letter and were, like, you're only telling me now about something that's been 17 years in the making; that doesn't seem very transparent?

MR. GERSON:  Objection.

A   I can't speculate about how other people felt.

Q   Okay. But the way -- transparency and whether someone is being transparent is a feeling, correct?

MR. GERSON:  Objection.

A   I wouldn't say that.

Q   Okay. Did anybody feel like the mayor wasn't being transparent?

MR. GERSON:  Objection.

A   I don't know.

Q   It's possible, right?

A   I really don't know.

MS. BENEDON:  Okay. You can put that aside, and let's do Tab 12, please.

(Whereupon, an Article from November

Page 84

Jay Turner

17, 2018 was marked as Turner Exhibit No. 8 for identification, as of this date.)

MS. BENEDON:  Turner 8 is an article that was published in Business Insider on November 17th of 2018 entitled "Wall Street is worried that a $1 billion acquisition will allow Virtu to spy on clients, but the firm has a big plan to quell those anxieties."

Have you seen this before?

A   No.

Q   Does the System believe that Virtu's handling of ITG's data posed the exact same risks as Virtu's handling of KCG's data?

MR. GERSON:  Objection.

A   I don't know.

Q   Okay. Let's look at the article. If you look at -- they're not numbered -- but the second page. It says:  In an interview, CEO Doug Cifu outlines a plan to -- I'm sorry. If we actually go back to

Page 85

Jay Turner

the first page, the bullet points say: Virtu Financial last week announced it would acquire ITG, the New York broker-dealer. The acquisition will position Virtu to break into the business for stock trading on behalf of large asset managers. Some worry that Virtu would be able to trade on its client data. In an interview, CEO Doug Cifu outlined a plan to stop that from happening, talked about the firm's hopes for the future and its unique company culture.

Do you see that?

A   Yes.

Q   And then beneath the bullet points, it goes on:  Virtu Financial got its start in the secretive world of high-frequency trading, but in recent years, it has been trying to break into a business dominated by Wall Street's bulge bracket banks, buying stock on behalf of large asset management clients such as hedge funds and pension firms.

The acquisition of New York

22 (Pages 82 - 85)

Page 86

Jay Turner

broker-dealer ITG for $1 billion, which Virtu announced last week, could position the firm for succeed in those businesses. It's not its first large deal. In 2017, the firm acquired KCG, which opened Virtu up to global quant strategies and equities and futures. That acquisition was viewed widely on Wall Street as a success.

As for the ITG acquisition, which is set to close in early 2019, there are concerns about conflicts of interest. Specifically, market observers are worried about Virtu's stock trading business, which trades the firm's capital, peeking into its new broker-dealer business and using that information to trade against clients.

Q    Have you ever read that before?

A    I don't recall.

Q    Okay. Virtu -- excuse me.

The System alleges that at this time Virtu had misled the market about the way in which it had protected KCG's data, correct?

MR. GERSON: Objection.

Page 87

Jay Turner

A    Yes.

Q    And the -- what is alleged to be false or misleading is that the market was under the misimpression that everything was going perfectly well with Virtu's handling of KCG data, correct?

MR. GERSON: Objection.

A    Sorry. I was trying to hold off that cough so I could listen to your question, but I then ended up not hearing all of your question.

MS. BENEDON: Would you mind reading it back, please.

THE WITNESS: My apologies.

COURT REPORTER: The cough kind of got me too. Just one second.

(The requested portion of the record was read back.)

MS. BENEDON: I think there was another question after that. So let me --

COURT REPORTER: Objection -- oh, yes. Okay. Oh, I'm sorry. Let me just get there.

Page 88

Jay Turner

(The requested portion of the record was read back.)

A    So, yes.

Q    Okay. But even still, at least according to this article, the market believed that the ITG acquisition posed a different conflict of interest, correct?

MR. GERSON: Objection.

A    I can't speak to what the market believed.

Q    Okay. If you turn two pages to the second-to-last page of the article, do you see there is a question towards the top of the page: Are there any other areas the firm is interested in exploring to build out either organically or through another acquisition?

Do you see that?

A    Yes.

Q    And if you read Mr. Cifu's response, it states: The ITG combination gives us a slate of organic growth opportunities. As combined firms, Virtu and ITG have built incredible franchises

Page 89

Jay Turner

with very complementary products and geographies. While these businesses are distinct and unique from what Virtu does today, they revolve around a common technology infrastructure like the one I was just describing.

For example, I am excited to offer Virtu's expertise and access to the global FX markets across ITG's suite of execution services, workflow technologies, and analytics franchises.

Our first order of business is to take the great ITG products, analytics, workflow technology, and commission management aggregation products and invest in them, and of course, we're going to enhance safeguards and transparency around the protection of client data.

Do you see that?

A    Yes.

Q    And Mr. Cifu was telling the market here that Virtu was not going to just rest on pre-existing safeguards, correct?

23 (Pages 86 - 89)

Page 90

Jay Turner

MR. GERSON: Objection.

A   He states: We're going to enhance safeguards and transparency around the protection of client data.

Q   Okay. And you would agree with me, sir, that stating that you're going to enhance something means that the current state of affairs isn't good enough, correct?

MR. GERSON: Objection.

A   I wouldn't characterize it that way, no.

Q   How would you characterize it?

A   I would just take the words on the page for exactly what he says, that they're going to enhance safeguards and transparency around the protection of client data.

Q   Okay. But no representation in that statement that what we're doing is perfect; so we're just going to keep doing that?

MR. GERSON: Objection.

A   Yeah, I -- I'm just going to take

Page 91

Jay Turner

what Mr. Cifu says here to state we're going to enhance safeguards and transparency around the protection of client data.

Q   Okay. And that particular statement, that they're going to enhance safeguards and transparency, the System doesn't allege that statement to be false or misleading, correct?

MR. GERSON: Objection.

A   I don't recall from the complaint.

Q   Okay. And did Virtu, in fact, enhance transparency?

MR. GERSON: Objection.

A   I don't know.

Q   How would you test whether they enhanced transparency?

A   That's a question for IT experts, not me. I don't know.

Q   Okay. The -- Mr. Cifu's response goes on: I can't overstate how important it is to me personally that client information is properly protected.

Page 92

Jay Turner

That part of the sentence, does Birmingham believe that to be false or misleading?

MR. GERSON: Objection.

A   Yes.

Q   So the System believes that Mr. Cifu did not personally believe it to be important to protect client information?

MR. GERSON: Objection.

A   He was telling the market how important it was to him personally that client information is properly protected.

Q   Okay. And if you read the next part of the sentence, he goes on to state: And to that end, we're talking to the buy side about establishing a client data governance committee made up of clients from all over the globe to assist in the oversight, design, implementation, and integrity of logical and invisible barriers.

Do you see that?

A   Yes.

Q   And the System doesn't allege

Page 93

Jay Turner

that that particular aspect is false or misleading, right?

MR. GERSON: Objection.

A   That second part, we're talking to the buy side about establishing --

Q   Yeah.

A   No.

Q   Okay. And does the System assert -- well, do you know -- does the System know why Virtu and Mr. Cifu talked to the buy side about establishing a client data governance committee?

A   I don't know.

Q   Does the System believe that Virtu was legally obligated to talk to the buy side and establish a client data governance committee?

MR. GERSON: Objection.

A   I don't know.

Q   Okay. But the System believes that Mr. Cifu was lying when he describes it as being important to him to do so; is that right?

MR. GERSON: Objection.

24 (Pages 90 - 93)

Page 94

Jay Turner

A  We believe Mr. Cifu was lying, that they were not protecting client information.

Q  Okay. How do you measure whether something is important to Mr. Cifu?

MR. GERSON: Objection.

A  Look at the actions and statements surrounding the issue.

Q  And is there like a scale by which the System measures the importance of something to any particular person?

MR. GERSON: Objection.

A  I don't have a scale.

Q  Okay. So if -- how -- how do we know whether truly in Mr. Cifu's heart it was important to him to protect client information?

MR. GERSON: Objection.

A  Well, it obviously was not.

Q  How was it obviously not?

A  He made all kind of misstatements about what Virtu was doing. They were not keeping client information secure.

Q  So is it your testimony that

Page 95

Jay Turner

you're able to test whether it is important to Mr. Cifu to protect client information because he made a misstatement about it?

MR. GERSON: Objection.

Misstates his testimony.

A  I think he was lying.

Q  Okay. The -- this paragraph goes on to say: It's still early, and we're engaging the buy side, getting their input but the idea is that clients would oversee the management of their data and then be empowered to recommend and engage an outside auditing firm, and the meetings will be open to all clients.

Does the System believe that statement is false or misleading?

MR. GERSON: Objection.

A  I don't recall.

Q  Okay. If you look at the top of the next page, it says: The committee concept is an extension of our history of always pushing for more transparency and using technology to deliver more transparency.

Page 96

Jay Turner

Did Virtu, in fact, use technology to deliver more transparency?

MR. GERSON: Objection.

A  I don't know the answer to that.

Q  Okay. How would one test whether they do or do not use technology to deliver more transparency?

MR. GERSON: Objection.

A  I think that would be an expert opinion.

Q  Okay. And Birmingham is not alleging -- sorry -- the System is not alleging that it was false or misleading when Mr. Cifu described the committee concept as being an extension of the history of transparency, correct?

MR. GERSON: Objection.

A  I don't know.

Q  Okay. What could Mr. Cifu have said to make these statements not false or misleading?

MR. GERSON: Objection.

A  I can't speculate about what he would or should have said.

Page 97

Jay Turner

Q  What information does the System believe was omitted from these remarks --

MR. GERSON: Objection.

Q  -- that rendered the statements false or misleading?

MR. GERSON: Objection.

A  Again, I can't speculate about what he should have said. I know that the statements that he made were false.

Q  Did anyone at the System read this article when it was published?

A  No.

Q  Did the System make any transactions in Virtu's securities in reliance on the alleged misstatements in this article?

MR. GERSON: Objection.

A  No.

Q  Okay. You can put that aside.

MS. BENEDON: Let's go to the next.

(Whereupon, an Earnings call transcript from 2/7/2019 was marked as Turner Exhibit No. 9 for

25 (Pages 94 - 97)

Page 98

Jay Turner

identification, as of this date.)

MS. BENEDON: This document, Turner 9, is an earnings call transcript from February 7 of 2019.

Q   Have you ever seen this document before?

A   No.

Q   Have you seen any other versions of an earnings call transcript from that date?

A   I believe they were excerpts from this earnings call in our complaint.

Q   Do you recall why this was excerpted in the complaint that?

A   That would have been a decision by our lawyers.

Q   And I asked a bad question.

Do you understand the purpose of the excerpt as it's used in the complaint?

A   That would again be a question for our lawyers.

Q   Okay.  If I can ask you to turn, please, to page 9?

Do you see there is a question

Page 99

Jay Turner

from Richard Henry Repetto of Sandler O'Neill + Partners?

A   Yes.

Q   And he asked:  So I've already gotten an email saying that it sounds like that you're more bullish on the ITG acquisition, and I guess the question is -- we've talked to clients, we know you've been out, as you said in the prepared remarks.  I was talking to clients and just some feedback and why the feedback we've gotten has been incrementally positive.  And how are you getting people over or getting to that more positive view?  A couple of people that we talked to certainly were more positive after they talked with you.  If you could expand on that?

And this is an extremely long response.  We're not going to read all of it unless you would like to.

But it begins -- Mr. Cifu responds:  Sure.  Yes.  Thank you.  And good morning, Rich.  Yes, I think it's

Page 100

Jay Turner

really two elements to that.  The first is you're right, we've been out there.  We've talked to dozens and dozens of ITG customers, both here, in Canada, and in Europe.  And I think this is obviously the initial concern around we're adding an additional conflict, because ITG historically has been an agency business and we are -- we get that.  We are very sensitive to that.  And we're very direct and transparent about that.

Do you see that?

A   Yes.

Q   So the System does not allege that it was false or misleading when Mr. Cifu said that they've spoken to dozen of ITG customers, correct?

MR. GERSON: Objection.

A   I don't believe so.

Q   Okay.  And when Mr. Cifu describes that the ITG acquisition was adding an additional conflict, the System doesn't dispute that either, correct?

MR. GERSON: Objection.

Page 101

Jay Turner

A   I don't believe so.

Q   Okay.  And when Mr. Cifu says "and we're -- we get that, we're very sensitive to that, and we're very direct and transparent about that," that -- the word "that" is a reference to the statement before, correct?

MR. GERSON: Objection.

A   I'm not 100 percent sure about that.

Q   Okay.  It's reasonable to interpret that statement as the fact that Virtu is transparent about the fact that they were adding an additional conflict because ITG historically has been an agency business, correct?

A   I read it with the sentence thereafter that says:  I think they like the transparency and the directness of Virtu.

I think they were -- I think he was talking about how Virtu represented itself to be transparent and open about its data practices.

26 (Pages 98 - 101)

Page 102

Jay Turner

Q   Okay.  And transparent and openness is being referred to in the context of Mr. Cifu having gone out and spoken to dozens and dozens of ITG customers, correct?

MR. GERSON:  Objection.

A   I believe that is how this is characterized.

Q   Okay.  And you would agree that the CEO of an acquiring company going out and speaking to dozens and dozens of customers of the company that's being acquired is consistent with transparency, correct?

MR. GERSON:  Objection.

A   I can't say that.

Q   Okay.  The sentence -- the next sentence is:  I think they like the transparency and the directness of Virtu.  We have no other way of conducting business.  There is no gray area at Virtu.

How does the System test whether there is a gray area at Virtu?

MR. GERSON:  Objection.

Page 103

Jay Turner

A   I don't know the answer to that.

Q   Okay.  Because that's not capable of any objective verification, correct?

MR. GERSON:  Objection?

A   That's a question for our lawyers and experts.

Q   Okay.  But you, the System, are accusing my client of defrauding shareholders by making that statement, correct?

A   Yes.

Q   Okay.  What is the basis for asserting that that's a statement that anyone could interpret as meaning really anything at all?

MR. GERSON:  Objection.

A   Our characterization of this is that he was lying to the market, that they weren't transparent, they weren't keeping client information secure.

Q   Where is a reference to keeping client information secure?

A   Well, I think it's kind of all implied by the context.

Page 104

Jay Turner

Q   What context?

Point me to the context, please.

A   Well, it's all of his statements relating to the concerns about this overlap of information.

Q   Okay.  So it's -- notwithstanding the fact that Mr. Cifu, in fact, did go out and talk to dozens and dozens of ITG customers and did, in fact, set up that client committee and did, in fact, take input from clients about how to design new information barriers, is it the System's view that a failure to disclose to those clients anything that has ever gone wrong at Virtu is inconsistent with transparency?

MR. GERSON:  Objection.

A   He was absolutely lying about how they did business.

Q   Did Mr. Cifu ever talk to a single one of those ITG customers about how Virtu handle KCG's data in any way?

MR. GERSON:  Objection.

A   I don't know.

Q   So then how do you know he lied

Page 105

Jay Turner

about it?

MR. GERSON:  Objection.

A   I rely upon the statements that he made.

Q   Okay.  Are there any references here to how the company previously handled KCG's data?

A   Yes.

Q   Where?

A   In his statements, he talks about:  We are very sensitive to that, talking about transparency, and we're very direct and transparent about that.  I think they like the transparency and the directness of Virtu.  We have no other way of conducting business.

Q   So --

A   There's no --

Q   I'm sorry.

A   -- gray area --

Q   I didn't mean to interrupt.

A   -- at Virtu.  It's all black and white, and so we've been very upfront about how we will physically and virtually

27 (Pages 102 - 105)

Page 106

Jay Turner

separate the businesses to ensure that we are good stewards of customer information, all the things you would expect that we do. And I think customers are encouraged to hear those words.

Q   Okay.  And you would agree with me that talking about how he will separate the businesses is about what Virtu would do in the future to separate Virtu and ITG, correct?

MR. GERSON:  Objection.

A   I can't say that.

Q   Okay.  But "will" is about the future, correct?

MR. GERSON:  Objection.

A   I can't say.

Q   When we're done with this deposition, will you leave Paul Weiss' offices?

MR. GERSON:  Objection.

A   I sure hope so.

Q   Okay.  When I just used the word "will," did you know that I was talking about something in the future?

Page 107

Jay Turner

A   I really wasn't sure what you were saying.

Q   Oh, couldn't tell.

You really didn't know?

A   I really was unsure of your question.

Q   Okay.  When you arrived in New York, did you take an airplane?

A   Yes.

Q   Will that happen in the future?

MR. GERSON:  Objection.

A   I sure hope so.

Q   Okay.  But when you arrived in New York, what time will the airplane arrive?

A   I don't know.

Q   Because it already happened, right?

So the sentence I just said makes no sense, correct.

MR. GERSON:  Objection.

A   I really have no idea what you're saying.

Q   Okay.  Because what I'm saying

Page 108

Jay Turner

makes no sense because "will" is a reference to what happens in the future, correct?

MR. GERSON:  Objection.

A   If I say I will eat lunch today and --

Q   Is that something --

A   -- and --

Q   -- you already did?

A   -- I --

MR. GERSON:  Let him finish.

A   -- I plan on --

Q   Exactly?

A   -- eating lunch.

Q   Thank you, sir.

And you are a native English-speaker correct?

A   Yes.

Q   Okay.  With three degrees?

A   Yes.

Q   And you've used the word "will" in your everyday speak, correct?

A   A whole lot.

Q   Okay.  Did anyone at the System

Page 109

Jay Turner

make any trading decisions on the basis of these statements?

MR. GERSON:  Objection.

A   No.

Q   You can put that aside.

MS. BENEDON:  I'm trying to expedite things.  Give me one second.

Q   The System has no basis to believe that Virtu did, in fact, ever misuse KCG's data, correct?

MR. GERSON:  Objection.

A   Would you repeat your question?

Q   Sure.

The System is accusing Virtu of having failed to maintain adequate information barriers, correct?

A   They failed to maintain adequate information barriers, and then made all kinds of statements that they were maintaining those types of barriers.

Q   Okay.  And the System's view is that the failure to maintain adequate information barriers is that the data could have been misused by Virtu, correct?

28 (Pages 106 - 109)

Page 110

Jay Turner

MR. GERSON: Objection.

A   It could have been misused.

Q   Okay. But the System is not accusing Virtu of actually having misused any data, correct?

A   Correct.

Q   Okay.

MS. BENEDON: Let's do Tab 20, please.

(Whereupon, a Document dated, June 5 of 2019 from the Sandler O'Neill Global Exchange and Brokerage Conference was marked as Turner Exhibit No. 10 for identification, as of this date.)

Q   While we're getting that document, do you know the timing of when the Virtu-ITG transaction actually closed?

A   I don't.

Q   Okay. And do you know the timing of when the issues with the FS database were resolved?

MR. GERSON: Objection.

A   I don't recall.

Page 111

Jay Turner

Q   Okay.

MS. BENEDON: I'm sorry. I forgot you can't mark while I'm talking. Okay. So Turner 10 is dated June 5 of 2019 from the Sandler O'Neill Global Exchange and Brokerage Conference.

Q   Have you ever seen this document before?

A   No.

Q   Do you understand why this is relevant to the case?

A   I'm going to presume that there are excerpts from this in our complaint.

Q   Okay. The page numbers are teeny tiny, but if you could turn, please, to page 7?

And let us know if you need glasses for this.

A   Only for the page numbers.

Q   Okay. There is a series of -- this is a transcript of a dialogue between Richard Repetto, who is an analyst at Sandler O'Neill, and Mr. Cifu. And the

Page 112

Jay Turner

question begins on page 7, where Mr. Repetto is asking about Virtu's guidance between the 25 and $50 million range.

If you could read from the middle of page 7?

I just want you to have context on where we're going on the following page.

And if you can continue reading through page 8, please and let me know when you've done so?

A   Okay.

Q   Have you completed reviewing through the bottom of page 8?

A   Yes.

Q   Are you able to identify for me what the System believes is false or misleading in the remarks you just read?

MR. GERSON: Objection.

A   So, in the third paragraph from the bottom, Douglas Cifu, chief executive offer -- officer, he's speaking and he talks about: A small handful of customers that who can't get themselves comfortable

Page 113

Jay Turner

because we were market-making or a HFT firm, but it's really going to be ultimately de minimis. The large asset managers in the fashion forward, if you will, hedge funds and others and quant firms that kind of understand what we are and recognize. We didn't buy ITG to steal customer information. It's kind of preposterous and borderline insulting to suggest we would do that. We would never do that. So people are sticking with us and giving us the benefit of the doubt here.

Q   What does the System believe is false or misleading about that statement?

MR. GERSON: Objection.

A   He was talking about how Virtu does business, that they would never steal customer information, that it's preposterous and borderline insulting to suggest that Virtu would do that, Virtu would never do that. It was a representation about how Virtu does business.

29 (Pages 110 - 113)

Page 114

Jay Turner

Q   You admitted a few moments ago, sir, that the System does not believe Virtu ever did steal any client data, correct?

MR. GERSON:  Objection.

A   We don't know.

Q   You have no reason to believe that it did, correct?

A   Correct.

Q   Okay.  And it's not -- the System does not believe that Virtu did, in fact, buy ITG to steal customer information, correct?

A   We don't allege that.

Q   Okay.  And the System does not believe that Virtu acquired KCG in order to steal information, correct?

A   We have not alleged that.

Q   Okay.  And you do know, sir, that by this point in time the FS database issues had been resolved, correct?

MR. GERSON:  Objection.

A   Yes.

Q   So as of this date at least, Virtu was, in fact, protecting client

Page 115

Jay Turner

information, correct?

MR. GERSON:  Objection.

A   I believe so.

Q   Did the system ever make any trading decisions on the basis of this statement?

MR. GERSON:  Objection.

A   No.

Q   You can put that aside.

When does the System allege that the fraud was revealed?

A   It was in 2023.

Q   Okay.  And how was the fraud revealed?

A   The SEC announced they were investigating Virtu.

Q   Are you familiar with the phrase "corrective disclosure"?

A   No.

MS. BENEDON:  Let's mark Tab 25A, please.

Eleven.

(Whereupon, an Excerpt from Virtu's February 17, 2023 Form 10-K was

Page 116

Jay Turner

marked as Turner Exhibit No. 11 for identification, as of this date.)

MS. BENEDON:  Turner 11 is an excerpt from Virtu's February 17, 2023 Form 10-K.

Q   Have you seen any part of that Form 10-K before?

A   I'm going to presume that they're excerpts in our complaint.

Q   Sitting here today, do you recall ever seeing the Form 10-K?

A   No.

Q   We've excerpted part of this.

If you turn to the second page of the exhibit, which is page 119 of the Form 10-K, do you see under Section 15: Commitments, contingencies, and guarantees, legal and regulatory proceedings?

A   Yes.

Q   Okay.  And in that first paragraph, Virtu disclosed:  In the ordinary course of business, the nature of the company's business subjects it to claims, lawsuits, regulatory examinations

Page 117

Jay Turner

or investigations, and other proceedings, any of which could result in the imposition of fines, penalties, or other sanctions against the company.

The company and its subsidiaries are subject to several of these matter at the present time including, among others, a matter in which the company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the company's information access barriers.  The company is cooperating with this civil investigation.

Do you see that?

A   Yes.

Q   What information does the System believe was revealed to the market through this disclosure?

MR. GERSON:  Objection.

A   They were being -- the company and its subsidiaries are subject to several of these matters at the present time including, among others, a matter in which

30 (Pages 114 - 117)

Page 118

Jay Turner

the company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the company's information access barriers.

Q   So which of the alleged misstatements did this disclosure correct?

MR. GERSON: Objection.

A   Repeat your question.

Q   Sure. Do you understand the relevance of this disclosure to the allegations in the complaint?

A   This was an admittance by Virtu that the SEC was investigating the company.

Q   Okay. And investigating the company, specifically, with respect to the sufficiency of its information barriers, correct?

A   Yes.

Q   Okay. So which of the alleged misstatements were revealed to be false or misleading as a result of this disclosure?

MR. GERSON: Objection.

A   That's a legal conclusion for our

Page 119

Jay Turner

lawyers. I can't speak specifically to that.

Q   Is it fair to say that as of this disclosure it was known that -- well, I'll withdraw the question. A few moments ago, I asked you how the fraud was revealed, and you said that there was an announcement that the SEC was investigating.

Do you recall that testimony?

A   Yes.

Q   As of this date, there was an announcement that the SEC was investigating Virtu, correct?

A   I believe so, yes.

Q   What other information does the System believe should have been revealed at this time to completely reveal the alleged fraud?

MR. GERSON: Objection. Calls for a legal conclusion.

A   I can't say.

Q   Okay. The System is not alleging that this was an untimely disclosure, correct?

Page 120

Jay Turner

MR. GERSON: Objection. Calls for a legal conclusion.

A   I don't know.

Q   Okay. But no basis to believe that as of the first date of the class period that Virtu was under investigation in connection with its information --

(Whereupon, the court reporter requested clarification.)

Q   -- in connection with its information access barriers, correct?

MR. GERSON: Objection.

A   I'm so sorry. Could you repeat that question.

Q   Sure. The System has no basis to believe that this disclosure that was made on February 17th of 2023 could have or should have been made as of the first date of the class period, correct?

MR. GERSON: Objection.

A   I can't speak to that.

Q   Okay. But you would agree with me that Virtu could not have disclosed that it was responding to requests for

Page 121

Jay Turner

information before it had received requests for information, correct?

MR. GERSON: Objection.

A   Yes.

Q   Okay. And is it the System's position that this was the first date on which it became known that Virtu had potential regulatory risk in connection with its information barriers?

MR. GERSON: Objection.

A   I don't recall.

MS. BENEDON: Okay. Let's mark 25 B, please.

(Whereupon, an Excerpt of Virtu's April 28, 2023 Form 10-Q was marked as Turner Exhibit No. 12 for identification, as of this date.)

MS. BENEDON: This is -- Turner 12 is an excerpt of Virtu's April 28, 2023 Form 10-Q.

Q   Have you ever seen this document before?

A   No.

Q   Have you seen any part of Virtu's

31 (Pages 118 - 121)

Page 122

Jay Turner

Form 10-Q from April 28th of 2023?

A    I'm going to presume that they're excerpts from this document in our complaint.

Q    Sitting here today, do you recall seeing any part of that Form 10-Q?

A    I can't say.  I have not read it.

Q    Okay.  If we look at page 31, which is the second page of the exhibit, do you see the "Legal and Regulatory Proceedings" heading?

A    Yes.

Q    And the disclosure reads:  In the ordinary course of business, the nature of the company's business subjects it to claims, lawsuits, regulatory examinations or investigation, and other proceedings, any of which could result in the imposition of fines, penalties, and other sanctions against the company.

So just focusing on that line, that was always public information, correct?

MR. GERSON:  Objection.

Page 123

Jay Turner

A    That anybody could be sued or investigated at any time?

Q    Correct.

A    Yes.

Q    And you don't dispute that Virtu made specific disclosures about the nature of its business and the regulatory risks that it faced as a result, correct?

MR. GERSON:  Objection.

A    I can't say.

Q    Okay.  Is it the System's view that Virtu misrepresented its regulatory risk?

MR. GERSON:  Objection.

A    I can't say.

Q    Okay.  No reason to believe that it did, correct?

MR. GERSON:  Objection.

A    I don't know.

Q    Okay.  The disclosure goes on:  The company and its subsidiaries are subject to several of these matters at the present time including, among others, a matter in which the company has been

Page 124

Jay Turner

responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the company's access barriers.

The company is cooperating with the civil investigation and has engaged in settlement discussions in respect of the matter.  In the absence of a settlement, the company currently believes it may receive a Wells notice from the SEC.  The proposed action would be expected to allege violations of federal securities laws with respect to the company's information barriers, policies, and procedures for a specified time period in and around January 28th -- excuse me -- January 2018 to April 2019 and related statements made by the company during such period.  The company believes it would have meritorious defenses in the event of such an action and would plan to assert them.

Do you know whether Virtu's stock price declined as a result of this disclosure?

Page 125

Jay Turner

MR. GERSON:  Objection.

A    I believe it did.

Q    Okay.  What incremental information was made known as a result of this disclosure that had not already been known to the market?

MR. GERSON:  Objection.

A    I believe it was that the company believed it was about to receive a Wells notice.

Q    Okay.  But the System is not alleging that that was an untimely disclosure, correct?

MR. GERSON:  Objection.

A    I don't know.

Q    Okay.  Any reason to believe that they -- that Virtu previously believed it would get a Wells notice but failed to disclose that?

MR. GERSON:  Objection.

A    I don't know.

Q    No basis to believe that, correct?

MR. GERSON:  Objection.

32 (Pages 122 - 125)

Page 126

Jay Turner

A   I don't know.

Q   Okay.  What other information does the System believe should have been disclosed but had not yet been disclosed to the market?

MR. GERSON:  Objection.

A   In the -- in this form.

Q   Correct.

A   Yeah, I don't know.

Q   As of this disclosure, the market was aware of what the SEC was investigating, correct?

MR. GERSON:  Objection.

A   They knew that Virtu was being investigated because of information security issues.

Q   Okay.  But it's more specific than that, correct?

MR. GERSON:  Objection.

A   I can't recall the specifics.

Q   Okay.

A   It's all detailed in our complaint.

Q   Okay.  But just I can refer you

Page 127

Jay Turner

to the words on the page:  The company disclosed the specific time period in which the SEC was investigating the company's information barriers.

Correct?

A   I see that on the page.

Q   Okay.  And the company is also disclosing to the market that at least the SEC believes they had made misstatements, correct?

A   I believe so.

Q   Okay.  So as of this date, the market would have known of any alleged fraud, correct?

MR. GERSON:  Objection.  That calls for a legal conclusion.

A   I can't say.

Q   Okay.  As of this date, the market would have known that the company had previously made alleged misstatements, correct?

MR. GERSON:  Same objection.

A   I can't say.

Q   Why can't you say?

Page 128

Jay Turner

A   That would call for a legal conclusion.

Q   I don't think it does.  So let's try it a different way.

As of this disclosure, it was publicly known that the company had made statements that the SEC believed to be false or misleading, correct?

MR. GERSON:  Objection.

A   I believe so.

Q   Okay.  And if the SEC believed -- the SEC was investigating the company's public statements, correct?

A   Yes.

Q   Okay.  And if there are public statements, the public could figure it out themselves as well, correct?

MR. GERSON:  Objection.

A   We have to hope so.

Q   Okay.  So no real secrets anymore once this disclosure is made that the SEC believes the company misrepresented the sufficiencies of its information barriers, correct?

Page 129

Jay Turner

MR. GERSON:  Objection.

A   I can't say.

Q   Why can't you say?

A   I don't know what people were thinking or feeling.

Q   Okay.  The -- and forgive me if I asked you this already.  Let me check.  The disclosure that the company believed it would be getting a Wells notice.  I did ask you that already.  So never mind.

You would agree with me that this disclosure is not one that could have been made on the first day of the class period, correct?

MR. GERSON:  Objection.

A   Correct.

Q   Okay.  You can put that aside?

MR. GERSON:  You want to take five at some point?

MS. BENEDON:  We can do it now.

MR. GERSON:  Okay.

VIDEOGRAPHER:  Off the record at 11:03.  This is the end of Media Unit 2.

33 (Pages 126 - 129)

Page 130

Jay Turner

(Whereupon, at 11:03 a.m., a recess was taken to 11:13 a.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER:  On the record at 11:13.  This is the start of Media Unit 3.

(Whereupon, an Excerpt from Virtu's July 28 of 2023 Form 10-Q was marked as Turner Exhibit No. 13 for identification, as of this date.)

MS. BENEDON:  Did you already hand the witness the document?

COURT REPORTER:  Yes, I did.

Q    Okay.  Mr. Turner, you should have Turner 13, which is Virtu's July 28 of 2023 Form 10-Q, or an excerpt of that Form 10-Q.

Do you recognize this document?

A    I have not seen it.

Q    Do you know why this document is relevant to the allegations in the case?

MR. GERSON:  Objection.

A    I'm going to presume that there

Page 131

Jay Turner

are excerpts from it in our complaint.

Q    Do you know whether that's true sitting here today?

A    I have not read this document.

Q    Okay.  Turn, please, to the second page of the exhibit, which is page 34 of the Form 10-Q.

And if you look with me at the paragraph beneath legal and regulatory proceedings, that states:  In the ordinary course of business, the nature of the company's business subjects it to claims, lawsuits, regulatory examinations, or investigations and other proceedings, any of which could result in the imposition of fines, penalties, or other sanctions against the company.  The company and its subsidiary are subject to several of these matters at the present time, including among others a matter in which the company has been responding to requests for information from the U.S. Securities and Exchange Commission in connection with an investigation of aspects of the company's

Page 132

Jay Turner

internal information access barriers.

The company has continued to cooperate with this civil investigation and engage in settlement discussions.  The company has been unable to reach a settlement and, consistent with its previous disclosure, has received a Wells notice from the SEC to which it has responded.  The company expects the SEC to file an action against the company alleging violations of federal securities laws with respect to the company's information barriers, policies, and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the company during such period.

The company believes it would have meritorious defenses in the event of such an action and intends to defend itself vigorously.

Have you ever seen that disclosure before?

A    I'm not sure.

Page 133

Jay Turner

Q    Okay.  What information does the System believe -- withdrawn.

What incremental information does the System believe the market learned upon this disclosure?

MR. GERSON:  Objection.

A    It states -- this disclosure states that:  Virtu had, in fact, received a Wells notice.

Q    But that's not something that the system believes Virtu had lied about, correct?

MR. GERSON:  Objection.

A    They lied about receiving a Wells notice?

Q    That's my question, sir.

A    I don't believe they lied about receiving a Wells notice.

Q    Okay.  So the only incremental information in this disclosure is not something that was ever misrepresented, correct?

MR. GERSON:  Objection.

A    I can't say.

34 (Pages 130 - 133)

Page 134

Jay Turner

Q   Why can't you say?

A   Well, I don't understand your question.

Q   Sure.

You would agree with me that the only incremental information in this disclosure is the fact that, between the prior disclosure and the date of this disclosure, the company actually had received a Wells notice, correct?

MR. GERSON:  Objection.

A   Yes.

Q   But the System is not accusing Virtu of having lied about receiving a Wells notice, correct?

A   I don't believe so.

Q   Okay.  So the incremental information that was disclosed in this document did not in any way impact the alleged misstatements, correct?

MR. GERSON:  Objection.

A   I can't say.

Q   Why can't you say?

A   I don't know.

Page 135

Jay Turner

Q   Okay.  No basis to believe that it did, correct?

MR. GERSON:  Objection.

A   I don't know.

Q   Do you have any basis to believe that the incremental information in this disclosure revealed the falsity of any alleged misstatement that the market and the System, at that point in time, still believed to be accurate?

MR. GERSON:  Objection.  Calls for a legal conclusion.

A   I don't know.

Q   Okay.  No reason to believe that it did, correct?

MR. GERSON:  Objection.

A   I can't say.

Q   What -- I don't understand that response.

I can't say because you're heeding your counsel's instruction or because you don't know?

MR. GERSON:  Objection.

A   Could you repeat your question?

Page 136

Jay Turner

Q   Sure.

Do you have any reason to believe that the incremental information revealed in this disclosure revealed the falsity of any statement that the market still believed to have been accurate?

MR. GERSON:  Objection.  Calls for a legal conclusion.

A   I can't say.  It calls for a legal conclusion.  I don't know.

Q   I'm asking if you have any reason to believe that?

MR. GERSON:  You're asking his personal or as the System?

MS. BENEDON:  I -- in -- at no point in this deposition am I asking for his personal view.  He's sitting in the chair because he is the System incarnate.

Q   I'm asking if the System has any reason to believe that the incremental information in this disclosure revealed that a prior statement was false?

MR. GERSON:  Objection.  Calls

Page 137

Jay Turner

for a legal conclusion.

A   I can't say.

Q   I'm going to interpret that response as you have no reason to believe that it did.

MR. GERSON:  Objection.  I mean, that misstates his testimony.

Q   Well, what does "I can't say" mean?

A   It means I can't say.

Q   Why can't you say?

A   It calls for a legal conclusion.

Q   It doesn't.  And, even if your counsel objects, unless he's instructing you not to respond, you have to answer my question, so I'll do it again.

Does the System have any reason to believe that the incremental information revealed in this disclosure made clear that a statement that the System is alleging was false or misleading was, in fact, false or misleading?

MR. GERSON:  Objection.  Asked and answered.

35 (Pages 134 - 137)

Page 138

Jay Turner

MS. BENEDON:  It hasn't been answered, and I will do this until I have to go make Shavuos if we have to, and then we'll pick it up on Monday.

Q   So let's do it again.

Does the System have any reason to believe that the incremental information in this disclosure revealed that a prior alleged misstatement was false.

MR. GERSON:  Objection. Continues to ask for a legal conclusion.

A   I can't say.

Q   Why can't you say, sir?

MR. GERSON:  Objection.

A   It calls for a legal conclusion.

Q   The System made allegations about this disclosure, correct?

A   The System made a lot of allegations in our complaint.

Q   Correct.

So what does the System allege was revealed with this disclosure?

Page 139

Jay Turner

A   The disclosure states:  The company has been unable to reach a settlement, and consistent with its previous disclosure, has received a Wells notice from the SEC to which it has responded.  The company expects the SEC to file an action against the company alleging violation of federal securities laws with respect to the company's information barriers, policies, and procedures for a specified time period in and around January 2018 to April 2019 and related statements made by the company during such period.

Q   Okay.  And several moments ago you confirmed for me that the only incremental information in this disclosure was the fact that it had -- that the company had received a Wells notice, correct?

A   Yes.

Q   And none of the alleged misstatements in this case relate in any way to whether the company had received a

Page 140

Jay Turner

Wells notice, correct?

MR. GERSON:  Objection.

A   We're not alleging that they didn't receive a Wells notice.

Q   That was not my question.

Do any of the alleged misstatements in this case have anything to do at all with whether or not the company has received a Wells notice?

MR. GERSON:  Objection.

A   I don't know.

Q   Okay.  Is it the System's view that Virtu misrepresented its risk of receiving a Wells notice?

MR. GERSON:  Objection.

A   I don't know.

Q   Well, in fact, Virtu had already disclosed that it believed it would receive a Wells notice, correct?

A   In the previous document that I reviewed, Exhibit 12, there was a disclosure that they expected to receive, if they didn't settle, a Wells notice.

Q   Okay.  So the market was already

Page 141

Jay Turner

aware of the risk that Virtu could receive the Wells notice before this disclosure, correct?

MR. GERSON:  Objection.

A   The 10-Q speaks for itself.

Q   Okay.

MS. BENEDON:  Let's mark the next one.

What's the number?

COURT REPORTER:  Fourteen.

(Whereupon, an SEC press release dated September 12 of 2023 entitled "SEC Charges Virtu for False and Misleading Disclosures Relating to Information Barriers." was marked as Turner Exhibit No. 14 for identification, as of this date.)

MS. BENEDON:  Turner 14 is an SEC press release dated September 12 of 2023 entitled "SEC Charges Virtu for False and Misleading Disclosures Relating to Information Barriers."

What information -- what incremental information does the

36 (Pages 138 - 141)

Page 142

Jay Turner

System allege was revealed with this disclosure?

MR. GERSON: Objection.

A   I don't know.

Q   Okay.  On the day before this disclosure, which alleged misstatements does the System allege were still thought to be accurate?

MR. GERSON: Object to the form.

A   Those are all detailed in our complaint.

Q   And what's the answer?

A   I don't recall.  I -- they're all in the complaint, but I don't have them memorized.

Q   Okay.  Do you know whether any of the alleged misstatements were still believed to be false the day before this announcement?

MR. GERSON: Objection.

A   I don't recall.

Q   Okay.  The System is not alleging that Virtu made any alleged misstatements about whether the SEC would charge it in

Page 143

Jay Turner

connection with its information barriers, correct?

MR. GERSON: Objection.

A   I don't recall.  I don't believe so.

Q   Okay.  And, before the SEC charged Virtu, Virtu could not have disclosed that the SEC had charged Virtu, correct?

MR. GERSON: Objection.

A   That feels right.

Q   Okay.  So looking at Turner 14, this is not information that the System believed should have been revealed on day one of the class period, correct?

MR. GERSON: Objection.

A   I could agree with that.

Q   Great.  You can put that aside.

MS. BENEDON:  Mark 32A, please.

(Whereupon, an Amended Complaint by the SEC against Virtu was marked as Turner Exhibit No. 15 for identification, as of this date.)

MS. BENEDON:  Turner 15 is an

Page 144

Jay Turner

Amended Complaint by the SEC against Virtu.

Q   Have you ever seen this document before?

A   No.

Q   You are aware that the System's complaint in this case is based, in large part, on the allegations in the SEC's complaint, correct?

MR. GERSON: Objection.

A   I can't say.

Q   Okay.  If you turn to page 9 of the SEC complaint?

Do you see there is a header "C. Defendants Made and Disseminated Materially False and Misleading Statements and Omissions Which Rendered Other Statements Materially Misleading to Customers and the Public Regarding VAL's Information Barriers"?

A   Yes.

Q   Okay.  And you can, of course, take a look.  But "VAL" is a defined term on the first page for Virtu Financial

Page 145

Jay Turner

Americas, LLC.

If I could ask you to, please, read to yourself paragraph 29 in this document and let me know when you've had a chance to review?

A   Okay.

Q   Have you now had a chance to review paragraph 29?

A   Yes.

Q   And you would agree with me that paragraph 29 -- in that paragraph, the SEC is challenging as false and misleading the same statements that we reviewed earlier in this deposition, correct?

A   Yes.

Q   Okay.  If you turn to page 22 in this document, do you see that this is where the SEC lays out the actual legal claims that it's asserting?

A   Yes.

Q   Okay.  And do you see that the first four claims are for violations of 17 -- of Section 17 of the Securities Act?

A   Yes.

37 (Pages 142 - 145)

Page 146

Jay Turner

Q   And if you read, for example, at paragraph 62, you can see that this is a fraud-based claim for making alleged false and misleading statements.

Do you see that?

A   Let me read the paragraph.

Q   Sure.  Yes.

A   I'll read it:  By knowingly recklessly or negligently obtained money or property by means of untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances in which -- under which they were made, not misleading.

Q   Okay.  If I can ask you to take a look at the fifth claim for relief.  This is under a different section -- under a different law.

Do you see that this is a claim for relief under 15G of the Exchange Act?

A   Yes.

Q   And if you read paragraph 74, which you should take the time to do, do

Page 147

Jay Turner

you see that this is a claim based on the actual failure to maintain and enforce policies and procedures regarding the information barriers at Virtu?

A   I read that:  They did not establish, maintain, and enforce written policies and procedures reasonably designed, taking into consideration the nature of VAL's business to prevent the misuse of material nonpublic information by VAL or any person associated with VAL.

Q   So having now read the causes of action, do you understand the SEC complaint included claims based on statements and also claims based on the actual policies in place at Virtu?

A   I believe so, yes.

Q   Okay.  Are you aware of how the SEC action has been resolved?

Well, actually, let me ask a different question.

Are you aware that the SEC action has been resolved?

A   I believe it's settled.

Page 148

Jay Turner

Q   Okay.  Do you know the details of that settlement?

A   Roughly, the amount was over $2 million, but I don't know any of the other terms.

MS. BENEDON:  Okay.  Let's mark 48, please.

(Whereupon, a Press Release dated December 3rd of 2025 was marked as Turner Exhibit No. 16 for identification, as of this date.)

MS. BENEDON:  Turner --
Are you ready?

COURT REPORTER:  Yes.

MS. BENEDON:  Okay.  Turner 16 is a press release dated December 3rd of 2025 by the SEC entitled "SEC obtains final consent judgment as to Virtu broker-dealer regarding alleged failure to establish, maintain, and enforce policies and procedures reasonably designed to prevent misuse of its customers material nonpublic information."

Page 149

Jay Turner

Do you see that?

A   Yes.

Q   Have you ever seen this document before?

A   No.

Q   If I can ask you to please read the text, the two paragraphs on the front page, please, and let me know when you've completed it.

A   Okay.

Q   And if you can continue to read on the next page, sir, and let me know when you have completed them.

A   Okay.

Q   So do you see, sir, that the agreement to pay a $2.5 million penalty was only with respect to the Section 15G claim?

A   I'm going to let the document speak for itself.  I don't know, I mean.

Q   Okay.  But if you let the document speak for itself, it is apparent that the $2.5 million that Virtu agreed to pay was with respect to the Section 15G of the Securities Exchange Act of 1934, that

38 (Pages 146 - 149)

Page 150

Jay Turner

claim, correct?

A   I don't know.

Q   Okay.  Do you have any reason to believe that the SEC's press release was false?

MR. GERSON:  Objection.

A   I don't.

Q   Okay.  So if the SEC is telling the public that they have settled the claim relating to a failure to maintain information barriers but has agreed to dismissal with prejudice of any of the claims based on the statements.

You have no reason to believe that's not accurate, correct?

MR. GERSON:  Objection.

A   No.

Q   Okay.  Before this deposition, were you aware that the SEC agreed to dismissal with prejudice of all of the claims relating to alleged misstatements that Virtu and Doug Cifu and anybody else at Virtu made?

A   I believe so, yes.

Page 151

Jay Turner

Q   Okay.  Okay.  And I'll obviously caution you not to reveal any information that you learned from discussions with counsel.

But do you believe that that is relevant to the System's claims being asserted in this case?

MR. GERSON:  Objection.

A   No.

Q   Okay.  So the System is asserting claims based on alleged misstatements, correct?

A   Yes.

Q   And the claim is that Virtu and its executives lied to the market, correct?

A   Yes.

Q   And the source of those allegations is in large part the SEC's complaint against Virtu, correct?

A   That's part of it, yes.

Q   Okay.  What other parts were there that led to the System's conclusion that Virtu lied to the market?

MR. GERSON:  Objection.

Page 152

Jay Turner

A   All of our allegations are detailed in our complaint.

Q   Okay.  Are you aware of any sources of information on which the complaint relied other than the SEC complaint?

A   I don't know the answer to that.  But our attorneys prepared that complaint and decided which parts to put in there.

Q   Okay.  You have been involved in pursuing other securities class actions on behalf of the System, correct?

A   Yes.

Q   And are you aware that -- well, let me ask it a different way.

Have any of those cases involved allegations that were sourced from anonymous, current, or former employees of the company that was being sued?

A   I can't recall.

Q   Are you aware of that concept generally?

A   Yes.

Q   Okay.  Are you aware of whether

Page 153

Jay Turner

there were any anonymous former employees who were quoted in the complaint against Virtu?

A   I can't recall.

Q   Are you aware of any sources of information that led to the allegations in the systems complaint in this case other than the SEC complaint?

MR. GERSON:  Objection.

A   I don't have the complaint memorized.  I can't say.

Q   Okay.  So sitting here today, you're not aware of any other sources of information, correct?

MR. GERSON:  Objection.

A   I don't know.

Q   Okay.  Virtu disclosed that the $2.5 million figure was not material to its business.

The System doesn't allege that that statement is false or misleading, correct?

MR. GERSON:  Object to the form.

A   I don't know.

39 (Pages 150 - 153)

Page 154

Jay Turner

Q   Okay.  No reason to believe that a $2.5 million settlement is, in fact, material to Virtu's business, correct?

MR. GERSON:  Objection.

A   I have no idea.

Q   Does the outcome of the SEC case inform in any way the System views of the strength of the allegations in this case?

MR. GERSON:  Objection.  It calls for a legal conclusion.

A   Yeah, that's a question for my lawyers.

Q   I'm actually asking the System. The System is alleging that my clients defrauded the market.

Knowing now that the very document on which those claims are based have in large part been dismissed with prejudice, does that inform the System's view on the strength of the allegations in this case?

MR. GERSON:  Objection.  You're still asking for the System's legal view.

Page 155

Jay Turner

MS. BENEDON:  No, I'm not.  I'm asking a yes or a no question.  I'm not asking how it informs.  I'm asking whether it informs.  I'm not asking for the disclosure of anything privileged.

Q   The System makes a judgment about whether or not a specific case is worth its time to get involved in, and there is some assessment on whether or not the System believes that the case is worth its time, true or false?

MR. GERSON:  Objection.

A   Repeat your question.

Q   Does the System -- in deciding whether to pursue being lead plaintiff in a given case, does the System make an assessment on whether or not it believes the case is worth its time?

MR. GERSON:  Objection.

A   Yes.

Q   And that is based in some way on a perceived strength of the allegations therein, correct?

Page 156

Jay Turner

MR. GERSON:  Objection.

A   Yes.

Q   Okay.  Would you have wanted to know that the claims on which this case is based would ultimately be dismissed by the SEC with prejudice?  Would that have informed in any way your decision whether to pursue this case?

MR. GERSON:  Objection.  Calls for speculation.

A   I always want to know as much as possible about the cases we're considering.

Q   Okay.  And this would be a relevant data point for the System to consider, correct?

A   I can't speculate generally about what might happen in a case, but I would want to know everything I possibly could about a case, yes.

Q   Okay.  If you were deciding today whether to begin going down this path of pursuing fraud claims based on fraud claims that the SEC had already dismissed with prejudice, would that fact impact your

Page 157

Jay Turner

assessment?

MR. GERSON:  Objection.

A   I would consider it.

Q   Okay.  I'll leave it at that. You can put that document aside.  And I'm going to switch gears a bit.

The System is a public pension fund, correct?

A   Yes.

Q   Okay.  And who is eligible to participate into the System's public pension fund?

A   All full-time employees of the City of Birmingham.

Q   And how many eligible -- did you say eligible or did I just make that up. Hold on.

How many full-time employees of the City of Birmingham are participants in the system?

A   Approximately 3700.

Q   And how many employees does the System have?

A   Right around 3700.  We don't

40 (Pages 154 - 157)

Page 158

Jay Turner

employ very many part-time employees at all.

Q   So I think I asked a bad question.  And I want to distinguish now between the City of Birmingham and the System in particular.

How many -- is the 3700 employees -- are those employees of the City of Birmingham or the -- or the System?

A   The System has no employees.

Q   Okay.  Are you an employee of the System?

A   No.

Q   Okay.  All right.  Well, then let me ask you a different way.

So you -- part of your job is to serve a role for the System, correct?

A   I serve as their attorney, yes.

Q   Okay.  So how many individuals are there whose job function relates to serving the System?

A   We -- the System is a nine-member board of managers.

Q   Okay.

Page 159

Jay Turner

A   They have all of the decision-making and administrative oversight responsibility for the System.  I serve as attorney for the System.  The chief financial officer of the City of Birmingham is statutorily appointed as the treasurer of the system.  The director of the personnel board of Jefferson County is statutorily appointed as the secretary of the system.

Q   Uh-huh.

A   There are a handful of employees in the human resources department, pension administration division, that calculate benefits.  One, two -- four -- four employees do the day-to-day work of meeting with employees and calculating their benefits and answering any general questions they have about retirement.  And then there are several individuals in the department of finance, payroll division, that process pension payments.  They cut the checks, make the direct deposits, and that kind of thing.

Page 160

Jay Turner

Q   Are there any investment professionals employed by the City of Birmingham that provide any assistance or service to the System?

A   Our investment consultant and our investment managers.

Q   Okay.  But those are outside entities that the System has contracts with, correct?

A   Yes.

Q   Okay.  Can you describe for me the role and responsibility of the nine-member board of managers?

A   Yeah, they're -- they're responsible for everything.

Q   Okay.

A   They run the System.

Q   Okay.  How often does the board meet?

A   Monthly.

Q   And do you attend those meetings?

A   Yes.

Q   What is the purpose of those monthly meetings?

Page 161

Jay Turner

A   For the most part, approving pension benefit payments.  No retiree or disabled individual can receive a pension benefit without the approval of the pension board, and the agenda -- usually the bulk of the agenda is about approving benefits.  The board also receives a monthly update from our investment advisors.  And then from time to time, retirees will be given the opportunity to make statements to the board, you know.

Q   You mentioned the pension board.

Is that the same as the nine-member board of managers that you were referring to?

A   Yes.

Q   Okay.  And the -- you mentioned updates from the investment managers.

Did I get that right?

A   It's from the investment advisor.

Q   Okay.  The -- that's Morgan Stanley?

A   Yes.

Q   Okay.  And what is the nature of

41 (Pages 158 - 161)

Page 162

Jay Turner

the update that Morgan Stanley provides at the board meetings?

A   It's a very high level "you have this much money in your fund and you're going to be able to pay pension benefits."

Q   Okay.

A   It's a general market update, too.

Q   Okay.  Is there ever discussion of individual securities in which the System is invested?

A   I don't believe so.  It's never happened --

Q   Okay.

A   -- since I've been there.

Q   Who at the System has ultimate responsibility for investment decisions?

A   The board of managers.  They've delegated the discretion to make all of their investment decisions to the various investment managers.

Q   How does the system assess the performance of its investment managers?

A   We rely upon our investment

Page 163

Jay Turner

advisor.

Q   Does your investment advisor report to the board about the performance of the investment managers?

A   Yes.

Q   Is that at every meeting?

A   Yes.

Q   And does Morgan Stanley report on the performance of all of the investment managers at that meeting?

A   Yes.

Q   And can you describe for me the nature of that reporting?

A   It's "you're doing well" or "you're not doing so well."  I mean, it's a very, very high level overview.

Q   Okay.  Who at the System has ultimate responsibility for whether the System will get involved in a securities class action?

A   The nine-member board of managers.

Q   Okay.  And is that something that you present on at board meetings?

Page 164

Jay Turner

A   Yes.

Q   Did the board of managers approve the lead plaintiff obligation in this case?

A   Yes.

Q   The decision to pursue lead plaintiff status in a securities case comes with it a commitment on behalf of the system to devote time and attention to the case, correct?

A   Yes.

Q   Why does the System choose to do so?

A   When we've suffered an investment loss, we try to regain some of those losses.

Q   Has the System regained some of its losses in securities class actions in which it has not served as lead plaintiff?

A   Yes.

Q   Okay.  So what is in it for the System in deciding to devote what sounds like your time and attention to any given securities case?

MR. GERSON:  Objection.

Page 165

Jay Turner

A   We get to control the litigation.

Q   Okay.  And how does the System control the litigation?

A   I monitor the case and manage our outside attorneys, provide discovery, review all of the pleadings in the case.

Q   How have you monitored this particular case?

A   I've been in regular communication with our attorneys.  I have reviewed all of the pleadings in the case.  I have assisted in providing discovery in the case, and I'm sitting for deposition today.

Q   When you say "reviewing the pleadings," are you referring to -- well, let me withdraw.

When you refer to reviewing the pleadings, what pleadings have you reviewed?

A   The first complaint, the second complaint, the amended complaint.  I reviewed the documents relating to discovery and this deposition.

42 (Pages 162 - 165)

Page 166

Jay Turner

Q   Did you review the pleadings in advance of their filing?

A   Yes.

Q   Okay.  Do you -- is it your practice to provide comments on the draft pleadings?

A   Yes.

Q   Did you do so in this case?

A   I don't recall.

Q   Okay.

MS. BENEDON:  Oh, that's me.  I'm sorry.

COURT REPORTER:  I didn't know what it was.

MS. BENEDON:  I'm sorry.  I'm scratching my shoulder.

Q   Does the System have a class action litigation policy?

A   No.

Q   Okay.  Are you aware that the System recently filed a motion for class certification?

A   Yes.

Q   Did you review that filing before

Page 167

Jay Turner

it was filed?

A   Yes.

Q   Did you provide comments on it?

A   I don't recall.

(Off the record discussion.)

Q   Are you aware of the fact that the System has an expert witness in connection with its class certification motion?

A   Yes.

Q   Did you review the expert's report?

A   I did not.

Q   Okay.  Do you know who the expert is?

A   Cane (ph).

Q   Have you ever spoken to Dr. Cane?

A   No.

Q   Did you play a role in his retention?

A   No.

Q   How much time have you spent on this litigation other than the time in which you prepared for -- I think I might

Page 168

Jay Turner

have misspoken.

How long have you spent in connection with this litigation other than the time spent preparing for the deposition?

A   I have no idea.  I didn't review my records to know how many hours I've spent on this case.

Q   Okay.  Does -- are you able to approximate in any way?

A   I couldn't begin to guess.

Q   Okay.

A   I'm sorry.

Q   Well, I wouldn't want you to guess, so that's fine.

Does the System maintain a file on this litigation?

A   Yes.

Q   And what's included in that file?

A   Everything produced by our attorneys.

Q   Are you talking about, like, discovery materials?

A   No.  All of the stuff that I get

Page 169

Jay Turner

sent from our attorneys.

Q   Okay.  Like court filings, is that what you are referencing?

A   Yes.

Q   I see.

Okay.  Have you seen any of the discovery -- discovery material produced by Defendants in this case?

A   Some of it, yes.

Q   Other than in connection with preparing for the deposition, have you seen any of the discovery material produced by Defendants?

A   Some of it, yes.

Q   Okay.

MS. BENEDON:  All right.  Let's mark, please, Tab 10.

(Whereupon, a City of Birmingham Retirement and Relief System Statement of Investment Policy Objectives and Guidelines dated November 14 of 2018 document was marked as Turner Exhibit No. 17 for identification, as of this date.)

43 (Pages 166 - 169)

Page 170

Jay Turner

MS. BENEDON: Turner 17 is a City of Birmingham Retirement and Relief System Statement of Investment Policy Objectives and Guidelines dated November 14 of 2018 bearing the Bates stamp Birmingham 13.

Q   Do you recognize this document?

A   Yes.

Q   What is this document?

A   It is the City of Birmingham Retirement and Relief System's Statement of Investment Policy Objectives and Guidelines.

Q   And what is the purpose of this document?

A   To generally set forth the System's investment policy objectives and guidelines.

Q   How often is this document updated?

A   It's reviewed annually.  It's not updated very often.

Q   Okay.  This is dated November 14 of 2018.

Page 171

Jay Turner

Does that -- is that the first date on which this version of the policy would have been in place?

A   There were -- for this document right here, yes.

Q   Okay.

A   There were previous versions of investment policies and -- and we've updated it since, but this is what was in effect beginning November 14, 2018.

Q   Okay.  The punitive class period begins about a week before this date.

Do you have any reason to believe the version that was in place, as of November 7 of 2018, was materially different than this version of the policy?

A   I don't remember if there were any differences.  I don't believe there were.

Q   Does the System maintain all prior iterations of its policy documents?

A   We try to.

Q   Okay.  We've received in discovery this version and one from 2022.

Page 172

Jay Turner

Do you know whether there were other iterations of the policy between 2018 and 2022?

A   There were none.

Q   Okay.  Do you know if the System maintained the version in place as of the beginning of the class period?

A   The 2015 document?

Q   I don't know because --

A   I --

Q   -- we haven't received it.

So is 2015 the iteration of the document immediately preceding the one you're looking at as Turner 17?

A   I believe -- we did have a prior investment policy statement.  Yes.

Q   Okay.  Does the System have that in its files as of today?

A   Yes.

Q   Okay.  We'll follow up with your counsel.

But if we call for the production of that document, is that something you could produce?

Page 173

Jay Turner

A   Yes.

Q   Okay.  Has Morgan Stanley been the sole investment consultant for the System at all times since November 7 of 2018?

A   Yes.

Q   Okay.  Is -- withdrawn.

If you look, please, at page 2 here?

Beneath the numbered paragraph 4, it says:  The board of managers will not reserve any control over investment decisions with the exception of specific limitations described in these statements.

Do you see that?

A   Yes.

Q   Do you know whether that aspect of this policy was different at any point during the class period?

A   I don't believe it was.

Q   If you turn, please, to page 3, it describes the responsibility of the investment consultant?

It says:  The investment

44 (Pages 170 - 173)

Page 174

Jay Turner

consultant's role is that of a non-discretionary advisor to the board of managers of the City of Birmingham Retirement and Relief System.

Q    What does "non-discretionary advisor" mean?

A    They do not have the discretion to make decisions on behalf of the board of managers. They're just there to advise.

Q    I see.

Okay. And numbered paragraph 4 describes the investment consultant's responsibilities as including: Monitoring the performance of the investment managers to provide the board of managers with the ability to determine the progress toward the investment objectives.

Do you see that?

A    Yes.

Q    And is it your view that Morgan Stanley has complied with that obligation?

A    Yes.

MR. GERSON:  Objection.

Q    And are you aware of how many

Page 175

Jay Turner

investment managers have purchased Virtu securities on behalf of the system between 2018 and 2023?

MR. GERSON:  Objection.

A    Yes.

Q    How many?

A    Three.

Q    Do you know which those are?

A    Great Lakes, PGIM, and RhumbLine.

Q    Does the System have active engagements with all three of those entities?

A    Yes.

Q    Okay.

A    Oh, no. I'm sorry. We're no longer with Great Lakes.

Q    Do you know -- sorry.

A    That happened in September actually.

Q    September of 2025?

A    Yes.

Q    What was the reason for terminating that relationship?

A    Poor performance.

Page 176

Jay Turner

Q    Had the System ever -- well, let me back up.

How did the System come to learn that Great Lakes was not performing in an acceptable fashion?

A    Our investment advisors informed us.

Q    Okay. And this -- this document refers to an investment consultant, but you used "consultant" and "advisors" interchangeably, correct?

A    Yes.

Q    Okay. I just want to make sure you're not talking about some other entity.

A    Okay.

Q    Who at Morgan Stanley advises the board?

A    Gregg Burchell.

Q    Can you spell that?

A    G-R-E -- I believe Greg is G-R-E-G-G.

Q    Okay.

A    And Burchell is B-U-R-C-H-E-L-L.

Q    Is there anyone else at Morgan

Page 177

Jay Turner

Stanley that advises the board in connection with this investment consultant role?

A    Daymeon Fishback will also attend the meetings. His name is spelled D-A-Y-M-E-O-M; Fishback, F-I-S-H-B-A-C-K.

Q    What was the nature of Great Lakes poor performance that led to the termination of the relationship?

A    I can't recall.

Q    Did any of the three investment managers who transacted in Virtu on behalf of the system ever communicate in any way with the system regarding Virtu?

A    No.

Q    Has the System ever asked any of its investment managers if the investment managers believed that Virtu had defrauded the market?

A    No.

Q    Has the System ever informed its investment managers that it did not wish to be invested in Virtu's securities on the basis of the company was being run by

45 (Pages 174 - 177)

Page 178

Jay Turner

fraudsters?

MR. GERSON:  Objection.

A   No.

Q   Why not?

MR. GERSON:  Objection.

A   We rely upon our investment managers to make investment decisions.

Q   Are there any types of companies in which the System does not allow its investment managers to transact on its behalf?

A   No.

Q   Okay.  If you turn, please, to page 6, do you see there is a list of allowable assets?

A   Yes.

Q   Okay.  And under the second category, which is "Fixed Income Securities," do you see that the fourth-to-last bullet point is "Derivative Securities"?

A   Yes.

Q   And are you aware whether any of your investment managers have transacted in

Page 179

Jay Turner

derivative securities relating to Virtu?

A   We have only purchased Class A stock in Virtu.

Q   Okay.  How do you know that?

A   That's what all of the transactions in Virtu's -- Virtu's stock show.

Q   According to whom?

A   Our custodian.

Q   Which is who?

A   Regions Bank.

Q   Okay.  Do you know whether the System has purchased -- do you know what a "put option" is?

A   No.

Q   Okay.  Do you know how you would find out if the System -- if any of the System's investment managers had purchased put options related to Virtu's securities?

A   I have no idea.

Q   Okay.  Do you know whether anybody made that assessment in connection with discovery in this case?

A   I don't know.

Page 180

Jay Turner

Q   Okay.  If -- please turn to the following page, page 7.

Do you see there at the top there is a list of prohibited transactions?

A   Yes.

Q   And do you see that short selling is on that list?

A   Yes.

Q   Beneath, it says:  Managers identified as alternative managers shall be exempt from this restriction.

What is an "alternative manager"?

A   I don't know.

Q   Do you know whether any of the three investment managers that we've been referring to count as alternative managers?

A   I do not.

Q   Do you know if any of the System's other investment managers qualify as alternative managers?

A   I don't know what the term "alternative managers" means.

MS. BENEDON:  Okay.  I am -- I have like -- why don't we go off the

Page 181

Jay Turner

record.

VIDEOGRAPHER:  Off the record at 12:07.  This is the end of Media Unit 4.

(Whereupon, at 12:07 p.m., a recess was taken to 12:19 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER:  On the record, 12:19.  This is the start of Media Unit 4.

(Whereupon, a Document, entitled Exhibit C was marked as Turner Exhibit No. 18 for identification, as of this date.)

MS. BENEDON:  Turner 18 is a document -- cover page says "Exhibit C."  And if you turn to the following page, it's entitled "Certification Pursuant to Federal Securities Laws."

Q   Do you recognize this document?

A   Yes.

Q   And this is a certification that

46 (Pages 178 - 181)

Page 182

Jay Turner

you signed under penalty of perjury, correct?

A   Yes.

Q   And in paragraph 4, it says: Plaintiff has made the following transactions during the class period in the securities that are the subject of this action.  See attached Schedule A.

Do you see that?

A   Yes.

Q   And Schedule A then sets forth trades in Virtu, correct?

A   Yes.

Q   How did you satisfy yourself that the information in this certification was accurate?

MR. GERSON:  Objection.

A   I relied upon my lawyers.

Q   Okay.  Do you stand by this certification?

A   Yes.

Q   Were you being transparent with the court when you submitted this certification?

Page 183

Jay Turner

MR. GERSON:  Object to the form.

A   Yes.

Q   This isn't the only certification that you submitted in connection with Virtu, the Virtu matter, correct?

A   Correct.

Q   And this isn't an accurate schedule of all of the trades that the System made in Virtu's securities, correct?

MR. GERSON:  Objection.

A   I have no reason to believe that.

MS. BENEDON:  Okay.  Well, let's take a look at 32, please.  You keep that handy, but we'll mark another document.

COURT REPORTER:  Nineteen.

(Whereupon, a Complaint was marked as Turner Exhibit No. 19 for identification, as of this date.)

MS. BENEDON:  Turner 19 is a complaint for violations of the federal securities law under case caption: City of Birmingham Retirement & Relief System versus

Page 184

Jay Turner

Virtu, et al.

Q   Do you see that?

A   Yes.

Q   Okay.  And this is a complaint that was filed on October 31 of 2023 if you look at the top.

Do you see that?

A   Yes.

Q   And do you recall that you submitted a certification in connection with this filing?

A   Yes.

Q   And if you turn, please, at the top it's labeled page 41 of 43?

A   Yes.

Q   Are you with me?  Okay.

Do you see here this is a certification of named Plaintiff pursuant to federal securities law with your signature.

Do you see that?

A   Yes.

Q   And this is also signed under penalty of perjury, correct?

Page 185

Jay Turner

A   Yes.

Q   And, again, at paragraph 4, you see a representation that plaintiff has made the following transactions during the class period and the securities that are the subject of this action.  See attached Schedule A.

Do you see that?

A   Yes.

Q   And then if you turn to Schedule A, there is a different set of trades in this document -- correct? -- as compared to the prior certification; is that right?

A   The list appeared to be different.

Q   Okay.  And in making this certification, were you intending to be transparent with the court?

MR. GERSON:  Object to the form.

A   Yes.

Q   Did you advise the court in this filing that you had previously submitted a false declaration?

47 (Pages 182 - 185)

Page 186

Jay Turner

MR. GERSON: Objection.

A   I did not.

Q   Is that transparent?

MR. GERSON: Object to the form.

A   I don't believe I have ever submitted anything falsely to a court ever.

Q   So which one is true, the schedule in Turner 19 or Turner 18?

MR. GERSON: Objection.

A   Sitting here today, I can't speak to the details of these transactions.

Q   So you don't know one way or the other which of these things that you submitted under penalty of perjury is accurate?

MR. GERSON: Objection.

A   I don't know the answer to your question.

Q   So sitting here today, you don't know whether of two -- which of two conflicting sets of transactions accurately reflects the System's transactions in Virtu?

MR. GERSON: Objection.

Page 187

Jay Turner

A   I don't know the answer to your question.

Q   Okay. Did you intend to perpetrate fraud on the court --

MR. GERSON: Objection.

Q   -- in submitting two competing declarations?

A   I have never perpetrated a fraud upon the court.

Q   Okay. But one of these is wrong, right?

A   I'm not going to say that.

Q   Well, they both can't be accurate, right?

MR. GERSON: Objection.

A   I can't say that.

Q   Are these both accurate?

A   I'm going to say they're both accurate, that they represent the securities bought and sold by the System.

Q   Okay. But it's not the same list, right?

A   To be honest, I don't know.

Q   Okay. So how did you satisfy

Page 188

Jay Turner

yourself when you submitted something under penalty of perjury that two competing lists were both accurate?

MR. GERSON: Objection.

A   I relied upon my lawyers.

Q   Okay. You have no independent basis for the assertion that what you were submitting to the court was accurate?

A   I did not go back and look at all of the trades in Virtu's stock. I relied upon my lawyers.

Q   If one of these is inaccurate, you did not intend to mislead the court, correct?

MR. GERSON: Objection.

A   I have never misled the court.

Q   Okay. But submitting something false to the court has the potential to mislead, correct?

MR. GERSON: Objection.

A   I mean, if we're talking general legal theory, yeah.

Q   Okay. If, for example, the first declaration that you submitted contains an

Page 189

Jay Turner

inaccurate set of trades, it was not your intention to submit something that was inaccurate, correct?

MR. GERSON: Objection. You're asking for speculation.

MS. BENEDON: No, I'm not.

MR. GERSON: You said if the first --

MS. BENEDON: Okay. So let's delete the word --

MR. GERSON: That's speculating.

MS. BENEDON: -- "if."

Q   Did you intend to mislead the court when you submitted the first declaration?

MR. GERSON: Objection.

A   I have never misled the court.

Q   Okay. Which time did you submit a false declaration?

MR. GERSON: Objection.

A   I have never submitted a false declaration to the court.

Q   Okay. But two different sets of transactions that are represented to be the

48 (Pages 186 - 189)

Page 190

Jay Turner

same thing can't both be true, correct?

MR. GERSON: Objection. You've now asked this about 12 times.

Q   You can answer.

A   I can't -- I can't speak to that.

Q   Okay. Do you have a practice of submitting documents under penalty of perjury without independently knowing whether they're true?

MR. GERSON: Objection. Lacks foundation.

A   I always review every pleading, every declaration before submitting it to the court to make sure it's true and accurate.

Q   So what process did you do in connection with these two certifications to ensure that they were true and accurate?

A   I relied upon my attorneys.

Q   Okay.

(Whereupon, an Investment management agreement between the System and RhumbLine Advisors Limited Partnership was marked as Turner

Page 191

Jay Turner

Exhibit No. 20 for identification, as of this date.)

MS. BENEDON: Turner 20 is an investment management agreement between the System and RhumbLine Advisors Limited Partnership.

Q   Do you recognize this document?

A   Yes.

Q   What do you recognize this to be?

A   This is the investment management agreement between RhumbLine and the System.

Q   Are you aware of any other written agreements between RhumbLine and the System?

A   No.

Q   Has this document been updated or amended in any way since October of 2007?

A   I don't recall.

Q   But sitting here today, you're not aware of any further amendments or updates to this document, correct?

A   Correct.

Q   And the System maintains an active investment management relationship

Page 192

Jay Turner

with RhumbLine as of today, correct?

A   Yes.

Q   If you look, please, at the bottom of the second page, which is the document ending in Birmingham Bates 043?

Do you see paragraph 3, "Standard of Care"?

A   Yes.

Q   If you look at the bottom three lines, it states: Notwithstanding the foregoing, it is agreed and acknowledged that the investment manager shall manage the investment fund as an index fund tracking the Russell 1000 Growth Index.

And is that consistent with how RhumbLine has managed the investment fund at all times since October 2007?

A   I don't know.

Q   Okay. Are you aware of any changes to this provision of how RhumbLine was to manage the investment fund?

A   No.

Q   Do you understand what it means that RhumbLine would manage the investment

Page 193

Jay Turner

fund tracking the Russell 1000 Growth Index?

A   I would just read the words on the page. I'm not an investment professional.

Q   Okay. Has the System's investment consultant ever recommended terminating the relationship with RhumbLine?

A   I don't remember.

Q   Are there other investment managers that invest on behalf of the System pursuant to an index strategy?

A   Yes.

Q   Okay. And do you know generally what it means to invest pursuant to an investment strategy -- excuse me -- pursuant to an index strategy?

A   Well, the fund basically buys all of the equities in the -- reflected in the index.

Q   Okay. And is it your understanding that RhumbLine managed the investment fund on behalf of the System

49 (Pages 190 - 193)

Page 194

Jay Turner

pursuant to an index strategy?

A   I don't know.

Q   Okay.

MS. BENEDON:  Mark, please, Tab 21.

(Whereupon, a Document with a set of transactions reflecting RhumbLine's trades in Virtu Securities on behalf of the System was marked as Turner Exhibit No. 21 for identification, as of this date.)

MS. BENEDON:  Turner 21 is a document that was produced by RhumbLine bearing Bates stamp RhumbLine with a bunch of zeros ending in 18.  This is a set of transactions reflecting RhumbLine's trades in Virtu Securities on behalf of the System.

Q   Have you seen this document before?

A   No.

Q   Okay.  I will represent to you that the System held 200 shares of Virtu

Page 195

Jay Turner

before the class period.

Do you have any -- in; the fund that RhumbLine managed.

Do you have any reason to quarrel with that representation?

A   I have no idea what stocks RhumbLine had.

Q   Okay.  Are you prepared to testify as to any of the particular trades RhumbLine made on behalf of the System?

A   No.

Q   Okay.  Do you know why RhumbLine sold out of its position in Virtu if Virtu was still on the Russell 1000 Index?

A   No.

Q   You can put that aside.

Do you know when the System entered into an investment management agreement with Great Lakes?

A   I do not.

Q   Okay.

MS. BENEDON:  Let's mark the document.

Twenty-two?

Page 196

Jay Turner

COURT REPORTER:  Yes.

(Whereupon, an Investment advisor agreement between the System and Great Lakes was marked as Turner Exhibit No. 22 for identification, as of this date.)

MS. BENEDON:  Turner 22 is an Investment advisor agreement between the System and Great Lakes.  At the top of the page, it says "the 22nd day of December," but I don't see a date.

Q   Do you have any knowledge as to when this was entered?

A   I do not.

Q   If you are -- if you could take a look at the -- page 77?

Are you able to decipher who the authorized representative is?

A   William Bell.

Q   And do you know what years William Bell was in office?

A   I do not.

Q   Okay.  Are you aware of any other

Page 197

Jay Turner

iterations of this document?

A   No.

Q   Okay.  And in the very first paragraph, it describes the authorization to invest and manage an "S mid-cap core equity portfolio."

Do you know what that means?

A   It invests in small and medium capitalization companies.

Q   Do you -- does -- withdrawn.

Does -- did Great Lakes invest, on the System's behalf, pursuant to an index strategy?

A   I don't believe they did.

Q   Okay.

A   This was the S mid-cap core equity portfolio.

Q   Do you have any information as to why Great Lakes bought or sold Virtu stock on behalf of the System on any particular date?

A   No.

Q   Okay.  Great Lakes first purchased Virtu on behalf of the system in

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 198

Jay Turner

March of 2021.

Do you know why they did so?

A   I do not.

Q   Do you know whether it was on the basis of any of the alleged misstatements in this case?

MR. GERSON:  Objection.

A   I do not.

Q   Okay.  And Great Lakes then sold out of the position on March 15 of 2023.

Do you know why?

A   No.

Q   Do you know whether it was because of the alleged fraud in this case?

MR. GERSON:  Objection.

A   I do not.

MS. BENEDON:  Let's mark the PGIM Tab 1.

(Whereupon, an Agreement dated March 28 of 2001 between the System and Prudential Investment Management was marked as Turner Exhibit No. 23 for identification, as of this date.)

MS. BENEDON:  Turner 23 is an

Page 199

Jay Turner

agreement dated March 28 of 2001 between the System and Prudential Investment Management.

Q   Do you recognize this document?

A   Yes.

Q   What do you recognize this to be?

A   This is the agreement between the System and Prudential Investment Management.

MS. BENEDON:  And I'm sorry.  I should have marked another document along with that.

(Whereupon, an August 19 of 2014 amendment to Turner 23 was marked as Turner Exhibit No. 24 for identification, as of this date.)

MS. BENEDON:  Turner 24 is an August 19 of 2014 amendment to Turner 23; is that correct?

A   Yes.

Q   Okay.  And, other than Turner 24, are there any other iterations of the document or amendments thereto?

A   I don't recall.

Page 200

Jay Turner

Q   Okay.  Do you know whether -- we have been referring to this entity as "PGIM."

Is that the -- how do you know this investment manager?

By what name do you know this investment manager?

A   We regularly call them "Quantitative."

Q   Okay.  Okay.  Are you familiar with an acronym "PGIM"?

A   Yes.

Q   Is that one and the same as far as you know?

A   Yes.

Q   Okay.  Do you know is PGIM invested in Virtu stock on behalf of the System pursuant to an index strategy?

A   I do not.

Q   Do you know what strategy PGIM uses or Quantitative uses to invest on behalf of the System?

A   It's a quantitative strategy.

Q   What do you understand that to

Page 201

Jay Turner

mean?

A   They have their mathematical formulas and algorithms that they use to choose stocks.

Q   Okay.  Do you know whether that algorithm takes into consideration whether the company has committed a fraud?

A   I do not.

MR. GERSON:  Objection.

Q   Do you know whether that algorithm takes into consideration the company's, like, public disclosures?

A   I do not.

Q   Do you know why PGIM acquired Virtu stock on the System's behalf on February 8 of 2023?

A   I do not.

Q   And do you know why PGIM continued to buy Virtu stock, even after the first and second alleged corrective disclosure?

MR. GERSON:  Objection.

A   I do not.

MS. BENEDON:  Let's mark Tab 28,

51 (Pages 198 - 201)

Page 202

Jay Turner

please.

(Whereupon, a Document related to the lead plaintiff application for the System was marked as Turner Exhibit No. 25 for identification, as of this date.)

MS. BENEDON:  Turner 25 is a document that was filed in connection with the System's lead plaintiff application.

Q   Have you ever seen this document before?

A   Yes.

Q   What do you understand this to be?

A   It reflects the total losses the System had on Virtu Class A stock.

Q   Did you review this before it was filed?

A   Yes.

Q   Did you do anything to verify the accuracy of the information contained on this document?

A   I relied upon my attorneys.

Page 203

Jay Turner

Q   This document asserts a loss of $500,000, 340, and 41 cents.

Does the System stand by that calculation?

MR. GERSON:  Objection.

A   Yes.

Q   Who at the System manages the System's relationship with Morgan Stanley?

A   The board of managers.

Q   Okay.  Other than the presentation by Morgan Stanley at the monthly board meetings, are you aware of whether the board of managers communicates with Morgan Stanley?

A   No.

Q   You're not aware or you know that they don't?

A   I'm not aware that they do.

Q   Okay.  Were you involved in the process of responding to Defendant's request for production of documents in this case?

A   Yes.

Q   And the System did conduct a

Page 204

Jay Turner

search of emails in response to Defendant's requests, correct?

A   Yes.

Q   What was the process that the System undertook to find responsive documents?

A   A member of the City's information management systems department, who specializes in this area, used the search terms provided by counsel to search all of the City's systems.

Q   Do the -- not -- do the nine members of the System's board have City of Birmingham email addresses?

A   They all do, I believe, yes.

Q   Okay.  So would the board members' emails have been part of the search that the System conducted?

A   Yes.

Q   Okay.

MS. BENEDON:  I have no further questions.

MR. GERSON:  Off the record?

VIDEOGRAPHER:  Off the record at

Page 205

Jay Turner

12:44.  This is the end of Media Unit 4.

(Whereupon, at 12:44 p.m., a recess was taken to 12:55 p.m.)

(The proceeding resumed with all parties present.)

VIDEOGRAPHER:  On the record at 12:55.  This is the start of Media Unit 5.

BY MR. GERSON:

Q   Mr. Turner, were you involved in the System's decision to purchase the Virtu common stock at issue in this case?

A   No.

Q   Was anyone employed by the City of Birmingham or the System involved in the -- in the decision to purchase the Virtu common stock at issue in this case?

A   Our investment managers.

Q   But no employees of the System?

A   No.  The -- the System doesn't have any employees.  No one at the board of managers decided to buy Virtu stock.

Q   Would you or anyone at the System

52 (Pages 202 - 205)

Page 206

Jay Turner

have reviewed any documents about Virtu before its investment managers purchased Virtu common stock on its behalf?

A   No.

Q   Do you know what documents its investment managers reviewed before purchasing Virtu common stock on the System's behalf?

A   No.

Q   And counsel before showed you various documents that included quotes that were contained in the complaint.

Do you recall that?

A   Yes.

Q   Including Turner Exhibits 3, 5, 6, 8, 9, 10, 11, and 12.

Does that sound right?

A   Yes.

Q   So, when you testified that you did not rely on those documents, you did not mean that the investment managers did not rely on those documents; is that right, sir?

A   Yes.  The City of Birmingham

Page 207

Jay Turner

never makes investment decisions with respect to what the investment managers purchase.  That is entirely at their discretion.  We don't get involved in any way.

MR. GERSON:  I have no further questions and pass the witness.

MS. BENEDON:  Nothing from me. Thank you for your time, sir.

MR. POLDEN:  Thank you.

VIDEOGRAPHER:  We are off the record at 12:57 p.m., and this concludes today's testimony given by Jay Turner.  The total media used was five and will be retained by Veritext.

(Time noted:  12:57 p.m.)

_____
          JAY TURNER

Subscribed and sworn to before me this_____day of _____2025.

Page 208

Jay Turner

_____
NOTARY PUBLIC

Page 209

Jay Turner

-------------------INDEX----------------------

WITNESS          EXAMINATION BY          PAGE
JAY TURNER        MS. BENEDON              7

------------------EXHIBITS---------------------

FOR IDENTIFICATION  DESCRIPTION          PAGE
Exhibit No. 1     30(b)(6) Deposition     14
                  Notice
Exhibit No. 2     Document entitled,      20
                  City of Birmingham,
                  Retirement & Relief
                  System, Engagement
                  Agreement for
                  Portfolio Monitoring
Exhibit No. 3     Earnings Call           33
                  Transcript from
                  Virtu's Third Quarter
                  of 2018 Earnings Call
                  on November 7th of
                  2018
Exhibit No. 4     Press Release dated     41
                  August 12 of 2015
Exhibit No. 5     Excerpt from Virtu's    53
                  Third Quarter of 2018

53 (Pages 206 - 209)

Page 210

Jay Turner

------------------EXHIBITS--------------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 6 | Bloomberg article from November 14, 2018 | 64 |
| Exhibit No. 7 | Letter | 78 |
| Exhibit No. 8 | Article from November 17, 2018 | 84 |
| Exhibit No. 9 | Earnings call transcript from 2/7/2019 | 98 |
| Exhibit No. 10 | Document dated, June 5 of 2019 from the Sandler O'Neill Global Exchange and Brokerage Conference | 110 |
| Exhibit No. 11 | Excerpt from Virtu's February 17, 2023 Form 10-K | 116 |
| Exhibit No. 12 | Excerpt of Virtu's April 28, 2023 Form 10-Q | 121 |
| Exhibit No. 13 | Excerpt from Virtu's July 28 of 2023 Form 10-Q | 130 |

Page 211

Jay Turner

------------------EXHIBITS--------------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 14 | SEC press release dated September 12 of 2023 entitled "SEC Charges Virtu for False and Misleading Disclosures Relating to Information Barriers." | 141 |
| Exhibit No. 15 | Amended Complaint by the SEC against Virtu | 143 |
| Exhibit No. 16 | Press Release dated December 3rd of 2025 | 148 |
| Exhibit No. 17 | City of Birmingham Retirement and Relief System Statement of Investment Policy Objectives and Guidelines dated November 14 of 2018 document | 170 |

Page 212

Jay Turner

------------------EXHIBITS--------------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 18 | Document, entitled Exhibit C | 181 |
| Exhibit No. 19 | Complaint | 183 |
| Exhibit No. 20 | Investment management mark agreement between the System and RhumbLine Advisors Limited Partnership | |
| Exhibit No. 21 | Document with a set of transactions reflecting RhumbLine's trades in Virtu Securities on behalf of the System | 194 |
| Exhibit No. 22 | Investment advisor agreement between the System and Great Lakes | 196 |
| Exhibit No. 23 | Agreement dated March 28 of 2001 between the System and Prudential Investment Management | 198 |

Page 213

Jay Turner

------------------EXHIBITS--------------------

| FOR IDENTIFICATION | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit No. 24 | August 19 of 2014 amendment to Turner 23 | 199 |
| Exhibit No. 25 | Document related to the lead plaintiff application for the System | 202 |

---- ***** ----

54 (Pages 210 - 213)

Veritext Legal Solutions

212-267-6868                 www.veritext.com                 516-608-2400

Page 214

Jay Turner

CERTIFICATE

STATE OF NEW YORK )

)ss:

COUNTY OF RICHMOND)

I, DANIELLE GRANT, a Certified Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That JAY TURNER, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by such witness.

I further certify that I am not related to any of the parties to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 18th day of December, 2025.

*Danielle Grant*

DANIELLE GRANT

---

Page 215

Jay Turner

DEPOSITION ERRATA SHEET

DECLARATION UNDER PENALTY OF PERJURY

I declare under penalty of perjury that I have read the entire transcript of my Deposition taken in the captioned matter or the same has been read to me, and the same is true and accurate, save and except for changes and/or corrections, if any, as indicated by me on the DEPOSITION ERRATA SHEET hereof, with the understanding that I offer these changes as if still under oath.

Signed on the _____ day of _____, 2025.

_____

JAY TURNER

---

Page 216

Jay Turner

DEPOSITION ERRATA SHEET

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

SIGNATURE:_____DATE:_____

JAY TURNER

---

Page 217

Jay Turner

DEPOSITION ERRATA SHEET

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

Page No._____Line No._____

Change to:_____

Reason for change:_____

SIGNATURE:_____DATE:_____

JAY TURNER

55 (Pages 214 - 217)

[& - 2000]                                                                          Page 1

| & |
| --- |
| **&**  2:18 3:3,13 5:22 6:22 19:24 20:7,17 21:5,6 38:20 81:24 82:7 183:25 209:12 |

| 0 |
| --- |
| **03770**  1:3,8 5:20 |
| **043**  192:6 |

| 1 |
| --- |
| **1**  5:12 14:21,25 56:22 64:24 65:9 78:20 84:9 86:2 198:19 209:8 |
| **1,000**  65:6 |
| **10**  27:11,24 53:16,18 54:3 54:12 55:23,24 60:13 62:20 110:15 111:5 115:25 116:6,8 116:12,17 121:16,21 122:2,7 130:10 130:18,19 131:8 141:6 169:18 206:17 210:12,19,22 210:25 |

**100**  101:10
**1000**  192:15 193:2 195:15
**10019**  3:16 5:24
**11**  66:13 116:2 116:4 206:17 210:17
**110**  210:12
**116**  210:17
**11747**  3:6
**119**  116:16
**11:03**  129:24 130:2
**11:13**  130:3,7
**12**  1:16 2:11 5:4 40:24 41:4 83:23 121:17 121:20 140:22 141:13,20 190:4 206:17 209:23 210:20 211:5
**121**  210:20
**1285**  2:18 3:15 5:23
**12:07**  181:4,6
**12:19**  181:7,11
**12:44**  205:2,4
**12:55**  205:5,9
**12:57**  207:13 207:19
**13**  56:2 130:11 130:17 170:7

210:23
**130**  210:23
**14**  63:24 66:14 141:17,19 143:13 169:23 170:6,24 171:11 209:8 210:5 211:4,22
**141**  211:4
**143**  211:12
**148**  211:14
**14th**  64:5 66:10
**15**  116:17 143:23,25 198:11 211:12
**15g**  146:22 149:18,24
**16**  148:11,16 211:14
**17**  79:24 80:19 81:3 83:5 84:2 115:25 116:5 145:24,24 169:24 170:2 172:15 210:8 210:18 211:16
**170**  211:16
**17th**  84:7 120:18
**18**  181:15,17 186:9 194:17 212:4
**181**  212:4

**183**  212:6
**18th**  214:18
**19**  183:19,21 186:9 199:14 199:19 212:6 213:4
**1934**  149:25
**194**  212:12
**196**  212:18
**198**  212:21
**199**  213:4
**1996**  10:14
**1998**  10:15
**1:23**  1:3,8 5:20
**1a**  55:23

| 2 |
| --- |
| **2**  20:3,5 21:9 25:11,13,13 57:5 71:11,12 129:25 148:5 173:9 209:10 |
| **2.5**  71:20 149:17,23 153:19 154:3 |
| **2.9**  79:21 |
| **2/7/2019**  97:24 210:11 |
| **20**  28:7 110:9 191:2,4 209:10 212:7 |
| **200**  194:25 |
| **2000**  10:16 |

**[2001 - 6]**                                                                    Page 2

**2001**  198:21 199:2 212:22
**2007**  191:18 192:18
**2014**  199:14,19 213:4
**2015**  20:10 21:13 40:24 41:4,13,20 42:24,24 48:25 51:7 172:9,13 209:23
**2017**  28:19 55:24 71:16 73:4 79:3,4 86:5
**2018**  11:10 29:23 30:7 32:14,17 33:7 33:8,14,16 41:22 42:5 53:11,16 56:2 63:24 64:5 66:10,13 78:13 84:2,8 124:17 132:16 139:13 169:23 170:6 170:25 171:11 171:16 172:3 173:6 175:4 209:19,21,25 210:5,8 211:22
**2018-2019**  78:10 79:18

**2019**  86:11 98:5 110:12 111:6 124:18 132:16 139:13 210:13
**202**  213:6
**2020**  11:19
**2021**  198:2
**2022**  171:25 172:4
**2023**  18:25 32:15,23 115:13,25 116:6 120:18 121:16,21 122:2 130:10 130:18 141:13 141:21 175:4 184:6 198:11 201:17 210:18 210:21,24 211:6
**2025**  1:16 2:11 5:4 9:12 148:10,18 175:21 207:25 211:15 214:18 215:16
**21**  194:6,11,13 212:12
**22**  145:17 196:6,8 212:18
**22nd**  196:11

**23**  198:23,25 199:15,20 212:21 213:5
**24**  199:16,18,22 213:4
**25**  112:4 121:14 202:6,8 213:6
**25a**  115:22
**28**  121:16,20 130:10,17 198:21 199:2 201:25 210:21 210:24 212:22
**28th**  122:2 124:17
**29**  145:4,9,12

**3**

**3**  33:9,12 40:22 42:14 130:8 173:22 192:7 206:16 209:16
**30**  14:19 15:2 209:8
**31**  122:9 184:6
**32**  183:14
**32a**  143:20
**33**  209:16
**34**  131:8
**340**  203:3
**359**  214:22
**3700**  157:22,25 158:8

**3rd**  148:10,17 211:15

**4**

**4**  21:8 40:25 41:3 173:11 174:12 181:5 181:12 182:5 185:3 205:3 209:22
**41**  184:15 203:3 209:22
**43**  184:15
**44**  54:12 61:12
**45**  17:7
**48**  148:8

**5**

**5**  34:14,25 40:21 53:12,14 110:11 111:6 205:10 206:16 209:24 210:12
**50**  112:4
**500,000**  203:3
**53**  209:24
**58**  3:5

**6**

**6**  14:19 15:2 34:16,25 63:25 64:3 178:15 206:17 209:8 210:4

**[62 - additional]**                                                    Page 3

| | | | |
|---|---|---|---|
| **62** 146:3 | **a** | 187:15,18,20 | **acting** 27:4 |
| **64** 210:4 | | 188:4,9 190:16 | **action** 6:6 7:15 |
| **7** | **a.m.** 1:17 2:12 | 190:19 215:9 | 124:12,21 |
| | 5:3 56:23,24 | **accurately** | 132:11,21 |
| **7** 77:22,23,25 | 130:2,3 | 186:22 | 139:8 147:14 |
| 78:3,6 98:5 | **abenedon** 3:17 | **accusing** 17:24 | 147:20,23 |
| 111:18 112:2,7 | **ability** 58:19 | 28:14 45:13 | 163:21 166:19 |
| 171:16 173:5 | 174:17 | 103:9 109:15 | 182:9 185:7 |
| 180:3 209:4 | **able** 21:9 27:8 | 110:5 134:14 | 214:14 |
| 210:6 | 54:13 55:4 | **achieved** 10:13 | **actions** 23:25 |
| **74** 146:24 | 57:7 85:9 95:2 | **acknowledged** | 81:16 94:8 |
| **77** 196:18 | 112:17 162:6 | 192:12 | 152:12 164:18 |
| **7772779** 1:25 | 168:10 196:19 | **acquire** 85:4 | **active** 175:11 |
| **78** 210:6 | **above** 57:11,15 | **acquired** 28:19 | 191:25 |
| **7th** 33:8,15 | **absence** 124:9 | 71:13 86:6 | **actual** 56:3,5 |
| 65:3 209:20 | **absolute** 59:9 | 102:14 114:16 | 57:16,18 58:9 |
| **8** | **absolutely** | 201:15 | 58:20 59:4,16 |
| | 42:19 104:18 | **acquiring** | 60:2 145:19 |
| **8** 11:10 84:3,5 | **accept** 52:10 | 28:24 29:23 | 147:3,16 |
| 112:11,15 | **acceptable** | 30:7 64:25 | **actually** 28:15 |
| 201:17 206:17 | 176:6 | 102:11 | 36:9 37:5 |
| 210:7 | **access** 35:14 | **acquisition** | 45:25 52:12,23 |
| **84** 210:7 | 36:16 89:9 | 28:21 29:25 | 60:21 62:11 |
| **8:30** 1:17 2:12 | 117:13 118:6 | 30:9 40:2 49:4 | 71:22 74:7 |
| 5:3 | 120:12 124:5 | 72:9,10 73:10 | 76:3 84:25 |
| **9** | 132:2 | 84:9 85:5,25 | 110:5,19 |
| | **accessed** 38:7,9 | 86:8,10 88:7 | 134:10 147:21 |
| **9** 21:13 38:16 | **accuracy** | 88:18 99:8 | 154:14 175:20 |
| 97:25 98:4,24 | 202:23 | 100:22 | **adding** 100:7 |
| 144:13 206:17 | **accurate** 36:19 | **acronym** | 100:23 101:15 |
| 210:9 | 37:8 135:11 | 200:12 | **additional** |
| **98** 210:9 | 136:7 142:9 | **act** 145:24 | 100:8,23 |
| **9:35** 56:21,23 | 150:16 182:17 | 146:22 149:25 | 101:15 |
| **9:46** 56:24 57:4 | 183:8 186:16 | | |

**[address - alternative]** Page 4

address  80:9
addresses
  204:15
addressing
  79:19
adequate
  109:16,18,23
administer
  4:15 6:4
administration
  159:15
administrative
  159:3
admittance
  118:14
admitted  114:2
advance  166:3
advice  12:6
  63:12
advise  174:10
  185:23
advises  176:17
  177:2
advisor  161:21
  163:2,3 174:3
  174:7 196:3,9
  212:18
advisors  161:9
  176:7,11
  190:24 191:7
  212:10
affairs  36:25
  90:9

affect  56:3
  57:16 58:9,19
  59:4
affiliations
  6:13
affirmative
  62:6
agency  39:3
  100:9 101:16
agenda  161:6,7
aggregation
  89:16
ago  38:2 71:25
  75:25 114:2
  119:6 139:16
agree  5:10
  39:24 47:21
  67:19 90:6
  102:10 106:7
  120:23 129:12
  134:6 143:18
  145:11
agreed  4:4,8,12
  65:3 82:22
  149:23 150:12
  150:20 192:12
agreement
  19:25 20:8,15
  20:20,23
  149:17 190:23
  191:5,12
  195:20 196:4,9
  198:20 199:2,8
  209:14 212:8

212:19,21
agreements
  13:17 191:14
ahead  35:23
airplane  107:9
  107:15
al  184:2
alabama  11:2
  44:19
alba  3:8 19:19
alex  31:18
alexi  6:18
algorithm
  201:7,12
algorithms
  201:4
alison  3:17
  6:16 7:13
allegation
  36:23
allegations
  37:20 118:13
  130:23 138:19
  138:22 144:9
  151:19 152:2
  152:18 153:7
  154:9,21
  155:24
allege  18:8
  27:25 91:9
  92:25 100:15
  114:14 115:11
  124:12 138:24
  142:2,8 153:21

alleged  30:14
  35:22 55:5
  59:15 62:23
  87:3 97:16
  114:18 118:7
  118:21 119:18
  127:14,21
  134:21 135:9
  138:11 139:23
  140:7 142:7,18
  142:24 146:4
  148:20 150:22
  151:12 198:6
  198:15 201:21
allegedly  54:13
alleges  36:6
  86:21
alleging  96:13
  96:14 119:23
  125:13 132:11
  137:21 139:8
  140:4 142:23
  154:15
allen  38:19,25
  41:21 42:4,17
allow  20:16
  84:10 178:10
allowable
  178:16
allowed  47:13
alternative
  180:11,13,17
  180:21,23

**[amended - asserting]**                                    Page 5

| | | | |
|---|---|---|---|
| **amended** 143:21 144:2 165:23 191:18 211:12 | 142:13 152:8 186:18 187:2 190:5 | **approve** 164:3 **approved** 78:19 | **aside** 42:12 52:19 53:4 63:15 77:21 83:23 97:20 |
| **amendment** 199:15,19 213:5 | **answered** 137:25 138:3 **answering** 159:19 | **approves** 82:4 **approving** 161:2,7 | 109:6 115:10 129:18 143:19 157:6 195:17 |
| **amendments** 191:21 199:24 | **anxieties** 84:12 **anybody** 83:16 123:2 150:23 | **approximate** 168:11 **approximately** 13:22 15:24 | **asked** 38:25 42:5 75:25 98:18 99:5 119:7 129:8 |
| **americas** 2:19 3:15 5:23 145:2 | 179:23 **anymore** 128:21 | 157:22 **april** 121:16,20 122:2 124:17 | 137:24 158:4 177:17 190:4 **asking** 9:2 10:3 |
| **amount** 148:4 **analyst** 111:24 **analytics** 89:12 89:14 | **anytime** 22:24 **apologies** 87:15 **apparent** 149:22 | 132:16 139:13 210:21 **area** 102:22,24 105:21 204:10 | 19:4 22:3 25:20 37:10,13 37:19 41:21 46:4,22 49:9 |
| **announced** 29:22 30:6 85:3 86:3 115:16 | **appearance** 6:10 **appearances** 3:2 6:12 | **areas** 88:15 **arguably** 39:12 **arrangement** 22:15 | 49:11 112:3 136:12,14,17 136:21 154:14 154:24 155:3,4 |
| **announcement** 119:8,13 142:20 | **appeared** 185:16 | **arrangements** 20:24 21:2 | 155:5,6 189:6 |
| **annual** 79:19 **annually** 170:22 | **appears** 67:23 **application** 202:4,11 213:8 | **arrive** 107:16 **arrived** 107:8 107:14 | **aspect** 35:3 93:2 173:18 **aspects** 117:13 118:5 124:5 |
| **anonymous** 152:19 153:2 | **appointed** 159:7,10 **appreciate** 35:5 | **article** 63:23 64:4,8,22 66:8 67:15 72:15,23 | 131:25 **assert** 93:10 124:22 |
| **answer** 18:5 24:8,12,13 25:12 27:15,18 35:22 44:20 52:16 96:5 103:2 137:16 | **appropriate** 22:9 46:18,20 81:17 **approval** 79:17 161:5 | 73:17 77:18 78:4,4 83:25 84:6,21 88:6 88:13 97:12,17 210:4,7 | **asserted** 16:18 151:8 **asserting** 19:15 24:15 27:12 |

37:21 58:5
103:14 145:20
151:11
**assertion** 29:6
29:16,18 38:5
52:22 63:11
188:8
**asserts** 43:18
203:2
**assess** 44:3
46:15 80:10
162:23
**assessment**
155:11,19
157:2 179:23
**asset** 85:7,23
113:4
**assets** 178:16
**assist** 68:18
92:19
**assistance**
160:4
**assistant** 11:15
**assisted** 165:13
**associated**
51:19 147:12
**assuage** 65:16
**assuming** 52:20
**assumption**
39:19
**assurances**
59:19
**attached** 182:9
185:7

**attack** 64:24
**attend** 160:22
177:5
**attention** 57:10
164:9,23
**attorney** 6:14
11:15 16:18
19:7,11,16
23:5 24:10,15
25:18 27:16
158:19 159:5
**attorneys** 3:4
3:14 4:5 15:21
16:16,22 17:21
19:21 63:13
152:9 165:6,11
168:22 169:2
190:20 202:25
**audio** 5:8
**auditing** 95:14
**august** 40:24
41:4 199:14,19
209:23 213:4
**author** 19:18
**authorization**
197:5
**authorized**
4:14 6:4
196:20
**avenue** 2:18
3:15 5:23
**aware** 7:22
25:14,23 26:4
30:20 40:16

41:12 42:9,23
51:6 81:13
126:12 141:2
144:7 147:19
147:23 150:20
152:4,15,22,25
153:6,14
166:21 167:7
174:25 178:24
191:13,21
192:20 196:25
203:13,17,19

**b**

**b** 14:19 15:2
27:11,24
121:14 176:24
177:7 209:8
**bachelor's** 10:8
10:14
**back** 30:18
38:12 40:21
42:13 48:12
84:25 87:14,19
88:3 176:3
188:10
**background**
10:7
**backup** 29:11
**bad** 98:18
158:4
**bank** 179:12
**banks** 85:22

**barely** 56:12
**barriers** 61:19
62:8 65:15
67:16 68:3,13
68:19 69:5,9
70:7,14,19,22
73:11 92:22
104:13 109:17
109:19,21,24
117:14 118:6
118:18 120:12
121:10 124:5
124:15 127:5
128:24 132:2
132:14 139:11
141:16,23
143:2 144:21
147:5 150:12
211:11
**based** 67:5
144:8 146:4
147:2,15,16
150:14 151:12
154:18 155:23
156:6,23
**basically**
193:20
**basis** 29:5,18
38:4 49:2 52:5
52:11,21 63:8
63:10 103:13
109:2,9 115:6
120:5,16
125:23 135:2,6

**[basis - billion]**                                                    Page 7

177:25 188:8
198:6
**batadase** 67:9
**bates** 16:6,9
  170:7 192:6
  194:15
**bearing** 170:6
  194:15
**beginning** 6:13
  171:11 172:8
**begins** 34:15
  78:20 81:7
  99:23 112:2
  171:13
**behalf** 6:17,22
  12:9 21:23
  34:6 49:12
  54:8 85:7,22
  152:13 164:8
  174:9 175:3
  177:13 178:12
  193:13,25
  194:9,19
  195:11 197:13
  197:21,25
  200:18,23
  201:16 206:4,9
  212:16
**belief** 75:17
**believe** 9:12
  10:15 31:8,23
  32:4 35:17
  36:17 37:6
  46:9 48:3

50:13 51:12,24
52:11 60:7,8
60:14,18 63:3
73:17 78:22
79:5 80:15
81:10,16 84:15
92:3,8 93:15
94:2 95:16
97:3 98:12
100:20 101:2
102:8 109:10
113:15 114:3,7
114:11,16
115:4 117:19
119:15,17
120:5,17
123:17 125:3,9
125:17,23
126:4 127:12
128:11 133:3,5
133:18 134:17
135:2,6,15
136:3,13,22
137:5,19 138:9
143:5 147:18
147:25 150:5
150:15,25
151:6 154:2
162:13 171:14
171:19 172:16
173:21 176:21
183:12 186:6
197:15 204:16

**believed** 82:19
  88:7,11 125:10
  125:18 128:8
  128:12 129:9
  135:11 136:7
  140:19 142:19
  143:15 177:19
**believes** 58:2
  92:7 93:21
  112:18 124:10
  124:20 127:10
  128:23 132:19
  133:12 155:12
  155:19
**bell** 21:11,12
  196:21,23
**beneath** 85:16
  131:10 173:11
  180:10
**benedon** 3:17
  6:15,16 7:11
  7:13 14:17
  20:5 26:8 33:3
  33:11 37:12
  40:20 41:3
  45:9,13,22
  47:13,18 53:14
  56:19 63:14,18
  63:22 64:3
  77:22 78:3
  83:22 84:5
  87:13,20 97:21
  98:3 109:7
  110:9 111:3

115:21 116:4
121:13,19
129:21 130:13
136:16 138:2
141:8,19
143:20,25
148:7,13,16
155:2 166:12
166:16 169:17
170:2 180:24
181:17 183:13
183:21 189:7
189:10,13
191:4 194:5,13
195:23 196:8
198:18,25
199:11,18
201:25 202:8
204:22 207:9
209:4
**benefit** 27:3,7
  113:13 161:3,5
**benefits** 11:6
  11:14 22:13
  159:16,19
  161:7 162:6
**best** 8:25 68:24
  73:24
**beyond** 8:16
  44:10
**big** 48:11 84:11
**bigger** 71:21
**billion** 64:24
  65:9 71:20

**[billion - calls]**                                                    Page 8

84:9 86:2
**binary** 46:23
**bind** 46:3
**birmingham**
8:7,11,12,22
9:15 11:2,7,9
11:13 12:22
19:24 20:6
21:14,17 78:7
78:16 79:6
80:2 81:23
92:3 96:12
157:15,20
158:6,10 159:7
160:4 169:19
170:3,7,11
174:4 183:24
192:6 204:15
205:17 206:25
209:11 211:16
**bit** 39:5 53:7
157:7
**black** 105:23
**blood** 214:14
**bloomberg**
63:23 64:4
210:4
**blowing** 75:21
**board** 12:7
14:11,12
158:24 159:9
160:14,19
161:6,8,12,13
161:15 162:3

162:19 163:4
163:22,25
164:3 173:12
174:3,9,16
176:18 177:2
203:10,13,14
204:14,17
205:23
**boogeyman**
64:7 68:23
73:23
**borderline**
113:10,21
**bottom** 55:9
112:15,22
192:5,10
**bought** 187:21
197:20
**bracket** 85:22
**brand** 39:2,12
42:21
**brands** 39:13
**break** 53:6
56:15 57:9
85:6,20
**brings** 80:5
**broker** 39:3
65:5 85:5 86:2
86:16 148:20
**brokerage**
110:13 111:7
210:15
**brokers** 71:18
73:6

**budget** 78:11
78:16,19 79:18
79:22 82:2,4,6
82:7
**budgets** 78:17
**build** 88:16
**built** 88:25
**bulge** 85:21
**bulk** 161:6
**bullet** 55:8,13
55:19 56:9
57:11,25 59:3
61:22,25 85:2
85:16 178:21
**bullish** 99:7
**bunch** 194:16
**burchell**
176:19,24
**business** 35:4
39:5 48:24,25
50:14 52:8
69:15 71:19
73:7 75:15
84:7 85:6,21
86:14,16 89:13
100:9 101:17
102:22 104:19
105:17 113:19
113:25 116:23
116:24 122:15
122:16 123:8
131:12,13
147:10 153:20
154:4

**businesses** 35:9
49:24 65:16
86:4 89:3
106:2,9
**buy** 65:3 68:18
92:16 93:6,12
93:17 95:10
113:8 114:12
201:20 205:24
**buying** 85:22
**buys** 193:20

c

**c** 144:15 176:24
177:7 181:14
181:19 212:5
**calculate**
159:15
**calculating**
159:18
**calculation**
203:5
**call** 33:5,7,13
33:15,22,25
34:4,8,11
41:23 42:6
51:3 97:23
98:4,10,13
128:2 172:23
200:9 209:16
209:19 210:9
**called** 7:5
**calls** 18:3 24:7
27:13 35:19

**[calls - cifu]** Page 9

50:6 52:14
119:20 120:2
127:17 135:12
136:8,10,25
137:13 138:18
154:11 156:10
**canada** 100:5
**candidly** 43:2
**cane** 167:17,18
**cap** 197:6,17
**capable** 48:4
74:7 103:3
**capacity** 13:15
27:4
**capital** 86:15
**capitalization**
197:10
**caption** 183:24
**captioned**
215:7
**care** 192:8
**career** 10:22
**case** 1:3,8 5:19
15:21,23 19:10
24:2,6 26:3
27:9 32:13
33:25 43:10
49:11 54:3
64:12 76:20
111:13 130:23
139:24 140:8
144:8 151:8
153:8 154:7,9
154:22 155:9

155:12,18,20
156:5,9,18,20
164:4,7,10,24
165:5,7,9,12,14
166:9 168:9
169:9 179:24
183:23 198:7
198:15 203:23
205:14,19
**cases** 22:11
152:17 156:13
**cash** 56:4 57:17
59:17
**category**
178:19
**cause** 40:2 56:5
57:18
**caused** 65:9
**causes** 147:13
**caution** 23:3
151:3
**cents** 203:3
**ceo** 84:24 85:10
102:11
**certain** 83:3
**certainly** 76:4
99:17
**certificate**
214:2
**certification**
4:7 166:23
167:9 181:21
181:25 182:16
182:21,25

183:4 184:11
184:19 185:14
185:19
**certifications**
190:18
**certified** 214:6
**certify** 214:8,13
**chair** 21:15,17
136:19
**chairman**
81:24
**challenges**
79:15 81:9
**challenging**
145:13
**chance** 145:6,8
**change** 37:16
216:4,5,7,8,10
216:11,13,14
216:16,17,19
216:20,22,23
217:4,5,7,8,10
217:11,13,14
217:16,17,19
217:20,22,23
**changed** 60:9
**changes** 192:21
215:10,13
**chapter** 10:20
**characterizati...**
103:18
**characterize**
90:12,14

**characterized**
102:9
**charge** 142:25
**charged** 40:17
143:8,9
**charges** 41:5,13
141:14,21
211:7
**check** 129:8
**checks** 159:24
**chief** 65:21
112:22 159:6
**chisolm** 6:19
**choose** 164:12
201:5
**christopher**
38:18,25 41:21
42:4,16
**cifu** 31:6,9 34:4
34:21 36:24
37:7 41:22
42:18 43:14
49:5 50:22
51:5,25 52:11
52:22 65:22
68:16 69:3
70:2 73:21
74:11 84:24
85:10 89:22
91:2 92:8
93:11,22 94:2
94:6 95:3
96:15,20 99:23
100:17,21

**[cifu - communicates]**                                                      Page 10

101:3 102:4
104:8,20
111:25 112:22
150:23
**cifu's** 42:16
48:13 88:21
91:22 94:16
**circumstances**
23:17 146:15
**city** 8:7,11,12
8:21 9:14 11:6
11:8,12,15
12:21 19:24
20:6 21:14,17
78:15 79:5
80:2 81:22
82:3,3,5
157:15,20
158:6,10 159:6
160:3 169:19
170:3,11 174:4
183:24 204:14
205:16 206:25
209:11 211:16
**city's** 79:16
204:8,12
**civil** 117:15
124:7 132:4
**claim** 27:11
146:4,18,21
147:2 149:18
150:2,10
151:15

**claiming** 18:10
76:23
**claims** 28:22
30:2,10 116:25
122:17 131:13
145:20,23
147:15,16
150:14,22
151:7,12
154:18 156:5
156:23,23
**clarification**
26:7 120:10
**class** 7:15
32:10,12 120:6
120:20 129:14
143:16 152:12
163:21 164:18
166:18,22
167:9 171:12
172:8 173:20
179:3 182:7
185:6 195:2
202:18
**clear** 9:5 13:3
137:20
**client** 16:18
18:13 19:7,16
23:5,21 24:10
24:15 25:18
27:16 28:11,15
29:21 30:15
35:3,8,10
65:19 71:18

73:6 85:9
89:19 90:5,19
91:5,24 92:9
92:13,17 93:12
93:17 94:3,17
94:24 95:3
103:9,21,23
104:11 114:4
114:25
**client's** 66:23
**clients** 17:24
18:8 35:12
37:22 43:3
48:21 65:12
66:2,4 68:18
70:7,14 84:10
85:23 86:17
92:18 95:11,15
99:9,11 104:12
104:15 154:15
**close** 86:11
**closed** 110:19
**cloud** 8:3
**cognizant**
42:20
**colleague** 6:25
**colleagues** 6:18
**combination**
88:22
**combined**
88:24
**come** 12:7
18:21 19:2
26:10 40:21

176:4
**comes** 164:7
**comfortable**
112:25
**comments**
166:6 167:4
**commission**
56:2 89:15
117:11 118:4
124:3 131:24
**commitment**
80:7 164:8
**commitments**
116:18
**committed**
201:8
**committee**
65:20 70:13
92:18 93:13,18
95:21 96:15
104:11
**committing**
17:25
**common** 25:7
29:10 89:5
205:14,19
206:4,8
**communicate**
13:23 14:9
22:8,11,21
23:9,10,17
177:14
**communicates**
203:14

communication 165:11
communicati... 14:8
companies 18:14,17,18 23:12 75:2 178:9 197:10
company 11:5 44:4 72:3 75:13,20 85:13 102:11,13 105:7 117:5,6 117:9,14,22 118:2,15,17 122:21 123:22 123:25 124:6 124:10,19,19 125:9 127:2,8 127:20 128:7 128:23 129:9 131:18,18,21 132:3,6,10,11 132:17,19 134:10 139:3,7 139:8,14,20,25 140:9 152:20 177:25 201:8
company's 62:7 71:16 116:24 117:13 118:6 122:16 124:5,14 127:4 128:13 131:13

131:25 132:13 139:10 201:13
compared 185:14
comparison 73:8
compass 38:19
compensation 11:5,14
competing 187:7 188:3
complaint 27:19,22,25 28:6 30:13,19 35:23,25 36:4 45:10 53:25 91:13 98:13,15 98:20 111:15 116:10 118:13 122:5 126:24 131:2 138:22 142:12,15 143:21 144:2,8 144:10,14 147:14 151:20 152:3,6,7,9 153:3,8,9,11 165:22,23,23 183:18,22 184:5 206:13 211:12 212:6
complementary 89:2

complete 44:20
completed 28:12 112:14 149:10,14
completely 18:10 33:2 119:18
compliance 12:8
complied 174:22
computer 29:2
concept 95:22 96:16 152:22
concern 65:25 66:21 100:7
concerning 66:25
concerns 35:6 65:17 71:23 86:12 104:5
concludes 207:14
conclusion 18:4 18:22 19:3 24:8 27:14 35:20 52:15 118:25 119:21 120:3 127:17 128:3 135:13 136:9,11 137:2 137:13 138:14 138:18 151:23 154:11

conduct 203:25
conducted 204:19
conducting 102:21 105:17
conference 110:14 111:8 210:16
confidence 80:5
confidences 22:7
confidential 18:13 19:6 55:10,16 58:7 58:25 59:11 60:23 61:4 62:3,13
confidentiality 28:11
confirm 75:8
confirmed 139:17
conflict 88:8 100:8,23 101:15
conflicting 49:24 186:22
conflicts 86:12
confusion 9:3 10:4
connection 9:14 12:19 117:12 118:4

**[connection - council]** Page 12

120:8,11 121:9 124:4 131:24 143:2 167:9 168:4 169:11 177:3 179:23 183:5 184:11 190:18 202:9

**connotations** 51:18

**consent** 148:19

**consider** 25:6 156:16 157:4

**consideration** 147:9 201:7,12

**considering** 47:10 156:13

**considers** 24:5

**consistent** 81:3 81:11 102:14 132:7 139:4 192:16

**construction** 11:4

**consultant** 160:6 173:4,24 176:10,11 177:3 193:8

**consultant's** 174:2,13

**consultants** 13:24 14:2

**contact** 26:18

**contacts** 54:24

**contained** 25:2 66:6 202:23 206:13

**contains** 188:25

**context** 102:4 103:25 104:2,3 112:8

**contingencies** 116:18

**continue** 5:9 35:11 46:4 112:10 149:12

**continued** 132:3 201:20

**continues** 138:13

**contracts** 24:23 160:9

**control** 27:6 35:14 165:2,4 173:13

**conversation** 19:11

**conversations** 5:7 17:20 19:6

**cooperate** 132:4

**cooperating** 117:14 124:6

**core** 39:2 197:6 197:17

**corporate** 9:18 9:22 23:23

28:4 31:13 32:21

**correct** 15:12 17:25 28:16,18 30:16 37:2 42:6 47:10 58:3,15 67:21 68:3,12 69:5 70:8,14,19 71:7,14 72:19 73:12 74:8,14 75:4 78:23 82:12 83:13 86:24 87:7 88:8 89:25 90:10 91:10 96:17 100:18 100:24 101:8 101:17 102:6 102:15 103:4 103:11 106:11 106:15 107:21 108:4,18,23 109:11,17,25 110:6,7 114:4 114:8,9,13,17 114:21 115:2 118:8,19 119:14,25 120:12,20 121:3 122:24 123:4,9,18 125:14,24 126:9,13,19

127:6,11,15,22 128:9,14,18,25 129:15,17 133:13,23 134:11,16,21 135:3,16 138:20,23 139:21 140:2 140:20 141:4 143:3,10,16 144:10 145:15 150:2,16 151:13,16,20 152:13 153:15 153:23 154:4 155:25 156:16 157:9 158:18 160:10 164:10 176:12 182:3 182:13 183:6,7 183:10 184:25 185:13 188:15 188:20 189:4 190:2 191:22 191:23 192:2 199:20 204:3

**corrections** 215:10

**corrective** 115:19 201:21

**correctly** 39:22

**cough** 87:10,16

**council** 79:18 82:3,3

**[counsel - deal]** Page 13

counsel  5:14
6:11 7:4 8:10
11:23,25 22:11
24:18,22 67:7
137:15 151:5
172:22 204:11
206:11
counsel's  24:14
135:22
count  180:17
county  159:9
214:5
couple  99:16
course  64:18
89:17 116:23
122:15 131:12
144:23
court  1:2 4:16
5:18 6:2 7:2
26:6 63:21
87:16,23 120:9
130:15 141:11
148:15 166:14
169:3 182:24
183:17 185:20
185:23 186:7
187:5,10 188:9
188:14,17,19
189:15,18,23
190:15 196:2
cover  181:18
create  70:7
criteria  24:4

critics  65:16
cross  47:14
culture  85:13
current  21:16
72:4 78:23
79:22 90:8
152:19
currently
124:10
custodian
179:10
customer  28:25
29:3 39:7,8
40:2 43:7,21
44:2 48:19
72:4 106:3
113:9,20
114:12
customers  35:6
39:9 49:16
50:15 100:5,18
102:6,13
104:10,21
106:5 112:24
144:19 148:24
cut  159:23
cv  1:3,8 5:20

**d**

d  3:7 177:7
damage  39:12
danielle  1:24
2:20 6:2 7:7
214:6,23

dark  41:7
dash  66:13,13
data  18:12,13
28:11,15,25
29:3 30:15,16
38:3 44:2
65:19 70:25
71:7 72:18
84:16,18 85:9
86:23 87:7
89:19 90:5,19
91:5 92:17
93:13,17 95:12
101:24 104:22
105:8 109:11
109:24 110:6
114:4 156:15
database  29:2
29:8,11,17,17
29:20 38:7,9
38:11,13 66:6
66:24 67:6,9
110:22 114:20
databases
29:13
date  10:15
14:22 20:4
33:10 36:18
41:2 53:13
64:2 66:8 78:2
84:4 98:2,11
110:16 114:24
116:3 119:12
120:6,19 121:7

121:18 127:13
127:19 130:12
134:9 141:18
143:24 148:12
169:25 171:3
171:13 181:16
183:20 191:3
194:12 196:7
196:13 197:22
198:24 199:17
202:7 216:24
217:24
dated  40:23
41:4 78:8
110:11 111:6
141:13,20
148:9,17
169:22 170:6
170:24 198:20
199:2 209:22
210:12 211:5
211:14,21
212:21
day  80:6
129:14 142:6
142:19 143:15
159:17,17
196:12 207:25
214:18 215:15
daymeon  177:5
de  113:4
deal  43:8,22
48:20 65:8
79:23 86:5

**[dealer - dialogue]**                                                Page 14

dealer 65:5
  85:5 86:2,16
  148:20
december 1:16
  2:11 5:4
  148:10,17
  196:12 211:15
  214:18
decent 39:20
decided 152:10
  205:24
deciding
  155:16 156:21
  164:22
decipher
  196:19
decision 98:16
  156:8 159:3
  164:6 205:13
  205:18
decisions 13:5
  62:24 77:17
  109:2 115:6
  162:18,21
  173:14 174:9
  178:8 207:2
declaration
  185:25 188:25
  189:16,20,23
  190:14 215:4
declarations
  187:8
declare 215:5

decline 23:13
  26:18
declined 26:5
  26:11 124:24
declining 68:20
defend 132:21
defendant 5:14
defendant's
  203:21 204:2
defendants
  3:14 6:17 7:14
  28:2,8 30:21
  31:2 144:16
  169:9,14
defenses
  124:20 132:20
defined 144:24
defraud 51:25
  52:12,23
defrauded
  18:22 154:16
  177:19
defrauding
  103:9
degree 10:9,16
degrees 10:13
  108:20
delegated
  162:20
delete 189:11
deliver 95:24
  96:3,7
denies 65:14
  67:15 68:7

department
  159:14,22
  204:9
depends 46:22
  47:9,22 74:12
  74:18
deposed 9:6,11
  9:17,21
deposition 1:14
  2:16 4:7,13
  5:13,21 9:13
  14:19,25 15:2
  15:8,19 16:2
  17:18,22 37:19
  44:14 45:7,19
  53:21 106:19
  136:17 145:15
  150:19 165:14
  165:25 168:6
  169:12 209:8
  214:10,11
  215:2,7,11
  216:2 217:2
deposits 159:24
deputy 8:9,14
  11:16
derivative
  178:21 179:2
describe 11:24
  22:5 160:12
  163:13
described
  55:21 96:15
  173:15

describes 93:22
  100:22 173:23
  174:13 197:5
describing
  61:18 69:18
  89:7
description
  67:6 209:7
  210:3 211:3
  212:3 213:3
design 35:11
  68:19 70:14
  92:20 104:12
designated
  15:10 37:15
designed 35:9
  147:9 148:23
designing 69:4
desk 41:6
detail 46:18
detailed 126:23
  142:11 152:3
details 148:2
  186:12
determine
  23:25 174:17
determining
  24:5
detriment
  18:15
devote 164:9,22
dialogue
  111:23

**[differ - document]** Page 15

**differ** 56:5
57:19
**differences**
171:19
**different** 11:3
39:5 59:13
74:19 88:8
128:5 146:19
146:20 147:22
152:16 158:16
171:17 173:19
185:12,17
189:24
**digging** 39:13
**direct** 7:10 27:8
43:6,20 48:17
100:11 101:5
105:14 159:24
**directing** 57:10
**directness**
101:20 102:20
105:16
**director** 8:9,15
11:5,15,16
159:8
**dis** 39:7,16,21
40:3
**disabled** 161:4
**disclose** 19:5
104:14 125:20
**disclosed** 36:18
116:22 120:24
126:5,5 127:3
134:19 140:19

143:9 153:18
**disclosing**
80:25 127:9
**disclosure** 61:2
63:5,9 115:19
117:20 118:8
118:12,23
119:5,24
120:17 122:14
123:21 124:25
125:6,14
126:11 128:6
128:22 129:9
129:13 132:8
132:24 133:6,8
133:21 134:8,9
134:10 135:8
136:5,23
137:20 138:10
138:20,25
139:2,5,18
140:23 141:3
142:3,7 155:6
201:22
**disclosures**
31:22 32:3,8
46:12,15 48:8
48:10 54:7
123:7 141:15
141:22 201:13
211:9
**discovery**
15:23 16:5,14
165:6,13,25

168:24 169:8,8
169:13 171:25
179:24
**discretion**
162:20 174:8
207:5
**discretionary**
174:3,6
**discuss** 49:3
**discussion** 15:8
70:13 73:3
162:10 167:6
**discussions**
124:8 132:5
151:4
**dismissal**
150:13,21
**dismissed**
154:19 156:6
156:24
**display** 56:16
**dispute** 100:24
123:6
**disseminated**
144:16
**distinct** 81:21
89:4
**distinguish**
158:5
**distinguishing**
31:15
**district** 1:2,2
5:18,19

**division** 159:15
159:22
**divulge** 27:16
**divulging** 24:10
**document** 15:3
15:7 19:14,23
20:11 21:10
25:24 33:17
38:16 53:7,23
53:25 62:23
64:19 71:10,15
98:3,6 110:11
110:18 111:9
121:22 122:4
130:14,20,22
131:5 134:20
140:21 144:4
145:5,18 149:4
149:19,22
154:18 157:6
169:23 170:8
170:10,16,20
171:5 172:9,14
172:24 176:9
181:13,18,23
183:16 185:13
191:8,17,22
192:6 194:7,14
194:21 195:24
197:2 199:5,12
199:24 202:3,9
202:12,24
203:2 209:10
210:12 211:23

**[document - entitlement]**

212:4,12 213:6
**documents**
15:24 16:5,9
16:10,13,17
165:24 171:22
190:8 203:22
204:7 206:2,6
206:12,21,23
**doing** 59:23
62:11 74:22,24
75:14 82:8,10
90:21,22 94:23
163:15,16
**dominated**
85:21
**doubt** 35:7
113:13
**doug** 31:8
34:21 50:22
65:22 73:21
84:24 85:10
150:23
**douglas** 112:22
**dowd** 3:3 6:22
20:17
**dozen** 100:17
**dozens** 100:4,4
102:5,5,12,12
104:9,9
**dr** 167:18
**draft** 166:6
**dropped** 59:24
**duly** 7:6 214:10

**duties** 11:25

**e**

**e** 7:5 176:21,22
176:24 177:7
**e.d.n.y.** 1:3
**earlier** 145:14
**early** 86:11
95:9
**earning** 34:8
**earnings** 33:5,7
33:13,15,21,25
34:8,11 41:22
42:5 97:23
98:4,10,13
209:16,19
210:9
**eastern** 1:2
5:18
**eat** 108:6
**eating** 108:15
**economou** 3:9
6:25
**educational**
10:7
**effect** 4:16
171:11
**eisenhofer** 21:7
**either** 46:24
88:17 100:24
**elected** 79:3
**elements** 100:2
**eleven** 115:23

**eligible** 157:11
157:16,17
**eliminate** 68:23
73:23
**email** 99:6
204:15
**emails** 16:15
204:2,18
**emerged** 72:2
**emphasizing**
31:17
**emphatic** 50:17
**employ** 158:2
**employed** 11:3
12:16 160:3
205:16
**employee** 80:3
158:12
**employees**
152:19 153:2
157:14,19,23
158:2,9,9,11
159:13,17,18
205:21,23
**empower** 68:17
**empowered**
95:13
**encouraged**
106:5
**ended** 87:11
**enforce** 147:3,7
148:22
**engage** 22:10
22:19 95:13

132:5
**engaged** 42:25
124:7
**engagement**
19:25 20:8
24:19 25:2
209:13
**engagements**
175:12
**engages** 22:23
**engaging** 95:10
**english** 108:18
**enhance** 89:17
90:4,8,17 91:3
91:7,15
**enhanced**
91:19
**ensure** 68:11
106:2 190:19
**entail** 22:2
**entered** 195:19
196:15
**entire** 215:6
**entirely** 207:4
**entities** 160:9
175:13
**entitled** 19:23
20:6 41:5 64:5
84:8 141:13,21
148:18 181:13
181:20 209:10
211:6 212:4
**entitlement**
35:15

**[entity - exploring]**                                                    Page 17

entity   176:15 200:3

equities   86:7 193:21

equity   197:7,18

erase   64:6

erect   65:15 67:16 68:13 73:11

errata   215:2,12 216:2 217:2

esq   3:7,8,9,17 3:18

establish   93:17 147:7 148:21

established   35:7

establishing   92:17 93:6,12

et   184:2

europe   100:6

event   124:21 132:20

everyday   108:23

exact   84:17

exactly   90:16 108:14

examination   7:10 47:14 209:3

examinations   116:25 122:17 131:14

examined   7:9

example   89:8 146:2 188:24

excellent   12:3

except   4:9 215:10

exception   173:14

excerpt   53:10 53:15 98:20 115:24 116:5 121:15,20 130:9,18 209:24 210:17 210:20,23

excerpted   98:15 116:14

excerpts   53:24 98:12 111:15 116:10 122:4 131:2

exchange   55:25 110:13 111:7 117:11 118:4 124:3 131:24 146:22 149:25 210:15

excited   89:8

excuse   22:24 86:20 124:17 193:18

executed   67:10

executes   65:5

executing   71:17 73:5

execution   67:11 89:11

executive   65:21 112:22

executives   151:16

exempt   180:12

exhibit   14:18 14:20,25 20:3 20:5 33:4,9,12 40:25 53:12 54:11 63:25 64:3 77:25 84:3 97:25 110:15 116:2 116:16 121:17 122:10 130:11 131:7 140:22 141:17 143:23 148:11 169:24 181:14,15,19 183:19 191:2 194:11 196:6 198:23 199:16 202:6 209:8,10 209:16,22,24 210:4,6,7,9,12 210:17,20,23 211:4,12,14,16 212:4,5,6,7,12 212:18,21 213:4,6

exhibits   206:16 209:6 210:2 211:2 212:2 213:2

existence   77:9

existing   35:8 70:22 89:24

expand   99:18

expect   106:4

expectation   47:23 50:21

expectations   74:13

expected   124:12 140:23

expects   132:10 139:7

expedite   109:8

experienced   26:19

experiences   23:13

expert   96:10 167:8,15

expert's   167:12

expertise   89:9

experts   91:20 103:7

explain   76:2

explanation   50:23

exploring   88:16

**[exposed - fines]**                                                   Page 18

**exposed**  33:2
**exposing**  22:6
**extend**  8:16
**extension**  95:22
  96:16
**extent**  12:23
  18:3 22:5
  52:14
**extremely**
  99:20

**f**

**f**  177:7
**faced**  123:9
**facing**  71:18
  73:6
**fact**  37:14,16
  58:8 59:4,22
  70:6 71:13
  72:16 91:14
  96:2 101:13,14
  104:8,8,10,11
  109:10 114:11
  114:25 133:9
  134:8 137:22
  139:19 140:18
  146:12 154:3
  156:25 167:7
**factor**  68:24
  73:24
**factors**  55:20
  55:21,24 57:14
  58:15,18 74:19

**facts**  146:13
**factual**  48:9
**fail**  55:15
**failed**  109:16
  109:18 125:19
**failure**  30:14
  55:9 58:6,24
  59:15 61:2
  62:2 104:14
  109:23 147:3
  148:21 150:11
**fair**  119:4
**false**  28:3,8
  31:12,14,22
  32:3,8 34:5
  35:17 36:6
  43:14,15 52:6
  52:10,21 54:13
  55:5,12 58:2
  60:10,18,19
  61:7 73:17
  74:3 75:13,19
  75:20 76:8,10
  76:16,19,22,24
  77:6,9,10,13
  87:4 91:9 92:3
  93:2 95:17
  96:14,21 97:6
  97:10 100:16
  112:18 113:16
  118:22 128:9
  136:24 137:22
  137:22 138:11
  141:14,22

  142:19 144:17
  145:13 146:4
  150:6 153:22
  155:13 185:25
  188:19 189:20
  189:22 211:8
**falsely**  186:7
**falsity**  52:19
  135:8 136:5
**familiar**  32:9
  40:15 41:25
  115:18 200:11
**far**  200:14
**fashion**  113:5
  176:6
**fault**  42:23
  51:6,9,15
**february**  9:12
  98:5 115:25
  116:5 120:18
  201:17 210:18
**federal**  4:2
  124:13 132:12
  139:9 181:21
  183:23 184:20
**feedback**  99:12
  99:12
**feel**  83:16
**feeling**  7:19
  83:13 129:6
**feels**  143:12
**felt**  83:10
**fifth**  146:18

**fight**  45:24
**figure**  128:17
  153:19
**file**  132:11
  139:8 168:17
  168:20
**filed**  5:17 27:19
  55:24 166:22
  167:2 184:6
  202:9,20
**files**  172:19
**filing**  4:6 166:3
  166:25 184:12
  185:24
**filings**  169:3
**final**  148:19
**finance**  159:22
**finance's**  65:10
**financial**  1:6
  5:16 7:15
  18:23 26:4
  54:9 56:3
  57:16 58:9,20
  59:5,16 60:2
  61:6 64:23
  85:3,17 144:25
  159:6
**financially**  6:6
**find**  179:18
  204:6
**fine**  46:3
  168:16
**fines**  117:4
  122:20 131:17

**[finish - further]**                                                                      Page 19

| | | | |
|---|---|---|---|
| **finish** 108:12 | **fixed** 178:19 | 185:21 186:5 | **fraudsters** |
| **finished** 41:18 | **flows** 56:4 | 210:18,21,24 | 178:2 |
| **fireman** 8:12 | 57:18 59:17 | **former** 152:19 | **fraudulent** |
| **firm** 6:3 10:25 | **focus** 12:25 | 153:2 | 28:3,9 31:12 |
| 21:6 48:23 | **focused** 70:12 | **formulas** 201:4 | 31:15,22 32:3 |
| 84:11 86:4,6 | **focusing** | **forth** 170:17 | 32:8 34:6 52:7 |
| 88:16 95:14 | 122:22 | 182:12 214:10 | 63:9 |
| 113:3 | **folks** 68:17 | **forward** 39:16 | **freaked** 72:5 |
| **firm's** 85:12 | **follow** 70:15 | 56:7 57:20 | **frequency** |
| 86:15 | 172:21 | 113:5 | 85:19 |
| **firms** 11:3 | **following** 68:15 | **foundation** | **friday** 1:16 |
| 12:10 20:25 | 71:23 112:9 | 190:12 | **front** 14:24 |
| 21:3,4 22:22 | 180:3 181:20 | **founded** 65:2 | 149:8 |
| 26:17 65:6,21 | 182:6 185:5 | **four** 9:23 17:13 | **fs** 29:12,17 |
| 85:24 88:24 | **follows** 7:9 | 17:14,14 30:25 | 38:13 66:6,24 |
| 113:7 | 49:20 70:12 | 48:14 145:23 | 67:8,9 110:22 |
| **first** 7:6 10:24 | **foot** 42:23 51:6 | 159:16,16 | 114:20 |
| 14:18 41:16 | 51:9,15 | **fourteen** | **full** 7:16 20:17 |
| 53:3 78:10 | **force** 4:15 | 141:11 | 34:15 157:14 |
| 79:11,22 85:2 | **foregoing** | **fourth** 178:21 | 157:19 |
| 86:5 89:13 | 192:12 | **fox** 64:24 | **function** |
| 100:2 116:21 | **forgive** 129:7 | **frame** 78:14 | 158:21 |
| 120:6,19 121:7 | **forgot** 111:4 | **franchises** | **fund** 22:18 |
| 129:14 144:25 | **form** 4:9 47:17 | 88:25 89:12 | 26:25 72:3 |
| 145:23 165:22 | 47:25 53:16,18 | **fraud** 17:25 | 157:9,13 162:5 |
| 171:2 188:24 | 54:3 55:23,24 | 23:23 32:25 | 192:14,14,17 |
| 189:9,15 197:4 | 58:10 62:9,20 | 79:6 80:11,16 | 192:22 193:2 |
| 197:24 201:21 | 76:18 115:25 | 80:16 115:12 | 193:20,25 |
| **fiscal** 78:20 | 116:6,8,12,17 | 115:14 119:7 | 195:3 |
| **fishback** 177:5 | 121:16,21 | 119:19 127:15 | **funds** 22:24 |
| 177:7 | 122:2,7 126:8 | 146:4 156:23 | 65:7 85:24 |
| **five** 9:9,20 | 130:10,18,19 | 156:23 187:5,9 | 113:6 |
| 129:20 207:16 | 131:8 142:10 | 198:15 201:8 | **further** 4:8,12 |
| | 153:24 183:2 | | 191:21 204:22 |

**[further - gerson]** Page 20

207:7 214:13
**future** 67:21
68:11 79:15
85:12 106:10
106:15,25
107:11 108:3
**futures** 86:8
**fx** 89:10

**g**

**g** 176:21,22,22
176:22
**gain** 26:22
**galvin** 31:6,24
**garrison** 2:18
3:13 5:22
**gears** 157:7
**geller** 3:3 6:21
16:24 19:12,22
20:16 21:23
22:10,15,22
23:11,18,22,24
26:13
**general** 8:10
10:21 11:23,25
24:17,21
159:19 162:8
188:22
**generally**
152:23 156:17
170:17 193:16
**geographies**
89:3

**gerson** 3:7 6:20
6:21 8:18
13:10 18:2,24
22:16 23:2,14
23:20 24:7
25:4,8,25
26:20 27:5,13
28:17,23 29:19
30:3,11,17
31:10,20,25
32:6,18,24
35:19 36:20
37:3,9 40:4,8
41:24 42:7
43:17,24 44:6
44:10,13,24
45:6,11,18
46:8,17,21
47:2,6,11,15,25
48:5 49:8 50:6
50:12,25 51:11
51:20 52:3,13
52:25 54:4,15
54:21 55:14
56:17 58:10
59:6,18 60:4
60:11,17,20
61:9,15 62:9
62:17,25 63:6
64:15 66:7
67:3,22 68:4
69:6,23 70:9
70:20 71:2,8
72:12,20 73:13

73:19 74:4,9
74:15 75:5,10
75:23 76:12,18
76:25 77:11,19
79:8 80:14,23
81:5,15 82:24
83:8,14,18
84:19 86:25
87:8 88:9 90:2
90:11,24 91:11
91:16 92:5,10
93:4,19,25
94:7,13,19
95:5,18 96:4,9
96:18,23 97:4
97:7,18 100:19
100:25 101:9
102:7,16,25
103:5,17
104:17,23
105:3 106:12
106:16,21
107:12,22
108:5,12 109:4
109:12 110:2
110:24 112:20
113:17 114:5
114:22 115:3,8
117:21 118:9
118:24 119:20
120:2,13,21
121:4,11
122:25 123:10
123:15,19

125:2,8,15,21
125:25 126:7
126:14,20
127:16,23
128:10,19
129:2,16,19,22
130:24 133:7
133:14,24
134:12,22
135:4,12,17,24
136:8,14,25
137:7,24
138:12,17
140:3,11,16
141:5 142:4,10
142:21 143:4
143:11,17
144:11 150:7
150:17 151:9
151:25 153:10
153:16,24
154:5,10,23
155:14,21
156:2,10 157:3
164:25 174:24
175:5 178:3,6
182:18 183:2
183:11 185:21
186:2,5,10,17
186:25 187:6
187:16 188:5
188:16,21
189:5,8,12,17
189:21 190:3

**[gerson - help]**                                                      Page 21

190:11 198:8
198:16 201:10
201:23 203:6
204:24 205:11
207:7

**getting** 95:10
99:14,15
110:17 129:10

**give** 10:21 12:6
35:21 109:8

**given** 50:23
155:18 161:10
164:23 207:14
214:12

**gives** 46:18
88:23

**giving** 113:13

**glasses** 54:24
63:17 111:20

**global** 86:7
89:10 110:13
111:7 210:14

**globe** 92:19

**go** 5:10 35:23
53:6 84:25
97:21 104:8
138:4 180:25
188:10

**goal** 78:18

**goes** 49:3 68:15
85:17 91:23
92:15 95:8
123:21

**going** 5:3 23:3
35:21,24 39:20
46:4 48:21
49:23 50:17
52:13 53:5
54:17 64:17
68:17 69:25
87:6 89:17,23
90:3,7,17,22,25
91:3,7 99:21
102:11 111:14
112:9 113:3
116:9 122:3
130:25 137:4
149:19 156:22
157:7 162:6
187:13,19

**good** 5:2 6:15
6:20 7:12 90:9
99:25 106:3

**gotten** 39:9
99:6,13

**governance**
65:19 92:18
93:13,18

**graduate** 10:11

**graduated**
10:22

**grant** 1:24 2:20
6:2 7:7 21:6
214:6,23

**granular** 50:23

**gray** 102:22,24
105:21

**great** 42:19,21
56:17 89:14
143:19 175:10
175:17 176:5
177:8 195:20
196:5,10
197:12,20,24
198:10 212:20

**greg** 176:21

**gregg** 176:19

**ground** 9:25

**group** 65:4
70:6 72:3

**growth** 88:23
192:15 193:2

**guarantee**
62:15

**guarantees**
116:18

**guess** 44:25
99:8 168:12,16

**guidance** 112:4

**guidelines**
169:22 170:5
170:14,19
211:21

**guys** 39:14,17

**h**

**h** 176:24 177:7

**half** 17:13,14

**hand** 130:14
214:18

**handful** 112:24
159:13

**handle** 104:22

**handled** 70:24
71:7 105:7

**handling** 84:16
84:17 87:6

**handy** 183:15

**happen** 107:11
156:18

**happened**
107:18 162:14
175:19

**happening** 36:9
37:5 85:11

**happens** 37:17
108:3

**hard** 54:16

**header** 144:15

**heading** 55:21
122:12

**hear** 106:6

**heard** 7:13

**hearing** 74:13
87:11

**heart** 94:16

**hedge** 65:7
85:24 113:6

**heeding** 24:14
135:22

**held** 2:17 11:21
194:25

**help** 69:17,17
70:7

hen 64:25
henry 99:2
hereinbefore 214:10
hereof 215:12
hereunto 214:17
hft 113:2
high 64:22 85:19 162:4 163:17
hired 12:11
historically 100:9 101:16
history 95:22 96:17
hold 47:7 87:9 157:18
holdings 71:16 73:4
honest 187:24
hooking 39:11
hope 26:22,24 106:22 107:13 128:20
hopes 85:12
hour 17:8 53:5
hours 17:6,13 17:15,19 168:8
house 11:4 64:25 66:25
housed 29:21
housing 29:8

huh 159:12
human 8:10,15 11:16 159:14
hundred 61:14 82:21

**i**

idea 95:11 107:23 154:6 168:7 179:21 195:7
identification 14:21 20:4 33:10 41:2 53:13 64:2 78:2 84:3 98:2 110:15 116:3 121:18 130:12 141:18 143:24 148:12 169:25 181:15 183:20 191:2 194:11 196:6 198:24 199:17 202:6 209:7 210:3 211:3 212:3 213:3
identified 57:24 58:18 79:14 81:8 180:11
identify 21:9 54:13 55:4 112:17

image 64:7
immediately 49:20 70:12 172:14
impact 59:16 61:5 134:20 156:25
implement 68:19
implementati... 92:20
implementing 69:4
implied 103:25
importance 35:2 80:4 94:11
important 91:23 92:9,12 93:23 94:6,17 95:2
imposition 117:3 122:19 131:16
inaccurate 188:13 189:2,4
incarnate 136:20
include 35:13 67:9 71:6
included 147:15 168:20 206:12

including 55:20 56:7 57:20 65:6 117:8,25 123:24 131:20 174:14 206:16
income 178:19
inconsistent 104:16
increasing 79:21
incredible 88:25
incremental 125:4 133:4,20 134:7,18 135:7 136:4,22 137:19 138:9 139:18 141:25
incrementally 99:13
independent 39:3 42:22 188:7
independently 190:9
index 192:14 192:15 193:3 193:14,19,22 194:2 195:15 197:14 200:19 209:2
indicated 215:11

**individual**
  30:21 161:4
  162:11
**individuals**
  158:20 159:21
**inflated** 59:21
**inform** 41:20
  154:8,20
**information**
  24:11 25:2
  27:17 29:9,21
  35:3,10 36:15
  41:8 47:24
  55:11,17 58:8
  59:2,11,20
  60:15,23 61:5
  61:19 62:4,7
  62:13 66:5,5
  66:25 67:11
  70:19,22 74:23
  75:3,12 76:5
  86:17 91:25
  92:9,13 94:4
  94:18,24 95:3
  97:2 103:21,23
  104:6,13 106:3
  109:17,19,24
  113:9,20
  114:12,17
  115:2 117:10
  117:13,18
  118:3,6,18
  119:16 120:8
  120:12 121:2,3

121:10 122:23
124:2,14 125:5
126:3,16 127:5
128:24 131:23
132:2,13 133:2
133:4,21 134:7
134:19 135:7
136:4,23
137:19 138:9
139:10,18
141:16,23,24
141:25 143:2
143:14 144:20
147:5,11
148:25 150:12
151:3 152:5
153:7,15
182:16 197:19
202:23 204:9
211:10
**informed** 156:8
  176:7 177:22
**informs** 155:4
  155:5
**infrastructure**
  89:6
**initial** 100:7
**input** 95:10
  104:12
**insider** 84:7
**instance** 50:22
  73:11
**instances** 9:20

**institutional**
  22:17 48:25
**instructing**
  137:15
**instruction**
  24:14 135:22
**insulting**
  113:10,21
**integrated**
  28:25
**integrations**
  18:14,16
**integrity** 92:21
**intend** 187:4
  188:14 189:14
**intended** 51:25
  52:12,23 63:4
**intending**
  185:19
**intends** 132:21
**intention** 189:3
**interact** 13:12
**interchangea...**
  176:12
**interest** 86:12
  88:8
**interested** 6:7
  88:16 214:15
**internal** 132:2
**interpret** 40:7
  59:25 69:22
  101:13 103:15
  137:4

**interprets**
  62:14
**interrupt**
  105:22
**interview** 65:23
  84:24 85:10
**invest** 89:16
  193:13,17
  197:6,12
  200:22
**invested** 23:12
  162:12 177:24
  200:18
**investigated**
  123:3 126:16
**investigating**
  115:17 118:15
  118:16 119:9
  119:13 126:13
  127:4 128:13
**investigation**
  40:17 117:12
  117:15 118:5
  120:7 122:18
  124:4,7 131:25
  132:4
**investigations**
  117:2 131:15
**investment**
  13:5,9,13,16,19
  13:20,24 14:2
  22:8 23:9,18
  65:4,21 160:2
  160:6,7 161:9

[investment - jay]                                                    Page 24

161:19,21
162:18,21,22
162:24,25
163:3,5,10
164:14 169:21
170:4,13,18
171:9 172:17
173:4,13,24,25
174:13,15,18
175:2 176:7,10
177:3,12,18,18
177:23 178:7,8
178:11,25
179:19 180:16
180:20 190:22
191:5,11,25
192:13,14,17
192:22,25
193:5,8,12,18
193:25 195:19
196:3,9 198:22
199:4,9 200:6
200:8 205:20
206:3,7,22
207:2,3 211:19
212:7,18,24
**investments**
20:18 22:19
**investors** 27:2
52:23
**invests** 197:9
**invisible** 92:21
**involved**
152:11,17

155:10 163:20
203:20 205:12
205:17 207:5
**involvement**
13:4,7 26:23
**ioffe** 31:6,18
**issue** 39:10
40:12 42:24
43:4 51:13
94:9 205:14,19
**issues** 19:10
110:22 114:21
126:17
**issuing** 63:5
**item** 55:23
**iteration**
172:13
**iterations**
171:22 172:3
197:2 199:23
**itg** 29:23 30:7
39:8,25 40:16
41:5,12 42:10
42:21 51:13
64:7 65:8
71:19,24 72:4
72:9 85:4 86:2
86:10 88:7,22
88:25 89:14
99:7 100:4,8
100:18,22
101:16 102:5
104:9,21
106:10 110:19

113:8 114:12
**itg's** 30:16 39:2
84:16 89:10

**j**

**j** 7:5
**january** 11:10
124:16,17
132:16 139:13
**jay** 1:14 2:16
5:13 7:1,18 8:1
9:1 10:1 11:1
12:1 13:1 14:1
15:1 16:1 17:1
18:1 19:1 20:1
21:1 22:1 23:1
24:1 25:1 26:1
27:1 28:1 29:1
30:1 31:1 32:1
33:1 34:1 35:1
36:1 37:1 38:1
39:1 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1 59:1
60:1 61:1 62:1
63:1 64:1 65:1
66:1 67:1 68:1
69:1 70:1 71:1
72:1 73:1 74:1
75:1 76:1 77:1

78:1 79:1 80:1
81:1 82:1 83:1
84:1 85:1 86:1
87:1 88:1 89:1
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1
105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1 142:1
143:1 144:1
145:1 146:1
147:1 148:1
149:1 150:1
151:1 152:1

**[jay - know]** Page 25

153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1 170:1
171:1 172:1
173:1 174:1
175:1 176:1
177:1 178:1
179:1 180:1
181:1 182:1
183:1 184:1
185:1 186:1
187:1 188:1
189:1 190:1
191:1 192:1
193:1 194:1
195:1 196:1
197:1 198:1
199:1 200:1
201:1 202:1
203:1 204:1
205:1 206:1
207:1,15,21
208:1 209:1,4
210:1 211:1
212:1 213:1
214:1,9 215:1
215:18 216:1
216:25 217:1

217:25
**jefferson** 159:9
**job** 1:25 158:17
158:21
**john** 38:19,25
41:21 42:4,16
**join** 11:8
**joined** 6:18
11:6 79:19
**joining** 6:24
**joseph** 32:5
**judgment** 8:3
148:19 155:8
**july** 78:20
130:10,17
210:24
**june** 18:25 20:9
21:13 110:11
111:6 210:12

**k**

**k** 55:24 60:13
115:25 116:6,8
116:12,17
177:7 210:19
**kcg** 18:20 28:19
28:24,25 29:21
49:4 71:9,11
71:12,14,16,19
72:10,15,23
73:4,9 86:6
87:7 114:16
**kcg's** 70:24
71:7 72:18

84:18 86:23
104:22 105:8
109:11
**keep** 65:15 68:9
90:22 183:14
**keeping** 18:12
59:20 94:24
103:20,22
**kentucky** 10:25
**kevin** 6:19
**kinak** 72:2
**kind** 39:6,11
43:7,8,20,21
48:18,19 87:16
94:22 103:24
113:7,9 159:25
**kinds** 109:20
**knew** 126:15
**know** 8:23 9:25
10:3 13:3 16:3
28:5 29:13
31:3 36:6 38:8
39:16 40:5,9
40:19 42:8
44:22 45:16
48:10,21,21
49:23 50:8,9
51:16 59:9
64:23 67:12
68:5 78:25
80:3 81:19,20
82:18,20,25
83:19,21 84:20
91:17,21 93:10

93:11,14,20
94:16 96:5,19
97:9 99:9
103:2 104:24
104:25 106:24
107:5,17
110:18,21
111:19 112:11
114:6,19 120:4
123:20 124:23
125:16,22
126:2,10 129:5
130:22 131:3
134:25 135:5
135:14,23
136:11 140:12
140:17 142:5
142:17 145:5
148:2,5 149:9
149:13,20
150:3 152:8
153:17,25
156:5,12,19
161:12 166:14
167:15 168:8
172:2,6,10
173:18 175:9
175:18 179:5
179:13,14,17
179:22,25
180:14,15,19
180:22 186:13
186:18,21
187:2,24

**[know - litigation]**

192:19 193:16
194:3 195:13
195:18 196:22
197:8 198:3,5
198:12,14
200:2,5,7,15,17
200:21 201:6
201:11,15,19
203:17 206:6
**knowing** 38:6
154:17 190:9
**knowingly**
146:9
**knowledge**
29:10 65:13
66:3 196:14
**known** 38:10
119:5 121:8
125:5,7 127:14
127:20 128:7

**l**

**l** 176:24,24
**labeled** 14:24
184:15
**lacks** 190:11
**lakes** 175:10,17
176:5 177:9
195:20 196:5
196:10 197:12
197:20,24
198:10 212:20
**laptop** 56:16

**large** 22:17
85:7,23 86:5
113:4 144:8
151:19 154:19
**larger** 54:22
**law** 10:9,16,23
11:3 21:6
44:19 146:20
183:23 184:20
**laws** 124:13
132:12 139:9
181:22
**lawsuit** 30:22
**lawsuits** 116:25
122:17 131:14
**lawyer** 10:18
37:15
**lawyers** 12:16
44:7 74:5
98:17,22 103:6
119:2 154:13
182:19 188:6
188:12
**lays** 145:19
**lead** 6:22 27:4
37:18 47:14
155:17 164:4,6
164:19 202:4
202:10 213:7
**leading** 47:12
47:16
**leah** 3:18
**learn** 26:10
176:4

**learned** 133:5
151:4
**leave** 106:19
157:5
**led** 151:23
153:7 177:9
**left** 36:15 38:3
**legacy** 49:2
**legal** 12:7 18:3
24:8 27:14
35:20,21 37:10
37:13 52:15
116:19 118:25
119:21 120:3
122:11 127:17
128:2 131:10
135:13 136:9
136:11 137:2
137:13 138:13
138:18 145:19
154:11,24
188:23
**legally** 93:16
**letter** 25:3
77:24 78:6
79:12 80:18
81:7,14 82:15
83:4 210:6
**letters** 24:19
**level** 39:7,20
162:4 163:17
**leveraging**
65:12 66:2

**liability** 27:11
27:23
**lied** 104:25
133:12,15,18
134:15 151:16
151:24
**light** 78:15
146:14
**limitations**
173:15
**limited** 56:8
57:21 190:24
191:7 212:10
**line** 51:4,17
122:22 216:3,6
216:9,12,15,18
216:21 217:3,6
217:9,12,15,18
217:21
**lines** 48:14
57:11,12,15
192:11
**list** 56:9 57:11
57:16 58:15,17
178:15 180:5,8
185:16 187:23
**listen** 34:7
87:10
**lists** 15:7 188:3
**litigate** 12:9
**litigation** 1:7
5:17 26:23
27:6 165:2,4
166:19 167:24

**[litigation - managers]** Page 27

168:4,18
**little** 39:5 59:12
**llc** 145:2
**llp** 2:18 3:3,13
5:22
**location** 5:21
**logical** 35:14
92:21
**long** 17:12,16
79:23 99:20
168:3
**longer** 175:17
**look** 21:8 30:13
34:20 42:15
46:14 55:18
68:14 84:21,22
94:8 95:20
122:9 131:9
144:24 146:18
173:9 183:14
184:7 188:10
192:4,10
196:18
**looking** 25:10
46:11,12 48:8
48:10 56:7
57:20 58:14
82:5,6 143:13
172:15
**loss** 22:25
23:19 164:15
203:2
**losses** 22:9,18
22:20 23:9,22

26:24 164:16
164:18 202:17
**lot** 74:18 76:19
108:24 138:21
**louisville** 10:10
10:25
**lunch** 108:6,15
**lweiser** 3:18
**lying** 45:14,17
76:6 93:22
94:2 95:7
103:19 104:18

**m**

**m** 177:7,7
**made** 18:9 28:2
28:8 31:11,21
32:2,7,20 34:5
43:14 46:12,13
48:9 53:2 54:7
65:20 73:9,20
75:20 76:11,17
77:12 92:18
94:22 95:4
97:10 105:5
109:19 120:17
120:19 123:7
124:18 125:5
127:10,21
128:7,22
129:14 132:17
137:20 138:19
138:21 139:14
142:24 144:16

146:14,16
150:24 179:23
182:6 183:10
185:5 195:11
**magdalene** 3:9
6:25
**maintain** 55:9
55:10,15 58:6
58:7,24,25
61:2,3 62:2,3
109:16,18,23
147:3,7 148:21
150:11 168:17
171:21
**maintained**
61:13 172:7
**maintaining**
59:10,11 60:22
62:12 109:21
**maintains**
191:24
**make** 36:19
37:7 60:10
77:16 78:14
96:21 97:14
109:2 115:5
138:4 146:13
155:18 157:17
159:24 161:11
162:20 174:9
176:14 178:8
190:15
**maker** 39:4

**makes** 107:20
108:2 155:8
207:2
**making** 35:9
39:12 48:23
52:2,6,24
62:24 75:13
79:24 80:19
83:6 103:10
113:2 146:4
159:3 185:18
**malba** 3:8
**manage** 12:10
165:5 192:13
192:22,25
197:6
**managed**
192:17 193:24
195:4
**management**
13:17 85:23
89:16 95:12
190:22 191:5
191:11,25
195:19 198:22
199:4,10 204:9
212:7,24
**manager**
180:13 192:13
200:6,8
**managers** 13:9
13:13,19,20
85:8 113:5
158:24 160:7

160:14 161:15 161:19 162:19 162:22,24 163:5,11,23 164:3 173:12 174:4,10,15,16 175:2 177:13 177:18,19,23 178:8,11,25 179:19 180:10 180:11,16,17 180:20,21,23 193:13 203:10 203:14 205:20 205:24 206:3,7 206:22 207:3

**manages** 21:22 203:8

**managing** 13:8

**manner** 71:6

**march** 56:2 198:2,11,20 199:2 212:21

**mario** 3:8 19:19

**mark** 14:17 33:3 40:20 63:15 111:4 115:21 121:13 141:8 143:20 148:7 169:18 183:15 194:5 195:23 198:18 201:25 212:7

**marked** 14:20 20:2 33:8 40:24 42:14 53:11 63:24 77:24 84:2 97:24 110:14 116:2 121:16 130:10 141:16 143:22 148:10 169:24 181:14 183:18 190:25 194:10 196:5 198:23 199:12 199:15 202:5

**market** 35:9 39:4,11,19 48:23 51:25 63:4 86:13,22 87:4 88:6,10 89:23 92:11 103:19 113:2 117:19 125:7 126:6,11 127:9 127:14,20 133:5 135:9 136:6 140:25 151:16,24 154:16 162:8 177:20

**markets** 49:17 50:16 89:10

**marriage** 214:15

**master's** 10:8 10:15

**material** 146:12,12 147:11 148:24 153:19 154:4 169:8,13

**materially** 56:6 57:19 144:16 144:19 171:16

**materials** 168:24

**mathematical** 201:3

**matter** 5:15 117:7,9,25 123:25 124:9 131:21 183:6 214:16 215:7

**matters** 12:7 22:12 117:24 123:23 131:20

**mayor** 12:21 21:14,16 78:7 78:23 79:2,4 80:15 81:19,21 81:22,25 82:8 82:9 83:17

**mayor's** 81:16

**mean** 47:15 51:15 72:24 105:22 137:7 137:10 149:20 163:16 174:7

188:22 201:2 206:22

**meaning** 103:15

**means** 40:10 69:24 90:8 137:11 146:11 180:23 192:24 193:17 197:8

**meant** 47:16

**measure** 45:4 45:11 46:7 74:2 76:2 81:18 94:5

**measures** 94:11

**meconomou** 3:9

**media** 5:12 56:21 57:4 129:24 130:7 181:4,11 205:2 205:9 207:15

**medications** 8:2

**medina** 3:22 5:25

**medium** 197:9

**meet** 160:20

**meeting** 17:12 159:17 163:7 163:11

**meetings** 14:11 14:12 44:17 95:14 160:22

**[meetings - n]**                                                        Page 29

160:25 162:3
163:25 177:6
203:13
**mehmet** 72:2
**melville** 3:6
**member** 158:23
160:14 161:15
163:22 204:8
**members** 68:21
79:7 204:14,18
**memo** 19:10,13
19:18 26:12,14
26:14
**memorized**
142:16 153:12
**memory** 8:3
**mention** 71:9
**mentioned**
18:16 161:13
161:18
**meritorious**
124:20 132:20
**met** 15:21
16:21 17:2
**microphones**
5:5
**mid** 197:6,17
**middle** 38:18
112:6
**miguel** 3:22
5:25
**million** 79:21
112:4 148:5
149:17,23

153:19 154:3
**mind** 35:12
87:13 129:11
**minimis** 113:4
**minute** 54:17
54:19
**minutes** 17:7
**misimpression**
87:5
**mislead** 63:4
188:14,20
189:14
**misleading**
35:17 36:7
54:14 55:5,12
58:3 60:10
61:8 73:18
87:4 91:10
92:4 93:3
95:17 96:14,22
97:6 100:16
112:19 113:16
118:23 128:9
137:22,23
141:15,22
144:17,19
145:13 146:5
146:16 153:22
211:8
**misled** 86:22
188:17 189:18
**misrepresented**
36:25 37:4
123:13 128:23

133:22 140:14
**misspoken**
168:2
**misstatement**
62:23 95:4
135:9 138:11
**misstatements**
94:22 97:16
118:8,22
127:10,21
134:21 139:24
140:8 142:7,18
142:24 150:22
151:12 198:6
**misstates** 77:2
95:6 137:8
**mistake** 51:21
**misuse** 109:11
147:11 148:23
**misused** 109:25
110:3,5
**misusing** 28:15
41:7
**modern** 65:10
**molluso** 31:7
32:5
**moment** 40:22
75:25
**moments** 38:2
114:2 119:6
139:16
**monday** 138:6
**money** 65:3
146:10 162:5

**monitor** 20:17
165:5
**monitored**
165:8
**monitoring**
20:2,9,23
22:14,23
174:14 209:15
**monthly** 14:10
160:21,25
161:8 203:13
**months** 71:25
79:14 81:8,13
**morgan** 14:6,8
14:10,14
161:22 162:2
163:9 173:3
174:21 176:17
176:25 203:9
203:12,15
**morning** 5:2
6:15,20,24
7:12 99:25
**motion** 166:22
167:10
**moved** 11:2
**moving** 39:16
**mute** 5:7
**mutual** 65:6
72:3

**n**

**n** 7:5

**[name - objection]** Page 30

**name** 5:25 7:13 7:17 68:20 177:6 200:7
**named** 30:21 184:19
**native** 108:17
**natural** 35:6
**nature** 14:7 116:23 122:15 123:7 131:12 147:10 161:25 163:14 177:8
**necessary** 146:13
**need** 10:20 54:21 63:18 64:16,18,20 80:8 111:19
**needing** 73:11
**negligently** 146:10
**negotiated** 13:16
**never** 53:2 62:15 113:11 113:19,23 129:11 162:13 187:9 188:17 189:18,22 207:2
**new** 1:2,15,15 2:19,19,21 3:6 3:16,16 5:19 5:23,24 7:8

69:4 70:7,14 72:9 85:4,25 86:16 104:12 107:9,15 214:3 214:8
**ngg** 1:3 5:20
**nine** 158:23 160:14 161:15 163:22 204:13
**nineteen** 183:17
**non** 174:3,6
**nonpublic** 147:11 148:24
**notary** 2:21 7:7 208:2 214:7
**note** 5:4
**noted** 207:19
**notice** 2:20 14:20,25 15:16 124:11 125:11 125:19 129:10 132:9 133:10 133:16,19 134:11,16 139:6,20 140:2 140:5,10,15,20 140:24 141:3 209:9
**noticing** 6:14
**notify** 23:24
**notwithstandi...** 104:7 192:11

**november** 29:23 30:7 32:14,16 33:8 33:15 41:22 42:5 63:24 64:5 65:3 66:10 79:4 83:25 84:7 169:23 170:6 170:24 171:11 171:16 173:5 209:20 210:5,7 211:22
**number** 5:20 63:20 141:10
**numbered** 84:22 173:11 174:12
**numbers** 111:16,21

**o**

**o** 177:7
**o'neill** 99:3 110:12 111:7 111:25 210:14
**oath** 4:15 6:4 215:14
**object** 37:9 52:13 58:10 76:18 142:10 153:24 183:2 185:21 186:5

**objection** 8:18 13:10 18:2,24 22:16 23:2,14 23:20 24:7 25:4,8,25 26:20 27:5,13 28:17,23 29:19 30:3,11,17 31:10,20,25 32:6,18,24 35:19 36:20 37:3 40:4,8 41:24 42:7 43:17,24 44:6 44:10,24 45:6 46:8,17,21 47:2,6,11,17,25 48:5 49:8 50:6 50:12,25 51:11 51:20 52:3,25 54:4,15 55:14 59:6,18 60:4 60:11,17,20 61:9,15 62:9 62:17,25 63:6 66:7 67:3,22 68:4 69:6,23 70:9,20 71:2,8 72:12,20 73:13 73:19 74:4,9 74:15 75:5,10 75:23 76:12,25 77:11,19 79:8 80:14,23 81:5

**[objection - okay]** Page 31

| | | | |
|---|---|---|---|
| 81:15 82:24 | 129:2,16 | 170:13,18 | 166:12 175:16 |
| 83:8,14,18 | 130:24 133:7 | 174:18 211:20 | **okay** 7:22 8:5,8 |
| 84:19 86:25 | 133:14,24 | **objects** 137:15 | 8:14,20,25 |
| 87:8,23 88:9 | 134:12,22 | **obligated** 75:2 | 9:10,17,24 |
| 90:2,11,24 | 135:4,12,17,24 | 93:16 | 10:20 11:20,24 |
| 91:11,16 92:5 | 136:8,25 137:7 | **obligation** 35:4 | 12:15,18 14:16 |
| 92:10 93:4,19 | 137:24 138:12 | 79:20 164:4 | 14:23 15:18 |
| 93:25 94:7,13 | 138:17 140:3 | 174:22 | 16:8,21,25 |
| 94:19 95:5,18 | 140:11,16 | **observers** | 17:9,16 21:12 |
| 96:4,9,18,23 | 141:5 142:4,21 | 86:13 | 21:16,20,22 |
| 97:4,7,18 | 143:4,11,17 | **obtained** | 23:16 24:17 |
| 100:19,25 | 144:11 150:7 | 146:10 | 25:6,10 26:3 |
| 101:9 102:7,16 | 150:17 151:9 | **obtains** 148:19 | 28:14 31:18 |
| 102:25 103:5 | 151:25 153:10 | **obviously** 39:4 | 33:11 34:24 |
| 103:17 104:17 | 153:16 154:5 | 39:10 42:20,22 | 40:11 42:3,9 |
| 104:23 105:3 | 154:10,23 | 48:20 49:22 | 44:8 45:3 |
| 106:12,16,21 | 155:14,21 | 51:5 94:20,21 | 46:23 47:4,8 |
| 107:12,22 | 156:2,10 157:3 | 100:6 151:2 | 47:18 50:9 |
| 108:5 109:4,12 | 164:25 174:24 | **occasions** 17:4 | 51:4,14,18 |
| 110:2,24 | 175:5 178:3,6 | **occurrence** | 52:9 53:7,8,9 |
| 112:20 113:17 | 182:18 183:11 | 25:7 | 53:20 54:2 |
| 114:5,22 115:3 | 186:2,10,17,25 | **october** 184:6 | 56:13,19 57:6 |
| 115:8 117:21 | 187:6,16 188:5 | 191:18 192:18 | 57:9 58:17,23 |
| 118:9,24 | 188:16,21 | **offer** 89:9 | 60:6 61:17 |
| 119:20 120:2 | 189:5,17,21 | 112:23 215:13 | 62:19 64:14 |
| 120:13,21 | 190:3,11 198:8 | **office** 81:20 | 67:5,8,13,25 |
| 121:4,11 | 198:16 201:10 | 82:5 196:23 | 68:14 69:8 |
| 122:25 123:10 | 201:23 203:6 | **officer** 4:14 | 70:11,17 71:5 |
| 123:15,19 | **objections** 4:9 | 65:22 112:23 | 71:22 72:14 |
| 125:2,8,15,21 | 6:8 | 159:6 | 73:2,8,16,25 |
| 125:25 126:7 | **objective** 48:4 | **offices** 2:17 | 74:6,11,17 |
| 126:14,20 | 74:7 103:4 | 106:20 | 75:7,16 76:21 |
| 127:16,23 | **objectives** | **oh** 47:15 71:10 | 77:14,21 78:21 |
| 128:10,19 | 169:22 170:5 | 87:24,24 107:4 | 78:25 80:18 |

**[okay - originally]** Page 32

81:7 82:14,19
83:2,11,16,22
84:21 86:20
87:24 88:5,12
90:6,20 91:6
91:14,22 92:14
93:9,21 94:5
94:15 95:8,20
96:6,12,20
97:20 98:23
100:21 101:3
101:12 102:2
102:10,18
103:3,8,13
104:7 105:6
106:7,14,23
107:8,14,25
108:20,25
109:22 110:4,8
110:21 111:2,5
111:16,22
112:13 114:10
114:15,19
115:14 116:21
118:16,21
119:23 120:5
120:23 121:6
121:13 122:9
123:12,17,21
125:4,12,17
126:3,18,22,25
127:8,13,19
128:12,16,21
129:7,18,22

130:16 131:6
133:2,20
134:18 135:2
135:15 139:16
140:13,25
141:7 142:6,17
142:23 143:7
143:13 144:13
144:23 145:7
145:17,22
146:17 147:19
148:2,7,16
149:11,15,21
150:4,9,19
151:2,2,11,22
152:4,11,25
153:13,18
154:2 156:4,14
156:21 157:5
157:11 158:12
158:15,20,25
160:8,12,17,19
161:18,22,25
162:7,10,15
163:18,24
164:21 165:3
166:5,11,21
167:15 168:10
168:13 169:3,7
169:16 170:24
171:7,12,24
172:6,18,21
173:3,8 174:12
175:15 176:9

176:14,16,23
178:14,18
179:5,13,17,22
180:2,24
182:20 183:13
184:5,17
185:18 187:4
187:11,22,25
188:7,18,24
189:10,19,24
190:7,21
192:20 193:7
193:16,23
194:4,24 195:9
195:13,22
196:25 197:4
197:16,24
198:10 199:22
200:2,11,11,17
201:6 203:11
203:20 204:17
204:21
**omega** 39:10
40:12 42:2,10
51:13
**omissions**
144:18
**omitted** 60:15
97:3 146:12
**once** 17:5 59:21
128:22
**ongoing** 81:2
**ooo** 4:19

**open** 29:3,6
36:16 38:3,11
44:17 95:15
101:24
**opened** 86:6
**openness** 102:3
**operating** 41:6
49:23 78:11,16
78:17 79:18
**operations** 56:4
57:17 59:17
**opinion** 35:21
37:11,14 47:7
49:10 96:11
**opportunities**
88:24
**opportunity**
161:11
**option** 179:15
**options** 179:20
**order** 10:12
60:9 89:13
114:16 146:13
**orders** 65:12
66:2,23,25
67:10
**ordinary**
116:23 122:15
131:11
**organic** 88:23
**organically**
88:17
**originally** 65:2

**[outcome - pension]**                                                    Page 33

**outcome** 6:7
  27:8 154:7
  214:16
**outlined** 85:10
**outlines** 84:24
**outside** 12:10
  14:12 95:14
  160:8 165:6
**overlap** 39:8
  104:5
**oversee** 95:11
**overseen** 65:19
**oversight** 92:20
  159:4
**overstate** 91:23
**overt** 44:19
**overview** 10:22
  163:17
**own** 65:2

**p**

**p.m.** 181:6,7
  205:4,5 207:13
  207:19
**page** 21:8
  25:11,13,23
  34:14,20,25
  38:16,18 54:11
  54:12 55:4
  58:14 61:12,18
  61:23,25 71:4
  71:5,11,11,12
  72:25 73:15
  84:23 85:2

88:13,15 90:16
95:21 98:24
111:16,18,21
112:2,7,9,11,15
116:15,16
122:9,10 127:2
127:7 131:7,8
144:13,25
145:17 149:9
149:13 173:9
173:22 178:15
180:3,3 181:18
181:20 184:15
192:5 193:5
196:11,18
209:3,7 210:3
211:3 212:3
213:3 216:3,6
216:9,12,15,18
216:21 217:3,6
217:9,12,15,18
217:21
**pages** 88:12
**paragraph**
  34:15,24 65:24
  66:21 67:13,14
  67:25 68:15
  71:23 78:10
  95:8 112:21
  116:22 131:10
  145:4,9,12,12
  146:3,7,24
  173:11 174:12
  182:5 185:3

192:7 197:5
**paragraphs**
  41:16 79:11
  149:8
**pardon** 78:4
**part** 53:17
  55:23 92:2,15
  93:5 116:7,14
  121:25 122:7
  144:9 151:19
  151:21 154:19
  158:2,17 161:2
  204:18
**participant**
  44:16,22
**participants**
  44:9 82:16,22
  83:3 157:20
**participate**
  157:12
**particular**
  35:18 36:24
  61:7 81:12
  91:6 93:2
  94:12 158:7
  165:9 195:10
  197:21
**parties** 4:5 5:10
  57:2 130:5
  181:9 205:7
  214:14
**partnered** 21:6
**partners** 99:3

**partnership**
  190:25 191:7
  212:11
**parts** 151:22
  152:10
**party** 6:5 43:7
  43:8,21,22
  48:18,19
**pass** 207:8
**password** 29:9
  29:12 38:12,13
**path** 156:22
**paul** 2:17 3:13
  5:21 6:16
  106:19
**paulweiss.com**
  3:17,18
**pay** 149:17,24
  162:6
**payment** 79:21
**payments**
  159:23 161:3
**payroll** 159:22
**peeking** 86:15
**penalties** 117:4
  122:20 131:17
**penalty** 149:17
  182:2 184:25
  186:15 188:3
  190:8 215:4,5
**pension** 8:13
  65:6 79:16,20
  80:4,9 85:24
  157:8,13

**[pension - polden]**

159:14,23
161:3,4,5,13
162:6
**people**  12:12
72:4 83:10
99:14,16
113:12 129:5
**perceived**
155:24
**percent**  39:17
61:14 82:21
101:10
**perfect**  90:22
**perfectly**  61:14
87:6
**performance**
162:24 163:4
163:10 174:15
175:25 177:9
**performing**
176:5
**period**  32:10,12
82:12 120:7,20
124:16,19
127:3 129:14
132:15,18
139:12,15
143:16 171:12
172:8 173:20
182:7 185:6
195:2
**perjury**  182:2
184:25 186:15
188:3 190:9

215:4,5
**perpetrate**
187:5
**perpetrated**
79:6 187:9
**perpetrating**
80:11,16
**person**  15:22
17:9 47:23
74:13 94:12
147:12
**personal**  49:9
136:15,18
**personally**
79:25 91:24
92:8,12
**personnel**
159:9
**perspective**
59:15
**pgim**  175:10
198:19 200:4
200:12,17,21
201:15,19
**ph**  167:17
**philip**  7:18
**phones**  5:8
**phrase**  115:18
**physical**  35:13
**physically**
105:25
**pick**  5:6 138:5
**picture**  48:11

**piece**  75:12
**pitch**  68:24
73:24
**pk**  1:3 5:20
**place**  5:10 35:2
36:12,14 53:3
65:13 66:3
147:17 171:4
171:15 172:7
**placed**  67:2
**plaintiff**  6:23
27:4 37:18
155:17 164:4,7
164:19 182:6
184:19 185:4
202:4,10 213:7
**plaintiffs**  3:4
20:25 21:3
26:17
**plan**  79:20,23
82:16,21 83:3
84:11,24 85:10
108:13 124:22
**planned**  71:25
**planning**  72:17
**play**  167:20
**player**  71:21
**playing**  51:16
**pleading**
190:13
**pleadings**
15:20 16:8,13
165:7,12,17,20
165:20 166:2,7

**please**  5:4,7 6:9
7:3,16 9:4 10:5
12:5 14:18
22:7 33:4
34:13 38:15
40:21 41:16
54:10 61:24
79:10 83:24
87:14 98:24
104:3 110:10
111:17 112:11
115:22 121:14
131:6 143:20
145:3 148:8
149:7,9 169:18
173:9,22
178:14 180:2
183:14 184:14
192:4 194:5
202:2
**point**  10:3 19:4
32:20 37:13
38:19 55:13
57:11,25 59:4
104:3 114:20
129:20 135:10
136:17 156:15
173:19 178:21
**points**  14:13
55:19 56:10
85:2,17
**poised**  64:24
**polden**  6:18
207:11

**[policeman - process]**                                                          Page 35

**policeman** 8:13
**policies** 35:7,11
  50:24 124:15
  132:14 139:11
  147:4,8,16
  148:22 171:9
**policy** 166:19
  169:21 170:5
  170:13,18
  171:3,17,22
  172:3,17
  173:19 211:19
**pool** 41:7
**poor** 175:25
  177:9
**portfolio** 20:2,8
  20:23 22:14,23
  197:7,18
  209:15
**portion** 87:18
  88:2
**posed** 72:9,11
  73:10 84:16
  88:7
**position** 58:24
  85:6 86:3
  121:7 195:14
  198:11
**positive** 99:13
  99:15,17
**possible** 83:20
  156:13
**possibly** 156:19

**post** 67:11
**potential** 39:6
  39:15 68:20
  121:9 188:19
**potentially**
  58:19
**practice** 10:25
  166:6 190:7
**practices** 28:4
  28:10 31:13
  32:21 50:14
  52:8 101:25
**practicing**
  10:17
**pre** 70:22 89:24
**preceding**
  172:14
**preexisting**
  68:3 69:9
  70:18
**prejudice**
  150:13,21
  154:20 156:7
  156:25
**prep** 17:10
**preparation**
  15:25 53:20
**prepare** 15:18
**prepared** 15:14
  99:10 152:9
  167:25 195:9
**prepares** 78:16
**preparing**
  17:17 168:5

169:12
**preposterous**
  113:10,21
**present** 3:22
  6:11 57:2
  117:8,24
  123:24 130:5
  131:20 163:25
  181:9 205:7
**presentation**
  203:12
**press** 40:23
  41:4,9,19
  141:12,20
  148:9,17 150:5
  209:22 211:4
  211:14
**presume**
  111:14 116:9
  122:3 130:25
**prevent** 147:10
  148:23
**previous** 132:8
  139:5 140:21
  171:8
**previously** 9:18
  26:15 42:14
  57:24 78:23
  105:7 125:18
  127:21 185:24
**price** 23:13
  26:18 59:21
  60:3 72:3
  124:24

**primary** 29:8
  29:17
**print** 54:22
**prior** 34:20
  134:9 136:24
  138:10 171:22
  172:16 185:14
**private** 5:7
**privilege** 16:19
  19:8,16 23:5
  24:16 25:16,18
  27:21
**privileged** 22:4
  24:10,25 25:24
  27:17,20 155:7
**problem** 79:23
  80:9,19
**problems** 62:16
**procedures**
  35:8,12 50:24
  124:15 132:14
  139:11 147:4,8
  148:22
**proceed** 7:4
**proceeding** 6:8
  56:25 130:4
  181:8 205:6
**proceedings**
  116:19 117:2
  122:12,18
  131:11,15
**process** 22:20
  159:23 190:17
  203:21 204:5

**produce** 172:25
**produced**
    15:23 16:6,14
    168:21 169:8
    169:13 194:14
**production**
    172:23 203:22
**products** 89:2
    89:14,16
**professional**
    193:6
**professionals**
    160:3
**progress**
    174:17
**prohibited**
    180:5
**project** 39:10
    42:2,10
**prop** 42:25
    48:22
**properly** 91:25
    92:13
**property**
    146:11
**proposed** 32:12
    124:12
**proposing** 82:2
**proprietary**
    55:11,17 58:8
    59:2 61:4,4
    62:4,13
**protect** 30:15
    92:9 94:17

95:3
**protected** 19:7
    23:4 86:23
    91:25 92:13
**protecting** 35:2
    94:3 114:25
**protection**
    89:19 90:5,18
    91:4
**provide** 75:2
    76:5 160:4
    165:6 166:6
    167:4 174:16
**provided**
    204:11
**provides** 162:2
**providing**
    165:13
**provision**
    192:21
**prudential**
    198:22 199:3,9
    212:23
**public** 2:21 7:7
    44:18 54:7,8
    79:25 122:23
    128:14,16,17
    144:20 150:10
    157:8,12
    201:13 208:2
    214:7
**publicly** 128:7
**published**
    78:12 81:14

82:15 84:6
    97:12
**punitive** 171:12
**purchase** 71:16
    73:4 205:13,18
    207:4
**purchased**
    18:14 175:2
    179:3,14,19
    197:25 206:3
**purchasing**
    206:8
**purpose** 20:14
    20:19 98:19
    160:24 170:15
**pursuant** 2:19
    181:21 184:19
    193:14,17,19
    194:2 197:13
    200:19
**pursue** 24:3,6
    155:17 156:9
    164:6
**pursuing**
    152:12 156:23
**pushing** 95:23
**put** 42:12 52:18
    53:4 60:13
    63:14 77:21
    83:22 97:20
    109:6 115:10
    129:18 143:19
    152:10 157:6
    179:15,20

195:17

**q**

**qualify** 180:20
**quant** 86:7
    113:6
**quantitative**
    200:10,22,24
**quarrel** 195:5
**quarter** 33:7,14
    53:11,15
    209:18,25
**quarterly**
    55:22
**quell** 84:11
**question** 4:10
    10:4 16:11
    23:7 27:18
    30:5 37:17
    38:17,22 39:25
    40:7,13 42:19
    47:10,19 52:17
    55:2,3 58:11
    59:12 61:10
    66:17,18 72:21
    75:24 77:3
    87:11,12,21
    88:14 91:20
    98:18,21,25
    99:8 103:6
    107:7 109:13
    112:2 118:10
    119:6 120:15
    133:17 134:4

**[question - records]** Page 37

135:25 137:17 140:6 147:22 154:12 155:3 155:15 158:5 186:19 187:3

**questioning** 13:2

**questions** 9:2 19:5 46:5 159:20 204:23 207:8

**quote** 68:16

**quoted** 153:3

**quotes** 206:12

**r**

**r** 3:17 7:5,5 176:21,22,24

**raised** 71:24

**randall** 21:21 78:7,21

**range** 112:5

**rare** 14:9

**reach** 132:6 139:3

**read** 34:11 36:3 39:22 41:16,17 49:19 54:17,19 61:24 64:16 71:3,22 72:24 86:18 87:19 88:3,21 92:14 97:11 99:21 101:18 112:6

112:19 122:8 131:5 145:4 146:2,7,9,24 147:6,13 149:7 149:12 193:4 215:6,8

**reading** 41:18 60:25 63:17 68:9 87:14 112:10

**reads** 34:19,25 71:15 122:14

**ready** 148:14

**real** 128:21

**really** 22:17 40:9 41:25 43:3 47:9,22 48:2 54:16,20 74:12 83:21 100:2 103:15 107:2,5,6,23 113:3

**reason** 7:23 114:7 123:17 125:17 135:15 136:3,12,22 137:5,18 138:8 150:4,15 154:2 171:14 175:23 183:12 195:5 216:5,8,11,14 216:17,20,23 217:5,8,11,14 217:17,20,23

**reasonable** 101:12

**reasonably** 147:8 148:23

**recall** 26:21 30:12 86:19 91:12 95:19 98:14 110:25 116:11 119:10 121:12 122:6 126:21 142:14 142:22 143:5 152:21 153:5 166:10 167:5 177:11 184:10 191:19 199:25 206:14

**receive** 23:21 124:11 125:10 140:5,19,23 141:2 161:4

**received** 10:14 10:16 26:12 67:7 83:3 121:2 132:8 133:9 134:11 139:5,20,25 140:10 171:24 172:12

**receives** 161:8

**receiving** 47:24 133:15,19 134:15 140:15

**reasonable** 101:12

**recent** 9:10 65:22 85:19

**recently** 166:22

**recess** 56:23 130:2 181:6 205:4

**recklessly** 146:10

**recognize** 35:5 113:8 130:20 170:8 181:23 191:8,10 199:5 199:7

**recommend** 95:13

**recommended** 193:8

**reconcile** 39:6

**record** 5:3,11 6:13 7:17 56:20 57:3 87:18 88:2 129:23 130:6 167:6 181:2,3 181:10 204:24 204:25 205:8 207:13 214:12

**recorded** 5:13

**recording** 5:9

**recordkeeping** 18:11

**records** 44:18 44:19 168:8

**recover** 22:20 26:24

**redacted** 25:17

**redaction** 25:15

**reeves** 21:6

**refer** 8:21,24 8:25 30:18 126:25 165:19

**reference** 42:4 49:21 51:9,12 68:2 69:8,19 70:5,18,23 71:6,12 72:15 72:16,23 73:9 78:9 101:7 103:22 108:3

**referenced** 19:14 26:15 40:12

**references** 73:20 105:6

**referencing** 169:4

**referred** 49:5 80:12 102:3

**referring** 16:23 18:18 50:4,10 161:16 165:17 180:17 200:3

**refers** 45:19 66:21 176:10

**reflect** 36:8

**reflected** 27:22 28:5 193:21

**reflecting** 194:8,18 212:14

**reflects** 186:23 202:17

**regain** 164:15

**regained** 164:17

**regarding** 23:18 144:20 147:4 148:20 177:15

**regime** 65:18

**regions** 179:12

**regular** 14:13 23:21 165:10

**regularly** 22:12 200:9

**regulatory** 116:19,25 121:9 122:11 122:17 123:8 123:13 131:10 131:14

**relate** 139:24

**related** 6:5 79:15 124:18 132:16 139:13 179:20 202:3 213:6 214:13

**relates** 158:21

**relating** 19:10 28:3 31:12 32:21 42:10 104:5 141:15 141:23 150:11 150:22 165:24 179:2 211:9

**relationship** 13:8 21:23 22:6 175:24 177:10 191:25 193:9 203:9

**release** 40:23 41:4,9,20 141:12,20 148:9,17 150:5 209:22 211:4 211:14

**released** 62:20

**relevance** 32:16 33:24 43:9 54:3 64:11 118:12

**relevant** 28:21 29:25 30:9 111:13 130:23 151:7 156:15

**reliance** 77:17 97:16

**relied** 63:12 152:6 182:19 188:6,11 190:20 202:25

**relief** 8:11,16 8:22 19:25 20:7 79:16 81:24 82:7 146:18,22 169:20 170:4 170:12 174:5 183:25 209:12 211:17

**rely** 44:7 62:22 72:17 74:5 105:4 162:25 178:7 206:21 206:23

**relying** 68:3 70:18

**remarks** 34:21 97:3 99:11 112:19

**remember** 30:19 171:18 193:11

**rendered** 77:9 97:5 144:18

**repeat** 30:5 47:19 52:17 61:10 66:18 75:24 109:13 118:10 120:14 135:25 155:15

**repetto** 99:2 111:24 112:3

**rephrase** 10:5 58:11 77:3

**[report - review]**                                                          Page 39

| | | | |
|---|---|---|---|
| **report** 12:18 55:22 163:4,9 167:13 | 120:25 121:2 124:2 131:22 204:3 | 204:2 | **retire** 80:6 |
| **reported** 1:24 | **required** 76:4 | **responsibilities** 174:14 | **retiree** 161:3 |
| **reporter** 2:21 6:2 7:3 26:6 63:21 87:16,23 120:9 130:15 141:11 148:15 166:14 183:17 196:2 214:7 | **research** 38:20 **reserve** 173:13 **reserved** 4:10 **resolved** 110:23 114:21 147:20,24 | **responsibility** 159:4 160:13 162:18 163:19 173:23 **responsible** 82:2 160:16 **responsive** 204:6 | **retirees** 161:10 **retirement** 8:11 8:16,22 19:24 20:7 79:16 81:24 82:6 159:20 169:20 170:3,12 174:5 183:25 209:12 211:17 |
| **reporting** 163:14 | **resources** 8:10 8:15 11:16 159:14 | **rest** 89:24 **restriction** 180:12 | **reveal** 23:4 119:18 151:3 |
| **represent** 6:3 7:14 187:20 194:24 | **respect** 15:15 42:21 72:18 118:17 124:8 124:14 132:13 139:10 149:18 149:24 207:3 | **result** 19:9 117:3 118:23 122:19 123:9 124:24 125:5 131:16 | **revealed** 115:12,15 117:19 118:22 119:7,17 135:8 136:4,5,23 137:20 138:10 138:25 142:2 143:15 |
| **representation** 61:12 62:6 90:20 113:24 185:4 195:6 | **respective** 4:5 **respond** 137:16 **responded** 132:10 139:7 | **results** 56:3,4,5 57:17,17,18 58:9,20 59:5 59:16,17 60:2 61:6 | **revealing** 74:23 80:18 |
| **representations** 61:18 | **responding** 117:10 118:2 120:25 124:2 131:22 203:21 | **resumed** 56:25 130:4 181:8 205:6 | **revelations** 59:22 |
| **representative** 9:18,22 196:20 | | **retail** 48:22 71:18 73:6 | **revenue** 39:15 39:18,20 40:3 |
| **representatives** 65:20 | **responds** 99:24 **response** 15:11 28:12 42:16 48:13 51:5 66:16 88:22 91:22 99:21 135:20 137:5 | **retained** 207:16 | **review** 16:9,12 16:13 24:23 62:20 79:11 145:6,9 165:7 166:2,25 167:12 168:7 190:13 202:19 |
| **represented** 101:23 189:25 **request** 203:22 **requested** 26:7 87:18 88:2 120:10 **requests** 117:10 118:2 | | **retention** 167:21 | |

[reviewed - sec]                                                           Page 40

**reviewed** 15:20
  15:22,25 16:4
  140:22 145:14
  165:12,21,24
  170:22 206:2,7
**reviewing** 19:9
  112:14 165:16
  165:19
**reviews** 35:15
**revolve** 89:5
**rgerson** 3:7
**rgrdlaw.com**
  3:7,8,9
**rhumbline**
  175:10 190:24
  191:6,12,14
  192:2,17,21,25
  193:10,24
  194:15,16
  195:4,8,11,13
  212:9
**rhumbline's**
  194:8,18
  212:14
**rich** 99:25
**richard** 99:2
  111:24
**richmond**
  214:5
**rifkind** 2:18
  3:13
**right** 17:10
  57:9 68:8
  83:20 93:3,24

100:3 107:19
143:12 157:25
158:15 161:20
169:17 171:6
185:15 187:12
187:15,23
206:18,23
**risk** 55:21,23
  58:15,18 60:25
  63:5 73:9
  121:9 123:14
  140:14 141:2
**risks** 72:9
  84:17 123:8
**rivkind** 5:22
**road** 3:5 10:2
**robbins** 3:3
  6:21 16:24
  19:22 20:16
  21:23 22:10,15
  22:22 23:11,18
  23:22,24 26:12
**robert** 3:7 6:21
**robins** 19:11
**role** 8:14 24:17
  24:21 81:25
  82:9 158:18
  160:13 167:20
  174:2 177:4
**roles** 11:11,21
  81:22
**roughly** 148:4
**routine** 37:17

**rowe** 72:3
**rudman** 3:3
  6:22 20:17
**rules** 9:25 10:2
**rumors** 71:25
**run** 160:18
  177:25
**russell** 192:15
  193:2 195:15

**s**

**s** 177:7 197:6
  197:17
**safeguard**
  35:10
**safeguards**
  35:13 36:11,13
  89:18,24 90:4
  90:17 91:3,8
**sales** 68:24
**sanctions** 117:4
  122:20 131:17
**sandler** 99:2
  110:12 111:6
  111:25 210:14
**satisfy** 182:15
  187:25
**save** 215:9
**saxena** 21:5
**saying** 45:18
  99:6 107:3,24
  107:25
**says** 35:25
  49:22 55:20

57:13 64:22
65:15 66:13
67:15,16 68:10
68:13 71:23
84:23 90:16
91:2 95:21
101:3,19
173:12,25
180:10 181:18
182:5 196:11
**scale** 94:10,14
**schedule** 182:9
  182:12 183:9
  185:8,12 186:9
**school** 10:23
**scope** 44:13
  46:19 48:9
**scott** 21:5,5
**scratching**
  166:17
**sealing** 4:6
**sean** 31:23
**search** 204:2,11
  204:11,19
**sec** 40:18 41:5
  41:13,19 54:8
  56:2 115:16
  118:15 119:9
  119:13 124:11
  126:12 127:4
  127:10 128:8
  128:12,13,22
  132:9,10 139:6
  139:7 141:12

**[sec - serve]**                                                    Page 41

141:14,20,21
142:25 143:7,9
143:22 144:2
144:14 145:12
145:19 147:14
147:20,23
148:18,18
150:9,20 152:6
153:9 154:7
156:7,24 211:4
211:6,13
**sec's** 144:9
150:5 151:19
**second** 51:4
52:19 54:11
55:8 57:25
59:3 61:22,25
65:24 66:21
84:23 87:17
88:13 93:5
109:8 116:15
122:10 131:7
165:22 178:18
192:5 201:21
**secret** 41:6
**secretary**
159:10
**secretive** 85:18
**secrets** 128:21
**section** 27:11
27:24 28:7
116:17 145:24
146:19 149:18
149:24

**secure** 59:21
94:24 103:21
103:23
**securities** 1:6
5:16 7:15
55:25 97:15
117:11 118:3
124:3,13
131:23 132:12
139:9 145:24
149:25 152:12
162:11 163:20
164:7,18,24
175:3 177:24
178:20,22
179:2,20
181:22 182:8
183:10,23
184:20 185:6
187:21 194:9
194:19 212:16
**security** 18:12
28:9 55:10,16
58:6,25 59:10
60:22 61:3,13
62:3,12 65:18
126:17
**see** 14:10 34:17
34:21,22,25
38:17 42:2
49:21,25 53:23
55:19 56:11,12
57:7,22 58:21
61:11,17 62:6

66:11,20 67:17
68:25 69:8
70:23 72:6
73:14 80:20,21
85:14 88:14,19
89:20 92:23
98:25 100:13
116:17 117:16
122:11 127:7
144:15 145:18
145:22 146:3,6
146:21 147:2
149:2,16 169:6
173:16 174:11
174:19 178:15
178:20 180:4,7
182:9,10 184:3
184:8,18,22
185:4,7,9
192:7 196:12
**seeing** 25:22
41:19 116:12
122:7
**seeks** 64:6
**seem** 83:6
**seems** 9:25
**seen** 15:3 20:11
24:18,25 33:17
33:20 38:22
41:9 53:17
64:8 84:13
98:6,9 111:9
116:7 121:22
121:25 130:21

132:23 144:4
149:4 169:7,12
194:21 202:12
**selling** 180:7
**sense** 78:14
107:21 108:2
**sensitive** 5:5
35:10 100:11
101:5 105:12
**sent** 169:2
**sentence** 49:20
70:11,16 92:2
92:15 101:18
102:18,19
107:20
**separate** 65:16
81:21 106:2,8
106:10
**separation**
35:14
**september**
32:14,23
141:13,20
175:19,21
211:5
**series** 18:9
31:11 32:19
77:12 111:22
**serious** 79:14
81:9
**seriously** 35:5
**servants** 79:25
**serve** 8:9 22:10
158:18,19

**[serve - specifically]**

159:5
**served** 11:11
  164:19
**serves** 81:21,22
  81:23
**service** 3:5
  160:5
**services** 89:11
**serving** 21:14
  80:2 158:22
**set** 72:9 86:11
  104:10 170:17
  185:12 189:2
  194:7,17
  212:12 214:10
  214:17
**sets** 182:12
  186:22 189:24
**setting** 70:6,13
**settle** 140:24
**settled** 41:12
  147:25 150:10
**settlement**
  124:8,9 132:5
  132:7 139:4
  148:3 154:3
**several** 81:13
  117:7,23
  123:23 131:19
  139:16 159:21
**shareholders**
  52:12 75:3
  103:10

**shares** 194:25
**sharing** 44:2
  80:8
**shavuos** 138:4
**sheet** 215:2,12
  216:2 217:2
**short** 180:7
**shorthand** 2:20
  8:20 214:6
**shoulder**
  166:17
**show** 179:8
**showed** 206:11
**side** 68:18
  92:17 93:6,12
  93:17 95:10
**signatory** 21:10
**signature**
  184:21 214:22
  216:24 217:24
**signed** 4:14,16
  20:9 182:2
  184:24 215:15
**significance**
  32:22
**significant**
  48:22
**similar** 20:24
  21:2
**similarly** 26:25
**simply** 72:17
**single** 37:18
  104:21

**sir** 41:15 90:7
  108:16 114:3
  114:19 133:17
  138:16 149:13
  149:16 206:24
  207:10
**sitting** 25:14
  36:5 116:11
  122:6 131:4
  136:18 153:13
  165:14 186:11
  186:20 191:20
**situated** 26:25
**six** 63:21,22
**skip** 9:24
**slate** 88:23
**slide** 34:16,25
**small** 112:24
  197:9
**snoop** 65:11
  66:2,22
**sold** 187:21
  195:14 197:20
  198:10
**sole** 173:4
**son** 79:25
**soon** 65:12
  66:22 81:19
**sorry** 25:12
  26:8 30:5
  47:17 54:19
  56:14 69:16
  84:25 87:9,24
  96:13 105:20

111:3 120:14
  166:13,16
  168:14 175:16
  175:18 199:11
**sound** 12:3
  206:18
**sounds** 56:18
  99:6 164:22
**source** 151:18
**sourced** 152:18
**sources** 152:5
  153:6,14
**south** 3:5
**speak** 62:18
  82:7,9 88:10
  108:23 119:2
  120:22 149:20
  149:22 186:11
  190:6
**speaker** 108:18
**speaking** 49:12
  102:12 112:23
**speaks** 141:6
**specializes**
  204:10
**specific** 123:7
  126:18 127:3
  155:9 173:14
**specifically**
  18:7 35:16
  43:15 49:6
  70:21 73:16
  86:13 118:17
  119:2

**[specifics - stop]** Page 43

specifics 126:21

specified 124:16 132:15 139:12

specify 12:24

spectrum 47:5

speculate 36:21 37:23 51:2 60:12 83:9 96:24 97:8 156:17

speculating 189:12

speculation 36:22 50:7 156:11 189:6

speed 64:22

spell 176:20

spelled 177:6

spent 10:24 17:17 71:20 167:23 168:3,5 168:9

spoken 17:21 100:17 102:5 167:18

spring 78:18

spy 84:10

ss 214:4

stamp 170:7 194:15

stamps 16:6,9

stand 35:24 182:20 203:4

standard 192:7

standpoint 12:9

stanley 14:6,8 14:10,14 161:23 162:2 163:9 173:3 174:22 176:17 177:2 203:9,12 203:15

start 11:17 26:8 57:4 78:19 85:18 130:7 181:11 205:9

started 82:5,6

starting 64:21

starts 43:4 48:16

state 2:21 6:9 6:12 7:8,16 36:25 44:19 68:6 90:9 91:2 92:15 146:12 214:3,8

stated 42:18 51:5

statement 35:18 36:7,19 37:8 43:10,16 52:10,21,24 53:3 59:25

60:9,16,24 61:7 62:10 67:20 70:15 74:14 75:17,20 76:7,9,10,24 77:7 90:21 91:7,9 95:17 101:7,13 103:10,14 113:16 115:7 136:6,24 137:21 153:22 169:21 170:4 170:12 172:17 211:18

statements 18:9 28:2,9 31:11,21 32:2 32:7,20 34:5 43:13 46:11 52:2,7 56:7 57:20 59:19 73:20 75:14 76:16,20,23 77:6,10,13 94:9 96:21 97:5,10 104:4 105:4,11 109:3 109:20 124:18 128:8,14,17 132:17 139:14 144:17,18 145:14 146:5 146:11,14

147:15 150:14 161:11 173:15

states 1:2 5:17 48:15 79:13 88:22 90:3 131:11 133:8,9 139:2 192:11

stating 90:7

status 164:7

statutorily 159:7,10

steal 113:8,19 114:4,12,17

step 51:17 79:22

stewards 106:3

sticking 113:12

stipulated 4:4,8 4:12

stipulations 4:2

stock 23:13 26:5,11,18,19 59:21,24 60:3 85:7,22 86:14 124:23 179:4,7 188:11 197:20 200:18 201:16 201:20 202:18 205:14,19,24 206:4,8

stocks 195:7 201:5

stop 85:11

**[straight - system]**

| | | | |
|---|---|---|---|
| **straight** 45:9 | **subscriber** 41:7 | 120:16 132:25 | 46:3 49:10,12 |
| **strategies** 86:7 | **subsidiaries** | 134:5 136:2 | 49:13 51:8,22 |
| **strategy** 193:14 | 117:6,23 | 146:8 176:14 | 51:24 52:11 |
| 193:18,19 | 123:22 | 190:15 | 55:9,16 58:2,5 |
| 194:2 197:14 | **subsidiary** | **surprise** 83:2 | 58:6,24 59:10 |
| 200:19,21,24 | 131:19 | **surrounding** | 60:6,8,14,22 |
| **street** 64:23 | **substance** 19:5 | 94:9 | 61:3,13 62:2 |
| 71:21 84:8 | 22:4 25:11 | **swear** 7:3 | 62:12,14,19,22 |
| 86:9 | **succeed** 86:4 | **switch** 157:7 | 63:3 69:22 |
| **street's** 85:21 | **success** 86:9 | **sworn** 4:13 7:6 | 73:17 74:2,25 |
| **strength** 61:19 | **successful** | 207:24 214:11 | 76:15 77:16 |
| 62:7 154:9,21 | 65:11 | **synergies** 39:7 | 79:17 80:12,17 |
| 155:24 | **sued** 123:2 | 39:16,18,21 | 81:12,24 82:7 |
| **stuff** 168:25 | 152:20 | 40:3 | 82:10,11,13,14 |
| **subject** 44:18 | **suffer** 22:18,25 | **system** 8:12,13 | 82:16 84:15 |
| 117:7,23 | **suffered** 26:25 | 8:17,22,24 | 86:21 91:8 |
| 123:23 131:19 | 164:14 | 11:18,22 12:2 | 92:7,25 93:9 |
| 182:8 185:7 | **sufficiencies** | 12:10,11,16,20 | 93:11,15,21 |
| **subjects** 116:24 | 128:24 | 12:25 13:21 | 94:11 95:16 |
| 122:16 131:13 | **sufficiency** | 14:3 15:11 | 96:13 97:2,11 |
| **submit** 189:3 | 118:18 | 16:18 17:24 | 97:14 100:15 |
| 189:19 | **suggest** 113:11 | 18:7,21 19:2 | 100:23 102:23 |
| **submitted** | 113:22 | 19:15,25 20:7 | 103:8 108:25 |
| 182:24 183:5 | **suite** 89:10 | 20:24 21:15,18 | 109:9,15 110:4 |
| 184:11 185:24 | **supplemental** | 21:24 22:9,14 | 112:18 113:15 |
| 186:7,15 188:2 | 8:13 | 22:21 23:10,12 | 114:3,10,15 |
| 188:25 189:15 | **sure** 23:6,8 | 23:17,23 24:5 | 115:5,11 |
| 189:22 | 30:6 47:20 | 24:18,22 26:4 | 117:18 119:17 |
| **submitting** | 52:18 58:12 | 26:10,22 27:3 | 119:23 120:16 |
| 187:7 188:9,18 | 61:11 75:25 | 28:14 31:8,23 | 125:12 126:4 |
| 190:8,14 | 77:4 99:24 | 32:4 34:7,10 | 133:3,5,12 |
| **subscribed** | 101:10 106:22 | 35:16 36:6,17 | 134:14 135:10 |
| 207:24 | 107:2,13 | 37:6,15,21 | 136:15,19,21 |
| | 109:14 118:11 | 44:3,8,15,23 | 137:18,21 |

**[system - test]**                                              Page 45

| | | t | 93:5 99:11 |
|---|---|---|---|
| 138:8,19,21,24 | 200:19,23 | | 101:23 105:13 |
| 142:2,8,23 | 202:5,18 203:4 | **t** 7:5 72:3 | 106:8,24 111:5 |
| 143:14 151:11 | 203:8,25 204:6 | **tab** 40:21 77:22 | 113:18 168:23 |
| 152:13 153:21 | 204:19 205:17 | 83:23 110:9 | 176:15 188:22 |
| 154:8,14,15 | 205:21,22,25 | 115:21 169:18 | **talks** 65:25 |
| 155:8,11,16,18 | 209:13 211:18 | 194:6 198:19 | 71:11 105:11 |
| 156:15 157:8 | 212:9,17,20,23 | 201:25 | 112:24 |
| 157:21,24 | 213:9 | **take** 5:9 35:4 | **team** 12:12 |
| 158:7,10,11,13 | **system's** 13:5,8 | 53:6 54:17 | **technologies** |
| 158:18,22,23 | 13:13,24 15:2 | 56:15 64:15,19 | 89:11 |
| 159:4,5,8,11 | 20:18,22 22:24 | 89:14 90:15,25 | **technology** |
| 160:5,9,18 | 27:10,23 28:21 | 104:11 107:9 | 65:4 89:6,15 |
| 162:12,17,23 | 29:25 30:9 | 129:19 144:24 | 95:24 96:3,7 |
| 163:18,20 | 31:19 37:20 | 146:17,25 | **teeny** 111:16 |
| 164:9,12,17,22 | 45:20 50:21 | 183:14 196:17 | **tell** 10:6 75:12 |
| 165:3 166:18 | 52:22 58:23 | **taken** 5:14 | 107:4 |
| 166:22 167:8 | 59:14 75:16 | 56:24 130:3 | **telling** 83:4 |
| 168:17 169:20 | 76:9,21 77:5 | 181:7 205:5 | 89:22 92:11 |
| 170:4 171:21 | 79:7 80:25 | 215:7 | 150:9 |
| 172:6,18 173:5 | 82:21 104:13 | **takeover** 64:7 | **ten** 10:24 13:22 |
| 174:5 175:3,11 | 109:22 121:6 | **takes** 201:7,12 | 17:19 |
| 176:2,4 177:14 | 123:12 140:13 | **talk** 70:21 | **tennis** 51:16 |
| 177:15,17,22 | 144:7 151:7,23 | 93:16 104:9,20 | **term** 32:9 51:9 |
| 178:10 179:14 | 154:20,24 | **talked** 39:17 | 51:14,19 79:23 |
| 179:18 183:10 | 157:12 170:12 | 85:11 93:11 | 144:24 180:22 |
| 183:25 187:21 | 170:18 179:19 | 99:9,16,18 | **terminating** |
| 190:23 191:6 | 180:20 186:23 | 100:4 | 175:24 193:9 |
| 191:12,15,24 | 193:7 197:13 | **talking** 8:23 9:4 | **termination** |
| 193:14,25 | 201:16 202:10 | 12:24 45:22 | 177:10 |
| 194:10,20,25 | 203:9 204:14 | 49:7,14,15 | **terms** 73:10 |
| 195:11,18 | 205:13 206:9 | 50:13 68:10 | 148:6 204:11 |
| 196:4,10 | **systems** 62:16 | 69:3,12,15 | **test** 91:18 95:2 |
| 197:21,25 | 153:8 204:9,12 | 70:2 92:16 | 96:6 102:23 |
| 198:21 199:3,9 | | | |

**[testified - transaction]** Page 46

| | | | |
|---|---|---|---|
| **testified** 7:9 78:22 206:20 | 101:22,22 102:19 103:24 105:14 106:5 128:4 158:4 167:25 | 161:10 164:9 164:23 167:23 167:24 168:5 189:19 207:10 207:19 | **topic** 45:19 |
| **testify** 7:23 15:11,14 195:10 | | | **topics** 15:7,12 15:15 44:14 45:8 |
| **testimony** 46:2 77:2 94:25 95:6 119:10 137:8 207:14 214:12 | **thinking** 39:15 129:6 | **times** 9:8,21 173:5 190:4 192:18 | **total** 17:18 202:17 207:15 |
| | **third** 33:6,14 34:15 53:11,15 67:14 112:21 209:18,25 | **timing** 110:18 110:21 | **touch** 14:13 |
| | | | **toward** 174:17 |
| | | | **towards** 88:14 |
| **text** 59:3 149:8 | | **tiny** 54:18,20 111:17 | **tracking** 192:15 193:2 |
| **thank** 7:21 63:16 99:24 108:16 207:10 207:11 | **thought** 142:8 | **title** 8:8 | **trade** 65:2 67:11 85:9 86:17 |
| | **three** 11:3 48:14 108:20 175:8,12 177:12 180:16 192:10 | **today** 7:19,24 13:2 15:8 21:20 25:14 36:5 54:25 89:5 108:6 116:11 122:6 131:4 153:13 156:21 165:15 172:19 186:11 186:20 191:20 192:2 | **trader** 64:6,22 |
| **theory** 27:10,23 28:6 188:23 | | | **traders** 65:11 |
| | | | **trades** 65:5,13 66:3 71:17 73:5 86:15 182:13 183:9 185:13 188:11 189:2 194:9,19 195:10 212:15 |
| **thereto** 199:24 | **time** 4:10 5:8 6:9 9:11 11:12 22:18,18 30:4 32:20 39:8 61:14 64:16,18 64:19 78:14 86:22 107:15 114:20 117:8 117:24 119:18 123:3,24 124:16 127:3 131:20 132:15 135:10 139:12 146:25 155:10 155:12,20 157:14,19 158:2 161:10 | | |
| **thing** 159:25 190:2 | | | |
| **things** 59:23 62:11 68:21,22 69:13,14,20,21 70:4 73:21,22 75:18,19 106:4 109:8 186:14 | | **today's** 17:17 207:14 | **trading** 38:20 41:6,7 42:25 62:24 85:7,19 86:14 109:2 115:6 |
| | | **together** 64:17 | |
| | | **took** 54:19 81:20 | **transact** 178:11 |
| **think** 27:20 39:14,18 42:24 49:6,14 50:16 69:14,24 74:18 76:13 80:6 87:20 95:7 96:10 99:25 100:6 101:19 | | **top** 64:21 66:11 88:14 95:20 180:4 184:7,15 196:11 | **transacted** 177:13 178:25 |
| | | | **transaction** 72:2 77:17 110:19 |

**[transactional - turner]** Page 47

| | | | |
|---|---|---|---|
| **transactional** 12:8 | 46:25 47:9,22 49:6,16,17 | 42:13 48:12 54:10 88:12 | 63:1,25 64:1,3 65:1 66:1 67:1 |
| **transactions** 97:15 179:7 180:5 182:7 185:5 186:12 186:22,23 189:25 194:8 194:18 212:13 | 50:5,11,15,17 68:22 69:13,20 69:25 70:3 73:22 75:18 76:8,14,24 77:8 80:13,22 81:4,11 82:20 82:23 83:7,13 | 98:23 111:17 116:15 131:6 144:13 145:17 173:22 178:14 180:2 181:19 184:14 185:11 **turner** 1:14 | 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1,25 78:1,3 78:6 79:1 80:1 81:1 82:1 83:1 84:1,2,5 85:1 |
| **transcript** 33:6 33:13,21 34:11 97:24 98:5,10 111:23 209:17 210:10 215:6 | 83:17 100:12 101:6,14,24 102:2 103:20 105:14 182:23 185:20 186:4 | 2:17 5:14 7:1 7:12,18,20 8:1 8:6 9:1 10:1 11:1 12:1 13:1 14:1,20,24 | 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 97:25 98:1,4 |
| **transforming** 71:20 | **treasurer** 159:8 | 15:1 16:1 17:1 18:1 19:1 20:1 | 99:1 100:1 101:1 102:1 |
| **transparency** 28:10 43:5,19 45:3,5,12,17,20 45:23 46:6,23 47:5 48:3,16 49:21 80:7 83:12 89:18 90:4,18 91:4,8 91:15,19 95:23 95:25 96:3,8 96:17 101:20 102:14,20 104:16 105:13 105:15 | **trial** 4:11 **trouble** 39:9 **true** 36:25 74:2 131:3 155:13 186:8 190:2,10 190:15,19 214:11 215:9 **truly** 94:16 **trust** 45:2 **truthful** 74:22 **truthfully** 7:23 **try** 9:4 128:5 164:15 171:23 | 20:3,5 21:1,9 22:1 23:1 24:1 25:1,13 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1,9,12 34:1 35:1 36:1 37:1 38:1 39:1 40:1 40:22,25 41:1 41:3 42:1,14 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1,12 | 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1,14 111:1,5 112:1 113:1 114:1 115:1 116:1,2 116:4 117:1 118:1 119:1 120:1 121:1,17 121:19 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1,11 |
| **transparent** 18:11 43:23,25 44:5,8,15,23 45:15 46:16,25 | **trying** 39:14 85:20 87:9 109:7 **turn** 25:11 34:13 38:15 | 53:14 54:1 55:1 56:1 57:1 57:6 58:1 59:1 60:1 61:1 62:1 | 130:16,17 131:1 132:1 133:1 134:1 |

**[turner - updated]**                                                      Page 48

135:1 136:1
137:1 138:1
139:1 140:1
141:1,17,19
142:1 143:1,13
143:23,25
144:1 145:1
146:1 147:1
148:1,11,13,16
149:1 150:1
151:1 152:1
153:1 154:1
155:1 156:1
157:1 158:1
159:1 160:1
161:1 162:1
163:1 164:1
165:1 166:1
167:1 168:1
169:1,24 170:1
170:2 171:1
172:1,15 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1,14
181:17 182:1
183:1,19,21
184:1 185:1
186:1,9,9
187:1 188:1
189:1 190:1,25
191:1,4 192:1
193:1 194:1,10

194:13 195:1
196:1,5,8
197:1 198:1,23
198:25 199:1
199:15,16,18
199:20,22
200:1 201:1
202:1,5,8
203:1 204:1
205:1,12 206:1
206:16 207:1
207:15,21
208:1 209:1,4
210:1 211:1
212:1 213:1,5
214:1,9 215:1
215:18 216:1
216:25 217:1
217:25
**turning**  34:16
   34:25
**twenty**  195:25
**two**  31:16
   41:16 48:14
   49:24 57:15
   81:21 88:12
   100:2 149:8
   159:16 186:21
   186:21 187:7
   188:3 189:24
   190:18 195:25
**type**  54:18,20
**types**  109:21
   178:9

**u**

**u**  7:5 176:24
**u.s.**  117:11
   118:3 124:3
   131:23
**uh**  159:12
**ultimate**
   162:17 163:19
**ultimately**  43:3
   82:3 113:4
   156:6
**unable**  132:6
   139:3
**under**  23:16
   27:11,24 28:6
   40:17 55:21
   87:5 116:17
   120:7 146:15
   146:19,19,22
   178:18 182:2
   183:23 184:24
   186:15 188:2
   190:8 215:4,5
   215:13
**underfunded**
   82:11,13
**understand**
   15:6 23:6
   33:24 40:11
   43:9 45:16
   51:8 54:2
   64:11 66:4,24
   67:8 69:17

72:8,21,22
74:25 80:4
98:19 111:12
113:7 118:11
134:3 135:19
147:14 192:24
200:25 202:15
**understanding**
   41:20 75:8
   78:12 193:24
   215:12
**understood**
   25:19
**undertook**
   204:6
**unique**  85:12
   89:4
**unit**  5:12 56:22
   57:5 129:25
   130:8 181:4,12
   205:3,10
**united**  1:2 5:17
**universe**  48:20
   49:22
**university**  10:9
**unsure**  107:6
**untimely**
   119:24 125:13
**untrue**  146:11
**update**  161:8
   162:2,8
**updated**  170:21
   170:23 171:10
   191:17

**[updates - virtu]**                                         Page 49

**updates** 23:21
161:19 191:22
**upfront** 43:2,6
43:19 48:17
68:21 69:13,20
69:25 70:3
73:21 74:3,6
74:12 75:9,18
76:3,6,8,14,23
77:8 105:24
**upset** 82:17
**use** 8:21 45:25
46:2 71:24
77:22 96:2,7
201:4
**used** 98:20
106:23 108:22
176:11 204:10
207:15
**user** 29:9,11
38:11,13
**uses** 200:22,22
**using** 86:16
95:24
**usually** 161:6

**v**

**vague** 43:24
**val** 144:24
147:12,12
**val's** 144:20
147:10
**valued** 65:8

**various** 13:19
162:21 206:12
**verbatim** 59:3
**verification**
48:4 74:7
103:4
**verify** 202:22
**veritext** 6:3
207:17
**verse** 10:21
**version** 33:20
78:8 171:3,15
171:17,25
172:7
**versions** 98:9
171:8
**versus** 183:25
**video** 5:9,13
**videographer**
3:22 5:2 7:2
56:20 57:3
129:23 130:6
181:3,10
204:25 205:8
207:12
**videotaped**
2:16
**view** 29:10,12
31:19 37:20
38:12,13 76:9
76:15,21 77:5
80:25 99:15
104:14 109:22
123:12 136:18

140:13 154:21
154:25 174:21
**viewed** 29:3,7
86:8
**views** 154:8
**vigorously**
132:22
**violation** 139:9
**violations**
124:13 132:12
145:23 183:22
**virtu** 1:6 5:15
7:14 18:23
26:3 28:15,19
29:4,7,14,22
30:6,25 34:6
35:7 36:9,16
36:23 37:5
38:6,8 39:4
43:4,18,23
45:14 48:15
49:2,15,17
54:9 58:18
59:20 61:12
63:4 64:6,22
64:25 65:10,14
65:21,25 66:22
67:15,20 68:2
68:2,7,10
69:15 70:3,24
71:7,19 72:10
72:16 73:10
74:3,11 75:9
76:7,11 77:7

84:10 85:3,6,8
85:17 86:3,6
86:20,22 88:24
89:4,23 91:14
93:11,16 94:23
96:2 101:14,21
101:23 102:20
102:22,24
104:16,22
105:16,23
106:9,10
109:10,15,25
110:5,19
113:18,22,22
113:24 114:3
114:11,16,25
115:17 116:22
118:14 119:14
120:7,24 121:8
123:6,13
125:18 126:15
133:9,12
134:15 140:14
140:18 141:2
141:14,21
142:24 143:8,8
143:9,22 144:3
144:25 147:5
147:17 148:20
149:23 150:23
150:24 151:15
151:20,24
153:4,18 175:2
177:13,15,19

**[virtu - work]**                                                                              Page 50

179:2,4 182:13 183:6,6 184:2 186:24 194:9 194:19,25 195:14,14 197:20,25 200:18 201:16 201:20 202:18 205:13,19,24 206:2,4,8 211:7,13 212:15

**virtu's** 26:5,11 26:19 29:2 30:14 31:13 32:21 33:6,14 50:14,24 52:7 53:10,15 58:6 58:9,20 59:4 59:16 61:19 71:24 73:3 84:16,17 86:14 87:6 89:9 97:15 112:3 115:24 116:5 121:15,20,25 124:23 130:9 130:17 154:4 177:24 179:7,7 179:20 183:10 188:11 209:18 209:24 210:17 210:20,23

**virtually** 105:25

**w**

**waived** 4:7 27:20
**wall** 64:23 71:21 84:8 85:21 86:9
**want** 45:24 53:6 112:8 129:19 156:12 156:19 158:5 168:15 176:14
**wanted** 39:2 156:4
**wants** 64:23
**way** 13:12 36:8 60:21 66:19 70:24 82:8 83:11 86:23 90:13 102:21 104:22 105:16 128:5 134:20 139:25 152:16 154:8 155:23 156:8 158:16 168:11 177:14 186:13 191:18 207:6 214:15
**we've** 14:24 53:5 60:24 81:8 99:9,12 100:3,3 105:24

116:14 164:14 171:9,24 180:16
**week** 85:3 86:3 171:13
**weiser** 3:18
**weiss** 2:17 3:13 5:22 6:16 106:19
**wells** 124:11 125:10,19 129:10 132:8 133:10,15,19 134:11,16 139:5,20 140:2 140:5,10,15,20 140:24 141:3
**went** 11:4
**wharton** 2:18 3:13 5:22
**whereof** 214:17
**whispering** 5:6
**whistle** 75:21
**white** 21:5 105:24
**wide** 29:3,6 36:16 38:3
**widely** 38:10 86:9
**william** 21:11 21:12 196:21 196:23
**winning** 65:13 66:3

**winter** 78:18
**wish** 177:23
**withdraw** 16:10 58:13 119:6 165:18
**withdrawn** 40:15 51:23 60:7 133:3 173:8 197:11
**witness** 6:23 7:3,5 23:3 54:23 63:16 87:15 130:14 167:8 207:8 209:3 214:9,12 214:17
**woodfin** 21:21 78:7,22 79:13 80:11 81:12 82:15,19
**word** 45:23 74:6 101:7 106:23 108:22 189:11
**words** 25:22 31:16 62:5 71:3,5 72:25 73:14 90:15 106:6 127:2 193:4
**work** 8:5 9:14 12:13,19,24 78:17 159:17

**[workflow - zoom]**                                                    Page 51

| | |
|---|---|
| **workflow** 89:11,15 | 83:5 85:20 196:22 |
| **working** 11:17 | **york** 1:2,15,15 2:19,19,22 3:6 3:16,16 5:19 5:24,24 7:8 85:4,25 107:9 107:15 214:3,8 |
| **world** 85:18 | |
| **worn** 54:24,24 | |
| **worried** 84:8 86:13 | |
| **worry** 65:9 85:8 | |

**z**

**zeros** 194:16
**zoom** 15:21
  17:2

**worth** 155:9,12
  155:20
**written** 147:7
  191:14
**wrong** 18:8
  31:9,19,24
  32:5 104:15
  187:11
**wrongdoing**
  23:24

**x**

**x** 1:4,9

**y**

**y** 7:5 177:7
**yeah** 66:19
  77:12 90:25
  93:7 126:10
  154:12 160:15
  188:23
**year** 78:20
  79:17
**years** 10:24
  79:24 80:3,19
  81:3 82:12

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.