# Exhibit Y

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

-----------------------------x

In re:

VIRTU FINANCIAL, INC. SECURITIES

LITIGATION

Case No. 1:23-cv-03770

-----------------------------x

Videotaped Deposition of

MATTHEW D. CAIN, Ph.D. taken pursuant

to Notice, on December 9, 2025,

commencing at 9:28 a.m., held at the

offices of Paul Weiss Rifkind Wharton &

Garrison, LLP, 1285 Avenue of the

Americas, New York, New York 10019

before Maureen Ratto, a Registered

Professional Reporter, Certified Court

Reporter and Notary Public.

Case No. 7772755

Page 2

APPEARANCES:

On Behalf of Plaintiffs:

ROBBINS GELLER RUDMAN & DOWD, LLP

58 South Service Road

Melville, New York 11747

BY: ROBERT D. GERSON, ESQ.

rgerson@rgrdlaw.com

MAGDALENE ECONOMOU, ESQ.

meconomou@rgrdlaw.com

On Behalf of Defendants:

PAUL WEISS RIFKIND WHARTON

& GARRISON, LLP

1285 Avenue of the Americas

New York, New York 10019

BY: ALISON R. BENEDON, ESQ.

abenedon@paulweiss.com

LEAH WEISER, ESQ.

lweiser@paulweiss.com

ALSO PRESENT:

Miguel Medina, Legal Videographer

Page 3

VIDEOGRAPHER: Good morning. We are going on the record at 9:28 a.m. on December 9th, 2025.

Please note that the microphones are sensitive and may pick up whispering and private conversations.

Please mute your phones at this time. Audio and video recording will continue to take place unless all parties agree to go off the record.

This is Media Unit 1 of the video-recorded deposition of Matthew D. Cain, taken by counsel for defendant in the matter of In Re: Virtu Financial, Inc. Securities Litigation filed in the United States District Court, for the Eastern District of New York. Case No. 1:23-CV-03770-NGG-CHK.

The location of the deposition is Paul Weiss Rifkind Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, New York 10019.

Page 4

My name is Miguel Medina, the court reporter is Maureen Ratto, we represent the firm Veritext.

I am not authorized to administer an oath, I am not related to any party in this action, nor am I financially interested in the outcome.

If there are any objections to proceeding, please state them at the time of your appearance.

Counsel and all present will now state their appearances and affiliations for the record, beginning with the noticing attorney.

MS. BENEDON: Alison Benedon from Paul Weiss on behalf of the defendants and I'm joined by my colleague Leah Weiser.

MR. GERSON: Robert Gerson from Robbins Geller Rudman & Dowd on behalf of the Lead Plaintiff and the witness and I'm joined by my colleague Magdalene Economou.

Page 5

MATTHEW D. CAIN, Ph.D.

VIDEOGRAPHER: Will the court reporter please swear in the witness and then counsel may proceed.

* * *

MATTHEW D. CAIN, Ph.D., having been first duly sworn according to law by the Officer, testifies as follows:

DIRECT EXAMINATION BY MS. BENEDON:

Q. Good morning.

A. Good morning.

Q. As you just heard, my name is Alison Benedon and I'm with the law firm Paul Weiss and I represent Virtu and the individual defendants in the case. Can you please state your name for the record?

A. Matthew Cain.

Q. And do you prefer that I call you Dr. Cain?

A. It's up to you. I don't have a strong preference either way.

Q. Okay. How are you feeling

2 (Pages 2 - 5)

Page 6

MATTHEW D. CAIN, Ph.D.

today?

A. I'm good. Thank you.

Q. Any reason why you can't testify truthfully today?

A. No.

Q. Did you prepare for today's deposition?

A. Yes.

Q. What did you do to prepare?

A. I reviewed my report in this case, the Complaint, the Motion to Dismiss order and I met with counsel for a few hours yesterday.

Q. And when you say "met with counsel", is that counsel who you are seated with today?

A. Yes.

Q. Were any non-lawyers in that meeting?

A. No.

Q. Okay. And did you meet with counsel on one occasion to prepare for your deposition?

A. I believe so. To the best of

Page 7

MATTHEW D. CAIN, Ph.D.

my recollection, yes.

Q. You said you reviewed your report in preparation for the deposition.

Is everything set forth in your report accurate, to the best of your understanding?

A. Yes.

Q. Are there any corrections you'd like to make to your report?

A. Not at this time.

Q. What do you consider to be your primary area of expertise?

A. I would say the field of finance.

Q. Are there any subspecialties in that field of finance that you consider to be an area of expertise?

MR. GERSON: Objection, form.

A. I think there are a lot of areas within finance that I have expertise on. I wouldn't necessarily limit it to any specific subspecialties but I think that the topics or specialties within finance that would be

Page 8

MATTHEW D. CAIN, Ph.D.

included would include mergers and acquisitions, securities, corporate finance, trading, market manipulation, disclosures, event study analysis, valuation and investments. So those would be I think some of the categories under that umbrella of finance that I would include.

Q. You mention disclosures. What do you mean by that?

A. Looking at disclosures of information and assessing their value relevance or importance or economic materiality to investors.

Q. Would you say that you -- withdrawn.

Within that specialty or area of focus of disclosures, would you say that you have any experience interpreting how the market understands disclosures?

MR. GERSON: Objection.

A. Yes. I think that would be included within many of the assessments that I conduct in terms of analyzing

Page 9

MATTHEW D. CAIN, Ph.D.

disclosures and their impact on securities prices and interpretations by investors and analysts.

Q. You mention "market manipulation". What do you mean by that?

A. So I've worked on a variety of cases, including allegations of market manipulation, including pump and dump schemes, and other forms of looking at either statements or trading behavior or conduct or schemes that have the potential to impact securities prices.

Q. Can you tell me at a high level how your career has progressed since -- well, withdrawn.

What is your highest form of education?

A. Ph.D.

Q. And when did you achieve -- is that the right word? I don't know. When did you get that?

A. I obtained that in I believe 2007.

Q. Okay. And after you obtained

3 (Pages 6 - 9)

Page 10

MATTHEW D. CAIN, Ph.D.

your Ph.D. what did you do professionally?

A.    I taught for one additional year at Purdue University where I earned the Ph.D. and then I became a finance professor at University of Notre Dame. After that I worked at the Securities and Exchange Commission as a financial economist, also as an advisor to one of the commissioners there. After that, over the past roughly, probably roughly seven years I've held a few different fellowships with academic institutions, including Harvard, Vanderbilt, Berkeley and New York University. And over the past seven years I've also engaged in a variety of expert witness and other consulting matters.

Q.    So approximately what years were you at the SEC?

A.    Those are listed on my CV that's in my report.

Q.    I'm happy to mark your report if you'd like to have it in front of you.

Page 11

MATTHEW D. CAIN, Ph.D.

A.    Thanks. That would be helpful.

(Cain Exhibit 1, Expert Report of Matthew D. Cain Ph.D. dated October 22, 2025 was received and marked on this date for identification.)

Q.    Alright. You should have now in front of you Cain Exhibit 1 which on the front cover says Cain Exhibit A and reads Expert Report of Matthew D. Cain Ph.D., October 22nd of 2025.

Do you recognize this to be the report you submitted in this matter?

A.    Yes.

Q.    Okay. And you're welcome to consult your CV as we discussed, your credentials, of course.

So let's talk about the SEC. You were there when?

A.    2014 through 2018.

Q.    And that period of time, is it fair to say that there were different presidential administrations over the course of those four years?

Page 12

MATTHEW D. CAIN, Ph.D.

A.    I believe so. I don't have the history memorized but I believe that is correct.

Q.    Do you -- is it accurate that Obama was in office at the time you started at the SEC?

A.    I believe so.

Q.    And fair to say you stayed through at least the beginning of Trump's first administration?

A.    That's correct.

Q.    Would you agree that the SEC has different priorities, depending on the administration?

MR. GERSON:  Objection, form.

A.    What do you mean by "priorities"?

Q.    Well, from your experience being at the SEC, did you observe any changes in the work that you performed depending on the administration?

A.    I don't think that it really affected the work that I performed. Obviously it had a change when I was an

Page 13

MATTHEW D. CAIN, Ph.D.

advisor to one of the commissioners, that was a significant change in the work that I was performing on a daily basis.  But outside of that, I think across multiple presidential administrations I was a financial economist working on investigations, settlement negotiations, trials relating to things like insider trading, market manipulation, accounting fraud, disclosure violations. In my experience I was doing both of those things under different presidential administrations.

Q.    Okay.  So your CV lists economic fellow/financial economist.

Are those two different roles or is that describing the same period of time?

A.    It's the same thing.  At the SEC -- and you're referring to -- you're referring to the listing for the SEC experience, right?

Q.    Correct. Yes.

A.    There is a lot of bureaucratic

4 (Pages 10 - 13)

Page 14

MATTHEW D. CAIN, Ph.D.
paper process in terms of the hiring process at the SEC, so I think I was initially hired as an economic fellow and then that transitioned into a permanent financial economist position but nothing changed in terms of my income, salary, compensation and day-to-day work whenever that sort of paperwork transition took place.

Q. Do you have any background or training in the fin-tech industry?

A. How would you define the fin-tech industry?

Q. I wouldn't. If it's not something that strikes you as something you have experience in I can ask a different question.

A. Okay. Well, I do have experience as an analyst in the financial industry and we obviously utilized technology I think in ways that fin-tech companies are utilizing today. We didn't -- I don't think back in 2021 to 2003 we didn't use the term fin-tech but I do

Page 15

MATTHEW D. CAIN, Ph.D.
have experience as a analyst in those years.

Q. Are you referring to the entry on your CV that says analyst debt capital markets at National Citibank in Cleveland?

A. Yes.

Q. Tell me a little bit about your experience in that role?

A. So I did a few different things while I was there. I assisted companies that were raising either debt or equity for a variety of purposes, including mergers and acquisitions, investments, general corporate purposes, that included syndicated bank loans and private placements of debt and equity with different institutional investors and I also spent some time assisting a trading desk that traded syndicated bank loans on a secondary market.

Q. And did you have any sectors or types of companies that you specialized in while you were in that

Page 16

MATTHEW D. CAIN, Ph.D.
role?

A. It was not limited to just one sector or industry. It was -- I worked on a variety of transactions and deals involving companies that were in various industries if they were working with the bank.

Q. Do you have any experience or training in designing information barriers?

A. I interacted with information barriers because I was working both on the trading side at various points as well as the investment side with the private placements of debt and equity as well as the syndications side. So there were information barriers in place but I did not -- that I interacted with but I did not design those information barriers.

Q. And is that answer again with reference to your analyst role from 2001 to 2003?

A. It is, yes.

Page 17

MATTHEW D. CAIN, Ph.D.

Q. And do you have a view about whether National Citibank's information barriers were sufficient?

MR. GERSON: Objection.

A. I don't have a view one way or the other on that question.

Q. Do you have any experience or training in database engineering?

A. I've interacted with databases in a variety of roles that I've had but I've not designed any of those databases myself.

Q. And you're not a lawyer, correct?

A. That's correct, I'm not a lawyer.

Q. Okay. And you're not offering any legal opinions in this matter, correct?

A. That's correct.

Q. I will try to make it clear in my questioning, but I'm not asking for any legal opinions. My questions in this deposition are limited to your expertise

5 (Pages 14 - 17)

Page 18

MATTHEW D. CAIN, Ph.D.
as a financial economist.

A.    Sounds good.

Q.    We'll see if I draw any objections. Excuse me.

Have you ever been a plaintiff or a defendant in a lawsuit?

A.    No.

Q.    Have you ever been accused of fraud?

A.    No.

Q.    How many times have you been -- I'm sorry, this is so obnoxious.

A.    I've been there many times, so no worries at all.

Q.    How many times have you been engaged to provide an expert opinion?

A.    In terms of total engagements, it's difficult for me to know off the top of my head but I would guess somewhere in the ballpark of 100 times.

Q.    And actually I want to clarify. Did you provide expert opinions as part of your work at the SEC?

Page 19

MATTHEW D. CAIN, Ph.D.

A.    No.

Q.    So I want to put that work aside --

A.    Okay.

Q.    -- and talk about your expert work in private practice.

Is the answer still a hundred or would it be a different number?

A.    I would still say my best guess is somewhere in the ballpark of 100, yes.

Q.    And just in 2025 what percent of your work is expert witness work as opposed to your work in academia?

A.    I would say I probably spend maybe 90% of my time on expert and consulting work and roughly 10% of my time on academic work.

Q.    And do you do your expert and consulting work through an entity?

A.    I have a LLC called Cleveland Analytics, which is essentially for accounting and tax purposes.

Q.    Your report at paragraph 13

Page 20

MATTHEW D. CAIN, Ph.D.
references staff at -- pardon my pronunciation. Why don't you say it? That way I don't have to guess.

A.    I think they pronounce it Fideres. I usually pronounce it Fideres. Some people say Fideres, I won't be offended how you pronounce it, but I usually say Fideres Partners.

Q.    And what is Fideres Partners?

A.    They're a consulting firm who assists on these types of cases and this type of work that I do.

Q.    So your ballpark was you've been engaged roughly a hundred times to do expert witness work, correct?

A.    That's my best estimate, yes.

Q.    Okay. And what percentage of that roughly hundred engagements has been in securities class actions?

A.    I'm not really sure but it's certainly the majority of those cases and it's certainly higher than 50% but less than 100%.

Q.    Is this roughly -- I'm just

Page 21

MATTHEW D. CAIN, Ph.D.
going to say a hundred to short-circuit but I know we're approximating. Are those hundred engagements all since you left the SEC or were some before you were at the SEC?

A.    I had a few things before working at the SEC and I also -- you asked me to exclude the expert work that I did while I was at the SEC, so I'm excluding the SEC expert engagements while I was at the SEC. I really just had a couple of expert engagements prior to joining the SEC. So then almost all of that 100, the way we're talking about it, has been since leaving the SEC.

Q.    Okay. And if you had to ballpark how many securities class actions you worked on, are you able to do so?

A.    It's, like I said before, it's certainly the majority but not all of them. So if I were to guess, that might be somewhere in the ballpark of maybe 85% of those cases.

6 (Pages 18 - 21)

MATTHEW D. CAIN, Ph.D.

Q. And of the approximately 85% of those cases, how many of those engagements has been at the class certification stage?

A. So we're setting aside the non-securities class actions. Of those, I think the majority of this subset my engagement would start at or before the class certification stage.

There were probably a few where I came in at a later stage but I guess there's also some that are opt-out cases. I guess -- I suppose we're excluding opt-out cases if they're not class actions.

So in terms of the class certifications, the vast majority of those would be at or before the class certification stage.

Q. In the security class action context, have you always been retained by plaintiffs?

MR. GERSON: Objection.

A. I have worked for defendants

MATTHEW D. CAIN, Ph.D.

in some cases.

Q. Can you name them, please?

A. Some of them I'm not able to name because they're not publicly disclosed and they're subject to confidentiality but if we're looking at the cases that proceeded to the point of a public disclosure, there's a case involving Bank of California, it's listed somewhere in my CV, that I do recall being on the defense side. And then there's some other defense-side cases that are not necessarily class actions, but I think in terms of that subset of securities class actions it's towards the bottom of page A7, the Bank of California was a defense-side case that I recall.

Q. Do you recall the nature of the opinions you offered in that case?

A. I was a rebuttal expert and I was explaining that there are common tools and techniques that experts such as financial economists are able to employ in order to assess whether information is

MATTHEW D. CAIN, Ph.D.

important to investors and in that case the plaintiffs' expert had failed to employ those tools and techniques.

Q. Did you offer an opinion on market efficiency in that case?

A. No, I did not.

Q. Did you offer an opinion on whether any alleged misstatements had an impact on the share price?

A. We were certainly talking about that question but it was -- for me it was in the context of a rebuttal report, explaining the deficiencies in a plaintiffs' expert report, so I don't recall the specific details of my opinions and whether they talked about price impact.

Q. So the Bank of California entry that you referred me to is from April of 2019.

Is it fair to say that you have not worked on or -- withdrawn.

That entry is from April of 2019. Is it fair to say that you have not

MATTHEW D. CAIN, Ph.D.

been retained by defendants in a securities class action since that time?

MR. GERSON: Objection.

A. I think, to the best of my recollection, I believe that's correct.

Like I said earlier, I have worked on the defense side of several cases since then but those have not proceeded to the point of public disclosure and I also believe that those were not securities class actions, to the best of my recollection.

Q. So I just want to make sure the record is clear.

Sitting here today, do you recall being retained by defendants in any securities class action since April of 2019?

A. It's the same answer as before. It's difficult for me to remember every engagement, but to the best of my recollection, the defense-side engagements that I have had since April of 2019 were in cases that did, in fact,

7 (Pages 22 - 25)

Page 26

MATTHEW D. CAIN, Ph.D.

securities frequently, but my recollection is that they were not securities class actions.

Q. When were you first contacted about this case?

A. I believe it was this past summer of 2025, possibly around July.

Q. Who contacted you about this case?

A. Plaintiffs' counsel.

Q. Do you recall who?

A. I believe it was Rob Gerson.

MS. BENEDON: Apologies for the interruption.

Q. Had you ever worked on any matters with Rob Gerson before?

A. Not that I can recall.

Q. Do you know what law firm Rob Gerson works at?

A. Yes.

Q. What is that?

A. Robbins Geller Rudman & Dowd.

Q. Have you ever been retained with Robbins Geller before?

Page 27

MATTHEW D. CAIN, Ph.D.

A. Yes.

Q. In how many matters would you say?

A. I don't know but it would likely be at least 10 or 15 matters.

Q. Would you agree that a substantial portion of your livelihood derives from working with a small number of plaintiff-side law firms?

MR. GERSON: Objection.

A. At this point in time I do make the majority of my annual income from expert work and the majority of that work is on the plaintiffs' side. So I would agree a large percentage of my income derives from that work.

Q. How many active matters would you say you have right now?

A. It's difficult for me to assess whether a matter is active or not, given how cases sort of disappear and occasionally pop up even after appeals or reversals. But in terms of cases that I've -- if I think back over the past, I

Page 28

MATTHEW D. CAIN, Ph.D.

think for the past month how many different cases have I generated billings on, I would estimate that that's somewhere between 15 to 20 cases.

Q. How many other depositions do you have in December?

A. I think that I have three other depositions in December.

Q. And how many depositions do you currently have scheduled for January?

A. I don't believe that I have any additional depositions, other than the three scheduled in this month.

Q. Looking at your CV on page A4 -- the first matter referenced is SolarEdge and it says report October of 2025. Is that a class certification opinion?

A. A market efficiency report, yes.

Q. Have you been deposed yet in that matter?

A. No.

Q. Do you know when you will be

Page 29

MATTHEW D. CAIN, Ph.D.

deposed?

A. I believe that's one of the depositions scheduled for next week.

Q. Do you have a reply report due in that matter? Let me withdraw the question.

Do you anticipate submitting a reply report in that case?

A. I don't know yet. I have not been asked to work on a reply report at this point in time.

Q. The next one is Joe Fasano versus Dangdang Holding Company, and it says report September of 2025. Is that a market efficiency report?

A. I did look at market efficiency in that case, yes, but it was an arbitration, so a little bit different from the typical class action report that I do.

Q. How is it different?

A. The allegations related to a merger at an allegedly unfair price, and so my --

8 (Pages 26 - 29)

Page 30

MATTHEW D. CAIN, Ph.D.

MR. GERSON: I'm just going to caution the witness not to reveal anything that's privileged or subject to confidentiality agreements with others.

THE WITNESS: Thank you.

A. My recollection is that the alleged damages were different from the typical securities class action which alleges that investors purchased shares during a given class period at inflated prices.

Q. Have you submitted any other reports in the seven weeks that have elapsed since October 22nd?

A. I believe so, yes.

Q. On what matters?

A. I worked on a declaration for the Department of Justice that I believe the Department of Justice provided to a defendant yesterday. It was a short declaration in a case for the Department of Justice.

I'm just going to look through

Page 31

MATTHEW D. CAIN, Ph.D.

the list here quickly to refresh my memory on other cases.

(Deponent reviews the document.)

A. I believe that I submitted a market efficiency report in a case involving iRhythm.

I may have submitted some additional reports, but those are the two that come to mind right now.

Q. Okay. Of the 15 to 20 matters that you recall or believe that you've billed to this month, are you anticipating submitting reports in any of those reports -- withdrawn.

You mention that you have 15 to 20 matters in which you've billed within this month?

A. Over the past month I said, yes.

Q. Okay. How many of those 15 to 20 are you expecting to submit reports in?

A. I would say right now I think

Page 32

MATTHEW D. CAIN, Ph.D.

that I'm working on roughly somewhere around five or six reports that I'm able to think of off the top of my head.

Q. How many of those are market efficiency reports?

A. I'd say roughly half of those maybe.

Q. And without revealing any confidential information, can you describe for me what the other half relate to?

A. There's some work for the Securities and Exchange Commission, and there's also I believe some work -- I'm trying to think. There might be some work related to the reply stages of cases. It's difficult for me to come up with a list at the moment.

Q. Have you ever submitted a report at the class certification stage in a matter where there was a parallel SEC case?

MR. GERSON: Objection.

A. I probably have but it's not

Page 33

MATTHEW D. CAIN, Ph.D.

something that I keep track of. I can think of one -- I can think of one example off the top of my head.

I believe that may have been the case in the Under Armour Securities Litigation and it's likely the case in some other matters but I don't keep track of that.

Q. Have your opinions ever been subject to Daubert motions?

A. I have received Daubert challenges but I've not had any opinions struck on those grounds.

Q. Have there been other instances where a court criticized your opinion or refused to credit your opinion even in the absence of granting a Daubert challenge?

MR. GERSON: Objection.

A. There were two cases I can think of in which a court did not consider my opinions on procedural grounds. It was not related to the substance of the opinions but there was a

9 (Pages 30 - 33)

Page 34

MATTHEW D. CAIN, Ph.D.

case involving Toshiba which the court said a sur-reply report was submitted after the cutoff or the deadline for the submission of reports, so the judge did not consider that because it was past the deadline. And then there was a case involving Facebook in which plaintiffs attempted to attach a declaration to their complaint and the judge said that they were not permitted to attach a declaration to a complaint.

So those are the two examples, two of the examples that come to mind in terms of courts ignoring the opinions on procedural grounds.

Q. Can you recall any instances where a court criticized the substance of your work?

MR. GERSON: Objection.

A. There was a case involving Bed Bath & Beyond which the judge did not certify the class because he credited the defense expert's opinion that there was a potential short squeeze during a one-week

Page 35

MATTHEW D. CAIN, Ph.D.

class period for that case.

So that's the one example that I can think of in which the judge did not accept my or give class certification based on my market efficiency findings.

Q. Who was that, you said Bed Bath & Beyond?

A. Yes.

Q. Are you being compensated for your work in this matter?

A. Yes.

Q. What is your billing rate that you're being compensated at?

A. It's $1,100 per hour.

Q. Does your compensation in any way impact the opinions you've offered in this case?

A. No.

Q. Is your compensation in any way contingent on the opinions you offer in this case?

A. No.

Q. Your report says you're being assisted by staff at Fideres.

Page 36

MATTHEW D. CAIN, Ph.D.

How many people are assisting you with your work in this matter?

A. I would estimate roughly four or five people. I don't keep close track of who is assisting on different matters. I work with roughly ten different people at Fideres, in general, but I would guess some subset of roughly four or five people assisted with this report.

Q. Are you always assisted by Fideres on your expert engagements?

A. I now have an exclusivity agreement in place with them.

Q. Okay.

A. So as of probably sometime around April of this past year I entered into that. So prior to that I was not exclusive with Fideres and these other firms, but going forward I am relying exclusively on Fideres.

Q. Can you describe the nature of the assistance from those individuals who are assisting you on this matter?

A. I instructed them to assist me

Page 37

MATTHEW D. CAIN, Ph.D.

with the full report, which includes the data analysis of the various efficiency factors and the drafting of the report itself.

Q. Other than the hours that you spent preparing for the deposition, how many hours have you spent on this matter?

A. I don't know exactly but I would estimate that it's probably somewhere between 10 and 20 hours.

Q. Who drafted your report?

A. I did, along with assistance from the Fideres staff.

Q. Is it fair to say that you have a template that you use for most of your market efficiency reports?

MR. GERSON: Objection.

A. I don't have a template but I do draw on the language from my prior reports when I'm describing something that is the same thing as in the prior reports.

Q. Who put together the first draft of your report in this instance?

10 (Pages 34 - 37)

Page 38

MATTHEW D. CAIN, Ph.D.

A. I think I worked alongside of Fideres on the first draft.

Q. And when you set out to draft this report did you start from a blank Word document or did you open a report previously submitted?

A. I think I instructed Fideres to send me a first draft which I edited and I'm not sure how they generated that first draft.

MS. BENEDON: Let's mark tab 19, please. And by the way, if you need to take a break at any point just let me know.

THE WITNESS: Great.

(Cain Exhibit 2, Expert Report of Matthew D. Cain, Ph.D. in re: SolarEdge Technologies, dated October 17, 2025 was received and marked on this date for identification.)

Q. You should now have what's been marked Cain 2 which on the very first page says Exhibit 1 and on the

Page 39

MATTHEW D. CAIN, Ph.D.

second page there is a case caption from the SolarEdge matter and it states Expert Report of Matthew D. Cain, Ph.D. October 17th of 2025.

Do you recognize this to be the report you submitted in the SolarEdge Securities Litigation?

A. Yes.

Q. And this is dated just the week before you submitted the report in the Virtu matter, correct?

A. Yes.

Q. So is it fair to say that you were working on this report simultaneously with your work on the report in Virtu?

A. Yes.

Q. Were you assisted by the same people in the SolarEdge matter as you are on the Virtu matter?

A. Certainly the same firm of Fideres but I don't recall exactly which staff assisted me.

Q. Would you agree with the

Page 40

MATTHEW D. CAIN, Ph.D.

characterization that your report in SolarEdge is nearly identical to your report in Virtu, other than the entity name and the specific numbers that are filled in?

MR. GERSON: Objection.

A. No.

Q. What do you take issue with that statement?

MR. GERSON: Objection.

A. So in each efficiency report I conduct completely independent analyses. So all of the underlying data and documents and review of the information environment is completely separate and unique to each case and its circumstances.

Also, my starting point for each case begins with a review of the complaint and the allegations, and I also describe those allegations as well as my consideration of those in forming my opinion of the appropriate damages methodology in each case. So those are

Page 41

MATTHEW D. CAIN, Ph.D.

quite distinct and separate across cases and reports.

Q. So if you just compare the table of contents between the two you'd agree with me that at least structurally the reports are exactly the same, correct?

MR. GERSON: Objection.

A. Well, I am asking the same questions or the same scope across the two reports, so they do have the same exact Cammer and Krogman Factors are being analyzed and assessed, as well as putting forward the same damages methodology across the two cases.

Q. And if you look at paragraph 3 in both reports, would you agree the opinions you're offering are the same in the two cases?

MR. GERSON: Objection.

A. Well, the opinions are different in that in one report I've conducted an analysis of market efficiency and damages methodology for

11 (Pages 38 - 41)

Page 42

MATTHEW D. CAIN, Ph.D.
SolarEdge and in the other report I've conducted an analysis of market efficiency and damages methodology for Virtu. So those are different opinions. But, like I said before, the scope of the questions in both reports was the same in terms of asking whether a market for a security was efficient and whether there was a damages methodology capable of calculating damages class-wide.

Q. Other than the fact -- withdrawn. You can put that aside, but keep handy your report.

Let's look at Appendix B, which is Documents Considered.

A. Okay.

Q. Did you review any materials, other than the ones listed on this Appendix B, in connection with your work on this matter?

A. I believe this covers everything that I reviewed in conjunction with the work that I performed for this report.

Page 43

MATTHEW D. CAIN, Ph.D.
Q. How did you select the materials to review in this matter?

A. Like I said before, I start with the Complaint and the Motion to Dismiss order to understand the allegations. Once I understand the allegations, the nature of the claims and the scope of my report or the questions that I'm trying to answer, then I go through the same process in each case, which is to carry out an analysis of the Cammer and Krogman Factors so that dictates an analysis of data such as stock prices, trading volume, analyst reports, bid-ask spreads, market capitalization and other data. So those data sources are generally very similar across cases, as well as looking at SEC filings. And I always cite and point to academic research or academic publications that underlie the nature of the opinions that I provide as well as some court decisions.

Q. You mentioned SEC filings. Did

Page 44

MATTHEW D. CAIN, Ph.D.
you review Virtu's SEC filings in this case?

A. I did some -- a little bit of searching for SEC filings, yes.

Q. For what, in particular?

A. That was part of the process for the Cammer 5 analysis in considering disclosures of new information and in terms of earnings announcements or preliminary earnings announcements.

Q. So were you looking for the date on which the company filed something with the SEC or were you reviewing for substance within SEC filings?

A. I was -- so in terms of that Cammer 5, and there were other reasons for other factors that I relied on SEC filings, but in terms of the Cammer 5 analysis, the starting point is asking for a given company what is the best context in which to test for a relationship between disclosures and information?

So the starting point for any

Page 45

MATTHEW D. CAIN, Ph.D.
company is that I ask whether earnings announcements might be a reasonable testing ground, and there are some companies for which, after looking at their SEC filings, I conclude that that may not be the best testing ground for some companies if they, for example, don't have any earnings, if it's a pre-revenue company.

So just understanding the nature of Virtu, and then beyond that it's to identify those types of disclosures, earnings-related disclosures in terms of the timing, the market impact date of those announcements. But I'm not looking at the exact amount of earnings, for example, in terms of the substance of those announcements.

Q. I just want to make sure I understand.

So is the process simply to check whether Virtu is a pre-revenue company?

MR. GERSON: Objection.

12 (Pages 42 - 45)

Page 46

MATTHEW D. CAIN, Ph.D.

Q. Is that the purpose of reviewing their SEC filings?

A. The purpose is what I just described in my previous answer.

Q. And I heard your previous answer but I want to make sure I understand what it means.

Did you review Virtu's SEC filings for any purpose other than to check whether it earns revenue?

MR. GERSON: Objection.

A. Yes.

Q. And for what purpose did you review Virtu's SEC filings?

A. So one purpose was for the Cammer Factor 4, which for Form S-3 filing eligibility the Cammer Factor talks about whether a company is entitled to file a shortened Registration Statement in connection with public offerings.

So I reviewed Virtu's SEC filings to see whether they qualified for filing a Form S-3 in terms of being on

Page 47

MATTHEW D. CAIN, Ph.D.

time with required SEC filings and, in fact, actually filing a Form S-3, automatic shelf registration, and I also talk about SEC filings and other factors with just the overall information requirement providing timely disclosures of information to investors.

I also talk in Cammer 5 about how Virtu compared its own stock price performance to certain market and industry -- industries in its annual reports. And I also talk about in Cammer 5 how the company provided earnings announcements and earnings-related disclosures to investors, so identifying the timing of those for purposes of conducting a Cammer 5.

So those would be some of the examples of ways in which I relied on the company's SEC filings.

Q. Which of Virtu's SEC filings did you consider for purposes of your work in this matter?

A. So I considered a Form S-3 ASR

Page 48

MATTHEW D. CAIN, Ph.D.

that was filed on April 30th, 2021. I also considered Form 10-K, filed on March 1st, 2019. And then in connection with Exhibit 6, I looked at the timing of some 8-K filings that corresponded to the market impact dates of the quarterly results and preliminary results. And those are the ones that come to mind.

Q. Did you review the company's SEC filings in which plaintiffs allege the company made false or misleading statements?

A. I believe that some of those overlapped with the allegations, but my review was for purposes of carrying out the efficiency analyses that I described before.

Q. Sorry. I didn't mean to cut you off.

Did you review any of Virtu's SEC filings in order to assess what the market knew about Virtu at any point in time?

MR. GERSON: Objection.

Page 49

MATTHEW D. CAIN, Ph.D.

A. I don't think I conducted that type of analysis, other than the extent to which that's part of the Cammer 5 test, itself, in terms of disclosures of new information.

Q. And as part of your explanation of why you review SEC filings, you said that you review in order to assess whether the company was providing timely disclosures of information to investors?

A. It's not -- I don't think it's quite accurate to say that I'm trying to determine whether they provide those disclosures in a timely way, other than the Form S-3 filing eligibility Cammer Factor.

So I look for, for example, a notification of an inability to file quarterly results or annual results, for example. That's how I would interact with the Form S-3 requirement.

Q. How many times have you reviewed the Complaint in this matter?

13 (Pages 46 - 49)

Page 50

MATTHEW D. CAIN, Ph.D.

A.   It's not something that I've kept track of. I've repeatedly referred back to different sections of the Complaint but I've not kept track of that.

Q.   Appendix B references the Motion to Dismiss order.

Can you describe the purpose of reviewing that document?

A.   Yes. So like I said earlier, my goal is to understand the nature of the allegations in a case in terms of establishing time periods over which I'm assessing market efficiency and also considering the allegations when putting forward a damages methodology. And so I also consider any additional information from a Motion to Dismiss order in terms of asking whether that alters the actionable class period or alters the actionable alleged misrepresentations for, again, purposes of the class period or the damages methodology.

Q.   There's also reference here to

Page 51

MATTHEW D. CAIN, Ph.D.

the SEC Complaint that was filed against Virtu?

A.   Yes.

Q.   What is the purpose of reviewing that document?

A.   That was also just part of my overall consideration of the allegations in the case.

Q.   Can you describe for me your assignment in this matter?

A.   Yes. So my assignment is set forth in the first two paragraphs of my report and it's really two questions that I've been asked at this point in time; the first being to determine whether the market for the company's common stock was efficient during the class period; and the second being asked whether damages for class members can be created using a common methodology.

Q.   And what opinions are you offering in this matter?

A.   At this point in time, my opinions are set forth in paragraph 3 of

Page 52

MATTHEW D. CAIN, Ph.D.

the report, which are that the market for Virtu's common stock was efficient throughout the class period and that damages can be calculated class-wide using a standard common methodology, which is the out-of-pocket damages methodology.

Q.   Do you anticipate offering any additional opinions in this case?

A.   If I'm asked to offer additional opinions then I'll consider that. But at this point in time, I've not been asked to form any additional opinions.

Q.   As you sit here today, do you have any additional opinions about issues that are relevant to class certification in this matter?

A.   As of this date I have not formed any additional opinions that are contained in this report.

Q.   Have you done any work to assess whether the alleged misstatements in this case impacted Virtu's stock

Page 53

MATTHEW D. CAIN, Ph.D.

price?

A.   I've not attempted to assess or form any opinions on that question at this point in time.

Q.   My question was a little bit different.

Have you done any work in order to make that assessment?

MR. GERSON:  Objection.

A.   No, I have not attempted to conduct that type of assessment as of today.

Q.   Has anyone on your team at Fideres begun assessing whether the alleged misstatements affected Virtu's stock price?

A.   Not to my knowledge.

Q.   Are you aware of the briefing schedule in this case?

A.   I don't have it memorized, no.

Q.   Do you know how long plaintiffs have to submit a reply following defendants' opposition to class certification?

14 (Pages 50 - 53)

Page 54

MATTHEW D. CAIN, Ph.D.

A. Off the top of my head, I don't recall the exact schedule.

Q. Would you agree with me that preparing a reply report on price impact is often more time-consuming than an initial market efficiency report?

MR. GERSON: Objection.

A. I think it would be difficult for me to make any sort of generalizations about that question. It depends on the nature of what defendants' opposition brief and rebuttal reports look like.

Q. Would you agree with me that you have substantial experience serving as a plaintiff-side expert at the class certification stage in securities class actions?

A. Yes.

Q. And would you agree with me that there's essentially a, like, class certification playbook of how expert opinions are rolled out at the class certification stage?

Page 55

MATTHEW D. CAIN, Ph.D.

MR. GERSON: Objection, form.

A. No, I don't think that I could give one single generalized answer to that question.

Q. Okay. Would you agree that in the overwhelming majority of security classes a plaintiff-side expert puts in a report at the time that plaintiff moves for class certification opining on market efficiency and whether damages can be calculated on a class-wide basis?

A. That has been my experience, yes.

Q. And would you agree with me that in a large majority of cases, defendants then put in a rebuttal expert attempting to rebut the presumption of reliance in connection with opposing class certification?

A. In my experience, I've had many cases in which that has been the case, but I've also had many cases in which they did not put forward any sort of rebuttal like that.

Page 56

MATTHEW D. CAIN, Ph.D.

Q. Would you agree that the number of cases in which defendants put in a rebuttal expert report attempting to rebut the presumption of reliance by demonstrating a lack of price impact has grown substantially since the Supreme Court's case in Goldman?

MR. GERSON: Objection.

A. I do believe that it has grown since then, yes.

Q. Would you agree that now price impact is a central tenet of defendants' class certification strategy?

MR. GERSON: Objection.

A. My experience that has become a more central focus of the litigation process.

Q. So sitting here today, is it fair to say that you anticipate defendants attempting to do so in this case?

A. I don't know what defendants plans are in the future in this case. And whenever you get to the end of this

Page 57

MATTHEW D. CAIN, Ph.D.

line of questioning, would it be a good time for a break?

Q. Sure. Just a few more questions --

A. Sure.

Q. -- and we'll break in a minute or two.

Before accepting the engagement in this matter, did you do anything to satisfy yourself that you'd be able to offer an opinion on whether the statements impacted Virtu's stock price that's consistent with plaintiffs' theory of the case?

MR. GERSON: Objection.

A. Like I said before, I've not conducted an analysis of that type of price impact question at this point in time.

Q. In all of the matters in which you've been a plaintiff-side expert at class certification, did you ever concede a lack of price impact in a rebuttal report?

15 (Pages 54 - 57)

Page 58

MATTHEW D. CAIN, Ph.D.

A.    I know that I have offered opinions that conceded price impact of certain misrepresentations. I don't recall whether those concessions occurred in a rebuttal report or in a loss causation and damages report.

Q.    I have further questions on that but I'm happy to break now if you need a comfort break?

A.    That would be good.  Thanks.

MS. BENEDON:  Let's go off the record.

VIDEOGRAPHER:  Off the record at 10:37. This is the end of Media Unit 1.

(Recess is taken.)

VIDEOGRAPHER:  On the record at 10:51. This is the start of Media Unit 2.

Q.    Dr. Cain, you mentioned that there have been instances where you've conceded a lack of price impact with respect to certain alleged misstatements. Can you recall which cases those were in?

Page 59

MATTHEW D. CAIN, Ph.D.

A.    One example I recall I believe was the case involving Recro Pharma. So that's at the top of page A7 of my listing of cases.

Q.    And do you recall any of the detail of the statements at issue in that case?

A.    It's been a while, so I'd have to go back and look at exactly what the details of the statements were. I think it might have -- may have had something to do with the manufacturing of drugs.

Q.    Do you recall anything about your analysis that led to conceding a lack of price impact with respect to certain statements in that case?

A.    I think it may have had something to do with a lack of connection between the misstatements and the corrective disclosures.

Q.    When you say "lack of connection", what do you mean by that?

A.    I think my recollection is that when I considered the totality of

Page 60

MATTHEW D. CAIN, Ph.D.

the information environment during the class period, that I determined that the corrective disclosures did not actually address or correct those specific misstatements.

Q.    Do you recall any other matters in which you've conceded a lack of price impact with respect to any alleged misstatements?

A.    Off the top of my head, I'm not able to think of other examples but it's possible that there may be some.

Q.    In all of the securities cases in which you've been engaged, did you ever put in an initial report on market efficiency and then refuse to provide a rebuttal report dealing with issues of price impact?

A.    I don't recall ever refusing to provide a reply report responding to price impact rebuttals.

Q.    In all of these securities cases in which you've been retained, have you ever been hired at the rebuttal stage

Page 61

MATTHEW D. CAIN, Ph.D.

to put in a report on price impact where you or some other expert had done the market efficiency report?

A.    We talked earlier about the Bank of California case where I came in as a rebuttal expert in that matter.

I believe that I've done some cases involving potentially a merits report where I did not do the market efficiency report.

I don't recall any cases in which I came in at the -- still at the class certification stage for a reply report when I did not also do the efficiency report, other than the Bank of California case.

Q.    And can you think of any securities class actions in which you've worked where defendants put in a rebuttal report where you did not submit both an initial price impact report as well as a rebuttal report?

MR. GERSON:  Objection.

A.    Other than the cases I just

16 (Pages 58 - 61)

Page 62

MATTHEW D. CAIN, Ph.D.
mentioned, I'm not able to think of any examples that fit that process.

Q. I'm not looking for you to disclose the substance of any privileged conversation so I'll ask this as a "yes" or a "no".

Before you finalized your report in this matter, did counsel have an opportunity to review the report?

A. Yes.

Q. And same thing, I'm asking as a "yes" or a "no", before finalizing your report, did you make any substantive edits to your report based on conversations you had with counsel?

A. I don't recall off the top of my head.

Q. Before you were retained in this matter, have you ever heard of Virtu?

A. Yes.

Q. What did you know about Virtu before you were retained in this matter?

A. I had a general familiarity or

Page 63

MATTHEW D. CAIN, Ph.D.
at least awareness of the company as a high-frequency trading firm going back for a number of years in which I've read about or studied or worked on cases involving high-frequency trading or algorithmic trading.

Q. Before you were retained on this matter, were you aware that the SEC was investigating Virtu?

A. I don't believe so, no.

Q. Before you were retained on this matter, were you aware that the SEC had sued Virtu?

A. I don't believe so.

Q. Before you were retained on this matter, had you ever heard of Doug Cifu?

A. I don't believe so.

Q. Before you were retained on this matter, had you heard of any of the other named defendants in this case?

A. No.

Q. What is your understanding of the allegations in this matter?

Page 64

MATTHEW D. CAIN, Ph.D.
A. I summarized those in Section III of my report, which is that essentially plaintiff alleges that during a certain time period employees at Virtu, including proprietary traders, could access a database containing customer trade information using widely known and shared usernames and passwords, and that the defendants allegedly made misrepresentations regarding the company's protection of client trading data, including failing to disclose the accessibility of this data by the company's employees, including the proprietary traders and the resulting financial regulatory and litigation risks.

Q. What is your understanding of plaintiffs' theory of liability in this case?

MR. GERSON: I'll object to the extent that calls for a legal conclusion. You can answer.

A. So my understanding is that

Page 65

MATTHEW D. CAIN, Ph.D.
plaintiffs allege claims under Section 10(b) of the Exchange Act, as well as 20(a), so that's lower case "A", based on the allegations that I just described and that the relevant truth was revealed over multiple disclosures at various dates, and that as a result, investors purchased the company's common stock at artificially inflated prices during the class period.

Q. In paragraph 3.d which is a summary of your opinion, you wrote that, "Damages in this matter can be calculated on a class-wide basis subject to a standard, common methodology. In particular, I demonstrate that the out-of-pocket damages methodology which is routinely used in §10(b) securities class actions, is reasonable and applicable given Plaintiff's theory of liability."

When you use the phrase "theory of liability" in that sentence, is that simply a reference to the fact

17 (Pages 62 - 65)

Page 66

MATTHEW D. CAIN, Ph.D. that this is a case involving claims under section 10(b) and 20(a)?

A. No.

Q. So what did you mean by "theory of liability" in that sentence?

A. So this is a summary of my opinion that I provide an analysis of in Section VI of my report.

So in Section VI I, again, summarize the allegations, and that's also done in reference to Section III of my report that we were just talking about. So I go through and talk about, in essence, their allegations of misrepresentations going back to the start of the class period and then later in the class period alleged disclosures of the relevant truth over different dates and that there's an economic coherence or connection between those alleged misrepresentations and alleged revelations of the relevant truth, and that it was as a result that there was an allegation that the common stock price

Page 67

MATTHEW D. CAIN, Ph.D. was artificially inflated during the class period.

And so based on the consideration of the allegations in the Complaint, what I explain is that the out-of-pocket damages methodologies formulaically calculates damages based on the amount of artificial inflation in the stock price at the time of purchase versus the time of sale and that importantly, this formula and methodology is able to be employed in a common way across any class member.

Q. Would you agree with me that this is an inflation maintenance case?

A. So I've not looked at the misrepresentations to assess whether there was an artificial inflation that may have been introduced on any of the misrepresentation dates, but I do believe that my understanding of the theory of liability is that at least some amount of artifical inflation was allegedly maintained as of the start of the class

Page 68

MATTHEW D. CAIN, Ph.D. period.

Q. Okay. Do you have an understanding of whether plaintiffs are alleging that any of statements introduced inflation into Virtu's stock price?

MR. GERSON: Objection.

A. Ultimately, I've not attempted to assess that question at this point in time.

Q. What would you do to assess that question?

A. So that's a question that I've assessed in many cases at the merits stage of a case.

In a loss causation and damages report I will construct an artificial inflation ribbon and I will consider the dates on which alleged misrepresentations were made, I'll look at the overall information environment, I could also look at additional dates during the class period and the information environment, and then conduct

Page 69

MATTHEW D. CAIN, Ph.D. an analysis and a study of the stock price to determine whether any portion of the artificial inflation, for example, that was dissipated upon later corrective disclosures or revelations of the relevant truth, if some portion of that was introduced during the class period as opposed to have been maintained as of the start of the class period.

Q. Do you understand whether the alleged misstatements in this case involve allegedly omitted information?

MR. GERSON: Objection.

A. I believe that there are allegations of omissions in the case.

Q. Do you know what the allegedly omitted information is?

A. I would just refer back to the Complaint for that. I don't have the Complaint memorized. It's a long document.

Q. Do you understand this case to involve the materialization of an allegedly concealed risk?

18 (Pages 66 - 69)

Page 70

MATTHEW D. CAIN, Ph.D.

A. I believe that there are allegations that relate to allegedly undisclosed risks.

Q. What do you understand the allegedly undisclosed risks to be?

A. I would also need to point back to the Complaint since I don't have it memorized.

Q. Are you aware that certain of the alleged misstatements in the Complaint have been dismissed?

A. Yes.

Q. Do you know which types of alleged misstatements were dismissed?

A. My recollection from the Motion to Dismiss order was that those were called Category 3 of the alleged misstatements, and that those potentially related to potential forward-looking statements about things that could happen in the future, but I don't have the specifics memorized.

Q. Is it fair to say that a company's stock price is based on a

Page 71

MATTHEW D. CAIN, Ph.D.

forward-looking assessment of the value of the company?

MR. GERSON: Objection.

A. I think it depends on the company, itself, and the valuation. But in general, as a general rule, when we think about discount cash flow analysis as a valuation tool, discounted cash flow analysis would be based on projections of future cash flows to be generated by the company in the future.

Q. So the Category 3 statements which dealt with forward-looking statements about what the company was going to do, it is possible that those could have impacted Virtu's stock price, correct?

MR. GERSON: Objection.

A. That's not an analysis that I've conducted at this point in time so I don't have any opinions one way or another.

Q. Putting Virtu aside, I'm not asking about this specific alleged

Page 72

MATTHEW D. CAIN, Ph.D.

misstatements, is it possible that statements about what a company intends to do in the future could impact the company's stock price?

MR. GERSON: Objection.

A. There are times when those statements impact prices, yes.

Q. As a general matter, do you agree that a specific statement has a greater potential to impact a company's stock price than a generic statement?

MR. GERSON: Objection.

A. I don't think that I would give one single universal answer to that question. I think it probably depends on the specific set of facts and circumstances.

Q. What specific facts or circumstances would you need to know in order to weigh in on something like that, as a general matter?

A. I would probably, if I was asking that type of price impact question, I would want to understand the

Page 73

MATTHEW D. CAIN, Ph.D.

totality of the information environment over the relevant time period. So that could include looking at SEC filings, company statements, it could include earnings call transcripts, press releases, analyst reports, financial media, analyses of stock prices, and other data that could speak to those types of questions.

Q. Are you familiar with the term puffery?

A. I've heard the term, yes.

Q. And I'm not asking for your legal views, but what do you understand the term to mean?

A. Well, I've heard it in the context of legal assessments of whether certain alleged misstatements are actionable or not and my general understanding is that if a court concludes that a statement is mere puffery then it may not be actionable.

Q. Okay. Would you agree that statements that can fairly be categorized

19 (Pages 70 - 73)

Page 74

MATTHEW D. CAIN, Ph.D.

as puffery are not capable of impacting a stock price?

MR. GERSON: Objection.

A. No, I don't think that I've formed that type of opinion.

Q. Do you have an opinion about whether statements that can fairly be characterized as puffery are relied upon by investors in making trading decisions?

MR. GERSON: Objection.

A. I don't have a universal opinion about that question.

I, again, like previously, would want to look at specific facts and circumstances and conduct an analysis if I was going to form an opinion.

MS. BENEDON: Let's mark tab 7.

(Cain Exhibit 3, Virtu Earnings Call Transcript dated September 2018 was received and marked on this date for identification.)

Q. So you have now in front of

Page 75

MATTHEW D. CAIN, Ph.D.

you Exhibit 3, which is an earnings call transcript from Virtu's earning call from September 2018.

Have you seen this document before?

A. I believe I may have seen certain excerpts from it in the Complaint. Off the top of my head, I don't recall one way or the other whether I've seen this exact document.

Q. So -- and I know that there are many different companies that put out transcripts from earnings calls, do you believe that you've reviewed any version of Virtu's earnings call transcripts, separate and aside from what's excerpted in the Complaint?

A. I don't recall off the top of my head one way or another.

Q. Do you recall why this earnings call is important or -- not "important".

Do you recall why this earnings call is relevant for this case?

Page 76

MATTHEW D. CAIN, Ph.D.

A. My recollection is that the Complaint alleges certain misstatements and misrepresentations within the earnings call.

Q. You're familiar with the Supreme Court's decision in the Goldman case, correct?

A. I have read it, yes.

Q. Are you familiar with the Second Circuit's decision in Arkansas Teachers following remand from the Supreme Court?

A. I have read that also previously.

Q. Okay. And so you are aware that the concept of whether a statement is generic versus specific is an issue that arises as part of rebutting price impact, correct?

A. My recollection is that that can be a topic of consideration in certain cases, yes.

Q. Okay. So let's turn first to page 6 -- 5.

Page 77

MATTHEW D. CAIN, Ph.D.

A. Okay.

Q. And at the third full paragraph that begins "Turning to slide 6"; do you see that?

A. I do.

Q. The first two sentences are, "You see the importance we place on protecting client information in all aspect of our business. We take this obligation seriously and we recognize and appreciate the natural concerns customers will no doubt have."

Did I read that correctly?

A. Yes.

Q. Do you agree that that's a fairly generic statement?

MR. GERSON: Objection.

A. I've -- I've not formed that opinion at this point in time.

Q. What analysis would you need to perform in order to form that opinion?

A. If I was asked to form an opinion about whether this statement was specific or generic, then I would look at

20 (Pages 74 - 77)

Page 78

MATTHEW D. CAIN, Ph.D.

the statement, I would look at the slide that they're referring to and I would potentially review the -- any court guidance, for example, from the court cases that you mentioned earlier. And beyond that, I would need to think about any additional analyses that I would want to conduct if I was asked that question.

Q. Have you ever weighed in on whether a statement is generic or specific?

A. I believe so, yes.

Q. In what matters?

A. I don't have that memorized off the top of my head but some of the reply reports that I've done at the class certification stage have talked about that issue.

Q. Okay. And if you look at the next two sentences it says, "Virtu has established policies and procedures for our existing client and market-making business that are designed to safeguard sensitive client information and will

Page 79

MATTHEW D. CAIN, Ph.D.

continue to design our policies and procedures with our clients in mind."

Do you have a view of whether that's a generic or specific statement?

MR. GERSON: Objection.

A. I've not formed an opinion on that question at this point in time.

Q. What specific analysis would you need to do to form an opinion about that?

A. It would be the same as what I described previously.

Q. If you turn to the next page in the second full paragraph towards the end of that paragraph it says, "We have identified $125 million of capital synergies." Do you see that?

A. I see that.

Q. Would you agree with me that that statement is far more specific than the statements we were just reading on the prior page?

MR. GERSON: Objection.

A. Again, I've not attempted to

Page 80

MATTHEW D. CAIN, Ph.D.

form any opinions on those types of questions at this point in time.

Q. So I'm not asking if you have, like, a capital "O" Opinion, but just having now read those words, do you agree that it's more specific to describe "$125 million of synergies" than to say "we place an importance on protecting client information?"

MR. GERSON: Objection, asked and answered.

A. Well, I would say that the statements, themselves, are obviously different, using different words and talking about different aspects of the business. But beyond that, I don't have any opinions off the top of my head about the extent to which either of those are generic or specific.

Q. So having read both Goldman and the Arkansas Teachers opinion, what do you understand the term "generic statement" to mean?

And, again, I'm not asking for

Page 81

MATTHEW D. CAIN, Ph.D.

your legal view, I'm asking for your view as an expert who performs this work in the ordinary course.

MR. GERSON: I'll object to the extent that this is beyond the scope of what's contained in his report.

A. My recollection from those cases, the Goldman cases, and obviously I don't have those memorized, so I'm attempting to recall the specific details from memory, but my recollection is that they were pointing to repetitive risk factor disclosures in Goldman Sachs' annual reports that -- and when I say "repetitive", that they were the exact same words used across multiple annual reports.

Again, I may be remembering incorrectly but that's -- my recollection is what they were drawing a contrast between those risk factor disclosures -- and I'm certainly not saying just because those were repeated that that rendered

21 (Pages 78 - 81)

Page 82

MATTHEW D. CAIN, Ph.D.

them somehow lacking in price impact, but then comparing to what they describe as a mismatch between that level of genericness and then the level of specificity in subsequent disclosures relating to the Paulson hedge fund's ability to select specific assets or transactions that went into Abacus Hedge Fund -- sorry -- Abacus Collateralized Debt Obligations, and then allowing the Paulson hedge funds to bet against those same funds that they had had a part in selecting the assets of, and that the court pointed to the difference in the level of genericness and specificity as something that gave rise to additional analyses to assess price impact.

And, again, that's -- I may have some of those details wrong, but that's my best recollection from reviewing those cases previously.

Q. You've written about those cases as well, correct?

A. Yes.

Page 83

MATTHEW D. CAIN, Ph.D.

Q. Okay. And who was the co-author on that article?

A. I think it was Per Axelson.

Q. Is that person a lawyer?

A. No.

Q. Is he a financial economist as well?

A. I believe he has a Ph.D. in either economics or finance.

Q. Were you assisted by any lawyers in preparing that article?

A. I don't believe so.

Well, yeah, that's -- well, it was published in a Law Review but those were not lawyers that were part of that process either. So to the best of my recollection, I was not assisted by any lawyers.

Q. Are you aware that roughly half of the alleged misstatements in this case are repetitive risk disclosures that were exactly the same quarter to quarter?

MR. GERSON: Objection.

A. I don't know what the

Page 84

MATTHEW D. CAIN, Ph.D.

breakdown is but I do recall reviewing one specific risk factor disclosure that was repeated across several SEC filings.

Q. And would you agree that that risk disclosure, like the risk disclosures in Goldman, are on the generic end of the generic-specific spectrum?

MR. GERSON: Objection.

A. I've not conducted an analysis of its genericness or specificity as of this point in time.

Q. And if you wanted to assess the genericness of the repetitive risk disclosures in this case, what specific analysis would you perform?

A. It would be what I previously described in terms of that question that you asked before.

Q. Before we leave the document that's in front of you, which is page 5 of Cain 3, do you have an understanding of what is alleged to be wrong about this statement?

Page 85

MATTHEW D. CAIN, Ph.D.

MR. GERSON: Objection to the extent that calls for a legal conclusion. You can answer.

A. Which? Sorry. Which statement?

Q. On page 5, the paragraph beginning "Turning to slide 6" that we reviewed a few moments ago.

MR. GERSON: Counsel, you read several different statements. Is there one statement in particular that you want to point him to?

MS. BENEDON: The first one, two, three, four, five lines in that paragraph, "Turning to slide 6".

Q. Do you have an understanding of what's alleged to be false or misleading about that statement?

MR. GERSON: Objection.

A. No. I point you to the complaint, because it's a long document, it contains a lot of details regarding this. But my recollection, from memory,

22 (Pages 82 - 85)

Page 86

MATTHEW D. CAIN, Ph.D.
attempting to give you this from memory, is that the Complaint alleges that despite these statements, including safeguards like physical separation, logical access controls and entitlement reviews that, in fact, the company did not enforce those types of safeguards and shared usernames and passwords widely within the company to employees, including proprietary traders, who could access the FS database, which included client trading information.

Q.   Do you have an understanding of what plaintiffs allege should have been disclosed on the first day of the class period?

MR. GERSON:  Objection.

A.   I don't have the specific wording of what that but-for disclosure should have been on day one of the class period, but I'd be happy to look at the Complaint if you want to point me to any sections of the Complaint.

Q.   Do you have -- would you agree

Page 87

MATTHEW D. CAIN, Ph.D.
that Virtu could not have disclosed on the first day of the class period that the SEC was investigating it for its information barriers, correct?

MR. GERSON:  Objection.

A.   It's not a question I've tried to answer at this point in time.

Q.   Okay. What would you do to assess whether that is what should have been disclosed on the first day of the class period?

MR. GERSON:  Objection.

A.   I guess I'd start by reading the Complaint and see if that's what the Complaint alleges.

Q.   Okay. But separate and aside from what the Complaint alleges as part of your -- well, withdrawn.

Regardless of what the Complaint alleges, part of the work of a financial economist is actually assessing how various statements impacts the stock price, correct?

MR. GERSON:  Objection.

Page 88

MATTHEW D. CAIN, Ph.D.
A.   I'm not sure that I really have any opinions.  That would be outside of the scope of considering the allegations of a Complaint in a matter like this. So I'd need to understand what type of context you're referring to, if it's -- if it's attempting to ignore the allegations in the Complaint.

Q.   Do you recall if plaintiffs allege whether anyone at Virtu actually improperly accessed confidential information?

MR. GERSON:  Objection.

A.   Off the top of my head, I don't recall the specific details of how the Complaint discusses the sharing of usernames and passwords and how those may or may not have been utilized.

Q.   Is that fact relevant in any way for the work that you've been asked to perform on this matter?

MR. GERSON:  Objection.

A.   Up to this point in time that's not a question that I've relied on

Page 89

MATTHEW D. CAIN, Ph.D.
in forming my opinions as of today.

Q.   Are you aware that the allegations in the Complaint involve certain acquisitions that Virtu made of other companies?

A.   I do recall two acquisitions of two different companies being discussed in the Complaint.

MS. BENEDON:  You know what, let's mark the Complaint.

(Cain Exhibit 4, Consolidated Complaint in re: Virtu Financial, Inc. Securities Litigation was received and marked on this date for identification.)

Q.   You should have now in front of you Cain Exhibit 4, which is the Consolidated Complaint For Violations of the Federal Securities Laws.

Do you recognize this to be the Complaint that you reviewed in this matter?

A.   Yes.

Q.   Okay. If you turn, please, to

23 (Pages 86 - 89)

Page 90

MATTHEW D. CAIN, Ph.D.
paragraph 10, do you see that it says, "The SEC's findings about ITG's failure to protect confidential trading information, confidential client trading information raised concerns in the market about Virtu's ability to protect the sensitive trading information generated and/or maintained within its business group?" Do you see that?

A. Yes.

Q. As a financial economist, what would you do to assess whether, in fact, the market was concerned about that topic?

A. I think it would be the same as what I previously described, which includes understanding the information environment during the relevant time period, it could include reviewing SEC filings, earnings call transcripts, questions and answers among analysts and company executives, press releases, subsequent disclosures, SEC findings, the analyses of the stock price movements

Page 91

MATTHEW D. CAIN, Ph.D.
around various disclosures, looking at analyst reports and financial media coverage, academic research, those types of tools and techniques if I was attempting to assess that type of question.

Q. Do you expect analysts to comment about topics that are of concern for market participants?

MR. GERSON: Objection.

A. Sometimes they do and sometimes they don't.

Q. So in the instances when they don't, how can you glean whether something is, in fact, of concern for the market?

A. It would be the variety of other tools and techniques that I described.

So, like I said, analysts reports are one of those sources of evidence but they're certainly not the only source, and they're certainly not a singular objective metric by which I

Page 92

MATTHEW D. CAIN, Ph.D.
would form an opinion about what is or is not important to investors.

Q. What is your understanding of the role that analysts play when they cover a specific company?

A. So they'll typically put out analyst reports, they'll publish research where they'll provide short summaries, typically in the first page or two of a typical analyst report will have a short subjective summary description of information. The analyst reports will also frequently include price targets and buy and sell recommendations. It will also include valuation models frequently for companies. Analysts will also frequently have conversations with management. Sometimes that happens during earnings calls and sometimes it happens at conferences, sometimes it happens behind closed doors and sometimes analysts will put certain details in their reports or they may disclose those details with investors or other clients.

Page 93

MATTHEW D. CAIN, Ph.D.
Q. Do you agree that an analyst -- withdrawn.

Would you agree that analysts generally assess the impact of new value-relevant information on a company's stock price?

A. Sometimes they do conduct that type of analysis, yes.

Q. And financial -- and analysts have financial incentives to report on value-relevant information, correct?

MR. GERSON: Objection.

A. Sometimes they have a financial incentive to report on certain types of value-relevant information, yes.

Q. Are you familiar with any of the analysts that covered Virtu's stock during the class period?

A. I have summarized -- I think I quote from one or two analyst reports and then I also summarize in I think Exhibit 3 what the analyst coverage that is publicly available looked like for the company during the class period.

24 (Pages 90 - 93)

Page 94

MATTHEW D. CAIN, Ph.D.

Q. Do you have any reason to believe that the analysts that covered Virtu's -- covered Virtu during the class period were biased in favor of Virtu?

A. One of the things that I've explained in my prior academic research is that analysts have a known optimistic bias in their research coverage of companies and that affects their price targets, their buy/sell recommendations, and the narrative discussions that they contain in their reports.

So there is a very well-known pro management or optimistic bias in analyst reports.

Notwithstanding that, their reports still have the ability to help to communicate new information to investors, but it may be lacking in a certain degree of questioning or negative commentary or coverage of companies.

Q. Other than your view that the whole industry is generally bias in favor of management, do you have any reason to

Page 95

MATTHEW D. CAIN, Ph.D.

believe that the analysts that covered Virtu, in particular, were biased toward Virtu, in particular?

MR. GERSON: Objection, form.

A. Other than the well-known and well-documented industry-wide tendencies, I've not specifically attempted to discuss the coverage of Virtu in this case.

Q. How would you make that assessment of analysts' bias in favor of management for any particular company?

A. Well, I would probably follow the steps that academic research sets out if I were to ask that type of question, which would be to look at over a long period of time price targets, buy/sell recommendations, the narrative discussion, and assess whether that seems to be unbiased or biased in a certain direction over time.

Q. I believe in your research you've noted that that general bias toward management is particularly evident

Page 96

MATTHEW D. CAIN, Ph.D.

in the case of short-seller reports; is that correct?

MR. GERSON: Objection.

A. I don't recall -- oh, sorry. So you mean -- I have seen academic research that quotes directly from analysts who say that they are under pressure to not discuss short-seller reports in their own analyst reports. Is that what you're referring to?

Q. I'll state the question differently.

A. Okay.

Q. In your experience, does the bias toward management reveal itself in the way in which analysts respond following the release of short-seller reports for particular companies?

MR. GERSON: Objection.

A. That can be -- I think the academic research has shown that that can be one of the ways in which pro management bias is evident because analysts have explicitly stated that they

Page 97

MATTHEW D. CAIN, Ph.D.

are under pressure not to acknowledge short-seller reports in their own research coverage.

Q. Are there other particular events or instances that the research describes as being impacted by the general bias toward management?

MR. GERSON: Objection. And I'll object also to this line of questioning as beyond the scope of what's in his report and the opinions that he's offered in this case.

A. In my prior research I point to price targets, the buy/sell recommendations as having an optimistic bias, and yet changes to those can still reveal new information to investors. And the academic research also documents that their general narrative discussions tend to shy away from being overly critical of management or negative of the views of the company. So those are some of the things the academic research has

25 (Pages 94 - 97)

Page 98

MATTHEW D. CAIN, Ph.D.
documented generally.

MS. BENEDON: I'm going to be switching gears. Do you mind if we take a very short break?

VIDEOGRAPHER: Off the record at 11:37. This is the end of Media Unit 2.

(Recess is taken.)

VIDEOGRAPHER: On the record at 11:49. This is the start of Media Unit 3.

Q. I want to talk about your market efficiency opinion --

A. Okay.

Q. -- or opinions.

Is market efficiency a spectrum or is it a binary question of yes, market efficient or no, market efficiency?

MR. GERSON: Objection.

A. So there are different definitions of market efficiency as used in academic research.

For example, the definition

Page 99

MATTHEW D. CAIN, Ph.D.
that I use in -- for purposes or that we use -- not just me -- but that is used at the class certification stage relates to informational efficiency which is; do prices react to information and would we expect that the value impact of alleged misstatements or omissions would, thus, be reflected in stock prices?

So I think that you could think about the different factors as being continuous data points that could be higher or lower. So there is certainly an aspect of looking at the different factors and the underlying data where those data points fall on a different -- various degrees of the spectrum. But then ultimately for each factor, I'm asking a binary question of; does this weigh in favor of or against market efficiency?

And ultimately, the opinions that I form come down to a yes/no question of; yes or no, is this market efficient during a certain time period?

Page 100

MATTHEW D. CAIN, Ph.D.
Q. So within informational efficiency, depending on the various factors, is it fair to say that some companies are more informationally efficient than other companies that are informationally efficient but just less so?

MR. GERSON: Objection, form.

A. Again, when I assess informational efficiency, I come to a yes/no conclusion.

Q. Okay.

A. So I don't have any opinions about two different companies, both of which are efficient and yet one is more efficient than the other.

Q. Have you ever turned down an assignment because you could not establish market efficiency?

A. I have assessed companies and come to the conclusion that they were not informationally efficient based on the high bar that I evaluate for that question. And in those cases, my

Page 101

MATTHEW D. CAIN, Ph.D.
recollection is that the law firms decided to rely on other experts.

Q. You mention the high bar by which you assess market efficiency. What are you referring to?

A. I think that the Cammer and Krogman Factors represent a relatively high bar.

Q. Okay. In paragraph I believe it's 29 of your report you wrote, "A market is considered" -- it starts on the bottom of page 8 you wrote, "A market is considered informationally efficient when the market price of securities begins to respond quickly to publicly available information."

What do you mean by "quickly", as used in that sentence?

A. I -- typically the way that I test that question within the Cammer 5 context is asking whether it begins to respond to information within the first trading day.

It does not mean that the

26 (Pages 98 - 101)

Page 102

MATTHEW D. CAIN, Ph.D.
information is fully impounded by the end of that first trading day, but that I see evidence in terms of prices or volume that it's beginning to respond to information within that first trading day following the release of new information.

Q. Why do you use one day?

A. Because that's the quickest time window over which to look is that first trading day in terms of testing for price responsiveness.

Q. Why is it important to use the quickest option to test price responsiveness?

A. Because, again, I'm asking this question about informational efficiency with a very high bar for that of, you know; do the stock prices react or begin to react within the first trading day?

There is certainly academic research that looks at longer horizons, like a week or a month or multiple months, but I'm focused at a much shorter

Page 103

MATTHEW D. CAIN, Ph.D.
time interval of that first day following new disclosures. And that also corresponds to the events, the daily event study analysis for purposes of testing that question and also for measuring, you know, potential artificial inflation down the road on a daily basis.

Q. Do you always use single day -- I'm sorry.

Do you always conduct your analyses at the class certification stage using the same single day price impact or impact date -- that's a horrible question. Let me redo it.

You mention that you do this work using this one day because that is the quickest interval within which you can measure whether the prices reacted to information. Is that always the approach you use in doing this work at the class certification stage?

A. So what I was talking about is evidence that the stock prices start to react within one trading day. So I am --

Page 104

MATTHEW D. CAIN, Ph.D.
my standard Cammer 5 test does look at the first trading day after a disclosure.

Would I ask a separate question at class certification stages about price impact in a reply report, then I will look at potentially additional days after the first day because that can also be relevant to asking and answering a separate question involving evidence of price impact.

Q. Under what circumstances would the stock price reaction on additional dates be relevant?

A. So I've had cases in which the stock price movement over multiple dates, not only the first day but also two or three days after an announcement, provides additional evidence that the given disclosure impacted securities prices for a given company.

Q. How does a stock price reaction on day two reveal an impact to information that was released two days prior?

Page 105

MATTHEW D. CAIN, Ph.D.
MR. GERSON: Objection.

A. So there are some times when a disclosure comes out and the stock price might drop by 5% on the first trading day afterwards and then an additional 3, 4, 5, 6, 7 percent on the second day, and even sometimes on the third day the stock price continues to drop. And so that is -- depending on the information environment, so it also -- it's not something that I measure in isolation, but it's part of a larger process of evaluating price impact using the tools and techniques that we talked about earlier; over that interval, is there evidence of price impact over that multiday interval?

Q. And when you are asking if there is price impact over a multiday interval, what specific analysis do you perform to assess whether the multiday decline is due to a single piece of information or some other market factors?

A. Yeah. So it would -- it would

27 (Pages 102 - 105)

Page 106

MATTHEW D. CAIN, Ph.D.

employ those same tools and techniques that I described earlier, which would be understanding the information environment over the relevant time period; what was disclosed; were there multiple disclosures or a single disclosure; was the disclosure more complex information or is there evidence that it took market participants multiple days to digest and react to the information?

You could look at analyst coverage, SEC filings, financial media, press releases, those -- as well as the event study results, market movements, industry price movements, all of those various pieces of evidence that are part of the totality of the information environment over the relevant time period.

Q.    Other than the fact of continual stock price decline, how can you discern whether it took the market more than one day to ascertain the impact of new value-relevant information?

Page 107

MATTHEW D. CAIN, Ph.D.

A.    It would be looking at all those other tools and techniques that I described.

Q.    Is it fair to say that in an informationally efficient market a stock price reflects all material public information about the company?

A.    To the extent that that public information has been widely disseminated then it is typically impounded into the stock price. The price still may be distorted away from fundamental values by virtue of other information, like misrepresentations. So the true correct value impact may not being reflected in prices but the prices do generally reflect a totality of the information environment to the extent that that's widely publicly available in a market that is efficient.

Q.    You're familiar with Eugene Fama, right?

A.    Yes.

Q.    Is that how you pronounce his

Page 108

MATTHEW D. CAIN, Ph.D.

name?

A.    Fama.

Q.    Fama. Okay. Thank you. And you cite his work in your report, correct?

A.    Yes.

Q.    Would you agree that he's one of the preeminent voices on the efficient market hypothesis?

A.    He was one of the initial scholars who developed the efficient markets hypothesis a number of decades ago.

Q.    And Fama's theory is not just about when a stock price begins to reflect new value-relevant information, correct?

A.    That's right. Many of his writings are about fundamental efficiency, which is different from informational efficiency, that we evaluate for class certification purposes.

Q.    So Fama's theory is that in an efficient market the market price of a

Page 109

MATTHEW D. CAIN, Ph.D.

stock instantly or at least very quickly and fully reflects publicly available information. Do you disagree with that statement?

A.    I think that that is a fair statement. Again, he's talking about typically fundamental efficiency, which is different from informational efficiency, but within that separate academic discussion, I think that's a fair description.

Q.    And what's fundamental efficiency?

A.    It's a question of; do stock prices reflect fundamental value? Or alternatively, the alternative to that would be; are there anomalies, are there instances in which stock prices are distorted away from their correct values? Which is also something that he studied and talked about in many of his publications.

Q.    The theory that a stock price instantly and fully reflects publicly

28 (Pages 106 - 109)

Page 110

MATTHEW D. CAIN, Ph.D.
available information, do you believe that to be inapplicable to informational efficiency?

MR. GERSON: Objection.

A. Well, I think it's certainly related to informational efficiency but it's also a little bit different from informational efficiency.

Q. Fama also states that, "In the Semi-Strong Form Efficient Markets, the market does not tolerate even modest lags in the period within which a stock price fully incorporates all publicly available information."

Are you familiar with that as an impact of Fama's work?

A. I'm not really sure what you mean by "tolerate" in that quote.

Q. Do you agree that if a stock price does not instantly begin to incorporate publicly available information then there is an opportunity that some participants in the market can exploit?

Page 111

MATTHEW D. CAIN, Ph.D.

MR. GERSON: Objection.

A. It depends on the circumstance. I mean, one of the things that academics talk about is those arbitrage opportunities, where traders can trade to earn profits before the price has fully responded to information, is what gives the financial incentive for investors to trade on new information so that that information is quickly impounded into stock prices which renders them efficient.

So those arbitrage or trading opportunities for profit are part of the process that introduces informational efficiency into stock prices.

Q. Do you agree that it is relevant to the question of whether a market is efficient how quickly a stock fully impounds new information into the stock price?

MR. GERSON: Objection.

A. I think for purposes of informational efficiency, the question is

Page 112

MATTHEW D. CAIN, Ph.D.
not, you know; did it take one day or three days? The question is; do we see evidence that prices are reacting to new information? But there's also an admission that stock prices may still be distorted away from their true value, for example, by virtue of misrepresentations for a given company. And for a securities class action case, where there's an allegation that prices were distorted for months or years, it may take years before the price discrepancies are corrected by relevant disclosures. So I think there is a lot of different concepts at play in your question.

Q. Well, so you said there's an admission that the price may be distorted; is that correct?

A. Yes.

Q. What did you mean by that?

A. Yeah. So, again, it goes back to the explanation of informational efficiency, which is simply that stock prices react to information, but it does

Page 113

MATTHEW D. CAIN, Ph.D.
not mean that stock prices are always correct because every securities class action case that I've worked on, to the best of my recollection, alleges that the price was distorted away from the true value because of misrepresentations. And that pricing inflation or deflation may not be corrected for days, weeks, months or years.

Q. When you say "may not be corrected for days, weeks, months or years", are you just referring to the length of an alleged class period?

A. That can be one example.

Q. Okay. But you're not saying that there have been alleged corrective disclosures that can take a week, a month or years for the market to understand in an efficient market, are you?

A. I'm not saying that.

Q. Okay. So you're talking about that a price, a market price can be distorted because of fraud for a certain period of time, correct?

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Page 114

MATTHEW D. CAIN, Ph.D.

A. It would include that, yes.

Q. Okay. But it's still your view that in an efficient market publicly available information is impounded into a stock price rapidly, even if incorrectly, as a result of fraud, correct?

MR. GERSON: Objection.

A. In my experience, for informationally efficient stock prices, disclosures begin to be impounded into stock prices typically within one trading day, yes.

Q. What are some factors that might help the time period within which new information is impounded into a stock price?

A. What do you mean by "help the time period"?

Q. So you just testified a moment ago that in your experience informationally efficient stocks begin to impound disclosures within one trading day.

Is it fair to say that

Page 115

MATTHEW D. CAIN, Ph.D.

sometimes disclosures are impounded into a stock price instantaneously and other times it might take a little bit more time to be impounded into a stock price?

A. So I think the concept of something being impounded instantaneously is a little bit of a theoretical concept because in reality we live in a time where nothing is actually instantaneous.

So we might talk about -- and obviously this is a case about Virtu. So with high-frequency trading firms, they would talk about trading at less than the second level. So they might talk about milliseconds, for example, in terms of trading, trading time periods, which I would say is still different from instantaneous.

But what I was explaining, or at least attempting to explain, is that typically when I talk about prices responding quickly to new public information, that that is occurring within the first trading day, but also in

Page 116

MATTHEW D. CAIN, Ph.D.

my professional experience, it can take two or three trading days to be fully impounded. It just depends on the individual situation and the facts and circumstances.

There's some academic research that shows that when information is more complex, it takes longer time to be digested, but it can take longer. Analysts may need to update their valuation models, publish research reports or investors may need to take time to update their own valuation models and assessments of the value of a company, and that is something that typically does not happen simultaneous with the disclosure of new information but may take a matter of hours or up to several days to fully complete that process.

Q. Does having a large number of analysts that follow a specific company help speed up the time within which new information is impounded into a stock

Page 117

MATTHEW D. CAIN, Ph.D.

price?

A. It's not an opinion that I've formed one way or another a universal answer to that question.

The process that one analyst has to go through to update their valuation model may be the same process that 20 analysts have to go through to update all of their valuation models. So it's not obvious that there's a significant time difference between that one analyst and the 20 different analysts updating all of their models.

Q. Is it your view that the market does not start impounding new information into the stock price until analysts update their models?

MR. GERSON: Objection.

A. No.

Q. Okay. Do you agree that in an informationally efficient market a stock price does not respond more than once to the release of the same information?

A. What do you mean by "respond

30 (Pages 114 - 117)

Page 118

MATTHEW D. CAIN, Ph.D.

more than once"?

Q. Sure. So information that -- well, if a company releases earnings on a Monday and then the earnings are repeated on Wednesday, would you expect the stock price to react again to the same information released two days later?

MR. GERSON: Objection.

A. There may be a continual reaction over Monday, Tuesday and Wednesday. So that would be one example where the stock price is continuing to respond to the earnings that were announced on Monday.

There can also be additional context that might be provided on Wednesday where there may have been certain statements made on Monday that have been reversed or corrected on Wednesday.

So I think it's important to really understand the totality of the information environment. But if, for example, I'm doing a Cammer 5 analysis, I

Page 119

MATTHEW D. CAIN, Ph.D.

would look at the earnings announcement price impact date of Monday as opposed to the price impact date of Wednesday if those earnings were announced premarket on Monday, for example, because that's the time when that specific piece of earnings-related information was first disclosed to the market.

Q. Okay. And so as a general matter, if the market had already fully impounded the Monday earnings into the stock price, and this is not an instance of continual reaction over multiple days, if no further information is released and it's just a pure repetition of the same information two days later, would you expect the market to react again to that release of same information two days later?

MR. GERSON: Objection.

A. Again, it would depend on what other information is going on in the marketplace. For example, if analysts had updated their valuation models and were

Page 120

MATTHEW D. CAIN, Ph.D.

putting out reports or having discussions with investors based on the Monday disclosure, you could still see a price response on Wednesday. But if we look -- if I were to assess an information environment and I were to conclude that nothing at all changed on Wednesday, there was merely a reposting of the identical information environment from Monday, then I would typically expect that price impact to be driven by Monday's disclosure.

Q. If a company has already disclosed a risk, would you expect the materialization of that risk to impact the stock price?

MR. GERSON: Objection.

A. There have been times when that has happened, yes.

Q. What comes to mind?

A. So I guess it depends on the nature of what we're talking about. But let's suppose that a company says that -- let's say there's a public company that

Page 121

MATTHEW D. CAIN, Ph.D.

sells cars and they say that we think next year our car sales may decrease by 5% and then because we have some problems with the dealer lots. And then next year they announce that actually the car sales decreased by 50% because of problems with the dealer lots. And so there could be a case where the allegation is that the car company knew at the time that they made this risk factor disclosure that, in fact, they knew that their car sales were likely to decline by 50% because the problems that they had on the dealer lots were more severe than they told investors. In essence, they knew that the reality was far worse than the hypothetical risk of a future possibility of a negative outcome occurring.

So next year when that negative outcome or that risk materializes, you could have a very large drop in the stock price. Even though that's a materialization of a disclosed risk, the allegation could be that the

31 (Pages 118 - 121)

Page 122

MATTHEW D. CAIN, Ph.D.
defendants knew or should have known or were reckless in ignoring or negligent in ignoring and failing to disclose the truth as of the first year.

Q. So in the hypothetical you just explained, the stock price reaction at the back end, is that -- what you described, is that stock price a reaction to the risk that's materializing or the fact that they've been lied to or something else?

MR. GERSON: Objection.

A. Well, in the example I gave it would be both, right?

So the problems with the dealer lots, there was a risk factor disclosure of problems that could lead to a drop in sales and that materializes next year because those problems lead to a very large drop in sales. At the same time, there could be an allegation that the executives at the company knew of those problems and instead of disclosing the all problems, they just disclosed the

Page 123

MATTHEW D. CAIN, Ph.D.
risk that problems could lead to a drop in future sales, as opposed to disclosing the actual problems they knew existed at the time they made the risk disclosure.

Q. I see. Okay. So if -- I'm going to respond to your hypothetical with a hypothetical. Can we do a drug company disclosing whether it will get FDA approval?

If you have a drug company that tells the market, we believe we have 100% chance of getting FDA approval, and then that either sustains a stock price or increases a stock price, we'll put that aside, but six months later they come out and say, actually, we now think there is a real risk that we're not going to get FDA approval. You would expect the stock price to react negatively, right?

MR. GERSON: Objection.

A. It's very possible that there could be a negative stock price reaction from that type of disclosure, yes.

Page 124

MATTHEW D. CAIN, Ph.D.
Q. And if as of that date the risk of not getting FDA approval is fully disclosed, would you expect that when that risk actually materializes that there would be a further decrease in the stock price?

MR. GERSON: Objection, calls for speculation. We're getting pretty far afield from his report here.

A. I would need to really look at the specific details of that type of hypothetical to form an expectation about what I think the stock price would do.

Q. Okay. But you do agree that, as a general matter, a company stock price is a reflection on what the market expects the value of the company to be in the future, correct?

MR. GERSON: Objection.

A. Well, I think it's a reflection of the market's assessment of the value today, which is based on future cash flows, for example.

Page 125

MATTHEW D. CAIN, Ph.D.
Q. Okay. So in my hypothetical, if when the company announces we now believe there is a real risk we will not get FDA approval, would you agree with me that ordinarily you would expect that the market, as of that date, to adjust the stock price to reflect the value of the company without FDA approval?

MR. GERSON: Objection, calls for speculation.

A. It's possible in the hypothetical that that could happen.

Q. Okay. Let's talk about Cammer 5. Can you at a high level explain the analysis you conducted in connection with your assessment of Cammer Factor 5?

A. Yes. I conducted a standard analysis, which is to compare the stock price behavior on a group of news days to the stock price behavior on a group of trading days that does not contain that type of news.

So the news that I am testing for here is represented by earnings

32 (Pages 122 - 125)

Page 126

MATTHEW D. CAIN, Ph.D.

announcements and preliminary announcements, and then I conduct an event study looking at the abnormal stock price changes on these different dates, controlling for market and industry movements and then conducting a statistical comparison of the group of significant news days and the group of significant no news days.

Q. And what is an event study?

A. An event study is a statistical process of analyzing stock price movements and controlling for contemporaneous movements in the market or the industry or both.

Q. In paragraph 64 you include a quote from Eugene Fama, this is on page 21. In the end of the first paragraph of that quote it says, "As a result, event studies can give a clear picture of the speed of adjustment of prices to information."

Does your event study do so here?

Page 127

MATTHEW D. CAIN, Ph.D.

A. Sorry. Which paragraph were you reading?

Q. I'm reading from the quote in paragraph 64.

A. Okay. Yes, my event study is consistent with this quote.

Q. As part of the work that you conducted in Cammer 5, you assessed whether the abnormal return of Virtu's stock relative to -- -- withdrawn.

Is it fair to say that you used a regression model to predict the daily returns of Virtu's stock compared to the actual returns?

MR. GERSON: Objection.

A. Yes.

Q. Okay. And is the purpose of that to determine the amount of the movement of the stock price that is not attributable to industry or market-wide factors?

A. Yes.

Q. And then you assess whether that abnormal return is statistically

Page 128

MATTHEW D. CAIN, Ph.D.

significant; is that right?

A. Yes.

Q. Okay. And in your report at paragraph 66 you explain statistically significant abnormal returns as "sufficiently large compared to the usual volatility in the company's stock price return such that simple random movement can be rejected as the cause." Do you see that?

A. Yes.

Q. And do you stand by that explanation of statistical significance?

A. Yes, that's one explanation. Although, I would caveat that the reality is we don't have any dates in real life that are driven by pure randomness because there is always news coming out on every day and there is always trading taking place on every day which affects stock prices. So those would be a component of what's included in the term "simple random movement" in this sentence.

Page 129

MATTHEW D. CAIN, Ph.D.

Q. Help me understand what you're talking about.

A. So what we're doing in an event study is we're comparing the return following an earnings announcement and the magnitude of that return following an earnings announcement to the typical day-to-day fluctuations in the stock prices over the previous six months, excluding earnings announcements, and referring to that six-month period as a baseline estimation of the typical "random movements" in the stock price to ask whether the return following this earnings announcement was relatively large compared to those typical daily random movements. But that does not mean that it's driven by pure randomness during those six months, because there are other disclosures, there's news, there are SEC filings, there's trading by large institutional investors, all of which can still have an impact on stock prices.

33 (Pages 126 - 129)

Page 130

MATTHEW D. CAIN, Ph.D.

We're not claiming that prices just moved -- that the prices just moved randomly completely divorced from the information environment during any time period.

Q. Okay. How did you pick the events that would be considered news days for purposes of your analysis here?

A. So I focus on earnings announcements or earnings-related disclosures for the company, which is a very standard testing ground for the Cammer 5 cause-and-effect relationship to the extent that companies are generating meaningful earnings. So that's guided by the academic research that I cite to in my report.

Q. How did you determine whether Virtu is generating meaningful earnings such that that would be appropriate here?

A. Yeah. So the -- just looking at the company, the Complaint, the company's SEC filings, examples of companies that do not fit that

Page 131

MATTHEW D. CAIN, Ph.D.

description would be pre-revenue companies or drug development companies whose values depend on FDA approval of drugs as opposed to ongoing sales which may not be happening yet for those types of companies.

Q. On page 26 in footnote 80 you wrote, "If the release was issued after the close of the market, the relevant news day is appropriately deemed to be the next trading day." Why is that the appropriate news day?

A. Because that's when the market reacts. So if let's say that an earnings release comes out at 4:30 p.m. after markets closed at 4:00 p.m. Eastern Time, then I would measure the return from right before that earnings announcement 4:00 p.m. market close today to 4:00 p.m. market close tomorrow because the stock price regular trading hours will be tomorrow if the earnings announcement comes out after the markets have closed for regular trading today.

Page 132

MATTHEW D. CAIN, Ph.D.

Q. And can you describe your process for defining no news trading days in this case?

A. That's described in paragraph 78. So those are the days in which there were no earnings announcements that fit the category of news days, no alleged revelations of the relevant truth, no SEC filings by Virtu and no news articles that have a tag through Factiva to Virtu in the Dow Jones Newswire articles.

Q. Is it fair to say that your definition of "no news trading days" excludes things that you might describe as news in the colloquial sense?

MR. GERSON: Objection.

A. Well, the types of news that I describe here. Like I said earlier, every single day in the real world there's always news coming out, there's always large trades that take place, and these things still impact securities prices of companies.

So I'm certainly not claiming

Page 133

MATTHEW D. CAIN, Ph.D.

that there was no information or news articles coming out on any given day during the class period but I am attempting to exclude the major sources of news, like earnings announcements or Dow Jones Newswires or SEC filings, those types of things to get a more realistic baseline of the typical day-to-day movements in the stock price.

Q. Okay. So then in paragraph 80 you describe the sort of results of the work you did reflecting 61.4% of news days causing statistically significant stock price movements at the 95% level and 4.31% of the no news trading day with statistically significant stock price movements. Is that also at the 95% level?

A. Yes.

Q. Okay. What does 95% mean in the context of statistical significance?

A. What that means is that we would expect 5% of the daily returns to be at that degree of movement in terms of magnitude just due to the random typical

34 (Pages 130 - 133)

Page 134

MATTHEW D. CAIN, Ph.D.
day-to-day fluctuations in the baseline.

Q.   Okay.

A.   So there's a 95% chance or better that the price movement is unusual and caused by something other than those typical -- whatever is causing the typical day-to-day movements in the baseline.

Q.   Okay. So the movement on 61.54% of news days was so great relative to what you'd expect, that there's a 95% chance that it was a reaction to the specific information that was disclosed; is that right?

MR. GERSON:  Objection.

A.   Well, there's a 95% chance or better that it's caused by something other than --

Q.   Random?

A.   -- typical random movements in that baseline. It may be the earnings announcement, it may be something else, like the earnings call, details, analyst reports, media coverage that all comes

Page 135

MATTHEW D. CAIN, Ph.D.
out on those days.

Q.   And then in the following sentence in paragraph 80 there is a reference to 99%. What does that mean?

A.   Yeah. So the statistic upon which I'm basing the conclusion for Cammer 5 is looking at the difference between the proportion of news day significant returns and no news day significant returns, what's the difference in those two portions, and is that difference relative large?  Do we tend to see large stock price movements on news days versus no news days?  And this is reporting the result of the statistical test across those two groups, and that's the statistic upon which I base my Cammer 5 conclusion.

Q.   I see. And then the footnote based on a Fisher's exact test, what does that mean?

A.   That's a small sample test that's designed for small samples and proportions like this. If we look at

Page 136

MATTHEW D. CAIN, Ph.D.
Exhibit 7, there's 26 news days.  So that's actually a fairly large sample because we have a long class period in this case, but sometimes I'll have a shorter class period.

Let's say I'm looking at a one-year analysis period and there's only four earnings announcements, then that's a relatively small sample.  And the Fisher's exact test is the test that I go with in smaller test samples as opposed to like a t-test for larger samples.

Q.   Let's look at Exhibit 6 to your report.

A.   Okay.

Q.   And this is the list of the 26 news days, correct?

A.   Yes.

Q.   Or the market impact date of the 26 news days; is that correct?

A.   Yes.

Q.   Okay. And for all of them you used a single-day event window, right?

A.   Yes.

Page 137

MATTHEW D. CAIN, Ph.D.
Q.   Do you agree that the longer an event window the more likely it is to pick up unrelated market noise?

MR. GERSON:  Objection.

A.   I think it just depends on the circumstances.  I'm still attempting to control for unrelated market noise by virtue of the market and industry controls within the event study. But there can be times if you have a longer event window that you can pull in other disclosures into that window that may be different from a certain disclosure that we're trying to study.

Q.   Did you have any concerns using a single-day event window in this case?

A.   No.

Q.   And using a single-day event window is sort of industry standard; would you agree with that?

A.   It's definitely the most common event window for the Cammer 5 tests that I do and I've seen other

35 (Pages 134 - 137)

Page 138

MATTHEW D. CAIN, Ph.D.

experts do. So I guess that's how I would characterize it.

Q. And do you agree that that's how it's often done for the Cammer 5 test because that's the sufficient amount of time for the market to have processed information?

A. Well, what I would say is it's the standard event window link because typically it's a sufficient amount of time for the stock price to begin reacting to a disclosure of new information.

Q. Did you exclude day two or day three following the market impact date from your analysis?

A. I didn't look at day two or day three, I only looked at the first trading day for the Cammer 5 analysis.

Q. What is a null hypothesis?

A. So the null hypothesis is what we're testing in a scientific method and ultimately asking; are we able to reject the null hypothesis or are we not able to

Page 139

MATTHEW D. CAIN, Ph.D.

reject the null hypothesis within a scientific test?

Q. Are you able to confirm the null hypothesis?

A. The phrasing that we use in the scientific method would be either you're able to reject or you're not able to reject the null hypothesis.

Q. But not able to reject is different than not able to confirm, correct?

A. Typically in the field of science that is, that's the way we would talk about it, yes.

Q. And in your work here what was the null hypothesis?

A. The null hypothesis, under the event study framework, is that there is not a price impact, that there is no -- that the movement is zero, that there's no meaningful stock price movement.

Q. So on this Exhibit 6 there's a column that says p-value?

A. Yes.

Page 140

MATTHEW D. CAIN, Ph.D.

Q. What does that mean?

A. So you can think of that as like one minus the level of statistical significance for a movement. So if the p-value is .02, for example, like in row 4 -- sorry -- yeah, row 4, p-value of .02, that means that stock price movement is statistically significant at the 98% level approximately.

Q. Okay. And so we have I think -- so one asterisk is statistically significant at the 90%; is that right?

A. That's right.

Q. And two asterisks is the 95th percentage and three asterisks is 99%; is that right?

A. Yes.

Q. Okay. Are you familiar with the Reference Guide on Statistics?

A. By who?

Q. The Federal Judicial Center.

A. It's possible. I'd need to take a look at it to refresh my recollection.

Page 141

MATTHEW D. CAIN, Ph.D.

Q. Well, let me -- we'll mark it.

(Cain Exhibit 5, excerpt from Reference Manual on Scientific Evidence was received and marked on this date for identification.)

Q. So we've handed you Cain Exhibit 5, which is an excerpt of the Reference Manual on Scientific Evidence, which is a resource by the Federal Judicial Center. We've included the full table of contents but then only a few pages.

Have you ever seen this before, as far as you know?

A. I may have but I don't recall one way or the other, off the top of my head.

Q. Okay. I want to -- I'm going to direct your attention to a specific part. If you need to read more to answer it you are welcome to but I think you'll have the view.

On 250, the last full paragraph that starts "Because p" --

36 (Pages 138 - 141)

Page 142

MATTHEW D. CAIN, Ph.D.

A.   Okay.

Q.   Do you see that?

A.   Yes.

Q.   That sentence reads "Because p is calculated by assuming that the null hypothesis is correct, p does not give the chance that the null is true."

Do you agree with that statement?

MR. GERSON:  Objection.

A.   I think I would need to read through the whole chapter to see how they are defining these terms.

Q.   So if you look down to the last two sentences here it says, "p is the probability of extreme data given the null hypothesis."

Do you agree with that summary or -- I'm sorry. If you back up one sentence it says, "The correct interpretation of the p-value can therefore be summarized in two lines:  p is the probability of extreme data given the null hypothesis, p is not the

Page 143

MATTHEW D. CAIN, Ph.D.

probability of the null hypothesis given extreme data."

Do you agree with that statement?

MR. GERSON:  Objection.

A.   Well, I think it's a little confusing because the footnote cites to contrary views about this but, like I said before, I think I would need to see the whole chapter and think about how they're defining all the different terms.

Q.   Well, then you can put it aside.

We talked about that there can be occasions when a stock price takes more than one day to fully react to new value-relevant information.

If the new value-relevant information is something that's objectively very good then you would expect the stock price to increase, correct?

MR. GERSON:  Objection.

A.   If it's -- if it's new

Page 144

MATTHEW D. CAIN, Ph.D.

value-relevant information that is objectively positive then I would typically expect the stock price to increase in response to that, in a hypothetical, yes.

Q.   And in that hypothetical, if it's information that takes more than one day to fully be impounded into the stock price, would you expect the reaction to all generally trend in the same direction?

MR. GERSON:  Objection, calls for speculation.

A.   Based on my own experience, I typically see prices fluctuate interday.

Q.   Okay. You see the fluctuation intraday or day-to-day?

A.   I've seen both, yeah.

Q.   So have you seen instances where a stock price reacts to positive, new value-relevant information on day one and then not on day two and then again reacts positively on day three?

A.   I believe so, yes.

Page 145

MATTHEW D. CAIN, Ph.D.

Q.   And under what circumstances -- let me withdraw that.

How are you handle to ascertain whether the reaction on day three is part of the same reaction that began on day one?

A.   So that would employ the same tools and techniques that I described earlier. So really understanding the totality of the information environment, potentially looking at SEC filings, company statements, press releases, analyst reports, financial media coverage, academic research, principles of finance and valuation analysis, event study analysis to understand why the stock price was moving over the relevant time period.

Q.   Okay. Have you ever opined in any of your cases that a reaction multiple days following the release of information was as a result of information released multiple days prior?

MR. GERSON:  Objection.

37 (Pages 142 - 145)

Page 146

MATTHEW D. CAIN, Ph.D.

A. Yes.

Q. What matters?

A. I don't have those all memorized, but I do recall I believe that it would include a case involving Deloitte, as the auditor of SCANA, in a merits report that I did in that case.

I believe that they were both single-day and multiday windows for price impact and artificial inflation measurement. I may have done that in the Vaxart case, I may have done that in other cases, but I don't have those memorized off the top of my head.

Q. Do you agree that 95% is industry standard when referring to statistical significance?

A. Well, I guess I would say it's a shorthand that many people use but they also use 99%, 90%.

There's other concepts of, in the legal context of something being more likely than not, it should be 50%. So I don't think there's -- what I always

Page 147

MATTHEW D. CAIN, Ph.D.

explain when I teach about statistical significance in academia is that statistical significance is a continuum. It's not a bright line cutoff but it's a continuum ranging from zero to 100%. So there are shorthand reference points that people refer to but statistical significance ultimately is a continuum.

Q. Okay. If you see a reference to statistical significance without a mention of a specific number, is that shorthand for 95%?

A. No.

Q. You mention 50% statistical significance?

A. Yes.

Q. In instances where you have 50% statistical significance, is it essentially, like, a coin toss as between whether something is as a result of random fluctuation or not?

MR. GERSON: Objection.

A. No, because I think part of the process in looking at questions about

Page 148

MATTHEW D. CAIN, Ph.D.

price impact revolve around understanding the information environment for a given company and it's also important to recognize, when we're comparing a movement to the previous six months what we're really asking is not how does this compare to some hypothetical world where stock prices move randomly, but actually the reality is on a daily basis prices are continually and continuously responding to information that comes out.

So what we're actually asking is; was this price movement larger in magnitude than prior movements and, therefore, was this disclosure more impactful than other disclosures?

So that's a different type of question, especially when the analysis also relies on understanding and assessing the information environment around a stock price movement.

Q. Have you ever used 50% statistical significance in any of your expert work?

Page 149

MATTHEW D. CAIN, Ph.D.

A. It's something that I have talked about in my research so I believe that I have probably talked about it in some of my expert reports as well.

Q. Have you ever opined that 50% was sufficient in a report submitted in any of your matters?

MR. GERSON: Objection.

A. I'd have to go back and look through my reports to see how I've opined about different cases. I don't have all those opinions memorized.

Q. But none come to mind; is that fair?

A. Again, I don't know one way or the other, so I don't want to attempt to answer either in the affirmative or the negative without reviewing all of my reports.

Q. Do you agree that the way that a regression is designed can impact the results of an event study?

A. Yes.

Q. And it is often the case that

38 (Pages 146 - 149)

Page 150

MATTHEW D. CAIN, Ph.D.

experts will submit dualing event studies with different outcomes, correct?

A.   I have been a part of cases in which opposing experts have submitted event studies with different results, yes.

Q.   So it's possible that one experts' event study can show statistical significance at the 95% level for a given day while another expert's event study shows only 40% statistical significance for the same date, correct?

A.   In terms of that specific example, I don't know. I'm not sure.

Q.   Okay. Well, whatever the numbers are, would you agree that it's depending on the assumptions and the design, the statistical significance for any given date can be vastly different as between two competing expert reports?

MR. GERSON:  Objection.

A.   I have been involved in cases where it's -- it is different across the different expert reports.

Page 151

MATTHEW D. CAIN, Ph.D.

Q.   Okay. And, again, I'm not asking for your legal view on this, but you do understand that when parties submit dualing expert reports with different outcomes and event studies, the court has to weigh which one it finds more persuasive, right?

MR. GERSON:  Objection.

A.   I think that question goes beyond my qualifications of what the -- to opine on what the court has to do.

Q.   Okay. Well, you made a reference to "more likely than not", correct?

A.   I mention that that's something that I've talked about in my research, yes.

Q.   And what about it have you discussed in your research?

A.   I think what I have explained is that if in the -- for purposes of my academic research, explaining that if courts articulate a legal standard of a preponderance of the evidence, meaning

Page 152

MATTHEW D. CAIN, Ph.D.

that something is more likely than not, that that could be viewed as being consistent with statistical significance at the 50% level, something being more likely than not.

Q.   It could be consistent with a 50%?

A.   Yes.

Q.   But you are aware that that's not a universally held view, correct?

MR. GERSON:  Objection.

A.   Again, I'm not providing any opinions beyond just pointing you to something I've written in my academic research.

Q.   So having also written about the Goldman and Arkansas Teachers cases, you are aware, though, that the Second Circuit requires typical statistical significance at the class certification stage, correct?

MR. GERSON:  Objection.

A.   I don't recall that specific component of the Second Circuit's

Page 153

MATTHEW D. CAIN, Ph.D.

decision, so I'd need to review that.

Q.   Is it fair to say that your event study measures the collective impact of all the information released on a given day?

A.   Which event study are you referring to?

Q.   The work that you performed in this matter.  When you're testing the impact on any given day, that is the collective impact of everything that happened on that day; is that correct?

A.   Well, if you're controlling for the market and the industry movements, it would -- it would measure the impact of information that came out during that event window.

Q.   Okay. And if multiple pieces of value-relevant information are released on the same day, the work that you've performed does not distinguish between the reaction to any specific piece of information; is that fair?

A.   My Cammer 5 event study does

39 (Pages 150 - 153)

Page 154

MATTHEW D. CAIN, Ph.D.

not attempt to break down and isolate the different pieces of value-relevant information that came out during each event window.

Q. Okay. And you refer to it as your Cammer 5 event study. Why do you refer to it in that manner?

A. Because that's the event study that I've done in this report.

Q. Okay. Is the event study that you've done in this report unusable for purposes other than Cammer 5?

MR. GERSON: Objection.

A. I've not attempted to ask or answer that question at this point in time.

Q. Okay. You've routinely performed event studies -- well, let me withdraw the question.

In the matters in which you've submitted both a class certification, price impact -- I'm sorry.

In the matter in which you submitted both a market efficiency report

Page 155

MATTHEW D. CAIN, Ph.D.

as well as a rebuttal report dealing with issues of price impact, do you usually run a different event study for purposes of your reply report?

A. It's possible that I have run different event studies. It just depends on the specific facts and circumstances and sitting down and asking the question of; was my Cammer 5 event study appropriate for the price impact question or does it require any sort of changes in order to ask and answer price impact-related questions?

Q. And what would make a Cammer 5 event study inappropriate for use at the price impact stage?

MR. GERSON: Objection.

A. I'm not sure that I have any clear opinions on what would make it inappropriate, but I do think that there have been times when I've looked at adding additional control variables or exclusion dates to an event study that's asking price impact-related questions.

Page 156

MATTHEW D. CAIN, Ph.D.

Q. Are you aware of anything wrong with your event study that you've performed so far that would make it unreliable for purposes of price impact?

MR. GERSON: Objection.

A. Again, I've not attempted to inquire as to whether my Cammer 5 event study is appropriate for looking into price impact-related questions at this point in time.

Q. Did you assess whether there were statistically significant stock price movements on the dates on which the alleged misstatements were made in this case?

A. My raw event study output, which we turned over in connection with my report, includes results on every day during the class period. So I would assume that there are dates within that output that have data associated with them, but I've not attempted to analyze those dates for purposes of asking price impact questions at this point in time.

Page 157

MATTHEW D. CAIN, Ph.D.

Q. Well, have you done -- have you assessed that for any purpose?

MR. GERSON: Objection.

A. Sorry. I'm not sure what your question is.

Q. In your response you said you have not assessed the data for purposes of asking price impact questions.

Did you assess the data and the statistical significance of the dates on which there were alleged misstatements for any purpose?

MR. GERSON: Objection.

A. Oh. The only purpose of the event study in my report was for carrying out the Cammer 5 analysis.

Q. Did you assess whether the dates on which there were alleged corrective disclosures in this case were statistically significant?

A. Again, I believe that those are included in at least the class period output data, but I don't recall what the actual data results are for those dates

Veritext Legal Solutions

212-267-6868          www.veritext.com          516-608-2400

Page 158

MATTHEW D. CAIN, Ph.D.

off the top of my head.

Q.   Would you be surprised to learn that there was no statistically significant stock price movement for some of the alleged corrective disclosures in this case?

MR. GERSON:  Objection.

A.   How are you defining "statistically significant"?

Q.   How do you define statistical significance?

A.   What I explained earlier is that statistical significance is a spectrum from zero to 100%. And so we can look at the p-values to see where along that spectrum a given return falls.

MR. GERSON:  We've been going over an hour now.

MS. BENEDON:  I'm happy to break now. We can take lunch.

VIDEOGRAPHER:  Off the record at 12:57. This is the end of Media Unit 3.

(Lunch recess is taken.)

Page 159

MATTHEW D. CAIN, Ph.D.

VIDEOGRAPHER:  On the record at 13:32. This is the start of Media Unit 4.

Q.   Is it typical for a company's stock price to drop following the announcement of SEC charges?

MR. GERSON:  Objection.

A.   I think there is some academic research that may look at samples of those types of announcements and may find on average a decline in the stock price. Beyond that, it's not something that I've studied at an aggregate level.

Q.   Are you aware that the SEC settled -- withdrawn.

Are you aware that Virtu and the SEC have now entered into a Settlement Agreement with respect to the charges that are at issue in this case?

MR. GERSON:  Objection.

A.   I did see that when I was reading the news last week.

Q.   Was that in connection with preparing for the deposition or just as a

Page 160

MATTHEW D. CAIN, Ph.D.

consumer of the news?

A.   I first saw it just as a consumer of the news.

Q.   Are you aware of the amount of the settlement?

A.   My recollection is that it may have mentioned penalties of around two and a half million dollars, but I don't have it memorized.

Q.   Is the fact or amount of the settlement in any way relevant for the work that you've performed on this matter?

A.   Up to this point in time I've not considered any post-class period events in terms of -- other than the alleged revelations of the relevant truth, so it's not something that interacts with any of the opinions that I've formed as of today.

Q.   Is the fact or amount of the SEC settlement relevant in any way to the assessment of whether the alleged misstatements impacted the stock price?

Page 161

MATTHEW D. CAIN, Ph.D.

A.   I've not thought about that question at this point in time, so I don't have an opinion as of today.

Q.   I want to turn now to Section VI of your report, which relates to the ability to calculate damages on a class-wide basis.

If I refer to your as your Comcast opinion, do you know what I'm talking about?

A.   Sure.

Q.   If you don't, I don't have to say it like that.

A.   So if you say "Comcast" you're referring to Section VI of my report?

Q.   Yes. And you're familiar generally with the Supreme Court case in Comcast and the impact that that has had on the work being performed in class certification, correct?

A.   It's not something that I specifically studied for academic purposes.

Q.   Can you describe for me the

41 (Pages 158 - 161)

Page 162

MATTHEW D. CAIN, Ph.D.
analysis that you undertook in assessing whether damages could be measured on a class-wide basis in this case?

A. Yes. I reviewed the Complaint and the Motion to Dismiss opinion, I evaluated the alleged misrepresentations in the case, the allegations, plaintiffs' theory of liability and the subsequent alleged revelations of the relevant truth, I summarized those things in Section III of my report. I took those into consideration and then I asked whether there is an alleged economic coherence or connection between the misrepresentations and the revelations of the relevant truth in plaintiffs' allegations that the stock price was artificially inflated during the class period and that that inflation was dissipated by the alleged revelations of the relevant truth. And then based on my consideration of that theory of liability, came to the opinion that damages are capable of being calculated

Page 163

MATTHEW D. CAIN, Ph.D.
class-wide using the out-of-pocket methodology.

Q. So I want to ask about a few things that you just said.

You said you evaluated the alleged misrepresentations in the case. What did you mean by that?

A. So I reviewed the Complaint, the Motion to Dismiss order, which dismissed a certain category of alleged misrepresentations. So it modified, as I understand it, modified the allegations.

And then the -- when I refer to evaluating the alleged misrepresentations was considering the allegation in the Complaint that those caused artificial inflation in the stock price and that that artificial inflation in the stock price was later removed over the course of multiple alleged corrective disclosures.

So the key element here is that whatever that artificial inflation ultimately is, whether it's zero or some

Page 164

MATTHEW D. CAIN, Ph.D.
positive amount, that that eventual calculation of the specific amount is done -- is capable of being carried out in a way that's common across every class member.

Q. And is that true for all securities class actions?

MR. GERSON: Objection.

A. I've not formed an opinion one way or another on that question.

Q. Okay. So what about this case, in particular, other than the fact that it's a securities class action alleging alleged misstatements that caused artificial or maintained artificial inflation, leaves you to believe that damages can be calculated on a class-wide basis?

A. So it would be the things that I described previously, which is -- and that boils down to the eventual calculation of artificial inflation that on a daily basis, over the course of the class period, that that calculation is

Page 165

MATTHEW D. CAIN, Ph.D.
the same for each class member and it's based only on the timing and amounts of their purchases and sales of Virtu common stock.

Q. Is it possible that the value relevance of either false or omitted information changed over the course of the class period?

MR. GERSON: Objection.

A. It's not something I've evaluated at this point in time.

Q. If that were the case, then would that impact the ability to calculate damages on a class-wide basis?

MR. GERSON: Objection, calls for speculation.

A. It could eventually affect the actual calculation of the input to the formula in terms of the artificial inflation amount, but it does not change the formula, itself. The formula remains valid even if these things change over the course of the class period.

Q. When I asked you to describe

42 (Pages 162 - 165)

Page 166

MATTHEW D. CAIN, Ph.D.
the analysis you performed in connection with your Comcast analysis, you described an assessment of the economic coherence between the alleged misstatements and the corrective disclosures.

A.   A-hum.

Q.   Can you describe for me what you mean by "economic coherence"?

A.   What I mean is that there is an allegation that there were certain misrepresentations about certain aspects of the business that caused the stock price to be inflated and that those same misrepresentations were subsequently corrected through these alleged revelations of the relevant truth, so that there's an alleged connection at the -- between the front end and the back end.

Q.   Did you do any work to actually assess whether there was a connection between the front end and back end?

A.   Not beyond relying on the

Page 167

MATTHEW D. CAIN, Ph.D.
allegations in the Complaint.

Q.   Okay. How much time did you dedicate to your Comcast analysis, in particular, when you prepared your report?

A.   It's not something that I tracked specifically, limited only to Section VI of my report.

Q.   Have you been involved in any securities case in which you did not believe the damages could be measured on a class-wide basis?

MR. GERSON:  Objection.

A.   Well, you mean -- yes, I have.

Q.   What matter are you thinking of, or matters?

A.   As I mentioned this morning, I have looked into some companies in which I concluded that the stock price did not trade efficiently during the class period and as a result, that would -- that would also indicate that the out-of-pocket damages methodology, which is based on the theory of reliance and the stock

Page 168

MATTHEW D. CAIN, Ph.D.
price reflecting the value impact of misstatements, that that methodology would not be applicable in those other matters.

Q.   Can you describe what the out-of-pocket methodology is?

A.   Yes. So this is described in paragraph 100 of my report.

In essence, it is -- it looks at investors' purchases and sales of common stock, the timing of those transactions, and it calculates damages as the difference between the amount of artificial inflation at the time of purchase versus at the time of sale, subject to additional caps or modifications.

Q.   And in paragraph 102 there's a reference to an artificial inflation ribbon. Can you describe what that means?

A.   Yes. That's the dollar or percentage amount by which the stock price was ultimately inflated on each day during the class period.

Page 169

MATTHEW D. CAIN, Ph.D.
So, for example, an analysis could conclude that throughout a given class period the stock price was trading at $5 more than it would have if the truth had been disclosed as of the start of the class period, and it wasn't until the end of that class period that a corrective disclosures was made that caused that amount of artificial inflation to dissipate by virtue of the stock price falling by that $5 inflation amount. And that's a hypothetical illustration.

Q.   In that paragraph 102 you say that you've "not been asked to perform a loss causation analysis at this time and such analysis often incorporates information produced during discovery."

What sort of information that might be produced in discovery informs your analysis or your construction of an artificial inflation ribbon?

MR. GERSON:  Objection, form.

A.   It depends on the given case,

43 (Pages 166 - 169)

Page 170

MATTHEW D. CAIN, Ph.D.

but I have relied on internal discovery documents, for example, to look at earnings announcements. When companies disclose a portion of relevant truth via a corrective disclosure in an earnings announcement, and identifying what portion of the stock price decline was caused by the corrective information, that's tied to the fraud versus what portion of the stock price decline was caused by non-fraud related confounding information.

So that would be, like, one example of ways in which the internal discovery documents can be useful in that analysis and that could include emails, presentations, board meeting minutes, models, Excel files. Those types of internal pieces of evidence can sometimes be useful in a loss causation analysis.

Q. You reference "constant dollar inflation" in paragraph 110.

A. Yes.

Q. Can you explain what that

Page 171

MATTHEW D. CAIN, Ph.D.

means?

A. So what that refers to is when constructing an artificial inflation ribbon in a loss causation and damages analysis, measuring artificial inflation that is dissipated on corrective disclosures or revelations of the relevant truth, looking at the stock price drop on those dates and then backcasting that amount, that dollar amount of that drop back to the start of the class period.

So let's say, back to my previous hypothetical, if the stock price drops by $5 at the end of the class period when a corrective disclosure is made, the constant dollar methodology would backcast that $5 amount of artificial inflation back to either the start of the class period or some prior portion of the class period, subject to further adjustments.

Q. And backcasting, as you used in that sentence, what does that mean?

Page 172

MATTHEW D. CAIN, Ph.D.

A. That refers to the fact that we're talking about measuring artificial inflation based on the stock price drops towards the end of the class period from a corrective disclosure, for example. And then when I say backcast, I mean that I am measuring artificial inflation over the course of the class period by taking that $5 drop and assigning it as artificial inflation that was present in the stock price on each previous day back in time all the way, potentially back to the start of the class period.

Q. And so doing so assumes that inflation was constant throughout the class period; is that right?

A. So that's what we're talking about is the constant dollar, that's why it's called constant dollar, is you're assuming or concluding that the amount of artificial inflation was constant. And like I said before, there's other -- there's adjustments that can be made even under the constant dollar inflation

Page 173

MATTHEW D. CAIN, Ph.D.

methodology, such as inflation-creating events during the class period or other changes. But at a high level, that's correct, we're talking about a conclusion that the amount of inflation was constant on a dollar basis over some period of time.

Q. And do you agree that a back end stock price decline is not always a reflection on the amount of inflation as a result of the front end alleged misstatements?

MR. GERSON: Objection.

A. Based on the work that I've done in cases, if I am assessing artificial inflation, often that's the starting point in terms of measuring the stock price drop after controlling for market and industry movements at the back end, but then making adjustments, if needed, for confounding information, non-fraud information. But if after those adjustments we look at that dollar drop and I conclude that that is driven by the

44 (Pages 170 - 173)

Page 174

MATTHEW D. CAIN, Ph.D.
fraud and that constant dollar
backcasting methodology is appropriate,
then that would represent the amount of
inflation back to the start of the class
period in the hypothetical.
Q.  Do you know whether it would
be appropriate to use the constant dollar
inflation approach in this case?
A.  I've not attempted to answer
that question at this point.
Q.  In paragraph 111 you talk
about constant percentage inflation. Can
you describe that damages methodology?
A.  Yes. So it's the same as the
-- what I described for constant dollar,
except that when looking at the stock
price decline at the back end, instead of
measuring it in terms of the dollar drop,
it's measuring it based on the percentage
drop.
So instead of, say, the stock
price dropping by $5, if that represents
a decline of 15%, then the backcasting
concludes that on each day during the

Page 175

MATTHEW D. CAIN, Ph.D.
class period the stock price was inflated
by 15%.
Q.  And under what circumstances
is that an appropriate measure of
damages?
A.  That -- the entirety of the
analysis always depends on a very careful
consideration of the facts and
circumstances of each individual case.
So it's difficult to come up with a
universal answer, but I have employed
constant percentage backcasting in cases
where the value of a company was
fluctuating over time, and so the amount
of inflation was fluctuating in
proportion to the value because the
misrepresentations pertained to some
portion of the business.
So let's say they pertain to
50%, like, one business segment that
represented 50% of the company, even
though the value of that segment in the
company may fluctuate over time, the
constant percentage methodology allows

Page 176

MATTHEW D. CAIN, Ph.D.
for artificial inflation to fluctuate
based on fluctuations in the value of
that business segment and business over
time.
Q.  And have you assessed at this
point whether the constant inflation --
I'm sorry -- constant percentage
inflation is an appropriate method to use
in this case?
A.  I've not attempted to form an
opinion on that question at this point in
time.
Q.  Okay. And then in 112 you talk
about, "In other instances artificial
inflation may have varied and could
evolve throughout the class period based
on the timing of specific information or
statements."
If that -- if you assume that
to be the case, would that impact the
ability to calculate damages on a
class-wide basis?
MR. GERSON:  Objection.
A.  So with this scenario, as in

Page 177

MATTHEW D. CAIN, Ph.D.
the other scenarios, this relates to the
calculation of the exact amount of
artificial inflation on each day, which
is an input to this formula. And so the
formula, itself, the out-of-pocket
methodology, itself, is valid because it
is the same formula that's applied to
every class member regardless of the
specific calculation of the input or the
specific amount of inflation that was
varying over the course of the class
period. So the methodology, itself,
remains valid in any of these scenarios.
Q.  Well, have you assessed
whether the methodology described in
paragraph 112 is appropriate for use in
this case?
A.  At this point in time I've not
attempted to form any opinions on that
question.
Q.  Do you agree that --
withdrawn.
If Plaintiffs' theory involves
materialization of a concealed risk, does

45 (Pages 174 - 177)

Page 178

MATTHEW D. CAIN, Ph.D.
that impact the way in which you calculate damages?

MR. GERSON: Objection.

A. Like I said previously, every time that I conduct a loss causation and damages analysis, I consider the totality of the allegations, the information environment, and the calculations of artificial inflation.

So all of the allegations form the -- in every case the allegations form the starting point for how I assess damages, and that would include whether there are alleged misstatements or alleged omissions, alleged materializations of concealed risks, things like that, but all of those form the starting point and the basis for a damages calculation.

Q. Did assessing whether this case involves a materialization of a concealed risk impact in any way the opinions you've offered in your report?

A. Well, it's, again, included as

Page 179

MATTHEW D. CAIN, Ph.D.
part of the theory of liability, but I've summarized in my report and also just point back to the allegations of the complaint. So it's something, in terms of the Complaint, that I considered in concluding that the out-of-pocket damages methodology is a standard and reasonable methodology to employ in this case.

Q. The fact that a risk had previously been concealed, once it is -- I'll withdraw the question and state it a different way.

Are you aware that the last alleged corrective disclosure in this case is the announcement of the SEC's lawsuit against Virtu?

A. The filed charges on September 12th, 2023; is that what you're referring to?

Q. That is.

A. Yes.

Q. And by then you'd agree that Virtu had disclosed the risk of that lawsuit?

Page 180

MATTHEW D. CAIN, Ph.D.
MR. GERSON: Objection.

A. That's not a question I've attempted to form an opinion on at this point in time.

Q. How does your damages methodology account for the fact that the market could have overreacted to the fact of the SEC charges, separate and aside from any revelation of an alleged fraud?

MR. GERSON: Objection.

A. So ultimately that question relates to what is the amount of artificial inflation present in the stock price on any given day during the class period and it's also a question of whether the stock price declines on the alleged revelations of the relevant truth are connected to the fraud or are they overreactions, are they driven by confounding information or non-fraud related information?

So those questions all relate to the precise amount of artificial inflation that ultimately feeds into the

Page 181

MATTHEW D. CAIN, Ph.D.
formula as an input, but that does not affect the validity in any way of the methodology, itself. It's really just a question of the exact calculation of artificial inflation at the loss causation stage of a case.

Q. In paragraph 8 you describe I think what you were just referring to, which is the impact of confounding information on Virtu's stock price.

A. What paragraph?

MR. GERSON: Paragraph 8?

MS. BENEDON: Paragraph 108. Sorry about that.

A. I see that, yes.

Q. In this paragraph you explain that if you were to conclude there was confounding information that impacted the stock price you would "determine based on various accepted methodologies such as valuation analysis, analyst reports, principles of finance and valuation analysis, and peer-reviewed academic research."

46 (Pages 178 - 181)

Page 182

MATTHEW D. CAIN, Ph.D.

What is valuation analysis?

A.    So that would include things like discounted cash flow analysis, comparable companies' trading multiples analysis in terms of assessing the value impact on a company or its stock price of certain types of information.

MS. BENEDON:  I have nothing further at this time. Thank you, Dr. Cain.

MR. GERSON:  Can we just take two minutes?

VIDEOGRAPHER:  Off the record at 14:00. It is the end of Media Unit 4.

(Recess is taken.)

VIDEOGRAPHER:  On the record at 14:03. This is the start of Media Unit 5.

MR. GERSON:  Dr. Cain, we have no questions at this time.

We'll mark the deposition closed.

VIDEOGRAPHER:  We are off the

Page 183

MATTHEW D. CAIN, Ph.D.

record at 14:04 p.m. and this concludes today's testimony given by Matthew Cain.

The total number of media used was 5 and will be retained by Veritext.

(The proceedings were adjourned at 2:04 p.m.)

Page 184

CERTIFICATE

I, MAUREEN M. RATTO, a Registered Professional Reporter, do hereby certify that prior to the commencement of the examination, MATTHEW D. CAIN, Ph.D. was sworn by me to testify the truth, the whole truth and nothing but the truth.

I DO FURTHER CERTIFY that the foregoing is a true and accurate transcript of the proceedings as taken stenographically by and before me at the time, place and on the date hereinbefore set forth.

I DO FURTHER CERTIFY that I am neither a relative nor employee nor attorney nor counsel of any of the parties to this action, and that I am neither a relative nor employee of such attorney or counsel, and that I am not financially interested in this action.

_Maureen Ratto_
_____
MAUREEN M. RATTO, RPR
License No. 817125

Page 185

INDEX

WITNESS:  MATTHEW D. CAIN Ph.D.  5
DIRECT EXAMINATION BY          5
MS. BENEDON

EXHIBITS

Cain Exhibit 1, Expert Report of   11
Matthew D. Cain Ph.D. dated
October 22, 2025
Cain Exhibit 2, Expert Report of   38
Matthew D. Cain, Ph.D. in re:
SolarEdge Technologies, dated
October 17, 2025
Cain Exhibit 3, Virtu Earnings   74
Call Transcript dated September
2018
Cain Exhibit 4, Consolidated      89
Complaint in re: Virtu
Financial, Inc. Securities
Litigation
Cain Exhibit 5, excerpt from      141
Reference Manual on Scientific
Evidence

47 (Pages 182 - 185)

Page 186

J U R A T

I do hereby certify that I have read the foregoing transcript of my deposition.

_____

MATTHEW D. CAIN, Ph.D.

Sworn and subscribed before me
this _____ day of
_____, 2025

_____

a Notary Public of
the State of _____

Page 187

ERRATA SHEET
I WISH TO MAKE THE FOLLOWING CHANGES:
Page  Line    From        To

48 (Pages 186 - 187)

[& - 5]                                                                           Page 1

| **&** | | | |
|---|---|---|---|
| **&** 1:13 2:4,14 3:23 4:22 26:23 34:22 35:8 | **111** 174:12 **112** 176:14 177:17 **11747** 2:6 **11:37** 98:7 **11:49** 98:11 | 65:4 66:3 117:9,13 **2001** 16:23 **2003** 14:24 16:24 | 49:17,23 51:25 70:18 71:13 74:20 75:2 84:23 93:23 98:12 105:6 158:24 185:14 |

**0**

**02** 140:6,8
**03770** 1:7 3:21

**1**

**1** 3:13 11:3,9
38:25 58:16
185:7
**1,100** 35:15
**10** 19:18 27:6
37:11 48:3
65:3,19 66:3
90:2
**100** 18:22
19:12 20:24
21:15 123:13
147:6 158:15
168:9
**10019** 1:15
2:16 3:25
**102** 168:19
169:15
**108** 181:14
**10:37** 58:15
**10:51** 58:19
**11** 185:7
**110** 170:23

**125** 79:17 80:7
**1285** 1:14 2:15
3:24
**12:57** 158:23
**12th** 179:19
**13** 19:25
**13:32** 159:3
**141** 185:21
**14:00** 182:15
**14:03** 182:19
**14:04** 183:2
**15** 27:6 28:5
31:12,17,22
174:24 175:3
**17** 38:20
185:13
**17425** 184:23
**17th** 39:5
**19** 38:13
**1:23** 1:7 3:21
**1st** 48:4

**2**

**2** 38:17,24
58:20 98:8
185:10
**20** 28:5 31:12
31:18,23 37:11

**2007** 9:24
**2014** 11:21
**2018** 11:21
74:22 75:4
185:16
**2019** 24:21,25
25:19,25 48:4
**2021** 14:24
48:2
**2023** 179:19
**2025** 1:11 3:3
11:5,12 19:13
26:8 28:18
29:15 38:20
39:5 185:9,13
186:11
**21** 126:19
**22** 11:5 185:9
**22nd** 11:12
30:16
**250** 141:24
**26** 131:8 136:2
136:17,21
**29** 101:11
**2:04** 183:9

**3**

**3** 41:17 46:17
46:25 47:3,25

**3.d** 65:12
**30th** 48:2
**38** 185:10

**4**

**4** 46:17 89:12
89:18 105:6
140:7,7 159:4
182:16 185:17
**4.31** 133:16
**40** 150:12
**4:30** 131:16

**5**

**5** 44:8,17,19
47:9,14,18
49:4 76:25
84:22 85:7
101:21 104:2
105:5,7 118:25
121:4 125:15
125:17 127:9
130:14 133:23
135:8,19
137:24 138:5
138:20 141:3,8
153:25 154:7
154:13 155:10
155:15 156:8

**[5 - actually]**                                                           Page 2

157:17 169:5
169:12 171:16
171:19 172:10
174:23 182:20
183:6 185:2,3
185:21

**50**  20:23 121:7
121:13 146:24
147:15,19
148:23 149:6
152:5,8 175:21
175:22

**58**  2:5

**6**

**6**  48:5 76:25
77:5 85:8,17
105:7 136:14
139:23

**61.4**  133:13

**61.54**  134:11

**64**  126:17
127:5

**66**  128:5

**7**

**7**  74:19 105:7
136:2

**74**  185:14

**7772755**  1:22

**78**  132:6

**8**

**8**  48:6 101:13
181:8,13

**80**  131:8
133:11 135:4

**817125**  184:25

**85**  21:24 22:2

**89**  185:17

**9**

**9**  1:11

**90**  19:17
140:13 146:21

**95**  133:15,18,20
134:4,12,17
146:16 147:13
150:10

**95th**  140:15

**98**  140:9

**99**  135:5
140:16 146:21

**9th**  3:3

**a**

**a.m.**  1:12 3:3

**a4**  28:15

**a7**  23:17 59:4

**abacus**  82:9,10

**abenedon**  2:18

**ability**  82:8
90:7 94:18
161:7 165:14
176:22

**able**  21:19 23:4
23:24 32:3
57:12 60:12
62:2 67:13
138:24,25

139:4,8,8,10,11

**abnormal**
126:4 127:10
127:25 128:6

**absence**  33:18

**academia**
19:15 147:3

**academic**  10:14
19:19 43:21,21
91:4 94:7
95:15 96:6,22
97:20,25 98:24
102:22 109:11
116:7 130:17
145:15 151:23
152:15 159:9
161:23 181:24

**academics**
111:5

**accept**  35:5

**accepted**
181:21

**accepting**  57:9

**access**  64:7
86:6,12

**accessed**  88:12

**accessibility**
64:14

**account**  180:7

**accounting**
13:10 19:24

**accurate**  7:6
12:5 49:14
184:10

**accused**  18:9

**achieve**  9:20

**acknowledge**
97:2

**acquisitions**
8:3 15:15 89:5
89:7

**act**  65:3

**action**  4:7
22:21 25:3,18
29:20 30:10
112:10 113:4
164:14 184:18
184:21

**actionable**
50:21,22 73:20
73:23

**actions**  20:20
21:19 22:7,16
23:14,16 25:12
26:4 54:19
61:19 65:20
164:8

**active**  27:18,21

**actual**  123:4
127:15 157:25
165:19

**actually**  18:23
47:3 60:4
87:22 88:11
115:10 121:6
123:17 124:5
136:3 148:9,13
166:22

**adding** 155:23

**additional** 10:4
28:13 31:10
50:18 52:10,12
52:14,17,21
68:23 78:8
82:17 104:8,13
104:19 105:6
118:16 155:23
168:17

**address** 60:5

**adjourned**
183:9

**adjust** 125:7

**adjustment**
126:22

**adjustments**
171:23 172:24
173:21,24

**administer** 4:5

**administration**
12:11,15,22

**administrations**
11:24 13:6,14

**admission**
112:6,18

**advisor** 10:10
13:2

**affect** 165:18
181:3

**affected** 12:24
53:16

**affects** 94:10
128:21

**affiliations**
4:14

**affirmative**
149:18

**afield** 124:10

**aggregate**
159:14

**ago** 85:9
108:13 114:21

**agree** 3:11
12:13 27:7,16
39:25 41:6,18
54:4,15,21
55:6,15 56:2
56:12 67:15
72:10 73:24
77:16 79:20
80:6 84:5
86:25 93:2,4
108:7 110:20
111:18 117:21
124:16 125:5
137:2,22 138:4
142:9,19 143:4
146:16 149:21
150:17 173:9
177:22 179:23

**agreement**
36:14 159:19

**agreements**
30:6

**algorithmic**
63:7

**alison** 2:17
4:17 5:15

**allegation**
66:25 112:11
121:9,25
122:22 163:17
166:11

**allegations** 9:8
29:23 40:21,22
43:7,8 48:15
50:13,16 51:8
63:25 65:5
66:11,15 67:5
69:16 70:3
88:5,9 89:4
162:8,18
163:13 167:2
178:8,11,12
179:4

**allege** 48:11
65:2 86:15
88:11

**alleged** 24:9
30:9 50:22
52:24 53:16
58:24 60:10
66:18,22,22
68:20 69:12
70:11,15,18
71:25 73:19
83:21 84:24
85:19 99:7
113:14,17
132:8 156:15

157:12,19
158:6 160:18
160:24 162:7
162:10,14,21
163:7,11,15,21
164:15 166:5
166:16,18
173:12 178:15
178:16,16
179:15 180:10
180:18

**allegedly** 29:24
64:10 67:24
69:13,17,25
70:3,6

**alleges** 30:11
64:4 76:3 86:3
87:16,18,21
113:5

**alleging** 68:5
164:14

**allowing** 82:11

**allows** 175:25

**alongside** 38:2

**alright** 11:8

**alternative**
109:17

**alternatively**
109:17

**alters** 50:20,21

**americas** 1:15
2:15 3:25

**amount** 45:17
67:9,23 127:19

**[amount - approximately]**                                                  Page 4

138:6,11 160:5
160:11,22
164:2,3 165:21
168:14,23
169:10,13
171:11,12,19
172:21 173:6
173:11 174:4
175:15 177:3
177:11 180:13
180:24
**amounts** 165:3
**analyses** 40:13
48:17 73:8
78:8 82:18
90:25 103:12
**analysis** 8:5
37:3 41:24
42:3 43:12,14
44:8,20 49:3
57:18 59:15
66:8 69:2 71:8
71:10,20 74:16
77:21 79:9
84:11,17 93:9
103:5 105:21
118:25 125:16
125:19 130:9
136:8 138:17
138:20 145:16
145:17 148:19
157:17 162:2
166:2,3 167:4
169:2,17,18,22

170:17,21
171:6 175:8
178:7 181:22
181:24 182:2,4
182:6
**analyst** 14:20
15:2,5 16:23
43:15 73:7
91:3 92:8,11
92:13 93:2,21
93:23 94:16
96:10 106:12
117:6,13
134:24 145:14
181:22
**analysts** 9:4
90:22 91:8,21
92:5,17,23
93:4,10,18
94:3,8 95:2,12
96:8,17,25
116:11,23
117:9,13,18
119:24
**analytics** 19:23
**analyze** 156:23
**analyzed** 41:14
**analyzing** 8:25
126:13
**announce** 121:6
**announced**
118:15 119:5

**announcement**
104:18 119:2
129:6,8,16
131:19,23
134:23 159:7
170:7 179:16
**announcements**
44:10,11 45:3
45:16,19 47:15
126:2,3 129:11
130:11 132:7
133:6 136:9
159:11 170:4
**announces**
125:3
**annual** 27:13
47:12 49:21
81:16,18
**anomalies**
109:18
**answer** 16:22
19:8 25:20
43:10 46:5,7
55:4 64:24
72:15 85:4
87:8 117:5
141:21 149:18
154:16 155:13
174:10 175:12
**answered**
80:12
**answering**
104:10

**answers** 90:22
**anticipate** 29:8
52:9 56:20
**anticipating**
31:15
**apologies** 26:14
**appeals** 27:23
**appearance**
4:11
**appearances**
4:13
**appendix** 42:15
42:20 50:7
**applicable**
65:21 168:4
**applied** 177:8
**appreciate**
77:12
**approach**
103:20 174:9
**appropriate**
40:24 130:21
131:13 155:11
156:9 174:3,8
175:5 176:9
177:17
**appropriately**
131:11
**approval**
123:10,13,19
124:3 125:5,9
131:4
**approximately**
10:20 22:2

140:10
**approximating**
  21:3
**april**  24:21,24
  25:18,24 36:17
  48:2
**arbitrage**  111:6
  111:14
**arbitration**
  29:19
**area**  7:13,18
  8:18
**areas**  7:21
**arises**  76:19
**arkansas**  76:11
  80:22 152:18
**armour**  33:6
**article**  83:3,12
**articles**  132:10
  132:12 133:3
**articulate**
  151:24
**artifical**  67:24
**artificial**  67:9
  67:19 68:19
  69:4 103:7
  146:11 163:18
  163:19,24
  164:16,16,23
  165:20 168:15
  168:20 169:10
  169:23 171:4,6
  171:20 172:3,8
  172:11,22

173:17 176:2
176:15 177:4
178:10 180:14
180:24 181:6
**artificially**
  65:10 67:2
  162:19
**ascertain**
  106:24 145:5
**aside**  19:4 22:6
  42:13 71:24
  75:17 87:17
  123:16 143:14
  180:9
**asked**  21:9
  29:11 51:15,19
  52:11,14 77:23
  78:9 80:11
  84:20 88:21
  162:13 165:25
  169:16
**asking**  17:23
  41:10 42:8
  44:20 50:20
  62:12 71:25
  72:24 73:14
  80:4,25 81:2
  99:19 101:22
  102:16 104:10
  105:19 138:24
  148:7,13 151:3
  155:9,25
  156:24 157:9

**aspect**  77:10
  99:14
**aspects**  80:16
  166:12
**asr**  47:25
**assess**  23:25
  27:21 48:22
  49:10 52:24
  53:3 67:18
  68:10,12 82:18
  84:14 87:10
  90:13 91:6
  93:5 95:20
  100:10 101:5
  105:22 120:6
  127:24 156:12
  157:10,18
  166:22 178:13
**assessed**  41:14
  68:15 100:21
  127:9 157:3,8
  176:6 177:15
**assessing**  8:13
  50:15 53:15
  87:22 148:21
  162:2 173:16
  178:21 182:6
**assessment**
  53:9,12 71:2
  95:12 124:23
  125:17 160:24
  166:4
**assessments**
  8:24 73:18

116:15
**assets**  82:8,14
**assigning**
  172:10
**assignment**
  51:11,12
  100:19
**assist**  36:25
**assistance**
  36:23 37:13
**assisted**  15:12
  35:25 36:10,11
  39:19,24 83:11
  83:18
**assisting**  15:20
  36:2,6,24
**assists**  20:12
**associated**
  156:22
**assume**  156:21
  176:20
**assumes**  172:15
**assuming**  142:6
  172:21
**assumptions**
  150:18
**asterisk**  140:12
**asterisks**
  140:15,16
**attach**  34:9,11
**attempt**  149:17
  154:2
**attempted**  34:9
  53:3,11 68:9

**[attempted - benedon]**                                    Page 6

79:25 95:8
154:15 156:7
156:23 174:10
176:11 177:20
180:4
**attempting**
55:18 56:4,21
81:12 86:2
88:8 91:6
115:21 133:5
137:7
**attention**
141:20
**attorney**  4:16
184:17,20
**attributable**
127:21
**audio**  3:9
**auditor**  146:7
**author**  83:3
**authorized**  4:4
**automatic**  47:4
**available**  93:24
101:16 107:20
109:3 110:2,14
110:22 114:5
**avenue**  1:14
2:15 3:24
**average**  159:12
**aware**  53:19
63:9,13 70:10
76:16 83:20
89:3 152:10,19
156:2 159:15

159:17 160:5
179:14
**awareness**  63:2
**axelson**  83:4

**b**

**b**  42:15,20 50:7
65:3,19 66:3
185:6
**back**  14:24
27:25 50:4
59:10 63:3
66:16 69:19
70:8 112:22
122:8 142:20
149:10 166:19
166:23 171:12
171:14,20
172:12,13
173:9,20 174:5
174:18 179:4
**backcast**
171:19 172:7
**backcasting**
171:11,24
174:3,24
175:13
**background**
14:11
**ballpark**  18:22
19:11 20:14
21:18,24
**bank**  15:17,21
16:8 23:10,17

24:19 61:6,16
**bar**  100:24
101:4,9 102:18
**barriers**  16:11
16:13,18,21
17:4 87:5
**base**  135:19
**based**  35:6
62:15 65:4
67:4,8 70:25
71:10 100:23
120:3 124:24
135:21 144:15
162:22 165:3
167:24 172:4
173:15 174:20
176:3,17
181:20
**baseline**  129:13
133:9 134:2,9
134:22
**basing**  135:7
**basis**  13:4
55:12 65:15
103:8 148:10
161:8 162:4
164:19,24
165:15 167:13
173:7 176:23
178:19
**bath**  34:22 35:8
**bed**  34:21 35:7
**began**  145:7

**beginning**  4:15
12:10 85:8
102:5
**begins**  40:20
77:4 101:15,22
108:15
**begun**  53:15
**behalf**  2:3,12
4:18,23
**behavior**  9:11
125:20,21
**believe**  6:25
9:23 12:2,3,8
25:6,11 26:7
26:13 28:12
29:3 30:17,20
31:6,13 32:15
33:5 42:22
48:14 56:10
59:2 61:8
63:11,15,19
67:21 69:15
70:2 75:7,15
78:13 83:9,13
94:3 95:2,23
101:10 110:2
123:12 125:4
144:25 146:5,9
149:3 157:22
164:17 167:12
**benedon**  2:17
4:17,17 5:11
5:15 26:14
38:12 58:12

74:18 85:14
89:10 98:3
158:20 181:14
182:9 185:4
**berkeley**  10:15
**best**  6:25 7:6
19:10 20:17
25:5,13,22
44:21 45:7
82:21 83:17
113:5
**bet**  82:12
**better**  134:5,18
**beyond**  34:22
35:8 45:12
78:7 80:17
81:6 97:11
151:11 152:14
159:13 166:25
**bias**  94:9,15,24
95:12,24 96:16
96:24 97:8,18
**biased**  94:5
95:3,21
**bid**  43:16
**billed**  31:14,18
**billing**  35:13
**billings**  28:3
**binary**  98:18
99:19
**bit**  15:9 29:19
44:4 53:6
110:8 115:4,8

**blank**  38:5
**board**  170:18
**boils**  164:22
**bottom**  23:17
101:13
**break**  38:14
57:3,7 58:9,10
98:5 154:2
158:21
**breakdown**
84:2
**brief**  54:13
**briefing**  53:19
**bright**  147:5
**bureaucratic**
13:25
**business**  77:10
78:24 80:17
90:9 166:13
175:19,21
176:4,4
**buy**  92:15
94:11 95:18
97:16

**c**

**c**  2:1 5:7 184:1
184:1
**cain**  1:10 3:15
5:1,20,22 6:1
7:1 8:1 9:1
10:1 11:1,3,4,9
11:10,11 12:1
13:1 14:1 15:1

16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1,17
38:18,24 39:1
39:4 40:1 41:1
42:1 43:1 44:1
45:1 46:1 47:1
48:1 49:1 50:1
51:1 52:1 53:1
54:1 55:1 56:1
57:1 58:1,21
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1,20 75:1
76:1 77:1 78:1
79:1 80:1 81:1
82:1 83:1 84:1
84:23 85:1
86:1 87:1 88:1
89:1,12,18
90:1 91:1 92:1
93:1 94:1 95:1
96:1 97:1 98:1
99:1 100:1
101:1 102:1
103:1 104:1

105:1 106:1
107:1 108:1
109:1 110:1
111:1 112:1
113:1 114:1
115:1 116:1
117:1 118:1
119:1 120:1
121:1 122:1
123:1 124:1
125:1 126:1
127:1 128:1
129:1 130:1
131:1 132:1
133:1 134:1
135:1 136:1
137:1 138:1
139:1 140:1
141:1,3,7
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1

172:1 173:1
174:1 175:1
176:1 177:1
178:1 179:1
180:1 181:1
182:1,11,21
183:1,4 184:6
185:2,7,8,10,11
185:14,17,21
186:6
**calculate**  161:7
165:15 176:22
178:3
**calculated**  52:5
55:12 65:14
142:6 162:25
164:18
**calculates**  67:8
168:13
**calculating**
42:11
**calculation**
164:3,23,25
165:19 177:3
177:10 178:20
181:5
**calculations**
178:9
**california**
23:10,17 24:19
61:6,17
**call**  5:21 73:6
74:21 75:2,3
75:16,22,25

76:5 90:21
134:24 185:15
**called**  19:22
70:18 172:20
**calls**  64:23
75:14 85:3
92:20 124:8
125:10 144:13
165:16
**cammer**  41:13
43:13 44:8,17
44:19 46:17,18
47:9,13,18
49:4,17 101:7
101:21 104:2
118:25 125:14
125:17 127:9
130:14 135:8
135:19 137:24
138:5,20
153:25 154:7
154:13 155:10
155:15 156:8
157:17
**capable**  42:10
74:2 162:25
164:4
**capital**  15:5
79:17 80:5
**capitalization**
43:17
**caps**  168:17
**caption**  39:2

**car**  121:3,6,9
121:12
**career**  9:15
**careful**  175:8
**carried**  164:4
**carry**  43:12
**carrying**  48:16
157:16
**cars**  121:2
**case**  1:7,22
3:21 5:17 6:12
23:9,18,20
24:2,6 26:6,10
29:9,18 30:23
31:7 32:23
33:6,7 34:2,7
34:21 35:2,18
35:22 39:2
40:17,20,25
43:11 44:3
50:13 51:9
52:10,25 53:20
55:23 56:8,22
56:24 57:15
59:3,8,17 61:6
61:17 63:22
64:21 65:4
66:2 67:16
68:16 69:12,16
69:23 75:25
76:8 83:22
84:16 95:10
96:2 97:14
112:10 113:4

115:12 121:9
132:4 136:5
137:18 146:6,8
146:13 149:25
156:16 157:20
158:7 159:20
161:18 162:4,8
163:7 164:12
165:13 167:11
169:25 174:9
175:10 176:10
176:21 177:18
178:12,22
179:9,16 181:7
**cases**  9:8 20:12
20:22 21:25
22:3,14,15
23:2,8,13 25:9
25:25 27:22,24
28:3,5 31:3
32:17 33:21
41:2,16,20
43:19 55:16,22
55:23 56:3
58:25 59:5
60:14,24 61:9
61:12,25 63:5
68:15 76:23
78:6 81:10,10
82:22,24
100:25 104:15
145:21 146:14
149:12 150:4
150:23 152:18

**[cases - class]**                                                                 Page 9

173:16 175:13
cash  71:8,9,11
  124:25 182:4
categories  8:7
categorized
  73:25
category  70:18
  71:13 132:8
  163:11
causation  58:7
  68:17 169:17
  170:21 171:5
  178:6 181:7
cause  128:10
  130:14
caused  134:6
  134:18 163:18
  164:15 166:13
  169:10 170:9
  170:12
causing  133:14
  134:7
caution  30:3
caveat  128:16
center  140:22
  141:11
central  56:13
  56:17
certain  47:11
  58:4,24 59:17
  64:5 70:10
  73:19 75:8
  76:3,23 89:5
  92:23 93:15

94:20 95:21
99:25 113:24
  118:19 137:14
  163:11 166:11
  166:12 182:8
certainly  20:22
  20:23 21:22
  24:11 39:22
  81:24 91:23,24
  99:14 102:22
  110:6 132:25
certification
  22:5,10,20
  28:18 32:21
  35:5 52:18
  53:25 54:18,23
  54:25 55:10,20
  56:14 57:23
  61:14 78:18
  99:4 103:12,22
  104:5 108:22
  152:21 154:22
  161:21
certifications
  22:18
certified  1:17
certify  34:23
  184:4,9,15
  186:3
challenge  33:19
challenges
  33:13
chance  123:13
  134:4,13,17

142:8
change  12:25
  13:3 165:21,23
changed  14:7
  120:8 165:8
changes  12:21
  97:18 126:5
  155:12 173:4
  187:1
chapter  142:13
  143:11
characterizati...
  40:2
characterize
  138:3
characterized
  74:9
charges  159:7
  159:20 179:18
  180:9
check  45:23
  46:11
chk  3:21
cifu  63:18
circuit  21:2
  152:20
circuit's  76:11
  152:25
circumstance
  111:4
circumstances
  40:18 72:18,20
  74:16 104:12
  116:6 137:7

145:2 155:8
  175:4,10
cite  43:20 108:5
  130:17
cites  143:8
citibank  15:6
citibank's  17:3
claiming  130:2
  132:25
claims  43:8
  65:2 66:2
clarify  18:24
class  20:20
  21:18 22:4,7
  22:10,16,17,19
  22:21 23:14,16
  25:3,12,18
  26:4 28:18
  29:20 30:10,12
  32:21 34:23
  35:2,5 42:11
  50:21,23 51:18
  51:20 52:4,5
  52:18 53:24
  54:17,18,22,24
  55:10,12,20
  56:14 57:23
  60:3 61:14,19
  65:11,15,20
  66:17,18 67:3
  67:14,25 68:24
  69:8,10 78:17
  86:17,21 87:3
  87:12 93:19,25

**[class - comparing]**                                                    Page 10

94:4 99:4
103:12,21
104:5 108:22
112:10 113:3
113:14 133:4
136:4,6 152:21
154:22 156:20
157:23 160:16
161:8,20 162:4
162:19 163:2
164:5,8,14,18
164:25 165:2,9
165:15,24
167:13,21
168:25 169:4,7
169:8 171:13
171:16,21,22
172:5,9,14,17
173:3 174:5
175:2 176:17
176:23 177:9
177:12 180:15
**classes** 55:8
**clear** 17:22
25:15 126:21
155:20
**cleveland** 15:7
19:22
**client** 64:12
77:9 78:23,25
80:9 86:13
90:5
**clients** 79:3
92:25

**close** 36:5
131:10,20,21
**closed** 92:22
131:17,24
182:24
**coherence**
66:21 162:15
166:4,9
**coin** 147:20
**collateralized**
82:10
**colleague** 4:20
4:25
**collective** 153:4
153:12
**colloquial**
132:16
**column** 139:24
**comcast** 161:10
161:15,19
166:3 167:4
**come** 31:11
32:18 34:14
48:9 99:23
100:11,22
123:17 149:14
175:11
**comes** 105:4
120:21 131:16
131:24 134:25
148:12
**comfort** 58:10
**coming** 128:19
132:21 133:3

**commencem...**
184:5
**commencing**
1:12
**comment** 91:9
**commentary**
94:21
**commission**
10:9 32:14
**commissioners**
10:11 13:2
**common** 23:22
51:17,21 52:3
52:6 65:9,16
66:25 67:13
137:24 164:5
165:4 168:12
**communicate**
94:19
**companies**
14:23 15:13,24
16:6 45:5,8
75:13 89:6,8
92:17 94:10,22
96:19 100:5,6
100:15,21
130:15,25
131:3,3,7
132:24 167:19
170:4 182:5
**company** 29:14
44:13,21 45:2
45:10,24 46:19
47:14 48:12

49:10 63:2
71:3,6,12,15
72:3 73:5 86:7
86:10 90:23
92:6 93:25
95:13 97:24
104:21 107:8
112:9 116:16
116:23 118:4
120:14,24,25
121:10 122:23
123:9,11
124:17,19
125:3,9 130:12
130:23 145:13
148:4 175:14
175:22,24
182:7
**company's**
47:21 48:10
51:17 64:12,15
65:9 70:25
72:5,11 93:6
128:8 130:24
159:5
**comparable**
182:5
**compare** 41:4
125:19 148:8
**compared**
47:10 127:14
128:7 129:17
**comparing**
82:3 129:5

148:5
**comparison**
126:8
**compensated**
35:10,14
**compensation**
14:8 35:16,20
**competing**
150:21
**complaint** 6:12
34:10,12 40:21
43:5 49:25
50:5 51:2 67:6
69:20,21 70:8
70:12 75:9,18
76:3 85:23
86:3,23,24
87:15,16,18,21
88:5,9,17 89:4
89:9,11,13,19
89:22 130:23
162:5 163:9,17
167:2 179:5,6
185:18
**complete**
116:20
**completely**
40:13,16 130:4
**complex** 106:8
116:9
**component**
128:23 152:25
**concealed**
69:25 177:25

178:17,23
179:11
**concede** 57:23
**conceded** 58:3
58:23 60:8
**conceding**
59:15
**concept** 76:17
115:6,8
**concepts**
112:16 146:22
**concern** 91:9
91:16
**concerned**
90:14
**concerns** 77:12
90:6 137:16
**concessions**
58:5
**conclude** 45:6
120:7 169:3
173:25 181:18
**concluded**
167:20
**concludes**
73:22 174:25
183:3
**concluding**
172:21 179:7
**conclusion**
64:24 85:4
100:12,22
135:7,19 173:5

**conduct** 8:25
9:12 40:13
53:12 68:25
74:16 78:9
93:8 103:11
126:3 178:6
**conducted**
41:24 42:3
49:2 57:18
71:21 84:11
125:16,18
127:9
**conducting**
47:18 126:7
**conferences**
92:21
**confidential**
32:10 88:12
90:4,5
**confidentiality**
23:7 30:5
**confirm** 139:4
139:11
**confounding**
170:12 173:22
180:21 181:10
181:19
**confusing**
143:8
**conjunction**
42:23
**connected**
180:19

**connection**
42:20 46:21
48:4 55:19
59:19,23 66:21
125:16 156:18
159:24 162:15
166:2,18,23
**consider** 7:12
7:18 33:23
34:6 47:23
50:18 52:12
68:20 178:7
**consideration**
40:23 51:8
67:5 76:22
162:13,23
175:9
**considered**
42:16 47:25
48:3 59:25
101:12,14
130:8 160:16
179:6
**considering**
44:8 50:16
88:4 163:16
**consistent**
57:14 127:7
152:4,7
**consolidated**
89:12,19
185:17
**constant**
170:22 171:18

**[constant - cover]** Page 12

172:16,19,20
172:22,25
173:6 174:2,8
174:13,16
175:13,25
176:7,8
**construct** 68:18
**constructing**
171:4
**construction**
169:22
**consult** 11:17
**consulting**
10:19 19:18,21
20:11
**consumer**
160:2,4
**consuming**
54:6
**contacted** 26:5
26:9
**contain** 94:13
125:22
**contained**
52:22 81:7
**containing** 64:7
**contains** 85:24
**contemporan...**
126:15
**contents** 41:5
141:12
**context** 22:22
24:13 44:22
73:18 88:7

101:22 118:17
133:21 146:23
**contingent**
35:21
**continual**
106:22 118:10
119:14
**continually**
148:11
**continue** 3:10
79:2
**continues**
105:9
**continuing**
118:13
**continuous**
99:12
**continuously**
148:11
**continuum**
147:4,6,9
**contrary** 143:9
**contrast** 81:22
**control** 137:8
155:23
**controlling**
126:6,14
153:14 173:19
**controls** 86:6
137:10
**conversation**
62:6
**conversations**
3:7 62:16

92:18
**corporate** 8:3
15:16
**correct** 12:4,12
13:24 17:15,16
17:20,21 20:16
25:6 39:12
41:8 60:5
71:18 76:8,20
82:24 87:5,24
93:12 96:3
107:15 108:5
108:17 109:20
112:19 113:3
113:25 114:7
124:20 136:18
136:21 139:12
142:7,21
143:23 150:3
150:13 151:15
152:11,22
153:13 161:21
173:5
**corrected**
112:14 113:9
113:12 118:20
166:16
**corrections** 7:9
**corrective**
59:21 60:4
69:5 113:17
157:20 158:6
163:21 166:6
169:9 170:6,9

171:7,17 172:6
179:15
**correctly** 77:14
**corresponded**
48:6
**corresponds**
103:4
**counsel** 3:15
4:12 5:4 6:13
6:16,16,23
26:11 62:9,16
85:10 184:17
184:20
**couple** 21:13
**course** 11:18,25
81:4 163:21
164:24 165:8
165:24 172:9
177:12
**court** 1:1,17
3:19 4:2 5:2
33:16,22 34:2
34:18 43:24
73:21 76:13
78:4,5 82:15
151:7,12
161:18
**court's** 56:8
76:7
**courts** 34:15
151:24
**cover** 11:10
92:6

[coverage - data]                                                    Page 13

| | | | |
|---|---|---|---|
| **coverage** 91:4 | 13:1 14:1 15:1 | 108:1 109:1 | 176:1 177:1 |
| 93:23 94:9,22 | 16:1 17:1 18:1 | 110:1 111:1 | 178:1 179:1 |
| 95:9 97:4 | 19:1 20:1 21:1 | 112:1 113:1 | 180:1 181:1 |
| 106:13 134:25 | 22:1 23:1 24:1 | 114:1 115:1 | 182:1 183:1 |
| 145:15 | 25:1 26:1 27:1 | 116:1 117:1 | 184:6 185:1,2 |
| **covered** 93:18 | 28:1 29:1 30:1 | 118:1 119:1 | 185:8,11 186:6 |
| 94:3,4 95:2 | 31:1 32:1 33:1 | 120:1 121:1 | **daily** 13:4 |
| **covers** 42:22 | 34:1 35:1 36:1 | 122:1 123:1 | 103:4,8 127:14 |
| **created** 51:20 | 37:1 38:1,18 | 124:1 125:1 | 129:17 133:23 |
| **creating** 173:2 | 39:1,4 40:1 | 126:1 127:1 | 148:10 164:24 |
| **credentials** | 41:1 42:1 43:1 | 128:1 129:1 | **damages** 30:9 |
| 11:18 | 44:1 45:1 46:1 | 130:1 131:1 | 40:24 41:15,25 |
| **credit** 33:17 | 47:1 48:1 49:1 | 132:1 133:1 | 42:4,10,11 |
| **credited** 34:23 | 50:1 51:1 52:1 | 134:1 135:1 | 50:17,24 51:19 |
| **critical** 97:22 | 53:1 54:1 55:1 | 136:1 137:1 | 52:5,7 55:11 |
| **criticized** 33:16 | 56:1 57:1 58:1 | 138:1 139:1 | 58:7 65:14,18 |
| 34:18 | 59:1 60:1 61:1 | 140:1 141:1 | 67:7,8 68:18 |
| **currently** 28:11 | 62:1 63:1 64:1 | 142:1 143:1 | 161:7 162:3,25 |
| **customer** 64:7 | 65:1 66:1 67:1 | 144:1 145:1 | 164:18 165:15 |
| **customers** | 68:1 69:1 70:1 | 146:1 147:1 | 167:12,24 |
| 77:12 | 71:1 72:1 73:1 | 148:1 149:1 | 168:13 171:5 |
| **cut** 48:19 | 74:1 75:1 76:1 | 150:1 151:1 | 174:14 175:6 |
| **cutoff** 34:4 | 77:1 78:1 79:1 | 152:1 153:1 | 176:22 178:3,7 |
| 147:5 | 80:1 81:1 82:1 | 154:1 155:1 | 178:14,20 |
| **cv** 1:7 3:21 | 83:1 84:1 85:1 | 156:1 157:1 | 179:7 180:6 |
| 10:22 11:17 | 86:1 87:1 88:1 | 158:1 159:1 | **dame** 10:7 |
| 13:15 15:5 | 89:1 90:1 91:1 | 160:1 161:1 | **dangdang** |
| 23:11 28:15 | 92:1 93:1 94:1 | 162:1 163:1 | 29:14 |
| **d** | 95:1 96:1 97:1 | 164:1 165:1 | **data** 37:3 40:14 |
| | 98:1 99:1 | 166:1 167:1 | 43:14,17,18 |
| **d** 1:10 2:7 3:15 | 100:1 101:1 | 168:1 169:1 | 64:13,14 73:9 |
| 5:1,7 6:1 7:1 | 102:1 103:1 | 170:1 171:1 | 99:12,15,16 |
| 8:1 9:1 10:1 | 104:1 105:1 | 172:1 173:1 | 142:17,24 |
| 11:1,4,11 12:1 | 106:1 107:1 | 174:1 175:1 | 143:3 156:22 |

**[data - deloitte]** Page 14

157:8,10,24,25
**database** 17:9
   64:7 86:12
**databases**
   17:10,12
**date** 11:6 38:21
   44:13 45:16
   52:20 74:23
   89:15 103:14
   119:3,4 124:2
   125:7 136:20
   138:16 141:6
   150:13,20
   184:13
**dated** 11:4
   38:19 39:10
   74:21 185:8,12
   185:15
**dates** 48:7 65:7
   66:20 67:21
   68:20,23
   104:14,16
   126:5 128:17
   155:24 156:14
   156:21,24
   157:11,19,25
   171:10
**daubert** 33:11
   33:12,18
**day** 14:8,8
   86:16,21 87:3
   87:11 101:24
   102:3,6,8,11,21
   103:2,10,13,17

103:25 104:3,8
104:17,23
105:5,7,8
106:24 112:2
114:13,24
115:25 128:20
128:21 129:9,9
131:11,12,13
132:20 133:3,9
133:9,16 134:2
134:2,8,8
135:9,10
136:24 137:17
137:20 138:15
138:15,18,19
138:20 143:17
144:9,18,18,22
144:23,24
145:5,7 146:10
150:11 153:6
153:11,13,21
156:19 168:24
172:12 174:25
177:4 180:15
186:11
**days** 104:8,18
   104:24 106:10
   112:3 113:9,12
   116:3,20 118:8
   119:14,17,19
   125:20,22
   126:9,10 130:8
   132:3,6,8,14
   133:14 134:11

135:2,15,15
136:2,18,21
145:22,24
**deadline** 34:4,7
**dealer** 121:5,8
   121:14 122:17
**dealing** 60:18
   155:2
**deals** 16:5
**dealt** 71:14
**debt** 15:5,13,18
   16:16 82:11
**decades** 108:12
**december** 1:11
   3:3 28:7,9
**decided** 101:3
**decision** 76:7
   76:11 153:2
**decisions** 43:24
   74:10
**declaration**
   30:19,23 34:9
   34:12
**decline** 105:23
   106:22 121:13
   159:12 170:8
   170:11 173:10
   174:18,24
**declines** 180:17
**decrease** 121:3
   124:6
**decreased**
   121:7

**dedicate** 167:4
**deemed** 131:11
**defendant** 3:16
   18:7 30:22
**defendants**
   2:12 4:19 5:17
   22:25 25:2,17
   53:24 54:12
   55:17 56:3,13
   56:21,23 61:20
   63:22 64:10
   122:2
**defense** 23:12
   23:13,18 25:8
   25:23 34:24
**deficiencies**
   24:14
**define** 14:13
   158:11
**defining** 132:3
   142:14 143:12
   158:9
**definitely**
   137:23
**definition**
   98:25 132:14
**definitions**
   98:23
**deflation** 113:8
**degree** 94:20
   133:24
**degrees** 99:17
**deloitte** 146:7

**[demonstrate - disclosing]** Page 15

**demonstrate**
  65:17
**demonstrating**
  56:6
**department**
  30:20,21,23
**depend** 119:22
  131:4
**depending**
  12:14,22 100:3
  105:10 150:18
**depends** 54:12
  71:5 72:16
  111:3 116:4
  120:22 137:6
  155:7 169:25
  175:8
**deponent** 31:4
**deposed** 28:22
  29:2
**deposition** 1:9
  3:14,22 6:8,24
  7:4 17:25 37:7
  159:25 182:23
  186:4
**depositions**
  28:6,9,10,13
  29:4
**derives** 27:9,17
**describe** 32:11
  36:22 40:22
  50:9 51:10
  80:7 82:3
  132:2,15,19

  133:12 161:25
  165:25 166:8
  168:6,21
  174:14 181:8
**described** 46:5
  48:17 65:5
  79:13 84:19
  90:17 91:20
  106:3 107:4
  122:9 132:5
  145:9 164:21
  166:3 168:8
  174:16 177:16
**describes** 97:7
**describing**
  13:18 37:21
**description**
  92:12 109:12
  131:2
**design** 16:20
  79:2 150:19
**designed** 17:12
  78:24 135:24
  149:22
**designing**
  16:10
**desk** 15:21
**despite** 86:4
**detail** 59:7
**details** 24:16
  59:11 81:12
  82:20 85:24
  88:16 92:23,25
  124:13 134:24

**determine**
  49:15 51:16
  69:3 127:19
  130:19 181:20
**determined**
  60:3
**developed**
  108:11
**development**
  131:3
**dictates** 43:14
**difference**
  82:15 117:12
  135:8,12,13
  168:14
**different** 10:13
  11:23 12:14
  13:13,17 14:18
  15:11,19 19:9
  28:3 29:19,22
  30:9 36:6,7
  41:23 42:5
  50:4 53:7
  66:19 75:13
  80:15,15,16
  85:11 89:8
  98:22 99:11,15
  99:17 100:15
  108:20 109:9
  110:8 112:15
  115:18 117:13
  126:5 137:14
  139:11 143:12
  148:18 149:12

  150:3,6,20,24
  150:25 151:6
  154:3 155:4,7
  179:13
**differently**
  96:13
**difficult** 18:20
  25:21 27:20
  32:18 54:9
  175:11
**digest** 106:10
**digested** 116:10
**direct** 5:11
  141:20 185:3
**direction** 95:22
  144:12
**directly** 96:7
**disagree** 109:4
**disappear**
  27:22
**discern** 106:23
**disclose** 62:5
  64:13 92:24
  122:4 170:5
**disclosed** 23:6
  86:16 87:2,11
  106:6 119:9
  120:15 121:24
  122:25 124:4
  134:14 169:6
  179:24
**disclosing**
  122:24 123:3,9

**[disclosure - dump]** Page 16

**disclosure**
13:11 23:9
25:11 84:3,6
86:20 104:3,20
105:4 106:7,8
116:18 120:4
120:13 121:11
122:18 123:5
123:25 137:14
138:13 148:16
170:6 171:17
172:6 179:15
**disclosures** 8:5
8:10,12,19,21
9:2 44:9,23
45:14,14 47:7
47:16 49:5,11
49:16 59:21
60:4 65:7
66:18 69:6
81:15,23 82:6
83:22 84:7,16
90:24 91:2
103:3 106:7
112:14 113:18
114:11,23
115:2 129:21
130:12 137:13
148:17 157:20
158:6 163:22
166:6 169:9
171:8
**discount** 71:8

**discounted**
71:9 182:4
**discovery**
169:19,21
170:2,16
**discrepancies**
112:13
**discuss** 95:9
96:9
**discussed** 11:17
89:9 151:20
**discusses** 88:17
**discussion**
95:20 109:11
**discussions**
94:12 97:21
120:2
**dismiss** 6:13
43:6 50:8,19
70:17 162:6
163:10
**dismissed**
70:12,15
163:11
**disseminated**
107:10
**dissipate**
169:11
**dissipated** 69:5
162:21 171:7
**distinct** 41:2
**distinguish**
153:22

**distorted**
107:13 109:20
112:7,12,19
113:6,24
**district** 1:1,2
3:19,20
**divorced** 130:4
**document** 31:5
38:6 50:10
51:6 69:22
75:5,11 84:21
85:23
**documented**
95:7 98:2
**documents**
40:15 42:16
97:20 170:3,16
**doing** 13:12
103:21 118:25
129:4 172:15
**dollar** 168:22
170:22 171:11
171:18 172:19
172:20,25
173:7,24 174:2
174:8,16,19
**dollars** 160:9
**doors** 92:22
**doubt** 77:13
**doug** 63:17
**dow** 132:12
133:7
**dowd** 2:4 4:22
26:23

**dr** 5:22 58:21
182:11,21
**draft** 37:25
38:3,4,9,11
**drafted** 37:12
**drafting** 37:4
**draw** 18:4
37:20
**drawing** 81:22
**driven** 120:12
128:18 129:19
173:25 180:20
**drop** 105:5,9
121:23 122:19
122:21 123:2
159:6 171:10
171:12 172:10
173:19,24
174:19,21
**dropping**
174:23
**drops** 171:16
172:4
**drug** 123:8,11
131:3
**drugs** 59:13
131:5
**dualing** 150:2
151:5
**due** 29:5
105:23 133:25
**duly** 5:8
**dump** 9:9

**e**

**e** 2:1,1 5:7 184:1,1 185:1 185:6
**earlier** 25:7 50:11 61:5 78:6 105:16 106:3 132:19 145:10 158:13
**earn** 111:7
**earned** 10:5
**earning** 75:3
**earnings** 44:10 44:11 45:2,9 45:14,17 47:14 47:15 73:6 74:21 75:2,14 75:16,22,25 76:5 90:21 92:20 118:4,5 118:14 119:2,5 119:8,12 125:25 129:6,8 129:11,16 130:10,11,16 130:20 131:15 131:19,23 132:7 133:6 134:22,24 136:9 170:4,6 185:14
**earns** 46:11

**eastern** 1:2 3:20 131:17
**economic** 8:14 13:16 14:4 66:20 162:14 166:4,9
**economics** 83:10
**economist** 10:10 13:7,16 14:6 18:2 83:7 87:22 90:12
**economists** 23:24
**economou** 2:9 4:25
**edited** 38:9
**edits** 62:15
**education** 9:18
**effect** 130:14
**efficiency** 24:6 28:20 29:16,18 31:7 32:6 35:6 37:3,17 40:12 41:25 42:4 48:17 50:15 54:7 55:11 60:17 61:4,11 61:16 98:14,17 98:20,23 99:5 99:21 100:3,11 100:20 101:5 102:18 108:20 108:21 109:8

109:10,14 110:4,7,9 111:17,25 112:24 154:25
**efficient** 42:9 51:18 52:3 98:19 99:25 100:6,7,16,17 100:23 101:14 107:6,21 108:8 108:11,25 110:11 111:13 111:20 113:20 114:4,10,22 117:22
**efficiently** 167:21
**either** 5:24 9:11 15:13 80:19 83:10,17 123:14 139:7 149:18 165:7 171:20
**elapsed** 30:16
**element** 163:23
**eligibility** 46:18 49:17
**emails** 170:17
**employ** 23:24 24:4 106:2 145:8 179:9
**employed** 67:13 175:12

**employee** 184:16,19
**employees** 64:5 64:15 86:10
**enforce** 86:8
**engaged** 10:17 18:18 20:15 60:15
**engagement** 22:9 25:22 57:10
**engagements** 18:19 20:19 21:4,11,13 22:4 25:24 36:12
**engineering** 17:9
**entered** 36:17 159:18
**entirety** 175:7
**entitled** 46:19
**entitlement** 86:6
**entity** 19:21 40:4
**entry** 15:4 24:20,24
**environment** 40:16 60:2 68:22,25 73:2 90:19 105:11 106:4,19 107:19 118:24

**[environment - expect]**                                    Page 18

120:7,10 130:5
145:11 148:3
148:21 178:9
**equity** 15:14,18
16:16
**errata** 187:1
**especially**
148:19
**esq** 2:7,9,17,19
**essence** 66:15
121:16 168:10
**essentially**
19:23 54:22
64:4 147:20
**establish**
100:20
**established**
78:22
**establishing**
50:14
**estimate** 20:17
28:4 36:4
37:10
**estimation**
129:13
**eugene** 107:22
126:18
**evaluate**
100:24 108:22
**evaluated**
162:7 163:6
165:12
**evaluating**
105:14 163:15

**event** 8:5 103:5
106:15 126:4
126:11,12,20
126:24 127:6
129:5 136:24
137:3,10,12,17
137:20,24
138:10 139:19
145:16 149:23
150:2,6,9,11
151:6 153:4,7
153:18,25
154:5,7,9,11,19
155:4,7,10,16
155:24 156:3,8
156:17 157:16
**events** 97:6
103:4 130:8
160:17 173:3
**eventual** 164:2
164:22
**eventually**
165:18
**evidence** 91:23
102:4 103:24
104:11,19
105:17 106:9
106:17 112:4
141:5,9 151:25
170:20 185:23
**evident** 95:25
96:24
**evolve** 176:17

**exact** 41:13
45:17 54:3
75:11 81:17
135:21 136:11
177:3 181:5
**exactly** 37:9
39:23 41:7
59:10 83:23
**examination**
5:11 184:5
185:3
**example** 33:4
35:3 45:8,18
49:19,22 59:2
69:4 78:5
98:25 112:8
113:15 115:16
118:12,25
119:6,24
122:14 124:25
140:6 150:15
169:2 170:3,15
172:6
**examples** 34:13
34:14 47:20
60:12 62:3
130:24
**excel** 170:19
**except** 174:17
**excerpt** 141:3,8
185:21
**excerpted**
75:17

**excerpts** 75:8
**exchange** 10:9
32:14 65:3
**exclude** 21:9
133:5 138:15
**excludes**
132:15
**excluding**
21:11 22:15
129:11
**exclusion**
155:24
**exclusive** 36:19
**exclusively**
36:21
**exclusivity**
36:13
**excuse** 18:5
**executives**
90:23 122:23
**exhibit** 11:3,9
11:10 38:17,25
48:5 74:20
75:2 89:12,18
93:22 136:2,14
139:23 141:3,8
185:7,10,14,17
185:21
**existed** 123:4
**existing** 78:23
**expect** 91:8
99:7 118:6
119:18 120:11
120:15 123:19

124:4 125:6 133:23 134:12 143:22 144:4 144:10

**expectation** 124:14

**expecting** 31:23

**expects** 124:19

**experience** 8:20 12:19 13:12,23 14:17,20 15:2 15:10 16:9 17:8 54:16 55:13,21 56:16 96:15 114:9,21 116:2 144:15

**expert** 10:18 11:3,11 18:18 18:24 19:6,14 19:17,20 20:16 21:9,11,13 23:21 24:3,15 27:14 36:12 38:17 39:3 54:17,23 55:8 55:17 56:4 57:22 61:3,7 81:3 148:25 149:5 150:21 150:25 151:5 185:7,10

**expert's** 34:24 150:11

**expertise** 7:13 7:18,22 17:25

**experts** 23:23 101:3 138:2 150:2,5,9

**explain** 67:6 115:21 125:15 128:5 147:2 170:25 181:17

**explained** 94:7 122:7 151:21 158:13

**explaining** 23:22 24:14 115:20 151:23

**explanation** 49:8 112:23 128:14,15

**explicitly** 96:25

**exploit** 110:25

**extent** 49:3 64:23 80:19 81:6 85:3 107:9,19 130:15

**extreme** 142:17 142:24 143:3

**f**

**f** 184:1

**facebook** 34:8

**fact** 25:25 42:12 47:3 65:25 86:7

88:20 90:13 91:16 106:21 121:12 122:11 160:11,22 164:13 172:2 179:10 180:7,8

**factiva** 132:11

**factor** 46:17,18 49:18 81:15,23 84:3 99:19 121:11 122:17 125:17

**factors** 37:4 41:13 43:13 44:18 47:5 99:11,15 100:4 101:8 105:24 114:14 127:22

**facts** 72:17,19 74:15 116:5 155:8 175:9

**failed** 24:3

**failing** 64:13 122:4

**failure** 90:3

**fair** 11:23 12:9 24:22,25 37:15 39:14 56:20 70:24 100:4 107:5 109:6,12 114:25 127:12 132:13 149:15 153:3,24

**fairly** 73:25 74:8 77:17 136:3

**fall** 99:16

**falling** 169:12

**falls** 158:17

**false** 48:12 85:19 165:7

**fama** 107:23 108:3,4 110:10 126:18

**fama's** 108:14 108:24 110:17

**familiar** 73:11 76:6,10 93:17 107:22 110:16 140:19 161:17

**familiarity** 62:25

**far** 79:21 121:17 124:10 141:15 156:4

**fasano** 29:13

**favor** 94:5,24 95:12 99:20

**fda** 123:10,13 123:19 124:3 125:5,9 131:4

**federal** 89:20 140:22 141:10

**feeds** 180:25

**feeling** 5:25

**fellow** 13:16 14:4

**[fellowships - formula]** Page 20

**fellowships**
10:14
**fideres** 20:6,6,7
20:9,10 35:25
36:8,12,19,21
37:14 38:3,8
39:23 53:15
**field** 7:14,17
139:13
**file** 46:20 49:20
**filed** 3:18 44:13
48:2,3 51:2
179:18
**files** 170:19
**filing** 46:18,25
47:3 49:17
**filings** 43:20,25
44:2,5,15,19
45:6 46:3,10
46:15,24 47:2
47:5,21,22
48:6,11,22
49:9 73:4 84:4
90:21 106:13
129:22 130:24
132:10 133:7
145:12
**filled** 40:6
**fin** 14:12,14,22
14:25
**finalized** 62:8
**finalizing** 62:13
**finance** 7:15,17
7:21,25 8:4,8

10:6 83:10
145:16 181:23
**financial** 1:5
3:17 10:9 13:7
13:16 14:6,20
18:2 23:24
64:17 73:7
83:7 87:22
89:13 90:12
91:3 93:10,11
93:15 106:13
111:9 145:14
185:19
**financially** 4:7
184:21
**find** 159:11
**findings** 35:6
90:3,24
**finds** 151:7
**firm** 4:3 5:15
20:11 26:19
39:22 63:3
**firms** 27:10
36:20 101:2
115:13
**first** 5:8 12:11
26:5 28:16
37:24 38:3,9
38:11,25 51:13
51:16 76:24
77:7 85:14
86:16 87:3,11
92:10 101:23
102:3,6,11,20

103:2 104:3,8
104:17 105:5
115:25 119:8
122:5 126:19
138:19 160:3
**fisher's** 135:21
136:11
**fit** 62:3 130:25
132:7
**five** 32:3 36:5,9
85:15
**flow** 71:8,9
182:4
**flows** 71:11
124:25
**fluctuate**
144:16 175:24
176:2
**fluctuating**
175:15,16
**fluctuation**
144:17 147:22
**fluctuations**
129:9 134:2
176:3
**focus** 8:19
56:17 130:10
**focused** 102:25
**follow** 95:14
116:23
**following** 53:24
76:12 96:18
102:7 103:2
129:6,7,15

135:3 138:16
145:22 159:6
187:1
**follows** 5:10
**footnote** 131:8
135:20 143:8
**foregoing**
184:10 186:3
**form** 7:19 9:17
12:16 46:17,25
47:3,25 48:3
49:17,23 52:14
53:4 55:2
74:17 77:22,23
79:10 80:2
92:2 95:5
99:23 100:9
110:11 124:14
169:24 176:11
177:20 178:11
178:12,18
180:4
**formed** 52:21
74:6 77:19
79:7 117:4
160:21 164:10
**forming** 40:23
89:2
**forms** 9:10
**formula** 67:12
165:20,22,22
177:5,6,8
181:2

**formulaically**
67:8
**forth** 7:5 51:13
51:25 184:14
**forward** 36:20
41:15 50:17
55:24 70:20
71:2,14
**four** 11:25 36:4
36:9 85:15
136:9
**framework**
139:19
**fraud** 13:11
18:10 113:24
114:7 170:10
170:12 173:23
174:2 180:10
180:19,21
**frequency** 63:3
63:6 115:13
**frequently** 26:2
92:14,16,18
**front** 10:25
11:9,10 74:25
84:22 89:17
166:19,23
173:12
**fs** 86:12
**full** 37:2 77:3
79:15 141:11
141:24
**fully** 102:2
109:3,25

110:14 111:8
111:21 116:3
116:20 119:11
124:3 143:17
144:9
**fund** 82:10
**fund's** 82:7
**fundamental**
107:13 108:19
109:8,13,16
**funds** 82:12,13
**further** 58:8
119:15 124:6
171:23 182:10
184:9,15
**future** 56:24
70:22 71:11,12
72:4 121:18
123:3 124:20
124:24

**g**

**garrison** 1:14
2:14 3:24
**gears** 98:4
**geller** 2:4 4:22
26:23,25
**general** 15:16
36:8 62:25
71:7,7 72:9,22
73:20 95:24
97:8,21 119:10
124:17

**generalizations**
54:11
**generalized**
55:4
**generally** 43:18
93:5 94:24
98:2 107:17
144:11 161:18
**generated** 28:3
38:10 71:11
90:8
**generating**
130:15,20
**generic** 72:12
76:18 77:17,25
78:11 79:5
80:20,23 84:8
84:8
**genericness**
82:5,16 84:12
84:15
**gerson** 2:7 4:21
4:21 7:19 8:22
12:16 17:5
22:24 25:4
26:13,17,20
27:11 30:2
32:24 33:20
34:20 37:18
40:7,11 41:9
41:21 45:25
46:12 48:25
53:10 54:8
55:2 56:9,15

57:16 61:24
64:22 68:8
69:14 71:4,19
72:6,13 74:4
74:11 77:18
79:6,24 80:11
81:5 83:24
84:10 85:2,10
85:21 86:18
87:6,13,25
88:14,23 91:11
93:13 95:5
96:4,20 97:9
98:21 100:9
105:2 110:5
111:2,23 114:8
117:19 118:9
119:21 120:18
122:13 123:22
124:8,21
125:10 127:16
132:17 134:16
137:5 142:11
143:6,24
144:13 145:25
147:23 149:9
150:22 151:9
152:12,23
154:14 155:18
156:6 157:4,14
158:8,18 159:8
159:21 164:9
165:10,16
167:14 169:24

**[gerson - hypothesis]**

173:14 176:24 178:4 180:2,11 181:13 182:12 182:21

**getting** 123:13 124:3,9

**give** 35:5 55:4 72:15 86:2 126:21 142:7

**given** 27:22 30:12 44:21 65:21 104:20 104:21 112:9 133:3 142:17 142:24 143:2 148:3 150:10 150:20 153:6 153:11 158:17 169:3,25 180:15 183:3

**gives** 111:9

**glean** 91:15

**go** 3:12 43:10 58:12 59:10 66:14 117:7,9 136:11 149:10

**goal** 50:12

**goes** 112:22 151:10

**going** 3:2 21:2 30:2,25 36:20 63:3 66:16 71:16 74:17 98:3 119:23

123:7,18 141:19 158:18

**goldman** 56:8 76:7 80:21 81:10,15 84:7 152:18

**good** 3:1 5:12 5:13 6:3 18:3 57:2 58:11 143:21

**granting** 33:18

**great** 38:16 134:11

**greater** 72:11

**ground** 45:4,7 130:13

**grounds** 33:14 33:24 34:16

**group** 90:10 125:20,21 126:8,9

**groups** 135:17

**grown** 56:7,10

**guess** 18:21 19:11 20:4 21:23 22:13,14 36:8 87:14 120:22 138:2 146:19

**guidance** 78:5

**guide** 140:20

**guided** 130:16

**h**

**h** 5:7 185:6

**half** 32:7,11 83:21 160:9

**handed** 141:7

**handle** 145:4

**handy** 42:14

**happen** 70:21 116:17 125:13

**happened** 120:20 153:13

**happening** 131:6

**happens** 92:19 92:21,22

**happy** 10:24 58:9 86:22 158:20

**harvard** 10:15

**head** 18:21 32:4 33:4 54:2 60:11 62:18 75:9,20 78:16 80:18 88:15 141:18 146:15 158:2

**heard** 5:14 46:6 62:20 63:17,21 73:13,17

**hedge** 82:7,9,12

**held** 1:12 10:13 152:11

**help** 94:18 114:15,18 116:24 129:2

**helpful** 11:2

**hereinbefore** 184:14

**high** 9:14 63:3 63:6 100:24 101:4,9 102:18 115:13 125:15 173:4

**higher** 20:23 99:13

**highest** 9:17

**hired** 14:4 60:25

**hiring** 14:2

**history** 12:3

**holding** 29:14

**horizons** 102:23

**horrible** 103:14

**hour** 35:15 158:19

**hours** 6:14 37:6 37:8,11 116:19 131:22

**hum** 166:7

**hundred** 19:8 20:15,19 21:2 21:4

**hypothesis** 108:9,12 138:21,22,25

**[hypothesis - individual]** Page 23

139:2,5,9,17,18
142:7,18,25
143:2
**hypothetical**
121:18 122:6
123:7,8 124:14
125:2,13 144:6
144:7 148:8
169:13 171:15
174:6

**i**

**identical** 40:3
120:10
**identification**
11:7 38:22
74:24 89:16
141:6
**identified**
79:17
**identify** 45:13
**identifying**
47:16 170:7
**ignore** 88:8
**ignoring** 34:15
122:3,4
**iii** 64:3 66:12
162:12
**illustration**
169:14
**impact** 9:2,13
24:10,18 35:17
45:15 48:7
54:5 56:6,13

57:19,24 58:3
58:23 59:16
60:9,19,22
61:2,22 72:4,8
72:11,24 76:20
82:2,18 93:5
99:7 103:13,14
104:6,11,23
105:14,17,20
106:24 107:16
110:17 119:3,4
120:12,16
129:24 132:23
136:20 138:16
139:20 146:11
148:2 149:22
153:5,11,12,17
154:23 155:3
155:11,14,17
155:25 156:5
156:10,25
157:9 161:19
165:14 168:2
176:21 178:2
178:23 181:10
182:7
**impacted** 52:25
57:13 71:17
97:7 104:20
160:25 181:19
**impactful**
148:17
**impacting** 74:2

**impacts** 87:23
**importance**
8:14 77:8 80:9
**important** 24:2
75:22,23 92:3
102:13 118:22
148:4
**importantly**
67:12
**impound**
114:23
**impounded**
102:2 107:11
111:12 114:5
114:11,16
115:2,5,7
116:4,25
119:12 144:9
**impounding**
117:16
**impounds**
111:21
**improperly**
88:12
**inability** 49:20
**inapplicable**
110:3
**inappropriate**
155:16,21
**incentive** 93:15
111:9
**incentives**
93:11

**include** 8:2,9
73:4,5 90:20
92:14,16 114:2
126:17 146:6
170:17 178:14
182:3
**included** 8:2,24
15:17 86:12
128:23 141:11
157:23 178:25
**includes** 37:2
90:18 156:19
**including** 9:8,9
10:15 15:15
64:6,13,15
86:4,11
**income** 14:7
27:13,17
**incorporate**
110:22
**incorporates**
110:14 169:18
**incorrectly**
81:21 114:6
**increase** 143:22
144:5
**increases**
123:15
**independent**
40:13
**indicate** 167:23
**individual** 5:17
116:5 175:10

**[individuals - interested]** Page 24

**individuals**
 36:23
**industries** 16:7
 47:12
**industry** 14:12
 14:14,21 16:4
 47:12 94:24
 95:7 106:16
 126:6,16
 127:21 137:9
 137:21 146:17
 153:15 173:20
**inflated** 30:12
 65:10 67:2
 162:19 166:14
 168:24 175:2
**inflation** 67:9
 67:16,19,24
 68:6,19 69:4
 103:8 113:8
 146:11 162:20
 163:18,19,24
 164:17,23
 165:21 168:15
 168:20 169:11
 169:12,23
 170:23 171:4,6
 171:20 172:4,8
 172:11,16,22
 172:25 173:2,6
 173:11,17
 174:5,9,13
 175:16 176:2,7
 176:9,16 177:4

 177:11 178:10
 180:14,25
 181:6
**information**
 8:13 16:10,12
 16:18,20 17:3
 23:25 32:10
 40:15 44:9,24
 47:6,8 49:6,12
 50:18 60:2
 64:8 68:22,25
 69:13,18 73:2
 77:9 78:25
 80:10 86:13
 87:5 88:13
 90:5,6,8,18
 92:13 93:6,12
 93:16 94:19
 97:19 99:6
 101:17,23
 102:2,6,7
 103:20 104:24
 105:10,24
 106:4,8,11,18
 106:25 107:8
 107:10,14,18
 108:16 109:4
 110:2,15,23
 111:8,10,11,21
 112:5,25 114:5
 114:16 115:24
 116:8,18,25
 117:17,24
 118:3,8,24

 119:8,15,17,19
 119:23 120:6
 120:10 126:23
 130:5 133:2
 134:14 138:8
 138:14 143:18
 143:20 144:2,8
 144:22 145:11
 145:23,24
 148:3,12,21
 153:5,17,20,24
 154:4 165:8
 169:19,20
 170:9,13
 173:22,23
 176:18 178:8
 180:21,22
 181:11,19
 182:8
**informational**
 99:5 100:2,11
 102:17 108:21
 109:9 110:3,7
 110:9 111:16
 111:25 112:23
**informational...**
 100:5,7,23
 101:14 107:6
 114:10,22
 117:22
**informs** 169:21
**initial** 54:7
 60:16 61:22
 108:10

**initially** 14:4
**input** 165:19
 177:5,10 181:2
**inquire** 156:8
**insider** 13:9
**instance** 37:25
 119:13
**instances** 33:16
 34:17 58:22
 91:14 97:6
 109:19 144:20
 147:18 176:15
**instantaneous**
 115:10,19
**instantaneous...**
 115:3,7
**instantly** 109:2
 109:25 110:21
**institutional**
 15:19 129:23
**institutions**
 10:14
**instructed**
 36:25 38:8
**intends** 72:3
**interact** 49:22
**interacted**
 16:12,19 17:10
**interacts**
 160:20
**interday**
 144:16
**interested** 4:8
 184:21

**internal** 170:2 170:15,20
**interpretation** 142:22
**interpretations** 9:3
**interpreting** 8:20
**interruption** 26:15
**interval** 103:2 103:18 105:16 105:18,21
**intraday** 144:18
**introduced** 67:20 68:6 69:8
**introduces** 111:16
**investigating** 63:10 87:4
**investigations** 13:8
**investment** 16:15
**investments** 8:6 15:16
**investors** 8:15 9:4 15:19 24:2 30:11 47:8,16 49:12 65:8 74:10 92:3,25 94:19 97:19

111:10 116:13 120:3 121:16 129:23 168:11
**involve** 69:13 69:24 89:4
**involved** 150:23 167:10
**involves** 177:24 178:22
**involving** 16:6 23:10 31:8 34:2,8,21 59:3 61:9 63:6 66:2 104:11 146:6
**irhythm** 31:8
**isolate** 154:2
**isolation** 105:12
**issue** 40:9 59:7 76:18 78:19 159:20
**issued** 131:9
**issues** 52:17 60:18 155:3
**itg's** 90:3

**j**

**j** 186:1
**january** 28:11
**joe** 29:13
**joined** 4:19,24
**joining** 21:14
**jones** 132:12 133:7

**judge** 34:5,10 34:22 35:4
**judicial** 140:22 141:11
**july** 26:8
**justice** 30:20,21 30:24

**k**

**k** 48:3,6
**keep** 33:2,8 36:5 42:14
**kept** 50:3,5
**key** 163:23
**knew** 48:23 121:10,12,16 122:2,23 123:4
**know** 9:21 18:20 21:3 26:19 27:5 28:25 29:10 37:9 38:15 53:22 56:23 58:2 62:23 69:17 70:14 72:20 75:12 83:25 89:10 102:19 103:7 112:2 141:15 149:16 150:15 161:10 174:7
**knowledge** 53:18

**known** 64:8 94:8,14 95:6 122:2
**krogman** 41:13 43:13 101:8

**l**

**lack** 56:6 57:24 58:23 59:16,19 59:22 60:8
**lacking** 82:2 94:20
**lags** 110:12
**language** 37:20
**large** 27:16 55:16 116:22 121:22 122:21 128:7 129:17 129:23 132:22 135:13,14 136:3
**larger** 105:13 136:13 148:14
**law** 5:9,15 26:19 27:10 83:15 101:2
**laws** 89:20
**lawsuit** 18:7 179:17,25
**lawyer** 17:14 17:17 83:5
**lawyers** 6:19 83:12,16,19

**[lead - maintained]** Page 26

**lead** 4:23 122:18,20 123:2

**leah** 2:19 4:20

**learn** 158:4

**leave** 84:21

**leaves** 164:17

**leaving** 21:16

**led** 59:15

**left** 21:5

**legal** 2:23 17:19,24 64:23 73:15,18 81:2 85:3 146:23 151:3,24

**length** 113:14

**level** 9:15 82:4 82:5,16 115:15 125:15 133:15 133:18 140:4 140:10 150:10 152:5 159:14 173:4

**liability** 64:20 65:22,24 66:6 67:23 162:9,24 179:2

**license** 184:25

**lied** 122:11

**life** 128:17

**likely** 27:6 33:7 121:13 137:3 146:24 151:14 152:2,6

**limit** 7:23

**limited** 16:3 17:25 167:8

**line** 57:2 97:10 147:5 187:2

**lines** 85:15 142:23

**link** 138:10

**list** 31:2 32:19 136:17

**listed** 10:22 23:10 42:19

**listing** 13:22 59:5

**lists** 13:15

**litigation** 1:6 3:18 33:7 39:8 56:17 64:17 89:14 185:20

**little** 15:9 29:19 44:4 53:6 110:8 115:4,8 143:7

**live** 115:9

**livelihood** 27:8

**llc** 19:22

**llp** 1:14 2:4,14 3:24

**loans** 15:17,22

**location** 3:22

**logical** 86:6

**long** 53:22 69:21 85:23 95:17 136:4

**longer** 102:23 116:9,10 137:2 137:11

**look** 29:17 30:25 41:17 42:15 49:19 54:14 59:10 68:21,23 74:15 77:25 78:2,20 86:22 95:17 102:10 104:2,7 106:12 119:2 120:5 124:12 135:25 136:14 138:18 140:24 142:15 149:10 158:16 159:10 170:3 173:24

**looked** 48:5 67:17 93:24 138:19 155:22 167:19

**looking** 8:12 9:10 23:7 28:15 43:19 44:12 45:5,17 62:4 70:20 71:2,14 73:4 91:2 99:14 107:2 126:4 130:22 135:8 136:7 145:12 147:25 156:9 171:9 174:17

**looks** 102:23 168:10

**loss** 58:6 68:17 169:17 170:21 171:5 178:6 181:6

**lot** 7:20 13:25 85:24 112:15

**lots** 121:5,8,14 122:17

**lower** 65:4 99:13

**lunch** 158:21 158:25

**lweiser** 2:20

**m**

**m** 5:7 184:2,24

**made** 48:12 64:10 68:21 89:5 118:19 121:10 123:5 151:13 156:15 169:9 171:18 172:24

**magdalene** 2:9 4:25

**magnitude** 129:7 133:25 148:15

**maintained** 67:25 69:9 90:9 164:16

**[maintenance - matthew]**

| | | | |
|---|---|---|---|
| **maintenance** 67:16 | **marked** 11:6 38:21,24 74:23 89:15 141:5 | 131:14,20,21 136:20 137:4,8 137:9 138:7,16 | 39:20,21 42:21 43:3 47:24 49:25 51:11,23 |
| **major** 133:5 | **market** 8:4,21 | 153:15 154:25 | 52:19 57:10 |
| **majority** 20:22 21:22 22:8,18 27:13,14 55:7 55:16 | 9:5,8 13:10 15:22 24:6 28:20 29:16,17 31:7 32:5 35:6 | 173:20 180:8 **market's** 124:23 **marketplace** 119:24 | 61:7 62:9,20 62:24 63:9,13 63:17,21,25 65:14 72:9,22 |
| **make** 7:10 17:22 25:14 27:13 45:20 46:7 53:9 54:10 62:14 95:11 155:15 155:20 156:4 187:1 | 37:17 41:24 42:3,8 43:16 45:15 47:11 48:7,23 50:15 51:17 52:2 54:7 55:10 60:16 61:4,10 78:23 90:6,14 | **markets** 15:6 108:12 110:11 131:17,24 **material** 107:7 **materiality** 8:15 **materialization** 69:24 120:16 | 88:5,22 89:23 116:19 119:11 124:17 153:10 154:24 160:14 167:16 **matters** 10:19 26:17 27:3,6 27:18 30:18 |
| **making** 74:10 78:23 173:21 | 91:10,17 98:14 98:17,19,19,23 99:21,24 | 121:24 177:25 178:22 | 31:12,18 33:8 36:6 57:21 60:8 78:14 |
| **management** 92:19 94:15,25 95:13,25 96:16 96:24 97:8,23 | 100:20 101:5 101:12,13,15 105:24 106:9 106:15,23 | **materializati...** 178:17 **materializes** 121:22 122:19 124:5 | 146:3 149:8 154:21 167:17 168:5 **matthew** 1:10 |
| **manipulation** 8:4 9:6,9 13:10 | 107:6,20 108:9 108:25,25 110:12,24 | **materializing** 122:10 | 3:15 5:1,20 6:1 7:1 8:1 9:1 |
| **manner** 154:8 **manual** 141:4,9 185:22 | 111:20 113:19 113:20,23 114:4 117:16 | **materials** 42:18 43:3 **matter** 3:16 | 10:1 11:1,4,11 12:1 13:1 14:1 15:1 16:1 17:1 |
| **manufacturing** 59:13 | 117:22 119:9 119:11,18 | 11:14 17:19 27:21 28:16,23 | 18:1 19:1 20:1 21:1 22:1 23:1 |
| **march** 48:3 **mark** 10:24 38:12 74:18 89:11 141:2 182:23 | 123:12 124:18 125:7 126:6,15 127:21 131:10 | 29:6 32:22 35:11 36:3,24 37:8 39:3,12 | 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 |

**[matthew - mention]**                                    Page 28

| | | | |
|---|---|---|---|
| 36:1 37:1 38:1 | 124:1 125:1 | **mean** 8:11 9:6 | **meconomou** |
| 38:18 39:1,4 | 126:1 127:1 | 12:17 48:19 | 2:10 |
| 40:1 41:1 42:1 | 128:1 129:1 | 59:23 66:5 | **media** 3:13 |
| 43:1 44:1 45:1 | 130:1 131:1 | 73:16 80:24 | 58:15,20 73:8 |
| 46:1 47:1 48:1 | 132:1 133:1 | 96:6 101:18,25 | 91:3 98:7,12 |
| 49:1 50:1 51:1 | 134:1 135:1 | 110:19 111:4 | 106:13 134:25 |
| 52:1 53:1 54:1 | 136:1 137:1 | 112:21 113:2 | 145:14 158:23 |
| 55:1 56:1 57:1 | 138:1 139:1 | 114:18 117:25 | 159:4 182:15 |
| 58:1 59:1 60:1 | 140:1 141:1 | 129:18 133:20 | 182:20 183:5 |
| 61:1 62:1 63:1 | 142:1 143:1 | 135:5,22 140:2 | **medina** 2:23 |
| 64:1 65:1 66:1 | 144:1 145:1 | 163:8 166:9,10 | 4:1 |
| 67:1 68:1 69:1 | 146:1 147:1 | 167:15 171:25 | **meet** 6:22 |
| 70:1 71:1 72:1 | 148:1 149:1 | 172:7 | **meeting** 6:20 |
| 73:1 74:1 75:1 | 150:1 151:1 | **meaning** | 170:18 |
| 76:1 77:1 78:1 | 152:1 153:1 | 151:25 | **melville** 2:6 |
| 79:1 80:1 81:1 | 154:1 155:1 | **meaningful** | **member** 67:14 |
| 82:1 83:1 84:1 | 156:1 157:1 | 130:16,20 | 164:6 165:2 |
| 85:1 86:1 87:1 | 158:1 159:1 | 139:22 | 177:9 |
| 88:1 89:1 90:1 | 160:1 161:1 | **means** 46:8 | **members** 51:20 |
| 91:1 92:1 93:1 | 162:1 163:1 | 133:22 140:8 | **memorized** |
| 94:1 95:1 96:1 | 164:1 165:1 | 168:21 171:2 | 12:3 53:21 |
| 97:1 98:1 99:1 | 166:1 167:1 | **measure** | 69:21 70:9,23 |
| 100:1 101:1 | 168:1 169:1 | 103:19 105:12 | 78:15 81:11 |
| 102:1 103:1 | 170:1 171:1 | 131:18 153:16 | 146:5,15 |
| 104:1 105:1 | 172:1 173:1 | 175:5 | 149:13 160:10 |
| 106:1 107:1 | 174:1 175:1 | **measured** | **memory** 31:3 |
| 108:1 109:1 | 176:1 177:1 | 162:3 167:12 | 81:13 85:25 |
| 110:1 111:1 | 178:1 179:1 | **measurement** | 86:2 |
| 112:1 113:1 | 180:1 181:1 | 146:12 | **mention** 8:10 |
| 114:1 115:1 | 182:1 183:1,4 | **measures** 153:4 | 9:5 31:17 |
| 116:1 117:1 | 184:6 185:2,8 | **measuring** | 101:4 103:16 |
| 118:1 119:1 | 185:11 186:6 | 103:7 171:6 | 147:12,15 |
| 120:1 121:1 | **maureen** 1:16 | 172:3,8 173:18 | 151:16 |
| 122:1 123:1 | 4:2 184:2,24 | 174:19,20 | |

**[mentioned - multiple]**

**mentioned** 43:25 58:21 62:2 78:6 160:8 167:18

**mere** 73:22

**merely** 120:9

**merger** 29:24

**mergers** 8:2 15:15

**merits** 61:9 68:15 146:8

**met** 6:13,15

**method** 138:23 139:7 176:9

**methodologies** 67:7 181:21

**methodology** 40:25 41:16,25 42:4,10 50:17 50:24 51:21 52:6,8 65:16 65:18 67:12 163:3 167:24 168:3,7 171:18 173:2 174:3,14 175:25 177:7 177:13,16 179:8,9 180:7 181:4

**metric** 91:25

**microphones** 3:5

**miguel** 2:23 4:1

**million** 79:17 80:8 160:9

**milliseconds** 115:16

**mind** 31:11 34:14 48:9 79:3 98:4 120:21 149:14

**minus** 140:4

**minute** 57:7

**minutes** 170:18 182:13

**misleading** 48:12 85:20

**mismatch** 82:4

**misrepresent...** 67:21

**misrepresent...** 50:22 58:4 64:11 66:16,22 67:18 68:21 76:4 107:15 112:8 113:7 162:7,16 163:7 163:12,16 166:12,15 175:18

**misstatements** 24:9 52:24 53:16 58:24 59:20 60:6,10 69:12 70:11,15 70:19 72:2 73:19 76:3

83:21 99:8 156:15 157:12 160:25 164:15 166:5 168:3 173:13 178:15

**model** 117:8 127:13

**models** 92:16 116:12,14 117:10,14,18 119:25 170:19

**modest** 110:12

**modifications** 168:18

**modified** 163:12,13

**moment** 32:19 114:20

**moments** 85:9

**monday** 118:5 118:11,15,19 119:3,6,12 120:3,11

**monday's** 120:13

**month** 28:2,14 31:14,19,20 102:24 113:18 129:12

**months** 102:25 112:12 113:9 113:12 123:16 129:10,20 148:6

**morning** 3:1 5:12,13 167:18

**motion** 6:12 43:5 50:8,19 70:17 162:6 163:10

**motions** 33:11

**move** 148:9

**moved** 130:3,3

**movement** 104:16 127:20 128:9,24 133:24 134:5 134:10 139:21 139:22 140:5,8 148:6,14,22 158:5

**movements** 90:25 106:15 106:16 126:7 126:14,15 129:14,18 133:10,15,18 134:8,21 135:14 148:15 153:16 156:14 173:20

**moves** 55:9

**moving** 145:18

**multiday** 105:18,20,22 146:10

**multiple** 13:5 65:7 81:18

**[multiple - objection]**

102:24 104:16 106:6,10 119:14 145:22 145:24 153:19 163:21

**multiples** 182:5

**mute** 3:8

**n**

**n** 2:1 5:7 185:1

**name** 4:1 5:14 5:18 23:3,5 40:5 108:2

**named** 63:22

**narrative** 94:12 95:19 97:21

**national** 15:6 17:3

**natural** 77:12

**nature** 23:19 36:22 43:8,22 45:12 50:12 54:12 120:23

**nearly** 40:3

**necessarily** 7:22 23:14

**need** 38:14 58:10 70:7 72:20 77:21 78:7 79:10 88:6 116:11,13 124:12 140:23 141:21 142:12 143:10 153:2

**needed** 173:22

**negative** 94:21 97:23 121:19 121:21 123:24 149:19

**negatively** 123:20

**negligent** 122:3

**negotiations** 13:8

**neither** 184:16 184:19

**new** 1:2,15,15 2:6,16,16 3:20 3:25,25 10:16 44:9 49:6 93:5 94:19 97:19 102:7 103:3 106:25 108:16 111:10,21 112:4 114:16 115:23 116:18 116:24 117:16 138:13 143:17 143:19,25 144:22

**news** 125:20,23 125:24 126:9 126:10 128:19 129:21 130:8 131:11,13 132:3,8,10,14 132:16,18,21 133:2,6,13,16

134:11 135:9 135:10,15,15 136:2,18,21 159:23 160:2,4

**newswire** 132:12

**newswires** 133:7

**ngg** 3:21

**noise** 137:4,8

**non** 6:19 22:7 170:12 173:23 180:21

**notary** 1:18 186:13

**note** 3:4

**noted** 95:24

**notice** 1:11

**noticing** 4:15

**notification** 49:20

**notre** 10:7

**notwithstandi...** 94:17

**null** 138:21,22 138:25 139:2,5 139:9,17,18 142:6,8,18,25 143:2

**number** 19:9 27:9 56:3 63:4 108:12 116:22 147:12 183:5

**numbers** 40:5 150:17

**o**

**o** 80:5

**oath** 4:5

**obama** 12:6

**object** 64:22 81:5 97:10

**objection** 7:19 8:22 12:16 17:5 22:24 25:4 27:11 32:24 33:20 34:20 37:18 40:7,11 41:9 41:21 45:25 46:12 48:25 53:10 54:8 55:2 56:9,15 57:16 61:24 68:8 69:14 71:4,19 72:6 72:13 74:4,11 77:18 79:6,24 80:11 83:24 84:10 85:2,21 86:18 87:6,13 87:25 88:14,23 91:11 93:13 95:5 96:4,20 97:9 98:21 100:9 105:2 110:5 111:2,23

**[objection - opinions]** Page 31

| | | | |
|---|---|---|---|
| 114:8 117:19 | **obvious** 117:11 | 13:15 14:19 | **once** 43:7 |
| 118:9 119:21 | **obviously** | 17:18 19:5 | 117:23 118:2 |
| 120:18 122:13 | 12:25 14:21 | 20:18 21:17 | 179:11 |
| 123:22 124:8 | 80:14 81:10 | 31:12,22 36:15 | **ones** 42:19 48:9 |
| 124:21 125:10 | 115:12 | 42:17 55:6 | **ongoing** 131:5 |
| 127:16 132:17 | **occasion** 6:23 | 68:3 73:24 | **open** 38:6 |
| 134:16 137:5 | **occasionally** | 76:16,24 77:2 | **opine** 151:12 |
| 142:11 143:6 | 27:23 | 78:20 83:2 | **opined** 145:20 |
| 143:24 144:13 | **occasions** | 87:9,17 89:25 | 149:6,11 |
| 145:25 147:23 | 143:16 | 96:14 98:15 | **opining** 55:10 |
| 149:9 150:22 | **occurred** 58:5 | 100:13 101:10 | **opinion** 18:18 |
| 151:9 152:12 | **occurring** | 108:4 113:16 | 24:5,8 28:19 |
| 152:23 154:14 | 115:24 121:19 | 113:22 114:3 | 33:17,17 34:24 |
| 155:18 156:6 | **october** 11:5,12 | 117:21 119:10 | 40:24 57:12 |
| 157:4,14 158:8 | 28:17 30:16 | 123:6 124:16 | 65:13 66:8 |
| 159:8,21 164:9 | 38:20 39:4 | 125:2,14 127:6 | 74:6,7,13,17 |
| 165:10,16 | 185:9,13 | 127:18 128:4 | 77:20,22,24 |
| 167:14 169:24 | **offended** 20:8 | 130:7 133:11 | 79:7,10 80:5 |
| 173:14 176:24 | **offer** 24:5,8 | 133:20 134:3 | 80:22 92:2 |
| 178:4 180:2,11 | 35:21 52:11 | 134:10 136:16 | 98:14 117:3 |
| **objections** 4:9 | 57:12 | 136:23 140:11 | 161:4,10 162:6 |
| 18:5 | **offered** 23:20 | 140:19 141:19 | 162:24 164:10 |
| **objective** 91:25 | 35:17 58:2 | 142:2 144:17 | 176:12 180:4 |
| **objectively** | 97:13 178:24 | 145:20 147:10 | **opinions** 17:19 |
| 143:21 144:3 | **offering** 17:18 | 150:16 151:2 | 17:24 18:24 |
| **obligation** | 41:19 51:23 | 151:13 153:19 | 23:20 24:17 |
| 77:11 | 52:9 | 154:6,11,18 | 33:10,13,23,25 |
| **obligations** | **offerings** 46:22 | 164:12 167:3 | 34:15 35:17,21 |
| 82:11 | **office** 12:6 | 176:14 | 41:19,22 42:5 |
| **obnoxious** | **officer** 5:9 | **omissions** | 43:23 51:22,25 |
| 18:13 | **offices** 1:13 | 69:16 99:8 | 52:10,12,15,17 |
| **observe** 12:20 | **oh** 96:5 157:15 | 178:16 | 52:21 53:4 |
| **obtained** 9:23 | **okay** 5:25 6:22 | **omitted** 69:13 | 54:24 58:3 |
| 9:25 | 9:25 11:16 | 69:18 165:7 | 71:22 80:2,18 |

**[opinions - people]**                                                      Page 32

| | | | |
|---|---|---|---|
| 88:3 89:2 97:13 98:16 99:22 100:14 149:13 152:14 155:20 160:20 177:20 178:24 | **outcomes** 150:3 151:6 | 84:22 85:7 92:10 101:13 126:18 131:8 187:2 | 147:24 150:4 179:2 |
| **opportunities** 111:6,15 | **output** 156:17 156:22 157:24 | **pages** 141:13 | **participants** 91:10 106:10 110:24 |
| **opportunity** 62:10 110:23 | **outside** 13:5 88:3 | **paper** 14:2 | **particular** 44:6 65:17 85:12 95:3,4,13 96:19 97:5 164:13 167:5 |
| **opposed** 19:15 69:9 119:3 123:3 131:5 136:12 | **overall** 47:6 51:8 68:22 | **paperwork** 14:9 | |
| | **overlapped** 48:15 | **paragraph** 19:25 41:17 51:25 65:12 77:4 79:15,16 85:7,16 90:2 101:10 126:17 126:19 127:2,5 128:5 132:5 133:11 135:4 141:25 168:9 168:19 169:15 170:23 174:12 177:17 181:8 181:12,13,14 181:17 | **particularly** 95:25 |
| **opposing** 55:19 150:5 | **overly** 97:22 | | **parties** 3:11 151:4 184:18 |
| **opposition** 53:24 54:13 | **overreacted** 180:8 | | **partners** 20:9 20:10 |
| **opt** 22:13,15 | **overreactions** 180:20 | | **party** 4:6 |
| **optimistic** 94:8 94:15 97:17 | **overwhelming** 55:7 | | **passwords** 64:9 86:9 88:18 |
| **option** 102:14 | **own** 47:10 96:10 97:3 116:14 144:15 | | **past** 10:12,17 26:7 27:25 28:2 31:20 34:6 36:17 |
| **order** 6:13 23:25 43:6 48:22 49:10 50:8,19 53:9 70:17 72:21 77:22 155:13 163:10 | **p** | **paragraphs** 51:13 | **paul** 1:13 2:13 3:23 4:18 5:16 |
| | **p** 2:1,1 139:24 140:6,7 141:25 142:5,7,16,22 142:23,25 158:16 | **parallel** 32:22 | **paulson** 82:7 82:12 |
| | | **pardon** 20:2 | |
| | **p.m.** 131:16,17 131:20,21 183:2,9 | **part** 18:25 44:7 49:4,7 51:7 76:19 82:13 83:16 87:18,21 105:13 106:17 111:15 127:8 141:21 145:6 | **paulweiss.com** 2:18,20 |
| **ordinarily** 125:6 | | | **peer** 181:24 |
| **ordinary** 81:4 | **page** 23:17 28:15 38:25 39:2 59:4 76:25 79:14,23 | | **penalties** 160:8 |
| **outcome** 4:8 121:19,21 | | | **people** 20:7 36:2,5,7,10 39:20 146:20 |

**[people - ph.d.]** Page 33

147:8
**percent** 19:13
  105:7
**percentage**
  20:18 27:16
  140:16 168:23
  174:13,20
  175:13,25
  176:8
**perform** 77:22
  84:17 88:22
  105:22 169:16
**performance**
  47:11
**performed**
  12:21,24 42:24
  153:9,22
  154:19 156:4
  160:13 161:20
  166:2
**performing**
  13:4
**performs** 81:3
**period** 11:22
  13:18 30:12
  35:2 50:21,23
  51:18 52:4
  60:3 64:5
  65:11 66:17,18
  67:3 68:2,24
  69:8,10 73:3
  86:17,22 87:3
  87:12 90:20
  93:19,25 94:5

95:18 99:25
106:5,20
110:13 113:14
113:25 114:15
114:19 129:12
130:6 133:4
136:4,6,8
145:19 156:20
157:23 160:16
162:20 164:25
165:9,24
167:21 168:25
169:4,7,8
171:13,17,21
171:22 172:5,9
172:14,17
173:3,7 174:6
175:2 176:17
177:13 180:16
**periods** 50:14
  115:17
**permanent**
  14:5
**permitted**
  34:11
**person** 83:5
**persuasive**
  151:8
**pertain** 175:20
**pertained**
  175:18
**ph.d.** 1:10 5:1,7
  6:1 7:1 8:1 9:1
  9:19 10:1,2,6

11:1,4,12 12:1
13:1 14:1 15:1
16:1 17:1 18:1
19:1 20:1 21:1
22:1 23:1 24:1
25:1 26:1 27:1
28:1 29:1 30:1
31:1 32:1 33:1
34:1 35:1 36:1
37:1 38:1,18
39:1,4 40:1
41:1 42:1 43:1
44:1 45:1 46:1
47:1 48:1 49:1
50:1 51:1 52:1
53:1 54:1 55:1
56:1 57:1 58:1
59:1 60:1 61:1
62:1 63:1 64:1
65:1 66:1 67:1
68:1 69:1 70:1
71:1 72:1 73:1
74:1 75:1 76:1
77:1 78:1 79:1
80:1 81:1 82:1
83:1,9 84:1
85:1 86:1 87:1
88:1 89:1 90:1
91:1 92:1 93:1
94:1 95:1 96:1
97:1 98:1 99:1
100:1 101:1
102:1 103:1
104:1 105:1

106:1 107:1
108:1 109:1
110:1 111:1
112:1 113:1
114:1 115:1
116:1 117:1
118:1 119:1
120:1 121:1
122:1 123:1
124:1 125:1
126:1 127:1
128:1 129:1
130:1 131:1
132:1 133:1
134:1 135:1
136:1 137:1
138:1 139:1
140:1 141:1
142:1 143:1
144:1 145:1
146:1 147:1
148:1 149:1
150:1 151:1
152:1 153:1
154:1 155:1
156:1 157:1
158:1 159:1
160:1 161:1
162:1 163:1
164:1 165:1
166:1 167:1
168:1 169:1
170:1 171:1
172:1 173:1

**[ph.d. - preponderance]**

174:1 175:1 176:1 177:1 178:1 179:1 180:1 181:1 182:1 183:1 184:6 185:2,8 185:11 186:6

**pharma** 59:3

**phones** 3:8

**phrase** 65:23

**phrasing** 139:6

**physical** 86:5

**pick** 3:6 130:7 137:4

**picture** 126:21

**piece** 105:23 119:7 153:24

**pieces** 106:17 153:19 154:3 170:20

**place** 3:11 14:10 16:18 36:14 77:8 80:9 128:21 132:22 184:13

**placements** 15:18 16:16

**plaintiff** 4:23 18:6 27:10 54:17 55:8,9 57:22 64:4

**plaintiff's** 65:21

**plaintiffs** 2:3 22:23 24:3,15 26:11 27:15 34:8 48:11 53:23 57:14 64:20 65:2 68:4 86:15 88:10 162:8,17 177:24

**plans** 56:24

**play** 92:5 112:16

**playbook** 54:23

**please** 3:4,8 4:10 5:3,18 23:3 38:13 89:25

**pocket** 52:7 65:18 67:7 163:2 167:23 168:7 177:6 179:7

**point** 23:8 25:10 27:12 29:12 38:14 40:19 43:20 44:20,25 48:23 51:15,24 52:13 53:5 57:19 68:10 70:7 71:21 77:20 79:8 80:3 84:13 85:13,22 86:23 87:8

88:24 97:15 154:16 156:11 156:25 160:15 161:3 165:12 173:18 174:11 176:7,12 177:19 178:13 178:19 179:4 180:5

**pointed** 82:15

**pointing** 81:14 152:14

**points** 16:14 99:12,16 147:7

**policies** 78:22 79:2

**pop** 27:23

**portion** 27:8 69:3,7 170:5,8 170:11 171:22 175:19

**portions** 135:12

**position** 14:6

**positive** 144:3 144:21 164:2

**positively** 144:24

**possibility** 121:18

**possible** 60:13 71:16 72:2 123:23 125:12 140:23 150:8

155:6 165:6

**possibly** 26:8

**post** 160:16

**potential** 9:13 34:25 70:20 72:11 103:7

**potentially** 61:9 70:19 78:4 104:7 145:12 172:13

**practice** 19:7

**pre** 45:10,23 131:2

**precise** 180:24

**predict** 127:13

**preeminent** 108:8

**prefer** 5:21

**preference** 5:24

**preliminary** 44:11 48:8 126:2

**premarket** 119:5

**preparation** 7:4

**prepare** 6:7,10 6:23

**prepared** 167:5

**preparing** 37:7 54:5 83:12 159:25

**preponderance** 151:25

**present** 2:22 4:12 172:11 180:14
**presentations** 170:18
**presidential** 11:24 13:6,13
**press** 73:6 90:23 106:14 145:13
**pressure** 96:9 97:2
**presumption** 55:18 56:5
**pretty** 124:10
**previous** 46:5,6 129:10 148:6 171:15 172:12
**previously** 38:7 74:14 76:15 79:13 82:22 84:18 90:17 164:21 178:5 179:11
**price** 24:10,18 29:24 47:10 53:2,17 54:5 56:6,12 57:14 57:19,24 58:3 58:23 59:16 60:9,19,22 61:2,22 66:25 67:10 68:7 69:3 70:25

71:17 72:5,12 72:24 74:3 76:19 82:2,18 87:24 90:25 92:14 93:7 94:10 95:18 97:16 101:15 102:12,14 103:13 104:6 104:11,13,16 104:22 105:4,9 105:14,17,20 106:16,22 107:7,12,12 108:15,25 109:24 110:13 110:21 111:8 111:22 112:13 112:18 113:6 113:23,23 114:6,17 115:3 115:5 117:2,17 117:23 118:7 118:13 119:3,4 119:13 120:4 120:12,17 121:23 122:7,9 123:14,15,20 123:24 124:7 124:15,18 125:8,20,21 126:5,14 127:20 128:8 129:14 131:22

133:10,15,17 134:5 135:14 138:12 139:20 139:22 140:8 143:16,22 144:4,10,21 145:18 146:10 148:2,14,22 154:23 155:3 155:11,13,17 155:25 156:5 156:10,14,24 157:9 158:5 159:6,12 160:25 162:18 163:19,20 166:14 167:20 168:2,24 169:4 169:12 170:8 170:11 171:10 171:15 172:4 172:12 173:10 173:19 174:18 174:23 175:2 180:15,17 181:11,20 182:7
**prices** 9:3,13 30:13 43:15 65:10 72:8 73:8 99:6,9 102:4,19 103:19,24 104:21 107:17

107:17 109:16 109:19 111:12 111:17 112:4,6 112:11,25 113:2 114:10 114:12 115:22 126:22 128:22 129:10,25 130:2,3 132:23 144:16 148:9 148:10
**pricing** 113:8
**primary** 7:13
**principles** 145:15 181:23
**prior** 21:13 36:18 37:20,22 79:23 94:7 97:15 104:25 145:24 148:15 171:21 184:4
**priorities** 12:14 12:18
**private** 3:6 15:18 16:16 19:7
**privileged** 30:4 62:5
**pro** 94:15 96:23
**probability** 142:17,24 143:2

**[probably - quarterly]**                                               Page 36

**probably** 10:12 19:16 22:11 32:25 36:16 37:10 72:16,23 95:14 149:4
**problems** 121:4 121:7,14 122:16,18,20 122:24,25 123:2,4
**procedural** 33:23 34:16
**procedures** 78:22 79:3
**proceed** 5:5
**proceeded** 23:8 25:10
**proceeding** 4:10
**proceedings** 183:8 184:11
**process** 14:2,3 43:11 44:7 45:22 56:18 62:3 83:17 105:13 111:16 116:21 117:6,8 126:13 132:3 147:25
**processed** 138:7
**produced** 169:19,21

**professional** 1:17 116:2 184:3
**professionally** 10:3
**professor** 10:7
**profit** 111:15
**profits** 111:7
**progressed** 9:15
**projections** 71:10
**pronounce** 20:5,6,8 107:25
**pronunciation** 20:3
**proportion** 135:9 175:17
**proportions** 135:25
**proprietary** 64:6,16 86:11
**protect** 90:4,7
**protecting** 77:9 80:9
**protection** 64:12
**provide** 18:18 18:24 43:23 49:15 60:17,21 66:8 92:9
**provided** 30:21 47:14 118:17

**provides** 104:19
**providing** 47:7 49:11 152:13
**public** 1:18 23:9 25:10 46:21 107:7,9 115:23 120:25 186:13
**publications** 43:22 109:23
**publicly** 23:5 93:24 101:16 107:20 109:3 109:25 110:14 110:22 114:4
**publish** 92:8 116:12
**published** 83:15
**puffery** 73:12 73:23 74:2,9
**pull** 137:12
**pump** 9:9
**purchase** 67:10 168:16
**purchased** 30:11 65:8
**purchases** 165:4 168:11
**purdue** 10:5
**pure** 119:16 128:18 129:19

**purpose** 46:2,4 46:10,14,16 50:9 51:5 127:18 157:3 157:13,15
**purposes** 15:14 15:16 19:24 47:17,23 48:16 50:23 99:2 103:5 108:23 111:24 130:9 151:22 154:13 155:4 156:5,24 157:8 161:24
**pursuant** 1:10
**put** 19:3 37:24 42:13 55:17,24 56:3 60:16 61:2,20 75:13 92:7,23 123:15 143:13
**puts** 55:8
**putting** 41:15 50:16 71:24 120:2

**q**

**qualifications** 151:11
**qualified** 46:24
**quarter** 83:23 83:23
**quarterly** 48:7 49:21

**question** 14:18 17:7 24:12 29:7 53:4,6 54:11 55:5 57:19 68:10,13 68:14 72:16,25 74:13 78:9 79:8 84:19 87:7 88:25 91:7 95:16 96:12 98:18 99:19,24 100:25 101:21 102:17 103:6 103:15 104:5 104:10 109:15 111:19,25 112:3,16 117:5 148:19 151:10 154:16,20 155:9,11 157:6 161:3 164:11 174:11 176:12 177:21 179:12 180:3,12,16 181:5

**questioning** 17:23 57:2 94:21 97:11

**questions** 17:24 41:11 42:7 43:9 51:14 57:5 58:8 73:10 80:3

90:22 147:25 155:14,25 156:10,25 157:9 180:23 182:22

**quickest** 102:9 102:14 103:18

**quickly** 31:2 101:16,18 109:2 111:11 111:20 115:23

**quite** 41:2 49:14

**quote** 93:21 110:19 126:18 126:20 127:4,7

**quotes** 96:7

**r**

**r** 2:1,17 184:1 186:1

**raised** 90:6

**raising** 15:13

**random** 128:9 128:24 129:14 129:18 133:25 134:20,21 147:22

**randomly** 130:4 148:9

**randomness** 128:18 129:19

**ranging** 147:6

**rapidly** 114:6

**rate** 35:13

**ratto** 1:16 4:2 184:2,24

**raw** 156:17

**react** 99:6 102:19,20 103:25 106:11 112:25 118:7 119:18 123:20 143:17

**reacted** 103:19

**reacting** 112:4 138:13

**reaction** 104:13 104:23 118:11 119:14 122:7,9 123:24 134:13 144:10 145:5,6 145:21 153:23

**reacts** 131:15 144:21,24

**read** 63:4 76:9 76:14 77:14 80:6,21 85:10 141:21 142:12 186:3

**reading** 79:22 87:14 127:3,4 159:23

**reads** 11:11 142:5

**real** 123:18 125:4 128:17

132:20

**realistic** 133:8

**reality** 115:9 121:17 128:16 148:10

**really** 12:23 20:21 21:12 51:14 88:2 110:18 118:23 124:12 145:10 148:7 181:4

**reason** 6:4 94:2 94:25

**reasonable** 45:3 65:20 179:8

**reasons** 44:17

**rebut** 55:18 56:5

**rebuttal** 23:21 24:13 54:13 55:17,25 56:4 57:24 58:6 60:18,25 61:7 61:20,23 155:2

**rebuttals** 60:22

**rebutting** 76:19

**recall** 23:11,18 23:19 24:16 25:17 26:12,18 31:13 34:17 39:23 54:3 58:5,25 59:2,6 59:14 60:7,20

61:12 62:17
75:10,19,21,24
81:12 84:2
88:10,16 89:7
96:5 141:16
146:5 152:24
157:24
**received**  11:5
33:12 38:20
74:22 89:15
141:5
**recess**  58:17
98:9 158:25
182:17
**reckless**  122:3
**recognize**
11:13 39:6
77:11 89:21
148:5
**recollection**  7:2
25:6,13,23
26:3 30:8
59:24 70:16
76:2,21 81:9
81:13,21 82:21
83:18 85:25
101:2 113:5
140:25 160:7
**recommendat...**
92:15 94:11
95:19 97:17
**record**  3:2,12
4:14 5:19
25:15 58:13,14

58:18 98:6,10
158:22 159:2
182:14,18
183:2
**recorded**  3:14
**recording**  3:10
**recro**  59:3
**redo**  103:15
**refer**  69:19
147:8 154:6,8
161:9 163:14
**reference**  16:23
50:25 65:25
66:12 135:5
140:20 141:4,9
147:7,10
151:14 168:20
170:22 185:22
**referenced**
28:16
**references**  20:2
50:7
**referred**  24:20
50:3
**referring**  13:21
13:22 15:4
78:3 88:7
96:11 101:6
113:13 129:12
146:17 153:8
161:16 179:19
181:9
**refers**  171:3
172:2

**reflect**  107:18
108:16 109:16
125:8
**reflected**  99:9
107:16
**reflecting**
133:13 168:2
**reflection**
124:18,23
173:11
**reflects**  107:7
109:3,25
**refresh**  31:2
140:24
**refuse**  60:17
**refused**  33:17
**refusing**  60:20
**regarding**
64:11 85:24
**regardless**
87:20 177:9
**registered**  1:16
184:3
**registration**
46:20 47:4
**regression**
127:13 149:22
**regular**  131:22
131:25
**regulatory**
64:17
**reject**  138:24
139:2,8,9,10

**rejected**  128:10
**relate**  32:12
70:3 180:23
**related**  4:6
29:23 32:17
33:24 45:14
47:15 70:20
110:7 119:8
130:11 155:14
155:25 156:10
170:12 180:22
**relates**  99:4
161:6 177:2
180:13
**relating**  13:9
82:7
**relationship**
44:23 130:14
**relative**  127:11
134:11 135:13
184:16,19
**relatively**  101:8
129:16 136:10
**release**  96:18
102:7 117:24
119:19 131:9
131:16 145:22
**released**  104:24
118:8 119:15
145:24 153:5
153:21
**releases**  73:7
90:23 106:14
118:4 145:13

**relevance** 8:14
165:7
**relevant** 52:18
65:6 66:19,23
69:7 73:3
75:25 88:20
90:19 93:6,12
93:16 104:9,14
106:5,19,25
108:16 111:19
112:14 131:10
132:9 143:18
143:19 144:2
144:22 145:18
153:20 154:3
160:12,18,23
162:10,17,22
166:17 170:5
171:9 180:18
**reliance** 55:19
56:5 167:25
**relied** 44:18
47:20 74:9
88:25 170:2
**relies** 148:20
**rely** 101:3
**relying** 36:20
166:25
**remains** 165:22
177:14
**remand** 76:12
**remember**
25:21

**remembering**
81:20
**removed**
163:20
**rendered** 81:25
**renders** 111:12
**repeated** 81:25
84:4 118:5
**repeatedly** 50:3
**repetition**
119:16
**repetitive**
81:14,17 83:22
84:15
**reply** 29:5,9,11
32:17 34:3
53:23 54:5
60:21 61:14
78:17 104:6
155:5
**report** 6:11 7:4
7:6,10 10:23
10:24 11:3,11
11:14 19:25
24:14,15 28:17
28:20 29:5,9
29:11,15,16,20
31:7 32:21
34:3 35:24
36:10 37:2,4
37:12,25 38:5
38:6,17 39:4,7
39:11,15,17
40:2,4,12

41:23 42:2,14
42:25 43:9
51:14 52:2,22
54:5,7 55:9
56:4 57:25
58:6,7 60:16
60:18,21 61:2
61:4,10,11,15
61:16,21,22,23
62:9,10,14,15
64:3 66:9,13
68:18 81:8
92:11 93:11,15
97:12 101:11
104:6 108:5
124:10 128:4
130:18 136:15
146:8 149:7
154:10,12,25
155:2,5 156:19
157:16 161:6
161:16 162:12
167:6,9 168:9
178:24 179:3
185:7,10
**reporter** 1:17
1:18 4:2 5:3
184:3
**reporting**
135:16
**reports** 30:15
31:10,15,16,23
32:3,6 34:5
37:17,21,23

41:3,7,12,18
42:7 43:16
47:13 54:13
73:7 78:17
81:16,19 91:3
91:22 92:8,13
92:24 93:21
94:13,16,18
96:2,10,10,19
97:3 116:13
120:2 134:25
145:14 149:5
149:11,20
150:21,25
151:5 181:22
**reposting** 120:9
**represent** 4:3
5:16 101:8
174:4
**represented**
125:25 175:22
**represents**
174:23
**require** 155:12
**required** 47:2
**requirement**
47:7 49:23
**requires**
152:20
**research** 43:21
91:4 92:8 94:7
94:9 95:15,23
96:7,22 97:4,6
97:15,20,25

98:24 102:23
116:7,12
130:17 145:15
149:3 151:18
151:20,23
152:16 159:10
181:25
**resource**
141:10
**respect** 58:24
59:16 60:9
159:19
**respond** 96:17
101:16,23
102:5 117:23
117:25 118:14
123:7
**responded**
111:8
**responding**
60:21 115:23
148:12
**response** 120:5
144:5 157:7
**responsiveness**
102:12,15
**result** 65:8
66:24 114:7
126:20 135:16
145:23 147:21
167:22 173:12
**resulting** 64:16
**results** 48:8,8
49:21,21

106:15 133:12
149:23 150:6
156:19 157:25
**retained** 22:22
25:2,17 26:24
60:24 62:19,24
63:8,12,16,20
183:6
**return** 127:10
127:25 128:9
129:5,7,15
131:18 158:17
**returns** 127:14
127:15 128:6
133:23 135:10
135:11
**reveal** 30:3
96:16 97:19
104:23
**revealed** 65:6
**revealing** 32:9
**revelation**
180:10
**revelations**
66:23 69:6
132:9 160:18
162:10,16,21
166:17 171:8
180:18
**revenue** 45:10
45:23 46:11
131:2
**reversals** 27:24

**reversed**
118:20
**review** 40:15
40:20 42:18
43:3 44:2 46:9
46:15 48:10,16
48:21 49:8,9
62:10 78:4
83:15 153:2
**reviewed** 6:11
7:3 42:23
46:23 49:25
75:15 85:9
89:22 162:5
163:9 181:24
**reviewing**
44:14 46:3
50:10 51:6
82:22 84:2
90:20 149:19
**reviews** 31:4
86:7
**revolve** 148:2
**rgerson** 2:8
**rgrdlaw.com**
2:8,10
**ribbon** 68:19
168:21 169:23
171:5
**rifkind** 1:13
2:13 3:23
**right** 9:21
13:23 27:19
31:11,25

107:23 108:18
122:15 123:21
128:2 131:19
134:15 136:24
140:13,14,17
151:8 172:17
**rise** 82:17
**risk** 69:25
81:14,23 83:22
84:3,6,6,15
120:15,16
121:11,18,21
121:25 122:10
122:17 123:2,5
123:18 124:3,5
125:4 177:25
178:23 179:10
179:24
**risks** 64:18
70:4,6 178:17
**road** 2:5 103:8
**rob** 26:13,17,19
**robbins** 2:4
4:22 26:23,25
**robert** 2:7 4:21
**role** 15:10 16:2
16:23 92:5
**roles** 13:17
17:11
**rolled** 54:24
**roughly** 10:12
10:12 19:18
20:15,19,25
32:2,7 36:4,7,9

**[roughly - seen]**                                          Page 41

83:20
**routinely** 65:19
  154:18
**row** 140:6,7
**rpr** 184:24
**rudman** 2:4
  4:22 26:23
**rule** 71:7
**run** 155:4,6

**s**

**s** 2:1 46:17,25
  47:3,25 49:17
  49:23 185:6
**sachs** 81:15
**safeguard**
  78:24
**safeguards**
  86:5,8
**salary** 14:7
**sale** 67:11
  168:16
**sales** 121:3,6,12
  122:19,21
  123:3 131:5
  165:4 168:11
**sample** 135:23
  136:3,10
**samples** 135:24
  136:12,13
  159:10
**satisfy** 57:11
**saw** 160:3

**saying** 81:24
  113:16,21
**says** 11:10 15:5
  28:17 29:15
  35:24 38:25
  78:21 79:16
  90:2 120:24
  126:20 139:24
  142:16,21
**scana** 146:7
**scenario**
  176:25
**scenarios** 177:2
  177:14
**schedule** 53:20
  54:3
**scheduled**
  28:11,14 29:4
**schemes** 9:10
  9:12
**scholars** 108:11
**science** 139:14
**scientific**
  138:23 139:3,7
  141:4,9 185:22
**scope** 41:11
  42:6 43:9 81:7
  88:4 97:11
**searching** 44:5
**seated** 6:17
**sec** 10:21 11:19
  12:7,13,20
  13:21,22 14:3
  18:25 21:5,6,8

21:10,11,12,14
  21:16 32:23
  43:19,25 44:2
  44:5,14,15,18
  45:6 46:3,9,15
  46:23 47:2,5
  47:21,22 48:11
  48:22 49:8
  51:2 63:9,13
  73:4 84:4 87:4
  90:20,24
  106:13 129:22
  130:24 132:9
  133:7 145:12
  159:7,15,18
  160:23 180:9
**sec's** 90:3
  179:16
**second** 39:2
  51:19 76:11
  79:15 105:7
  115:15 152:19
  152:25
**secondary**
  15:22
**section** 64:2
  65:2 66:3,9,10
  66:12 161:5,16
  162:12 167:9
**sections** 50:4
  86:24
**sector** 16:4
**sectors** 15:23

**securities** 1:5
  3:18 8:3 9:3,13
  10:8 20:20
  21:18 22:7
  23:16 25:3,12
  25:18 26:2,4
  30:10 32:14
  33:6 39:8
  54:18 60:14,23
  61:19 65:19
  89:14,20
  101:15 104:20
  112:10 113:3
  132:23 164:8
  164:14 167:11
  185:19
**security** 22:21
  42:9 55:7
**see** 18:4 46:24
  77:5,8 79:18
  79:19 87:15
  90:2,10 102:3
  112:3 120:4
  123:6 128:10
  135:14,20
  142:3,13
  143:10 144:16
  144:17 147:10
  149:11 158:16
  159:22 181:16
**seems** 95:20
**seen** 75:5,7,11
  96:6 137:25
  141:14 144:19

**[seen - sorry]** Page 42

144:20

**segment** 175:21 175:23 176:4

**select** 43:2 82:8

**selecting** 82:14

**sell** 92:15 94:11 95:18 97:16

**seller** 96:2,9,18 97:3

**sells** 121:2

**semi** 110:11

**send** 38:9

**sense** 132:16

**sensitive** 3:5 78:25 90:8

**sentence** 65:24 66:6 101:19 128:25 135:4 142:5,21 171:25

**sentences** 77:7 78:21 142:16

**separate** 40:16 41:2 75:17 87:17 104:4,10 109:10 180:9

**separation** 86:5

**september** 29:15 74:22 75:4 179:18 185:15

**seriously** 77:11

**service** 2:5

**serving** 54:16

**set** 7:5 38:4 51:12,25 72:17 184:14

**sets** 95:15

**setting** 22:6

**settled** 159:16

**settlement** 13:8 159:19 160:6 160:12,23

**seven** 10:12,17 30:15

**several** 25:8 84:4 85:11 116:20

**severe** 121:15

**share** 24:10

**shared** 64:9 86:9

**shares** 30:11

**sharing** 88:17

**sheet** 187:1

**shelf** 47:4

**short** 21:2 30:22 34:25 92:9,11 96:2,9 96:18 97:3 98:5

**shortened** 46:20

**shorter** 102:25 136:6

**shorthand** 146:20 147:7

147:13

**show** 150:9

**shown** 96:22

**shows** 116:8 150:12

**shy** 97:22

**side** 16:14,15 16:17 23:12,13 23:18 25:8,23 27:10,15 54:17 55:8 57:22

**signature** 184:23

**significance** 128:14 133:21 140:5 146:18 147:3,4,9,11,16 147:19 148:24 150:10,12,19 152:4,21 157:11 158:12 158:14

**significant** 13:3 117:12 126:9 126:10 128:2,6 133:14,17 135:10,11 140:9,13 156:13 157:21 158:5,10

**similar** 43:18

**simple** 128:9,24

**simply** 45:22 65:25 112:24

**simultaneous** 116:17

**simultaneously** 39:16

**single** 55:4 72:15 103:9,13 105:23 106:7 132:20 136:24 137:17,20 146:10

**singular** 91:25

**sit** 52:16

**sitting** 25:16 56:19 155:9

**situation** 116:5

**six** 32:3 123:16 129:10,12,20 148:6

**slide** 77:4 78:2 85:8,16

**small** 27:9 135:23,24 136:10

**smaller** 136:12

**solaredge** 28:17 38:19 39:3,7,20 40:3 42:2 185:12

**sorry** 18:13 48:19 82:10 85:5 96:5 103:10 127:2 140:7 142:20 154:23 157:5

**[sorry - statistics]**                                            Page 43

| | | | |
|---|---|---|---|
| 176:8 181:15 | **specifically** | 125:18 130:13 | **statements** |
| **sort** 14:9 27:22 | 95:8 161:23 | 137:21 138:10 | 9:11 48:13 |
| 54:10 55:24 | 167:8 | 146:17 151:24 | 57:13 59:7,11 |
| 133:12 137:21 | **specificity** 82:6 | 179:8 | 59:17 68:5 |
| 155:12 169:20 | 82:16 84:12 | **start** 22:9 38:5 | 70:21 71:13,15 |
| **sounds** 18:3 | **specifics** 70:23 | 43:4 58:19 | 72:3,8 73:5,25 |
| **source** 91:24 | **spectrum** 84:9 | 66:17 67:25 | 74:8 79:22 |
| **sources** 43:18 | 98:18 99:18 | 69:10 87:14 | 80:14 85:11 |
| 91:22 133:5 | 158:15,17 | 98:11 103:24 | 86:4 87:23 |
| **south** 2:5 | **speculation** | 117:16 159:3 | 118:19 145:13 |
| **speak** 73:9 | 124:9 125:11 | 169:6 171:12 | 176:19 |
| **specialized** | 144:14 165:17 | 171:21 172:14 | **states** 1:1 3:19 |
| 15:25 | **speed** 116:24 | 174:5 182:19 | 39:3 110:10 |
| **specialties** 7:25 | 126:22 | **started** 12:7 | **statistic** 135:6 |
| **specialty** 8:18 | **spend** 19:16 | **starting** 40:19 | 135:18 |
| **specific** 7:23 | **spent** 15:20 | 44:20,25 | **statistical** |
| 24:16 40:5 | 37:7,8 | 173:18 178:13 | 126:8,13 |
| 60:5 71:25 | **spreads** 43:16 | 178:19 | 128:14 133:21 |
| 72:10,17,19 | **squeeze** 34:25 | **starts** 101:12 | 135:17 140:4 |
| 74:15 76:18 | **staff** 20:2 35:25 | 141:25 | 146:18 147:2,4 |
| 77:25 78:12 | 37:14 39:24 | **state** 4:10,13 | 147:8,11,15,19 |
| 79:5,9,21 80:7 | **stage** 22:5,10 | 5:18 96:12 | 148:24 150:9 |
| 80:20 81:12 | 22:12,20 32:21 | 179:12 186:13 | 150:12,19 |
| 82:8 84:3,8,16 | 54:18,25 60:25 | **stated** 96:25 | 152:4,20 |
| 86:19 88:16 | 61:14 68:16 | **statement** | 157:11 158:11 |
| 92:6 105:21 | 78:18 99:4 | 40:10 46:21 | 158:14 |
| 116:23 119:7 | 103:12,22 | 72:10,12 73:22 | **statistically** |
| 124:13 134:14 | 152:22 155:17 | 76:17 77:17,24 | 127:25 128:5 |
| 141:20 147:12 | 181:7 | 78:2,11 79:5 | 133:14,17 |
| 150:14 152:24 | **stages** 32:17 | 79:21 80:24 | 140:9,12 |
| 153:23 155:8 | 104:5 | 84:25 85:6,12 | 156:13 157:21 |
| 164:3 176:18 | **stand** 128:13 | 85:20 109:5,7 | 158:4,10 |
| 177:10,11 | **standard** 52:6 | 142:10 143:5 | **statistics** |
| | 65:16 104:2 | | 140:20 |

**[stayed - sufficient]**                                                    Page 44

| | | | |
|---|---|---|---|
| **stayed** 12:9 | 125:8,19,21 | **struck** 33:14 | **submitted** |
| **stenographic...** | 126:4,13 | **structurally** | 11:14 30:14 |
| 184:12 | 127:11,14,20 | 41:6 | 31:6,9 32:20 |
| **steps** 95:15 | 128:8,22 129:9 | **studied** 63:5 | 34:3 38:7 39:7 |
| **stock** 43:15 | 129:14,24 | 109:21 159:14 | 39:11 149:7 |
| 47:10 51:17 | 131:22 133:10 | 161:23 | 150:5 154:22 |
| 52:3,25 53:17 | 133:15,17 | **studies** 126:21 | 154:25 |
| 57:13 65:9 | 135:14 138:12 | 150:2,6 151:6 | **submitting** |
| 66:25 67:10 | 139:22 140:8 | 154:19 155:7 | 29:8 31:15 |
| 68:6 69:2 | 143:16,22 | **study** 8:5 69:2 | **subscribed** |
| 70:25 71:17 | 144:4,9,21 | 103:5 106:15 | 186:10 |
| 72:5,12 73:8 | 145:18 148:9 | 126:4,11,12,24 | **subsequent** |
| 74:3 87:23 | 148:22 156:13 | 127:6 129:5 | 82:6 90:24 |
| 90:25 93:7,18 | 158:5 159:6,12 | 137:10,15 | 162:9 |
| 99:9 102:19 | 160:25 162:18 | 139:19 145:17 | **subsequently** |
| 103:24 104:13 | 163:18,20 | 149:23 150:9 | 166:15 |
| 104:16,22 | 165:5 166:13 | 150:11 153:4,7 | **subset** 22:8 |
| 105:4,8 106:22 | 167:20,25 | 153:25 154:7,9 | 23:15 36:9 |
| 107:6,12 | 168:12,23 | 154:11 155:4 | **subspecialties** |
| 108:15 109:2 | 169:4,12 170:8 | 155:10,16,24 | 7:16,23 |
| 109:15,19,24 | 170:11 171:9 | 156:3,9,17 | **substance** |
| 110:13,20 | 171:15 172:4 | 157:16 | 33:25 34:18 |
| 111:12,17,20 | 172:12 173:10 | **subject** 23:6 | 44:15 45:18 |
| 111:22 112:6 | 173:19 174:17 | 30:5 33:11 | 62:5 |
| 112:24 113:2 | 174:22 175:2 | 65:15 168:17 | **substantial** |
| 114:6,10,12,16 | 180:14,17 | 171:22 | 27:8 54:16 |
| 115:3,5 116:25 | 181:11,20 | **subjective** | **substantially** |
| 117:17,22 | 182:7 | 92:12 | 56:7 |
| 118:6,13 | **stocks** 114:22 | **submission** | **substantive** |
| 119:13 120:17 | **strategy** 56:14 | 34:5 | 62:14 |
| 121:23 122:7,9 | **strikes** 14:16 | **submit** 31:23 | **sued** 63:14 |
| 123:14,15,20 | **strong** 5:24 | 53:23 61:21 | **sufficient** 17:4 |
| 123:24 124:7 | 110:11 | 150:2 151:5 | 138:6,11 149:7 |
| 124:15,17 | | | |

**sufficiently**
  128:7
**summaries**
  92:9
**summarize**
  66:11 93:22
**summarized**
  64:2 93:20
  142:23 162:11
  179:3
**summary**  65:13
  66:7 92:12
  142:19
**summer**  26:8
**suppose**  22:14
  120:24
**supreme**  56:7
  76:7,13 161:18
**sur**  34:3
**sure**  20:21
  25:14 38:10
  45:20 46:7
  57:4,6 88:2
  110:18 118:3
  150:15 155:19
  157:5 161:12
**surprised**
  158:3
**sustains**  123:14
**swear**  5:3
**switching**  98:4
**sworn**  5:8
  184:6 186:10

**syndicated**
  15:17,21
**syndications**
  16:17
**synergies**  79:18
  80:8

**t**

**t**  5:7,7 136:13
  184:1,1 185:6
  186:1
**tab**  38:12 74:18
**table**  41:5
  141:12
**tag**  132:11
**take**  3:10 38:14
  40:9 77:10
  98:5 112:2,13
  113:18 115:4
  116:2,10,13,19
  132:22 140:24
  158:21 182:12
**taken**  1:10 3:15
  58:17 98:9
  158:25 182:17
  184:11
**takes**  116:9
  143:16 144:8
**talk**  11:19 19:6
  47:5,9,13
  66:14 98:13
  111:5 115:11
  115:14,15,22
  125:14 139:15

  174:12 176:14
**talked**  24:17
  61:5 78:18
  105:15 109:22
  143:15 149:3,4
  151:17
**talking**  21:15
  24:11 66:13
  80:16 103:23
  109:7 113:22
  120:23 129:3
  161:11 172:3
  172:18 173:5
**talks**  46:19
**targets**  92:14
  94:11 95:18
  97:16
**taught**  10:4
**tax**  19:24
**teach**  147:2
**teachers**  76:12
  80:22 152:18
**team**  53:14
**tech**  14:12,14
  14:22,25
**techniques**
  23:23 24:4
  91:5,19 105:15
  106:2 107:3
  145:9
**technologies**
  38:19 185:12
**technology**
  14:22

**tell**  9:14 15:9
**tells**  123:12
**template**  37:16
  37:19
**ten**  36:7
**tend**  97:21
  135:14
**tendencies**  95:7
**tenet**  56:13
**term**  14:25
  73:11,13,16
  80:23 128:23
**terms**  8:25 14:2
  14:7 18:19
  22:17 23:15
  27:24 34:15
  42:8 44:10,16
  44:19 45:15,18
  46:25 49:5
  50:13,19 84:19
  102:4,11
  115:16 133:24
  142:14 143:12
  150:14 160:17
  165:20 173:18
  174:19 179:5
  182:6
**test**  44:22 49:5
  101:21 102:14
  104:2 135:17
  135:21,23
  136:11,11,12
  136:13 138:5
  139:3

**[testified - today]** Page 46

| | | | |
|---|---|---|---|
| **testified** 114:20 | 182:3 | **third** 77:3 | 123:5 130:5 |
| **testifies** 5:9 | **think** 7:20,24 | 105:8 | 131:17 138:7 |
| **testify** 6:5 | 8:7,23 12:23 | **thought** 161:2 | 138:12 145:19 |
| 184:7 | 13:5 14:3,22 | **three** 28:8,14 | 154:17 156:11 |
| **testimony** | 14:24 20:5 | 85:15 104:18 | 156:25 160:15 |
| 183:3 | 22:8 23:15 | 112:3 116:3 | 161:3 165:12 |
| **testing** 45:4,7 | 25:5 27:25 | 138:16,19 | 167:3 168:15 |
| 102:11 103:6 | 28:2,8 31:25 | 140:16 144:24 | 168:16 169:17 |
| 125:24 130:13 | 32:4,16 33:3,3 | 145:6 | 172:13 173:8 |
| 138:23 153:10 | 33:22 35:4 | **tied** 170:10 | 175:15,24 |
| **tests** 137:25 | 38:2,8 49:2,13 | **time** 3:9 4:11 | 176:5,13 |
| **thank** 6:3 30:7 | 54:9 55:3 | 7:11 11:22 | 177:19 178:6 |
| 108:4 182:10 | 59:11,18,24 | 12:6 13:19 | 180:5 182:10 |
| **thanks** 11:2 | 60:12 61:18 | 15:20 19:17,19 | 182:22 184:13 |
| 58:11 | 62:2 71:5,8 | 25:3 27:12 | **timely** 47:7 |
| **theoretical** | 72:14,16 74:5 | 29:12 47:2 | 49:11,16 |
| 115:8 | 78:7 83:4 | 48:24 50:14 | **times** 18:12,15 |
| **theory** 57:15 | 90:16 93:20,22 | 51:15,24 52:13 | 18:17,22 20:15 |
| 64:20 65:21,24 | 96:21 99:10,11 | 53:5 54:6 55:9 | 49:24 72:7 |
| 66:6 67:22 | 101:7 109:6,11 | 57:3,20 64:5 | 105:3 115:4 |
| 108:14,24 | 110:6 111:24 | 67:10,11 68:11 | 120:19 137:11 |
| 109:24 162:9 | 112:15 115:6 | 71:21 73:3 | 155:22 |
| 162:23 167:25 | 118:22 121:2 | 77:20 79:8 | **timing** 45:15 |
| 177:24 179:2 | 123:17 124:15 | 80:3 84:13 | 47:17 48:5 |
| **thing** 13:20 | 124:22 137:6 | 87:8 88:24 | 165:3 168:12 |
| 37:22 62:12 | 140:3,11 | 90:19 95:18,22 | 176:18 |
| **things** 13:9,13 | 141:22 142:12 | 99:25 102:10 | **today** 6:2,5,17 |
| 15:12 21:7 | 143:7,10,11 | 103:2 106:5,19 | 14:23 25:16 |
| 70:21 94:6 | 146:25 147:24 | 113:25 114:15 | 52:16 53:13 |
| 97:25 111:4 | 151:10,21 | 114:19 115:5,9 | 56:19 89:2 |
| 132:15,23 | 155:21 159:9 | 115:17 116:9 | 124:24 131:20 |
| 133:8 162:11 | 181:9 | 116:14,24 | 131:25 160:21 |
| 163:5 164:20 | **thinking** | 117:12 119:7 | 161:4 |
| 165:23 178:18 | 167:16 | 121:10 122:22 | |

**[today's - type]**                                                      Page 47

| | | | |
|---|---|---|---|
| **today's** 6:7 183:3 | **toward** 95:3,25 96:16 97:8 | **training** 14:12 16:10 17:9 | **try** 17:22 |
| **together** 37:24 | **towards** 23:16 79:15 172:5 | **transactions** 16:5 82:9 168:13 | **trying** 32:16 43:10 49:14 137:15 |
| **told** 121:15 | **track** 33:2,8 36:5 50:3,5 | **transcript** 74:21 75:3 184:11 185:15 186:3 | **tuesday** 118:11 |
| **tolerate** 110:12 110:19 | **tracked** 167:8 | | **turn** 76:24 79:14 89:25 161:5 |
| **tomorrow** 131:21,23 | **trade** 64:8 111:7,10 167:21 | **transcripts** 73:6 75:14,16 90:21 | **turned** 100:18 156:18 |
| **took** 14:9 106:9 106:23 162:12 | **traded** 15:21 | **transition** 14:9 | **turning** 77:4 85:8,16 |
| **tool** 71:9 | **traders** 64:6,16 86:11 111:6 | **transitioned** 14:5 | **two** 13:17 31:10 33:21 |
| **tools** 23:23 24:4 91:5,19 105:14 106:2 107:3 145:9 | **trades** 132:22 | **trend** 144:11 | 34:13,14 41:5 41:12,16,20 |
| **top** 18:20 32:4 33:4 54:2 59:4 60:11 62:17 75:9,19 78:16 80:18 88:15 141:17 146:15 158:2 | **trading** 8:4 9:11 13:10 15:21 16:14 43:15 63:3,6,7 64:12 74:10 86:13 90:4,5,8 101:24 102:3,6 102:11,21 103:25 104:3 105:5 111:14 114:12,23 115:13,14,17 115:17,25 116:3 125:22 128:20 129:22 131:12,22,25 132:3,14 133:16 138:20 169:4 182:5 | **trials** 13:9 | 51:13,14 57:8 77:7 78:21 85:15 89:7,8 92:10 93:21 100:15 104:17 104:23,24 116:3 118:8 119:17,19 135:12,17 138:15,18 140:15 142:16 142:23 144:23 150:21 160:8 182:13 |
| **topic** 76:22 90:15 | | **tried** 87:7 | |
| **topics** 7:24 91:9 | | **true** 107:15 112:7 113:6 142:8 164:7 184:10 | |
| **toshiba** 34:2 | | **trump's** 12:10 | |
| **toss** 147:20 | | **truth** 65:6 66:19,23 69:7 122:5 132:9 160:19 162:11 162:17,22 166:17 169:6 170:5 171:9 180:18 184:7,7 184:8 | |
| **total** 18:19 183:5 | | | **type** 20:13 49:3 53:12 57:18 72:24 74:6 88:7 91:6 93:9 |
| **totality** 59:25 73:2 106:18 107:18 118:23 145:11 178:7 | | **truthfully** 6:5 | |

**[type - valuation]** Page 48

95:16 123:25
124:13 125:23
148:18
**types** 15:24
20:12 45:13
70:14 73:10
80:2 86:8 91:4
93:16 131:6
132:18 133:8
159:11 170:19
182:8
**typical** 29:20
30:10 92:11
129:8,13,17
133:9,25 134:7
134:8,21
152:20 159:5
**typically** 92:7
92:10 101:20
107:11 109:8
114:12 115:22
116:17 120:11
138:11 139:13
144:4,16

**u**

**u** 186:1
**ultimately** 68:9
99:18,22
138:24 147:9
163:25 168:24
180:12,25
**umbrella** 8:8

**unbiased** 95:21
**under** 8:7
13:13 33:6
65:2 66:3 96:8
97:2 104:12
139:18 145:2
172:25 175:4
**underlie** 43:22
**underlying**
40:14 99:15
**understand**
43:6,7 45:21
46:8 50:12
69:11,23 70:5
72:25 73:15
80:23 88:6
113:19 118:23
129:2 145:17
151:4 163:13
**understanding**
7:7 45:11
63:24 64:19,25
67:22 68:4
73:21 84:23
85:18 86:14
90:18 92:4
106:4 145:10
148:2,20
**understands**
8:21
**undertook**
162:2
**undisclosed**
70:4,6

**unfair** 29:24
**unique** 40:17
**unit** 3:13 58:16
58:20 98:8,12
158:24 159:4
182:16,20
**united** 1:1 3:19
**universal** 72:15
74:12 117:4
175:12
**universally**
152:11
**university** 10:5
10:7,16
**unrelated**
137:4,8
**unreliable**
156:5
**unusable**
154:12
**unusual** 134:5
**update** 116:11
116:14 117:7
117:10,18
**updated** 119:25
**updating**
117:14
**use** 14:25 37:16
65:23 99:2,3
102:8,13 103:9
103:21 139:6
146:20,21
155:16 174:8
176:9 177:17

**used** 65:19
81:18 98:23
99:3 101:19
127:13 136:24
148:23 171:24
183:5
**useful** 170:16
170:21
**usernames** 64:9
86:9 88:18
**using** 51:20
52:6 64:8
80:15 103:13
103:17 105:14
137:17,20
163:2
**usual** 128:7
**usually** 20:6,9
155:3
**utilized** 14:21
88:19
**utilizing** 14:23

**v**

**valid** 165:23
177:7,14
**validity** 181:3
**valuation** 8:6
71:6,9 92:16
116:12,14
117:8,10
119:25 145:16
181:22,23
182:2

**[value - weeks]**

Page 49

**value** 8:13 71:2
93:6,12,16
99:7 106:25
107:16 108:16
109:16 112:7
113:7 116:15
124:19,24
125:8 139:24
140:6,7 142:22
143:18,19
144:2,22
153:20 154:3
165:6 168:2
175:14,17,23
176:3 182:6
**values** 107:13
109:20 131:4
158:16
**vanderbilt**
10:15
**variables**
155:23
**varied** 176:16
**variety** 9:7
10:18 15:14
16:5 17:11
91:18
**various** 16:6,14
37:3 65:7
87:23 91:2
99:17 100:3
106:17 181:21
**varying** 177:12

**vast** 22:18
**vastly** 150:20
**vaxart** 146:13
**veritext** 4:3
183:7
**version** 75:15
**versus** 29:14
67:11 76:18
135:15 168:16
170:10
**vi** 66:9,10
161:6,16 167:9
**video** 3:9,14
**videographer**
2:23 3:1 5:2
58:14,18 98:6
98:10 158:22
159:2 182:14
182:18,25
**videotaped** 1:9
**view** 17:2,6
79:4 81:2,2
94:23 114:3
117:15 141:23
151:3 152:11
**viewed** 152:3
**views** 73:15
97:23 143:9
**violations**
13:11 89:19
**virtu** 1:5 3:17
5:16 39:12,17
39:21 40:4
42:5 45:12,23

47:10 48:23
51:3 62:21,23
63:10,14 64:5
71:24 74:20
78:21 87:2
88:11 89:5,13
94:4,5 95:3,4,9
115:12 130:20
132:10,11
159:17 165:4
179:17,24
185:14,18
**virtu's** 44:2
46:9,15,23
47:22 48:21
52:3,25 53:16
57:13 68:6
71:17 75:3,16
90:7 93:18
94:4 127:10,14
181:11
**virtue** 107:14
112:8 137:9
169:11
**voices** 108:8
**volatility** 128:8
**volume** 43:15
102:4

**w**

**w** 5:7
**want** 18:23
19:3 25:14
45:20 46:7

72:25 74:15
78:8 85:13
86:23 98:13
141:19 149:17
161:5 163:4
**wanted** 84:14
**way** 5:24 17:6
20:4 21:15
35:17,21 38:13
49:16 67:13
71:22 75:10,20
88:21 96:17
101:20 117:4
139:14 141:17
149:16,21
160:12,23
164:5,11
172:13 178:2
178:23 179:13
181:3
**ways** 14:22
47:20 96:23
170:15
**we've** 141:7,11
158:18
**wednesday**
118:6,12,18,21
119:4 120:5,8
**week** 29:4
34:25 39:11
102:24 113:18
159:23
**weeks** 30:15
113:9,12

**[weigh - zero]**                                                                              Page 50

| | | | |
|---|---|---|---|
| **weigh** 72:21 99:20 151:7 | **withdrawn** 8:17 9:16 24:23 31:16 42:13 87:19 93:3 127:11 159:16 177:23 | 160:13 161:20 166:21 173:15 | **year** 10:5 36:17 121:3,5,20 122:5,20 136:8 |
| **weighed** 78:10 | | **worked** 9:7 10:8 16:4 21:19 22:25 24:23 25:8 26:16 30:19 38:2 61:20 63:5 113:4 | **years** 10:13,17 10:20 11:25 15:3 63:4 112:12,13 113:10,13,19 |
| **weiser** 2:19 4:20 | | | |
| **weiss** 1:13 2:13 3:23 4:18 5:16 | **witness** 4:24 5:4 10:18 19:14 20:16 30:3,7 38:16 185:2 | | **yesterday** 6:14 30:22 |
| **welcome** 11:16 141:22 | | **working** 13:7 16:7,13 21:8 27:9 32:2 39:15 | **york** 1:2,15,15 2:6,16,16 3:20 3:25,25 10:16 |
| **went** 82:9 | | | |
| **wharton** 1:13 2:13 3:23 | **word** 9:21 38:6 | **works** 26:20 | |
| **whispering** 3:6 | **wording** 86:20 | **world** 132:20 148:8 | **z** |
| **wide** 42:11 52:5 55:12 65:15 95:7 127:21 161:8 162:4 163:2 164:18 165:15 167:13 176:23 | **words** 80:6,15 81:18 | **worries** 18:16 | **zero** 139:21 147:6 158:15 163:25 |
| | **work** 12:21,24 13:3 14:8 18:25 19:3,7 19:14,14,15,18 19:19,21 20:13 20:16 21:9 27:14,15,17 29:11 32:13,15 32:16 34:19 35:11 36:3,7 39:16 42:20,24 47:24 52:23 53:8 81:3 87:21 88:21 103:17,21 108:5 110:17 127:8 133:13 139:16 148:25 153:9,21 | **worse** 121:17 | |
| | | **writings** 108:19 | |
| | | **written** 82:23 152:15,17 | |
| **widely** 64:8 86:9 107:10,20 | | **wrong** 82:20 84:24 156:3 | |
| **window** 102:10 136:24 137:3 137:12,13,17 137:21,24 138:10 153:18 154:5 | | **wrote** 65:13 101:11,13 131:9 | |
| | | **x** | |
| | | **x** 1:3,8 185:1,6 | |
| | | **y** | |
| **windows** 146:10 | | **yeah** 83:14 105:25 112:22 130:22 135:6 140:7 144:19 | |
| **wish** 187:1 | | | |
| **withdraw** 29:6 145:3 154:20 179:12 | | | |

Veritext Legal Solutions
212-267-6868          www.veritext.com          516-608-2400

Federal Rules of Civil Procedure

Rule 30

(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

(2) Changes Indicated in the Officer's Certificate. The officer must note in the certificate prescribed by Rule 30(f)(1) whether a review was requested and, if so, must attach any changes the deponent makes during the 30-day period.

DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY. THE ABOVE RULES ARE CURRENT AS OF APRIL 1, 2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS

COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted

fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.